IN THE UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

| | |
|---|---|
| JOHN RUFFINO and MARTHA RUFFINO, Husband and Wife, ) ) ) Plaintiffs, ) ) v. ) ) ) DR. CLARK ARCHER and HCA HEALTH ) SERVICES OF TENNESSEE, INC. d/b/a ) STONECREST MEDICAL CENTER, ) ) Defendants. ) | Civil Action No.: _____ Jury Demand |

## COMPLAINT

The Plaintiffs, for their causes of action, respectfully states to the Court and the Jury the following:

### PARTIES, VENUE, AND JURISDICTION

**THE PLAINTIFFS**

1. The Plaintiffs are adult residents of Kentucky at the time of the filing of this lawsuit.

2. During all times referenced in the Complaint, the Plaintiffs have been husband and wife.

**THE DEFENDANTS**

3. Dr. Clark Archer ("Dr. Archer") is a medical doctor licensed to practice medicine in Tennessee. Dr. Archer provided care and treatment, and oversaw the care and treatment provided by others, as described herein in Tennessee. Upon information and belief, Dr. Archer is a Tennessee resident. Dr. Archer is a citizen of Tennessee for purposes of determining diversity under 28 U.S.C. §1332.

4. HCA Health Services of Tennessee, Inc. d/b/a StoneCrest Medical Center ("StoneCrest") does business in Middle Tennessee. StoneCrest is an entity that does business in Tennessee for purposes of determining diversity under 28 U.S.C. §1332. StoneCrest can be served with process via its Registered Agent, CT Corporation System, 800 South Gay St., #2021, Knoxville, TN 37929-9710.

5. Venue and jurisdiction in this matter are appropriate with the United States District Court of Tennessee, Nashville Division.

**MEDICAL, LEGAL, & ECONOMIC RELATIONSHIPS**

6. Dr. Archer is an ER physician.

7. Dr. Archer provided care and treatment to John Ruffino during the ER presentation to StoneCrest that is described herein.

8. Dr. Archer was the ER physician who oversaw the care and treatment provided to Mr. Ruffino during the ER presentation to StoneCrest that is described herein.

9. Dr. Archer is an agent, employee and/or servant of StoneCrest.

10. Alternatively, Dr. Archer acted as an ostensible agent/employee/servant of StoneCrest during the events described in this Complaint.

11. Mr. Ruffino presented to StoneCrest's Emergency Department on February 17, 2016, and Mr. Ruffino played no role in selecting Dr. Archer to participate in the medical care and treatment he sought at StoneCrest.

12. During the ER presentation described herein, employee and agents of StoneCrest provided care and treatment to Mr. Ruffino.

13. At the time of the matters contained in this Complaint, the Plaintiff, Mr. Ruffino, and the Defendants had a healthcare provider-patient relationship. This relationship between the Plaintiff and Defendants began no later than February 17, 2016.

14. Mr. Ruffino was seen and treated in the StoneCrest ER on February 17, 2016 by Dr. Archer and by other healthcare providers (Dr. Archer and these other healthcare providers will be referred to as "ER staff" herein).

## STATEMENT OF FACTS

### February 17, 2016 – StoneCrest Medical Center

15. On February 17, 2016, Mr. Ruffino presented to the ER at StoneCrest Medical Center ("the ER presentation").

16. Medical records were prepared by employees or agents of StoneCrest regarding the February 17, 2016 ER presentation.

17. The medical records prepared regarding the ER presentation are accurate.

18. Mr. Ruffino presented to the ER at StoneCrest by 0948 on February 17, 2016.

19. Upon his presentation to the ER, Mr. Ruffino complained of (1) weakness, including weakness in his face, (2) slurred speech, and (3) dizziness. Mr. Ruffino reported in the ER that the weakness and slurred speech had started suddenly at 0830 that same day. Mr. Ruffino's complaints during this ER presentation were timely documented.

20. The sudden onset of weakness is a neurological change.

21. Slurred speech is a neurological change.

22. Dizziness is a neurological change.

23. It is not normal for an adult male to suffer the sudden onset of weakness, slurred speech, and dizziness at the same time.

24. There is less than 90 minutes between 0830 on February 17, 2016 and 0948 on February 17, 2016.

25. Mr. Ruffino complained of dizziness during the ER presentation.

26. Mr. Ruffino's dizziness was timely documented in the medical records.

27. Mr. Ruffino demonstrated abnormal speech during the ER presentation.

28. Mr. Ruffino's abnormal speech was timely documented in the medical records.

29. Mr. Ruffino's vital signs were taken in the ER by 0956 on February 17, 2016. At 0956 on February 17, 2016, Mr. Ruffino's BP was 187/89, his pulse/HR was 66, and his RR was 189. These vital signs were timely documented in the medical records.

30. Based on the triage of Mr. Ruffino performed in the ER on the morning of February 17, 2016, and based on the history Mr. Ruffino provided of his complaints at that time, Mr. Ruffino was classified as CTAS 3/Urgent with regard to Priority.

31. During this ER presentation, a member of the ER staff documented that Mr. Ruffino's speech was slow and slurred.

32. The fact that Mr. Ruffino's speech was slow and slurred during this ER presentation was timely documented in the medical records.

33. At 1015 on February 17, 2016, the ER staff reassessed Mr. Ruffino's vertigo/dizziness.

34. Nurse Robert Bromley documented that Mr. Ruffino's dizziness was unchanged as of 1015.

35. The fact that Mr. Ruffino's dizziness was unchanged by 1015 was timely documented.

36. By 1015 on February 17, 2016, Mr. Ruffino had suffered dizziness for more than 90 minutes.

37. During this ER presentation, lab results were obtained regarding a blood draw taken in the ER on February 17, 2016. The results from the blood draw were available by 1015. Those lab results demonstrated a normal Troponin I level.

38. An abnormal Troponin I level is indicative of a recent myocardial infarction (aka heart attack).

39. The lab results obtained by 1015 on February 17, 2016 demonstrated normal values for PT and INR. Normal PT and INR values indicate that the patient has not had a recent myocardial infarction.

40. By 1015 on February 17, 2016, the ER staff at StoneCrest knew form the initial lab results that the normal Troponin I level indicated that a relatively recent myocardial infarction was not the cause of Mr. Ruffino's complaints that morning.

41. During this ER presentation, CT of Mr. Ruffino's head without contrast was performed by 1000 on February 17, 2016. The radiologist who reviewed and interpreted the CT scan of Mr. Ruffino's head provided an Impression that the imaging did not show an acute intracranial abnormality. This CT imaging also demonstrated the presence of calcific plaque of the distal left vertebral artery. The radiologist's Impression regarding this CT imaging was available to the ER staff by 1017 on February 17, 2016.

42. By 1017 on February 17, 2016, the ER staff knew that the CT scan of Mr. Ruffino's head demonstrated that the cause of Mr. Ruffino's complaints that morning was not an intracranial bleed / hemorrhagic stroke.

43. The interpretation of the CT scan of Mr. Ruffino's head that was performed on the morning of February 17, 2016 did not rule out a thrombotic stroke as the cause of Mr. Ruffino's then-existing complaints.

44. There is less than 120 minutes between 0830 on February 17, 2016 and 1017 on February 17, 2016.

45. By 1030 on February 17, 2016, the ER staff had information available to it to rule out a traumatic head/brain injury as the cause of Mr. Ruffino's neurological complaints that morning.

46. By 1030 on February 17, 2016, the ER staff had information available to it to rule out a myocardial infarction as the cause of Mr. Ruffino's neurological complaints that morning.

47. By 1030 on February 17, 2016, the ER staff had information available to it to rule out an intracranial bleed as the cause of Mr. Ruffino's neurological complaints that morning.

48. By 1030 on February 17, 2016, one of the potential causes of Mr. Ruffino's neurological complaints that morning that had not been ruled out was a thrombotic stroke.

49. By 1030 on February 17, 2016, Mr. Ruffino had the same issues or complaints in that he had when he initially presented to the ER at StoneCrest earlier that day.

50. Dr. Archer could have ordered a CT angio (CTA) of Mr. Ruffino's head and neck by 1030 on February 17, 2016.

51. Dr. Archer could have ordered an MRI of Mr. Ruffino's head/brain by 1030 on February 17, 2016.

52. Dr. Archer did not order any imaging of Mr. Ruffino's head from 1030 on February 17, 2016 through 1215 on February 17, 2016.

53. With regard to strokes, Dr. Archer has heard the expression "time is brain."

54. With regard to strokes, Dr. Archer had heard the expression "time is brain" by February 17, 2016.

55. By 1225 on February 17, 2016, the ER staff performed a Severe Sepsis Screening on Mr. Ruffino. The results of that Severe Sepsis Screening were negative for sepsis.

56. By 1225 on February 17, 2016, the ER staff had information that indicated that Mr. Ruffino's complaints that morning were not being caused by sepsis.

57. By 1252 on February 17, 2016, Mr. Ruffino had the same issues or complaints in that he had when he initially presented to the ER at StoneCrest earlier that day.

58. At 1252 on February 17, 2016, a CT angio (CTA) of the head and neck were ordered.

59. The documented Reason for the ordering the CTA imaging on February 17, 2016 was documented as "Neurological Deficit."

60. By the time the CTA imaging was ordered on February 17, 2016, Mr. Ruffino had the same neurological symptoms that he had when he presented to the ER that morning.

61. The CTA of the head that was performed on February 17, 2016 was interpreted as demonstrating a complete occlusion of the proximal Left MCA M2 segment."

62. The CTA of the neck that was performed on February 17, 2016 was interpreted as demonstrating no occlusion of hemodynamic stenosis.

63. There is more than four hours difference between 0830 on February 17, 2016 and 1252 on February 17, 2016.

64. The CTA imaging that was ordered for Mr. Ruffino on February 17, 2016 was ordered more than four hours after Mr. Ruffino's presenting symptoms began.

65. No CTA was ordered within the first three hours following the reported time of the onset of Mr. Ruffino's complaints on February 17, 2016.

66. The CTA imaging that was ordered for Mr. Ruffino on February 17, 2016 was ordered more than three hours after Mr. Ruffino presented to the ER with new symptoms and/or new complaints.

67. No MRI was ordered within the first three hours following the reported time of the onset of Mr. Ruffino's complaints on February 17, 2016.

68. The first time that neurological checks were ordered for Mr. Ruffino in the ER was 1414 on February 17, 2016.

69. The first time that neurological checks were ordered for Mr. Ruffino in the ER was more than four hours after Mr. Ruffino presented to the ER on February 17, 2016.

70. No neurology consult was obtained within the first three hours following the reported time of the onset of Mr. Ruffino's complaints on February 17, 2016.

71. On February 17, 2016, StoneCrest was required to have neurology coverage for its ER.

72. On February 17, 2016, StoneCrest had neurology coverage for its ER.

73. If a STAT neurology consult was requested for Mr. Ruffino in the StoneCrest ER on the morning of February 17, 2016, a neurologist could have seen Mr. Ruffino within 60 minutes of that request.

74. On February 17, 2016, Dr. Archer could have ordered a STAT neurology consult for Mr. Ruffino.

75. When a neurologist first saw Mr. Ruffino at StoneCrest on February 17, 2016, that neurologist's Assessment included "likely stroke."

76. At some point on February 17, 2016, Dr. Archer diagnosed Mr. Ruffino with an acute stroke (CVA).

77. On the evening of February 17, 2016, Mr. Ruffino was transferred to Centennial Medical Center (Centennial).

78. When Mr. Ruffino was transferred to Centennial on February 17, 2016, it was more than six hours after the onset of Mr. Ruffino's neurological symptoms that day.

79. The Centennial Medical Center (Centennial) medical records for the February 2016 admission to Centennial document that Mr. Ruffino suffered an acute thromboembolic CVA.

80. An acute thromboembolic CVA is a thrombotic stroke.

81. A thrombotic stroke occurs when a blood clot obstructs normal blood flow in the brain.

82. In February 2016, treatment for a thrombotic stroke included tissue plasminogen activator (tPA) if tPA could be provided within a certain number of hours after the onset of the patient's neurological symptoms.

83. In February 2016, the treatment of a thrombotic stroke with tPA typically required that tPA be provided within 4.5 hours of the onset of the symptoms.

84. On February 17, 2016, StoneCrest's ER staff documented that the onset time of the symptoms that Mr. Ruffino complained of in the ER that day was 0830.

85. The Centennial medical records for the February 2016 admission document that Mr. Ruffino was outside the window of time for thrombolytics (aka tPA) by the time he arrived at Centennial.

86. In February 2016, treatment of a thrombotic stroke included performing a procedure known as a thrombectomy, which involves the physical removal of the clot at issue.

9

Case 3:17-cv-00725   Document 1   Filed 04/20/17   Page 9 of 15 PageID #: 9

87. On February 17, 2016, Mr. Ruffino was in the ER at StoneCrest within 90 minutes of the onset of his symptoms.

88. Had Mr. Ruffino's thrombotic stroke been diagnosed in the StoneCrest ER within the first 90 minutes of his ER presentation, he could have received tPA and promptly undergone a thrombectomy.

89. In February 2016, Dr. Clark knew that timely treatment of a patient with a thrombotic stroke via tPA and/or a thrombectomy decreased the extent of any neurological injury a person with such a stroke would suffer in the long term.

90. In February 2016, seizure activity was not a contraindication for giving tPA for a thrombotic stroke.

91. On February 17, 2016, there were no contraindications for Mr. Ruffino receiving tPA.

92. On February 17, 2016, the ER staff at StoneCrest did nothing to treat Mr. Ruffino's stroke.

## NEGLIGENCE OF DR. CLARK ARCHER

93. The Plaintiffs incorporate the factual averments and allegations set forth above as if fully described herein.

94. The relationship of health care provider – patient existed between the Plaintiff, Mr. Ruffino, and Dr. Archer during the time in question.

95. Dr. Archer owed Mr. Ruffino a duty to provide appropriate care and treatment, including during the time in question.

96. The ways in which Dr. Archer failed to comply with the applicable standard of recognized acceptable professional practice ("standard of care") include, but are not limited to:

10

a. Not providing proper care and treatment to Mr. Ruffino during his February 17, 2016 ER presentation;

b. Not timely ordering a neurology consult for Mr. Ruffino during his February 17, 2016 ER presentation;

c. Not timely ordering an MRI of the brain for Mr. Ruffino during his February 17, 2016 ER presentation;

d. Not timely ordering a CTA for Mr. Ruffino during his February 17, 2016 ER presentation;

e. Not timely ordering the administration of tPA for Mr. Ruffino for his thrombotic stroke on February 17, 2016;

f. Not timely arranging for a thrombectomy to be performed on Mr. Ruffino for his thrombotic stroke on February 17, 2016;

g. Not following StoneCrest's written policies and procedures that existed on February 17, 2016 as applied to the workup, diagnosis, and treatment of ER patients with a suspected stroke;

h. Not timely diagnosing Mr. Ruffino with a thrombotic stroke on February 17, 2016; and,

i. Not timely arranging for treatment for Mr. Ruffino's thrombotic stroke on February 17, 2016.

## **NEGLIGENCE OF STONECREST MEDICAL CENTER**

97. The Plaintiffs incorporate the factual averments and allegations set forth above as if fully described herein.

98. Pursuant to Tenn. Code Ann. §29-26-115, StoneCrest, through its employees and agents, and at the institutional level, owed a duty to Mr. Ruffino to provide services in accordance with prevailing standards of acceptable professional practice.

99. StoneCrest owed an institutional duty of care to Mr. Ruffino to establish, implement, and enforce policies and procedures to lead to the proper and timely provision of care

to ER patients who had a suspected stroke or who had a diagnosed stroke. StoneCrest failed to satisfy this duty with regard to Mr. Ruffino's February 17, 2016 ER presentation.

100. StoneCrest, directly through its employees and agents, was negligent in the provision of care to Mr. Ruffino during the ER presentation described herein.

101. StoneCrest, through its employee and agents, failed to comply with the standard of recognized acceptable professional practice applicable to the medical and surgical care it provided to Mr. Ruffino.

102. The ways in which StoneCrest's employees and agents failed to comply with the applicable standard of recognized acceptable professional practice ("standard of care") include, but are not limited to:

  a. Not providing proper care and treatment to Mr. Ruffino during his February 17, 2016 ER presentation;

  b. Not timely acting to lead to the ordering a neurology consult for Mr. Ruffino during his February 17, 2016 ER presentation;

  c. Not timely acting to lead to the ordering an MRI of the brain for Mr. Ruffino during his February 17, 2016 ER presentation;

  d. Not timely acting to lead to the ordering a CTA for Mr. Ruffino during his February 17, 2016 ER presentation;

  e. Not timely acting to lead to the ordering the administration of tPA for Mr. Ruffino for his thrombotic stroke on February 17, 2016;

  f. Not timely acting to lead to the ordering of a thrombectomy to be performed on Mr. Ruffino for his thrombotic stroke on February 17, 2016;

  g. Not following StoneCrest's written policies and procedures that existed on February 17, 2016 as applied to the workup, diagnosis, and treatment of ER patients with a suspected stroke;

  h. Not timely diagnosing Mr. Ruffino with a thrombotic stroke on February 17, 2016; and,

     i. Not timely arranging for treatment for Mr. Ruffino's thrombotic stroke on February 17, 2016.

## VICAROUS LIABILITY OF STONECREST MEDICAL CENTER

103. The Plaintiffs incorporate the factual averments and allegations set forth above as if fully described herein.

104. StoneCrest is liable for the negligence of Dr. Archer via the legal theory of vicarious liability, including because Dr. Archer saw and treated Mr. Ruffino as an employee or agent of StoneCrest.

## CAUSATION AND DAMAGES

105. The Plaintiffs incorporate the factual averments and allegations set forth above as if fully described herein.

106. As a direct and proximate result of the Defendants' failures to comply with the applicable standard of care as described herein, Mr. Ruffino suffered severe injury and damages as a result of his stroke not being timely treated. Those injuries and damages include, but are not limited to: past medical expenses, future medical expenses (including lifetime future care due to his stroke), lost earning/lost income, lost earning capacity, physical pain and suffering, emotional pain and suffering, loss of enjoyment of life, and loss of consortium between him and his wife, and Mrs. Ruffino suffered loss of consortium between her and her husband, all of which would not otherwise have incurred. These injuries and damages would not otherwise have occurred absent the Defendants' negligence.

## COMPLIANCE WITH STATUTORY NOTICE
## AND GOOD FAITH REQUIREMENTS

107. The Plaintiffs, through counsel, have complied with the provisions of Tenn. Code Ann. §29-26-121 requiring individuals asserting a potential health care liability claim to give written notice of such potential claim to each health care provider that will be a named Defendant at least 60 days prior to filing a complaint. On or by December 30, 2016, notice was given to the Defendants in accordance with Tenn. Code Ann. §29-26-121. The Affidavit of Brian Manookian and supporting documentation demonstrating compliance are attached to this Complaint as **Exhibit 1**. The Complaint was filed more than 60 days after notice was given. The Complaint was filed more than 60 days after Defendants received Pre-Suit Notice.

108. Defendants had the opportunity to review the facts of this matter between the time of receipt of Pre-Suit Notice by December 30, 2016 and the filing of this Complaint. No agent or representative for the Defendants ever communicated to counsel for the Plaintiffs any inability or problem with obtaining or reviewing the pertinent medical records, which counsel for the Plaintiffs provided access to via an appropriate, HIPAA-compliant release for Defendants to obtain.

109. The Notice described in this section was provided within the applicable period of time. More than 60 days have passed since the notice was given. This suit is timely filed before the applicable statute of limitations (as extended by Tenn. Code Ann. §29-26-121) expired.

110. In accordance with Tenn. Code Ann. §29-26-122, the Plaintiffs' counsel has consulted with one or more experts who provided a signed written statement confirming that upon information and belief they are competent under Tenn. Code Ann. §29-26-115 to express opinions in this case and believe, based on the information available from medical records concerning the care and treatment of the Plaintiff, John Ruffino, that there is a good faith basis to maintain this

action consistent with the requirements of Tenn. Code Ann. §29-26-115. The Certificate of Good Faith demonstrating the same is attached to this Complaint as **Exhibit 2**.

### PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs pray for the following relief:

1. That proper process be issued and be served upon the Defendants, and the Defendants be required to appear and answer this Complaint within the time required by law;

2. That the Plaintiffs be awarded fair and reasonable damages, including compensatory damages up to $6,000,000.00;

3. That the Plaintiffs be awarded the costs of trying this action;

4. That this action be heard by a jury;

5. That costs of this action be taxed to the Defendants;

6. That prejudgment interest be awarded to the Plaintiffs;

7. That the Plaintiff be awarded all and any such other and further relief as the Court deems proper; and,

8. That Plaintiffs' right to amend this Complaint to conform to the evidence be reserved.

**RESPECTFULLY SUBMITTED,**

/s/ Brian Cummings
**Brian Cummings, #19354**
**Brian P. Manookian, #26455**
Cummings Manookian PLC
45 Music Square West
Nashville, Tennessee 37203
(615) 266-3333 (phone)
(615) 266-0250 (fax)
bcummings@cummingsmanookian.com
bmanookian@cummingsmanookian.com

*Attorneys for Plaintiffs*