UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JOHN RUFFINO and MARTHA RUFFINO, ) <br> Husband and Wife, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> DR. CLARK ARCHER and HCA ) <br> HEALTH SERVICES OF TENNESSEE, INC. ) <br> d/b/a STONECREST MEDICAL CENTER, ) <br> ) <br> Defendants. ) | Civil Action No.: 3:17-cv-00725 <br><br> Jury Demand <br> Judge Crenshaw <br> Magistrate Judge Newbern |

## MEMORANDUM OF LAW IN SUPPORT OF HCA HEALTH SERVICES OF TENNESSEE, INC.'S MOTION FOR SUMMARY JUDGMENT

HCA Health Services of Tennessee, Inc. d/b/a StoneCrest Medical Center ("StoneCrest"), in compliance with Fed. R. of Civ. P. 56 and Local Rules 7.01(a) and 56.01, files this Memorandum of Law in support of its Motion for Summary Judgment.

StoneCrest relies on (1) its Statement of Undisputed Material Facts, (2) Plaintiffs' Complaint, (3) affidavit testimony of Adrian A. Jarquin-Valdivia, M.D., and Jodi Dodds, M.D., (4) authenticated medical records from (a) Neurology Clinic Associates, (b) University Medical Center, (c) StoneCrest Medical Center, and (d) Centennial Medical Center, and (5) the deposition testimony of Martha Ruffino. The supporting materials are submitted with a Notice of Filing. Because there is no genuine issue of material fact that StoneCrest complied with accepted standards of care and did not cause any injury to Plaintiffs that would not otherwise have occurred, StoneCrest respectfully submits it is entitled to summary judgment as a matter of law.

## I. INTRODUCTION

Plaintiffs' Complaint was filed on April 20, 2017.[1] Plaintiffs' claim is a healthcare liability action governed by the Tennessee Healthcare Liability Act, Tenn. Code Ann. §29-26-101, *et. seq.*[2] Plaintiffs allege that when John Ruffino presented to StoneCrest on the morning of February 17, 2016, StoneCrest provided negligent medical treatment for an alleged stroke.[3] StoneCrest denies Plaintiffs' allegations. The care provided to Mr. Ruffino complied with accepted standards of care and was not the cause of any injury to Mr. Ruffino that would not otherwise have occurred.[4] In addition to the medical records themselves, StoneCrest's Motion for Summary Judgment is supported by affidavits from Mr. Ruffino's subsequent treating neurologist at Centennial Medical Center,[5] Adrian Jarquin Valdivia, M.D., and the Medical Director of the Duke Regional Hospital Stroke Center, Jodi Dodds. M.D.[6]

The affidavits of Dr. Valdivia and Dr. Dodds confirm Plaintiffs' case has no merit – treatment with tissue plasminogen activator, or tPA, was not indicated at any time during his admission based on Mr. Ruffino's medical history. Even if tPA had been administered to Mr. Ruffino, the outcome in this case would not be different.

## II. UNDISPUTED MATERIAL FACTS

Mr. Ruffino experienced a series of transient ischemic attacks (TIAs)[7] in December 2015, with repetition of the same symptoms, including impact on speech,

---

[1] Dkt. No. 1.
[2] Dkt. No. 1, ¶¶95, 98, and 107-110.
[3] Dkt. No. 1, ¶¶96 and 102.
[4] Dkt. No. 10.
[5] Affidavit of Adrian A. Jarquin-Valdivia, M.D. (filed with Notice of Filing).
[6] Affidavit of Jodi Dodds, M.D. (filed with Notice of Filing).
[7] A TIA is often referred to as a mini-stroke.

facial drooping, and dysfunction of his right extremities.[8] Mr. Ruffino was a lifelong, heavy cigarette smoker.[9]

On December 23, 2015, Mr. Ruffino presented to University Medical Center in Lebanon, Tennessee where he underwent a Magnetic Resonance Angiogram (MRA) of the brain, without contrast, and Magnetic Resonance Imaging (MRI) of the brain, with and without contrast,[10] both ordered by Deka Efobi, M.D., a neurologist providing treatment to Mr. Ruffino at the time. *The December 23, 2015 MRA demonstrates blockage in Mr. Ruffino's left middle cerebral artery (MCA)*.[11] The left MCA is either completely occluded in the distal M1 segment, or 99% stenosed.[12] There is no appreciable flow of blood through the distal M1 segment of Mr. Ruffino's MCA on the MRA of December 23, 2015.[13]

Following completion of these studies at University Medical Center, Mr. Ruffino returned to see Deka Efobi, M.D., on February 11, 2016.[14] At that time, Mr. Ruffino was on an antiplatelet medication (aspirin) and a statin.[15] Dr. Efobi also appropriately encouraged smoking cessation, which Mr. Ruffino refused.[16]

The transient ischemic attacks documented in December of 2015 were crescendo, stereotypical TIAs caused by a fixed lesion with structural narrowing in the left MCA leading to Mr. Ruffino's stroke.[17]

---

[8] Affidavit of Jodi Dodds, ¶9; Neurology Clinic Associates, 001 and 008-010.
[9] Affidavit of Jodi Dodds, ¶10; Neurology Clinic Associates, 005.
[10] Affidavit of Dr. Dodds, ¶11; Neurology Clinic Associates, 011-013.
[11] Affidavit of Dr. Dodds, ¶11.
[12] Affidavit of Dr. Dodds, ¶11.
[13] Affidavit of Dr. Dodds, ¶11.
[14] Affidavit of Dr. Dodds, ¶12; Neurology Clinic Associates, 004-011.
[15] Affidavit of Dr. Dodds, ¶12; Neurology Clinic Associates, 005.
[16] Affidavit of Dr. Dodds, ¶12; Neurology Clinic Associates, 010.
[17] Affidavit of Dr. Dodds, ¶13; Affidavit of Dr. Valdivia, ¶7.

Mr. Ruffino presented to StoneCrest Medical Center on the morning of February 17, 2016.[18] He was transported by the emergency medical services team with a complaint of dizziness.[19] Mr. Ruffino reported to his physician at Centennial Medical Center *that he had awakened with right facial weakness, facial droop, slurred speech and expressive aphasia first thing on the morning of February 17, 2016*.[20] Mr. Ruffino was treated at StoneCrest upon his arrival.[21] Neuroimaging studies were performed to evaluate the potential cause of his symptoms.[22] The CT angiogram performed at StoneCrest Medical Center on the afternoon of February 17, 2016 demonstrated occlusion of the M1 segment of the left MCA,[23] the same vessel shown to be occluded on December 23, 2015 in the MRA performed at University Medical Center.

After evaluation by a neurologist at StoneCrest, Mr. Ruffino was transferred to Centennial Medical Center on February 17, 2016.[24] At Centennial, Mr. Ruffino was treated by the Medical Director of the Stroke Center, Dr. Jarquin-Valdivia.[25]

Mr. Ruffino was discharged from Centennial on February 26, 2016, demonstrating remarkable improvement.[26] At discharge, Mr. Ruffino could participate in conversation and was ambulating on his own, without aggravation of motor function.[27]

At 0430 in the morning on February 27, 2016, Mr. Ruffino fell at home.[28] His condition began to decline throughout the morning and day.[29] He waited nearly fifteen

---

[18] Affidavit of Dr. Dodds, ¶14; StoneCrest 001 and 014.
[19] Affidavit of Dr. Dodds, ¶14; StoneCrest 014.
[20] Affidavit of Dr. Dodds, ¶14; Centennial Medical Center 001 and 017 (**use version we got – not Ps**).
[21] StoneCrest 005-011, 014-020.
[22] StoneCrest 065 – 068.
[23] Affidavit of Dr. Dodds, ¶15; Affidavit of Dr. Valdivia, ¶9.
[24] StoneCrest 004; Centennial 017-019.
[25] Centennial 031-040; Affidavit of Dr. Valdivia, ¶5.
[26] Centennial 072-075.
[27] *Id.*
[28] Centennial 509-516.

(15) hours to present to Centennial, returning at 1918 on February 27, 2016.[30] When he returned, Mr. Ruffino demonstrated increased speech problems and right-sided weakness.[31] Mr. Ruffino was discharged from Centennial on March 3, 2016 with some improvement, but not the same level of function documented at his first discharge.[32]

### III. ARGUMENT

#### A. Summary Judgment Standard

Summary judgment is proper when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine dispute of material fact and compels judgment as a matter of law.[33] In support of its position, a movant may cite to particular materials in the record to establish a fact is undisputed, *or* may show that the non-movant has failed to cite to any admissible materials establishing a dispute.[34] Parties opposing a motion for summary judgment may not rest upon the allegations in their pleading but must, by admissible affidavits, set forth specific facts showing that there is a genuine issue for trial.[35] "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[36]

#### B. Healthcare Liability Action

This Court has diversity jurisdiction in this case over the Plaintiffs' sole claim - a Tennessee state law healthcare liability action governed by Tenn. Code Ann. §29-26-101, *et seq.*[37] A federal court sitting in its diversity jurisdiction applies the choice of law

---

[29] Centennial 509-516; Deposition of Martha Ruffino, 89:23-91:4.
[30] Centennial 509.
[31] Centennial 509-516.
[32] Centennial 501.
[33] Fed. R .Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).
[34] Fed. R. Civ. P. 56(c).
[35] Fed.R.Civ.P. 56(e); *Hartwig v. Nat'l Broad*. Co., 76 F.3d 379 (6th Cir. 1996).
[36] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[37] Dkt. No. 1.

rules of the forum state.[38] With respect to conflicts of laws involving tort claims, Tennessee has adopted the "most significant relationship" approach of the Restatement (Second) of Conflict of Laws.[39] This approach provides that the rights of the parties to an action in tort are determined by the local law of the state that has the most significant relationship to the incident and the parties involved.[40] The most significant relationship is determined by examining: (1) the place of the alleged injury, (2) the place where the injurious conduct occurred, (3) the domicile and/or place of business of the parties involved, and (4) the place where the relationship of the parties is centered.[41] Tennessee is the answer to each factor. This Court must apply Tennessee law in deciding whether summary judgment is proper in the Plaintiffs' healthcare liability action.

In order for a plaintiff to prevail in a healthcare liability action, Tenn. Code Ann. §29-26-115 requires the plaintiff to prove the following material elements of his claim:

A.  The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices…at the time the alleged injury or wrongful action occurred (the "standard of care");

B.  That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

C.  As a proximate result of the defendant's negligent act or omission, the Plaintiff suffered injuries which would not otherwise have occurred.[42]

Expert testimony is required to establish the standard of care, a deviation from the standard of care, and proximate causation in all healthcare liability actions except those

---

[38] *Miller v. State Farm Mut. Auto. Ins. Co.*, 87 F.3d 822, 824 (6th Cir. 1996).
[39] *Hataway v. McKinley*, 830 S.W.2d 53, 56 (Tenn.1992).
[40] *Id.*
[41] *See Glennon v. Dean Witter Reynolds, Inc.*, 83 F.3d 132, 136 (6th Cir.1996).
[42] Tenn. Code Ann. §29-26-115 (emphasis added).

where the alleged negligence is within "the common knowledge of laymen."[43] Appropriate treatment for a stroke is not within the common knowledge of laymen.[44] The Tennessee Supreme Court recognized that healthcare liability cases are particularly amenable to resolution by summary judgment, noting:

> [I]n those malpractice actions wherein expert testimony is required to establish negligence and proximate cause, affidavits by medical doctors which clearly and completely refute plaintiff's contention afford a proper basis for dismissal of the action on summary judgment in the absence of proper responsive proof by affidavit or otherwise.[45]

The law is clear that in addition to an affidavit from an expert witness, a treating physician's own affidavit can affirmatively negate an essential element of a plaintiff's claim to support a motion for summary judgment.[46] StoneCrest submits the following affidavits in support of its Motion for Summary Judgment – (1) the Affidavit of Jodi Dodds, M.D. and (2) the affidavit of Adrian A. Jarquin-Valdivia, M.D. The supporting affidavits confirm that StoneCrest did not breach the standard of care and did not cause or contribute to any injury to the Plaintiffs that would not otherwise have occurred.

### 1. StoneCrest Did Not Breach the Standard of Care

Summary judgment should be granted because StoneCrest, and its alleged agents, complied with the standard of care.[47] Generally, in the absence of a preponderance of the evidence to the contrary, it is presumed in Tennessee that a

---

[43] *Phelps v. Vanderbilt University*, 520 S.W.2d 353, 357 (Tenn. Ct. App. 1974).
[44] *See, e.g., Young v. Jordan,* No. W201502453COAR9CV, 2016 WL 5210873, at *2 (Tenn. Ct. App. Sept. 20, 2016), appeal denied (Jan. 20, 2017)(attached as Exhibit A to this Memorandum of Law).
[45] *Bowman v. Henard*, 547 S.W.2d 527, 531 (Tenn. 1977).
[46] *Miller v. Birdwell*, 327 S.W.3d 53, 55 (Tenn. Ct. App. 2010)(granting a motion for summary judgment based exclusively on a supporting affidavit filed by a treating physician).
[47] Affidavit of Dr. Dodds, ¶18 and ¶20.

7

medical provider satisfied his duty of compliance with standard of care.[48] The mere fact that a patient has an injury does not permit an inference of negligence.[49]

Plaintiffs allege the care provided by StoneCrest fell below the standard of care.[50] Plaintiffs allege that Mr. Ruffino should have received interventional treatment in the emergency room (E.R.) at StoneCrest, employing tissue plasminogen activator (tPA) or an endovascular thrombectomy.[51] Plaintiffs' theory is based, in part, on the uninformed, incorrect assumption that tPA was indicated for Mr. Ruffino, and safe to administer within three (3) to four and a half (4.5) hours after Mr. Ruffino arrived in the E.R.

The federal Food and Drug Administration permits on-label use of tPA within three (3) hours after the patient was last *normal*.[52] To calculate "last known time of normal" for evaluation of tPA administration, or for interventional therapy, a patient must be normal when he wakes up.[53] A patient that wakes up with a deficit is considered "last normal" at the time he went to sleep.[54] Based on Mr. Ruffino's history recorded in the E.R. at Centennial, Mr. Ruffino's last known "normal" was when he went to bed on the night of February 15, 2016.[55] Mr. Ruffino did not arrive in the E.R. at StoneCrest until 9:48 a.m. on February 17, 2016, well beyond three (3) hours after he was "last normal" the previous evening.[56]

Mr. Ruffino's reported symptoms upon arrival to the E.R. were dizziness and/or seizures, neither of which is an indication to administer tPA or perform interventional

---

[48] *Roddy v. Volunteer Medical Clinic, Inc.,* 926 S.W.2d 572, 578 (Tenn. App. 1996); *Redwood v. Raskind*, 350 S.W.2d 414, 417 (Tenn. Ct. App. 1961); *Richardson v. Miller*, 44 S.W.3d 1, 15 (Tenn. App. 2000).
[49] *Redwood,* 350 S.W.2d at 417 (Tenn. Ct. App. 1961).
[50] Dkt. No. 1, ¶102, including all subparts.
[51] *Id.* at ¶102(e) and ¶102(f).
[52] Affidavit of Dr. Dodds, ¶17; Affidavit of Dr. Valdivia, ¶10.
[53] Affidavit of Dr. Dodds, ¶18; Affidavit of Dr. Valdivia, ¶11.
[54] Affidavit of Dr. Dodds, ¶18; Affidavit of Dr. Valdivia, ¶11.
[55] Affidavit of Dr. Dodds, ¶18; Affidavit of Dr. Valdivia, ¶11 (see also Exhibit B to affidavit).
[56] Affidavit of Dr. Dodds, ¶18; Affidavit of Dr. Valdivia, ¶11.

therapy.[57] The decision not to offer interventional therapies to Mr. Ruffino was not a deviation from the standard of care.

The record evidence submitted by StoneCrest negates the breach element of the Plaintiffs' healthcare liability action against StoneCrest by establishing StoneCrest's compliance with the standard of care.[58] Absent competent expert proof to the contrary, the Plaintiffs cannot create a genuine issue of material fact to survive summary judgment.[59] The Plaintiffs' healthcare liability action against StoneCrest fails as a matter of law, requiring summary judgment.

### 2. StoneCrest Did Not Cause Any Injury to Mr. Ruffino

No action or omission of StoneCrest was the proximate cause of Plaintiffs injuries. Tenn. Code Ann. §29-26-115(a)(3) requires a plaintiff to prove that "[a]s a proximate result of the defendant's negligent act or omission [of accepted community medical standards], the plaintiff suffered injuries which would not otherwise have occurred." Stated differently, this language codifies the traditional causation element of a negligence claim, which requires a plaintiff prove that the injury would not have occurred but for the defendant's negligence.[60] Under Tennessee law, causation in healthcare liability actions must be established "as a matter of probability," *i.e.*, more likely than not, that a plaintiff's injuries would not have occurred *but for* the negligent action.[61]

Even when a genuine issue exists on compliance with accepted standards of care, the plaintiff must still establish the requisite causal connection between the

---

[57] Affidavit of Dr. Valdivia, ¶12.
[58] Affidavit of Dr. Dodds, ¶18 and ¶20.
[59] Fed. R. Civ. P. 56(c)(1)(B).
[60] *Kilpatrick v. Bryant*, 868 S.W.2d 594, 602 (Tenn. 1993).
[61] *Volz v. Ledes*, 895 S.W.2d 677, 679 (Tenn. 1995) (citing *Kilpatrick*, *supra*).

defendant's conduct and the plaintiff's injury.[62] "Proof of negligence without proof of causation is nothing."[63]

Proximate causation is a high bar.[64] "Causation…is a matter of probability, not possibility, and in a medical malpractice case, such must be shown to a reasonable degree of medical certainty."[65] Establishing proximate causation requires more than presentation of mere *possibility* of a causal relationship.[66] In order to establish medical negligence, Plaintiffs must present expert testimony that, within a reasonable degree of medical certainty, a specific deviation from the standard of care caused Plaintiff's injury.[67] "A doctor's testimony that a certain thing is possible is no evidence at all."[68]

In the instant case, the Plaintiffs allege StoneCrest's failure to administer tPA or perform interventional treatment led Mr. Ruffino to experience greater disability due to stroke.[69] The competent evidence before the Court demonstrates a fundamental lack of the requisite causal connection between the claims made and Mr. Ruffino's outcome.

First, Plaintiffs cannot establish causation because the occlusion that caused Mr. Ruffino's stroke existed long before his presentation to StoneCrest, unequivocally precluding *any of the interventional treatments* that Plaintiffs claim were required by the standard of care.[70]

Prior to Mr. Ruffino's admission to StoneCrest Medical Center on February 17, 2016, Mr. Ruffino experienced a series of transient ischemic attacks (TIAs) with

---

[62] *Id.*
[63] *Doe v. Linder Const. Co.*, 845 S.W.2d 173, 181 (Tenn. 1992).
[64] *Id.* at 602.
[65] *Id.*
[66] *Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 862 (Tenn. 1985) (rejecting a physician's opinion testimony as to proximate cause as speculative and inadmissible).
[67] *Kilpatrick*, 868 S.W.2d at 598.
[68] *Palace Bar, Inc. v. Fearnot*, 381 N.E.2d 858, 864 (1978).
[69] Dkt. No. 1, ¶102, including all subparts.
[70] Affidavit of Dr. Dodds, ¶16.

repetition of the same symptoms, including impact on speech, facial drooping, and dysfunction of his right arm and leg.[71] The documented TIAs were crescendo, stereotypical TIAs caused by a fixed lesion with structural narrowing in the MCA.[72]

The cause of the TIAs is confirmed by the December 23, 2015 MRA performed at University Medical Center, which demonstrates occlusion in Mr. Ruffino's left MCA in the M1 segment.[73] In addition, the February 18, 2016 and February 28, 2016 MRI studies of Mr. Ruffino's brain, performed at Centennial, demonstrate old infarction,[74] which are "old" strokes causing permanent tissue damage.

With a complete, or nearly complete, occlusion, in the M1 segment of Mr. Ruffino's left MCA on December 23, 2015, and February 17, 2016, an attempt to perform a thrombectomy [mechanical removal of the blockage] was not appropriate.[75] A thrombectomy is not indicated to excavate a fixed lesion.[76] tPA was not indicated, either, and would not have opened the occluded vessel.[77] A final consideration, attempting to bridge the occlusion with a man-made stent, was not indicated based on poor outcomes confirmed in the 2011 SAMMPRIS trial (incidence of stroke or death was 15% for those undergoing stenting vs. 5% for supportive medical treatment only).[78]

Putting timing issues aside, and ignoring the long-standing stenosis of the vessel shown on the MRA of December 23, 2015, because Mr. Ruffino's occlusion was in the M1 segment of his middle cerebral artery, Mr. Ruffino was unlikely, to a reasonable degree of medical probability, to have improved with the administration of tPA. The

---

[71] Affidavit of Jodi Dodds, ¶9; Neurology Clinic Associates, 001 and 008-010.
[72] Affidavit of Dr. Valdivia, ¶7.
[73] Affidavit of Dr. Dodds, ¶11.
[74] Affidavit of Dr. Valdivia, ¶8.
[75] Affidavit of Dr. Dodds, ¶16.
[76] Affidavit of Dr. Dodds, ¶16.
[77] Affidavit of Dr. Dodds, ¶16.
[78] Affidavit of Dr. Dodds, ¶16.

unfortunate fact is that treatment of an *acute* occlusion in the M1 segment of the MCA with tPA does not offer any assurance of improvement in outcome to a reasonable degree of medical certainty, irrespective of time of administration of tPA.[79] Table 4 from "Site of Arterial Occlusion Identified by Transcranial Doppler Predicts the Response to Intravenous Thrombolysis for Stroke," STROKE, 2007 38: 948-954,[80] establishes that 84.5% of patients with an occlusion in the M1 segment had a poor outcome despite administration of tPA.[81] Even if tPA had been administered to Mr. Ruffino shortly after his arrival to StoneCrest, it is not likely, to a reasonable degree of medical probability, that administration of tPA would have changed the outcome or prevented an injury.[82]

It is not enough to raise the possibility of a better outcome – the Plaintiffs must establish that had tPA been administered, Mr. Ruffino had a better than 50% chance of a better outcome.[83] The scientific literature establishes the Plaintiffs cannot meet this burden with scientifically valid evidence.

Plaintiffs will never be able to meet their burden of proof on causation in this case. Mr. Ruffino's occlusion predated his presentation by months – eliminating consideration of the interventional therapies the Plaintiffs claim should have been pursued. Even if tPA had actually been an option, the scientific literature demonstrates, unequivocally, that the tPA would not have been effective on Mr. Ruffino given the precise location of his occlusion in the M1 branch of his left MCA.

---

[79] Affidavit of Dr. Dodds, ¶17; Affidavit of Dr. Valdivia, ¶10.
[80] Filed with Notice of Filing.
[81] Affidavit of Dr. Dodds, ¶17; Affidavit of Dr. Valdivia, ¶10.
[82] Affidavit of Dr. Dodds, ¶17; Affidavit of Dr. Valdivia, ¶10.
[83] *Kilpatrick v. Bryant*, 868 S.W.2d 594, 602 (Tenn. 1993).

In the face of affirmative evidence from Drs. Dodds and Valdivia on causation, and in the absence of expert proof from the Plaintiffs to refute this testimony, the Plaintiff cannot create a genuine issue of material fact to survive summary judgment.

### C. Plaintiffs' Agency / Vicarious Liability Fails as Matter of Law

In addition to their "direct" healthcare liability action against StoneCrest, Plaintiffs assert a claim against StoneCrest based on the legal theory of "agency."[84] In Tennessee, this doctrine permits, in limited circumstances, a principal to be held vicariously liable for the negligent actions of his agent.[85] However, a principal may not be held vicariously liable for the acts of its agent when the agent has been exonerated by an adjudication of non-liability.[86] In this case, StoneCrest filed affirmative evidence in the form of affidavits establishing that Dr. Archer's care complied with the standard of care and did not cause any injury to Plaintiffs that would not have otherwise occurred.[87] Plaintiffs must meet the requirements of Tenn. Code Ann. §29-26-115 in order to pursue a claim for healthcare liability against Dr. Archer, and in turn, StoneCrest. In the absence of expert proof and in the face of affirmative proof establishing that Dr. Archer was not negligent, StoneCrest is exonerated from liability.

StoneCrest is also entitled to summary judgment as a matter of law on Plaintiffs' vicarious liability claim because there is no genuine issue as to any material fact as to Dr. Archer's negligence in the care provided to Mr. Ruffino at StoneCrest.

---

[84] Dkt. No. 1, ¶¶103-104.
[85] *Johnson,* 74 S.W.3d at 343 (Tenn. 2002).
[86] *Id.* at 344.
[87] Affidavit of Dr. Dodds, ¶18 and ¶20.

13

Case 3:17-cv-00725   Document 39   Filed 11/30/17   Page 13 of 15 PageID #: 327

## IV. CONCLUSION

In conclusion, StoneCrest is entitled to summary judgment because it negated essential elements of the Plaintiffs' healthcare liability action - a breach of standard of care by StoneCrest, or Dr. Archer, and causation by either. Plaintiffs cannot satisfy their burden of production, as the irrefutable medical evidence establishes that the treatments the Plaintiffs allege were necessary either were precluded by Mr. Ruffino's medical history, or would not have more probably than not led to a different outcome.

Respectfully submitted,

**GIDEON, COOPER & ESSARY, PLC**

**/s/ J. Blake Carter**
**C.J. Gideon, Jr., # 6034**
**J. Blake Carter, # 30098**
315 Deaderick Street, Suite 1100
Nashville, TN 37238
(615) 254-0400
cj@gideoncooper.com
blake@gideoncooper.com

*Counsel for HCA Health Services of Tennessee, Inc. d/b/a StoneCrest Medical Center*

## CERTIFICATE OF SERVICE

      I hereby certify that a true and correct copy of the foregoing has been furnished, by electronic means via the Court's electronic filing system, this 30th day of November, 2017, to the following:

Brian Cummings
Brian Manookian
Cummings Manookian, PLC
45 Music Square West
Nashville, TN 37203

*Counsel for Plaintiff*

James E. Looper
Bryant Witt
Nate Gorman
Hall Booth Smith, P.C.
Fifth Third Center
424 Church Street, Suite 2950
Nashville, TN 37219

*Counsel for Clark Archer, M.D.*

                                               **/s/ J. Blake Carter**