UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JOHN RUFFINO and MARTHA RUFFINO, Husband and Wife, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No.: 3:17-cv-00725 |
| DR. CLARK ARCHER and HCA HEALTH SERVICES OF TENNESSEE, INC. d/b/a STONECREST MEDICAL CENTER, | ) ) ) ) | Jury Demand Judge Crenshaw Magistrate Judge Newbern |
| Defendants. | ) | |

## DEFENDANT'S STATEMENT OF FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

HCA Health Services of Tennessee, Inc. submits a concise statement of facts pursuant to Local Rule 56.01 of the United States District Court for the Middle District of Tennessee. This statement is filed in support of its Motion for Summary Judgment.

1. Prior to Mr. Ruffino's admission to StoneCrest Medical Center on February 17, 2016, Mr. Ruffino experienced a series of transient ischemic attacks (TIAs) with repetition of the same symptoms, including impact on speech, facial drooping, and dysfunction of his right arm and leg.[1]

    **RESPONSE:**


2. Prior to and during February 2016, Mr. Ruffino was a heavy cigarette smoker.[2]

    **RESPONSE:**

---

[1] Affidavit of Dr. Dodds, ¶9; Neurology Clinic Associates, 001 and 008-010.
[2] Affidavit of Jodi Dodds, ¶10; Neurology Clinic Associates, 005.

3. On December 23, 2015, Mr. Ruffino presented to University Medical Center in Lebanon, Tennessee where he underwent a Magnetic Resonance Angiogram (MRA) of the brain, without contrast, and Magnetic Resonance Imaging (MRI) of the brain, with and without contrast.[3]

**RESPONSE:**

4. The December 23, 2015 MRA demonstrates blockage in Mr. Ruffino's left middle cerebral artery (MCA).[4]

**RESPONSE:**

5. In the December 23, 2015 MRA, the left MCA is either completely occluded in the distal M1 segment, or 99% stenosed.[5]

**RESPONSE:**

6. There is no appreciable flow through the distal M1 segment of Mr. Ruffino's MCA on the MRA of December 23, 2015.[6]

**RESPONSE:**

7. Following completion of these studies at University Medical Center, Mr. Ruffino returned to see his private neurologist, Deka Efobi, M.D., on February 11, 2016.[7]

**RESPONSE:**

---

[3] Affidavit of Dr. Dodds, ¶11; Neurology Clinic Associates, 011-013.
[4] Affidavit of Dr. Dodds, ¶11.
[5] Affidavit of Dr. Dodds, ¶11.
[6] Affidavit of Dr. Dodds, ¶11.
[7] Affidavit of Dr. Dodds, ¶12; Neurology Clinic Associates, 004-011.

8. At that time, Mr. Ruffino was on an antiplatelet medication (aspirin) and a statin.[8]

   **RESPONSE:**

9. Dr. Efobi also appropriately encouraged smoking cessation, which Mr. Ruffino refused.[9]

   **RESPONSE:**

10. The documented TIAs were crescendo, stereotypical TIAs caused by a fixed lesion with structural narrowing in the left MCA leading to Mr. Ruffino's stroke.[10]

    **RESPONSE:**

11. Mr. Ruffino presented to StoneCrest Medical Center on the morning of February 17, 2016.[11]

    **RESPONSE:**

12. Mr. Ruffino was transported by EMS to StoneCrest with a complaint of dizziness.[12]

    **RESPONSE:**

---

[8] Affidavit of Dr. Dodds, ¶12; Neurology Clinic Associates, 005.
[9] Affidavit of Dr. Dodds, ¶12; Neurology Clinic Associates, 010.
[10] Affidavit of Dr. Dodds, ¶13; Affidavit of Dr. Valdivia, ¶7.
[11] Affidavit of Dr. Dodds, ¶14; StoneCrest 001 and 014.
[12] Affidavit of Dr. Dodds, ¶14; StoneCrest 014.

13. Mr. Ruffino later reported to his physician at Centennial Medical Center that he had awakened with right facial weakness, facial droop, slurred speech and expressive aphasia first thing on the morning of February 17, 2016.[13]

    **RESPONSE:**

14. Mr. Ruffino received neuroimaging studies at StoneCrest on February 17, 2016 to evaluate the cause of his symptoms.[14]

    **RESPONSE:**

15. To a reasonable degree of medical probability, the CT angiogram performed at StoneCrest Medical Center on the afternoon of February 17, 2016 demonstrated an occlusion in the M1 segment of the left MCA.[15]

    **RESPONSE:**

16. After being evaluated by a neurologist, Mr. Ruffino was transferred to Centennial Medical Center on February 17, 2016.[16]

    **RESPONSE:**

17. At Centennial, during his first admission, Mr. Ruffino was evaluated and treated by the Medical Director of the Stroke Center at Centennial, Dr. Jarquin-Valdivia.[17]

    **RESPONSE:**

---

[13] Affidavit of Dr. Dodds, ¶14; Centennial Medical Center 001 and 017.
[14] StoneCrest 065 – 068.
[15] Affidavit of Dr. Dodds, ¶15; Affidavit of Dr. Valdivia, ¶9.
[16] StoneCrest 004; Centennial 017-019.
[17] Centennial 031-040; Affidavit of Dr. Valdivia, ¶5.

18. Mr. Ruffino was discharged from Centennial on February 26, 2016.[18]

   **RESPONSE:**

19. Dr. Jodi Dodds is qualified to provide expert opinions in this matter on the applicable standard of care and causation.[19]

   **RESPONSE:**

20. Dr. Jarquin-Valdivia is qualified to provide expert opinions in this matter on the applicable standard of care and causation.[20]

   **RESPONSE:**

21. The federal Food and Drug Administration authorizes use of tPA within three (3) hours after the patient was last *normal*.[21]

   **RESPONSE:**

22. To calculate "last known time of normal" for evaluation of tPA administration or interventional therapy, a patient must be normal when he awakens.[22]

   **RESPONSE:**

[18] Centennial 072-075.
[19] Affidavit of Dr. Dodds, ¶¶1-8.
[20] Affidavit of Dr. Jarquin-Valdivia, ¶¶1-5.
[21] Affidavit of Dr. Dodds, ¶17; Affidavit of Dr. Valdivia, ¶10.
[22] Affidavit of Dr. Dodds, ¶18; Affidavit of Dr. Valdivia, ¶11.

23. A patient that wakes up with a deficit is considered "last normal" at the time he went to sleep.[23]

**RESPONSE:**


24. Based on the recorded history given in the emergency room at Centennial, Mr. Ruffino's last known time of normal was when he went to bed the night before.[24]

**RESPONSE:**


25. Mr. Ruffino did not arrive in the ED at StoneCrest until 9:48 a.m. on February 17, 2016, well beyond three (3) hours after he was "last normal" by his own recorded history.[25]

**RESPONSE:**


26. Mr. Ruffino's reported symptoms in the ER were dizziness and/or seizures, neither of which is an indication to administer tPA or perform interventional therapy.[26]

**RESPONSE:**


27. The care provided by all providers at StoneCrest complied with accepted standards of care.[27]

**RESPONSE:**

---

[23] Affidavit of Dr. Dodds, ¶18; Affidavit of Dr. Valdivia, ¶11.
[24] Affidavit of Dr. Dodds, ¶18; Affidavit of Dr. Valdivia, ¶11 (see also Exhibit B to affidavit).
[25] Affidavit of Dr. Dodds, ¶18; Affidavit of Dr. Valdivia, ¶11.
[26] Affidavit of Dr. Valdivia, ¶12.
[27] Affidavit of Dr. Dodds, ¶16 and ¶20.

28. On February 17, 2016, given the complete, or nearly complete, occlusion, in the M1 segment of Mr. Ruffino's left MCA, a thrombectomy was not appropriate.[28]

    **RESPONSE:**


29. A thrombectomy is not indicated to excavate a fixed lesion.[29]

    **RESPONSE:**


30. tPA was not indicated and would not have opened the occluded vessel.[30]

    **RESPONSE:**


31. Based on the 2011 SAMMPRIS trial, stenting of the long-occluded vessel was not indicated (incidence of stroke or death was 15% for those undergoing stenting vs. 5% for medical treatment only).[31]

    **RESPONSE:**


32. Because of the location of Mr. Ruffino's occlusion in the M1 segment of Mr. Ruffino's middle cerebral artery, Mr. Ruffino was unlikely, to a reasonable degree of medical probability, to have received any improvement from the administration of tPA.[32]

    **RESPONSE:**

---

[28] Affidavit of Dr. Dodds, ¶16.
[29] Affidavit of Dr. Dodds, ¶16.
[30] Affidavit of Dr. Dodds, ¶16.
[31] Affidavit of Dr. Dodds, ¶16.
[32] Affidavit of Dr. Dodds, ¶17; Affidavit of Dr. Valdivia, ¶10.

33. Treatment of an occlusion in the M1 segment of the MCA with tPA does not offer any assurance of improvement in outcome to a reasonable degree of medical certainty, irrespective of time of administration of tPA.[33]

    **RESPONSE:**


34. Table 4 from Site of Arterial Occlusion Identified by Transcranial Doppler Predicts the Response to Intravenous Thrombolysis for Stroke, STROKE, 2007 38: 948-954,[34] establishes that 84.5% of patients with an occlusion in the M1 segment had a poor outcome despite administration of tPA.[35]

    **RESPONSE:**


35. Even if Mr. Ruffino had received tPA shortly after his arrival to StoneCrest, it is not likely, to a reasonable degree of medical probability, that administration of tPA would have changed the outcome or prevented an injury.[36]

    **RESPONSE:**


36. No action or inaction by any healthcare provider at StoneCrest was the cause of any injury to Plaintiffs that would not otherwise have occurred.[37]

    **RESPONSE:**

---

[33] Affidavit of Dr. Dodds, ¶17; Affidavit of Dr. Valdivia, ¶10.
[34] Filed with Notice of Filing.
[35] Affidavit of Dr. Dodds, ¶17; Affidavit of Dr. Valdivia, ¶10.
[36] Affidavit of Dr. Dodds, ¶17; Affidavit of Dr. Valdivia, ¶10.
[37] Affidavit of Dr. Dodds, ¶¶17 and 21; Affidavit of Dr. Valdivia, ¶¶10 and 13.

Respectfully submitted,

**GIDEON, COOPER & ESSARY, PLC**

**/s/ J. Blake Carter**
**C.J. Gideon, Jr., # 6034**
**J. Blake Carter, # 30098**
315 Deaderick Street, Suite 1100
Nashville, TN  37238
(615) 254-0400
cj@gideoncooper.com
blake@gideoncooper.com

*Counsel for HCA Health Services of*
*Tennessee, Inc. d/b/a StoneCrest*
*Medical Center*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished, by electronic means via the Court's electronic filing system, this 30th day of November, 2017, to the following:

Brian Cummings
Brian Manookian
Cummings Manookian, PLC
45 Music Square West
Nashville, TN  37203

*Counsel for Plaintiff*

James E. Looper
Bryant Witt
Nate Gorman
Hall Booth Smith, P.C.
Fifth Third Center
424 Church Street, Suite 2950
Nashville, TN  37219

*Counsel for Clark Archer, M.D.*

**/s/ J. Blake Carter**