# In The Matter Of:

*JOHN AND MARTHA RUFFINO v.*

*DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.*

*CAROL McCULLOCH, RN*

*November 29, 2017*

*CARISSA L. BOONE, LCR, RPR*

*1209 Pine Street, Unit 409*

*Nashville, Tennessee 37213*

*615.243.1025*

*Carissaboone@gmail.com*

Original File 11 29 17 McCullouch (D).txt

**Min-U-Script® with Word Index**

JOHN AND MARTHA RUFFINO v.
DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.

CAROL McCULLOCH, RN
November 29, 2017

## Page 1

```
          IN THE UNITED STATES DISTRICT COURT
             MIDDLE DISTRICT OF TENNESSEE
                   NASHVILLE DIVISION


JOHN RUFFINO and MARTHA      )
RUFFINO, Husband and Wife,   )
                             )
          Plaintiffs,        )
                             )
vs.                          )  CASE NO.
                             )  3:17-CV-00725
DR. CLARK ARCHER and HCA     )
HEALTH SERVICES OF           )
TENNESSEE, INC. d/b/a        )
STONECREST MEDICAL CENTER,   )
                             )
          Defendants.        )
_____)




          DEPOSITION OF:

          CAROL McCULLOCH, RN

          Taken on behalf of the Plaintiffs

          November 29, 2017
```

## Page 2

 1  APPEARANCES:
 2  For the Plaintiffs:
 3  BRIAN CUMMINGS, ESQ.
    Cummings Manookian, PLC
 4  45 Music Square West
    615.266.3333
 5  Nashville, Tennessee 37203
    615.266.3333
 6  Bcummings@cummingsmanookian.com
 7  For the Defendant HCA Health Services of
    Tennessee, Inc. and StoneCrest Medical
 8  Center:
 9  J. BLAKE CARTER, ESQ.
    Gideon, Cooper & Essary, PLC
10  315 Deaderick Street
    Suite 1100
11  Nashville, Tennessee 37238
    615.254.0400
12  Blake@gideoncooper.com
13  For the Defendant Clark Archer, M.D.:
14  BRYANT C. WITT, ESQ.
    Hall Booth Smith, PC
15  424 Church Street
    Suite 2950
16  Nashville, Tennessee 37219
    615.313.9911
17  Bwitt@hallboothsmith.com

## Page 3

 1              I N D E X
                                    Page/Line
 2
 3  THE WITNESS:  CAROL McCULLOCH, RN
 4  EXAMINATION BY MR. CUMMINGS         5    4
    EXAMINATION BY MR. CARTER          31    4
 5
 6
 7
 8           INDEX OF EXHIBITS
 9  Exhibits      Description       Page/Line
10  None.

## Page 4

 1          The deposition of CAROL McCULLOCH,
 2  RN, was taken by counsel for the Plaintiff,
 3  on November 29, 2017, commencing at 1:49
 4  p.m., in the offices of Gideon, Cooper &
 5  Essary, PLC, 315 Deaderick Street, Suite
 6  1100, Nashville, Tennessee, for all purposes
 7  under the Tennessee Rules of Civil
 8  Procedure.
 9          The formalities as to notice,
10  caption, certificate, et cetera, are not
11  waived.  All objections, except as to the
12  form of the questions, are reserved to the
13  hearing.
14          It is agreed that Carissa L.
15  Boone, being a Notary Public and Court
16  Reporter, may swear the witness, and that the
17  reading and signing of the completed
18  deposition by the witness are not waived.
19
20
21              *    *    *

Page 5

1    CAROL McCULLOCH, RN,
2 having been first duly sworn, was examined
3 and testified as follows:
4           EXAMINATION
5 BY MR. CUMMINGS:
6 Q.    Ma'am, please tell us your full name.
7 A.    Carol McCulloch.
8 Q.    How do you spell your last name?
9 A.    It's M-c-C-u-l-l-o-c-h.
10 Q.   My name is Brian Cummings.  I'm going
11 to ask you some questions about a patient in
12 StoneCrest's ER back in February 2016.
13 A.   Okay.
14 Q.   Do you remember a patient named
15 John Ruffino?
16 A.   No.
17 Q.   Do you currently work as a nurse?
18 A.   No.
19 Q.   Did you retire?
20 A.   I retired almost a year ago.  Last
21 December.
22 Q.   For about how many years did you work
23 as a nurse?
24 A.   I worked as a nurse for 48 years, 46
25 of those with HCA.

Page 6

1 Q.    What is HCA?
2 A.    What is it?
3 Q.    Yes, ma'am.  When you say you worked
4 46 years --
5 A.    Oh, I'm sorry.
6 Q.    -- for HCA, what is HCA?
7 A.    Well, you made me go blank there.
8 Q.    Well, what did it mean when you said
9 it?
10 A.   It's the company I worked for.
11 Q.   Okay.  And when you worked in the
12 StoneCrest ER in February 2016, you worked
13 for HCA?
14 A.   Yeah, it's a -- it's one of the
15 hospitals with HCA.
16 Q.   Okay.
17 A.   With the corporation.  Hospital
18 Corporation of America, that's what it stands
19 for.
20 Q.   How many years did you work at
21 StoneCrest?
22 A.   I think it was 14.  I started working
23 there when they opened.
24 Q.   I was just going to ask that.  It
25 almost had to be if it was 14 years, right?

Page 7

1 A.    Right.  What it -- I think it was 14
2 years that they -- or maybe 15 years now, I
3 guess.
4 Q.    Did you work in the ER the entire time
5 you worked at StoneCrest?
6 A.    Yes, sir.
7 Q.    Did that mean by February 2016 you
8 were familiar with the policies and
9 procedures regarding stroke patients --
10 A.   Yes, sir.
11 Q.   -- that existed for the StoneCrest ER?
12 A.   Yes, sir.
13 Q.   What do you remember about those
14 policies and procedures?
15 A.   Any specific one, or what do you mean?
16 You said with a stroke?
17 Q.   Yes, ma'am.
18 A.   Well, we had a -- what we called a
19 Code Stroke policy that -- it was just a --
20 we could announce that would start things
21 moving a little faster as far as when a
22 patient arrived.
23 Q.   If a patient arrived at the ER and a
24 healthcare provider thought that patient was
25 having a stroke or recently had the acute

Page 8

1 onset of a new stroke, a Code Stroke could be
2 called?
3 A.    Yes.
4 Q.    What would your role as a nurse be in
5 getting a Code Stroke called for such a
6 patient?
7 A.    Well, I would notify -- I would make
8 sure there was a physician or a provider
9 there, being a nurse practitioner or....
10 Q.   Do you --
11 A.   And --
12 Q.   Go ahead, ma'am.
13 A.   And my role as a nurse would be to get
14 the -- get the patient to CT as soon as
15 possible.
16 Q.   Why would you want to get a stroke
17 patient to CT as soon as possible in an ER
18 setting?
19 A.   To see what further treatment we
20 needed.
21 Q.   And what would a CT scan of the head
22 tell someone about what further treatment was
23 needed for a stroke patient?
24 A.   Well, depending on what they find.
25 Q.   If that CT was negative or normal,

JOHN AND MARTHA RUFFINO v.
DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.

CAROL McCULLOCH, RN
November 29, 2017

Page 9

1 what would happen?
2 A. There would be a re-evaluation of the
3 patient by the physician. Then he would
4 decide at that point if there needed to be
5 further studies done.
6 Q. And when you say "he," you mean the
7 doctor?
8 A. The doctor, yes.
9 Q. If you -- if I use the term "triage,"
10 is that a term you're familiar with?
11 A. Yes.
12 Q. If you triaged an ER patient and felt
13 they might be in the midst of a new stroke,
14 could you notify a doctor or a nurse
15 practitioner to help get a Code Stroke
16 initiated?
17 A. Yes.
18 Q. And in your time working in the
19 StoneCrest ER for ten-plus years, did you
20 ever see an ER patient who you triaged and
21 felt was in the midst of a recent stroke?
22 A. Did I --
23 Q. Yes, ma'am.
24 A. -- ever see one?
25 Q. Yes.

Page 10

1 A. Yes.
2 Q. Instead of this just being
3 theoretical, did you actually do that at
4 times?
5 A. Yes.
6 Q. And you would decide, based on what
7 you found in examining the patient or
8 evaluating a patient, whether to get a doctor
9 or a nurse practitioner involved to
10 potentially call a Code Stroke, correct?
11 A. Right. But during the triage, we
12 usually had a doctor or a nurse treating the
13 patient at the same time.
14 Q. Okay. There's a stack of records to
15 your right side that have page numbers in the
16 lower right. Can you turn --
17 A. This one (indicating)?
18 Q. Yes, ma'am.
19 A. This one (indicating) or this one
20 (indicating)?
21 Q. Mr. Carter might be able to help us
22 with that.
23 A. Are they the same?
24     MR. CARTER: They're the same.
25     THE WITNESS: Oh, okay.

Page 11

1 BY MR. CUMMINGS:
2 Q. If you use those page numbers, will
3 you please turn to Page 11.
4 A. (Witness complies.) Okay.
5 Q. Are you there?
6 A. Yes.
7 Q. Do you see the assessment you did that
8 you documented at 9:58 in the morning on
9 February 17th?
10 A. On 11?
11 Q. It's the left hand -- yep.
12     MR. CARTER: (Indicating.) We're
13 using this page and he's using that page.
14 That's my fault. She was on Bates-stamp
15 No. 21.
16     MR. CUMMINGS: Okay.
17     THE WITNESS: Okay. I was going
18 to say that didn't look like my charting.
19     MR. CARTER: When he says
20 "Bates-stamp number," he's talking about --
21     THE WITNESS: Down here
22 (indicting)?
23     MR. CARTER: Yeah.
24     THE WITNESS: Okay. Sorry.
25     MR. CARTER: No, we're good.

Page 12

1     THE WITNESS: I saw these numbers
2 over here first.
3 BU MR. CUMMINGS:
4 Q. Are you on Page 11?
5 A. Now I'm on Page 11 down -- this 11.
6 Okay.
7 Q. Do you see in the left-hand column
8 your note that you made at 9:58 in the
9 morning on February 17th? There's a recorded
10 time.
11 A. Right here (indicating)? Okay.
12 Q. Do you see that now?
13 A. I do now.
14 Q. And you entered the Occurrence Time as
15 9:56 that same day, correct?
16 A. Yes.
17 Q. What would you tell us this note is?
18 What does it represent?
19 A. The Rapid Initial Assessment, which is
20 the triage note. Would be the first
21 assessment of the patient when they arrived.
22 Q. Okay. Is that --
23 A. After they arrived.
24 Q. Is that the name of this note?
25 A. Rapid Initial Assessment, I think, is

JOHN AND MARTHA RUFFINO v.
DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.

CAROL McCULLOCH, RN
November 29, 2017

Page 13

1  the name of it.
2  Q.   Okay.
3  A.   It's up there at the very top.
4  Q.   And that's what I was looking at, and
5  maybe we're not on the same page.  My copy of
6  Page 11 for the note you made at 9:58 that
7  day says "Rapid Initial Assessment with
8  Sepsis" at the top.  Do you see that?
9  A.   Uh-huh.
10 Q.   Is that a "yes"?
11 A.   Yes.
12 Q.   Why is it when I asked you what this
13 note was called, you didn't mention the "with
14 sepsis"?
15 A.   Because I did the Rapid Initial
16 Assessment.  I don't -- I don't know.
17 Q.   This patient didn't have sepsis, did
18 he?
19 A.   I don't know.
20 Q.   Well, who chose to use the Rapid
21 Initial Assessment with Sepsis note?
22 A.   I -- I think that's the way the -- it
23 comes up with every patient.
24 Q.   Every patient's initial assessment
25 note in the StoneCrest ER in February 2016

Page 14

1  would say Rapid Initial Assessment with
2  Sepsis at the top?
3  A.   I think so.  I....
4       MR. CARTER: If you don't --
5       THE WITNESS: I don't know.
6       MR. CARTER: -- know, just say "I
7  don't know."
8       THE WITNESS: I don't know that
9  for sure, but I know that that was something
10 that would come up because we would assess
11 that at some point --
12 BY MR. CUMMINGS:
13 Q.   Okay.
14 A.   -- on everybody.
15 Q.   Do you think this note includes a
16 severe sepsis screening?  And you might see
17 it in the right column midway down.
18 A.   It does.
19 Q.   Okay.  Why was Mr. Ruffino screened
20 for sepsis as part of the initial assessment
21 in the ER that day?
22 A.   Why was he?
23 Q.   Yes, ma'am.
24 A.   I think that was -- I -- I think
25 that's on every patient that we did.

Page 15

1  Q.   Okay.  So in your 14 years or so of
2  working in the StoneCrest ER, your initial
3  assessment of every ER patient at StoneCrest
4  included a severe sepsis screening?
5  A.   After a certain time.  Not from the
6  very beginning, but after a certain time,
7  yes.
8  Q.   What does it mean when you say "after
9  a certain time"?
10 A.   Well, when sepsis became a -- when it
11 became that sepsis needed to be addressed
12 right away.  The sooner the better.  That
13 wasn't always -- that wasn't always the case.
14 Q.   Did you choose some option that led to
15 this note being in the form or format called
16 Rapid Initial Assessment with Sepsis?
17 A.   Did I chose that?
18 Q.   Yes, ma'am.
19 A.   There was a way you put the patient in
20 initially to get them into the computer, and
21 I don't know what it was called.
22      MR. CARTER: That's fine.  Just
23 tell him what you remember.
24      THE WITNESS: It's been a while.
25 But you chose -- there was one -- one form

Page 16

1  that you went -- one spot you went to, and I
2  don't remember the name.  I don't know if it
3  was -- that was the name initially, but you
4  put in the patient's information to get them
5  in to the computer.
6  BY MR. CUMMINGS:
7  Q.   What do you think you put in to the
8  computer about Mr. Ruffino that led to this
9  note being entitled Rapid Initial Assessment
10 with Sepsis?
11 A.   I think that comes up with every
12 patient.
13 Q.   Okay.  Does this note indicate to you
14 that you were the first point of contact with
15 this patient?
16 A.   As far as I -- yes, looking at this.
17 That would be the first charting, first --
18 the first assessment.
19 Q.   Well, I'm being simpler than maybe you
20 appreciate.  The very first line of this note
21 says: "First point of contact," and then
22 says "Yes," correct?
23 A.   Oh, okay.
24 Q.   And this is your note?
25 A.   Yes.

JOHN AND MARTHA RUFFINO v.
DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.

CAROL McCULLOCH, RN
November 29, 2017

Page 17

1 Q. Do you think you were the first point
2 of contact with this patient at the ER that
3 day?
4 A. As far as I know, I was. According to
5 what I charted here.
6 Q. Okay. And you would rely on what you
7 charted as being accurate, correct?
8 A. Yes.
9 Q. You documented the patient arrived by
10 ambulance, right?
11 A. Okay. Yes.
12 Q. Do you believe that's accurate?
13 A. If I charted it.
14 Q. Okay. Under Subjective Assessment,
15 you typed: "Reported dizziness while
16 driving. History of seizures."
17    Do you see that?
18 A. I do.
19 Q. Okay. Will you tell me if there's
20 anything in this note -- and take as long as
21 you need to read it -- that Mr. Ruffino told
22 you that he was having dizziness while he was
23 in the ER, rather than he had dizziness when
24 he was driving?
25 A. Can I read the note?

Page 18

1 Q. Please, yeah. And I thought I just
2 encouraged you to do that, but please do so.
3 A. Okay. (Witness reviews document.)
4 No, nothing.
5 Q. If Mr. Ruffino had complained to you
6 of dizziness while in the ER, you would have
7 documented it, correct?
8 A. Yes, I would have.
9 Q. Look at the Chief Complaint that you
10 documented in this note. It's in the
11 left-hand column about where your fingers
12 just were.
13 A. "Vertigo/dizziness."
14 Q. The way vertigo/dizziness is listed
15 there, is that something chosen from a menu,
16 or did you type that?
17 A. It's chosen from a menu.
18 Q. Okay. Do you know whether vertigo/
19 dizziness was chosen incorrectly from a menu
20 if you didn't type it?
21 A. If it was chosen incorrectly?
22 Q. Yes, ma'am. Or you can tell me you
23 never make mistakes in documentation, and
24 I'll rely on that.
25 A. Well, I won't say that I never made a

Page 19

1 mistake in documentation, but we had to
2 choose -- when you put in a chief complaint,
3 you had to choose something, some kind of,
4 like say it was a list, and "Vertigo/
5 Dizziness" I chose as being the closest thing
6 to his complaint.
7 Q. Okay. What was the complaint he told
8 you he was having in the ER, if you remember?
9 A. Apparently nothing, according to my
10 charting.
11 Q. Okay. And then let's look at the
12 right-hand column. Do you see the vital
13 signs you documented?
14 A. Uh-huh.
15 Q. Is that a "yes," just so she can type
16 it?
17 A. Yes. Oh, I'm sorry.
18 Q. It's okay. Everybody does that.
19 A. Yes.
20 Q. Okay.
21 A. And the respirations are obviously
22 incorrectly documented.
23 Q. Did you know that before we started
24 the deposition?
25 A. No.

Page 20

1 Q. Okay. What does it mean to you if the
2 respirations you documented as part of this
3 initial assessment is incorrect?
4 A. Well, it's an impossible number to
5 count, 189 respirations. You wouldn't be
6 alive. I don't know that anybody can breath
7 that fast.
8 Q. So how would you --
9 A. That is a number I do type in with my
10 fingers. And 8 and 9 are next to each other.
11 It's easy to hit the next key. And I -- I'm
12 sure I've done that before.
13 Q. What do you think is the best
14 explanation for why you documented the
15 respiration rate was 189 as part of your
16 initial assessment?
17 A. I just hit an extra key.
18 Q. Okay. Do you know what the actual
19 respirations you meant to document were?
20 A. Probably 18, because normal is 18 to
21 20, 22.
22 Q. Okay. Have you ever thought that a
23 normal respiratory rate was 16 to 20?
24 A. I mean, 16 could be normal, too.
25 Q. I'm just asking you. I've never

JOHN AND MARTHA RUFFINO v.
DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.

CAROL McCULLOCH, RN
November 29, 2017

Page 21

1 worked 40 years as a nurse. Do you think --
2 have you ever thought that 16 to 20 has been
3 considered a normal respiratory rate?
4 A. Well, it can be.
5 Q. Okay. When you would obtain a
6 patient's respiratory rate for this kind of
7 assessment, how would you do it, whether it
8 was with a monitor or some other device?
9 A. Sometimes with a monitor and sometimes
10 I actually would count using my watch.
11 Q. Which method do you think you used,
12 just based on your habit that existed as of
13 February 2016?
14 A. Probably by the monitor. Because our
15 monitors, it's just an observation of -- they
16 would look pretty normal in his breathing,
17 according to the rest of this. That he was
18 -- his color was good, and he was awake and
19 alert.
20 Q. If you --
21 A. He was -- he was normal otherwise.
22 Q. From looking at this note and
23 presuming the respiration rate is incorrect,
24 just incorrect as it's typed or --
25 A. Uh-huh.

Page 22

1 Q. -- for whatever reason, would you
2 characterize the patient who this note
3 corresponds to as appearing relatively normal
4 at the time of the assessment?
5 A. Would you ask that again?
6 Q. Sure. Based on what you documented in
7 this initial assessment note, does it appear
8 Mr. Ruffino was relatively normal at the time
9 of this assessment?
10 A. Yes.
11 Q. Is there anything you can tell me that
12 was abnormal at the time of your assessment
13 of him in the ER at about 9:56 on
14 February 17th?
15 A. His blood pressure was a little bit
16 high.
17 Q. Okay. Anything else abnormal?
18 A. No.
19 Q. Do you see in the left-hand column --
20 and I think your answers to this section are
21 in caps -- where you documented an Objective
22 Assessment?
23 A. Okay.
24 Q. Do you see that?
25 A. Uh-huh. Yes.

Page 23

1 Q. And you documented: "Awake and alert.
2 Color good. Moving all extremities,"
3 correct?
4 A. Yes.
5 Q. Do you agree that everything you
6 documented for his Objective Assessment was
7 good or normal?
8 A. Yes.
9 Q. Did you document a single abnormal
10 objective finding in your Objective
11 Assessment?
12 A. An abnormal one? No.
13 Q. Do you see the Priority Item a few
14 lines down from where we're looking?
15 A. Yes.
16 Q. What does it say after Priority?
17 A. "Urgent."
18 Q. Well --
19 A. 3 -- "CTAS 3/urgent."
20 Q. There we go.
21 A. Okay.
22 Q. "CTAS 3/urgent," right?
23 A. I just moved to my nursing part, I'm
24 sorry.
25 Q. That's okay. At this point, this is

Page 24

1 just a reading quiz, okay?
2 A. Okay.
3 Q. What does "CTAS" stand for in this
4 note of yours?
5 A. I don't know what the CTAS is. Three
6 is -- every patient was assigned a category,
7 1 through 5.
8 Q. Okay. Was 1 the most severe category
9 or the least severe?
10 A. One was the least severe.
11 Q. Okay. Either way, 3 is middle of the
12 road?
13 A. Three is right in the middle.
14 Q. Understood. "Urgent" is a term that
15 in normal society sounds like a big deal.
16 A. Right.
17 Q. Where did "Urgent" fall with regards
18 to ER patient priority?
19 A. Well, I'll have to kind of go
20 backwards. Five was the most severe. That
21 would be somebody that we were resuscitating.
22 Q. Okay.
23 A. Four would be somebody that needed
24 something right now, can't wait or they will
25 be resuscitating. Or possibly. And 3 was

JOHN AND MARTHA RUFFINO v.
DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.

CAROL McCULLOCH, RN
November 29, 2017

Page 25

1  they need -- they need care and they need to
2  be taken care of, but we've got just a little
3  bit of time to do it.
4  Q.   Okay.
5  A.   And I don't remember -- there were
6  numbers there how much time, but I couldn't
7  tell you right now.
8  Q.   Understood. And you determined what
9  this patient's priority was based on your
10 initial assessment, right?
11 A.   Yes.
12 Q.   And you felt he needed care but not
13 immediately, right?
14 A.   Yes.
15 Q.   If you felt he was in the midst of a
16 new stroke at that time, you would not have
17 classified him as Class 3, would you?
18 A.   No.
19 Q.   So is it fair to say that the way you
20 classified him, based on your initial
21 assessment on February 17th, that you did not
22 think he was in the midst of a stroke or had
23 recently had the onset of an acute stroke?
24 A.   Ask me that again.
25 Q.   Sure. Based on the fact you

Page 26

1  documented him as what I'm calling a
2  Class 3 --
3  A.   Okay.
4  Q.   -- do you agree that that means you
5  did not think he was having a stroke at the
6  time?
7  A.   Yes.
8  Q.   Because if you thought he was having a
9  stroke when you did the initial assessment --
10 A.   Yes.
11 Q.   -- you would have assigned him a 1 or
12 2 priority status, correct?
13 A.   Probably a 4. It goes the other way.
14 Q.   Five is the worst?
15 A.   Five is the worst.
16 Q.   Okay.
17 A.   He would have probably been a 4.
18 Q.   Okay. And a priority status 4, if you
19 would have assigned that to Mr. Ruffino,
20 would have meant what?
21 A.   To be seen right away, and he would
22 have priority over other patients that might
23 could wait an hour or so.
24 Q.   On February --
25 A.   And like I say, I don't remember the

Page 27

1  exact amount of time. I don't remember that
2  part, but....
3  Q.   On February 17th, 2016 when you saw
4  Mr. Ruffino, could you have assigned him any
5  priority status you wanted if it matched what
6  you saw on your initial assessment?
7  A.   Yes.
8  Q.   And do you stand by the priority
9  status you assigned to Mr. Ruffino, based on
10 what you saw on February 17th, based on at
11 least 40 years of nursing experience?
12 A.   Yes, I do.
13 Q.   And by February 17th, 2016, how many
14 years had you worked as an ER nurse? Not
15 just at StoneCrest, because you gave me that,
16 but the bigger number.
17 A.   Probably another 15 years.
18 Q.   Is it fair to say, then, that by
19 February 17th, 2016, you had approximately
20 30 years' experience working as an ER nurse?
21 A.   Yes.
22 Q.   And by February 17th, 2016, you were
23 experienced and fully competent to recognize
24 if an ER patient you're assessing had any
25 signs or symptoms of a stroke?

Page 28

1  A.   I do.
2  Q.   If you had any reason to think
3  Mr. Ruffino was having a stroke and a new
4  stroke when you saw him, would your
5  documentation read differently?
6  A.   Yes.
7  Q.   And in what way would it read
8  differently?
9  A.   Well, I would put any symptoms he was
10 having, such as not able to talk or not being
11 able to move an extremity, weakness.
12 Q.   Would his priority status also be
13 different?
14 A.   Yes.
15 Q.   Would your note also indicate that
16 maybe you had reached out or notified a
17 physician?
18 A.   Possibly.
19 Q.   If you thought a Code Stroke had to be
20 called, you'd have to reach out to a
21 physician?
22 A.   Yes.
23 Q.   Okay. If you observed any
24 neurological deficits during your initial
25 assessment, would it be in your note?

Page 29

1  A.   Yes.
2  Q.   Do you agree there are no neurological
3       deficits documented?
4  A.   I agree.
5  Q.   And do you agree that based on what
6       your note tells you, you know that you didn't
7       find a single neurological deficit in your
8       initial assessment of Mr. Ruffino?
9  A.   I agree.
10 Q.   Do you remember speaking with any
11      doctors about Mr. Ruffino that day?
12 A.   No. I --
13 Q.   Do you remember --
14 A.   -- I don't remember.
15 Q.   Understood. I don't know unless I ask
16      you.
17 A.   That's fine.
18 Q.   Do you remember speaking with any
19      doctors about -- or nurse practitioners about
20      Mr. Ruffino after this day?
21 A.   After this day?
22 Q.   Yes, ma'am.
23 A.   No. I don't remember talking to them
24      about, you know -- this case particularly,
25      that's what you're saying?

Page 30

1  Q.   To me "case" is something that means
2       there's a lawsuit filed in a building.
3  A.   Oh.
4  Q.   I wasn't trying to limit it to that.
5  A.   Okay.
6       MR. CARTER: And she's trying to
7       make sure you're not asking about talking to
8       the other nurses involved in the care ever.
9       So y'all are just missing each other.
10      THE WITNESS: Okay. Ask it --
11 BY MR. CUMMINGS:
12 Q.   Have you ever --
13 A.   Ask it again.
14 Q.   Sure. And that's a great thing for
15      you to say to me.
16      Have you ever spoken with a nurse
17      practitioner or a doctor about Mr. Ruffino,
18      after February 17th, 2016?
19 A.   No.
20 Q.   From your awareness of your experience
21      with stroke patients by February 2016 and
22      your note, do you have any reason to think
23      Mr. Ruffino was having a stroke at the time
24      of your initial assessment and you missed it?
25 A.   No.

Page 31

1  Q.   Those are all my questions.
2       Thank you.
3       MR. WITT: No questions.
4              EXAMINATION
5  BY MR. CARTER:
6  Q.   I have one short series.
7       You testified at the very beginning of
8       this deposition that you had worked for
9       hospitals that HCA owned for 46 years, I
10      think was your testimony. Do you recall
11      that?
12 A.   Yes.
13 Q.   You understood in February 2016 that
14      you were actually employed by StoneCrest,
15      correct?
16 A.   Yes.
17 Q.   You didn't believe that you were
18      employed by HCA directly, right, or did you
19      know?
20 A.   Well, I worked for StoneCrest --
21 Q.   Okay.
22 A.   -- which is part of HCA.
23 Q.   Your understanding is HCA is the
24      entity that owns StoneCrest, but you were
25      employed by StoneCrest?

Page 32

1  A.   Yes.
2  Q.   Okay. Good enough.
3       MR. CARTER: No further questions.
4       We'll read and sign.
5       THE COURT REPORTER: Brian, are
6       you going to order all of these?
7       (Discussion off the record.)
8       MR. CUMMINGS: I definitely want
9       the transcripts. Electronic everything.
10      (Discussion off the record.)
11      THE COURT REPORTER: And are you
12      going to order all of them as well?
13      MR. WITT: I guess I will, yeah,
14      all three.
15      (Discussion off the record.)
16      THE COURT REPORTER: And you want
17      all three, a copy of all three, right?
18      MR. CARTER: Yes, I am.
19      FURTHER DEPONENT SAITH NOT.
20      (Proceedings concluded at
21      2:18 p.m.)

JOHN AND MARTHA RUFFINO v.
DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.

CAROL McCULLOCH, RN
November 29, 2017

Page 33

```
 1           REPORTER'S CERTIFICATE
 2           I certify that the witness in the
 3  foregoing deposition, CAROL McCULLOCH, RN,
 4  was by me duly sworn to testify in the within
 5  entitled cause; that the said deposition was
 6  taken at the time and place therein named;
 7  that the testimony of said witness was
 8  reported by me, a Shorthand Reporter and
 9  Notary Public of the State of Tennessee
10  authorized to administer oaths and
11  affirmations, and said testimony, Pages 5
12  through 33 was thereafter transcribed into
13  typewriting.
14           I further certify that I am not of
15  counsel or attorney for either or any of the
16  parties to said deposition, nor in any way
17  interested in the outcome of the cause named
18  in said deposition.
19           IN WITNESS WHE
20  set my hand this 8th d
21
22
23
24  _____
              Carissa L. Boone, LCR No. 382
25            My License Expires: 6/30/2018
```

Page 34

```
 1               E R R A T A
 2
        I, CAROL McCULLOCH, RN, having read
 3  the foregoing deposition, Pages 5 through 33,
    taken November 29, 2017, do hereby certify
 4  said testimony is a true and accurate
    transcript, with the following changes (if
 5  any):
 6
    PAGE LINE    SHOULD HAVE BEEN         REASON
 7  ___  ____    _____     _____
 8  ___  ____    _____     _____
 9  ___  ____    _____     _____
10  ___  ____    _____     _____
11  ___  ____    _____     _____
12  ___  ____    _____     _____
13  ___  ____    _____     _____
14  ___  ____    _____     _____
15  ___  ____    _____     _____
16  ___  ____    _____     _____
17  ___  ____    _____     _____
18  ___  ____    _____     _____
19  ___  ____    _____     _____
20  _____
           CAROL McCULLOCH, RN
21
22
23  _____
    Notary Public
24
    My Commission Expires: _____
25
```