# In The Matter Of:

*JOHN AND MARTHA RUFFINO v.*

*DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.*

---

*ROBERT BROMLEY, RN*

*November 29, 2017*

---

*CARISSA L. BOONE, LCR, RPR*

*1209 Pine Street, Unit 409*

*Nashville, Tennessee 37213*

*615.243.1025*

*Carissaboone@gmail.com*

Original File 11 29 17 Bromley (D).txt

**Min-U-Script® with Word Index**

JOHN AND MARTHA RUFFINO v.
DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.

ROBERT BROMLEY, RN
November 29, 2017

Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JOHN RUFFINO and MARTHA           )
RUFFINO, Husband and Wife,        )
                                  )
        Plaintiffs,                )
                                  )
vs.                               ) CASE NO.
                                  ) 3:17-CV-00725
DR. CLARK ARCHER and HCA          )
HEALTH SERVICES OF                )
TENNESSEE, INC., d/b/a            )
STONECREST MEDICAL CENTER,        )
                                  )
        Defendants.                )
_____   )


        DEPOSITION OF:

        ROBERT BROMLEY, RN

        Taken on behalf of the Plaintiffs

        November 29, 2017

---

Page 2

1  APPEARANCES:
2  For the Plaintiffs:
3  BRIAN CUMMINGS, ESQ.
   Cummings Manookian, PLC
4  102 Woodmont Boulevard
   Suite 241
5  Nashville, Tennessee 37205
   615.266.3333
6  Bcummings@cummingsmanookian.com
7  For the Defendant HCA Health Services of
   Tennessee, Inc. and StoneCrest Medical
8  Center:
9  J. BLAKE CARTER, ESQ.
   Gideon, Cooper & Essary, PLC
10 315 Deaderick Street
    Suite 1100
11 Nashville, Tennessee 37238
   615.254.0400
12 Blake@gideoncooper.com
13 For the Defendant Clark Archer, M.D.:
14 BRYANT C. WITT, ESQ.
   Hall Booth Smith, PC
15 424 Church Street
   Suite 2950
16 Nashville, Tennessee 37219
   615.313.9911
17 Bwitt@hallboothsmith.com
18
19
20
21
22
23
24
25

---

Page 3

                  I N D E X
                                         Page/Line

THE WITNESS:  ROBERT BROMLEY, RN

EXAMINATION BY MR. CUMMINGS               5     4
EXAMINATION BY MR. WITT                 129    16
EXAMINATION BY MR. CUMMINGS             130    12


               INDEX OF EXHIBITS
 Exhibits        Description          Page/Line
 None.

1




2

---

Page 4

1         The deposition of ROBERT BROMLEY,
2  RN, was taken by counsel for the Plaintiffs,
3  on November 29, 2017, commencing at
4  9:24 a.m., in the offices of Gideon, Cooper &
5  Essary, PLC, 315 Deaderick Street, Suite
6  1100, Nashville, Tennessee, for all purposes
7  under the Tennessee Rules of Civil
8  Procedure.
9         The formalities as to notice,
10 caption, certificate, et cetera, are not
11 waived.  All objections, except as to the
12 form of the questions, are reserved to the
13 hearing.
14        It is agreed that Carissa L.
15 Boone, being a Notary Public and Court
16 Reporter, may swear the witness, and that the
17 reading and signing of the completed
18 deposition by the witness are not waived.
19
20
21              *    *    *
22
23
24
25

JOHN AND MARTHA RUFFINO v.
DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.

ROBERT BROMLEY, RN
November 29, 2017

Page 13

1  filed?
2  A.  That there's been a lawsuit filed.
3  And I did not remember his name, but when
4  they brought up the situation, yes, I
5  remembered.
6  Q.  What did you remember about
7  Mr. Ruffino's situation when you heard there
8  was a lawsuit but yet hadn't reviewed the
9  records again?
10 A.  I remembered the room he was in.  I
11 remembered the situation of him coming in by
12 ambulance and giving him food.
13 Q.  Before you reviewed Mr. Ruffino's
14 records again, is there anything else you
15 remembered about him?
16 A.  I remember he was driving, and they
17 picked him up and brought him in from the
18 side of the road.  That was unusual because
19 normally they have to go to a house to pick
20 people up.  I can't remember anything else at
21 this time.
22 Q.  After you learned there was a lawsuit
23 and before today, did you review
24 Mr. Ruffino's ER records?
25 A.  No.

Page 14

1  Q.  Okay.  That might then eliminate
2  anything you might say to my next question.
3  But after you learned there was a lawsuit and
4  when you either talked to anybody or reviewed
5  records, did you remember more about
6  Mr. Ruffino because something got triggered?
7  A.  Yes.
8  Q.  Tell me what you remember about
9  Mr. Ruffino that's not in the records, other
10 than that he came to the ER by ambulance,
11 that you gave him food, and that he was
12 driving before he was brought to the ER.
13 A.  You want to know what I remember after
14 I started talking to Blake?
15 Q.  Yes.  Well, what I'm trying to do is
16 get, if it can be put in a box so to speak,
17 what Mr. Bromley remembers, because we know
18 what the records say.  And I'm still going to
19 cover the records.  But sometimes there's
20 documentation about things and people who
21 were involved have memories, and for whatever
22 reason, their memories add to the information
23 that's in the records.  So I'm trying to just
24 learn what that memory list is at this point.
25 A.  Maybe as we talk, I'll remember more.

Page 15

1  And that's the way it's been going.  But I
2  can't remember more if we don't bring up
3  things that have happened.  Does that make
4  sense?
5  Q.  It absolutely does.
6  As an ER nurse, have you seen patients
7  who presented with stroke-like symptoms?
8  A.  Yes.
9  Q.  As an ER nurse, have you done
10 neurological checks of patients at certain
11 time intervals?
12 A.  Yes.
13 Q.  In February 2016, do you believe you
14 were familiar with what types of signs or
15 symptoms could exist that might indicate a
16 patient was in the midst of a new stroke?
17 A.  Yes.
18 Q.  In February 2016, what were the signs
19 and symptoms you knew a patient might have
20 that could indicate they were in the midst of
21 a stroke or recently had a new stroke?
22 A.  There are a lot of -- of them.  The
23 main one that I would look for is facial
24 droop or unable to use a whole side of their
25 body.  Those are the top two that I would

Page 16

1  think stroke.
2  Q.  Sure.  Would slurred speech be
3  something that you knew in February 2016
4  could be indicative that someone was in the
5  midst of a stroke or recently had a new
6  stroke?
7  A.  It -- it could be, but there's other
8  things that that could be involved with.
9  Q.  Sure.  Understood.  I'm not trying to
10 ask it in a way or have you say something in
11 a way that if X exists, it can only be due to
12 a stroke and has to mean there's a stroke,
13 okay?
14 A.  Yes.
15 Q.  Just so you know where my questions
16 are coming from.
17 In February 2016, what did you
18 understand was the requirement at StoneCrest
19 that applied to you with regards to how
20 timely your documentation about a patient had
21 to be?
22 A.  Can you repeat that one more time?
23 Q.  Absolutely.  It's going to sound
24 different --
25 A.  Yeah.

JOHN AND MARTHA RUFFINO v.
DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.

ROBERT BROMLEY, RN
November 29, 2017

Page 53

1  the way to work," that's what you're talking
2  about, right?
3  Q.   No.
4  A.   Okay. I'm sorry.
5  Q.   I'm only asking you about the one line
6  in this note you made where it says: "Onset
7  of Current Episode: Less than one hour ago."
8  A.   Right. I see that.
9  Q.   When you --
10 A.   "Intermittent," right?
11 Q.   No, no, no.
12 A.   Are you talking about --
13 Q.   Just on --
14 A.   -- "less than an hour ago"?
15 Q.   Yeah. If you could draw a horizontal
16 line, I'm only on the line that says: "Onset
17 of Current Episode: Less than one hour ago."
18 A.   Right.
19 Q.   Okay.
20 A.   I'm not -- I'm only doing that one.
21 Q.   That's in your note?
22 A.   It is.
23 Q.   And it's a note you made when you had
24 time to make it?
25 A.   At 12:30, right.

Page 54

1  Q.   Is the information where it says "less
2  than one hour ago," was that accurate when
3  you made this note?
4  A.   No.
5  Q.   Where within one hour of 10:00 a.m. is
6  when that episode had its onset?
7  A.   Okay. So let me get -- make sure
8  we're correct here. So you're saying this
9  "less than one hour ago," what time would
10 that be? I'm thinking it would be around
11 9:00 a.m. --
12 Q.   Okay.
13 A.   -- okay? So that's what I'm thinking.
14 Not 12:2- -- on using the 12:29 time.
15 Q.   I'm totally with you.
16 A.   Okay. So I think that's where we were
17 confused.
18 Q.   Okay. So I --
19 A.   Or I was confused.
20 Q.   That's okay. When you made this note
21 at 12:29, part of what you were trying to
22 document and document accurately is you
23 thought that when you saw the patient at
24 10:00 a.m. --
25 A.   Uh-huh.

Page 55

1  Q.   -- the onset of the episode you saw at
2  that time had started less than one hour
3  before 10:00 a.m., correct?
4  A.   Yes. Yes. And that's a long way to
5  get to where we're at.
6  Q.   If you turn the page to Page 12, do
7  you see that it's a continuation of the same
8  note?
9  A.   "Level of Consciousness," it starts
10 with -- is where you're at?
11 Q.   Correct.
12 A.   Okay.
13 Q.   But that it's the same note, including
14 because there's no new recorded time?
15 A.   It's the same thing before you hit
16 Enter.
17 Q.   All right.
18 A.   It keeps going down through there.
19 Q.   The portion of your 12:29 note that
20 started on Page 11 but we're at on Page 12
21 now, do you agree that every neurological
22 item you documented about was normal as of
23 10:00 a.m.?
24 A.   Yes, sir.
25 Q.   Okay. If Mr. Ruffino had any abnormal

Page 56

1  neurological signs or symptoms at 10:00 a.m.,
2  would you have documented it in this note?
3  A.   Yes, at 10:00. When I saw him at
4  10:00 a.m., yes.
5  Q.   Right.
6  A.   And, you know, there may be a place to
7  say "no" or "yes," but if something like that
8  happens, it's something that would probably
9  go in all caps. You know what I mean? That
10 I would type in saying what happened.
11 Q.   Okay. I want to look at the next
12 note. It's on Page 12, left-hand column,
13 where at 12:29, you entered a note about
14 something that happened at 10:08. Do you see
15 that?
16 A.   The same column over here?
17 Q.   Yes, sir.
18 A.   12:2- -- yeah, at 10:08, uh-huh.
19 Q.   Okay. And is this a Swallowing
20 Screens Assessment that you did around 10:08
21 that day?
22 A.   Yes, sir.
23 Q.   And the second line in that note says:
24 "Acute stroke/neurological DX" -- and that
25 means diagnosis, correct?

JOHN AND MARTHA RUFFINO v.
DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.

ROBERT BROMLEY, RN
November 29, 2017

Page 57

1  A.    Yes, sir.
2  Q.    And you put the capital letter "N"
3  there, right?
4  A.    Yes, sir.
5  Q.    Does that mean that at 10:08 on
6  February 17, 2016, from a nursing
7  perspective, you did not think the patient
8  had an acute stroke or any neurological
9  diagnosis?
10 A.    By this, yes.
11 Q.    Okay.  When you say "by this, yes,"
12 this is your note, correct?
13 A.    It is my note.
14 Q.    And it's a note that, per what you've
15 told us, you made those notes when you had
16 time to?
17 A.    Yes.
18 Q.    Okay.
19 A.    But -- at this time, yes.
20 Q.    Okay.
21 A.    You know, you have to understand that
22 I've gone through all this other -- I know so
23 much more now.  It's just hard to think back
24 about what I was doing then and what I know
25 now.

Page 58

1  Q.    Okay.
2  A.    Does that make sense?
3  Q.    Sure.
4  A.    All right.
5  Q.    This same note where there's a
6  category "Facial Weakness/Slurred Speech," do
7  you see that?
8  A.    Facial -- yes.
9  Q.    And it -- you put the capital letter
10 "N" there, which means no, correct?
11 A.    Yes, sir.
12 Q.    Do you agree that this note, to the
13 extent it makes any references to a
14 neurological sign, symptom or condition,
15 documents that all of those things were
16 completely normal at 10:08 a.m. that day?
17 A.    Yes.
18 Q.    Okay.  Below that there's a note made
19 at 1601 by you referring to events at 10:15.
20 Do you see that?
21 A.    Yes.
22 Q.    And that note starts at the bottom
23 left column of Page 12 and continues to the
24 right column, correct?
25 A.    Yes, sir.

Page 59

1  Q.    Why was there --
2  A.    Six hours?
3  Q.    Well --
4  A.    Eight hours?
5  Q.    -- there's five hours and 46 minutes,
6  but we're looking at the same thing.  Why was
7  there almost a six-hour difference between
8  when the event occurred that's in this note
9  and when you had time to make the note?
10 A.    I was indisposed, I assume.  Drawing
11 blood, taking care of another sick patient.
12 I don't know what I was doing at the time for
13 those other hours.
14 Q.    Okay.  When you were in the chart at
15 12:29 making the 10:08 entry -- note about
16 10:08 we just looked at above -- do you see
17 that?
18 A.    Yeah, the 10:08/12:29, yeah.
19 Q.    Right.  That --
20 A.    Yeah, this is the one same one at the
21 lower....
22 Q.    Right.  Could you also at 12:29 have
23 documented this 10:15 Vertigo/Dizziness
24 Assessment or reassessment?
25 A.    Well, this is a swallow screen,

Page 60

1  though.  Oh, that's done up there.  I guess
2  this one is down here.  Things happen pretty
3  fast.  I mean, if you're sitting there and --
4  I feel like I'm talking too much.
5        But you're saying -- asking me why it
6  took six hours to do this.  If you're sitting
7  there and an ambulance comes in -- and I've
8  already said that I didn't think he was, you
9  know, a high priority here, evidently, by him
10 not having a stroke.
11 Q.    Right.
12 A.    And another one -- so another
13 ambulance comes in that you haven't seen even
14 yet, and you're the only one at the desk, and
15 maybe it's your room, maybe it's not your
16 room, then you have to go to the next
17 patient.  And it may take a while to get a
18 patient done, then something else happens.
19 So you can't just keep charting.  You have to
20 get off, press Enter, click out with your
21 little badge and take off.  So it -- it's
22 pretty important that you get the next
23 patient first before you do charting.
24 Q.    Okay.  Staying on Page 12, see the
25 Swallowing Screening Assessment --

JOHN AND MARTHA RUFFINO v.
DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.

ROBERT BROMLEY, RN
November 29, 2017

Page 61

1  A.  Uh-huh.
2  Q.  -- that you documented at 12:29 as
3  done at 10:08?
4  A.  Yes, sir.
5  Q.  Do you agree that if you're in the
6  chart at 12:29 to make that note, that meant
7  you had the time to be in the chart then, or
8  were you neglecting patient care?
9  A.  His -- this patient?
10 Q.  Anybody's.  Were you in the chart and
11 ignoring ambulances and patients and codes?
12 A.  No, I wasn't ignoring --
13 Q.  Okay.
14 A.  -- anything.
15 Q.  I don't think so.  Right.  You're
16 making that note at 12:29 because you had
17 time to make it, right?
18 A.  Yes, sir.  Yes, sir.
19 Q.  If you had time to make the Swallowing
20 Screening Assessment note at 12:29, why was
21 it not until 1601 that you made the
22 Vertigo/Dizziness Assessment note below that
23 that you documented you had done by 10:15?
24 A.  Oh, you're saying I was in the room at
25 10:15.  You know, I may have mistimed there

Page 62

1  at 10:15, but I definitely did this
2  assessment here.
3          MR. CARTER:  You guys -- you guys
4  are missing each other.  He's asking you if
5  you were documenting the 10:08 assessment at
6  12:29, how come you didn't document the 10:15
7  assessment also at 12:29?  That's all he
8  wants to know.
9          THE WITNESS:  Oh, because I was
10 doing something else.  I had to go and do
11 something.  I couldn't just stay there and
12 chart.
13 BY MR. CUMMINGS:
14 Q.  Okay.  So at --
15 A.  Something else happened.
16 Q.  -- at 12:29, somehow you decided you'd
17 document the Swallowing Screening Assessment
18 that had already occurred, but wait to
19 document the Vertigo/Dizziness Reassessment
20 that had already occurred?
21 A.  Yes, sir.
22 Q.  Okay.
23 A.  I did it all while I was in the room.
24 Q.  Okay.
25 A.  Just -- I couldn't just stay there and

Page 63

1  stay on the computer while there's another
2  ambulance -- I don't know what kind of
3  ambulance it was.  But you just can't let the
4  ambulance sit there.
5  Q.  Okay.  Do you remember another
6  ambulance coming that day that you're
7  thinking of?
8  A.  No, sir.
9  Q.  Okay.  Going back to your comment that
10 you may have mistimed the 10:15 reference in
11 your 1601 note, how far off could that
12 mistiming be?
13 A.  I don't know that it was.
14 Q.  Okay.
15 A.  I was just trying to answer your
16 question.  I thought we were on a different
17 answer.
18 Q.  That's okay.  Do you know whether the
19 1601 time that you made the Vertigo/Dizziness
20 Reassessment note was after the patient had
21 been diagnosed with a stroke?
22 A.  I don't recall when or if he was
23 diagnosed with a stroke.  I didn't -- I don't
24 know.
25 Q.  Okay.  I want to ask you about some of

Page 64

1  the entries in this 1601 note.
2  A.  Okay.
3  Q.  Where it says:  "Ongoing Signs and
4  Symptoms:  Dizziness," do you see that?
5  A.  Uh-huh.
6  Q.  Did you type that word or was it
7  auto-populated?
8  A.  That auto-populates because that's
9  what he's there for.
10 Q.  Okay.  Did you type anything in the
11 1601 note about what you reportedly saw at
12 10:15 that is any kind of neurologic
13 abnormality?
14 A.  I don't see anything in the -- no,
15 sir.
16 Q.  Okay.  Your next note -- and by
17 "next," I mean it's right-hand column on the
18 same page -- is a 10:57 note referencing a
19 10:52 encounter.  Do you see that?
20 A.  Yes, sir.
21 Q.  And so this note, you made within five
22 minutes of the event in question.  Do you
23 agree with my math?
24 A.  Yes, sir.
25 Q.  Okay.  Does that indicate to you that

JOHN AND MARTHA RUFFINO v.
DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.

ROBERT BROMLEY, RN
November 29, 2017

Page 73

1 Q. So at 12:29 when you're in the chart
2 making other entries we looked at, did you
3 just forget to document what's in this 1603
4 note that had already occurred by 10:00 a.m.?
5 A. This is a totally different screen.
6 You got to go to a different place in
7 MEDITECH to find this.
8 Q. Okay.
9 A. Yes, that's correct.
10 Q. Okay. By February 2016, you had
11 worked in the StoneCrest ER for five years?
12 A. Yes, sir.
13 Q. Okay. Were you a novice with MEDITECH
14 on February 17th, 2016?
15 A. With this particular dizziness/vertigo
16 diagnosis that MEDITECH makes for you, yes.
17 Q. Okay. The dizziness/vertigo diagnosis
18 in the chart during your involvement was made
19 by MEDITECH?
20 A. Was made by -- Carol picks a
21 diagnosis.
22 Q. Right.
23 A. You have to pick one.
24 Q. Carol, who's not a doctor, right?
25 A. Yes.

Page 74

1 Q. And MEDITECH is not a doctor, correct?
2 A. Yes.
3 Q. So by 10:00 or 11:00 or 12:00 --
4 10:00 a.m., 11:00 a.m. or 12:00 p.m. on
5 February 17th, do you have any reason to
6 think a doctor at StoneCrest had diagnosed
7 this patient with vertigo or dizziness?
8 A. I don't recall that, no.
9 Q. Okay. And nurses can't make medical
10 diagnoses, correct?
11 A. Yes, sir.
12 Q. And software programs can't make
13 medical diagnoses, correct?
14 A. Yes, sir.
15 Q. If we stay on Page 15 and look at this
16 1603 entry, do you agree that every
17 neurological item documented there is
18 documented by you to be perfectly normal?
19 A. We're still on Page 15?
20 Q. Yep.
21 A. Other than his blood pressure being a
22 little elevated, everything's normal.
23 Q. Okay. Do you think -- oh, I missed
24 you. I'm talking about the 1603 entry, okay?
25 A. So just this one right here

Page 75

1 (indicating)?
2 Q. Yes, sir. And first of all, what is
3 the 1603 entry? Is it a neuro check?
4 A. It is a neuro check.
5 Q. Okay. Why were you doing a neuro
6 check at 10:00 a.m. on a patient you didn't
7 think was a stroke patient?
8 A. At 1603, Dr. Raad had come to me and
9 -- or I think it may have been before 1603.
10 I don't know exactly when it was. Dr. Raad
11 had come and said that he wanted to rule out
12 a stroke. Or -- or something to that extent.
13 And that's why I started doing this protocol
14 thing.
15 Q. At what time do you think Dr. Raad
16 asked you to do neuro checks?
17 A. I don't remember what time it was.
18 Q. In your experience when a physician
19 asks that neuro checks be done, is there
20 usually a corresponding order?
21 A. Usually there is a corresponding
22 order, yes, sir.
23 Q. And --
24 A. In the chart, yes, sir.
25 Q. Okay. And let's look at Page 43 of

Page 76

1 this chart. Just let me know when you get
2 there.
3 A. Yes, sir. I'm there.
4 Q. Okay. Do you see in the middle of
5 Page 43, there's an order for neuro checks
6 that's documented?
7 A. In the middle?
8 Q. Yes, sir.
9 A. "Order. Enter room."
10   MR. CARTER: (Indicating.)
11   THE WITNESS: All right. You got
12 to understand. I don't see this. This is
13 not something I see.
14 BY MR. CUMMINGS:
15 Q. Understood.
16 A. So where does it say "Order" -- "Order
17 Number, Update, Time, 2/17." I guess it's
18 1414, 2/17/16.
19 Q. I was going to get to that. But do
20 you at least see that this somehow documents
21 about a Neurological Check Order given on
22 February 17th, 2016 about Mr. Ruffino?
23 A. Neurological check frequency with the
24 vital signs, yes, sir, I see that.
25 Q. You lost me when you just mentioned

JOHN AND MARTHA RUFFINO v.
DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.

ROBERT BROMLEY, RN
November 29, 2017

Page 77

1  vital signs.
2  A.  Well --
3  Q.  Oh, I see where --
4  A.  -- it's down there --
5  Q.  Right. But where -- in the upper
6  portion of this middle-of-the-page entry, do
7  you see where it says: "Neurological Check"
8  under Procedure Name?
9  A.  Yes, sir.
10  Q.  Okay. And you see, if you carry that
11  line out to the right horizontally, the time
12  is 1414?
13  A.  Yes, sir.
14  Q.  Which is four hours and 14 minutes
15  after 10:00 in the morning, correct?
16  A.  Yes, sir.
17  Q.  If this is the only order about
18  neurological checks and you don't own a time
19  machine, why were you doing a neuro check at
20  10:00 a.m. if the order for neuro checks
21  wasn't issued for four hours later?
22      MR. CARTER: Object to the form.
23      You can answer.
24      THE WITNESS: I was in the room
25  with him.

Page 78

1  BY MR. CUMMINGS:
2  Q.  Okay.
3  A.  I was able to see that he wasn't
4  slurred speech. I know he wasn't slurred
5  speech. He was moving his arms, moving his
6  legs. At one point he got up and walked to
7  the bathroom, changed his clothes. I could
8  do a neuro check by that. I talked to him.
9  Q.  Right.
10  A.  I can do neuro checks by that.
11  Q.  Do you agree this neuro check order is
12  being documented as being given by
13  Dr. Archer?
14  A.  "ARCTL" is Dr. Archer.
15  Q.  Okay. And Dr. Archer, to your
16  knowledge and memory, was not involved in the
17  patient's care before noon that day, correct?
18  A.  Archer was not there when he got
19  there. I know that for sure.
20  Q.  Okay. Is what happened with the neuro
21  checks you documented, that at 10:00 or 10:15
22  or 10:30, 10:45, 11:00 or noon, there wasn't
23  an order for neuro checks, but one was issued
24  later --
25  A.  Uh-huh.

Page 79

1  Q.  -- and you then chose to document what
2  you think the patient's neurological status
3  was at those earlier points in time?
4  A.  I'm sorry. Can you back up a little
5  bit? I missed the first part.
6  Q.  Sure. Is what you think happened with
7  regards to the neuro checks you documented
8  from 1600 hours after, when you made the
9  notes, that is, that a doctor issued an order
10  for neuro checks after 1400 hours that day,
11  you learned of the order, and for whatever
12  reason, decided to go back and document what
13  you thought the patient's neurological status
14  had been at 10:00, 10:15, 10:30, 10:45, 11:00
15  and 12:00 even though you hadn't documented
16  it around that time?
17  A.  Yes, that's why I went back and
18  documented.
19  Q.  Okay. Do you agree you were not
20  actually doing neuro checks at 10:00 or 10:15
21  or 10:30, but instead went and documented
22  once you saw an order what you thought those
23  checks would have led to because you were in
24  the room around that time?
25  A.  No.

Page 80

1  Q.  Okay.
2  A.  I -- I think what I did was
3  appropriate.
4  Q.  Did you do neuro checks at 10:00,
5  10:15, 10:30, 1045, 11:00 and 12:00 for this
6  patient?
7  A.  Yes.
8  Q.  If this patient was not a stroke
9  patient and you did not have an order at that
10  time to do those neuro checks that way and
11  there hadn't been a Code Stroke called by a
12  doctor, why were you doing neuro checks at
13  those times in those intervals?
14  A.  I think we're getting confused on
15  neuro checks. I documented him able to do
16  those things because I saw him up in the
17  room, walking around, talking to me.
18  Q.  Did you do -- what is a neuro check?
19  Tell me that.
20  A.  It's testing nerves.
21  Q.  To test cranial nerves, what do you
22  have to do?
23  A.  Tongues, smile, eyes.
24  Q.  Have them try to do an activity and
25  you observe their ability to perform it?

JOHN AND MARTHA RUFFINO v.
DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.

ROBERT BROMLEY, RN
November 29, 2017

Page 81

1  A.  Uh-huh.
2  Q.  Is that a "yes"?
3  A.  Yes.
4  Q.  Did you ask Mr. Ruffino to go through
5  physical motions or activities with his
6  tongue or face for the purposes of a neuro
7  check at 10:00 a.m. this day?
8  A.  I talked to him. We talked about
9  everything. I didn't see a facial slur -- I
10 mean a speech slur, a facial droop. Me being
11 in the room, seeing him walk back and forth,
12 changing his clothes was enough to be -- pass
13 all of those things.
14 Q.  I understand the words you're saying,
15 but I'm going to ask a similar question
16 again.
17     At 10:00 a.m., did you go through the
18 steps you would go through as a nurse to
19 perform a neuro check on a patient like
20 Mr. Ruffino, including asking him to do
21 things with his tongue or with his face, or
22 is what you documented for 10:00 a.m. on Page
23 15 based on what you observed in a non-neuro
24 check but what you thought gave you some
25 information comparable to a neuro check?

Page 82

1  A.  I documented what I saw him do.
2  Q.  Okay. Did you perform a neuro check
3  of this patient at 10:00 per the standard of
4  care that applied to a nurse?
5  A.  Per the standard of care by a nurse,
6  yes.
7  Q.  Okay. What did you do when you
8  performed your neuro check at 10:00 a.m.,
9  that complied with the standard of care?
10 A.  I had him take -- talk to me. No, I
11 -- at 10:00 a.m. That was when I first saw
12 him?
13 Q.  I'm just looking at your 1603 note on
14 Page 15.
15 A.  I don't recall exactly. I remember
16 talking to him and him getting up and walking
17 to the restroom as soon as I came in the
18 room.
19 Q.  Talk us through the steps you go
20 through when you perform a neuro check on an
21 ER patient.
22 A.  "What's your name? Who's the
23 President? Where do you live? Who is this,"
24 if there's a family member or friend in the
25 room. "Smile. Hold your hands out. Hold

Page 83

1  your legs out."
2  Q.  If you did all of those things for any
3  patient in an ER on February 17, 2016, would
4  that constitute performing a neuro check?
5  A.  If I did that to anyone in the ER,
6  yes, that is a neuro check.
7  Q.  Did you perform that type of neuro
8  check on Mr. Ruffino around 10:00 a.m. on
9  February 17th, 2016?
10 A.  I saw him walk to the bathroom. He
11 could lift his legs. I saw him swing his
12 arms. He told me his name. So those things
13 that I asked were supposed to be done were
14 done.
15 Q.  Are you saying you did perform a
16 standard neuro check at 10:00 a.m., or you
17 observed things that you extrapolated to the
18 information in this note?
19 A.  I'm saying I did a neuro check.
20 Q.  Okay. Why did you do a neuro check at
21 10:00 a.m. of a patient you did not have an
22 order to do one for and who you did not think
23 was in the midst of a stroke?
24 A.  At some point a doctor told me that he
25 thought he was having a stroke, so I back --

Page 84

1  went back and put in things that happened at
2  10:00.
3  Q.  I understand you just told me why you
4  went and put this in there. I'm trying to
5  ask why you did a neuro check at 10:00 a.m.
6  for this patient?
7  A.  Because the doctor ordered it at 1414.
8  Q.  Okay. I was trying to be funny before
9  when I mentioned a time machine, but you're
10 actually making it relevant. Are you saying
11 you went back at -- to 10:00 a.m. to do a
12 neuro check after a physician ordered one
13 after 1400 hours?
14 A.  I'm saying I recalled by memory what
15 happened at 10:00.
16 Q.  Why did you do a neuro check on this
17 patient at 10:00 a.m.?
18 A.  There was an order for it at 1414. At
19 some point, the doctor told me to do it.
20 Q.  I'm smiling because we're missing each
21 other and I don't know how else to ask my
22 question.
23 A.  Well, there's an order for it, so I
24 did it.
25 Q.  Right. But if the order's not till

JOHN AND MARTHA RUFFINO v.
DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.

ROBERT BROMLEY, RN
November 29, 2017

Page 85

1400 hours, you agree that can't affect what
you did at 10:00 a.m., absent a time machine?
A. Uh-huh.
Q. "Yes"?
A. Well, I just charted what I did at
10:00.
Q. Right. And you did a neuro check on
this patient at 10:00 a.m. that day in your
ER, right?
A. Yes. I -- I assume that's what would
be charted, yes.
Q. Well, you charted it.
A. I did.
Q. Okay. And you charted that it
occurred at 10:00 a.m.?
A. Yes.
Q. Why, when it was 10:00 a.m., did you
do a neuro check on this patient?
A. I really think we are missing each
other. I did what I did because that was
ordered at such-and-such a time or the doctor
told me to. I don't know what you're getting
at there.
Q. Are you unable to tell us why you did
a neuro check on this patient at 10:00 a.m.?

Page 86

A. I'm telling you. It's because the
doctor ordered it.
Q. Four hours later.
A. At 1414, yeah, or whenever he told me.
Q. Do you not see the illogical issue
there? It sounds like you're telling me you
did something about 10:00 a.m. because
someone ordered it four hours later.
A. I'm telling you what I did.
Q. Right. And you did a neuro check at
10:00 a.m.?
A. Uh-huh.
Q. Is that a "yes"?
A. Yes.
Q. Why did you do a neuro check at
10:00 a.m. on this patient?
A. By memory --
Q. Right.
A. -- I can say what happened and that's
what I did.
Q. Right. Why did you do a neuro check
on this patient at 10:00 a.m. that day?
A. I do it on everyone.
Q. Okay.
A. Is that bad? I mean, I can see what's

Page 87

going on with people.
Q. So you do neuro checks on every ER
patient?
A. Is that what you wanted?
Q. I need to ask if you do neuro checks
on every ER patient?
A. If there is a neuro check ordered,
then I can do it.
Q. Okay. Do you do neuro checks on every
ER patient?
A. If there's one ordered.
Q. Okay. Is a different way to answer
that that you do not do neuro checks on every
ER patient?
A. No.
Q. You don't?
A. That's not a different way to ask it.
Q. Okay.
A. If there's an order for it, then I
chart it.
Q. Okay. Let's forget about what you
document --
A. Yes.
Q. -- and forget about what's ordered.
In February 2016, did you do neuro

Page 88

checks every 15 minutes in the first hour for
every ER patient?
A. I didn't document them.
Q. Did you do them?
A. I wasn't in the room every 15 minutes
either.
Q. I'll get to that.
A. No.
Q. What I'm trying to learn is regardless
of what an order said in February 2016, did
you do neuro checks every 15 minutes or so on
-- in the first hour you cared for every one
of your ER patients?
A. I didn't chart them, but I do neuro
checks on everyone. It's part of the
procedure when you come to the emergency
room. If they're awake, alert and oriented.
If they can breath, even and unlabored; if
they can move all extremities.
Q. Okay. So if you told us earlier in
this deposition that you don't do neuro
checks every 15 minutes in the first hour if
a patient is not a stroke patient and there's
no such order, if you said that, is that
wrong?

JOHN AND MARTHA RUFFINO v.
DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.

ROBERT BROMLEY, RN
November 29, 2017

Page 89

1 A. That's hard to remember. Okay. Can
2 you ask it a different way? Because it was,
3 like, no and yes together there.
4 Q. If you've already told us in your
5 sworn testimony today that you would not do
6 neuro checks on an ER patient the first 15 --
7 every 15 minutes in the first hour if they
8 were not a stroke patient and if you didn't
9 have an order to do so, is that testimony
10 false?
11 A. I'm still missing it. Okay. Can you
12 ask it a little bit at a time?
13 Q. Sure. Do you think you've been honest
14 with all your answers so far?
15 A. I have been honest.
16 Q. Do you want us to rely on your honest
17 answers so far?
18 A. I do.
19 Q. If your honest answers thus far might
20 completely contradict one another --
21 A. Oh, God.
22 Q. -- what do you suggest anybody do?
23 A. My honest answers are attempted to be
24 just that, honest. And I can't understand
25 what you're saying sometimes because it's

Page 90

1 pretty long and it's, like, they're
2 different --
3 Q. Right.
4 A. -- as far as when they come out.
5 Q. Let me try a short one, one more time.
6 A. Okay.
7 Q. Why did you do a neuro check on this
8 patient at 10:00 a.m. on February 17, 2016?
9 A. Because it was ordered. I don't know
10 what you want me to say.
11 Q. Do you agree the neuro check you did
12 at 10:00 a.m. on February 17th, per a
13 physician order, revealed completely normal
14 neurological findings?
15 A. Yes, 10:00 a.m.
16 Q. Did you have any reason to think this
17 patient had a sign or symptom of a stroke at
18 10:00 a.m.?
19 A. No.
20 Q. If you thought this patient began to
21 demonstrate signs or symptoms of a stroke
22 under your care, you would have told a
23 physician, correct?
24 A. Yes.
25 Q. Because you would have wanted a Code

Page 91

1 Stroke called, correct?
2 A. Yes.
3 Q. Let's look at the neuro check you did
4 at 10:15 that's documented on Page 15. It
5 starts at the very bottom of the left column.
6 A. Fifteen?
7 Q. Yes, sir.
8 It starts at the very bottom of the
9 left column and then carries over. But do
10 you see the 10:15 neuro check you documented?
11 A. Oh, yeah, there (indicating).
12 Q. Okay. And you documented that at
13 1604, correct?
14 A. Yes, sir.
15 Q. Do you know if 1604 is after the
16 patient had been diagnosed with a stroke?
17 A. No.
18 Q. Okay.
19 A. I don't know.
20 Q. When you document in these neuro
21 checks about the status of the cranial
22 nerves, what is that information based on?
23 A. Able to talk without speech being
24 slurred. If you can move your tongue side to
25 side, that's -- your speech won't be slurred.

Page 92

1 There's a gag reflex. The pupil size. He's
2 already had his swallow screen done, so
3 there's that done.
4 Q. Do you agree that what you documented
5 for the 10:15 neuro check on Page 15
6 documents that everything you checked and
7 knew about was completely normal?
8 A. Yes.
9 Q. And you stand by that, correct?
10 A. Yes.
11 Q. Let's look at the bottom of this page.
12 Do you see a neuro check -- it starts at the
13 bottom of 15 but carries over to 16 -- where
14 at 1606, you documented a neuro check you did
15 at 10:30?
16 A. Yes, sir.
17 Q. That 10:30 neuro check that you
18 performed on this patient indicated that
19 everything you checked and knew about was
20 completely normal, correct?
21 A. Yes, sir.
22 Q. In fact, you made a comment --
23 A. That's what it says.
24 Q. You made a comment at the end of the
25 10:30 note. And if it's in all caps, that

JOHN AND MARTHA RUFFINO v.
DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.

ROBERT BROMLEY, RN
November 29, 2017

Page 93

1 means that you typed it, correct?
2 A. Usually, yes, sir.
3 Q. Well, who else would be typing the
4 comment in your 10:30 note?
5 A. That's right, yeah. It's mine.
6 Q. Okay. The comment says: "Patient up
7 and ambulated to restroom. S/E gait."
8    Do you see that?
9         MR. CUMMINGS: And "gait" is
10 g-a-i-t.
11 BY MR. CUMMINGS:
12 Q. What is S/E?
13 A. Steady/Even.
14 Q. So that comment you made in addition
15 to the perfectly normal neurological findings
16 adds how well he's doing, correct?
17 A. Yes, sir.
18 Q. He's walking around, going places with
19 a steady and even gait, correct?
20 A. Yes, sir.
21 Q. Does this note you made to be accurate
22 as of the patient status at 10:30 indicate he
23 was completely neurologically normal at that
24 time?
25 A. Yes, sir.

Page 94

1 Q. Let's look at your 10:45 neuro check
2 note. It's at the bottom of the left column
3 on Page 16. Do you see that?
4 A. Page 16?
5 Q. Yes, sir, bottom left column.
6 A. Yes.
7 Q. This note is one you entered at 1607
8 about your 10:45 neuro check, correct?
9 A. Yes, sir.
10 Q. And I want to make sure I'm not
11 skipping something. You knew in February
12 2016 how to do a thorough and complete neuro
13 check, right?
14 A. Yes, sir.
15 Q. Got it.
16    This note for 10:45 documents that
17 everything you tested and knew about at 10:45
18 for that patient neurologically was
19 completely normal, right?
20 A. Yes.
21 Q. Okay. If I get to something where one
22 of your entries showed there's an abnormality
23 for him neurologically that you entered, will
24 you tell me when we get to that?
25 A. Oh, yes, sir, I'll tell you.

Page 95

1 Q. Okay. If we turn the page to Page 17
2 -- and are you there already?
3 A. I am, yes, sir.
4 Q. Do you see the note you entered? It's
5 in the left-hand column, where it's 1608, you
6 documented about your 11:00 a.m. neuro check
7 for the same patient?
8 A. 1608, yes, sir.
9 Q. Do you agree that your 11:00 neuro
10 check for this same patient revealed that
11 everything you checked and knew about
12 neurologically for him was completely normal?
13 A. Yes, sir.
14 Q. Okay. Right below that, do you see
15 the neuro check note you made at 1702
16 regarding your noon neuro check for the same
17 patient?
18 A. Yes, sir.
19 Q. Do you agree that everything you
20 documented on Page 17 regarding what you
21 found and knew about his neurological status,
22 when you did your noon neuro check, indicates
23 everything was completely normal?
24 A. Yes. Everything says normal power --
25 Q. Okay.

Page 96

1 A. -- at 3 milliliters.
2 Q. Right below where that neuro check
3 ends, do you see the vitals you documented at
4 12:22?
5 A. Yes, sir.
6 Q. If you're in the chart documenting
7 vitals at 12:22 as they existed at 12:22, do
8 you agree that means you had time to be in
9 the patient's room and be in the chart at
10 12:22 that day?
11 A. No.
12 Q. Why not?
13 A. There's 20 minutes' difference. I
14 mean, we could get 20 new patients in 22
15 minutes. I mean, it's pretty important to
16 get those other ones taken care of,
17 especially while --
18         MR. CARTER: You've missed each
19 other again.
20         THE WITNESS: Oh, did I?
21         MR. CARTER: Yeah.
22         THE WITNESS: I thought he meant
23 from -- if I was in the chart at 12:00 -- if
24 I was in the room at 12:00, why didn't I
25 document it till 12:22?

JOHN AND MARTHA RUFFINO v.
DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.

ROBERT BROMLEY, RN
November 29, 2017

Page 97

    MR. CARTER: Well, he may have been getting there, but all he wants to know is if you -- at 12:22, you documented something that happened at 12:22, do you agree that you had some time to make some documentation at 12:22?
    THE WITNESS: Yeah. I'm there.
    MR. CARTER: Okay.
BY MR. CUMMINGS:
Q. And what was more important to document at 12:22: Vital signs you knew about or a neuro check you knew about?
A. They're -- I don't really -- if I -- I don't know.
Q. Okay. Do you agree that the vital signs you documented at 12:22 were very timely documented?
A. They happened, yeah, the same time.
Q. Okay. And if we go down that column to the information about the IV you documented, do you see that?
A. Yes, sir.
Q. You documented at 12:23 what the status was of the IV a minute earlier. Do you see that?

Page 98

A. Time IV started 10:30. What was your question again?
Q. Do you agree that at 12:23, per this entry on Page 17 --
A. Uh-huh.
Q. -- you documented the status of the IV as it existed at 12:22?
A. Sure, I guess. Yeah. I don't recall if he already had an IV or if I started that. It looks like I started -- Tony. Yeah, I started it.
Q. From looking -- we went through a bunch of your neuro checks, and we can go back to look at the noon one, but do you agree from looking at your notes about the neuro checks you did on that patient, that he, as of noon that day under your ongoing watch, was completely neurologically normal?
A. Yes, sir.
Q. Okay. If you'd turn to Page 18 --
A. Yes, sir.
Q. -- and look at the right-hand column.
A. Uh-huh.
Q. Do you see the neurological check documented by you at 1703, but to reference

Page 99

the check you did at 1300 hours or 1:00 p.m.?
A. Yes, "slurred speech." I see what you're talking about right there.
Q. Right. And this is about what existed at 1:00 p.m. or 1300 hours, correct?
A. Yes, sir.
Q. And at this point, Mr. Ruffino, when you did your neuro check at that time, had slurred speech, correct?
A. Yes, sir.
Q. And you can tell from your notes that was a new neurologic finding compared to noon, right?
A. Yes, sir.
Q. Because if you put "normal" at noon and "slurred speech" at 1300, that's a change, right?
A. Yes, sir.
Q. Change for the worse?
A. If you have slurred speech, it is different definitely.
Q. Okay. If somebody goes from normal speech to slurred speech, have you ever considered that an improvement?
A. Never.

Page 100

Q. Have you ever considered that no change?
A. No.
Q. If someone goes from normal speech to slurred speech, do you agree that's a change for the worse?
A. Yes. The -- okay. Sorry.
Q. And when you think of the neuro checks we looked at that you documented that day at 10:00, 10:15, 10:30, 10:45, 11:00, noon and then 1:00 p.m., can we agree that your 1:00 p.m. neuro check was the first time you noticed any neurologic abnormality?
A. Yes, sir.
Q. And you stand by your 13- -- your documentation about the 1300 neuro check as well, right?
A. I don't -- I don't think I told anybody this, but some things happen --
Q. Yeah.
A. -- you know and click in your head. And I don't know if I could say it --
    THE WITNESS: Can I?
    MR. CARTER: If it's the truth. I mean --

JOHN AND MARTHA RUFFINO v.
DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.

ROBERT BROMLEY, RN
November 29, 2017

Page 101

1    THE WITNESS: It's the truth.
2    MR. CARTER: -- I'm a little
3  nervous right now, but....
4    THE WITNESS: I think that's what
5  happened. When -- I remember Dr. Raad coming
6  by to me and saying something about his
7  speech, and I had -- it was -- it was very
8  subtle. I remember it being very subtle.
9  Because I noticed it. When he came out of
10 the room, he noticed it. And I think we
11 talk- -- I'm almost positive we talked about
12 it right then. That's -- that's when I
13 charted that.
14 BY MR. CUMMINGS:
15 Q.  Do you think that Dr. Raad's
16 interaction you referenced and when you first
17 noticed anything but normal speech in
18 Mr. Ruffino was around 1300 hours --
19 A.  Yes.
20 Q.  -- on February 17th?
21 A.  Yes.
22 Q.  And that's --
23 A.  That's correct.
24 Q.  -- consistent with your serial --
25    MR. CUMMINGS: S-e-r-i-a-l.

Page 102

1  BY MR. CUMMINGS:
2  Q.  -- documentation, correct?
3  A.  Yes.
4  Q.  Please turn to Page 19. And when
5  you're there, look at the left-hand column
6  where you documented a neuro check you did
7  at --
8  A.  That's --
9  Q.  -- 2:00 p.m., right?
10 A.  That's -- yes.
11 Q.  Okay.
12 A.  I remember now.
13 Q.  Tell me what you remember now.
14 A.  It wasn't -- it wasn't slurred speech.
15 Q.  Okay.
16 A.  It was stopping talking. He would
17 talk and then he would stop. And that's what
18 Dr. Raad and I were talking about.
19 Q.  Okay. So when your 1400 neuro check
20 documentation references "expressive
21 aphasia" --
22 A.  Uh-huh.
23 Q.  -- even though the words are different
24 from your 1300 note, is it the same speech
25 abnormality?

Page 103

1  A.  Yes, sir.
2  Q.  Okay.
3  A.  It is.
4  Q.  And that's the speech abnormality that
5  did not exist at 10:00, 10:15, 10:30, 11:00
6  or 12:00?
7  A.  That's correct.
8  Q.  And if he had speech abnormalities
9  before noon, you're confident you would have
10 recognized it all the times you did your
11 neuro checks, right?
12 A.  Yes, sir.
13 Q.  Okay. Do you have any memory of
14 Mr. Ruffino having any neurologic abnormality
15 under your care before 1:00 p.m. on
16 February 17th?
17 A.  No, sir.
18 Q.  And if you had noticed any such thing,
19 you would have documented it, correct?
20 A.  Yes, sir.
21 Q.  Even if you made the note hours
22 later --
23 A.  Yes, sir.
24 Q.  -- you would have documented it?
25 A.  Yes, sir.

Page 104

1  Q.  And when you do document or did
2  document hours later, you would do so based
3  on notes you made from around the time of the
4  events in question, right?
5  A.  Yes, sir.
6  Q.  And so those notes -- those notes,
7  from your experience, would be accurate,
8  right?
9  A.  Yes.
10 Q.  Okay. So the notes you make hours
11 later aren't simply based on memories you
12 had; you had notes that you handwrote --
13 A.  Yes.
14 Q.  -- to turn into the formal typed
15 notes, correct?
16 A.  Yes.
17 Q.  And then once you made the formal
18 typed notes, what happened to the handwritten
19 notes?
20 A.  You just throw them away.
21 Q.  Correct. Including so someone can't
22 see patient information inappropriately,
23 right?
24 A.  Yes.
25 Q.  Because at that point, you've already

JOHN AND MARTHA RUFFINO v.
DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.

ROBERT BROMLEY, RN
November 29, 2017

Page 129

1 from 10:00 a.m. to noon, did you tell him
2 that because you thought it had some
3 relevance?
4 A. Yes.
5 Q. Were you leaving it up to Dr. Archer
6 to decide what to do with that information as
7 the physician?
8 A. Yes.
9 Q. If you had ever thought Mr. Ruffino
10 had chest pain during your involvement, would
11 you have documented it?
12 A. Yes.
13 Q. Those are all of my questions.
14 Thank you.
15 A. You're welcome.
16 EXAMINATION
17 BY MR. WITT:
18 Q. Mr. Bromley, my name is Bryant Witt,
19 and I believe we met just a little bit
20 earlier today for the first time; is that
21 right?
22 A. Yes, sir.
23 Q. Okay. I have just maybe one or two
24 questions for you, just to make sure I
25 understand your testimony.

Page 130

1 Is it your understanding that
2 dizziness can be an abnormal neurological
3 finding?
4 A. Dizziness can be an abnormal
5 neurological finding, yes.
6 Q. I don't have any other questions.
7 MR. CARTER: I don't have any
8 questions. We will read and sign.
9 MR. CUMMINGS: I'm following up on
10 Mr. Witt's question.
11 MR. CARTER: Okay. Go ahead.
12 EXAMINATION
13 BY MR. CUMMINGS:
14 Q. Nurse Bromley, if you had ever wanted
15 to document that you thought this patient had
16 dizziness under your care, you could have
17 typed in those -- that word in either the
18 Emergency Notes or somewhere else in all
19 caps, correct?
20 A. Yes, I could have typed it in.
21 Q. And you did not see any entries by
22 you, at least the ones we looked at, where
23 you typed in that you thought this patient
24 had dizziness during your involvement,
25 correct?

Page 131

1 A. Yes.
2 Q. That's all I have.
3 Thank you.
4 MR. CARTER: I still have no
5 questions. We will read and sign.
6 MR. WITT: I'm done.
7 THE COURT REPORTER: Are both of
8 you going to order a copy?
9 MR. CARTER: I will.
10 MR. WITT: Yes.
11 FURTHER DEPONENT SAITH NOT.
12 (Proceedings concluded at
13 11:45 a.m.)

Page 132

1 REPORTER'S CERTIFICATE
2 I certify that the witness in the
3 foregoing deposition, ROBERT BROMLEY, RN, was
4 by me duly sworn to testify in the within
5 entitled cause; that the said deposition was
6 taken at the time and place therein named;
7 that the testimony of said witness was
8 reported by me, a Shorthand Reporter and
9 Notary Public of the State of Tennessee
10 authorized to administer oaths and
11 affirmations, and said testimony, Pages 5
12 through 131 was thereafter transcribed into
13 typewriting.
14 I further certify that I am not of
15 counsel or attorney for either or any of the
16 parties to said deposition, nor in any way
17 interested in the outcome of the cause named
18 in said deposition.
19 IN WITNESS WHE
20 set my hand this 6th d
21
22
23
24
25 Carissa L. Boone, LCR No. 382
My License Expires: 6/30/2018