# In The Matter Of:

*JOHN AND MARTHA RUFFINO v.*

*DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.*

---

*ROBERT BROMLEY, RN*

*November 29, 2017*

---

*CARISSA L. BOONE, LCR, RPR*

*1209 Pine Street, Unit 409*

*Nashville, Tennessee 37213*

*615.243.1025*

*Carissaboone@gmail.com*

Original File 11 29 17 Bromley (D).txt

**Min-U-Script® with Word Index**

Page 1

```
        IN THE UNITED STATES DISTRICT COURT
           MIDDLE DISTRICT OF TENNESSEE
                 NASHVILLE DIVISION


 JOHN RUFFINO and MARTHA      )
 RUFFINO, Husband and Wife,   )
                              )
         Plaintiffs,          )
                              )
 vs.                          )   CASE NO.
                              )   3:17-CV-00725
 DR. CLARK ARCHER and HCA     )
 HEALTH SERVICES OF           )
 TENNESSEE, INC., d/b/a       )
 STONECREST MEDICAL CENTER,   )
                              )
         Defendants.          )
 _____)




        DEPOSITION OF:

        ROBERT BROMLEY, RN

        Taken on behalf of the Plaintiffs

        November 29, 2017
```

Page 2

```
 1   APPEARANCES:
 2   For the Plaintiffs:
 3   BRIAN CUMMINGS, ESQ.
     Cummings Manookian, PLC
 4   102 Woodmont Boulevard
     Suite 241
 5   Nashville, Tennessee 37205
     615.266.3333
 6   Bcummings@cummingsmanookian.com
 7   For the Defendant HCA Health Services of
     Tennessee, Inc. and StoneCrest Medical
 8   Center:
 9   J. BLAKE CARTER, ESQ.
     Gideon, Cooper & Essary, PLC
10   315 Deaderick Street
      Suite 1100
11   Nashville, Tennessee 37238
     615.254.0400
12   Blake@gideoncooper.com
13   For the Defendant Clark Archer, M.D.:
14   BRYANT C. WITT, ESQ.
     Hall Booth Smith, PC
15   424 Church Street
     Suite 2950
16   Nashville, Tennessee 37219
     615.313.9911
17   Bwitt@hallboothsmith.com
18
19
20
21
22
23
24
25
```

Page 3

```
                    I N D E X
                                         Page/Line

 THE WITNESS: ROBERT BROMLEY, RN

 EXAMINATION BY MR. CUMMINGS              5    4
 EXAMINATION BY MR. WITT                129   16
 EXAMINATION BY MR. CUMMINGS            130   12


              INDEX OF EXHIBITS
 Exhibits      Description          Page/Line
 None.
```

Page 4

```
 1           The deposition of ROBERT BROMLEY,
 2   RN, was taken by counsel for the Plaintiffs,
 3   on November 29, 2017, commencing at
 4   9:24 a.m., in the offices of Gideon, Cooper &
 5   Essary, PLC, 315 Deaderick Street, Suite
 6   1100, Nashville, Tennessee, for all purposes
 7   under the Tennessee Rules of Civil
 8   Procedure.
 9           The formalities as to notice,
10   caption, certificate, et cetera, are not
11   waived.  All objections, except as to the
12   form of the questions, are reserved to the
13   hearing.
14           It is agreed that Carissa L.
15   Boone, being a Notary Public and Court
16   Reporter, may swear the witness, and that the
17   reading and signing of the completed
18   deposition by the witness are not waived.
19
20
21               *    *    *
22
23
24
25
```

Page 105

1 put the accurate information in the chart --
2 A. Uh-huh.
3 Q. -- for people to use and see, and you
4 don't need the notes anymore, right?
5 A. Yes, sir.
6 Q. Please turn to -- and I'm running out
7 of pages to ask you about --
8 A. Thank God.
9 Q. -- if that helps you.
10   Please turn to Page 22.
11 A. (Witness complies.)
12 Q. Do you see in the lower right-hand
13 corner of Page 22, there's this kind of
14 grayed-in heading called "Emergency Notes."
15 It's a line.
16 A. Yeah, I see it.
17 Q. Okay. Do you agree that this section
18 of these notes is where you could type
19 anything you wanted in a narrative sense?
20 A. Yes.
21 Q. Okay.
22 A. That's what it is.
23 Q. And you used that opportunity in this
24 section of the notes on that day about
25 Mr. Ruffino, right?

Page 106

1 A. Yes.
2 Q. And we see that at 1309 --
3 A. Huh.
4 Q. -- you made that kind of an entry,
5 right?
6 A. Yes. And I didn't even see this.
7 Q. But we can tell that at 1309 when you
8 were caring for Mr. Ruffino, you documented
9 that at 12:53: "Code Stroke called.
10 Dr. Archer" -- and I'm changing abbreviation
11 to a word -- "states patient has some slurred
12 slurred speech" --
13   MR. CUMMINGS: Don't put "sic" in
14 the transcript. It really says "slurred"
15 twice.
16 BY MR. CUMMINGS:
17 Q. -- and ordered another CTA. Do you
18 see that?
19 A. Yes, sir.
20 Q. You documented that within 20 minutes
21 of it occurring --
22 A. Uh-huh.
23 Q. -- when it was fresh in your mind --
24 A. Uh-huh.
25 Q. -- and accurate, right?

Page 107

1 A. Oh, yeah.
2 Q. Okay. When you've been telling us
3 about Dr. Raad talking to you about the
4 patient's speech, do you now think, from
5 looking at the note, that it was Dr. Archer,
6 and you had your doctors confused?
7 A. No.
8 Q. Okay. What time would you estimate --
9 including using your notes as a time
10 reference -- do you estimate it was that
11 Dr. Raad told you, "I think Mr. Ruffino has
12 some kind of a speech issue"?
13 A. I think it -- I would -- I don't know.
14 I don't know. I can't guess. I'm not going
15 to guess.
16 Q. Okay. Do you have any reason to think
17 Dr. Raad told you the patient had a speech
18 issue before 1:00 p.m. and you just did
19 nothing about it?
20 A. No.
21 Q. Okay. And if you had checked on a
22 supposed speech issue, what you found would
23 be in your neuro check notes, right?
24 A. Yes.
25 Q. Do you see any notes form Dr. Raad

Page 108

1 indicating he thought this patient had any
2 abnormal neurological issues before 1300?
3 A. I haven't seen any notes about
4 Dr. Raad or -- in this chart.
5 Q. Okay. Let me ask you about the other
6 emergency note on this page. Are you still
7 there on 22?
8 A. I haven't seen this part, and it is
9 something I wish I had.
10 Q. Tell me why you wish you had seen it.
11 A. The -- like I said, the times -- this
12 is -- I mean, obviously, something happened
13 at this time because I put in a note under
14 Emergency Notes. Just that when you have
15 more information, more things click with you,
16 and I think I would have seen it or it would
17 have clicked quicker.
18 Q. Clicked quicker today answering
19 questions, is that what you mean?
20 A. Oh, yeah. I wouldn't have been so
21 stressed out earlier.
22 Q. That's okay.
23   Looking at this 1309 entry you made --
24 and, again, you made it about something at
25 12:53 -- does that remind you or trigger you

JOHN AND MARTHA RUFFINO v.
DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.

ROBERT BROMLEY, RN
November 29, 2017

Page 109

1  to know that it was around 1:00 p.m. that
2  day --
3  A.    Yes.
4  Q.    -- that you or anybody else first
5  noticed a neurological change --
6  A.    Yes.
7  Q.    -- or an abnormal neurological issue
8  in Mr. Ruffino?
9  A.    Yes.
10 Q.    And a Code Stroke was called around
11 that time, correct?
12 A.    Yes.
13 Q.    And when that Code Stroke was called,
14 you had seen the patient in a normal
15 neurological state for at least three
16 consecutive hours, right?
17 A.    Yes.  I don't recall when I charted
18 the expressive aphasia, but that's the first
19 I saw of it.
20 Q.    Understood.  Do you have any reason to
21 think that -- and let me put it this way.
22 From 10:00 a.m. to 1:00 p.m. that day, do you
23 agree you had the most knowledge of
24 Mr. Ruffino's condition?
25 A.    No.

Page 110

1  Q.    Who did?
2  A.    Well, I would think Rinehart,
3  Mark Rinehart would and whoever the doctor
4  would -- would.  Because they had histories,
5  more history.  And, again, I know more now
6  than I did then.  I didn't know about some of
7  the history he had, and evidently the doctors
8  did.  So I didn't know about -- I knew he had
9  seizures at the time.
10 Q.    Right.
11 A.    I didn't know about other things that
12 I know now.
13 Q.    Okay.  Let me ask you this, and I'll
14 try to get this into small bites, but it's --
15 right now I'm admitting it's going to be
16 hard.
17 A.    Okay.
18 Q.    If your neurologic checks from
19 10:00 a.m. to noon were not documented until
20 4:00 p.m., how would a doctor have known that
21 the patient was completely neurologically
22 normal at those times if you didn't tell them
23 that orally?
24 A.    Well, several doctors went in to see
25 him, and they were in and out of there quite

Page 111

1  a bit.  I mean, we had Dr. Raad, Dr. Archer,
2  Dr. Rinehart, Carol McCullough, another nurse
3  was in there, Charge Nurse.  There are other
4  people to communicate something that was
5  going on.
6  Q.    If a healthcare provider went in
7  Mr. Ruffino's room and did any kind of
8  examination or provided any kind of care,
9  what they did should be documented, correct?
10 A.    Yes.
11 Q.    Okay.  Are you familiar with the
12 phrase "not documented, not done"?
13 A.    Yes.
14 Q.    What do you think that expression
15 means in the healthcare field?
16 A.    Just exactly what it says.
17 Q.    Did anybody who's a healthcare
18 provider ever tell you why TPA was not given
19 to Mr. Ruffino at StoneCrest?
20 A.    I didn't ask about TPA.  I didn't know
21 he had had a stroke.  If he'd had a stroke, I
22 didn't know.  During my time there that day,
23 nobody ever told me that he'd had a stroke.
24 Q.    Was the first time you had any reason
25 to think Mr. Ruffino had a sign or symptom of

Page 112

1  stroke when there was the abnormal speech
2  around 1:00 p.m. on February 17th?
3  A.    Yes.
4  Q.    I want to go back because I realize I
5  may have missed you with the TPA question.
6  Has any healthcare provider ever told you why
7  TPA was not given to Mr. Ruffino in the
8  StoneCrest ER?
9  A.    No.
10 Q.    Have you ever been involved with an ER
11 patient at StoneCrest where TPA was given?
12 A.    Yes.
13 Q.    In any of those instances, was TPA
14 given per the order of an ER doctor?
15 A.    No.
16 Q.    What happened then?  Who -- who gave
17 the order?
18 A.    The neurologist comes down.
19 Q.    Do you have any knowledge as to
20 whether StoneCrest had a policy in
21 February 2016 that applied to ER patients
22 where an ER doctor could initiate the
23 administration of TPA even before a
24 neurologist consult was performed?
25 A.    I don't know that at all.  I don't

JOHN AND MARTHA RUFFINO v.
DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.

ROBERT BROMLEY, RN
November 29, 2017

Page 121

1 noon weren't documented until 4:00 p.m. and a
2 neurologist is doing a consult around 1:00 or
3 2:00 p.m., do you agree they couldn't know
4 what your neuro check findings were unless
5 you told them?
6 A. Yes, I -- I assume, yes.
7 Q. So at that point, whose fault is it if
8 the neurologist doesn't know the patient was
9 perfectly neurologically normal from 10:00 to
10 noon if you didn't document it by then and
11 didn't tell them?
12 A. If -- there wasn't anything with him
13 from 10:00 to noon, though.
14 Q. I agree.
15 A. Yes.
16 Q. Whose fault is it that the neurologist
17 might not have known that?
18 A. I don't know that it's anybody's fault
19 if it didn't happen.
20 Q. Okay. What do you know about whether
21 the neurologist who did the consult,
22 Dr. Chitturi, ever knew that the patient was
23 neurologically normal from 10:00 a.m. to
24 noon?
25 A. What do I know about it?

Page 122

1 Q. Right. And the answer might be
2 "nothing," but I need --
3 A. I don't know anything. I haven't seen
4 Doctor -- I don't know his name.
5 Q. Chitturi.
6 A. Chitturi, yeah. I never saw him.
7 Q. What did you tell Dr. Archer -- do you
8 remember that 1300 or so note in the
9 Emergency Notes? It's still in front of you.
10 A. Yes, sir.
11 Q. What did you tell Dr. Archer around
12 1:00 p.m. regarding what Mr. Ruffino's
13 neurological condition had been from
14 10:00 a.m. through noon?
15 A. Oh, they were normal. The only thing
16 we discussed, Dr. Archer and I, was the way
17 he was talking. And he wanted to know -- I
18 remember him saying was it slurred speech or
19 was it him talking, you know, and then
20 stopping talking and then talking. And we
21 talked about it, and I said, "Well, it seemed
22 like it was a little bit of this and a little
23 bit of that, you know, both, a little bit."
24 So I remember talking to him about
25 that, and that's all I remember talking to

Page 123

1 Dr. Archer about.
2 Q. Did you let Dr. Archer know when he
3 first saw Mr. Ruffino and was requesting a
4 neuro consult, that per your neuro checks,
5 the patient had been neurologically normal
6 from 10:00 a.m. to noon?
7 A. Yes.
8 Q. You told Dr. Archer that?
9 A. Yes.
10 Q. What do you remember speaking with
11 Nurse Practitioner Rinehart about regarding
12 any abnormal neurological issues Mr. Ruffino
13 had under your watch?
14 A. I didn't. I only asked him what labs
15 he wanted when he first got there. Because
16 Doctor -- Nurse Practitioner Rinehart was
17 just the initial -- the fast check person.
18 Q. Do you remember having any
19 conversations with Mrs. Ruffino?
20 A. I remember she came in later and --
21 yes, I remember -- can I look at the chart?
22 Q. Absolutely. And I'm going to get some
23 water. Can I pour you some more?
24 A. Please do. And after I answer this,
25 can I go pee real quick?

Page 124

1 Q. You can pee first, if you want.
2 A. I think I'll answer this question
3 first.
4 Okay. What I remember was, is that
5 she didn't get there until later and she
6 wasn't very concerned about him, is what I
7 remember from her. Just in my memory.
8 (Counsel tenders water.)
9 THE WITNESS: Thank you.
10 And he was hungry, hadn't eaten
11 all day. So I got them both a sack -- we
12 have these little white sack lunches there
13 that I gave to people that were hungry. He
14 had passed his swallow screen, so I gave him
15 that. And that -- that's about all I
16 remember about her.
17 Oh, well, I charted something
18 about her going to the car, but I don't
19 remember her going to the car. I remember
20 giving her food, though.
21 BY MR. CUMMINGS:
22 Q. Do you remember anything else you
23 spoke with Mrs. Ruffino about?
24 A. Again, I can look at this chart,
25 right?

JOHN AND MARTHA RUFFINO v.
DR. CLARK ARCHER and HCA HEALTH SERVICES OF TN, et al.

ROBERT BROMLEY, RN
November 29, 2017

Page 129

1  from 10:00 a.m. to noon, did you tell him
2  that because you thought it had some
3  relevance?
4  A.   Yes.
5  Q.   Were you leaving it up to Dr. Archer
6  to decide what to do with that information as
7  the physician?
8  A.   Yes.
9  Q.   If you had ever thought Mr. Ruffino
10 had chest pain during your involvement, would
11 you have documented it?
12 A.   Yes.
13 Q.   Those are all of my questions.
14      Thank you.
15 A.   You're welcome.
16           EXAMINATION
17 BY MR. WITT:
18 Q.   Mr. Bromley, my name is Bryant Witt,
19 and I believe we met just a little bit
20 earlier today for the first time; is that
21 right?
22 A.   Yes, sir.
23 Q.   Okay.  I have just maybe one or two
24 questions for you, just to make sure I
25 understand your testimony.

Page 130

1       Is it your understanding that
2  dizziness can be an abnormal neurological
3  finding?
4  A.   Dizziness can be an abnormal
5  neurological finding, yes.
6  Q.   I don't have any other questions.
7       MR. CARTER: I don't have any
8  questions.  We will read and sign.
9       MR. CUMMINGS: I'm following up on
10 Mr. Witt's question.
11      MR. CARTER: Okay.  Go ahead.
12           EXAMINATION
13 BY MR. CUMMINGS:
14 Q.   Nurse Bromley, if you had ever wanted
15 to document that you thought this patient had
16 dizziness under your care, you could have
17 typed in those -- that word in either the
18 Emergency Notes or somewhere else in all
19 caps, correct?
20 A.   Yes, I could have typed it in.
21 Q.   And you did not see any entries by
22 you, at least the ones we looked at, where
23 you typed in that you thought this patient
24 had dizziness during your involvement,
25 correct?

Page 131

1  A.   Yes.
2  Q.   That's all I have.
3       Thank you.
4       MR. CARTER: I still have no
5  questions.  We will read and sign.
6       MR. WITT: I'm done.
7       THE COURT REPORTER: Are both of
8  you going to order a copy?
9       MR. CARTER: I will.
10      MR. WITT: Yes.
11      FURTHER DEPONENT SAITH NOT.
12      (Proceedings concluded at
13 11:45 a.m.)

Page 132

            REPORTER'S CERTIFICATE

        I certify that the witness in the
foregoing deposition, ROBERT BROMLEY, RN, was
by me duly sworn to testify in the within
entitled cause; that the said deposition was
taken at the time and place therein named;
that the testimony of said witness was
reported by me, a Shorthand Reporter and
Notary Public of the State of Tennessee
authorized to administer oaths and
affirmations, and said testimony, Pages 5
through 131 was thereafter transcribed into
typewriting.
        I further certify that I am not of
counsel or attorney for either or any of the
parties to said deposition, nor in any way
interested in the outcome of the cause named
in said deposition.
        IN WITNESS WHE
set my hand this 6th d

                Carissa L. Boone, LCR No. 382
                My License Expires: 6/30/2018