IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JOHN RUFFINO and MARTHA RUFFINO, Husband and Wife,<br><br>Plaintiffs,<br><br>v.<br><br>DR. CLARK ARCHER and HCA HEALTH SERVICES OF TENNESSEE, INC. d/b/a STONECREST MEDICAL CENTER<br><br>Defendants. | CASE No. 3:17-cv-00725<br>Chief Judge Waverly D. Crenshaw<br>Magistrate Judge Alistair Newbern<br><br>JURY DEMAND |

___

## ANSWER OF DR. CLARK ARCHER
___

COMES NOW Defendant, **DR. CLARK ARCHER** ("Dr. Archer" or "Defendant"), by and through counsel, and responds to the Plaintiffs' Complaint. Other than the affirmative defenses, the numbered responses correspond to the numbered paragraphs in the Complaint.

### PARTIES, VENUE, AND JURISDICTION

**THE PLAINTIFFS**

1. Upon information and belief formed after a review of Plaintiffs' Revised Responses to the First Set of Interrogatories Propounded to Plaintiffs by StoneCrest Medical Center ("Plaintiffs' Revised Interrogatory Responses"),[1] it is admitted that Plaintiffs[2] have resided in Mayfield, Kentucky since November 15, 2016, which was prior to filing date of the present lawsuit.

---

[1] Co-defendant is named as HCA Health Services of Tennessee, Inc. d/b/a StoneCrest Medical Center, but for ease of reference will be referred to throughout this answer as StoneCrest.

[2] John Ruffino and Martha Ruffino.

65319547-2

2. Upon information and belief formed after a review of Plaintiffs' Revised Interrogatory Responses, it is admitted that Plaintiffs have been married since 2002.

**THE DEFENDANTS**

3. It is admitted that Dr. Archer is a resident and citizen of the State of Tennessee. It is admitted that Dr. Archer is a medical doctor licensed to practice medicine in Tennessee. It is further admitted that Dr. Archer provided medical care and treatment to John Ruffino in Tennessee, specifically at StoneCrest. All allegations or inferences of negligence or liability are denied. All other allegations in paragraph 3 of the Complaint and any allegations inconsistent with the foregoing are denied.

4. The allegations contained in paragraph 4 are not directed to Dr. Archer, and thus no answer is required.

5. Admitted.

**MEDICAL, LEGAL, & ECONOMIC RELATIONSHIPS**

6. Admitted.

7. It is admitted that Dr. Archer was one of the medical providers involved in treating John Ruffino during his presentation to the emergency department at StoneCrest on February 17. 2016. It is denied that the care and treatment rendered to Mr. Ruffino by Dr. Archer occurred as described in the Complaint.

8. Denied.

9. Denied.

10. Denied.

11. It is admitted in part that Mr. Ruffino presented to the emergency department of StoneCrest on February 17, 2016 at approximately 9:40 a.m. Dr. Archer lacks knowledge or

information sufficient to form a belief about the truth of the remainder of the allegations in this Paragraph.

12. Admitted.

13. Dr. Archer admits that he entered into a physician patient relationship with John Ruffino on or about 12:20 p.m. on February 17, 2016. All other allegations inconsistent with the foregoing are denied. To the extent the allegations of this paragraph are not addressed to this Defendant no response is required of him.

14. Admitted.

## STATEMENT OF FACTS

### February 17, 2016 – StoneCrest Medical Center

15. Admitted.

16. Admitted.

17. Dr. Archer admits that the entries he made into the medical chart are accurate based upon his clinical assessment, observations and evaluation of John Ruffino from the time that Dr. Archer arrived at the emergency department at StoneCrest and became involved in Mr. Ruffino's care at approximately 12:20 p.m. on February 17, 2016, as well as the medical history he obtained from Plaintiffs. Dr. Archer was not involved in Mr. Ruffino's treatment prior to that time, and was not present to observe or assess Mr. Ruffino prior to that time, and he lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 17 regarding these entries into the medical chart.

18. Dr. Archer was not present in the emergency department of StoneCrest at the time of Mr. Ruffino's presentation, but based upon information and belief, these allegations are admitted.

19. Denied as stated. Dr. Archer was not present in the emergency department at the time of Mr. Ruffino's initial presentation and did not become involved in Mr. Ruffino's care and treatment until approximately 12:20 p.m. on February 17, 2016. Upon information and belief, at the time of initial presentation, Mr. Ruffino reported symptoms occurring earlier that morning and a medical history that included seizures for which he was prescribed medication but that he had not taken his medication that morning. Upon information and belief, medical providers who interacted with Mr. Ruffino earlier that morning noted slightly slurred speech and noted that Mr. Ruffino reported to them that slightly slurred speech was "normal for him since December of last year." All other allegations inconsistent with the foregoing, are denied.

20. Denied as stated. Dr. Archer states that the sudden onset of weakness can potentially, but does not necessarily in all cases, indicate a neurological change, and that change can be the manifestation of an acute or chronic process. All other allegations inconsistent with the foregoing are denied.

21. Denied as stated. Dr. Archer states that slurred speech can potentially, but does not necessarily in all cases, indicate a neurological change, and that change can be the manifestation of an acute or chronic process. All other allegations inconsistent with the foregoing are denied.

22. Denied as stated. Dr. Archer states that dizziness can potentially, but does not necessarily in all cases, indicate a neurological change, and that change can be the manifestation of an acute or chronic process. All other allegations inconsistent with the foregoing are denied.

23. It is admitted that sudden onset of weakness, slurred speech, or dizziness are each an abnormal finding in an adult male, whether these symptoms appear separately or all at the same time.

24. Admitted.

25. Admitted.

26. Admitted.

27. Denied as stated. Upon information and belief, Mr. Ruffino was noted to have demonstrated slightly slurred speech as per medical records created by other providers. It is also documented that Mr. Ruffino reported that his slightly slurred speech had been present since December. All other allegations inconsistent with the foregoing are denied.

28. Denied as stated. Upon information and belief, Mr. Ruffino was noted to have demonstrated slightly slurred speech as per medical records created by other providers. It is also documented that Mr. Ruffino reported that his slightly slurred speech had been present since December. All other allegations inconsistent with the foregoing are denied.

29. Denied as stated. Dr. Archer was not present in the emergency department of StoneCrest at the time of Mr. Ruffino's presentation, but upon information and belief, vital signs were recorded in the medical chart showing a time of 9:58 a.m. with values recorded as stated in paragraph 29 of the Complaint.

30. Dr. Archer was not present in the emergency department of StoneCrest at the time of Mr. Ruffino's presentation on February 17, 2016, but these allegations are admitted upon information and belief based on medical records created by other providers..

31. Denied.

32. Denied as stated. Upon information and belief, Mr. Ruffino was noted to have demonstrated slightly slurred speech as per medical records created by other providers. It is also documented that Mr. Ruffino reported that his slightly slurred speech had been present since December. All other allegations inconsistent with the foregoing are denied.

5

33. Denied as stated. Dr. Archer was not involved in Mr. Ruffino's medical care until 12:20 p.m., but it is admitted that the medical record includes documentation timed at 10:15 a.m. stating that a dizziness reassessment was performed and indicating that Mr. Ruffino's condition was unchanged. All other allegations inconsistent with the foregoing are denied.

34. The response to Paragraph 33 is adopted here.

35. Denied as stated. Dr. Archer was not involved in Mr. Ruffino's medical care until 12:20 p.m., but it is admitted that the medical records includes documentation timed at 10:15 a.m. stating that a dizziness reassessment was performed and that this entry in the chart shows a creation time of 4:01 p.m. All other allegations, inconsistent with the foregoing, are denied.

36. Dr. Archer was not involved in Mr. Ruffino's medical care until 12:20 p.m. and is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 36. Dr. Archer admits that the medical records reflects a complaint of dizziness upon presentation and an entry into the chart timed at 10:15 a.m. recording a dizziness reassessment that states no change.

37. Dr. Archer admits that the medical record for Mr. Ruffino created in the emergency department of StoneCrest on February 17, 2016, shows certain laboratory values including a Troponin I result reported at 10:44 a.m. that were within the reference range. All allegations in paragraph 37 inconsistent with the foregoing are denied.

38. Dr. Archer admits that a materially elevated Troponin I level can indicate damage to the myocardial muscle, which can be caused by a myocardial infarction.

39. Dr. Archer admits that the medical records for Mr. Ruffino created in the emergency department of StoneCrest on February 17, 2016, shows certain laboratory values

including PT and INR levels that are timed at 10:34 a.m. and were within the reference ranges. All other allegations are denied.

40. Denied.

41. Denied as stated. Dr. Archer admits that the medical records for Mr. Ruffino created in the emergency department of StoneCrest on February 17, 2016, indicate that a CT scan without contrast was performed. Dr. Archer admits that the medical records for Mr. Ruffino also show results from the radiologist's interpretation of that study timed at 10:29 a.m. by Dr. Keith Parker that included some of the findings stated in paragraph 41 of the Complaint. All other allegations inconsistent with the foregoing are denied.

42. Denied.

43. Dr. Archer is without information sufficient to form a belief as to the truth of the allegations contained in paragraph 43 and the same are therefore denied.

44. Admitted.

45. Denied. To the extent the term "ER staff" in paragraph 45 of the Complaint intends to refer to Dr. Archer, he was not involved in the care of Mr. Ruffino at the time referenced, had no information or basis upon which to make any medical diagnosis regarding Mr. Ruffino's condition, and had not entered into a physician patient relationship with Mr. Ruffino at that time.

46. Denied. To the extent the term "ER staff" in paragraph 46 of the Complaint intends to refer to Dr. Archer, he was not involved in the care of Mr. Ruffino at the time referenced, had no information or basis upon which to make any medical diagnosis regarding Mr. Ruffino's condition, and had not entered into a physician patient relationship with Mr. Ruffino at that time.

47. Denied. To the extent the term "ER staff" in paragraph 47 of the Complaint intends to refer to Dr. Archer, he was not involved in the care of Mr. Ruffino at the time referenced, had no information or basis upon which to make any medical diagnosis regarding Mr. Ruffino's condition, and had not entered into a physician patient relationship with Mr. Ruffino at that time.

48. Dr. Archer lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 48 of the Complaint since Dr. Archer was not involved in the care of Mr. Ruffino at the time referenced, had no information or basis upon which to make any medical diagnosis regarding Mr. Ruffino's condition, and had not entered into a physician patient relationship with Mr. Ruffino at that time.

49. Denied as stated. Based upon information and belief and review of the medical records relating to treatment by other providers prior to Dr. Archer's involvement, Mr. Ruffino's symptoms waxed and waned from the time of their initial presentation.

50. Denied.

51. Denied.

52. Denied as stated. Dr. Archer could not order any imaging of Mr. Ruffino's head from 10:30 a.m. on February 17, 2016, through 12:15 p.m. on February 17, 2016, as he was not involved in the care of Mr. Ruffino at the time referenced, had no information or basis upon which to make any medical diagnosis or decisions regarding Mr. Ruffino's condition, and had not entered into a physician patient relationship with Mr. Ruffino at that time. All other allegations inconsistent with the foregoing are denied.

53. Denied as stated. Dr. Archer has heard this or similar terminology which upon information and belief is intended to convey to laypersons a sense of urgency in seeking medical

attention in response to potential stroke symptoms. Dr. Archer denies any implication in the allegations of paragraph 53 of the Complaint that the care that he provided to Mr. Ruffino failed to comply with the professional standard of care applicable to him.

54. *See* Response to Paragraph 53, adopted in response to this allegation.

55. Admitted.

56. Denied as stated. Dr. Archer admits that a Severe Sepsis Screening was performed with negative results.

57. Denied as stated. Dr. Archer admits that the records generated by medical providers prior to his involvement in Mr. Ruffino's care coupled with his own evaluation and assessment as well as the history given by the Plaintiffs demonstrated a waxing and waning constellation of symptoms.

58. Dr. Archer admits that he ordered a CT angiogram and that this order was entered into the computer at 12:52 p.m.

59. Dr. Archer admits that the reason listed for his order of a CT angiogram was "neurological deficit."

60. Denied as stated. Dr. Archer admits that the records generated by medical providers prior to his involvement in Mr. Ruffino's care coupled with his own evaluation and assessment as well as the history given by the Plaintiffs demonstrated a waxing and waning constellation of symptoms.

61. Admitted.

62. There is a material typographical error in the Complaint. The CTA of the neck demonstrated no occlusion or hemodynamic stenosis among the vessels in the neck, not the brain.

63. Admitted.

64. Denied as stated. Dr. Archer admits that the records generated by medical providers prior to his involvement in Mr. Ruffino's care coupled with his own evaluation and assessment as well as the history given by the Plaintiffs demonstrated a waxing and waning constellation of symptoms.

65. Denied as stated. Dr. Archer admits that the records generated by medical providers prior to his involvement in Mr. Ruffino's care coupled with his own evaluation and assessment as well as the history given by the Plaintiffs demonstrated a waxing and waning constellation of symptoms.

66. Denied as stated. Dr. Archer admits that the records generated by medical providers prior to his involvement in Mr. Ruffino's care coupled with his own evaluation and assessment as well as the history given by the Plaintiffs demonstrated a waxing and waning constellation of symptoms.

67. Admitted.

68. Denied as stated. It is admitted that Dr. Archer's orders for Mr. Ruffino included to be admitted to the hospital and to perform neurological checks every hour in critical care and every four (4) hours in the medical/surgical unit. Dr. Archer admits that this particular order was entered into the computer at 2:14 p.m. on February 17, 2016. Upon information and belief and based upon review of the records generated by other providers prior to his involvement, Dr. Archer admits that these records include documentation of evaluation of neurological status including swallow studies and recording Glasgow Coma scale. All other allegations in paragraph 68 inconsistent with the foregoing are denied

69. Denied. *See* Response to No. 68, adopted in response to this allegation.

70. Admitted.

71. Dr. Archer lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 71 of the Complaint. Moreover these allegations appear to be addressed to StoneCrest.

72. Admitted.

73. Based upon Dr. Archer's experience in the emergency department of StoneCrest, these allegations are admitted.

74. Denied as stated. Dr. Archer did promptly and appropriately obtain a neurological consultation for Mr. Ruffino after first becoming involved in Mr. Ruffino's care at approximately 12:20 p.m. Dr. Archer admits that he could have ordered a STAT neurological consultation but denies that he in any way deviated from the professional standard of care applicable to him in the timing of his request for a neurological consultation or in any other manner. All other allegations inconsistent with the foregoing are denied.

75. It is admitted that Dr. Chitturi's report includes the words "likely stroke" among documentation of many other items including relevant medical history, evaluations, assessments and orders.

76. Dr. Archer admits that his recorded impression was TIA/CVA Syndrome, acute.

77. Admitted.

78. Denied as stated. Dr. Archer admits that the records generated by medical providers prior to his involvement in Mr. Ruffino's care coupled with his own evaluation and assessment as well as the history given by the Plaintiffs demonstrated a waxing and waning constellation of symptoms. Dr. Archer admits that transfer to Centennial Medical Center occurred more than 6 hours after 8:00 a.m. on February 17, 2016.

79. Denied as stated. Upon information and belief, Dr. Archer admits that the Discharge Summary for Mr. Ruffino's first February 2016 admission to Centennial Medical Center indicates his primary discharge diagnoses were "[a]cute cerebrovascular accident, middle cerebral artery, residual dysarthria." All allegations inconsistent with the foregoing are denied.

80. Admitted.

81 Denied as stated. A thrombus is a clot obstructing blood flow. An embolus is a blood clot, air bubble, piece of atheromatous tissue, or other object transported in the blood stream and lodged in a vessel, causing full or partial obstruction of blood flow. A blood clot is only one of many causes for a thromboembolic blockage.

82. It is admitted that tPa was a method of treatment for patients with certain symptoms, past history, time, and nature of onset, satisfying more criteria than that alleged in paragraphs 82 and 83, in February of 2016. All allegations inconsistent with the foregoing are denied.

83. *See* Response to Paragraph 82.

84. Denied as stated. Dr. Archer admits that the records generated by medical providers prior to his involvement in Mr. Ruffino's care coupled with his own evaluation and assessment as well as the history given by the Plaintiffs demonstrated a waxing and waning constellation of symptoms. Mr. Ruffino apparently provided several different times of onset of his symptoms on February 17, 2016. He told the EMS team his symptom of dizziness began when he was driving, shortly before his call to 911 at 9:25 a.m. Mr. Ruffino told the nursing staff his dizziness began more than one (1) month ago, was intermittent, and had been present for less than one (1) hour before arrival. Dr. Chitturi recorded an onset of symptoms at 0800, nearly 1.5 hours earlier than the report to 911.

85. Denied as stated. The History and Physical report from Centennial Medical Center, dated February 18, 2016, states, "The patient was presented to the StoneCrest medical facility way way after the thrombolytic window. . ." Accordingly, when Mr. Ruffino presented to Centennial Medical Center, he was beyond the window for administering tPa. All allegations inconsistent with foregoing are denied.

86. Denied. A thrombectomy was not indicated for every ischemic, non-hemorrhagic stroke in February 2016.

87. Denied as stated. Dr. Archer admits that the records generated by medical providers prior to his involvement in Mr. Ruffino's care coupled with his own evaluation and assessment as well as the history given by the Plaintiffs demonstrated a waxing and waning constellation of symptoms. Mr. Ruffino apparently provided several different times of onset of his symptoms on February 17, 2016. He told the EMS team his symptom of dizziness began when he was driving, shortly before his call to 911 at 0925. Mr. Ruffino told the nursing staff his dizziness began more than one (1) month ago, was intermittent, and had been present for less than one (1) hour before arrival. Dr. Chitturi recorded an onset of symptoms at 0800, nearly 1.5 hours earlier than the report to 911.

88. Denied.

89. Denied. The long-term outcome for a person diagnosed with a thrombotic stroke is dependent on additional factors besides timely treatment with either tPa and/or a thromectomy such that overreliance on timely treatment, at the expense of other relevant factors, could, in fact, increase the chance of and/or severity of any potential neurological injury.

90. Denied.

91. Denied.

92. Denied.

## ALLEGATIONS AGAINST DR. CLARK ARCHER

93. Defendant incorporates his previous responses to each corresponding allegation as if set forth here in full.

94. Admitted in part. Dr. Archer did have a relationship of health care provider – patient with Mr. Ruffino that began upon assuming care of Mr. Ruffino. All other allegations inconsistent with the foregoing are denied.

95. Dr. Archer admits that after initiation of the physician patient relationship he was required to deliver any medical care provided to Dr. Ruffino in accordance with the professional standard of care applicable to him as defined under Tennessee Code Annotated section 29-26-115, along with expert testimony from an appropriately qualified expert. Dr. Archer affirmatively alleges that all medical care provided by him in this case complied with the applicable standard of care.

96. Denied, including all subparts.

## ALLEGATIONS AGAINST STONECREST MEDICAL CENTER

97. Defendant incorporates his previous responses to each corresponding allegation as if set forth here in full.

98. This allegation is not directed at Dr. Archer and thus does require a response from him. To the extent this allegation is construed as being directed at Dr. Archer, it is denied.

99. This allegation is not directed at Dr. Archer and thus does require a response from him. To the extent this allegation is construed as being directed at Dr. Archer, it is denied.

100. This allegation is not directed at Dr. Archer and thus does require a response from him. To the extent this allegation is construed as being directed at Dr. Archer, it is denied.

101. This allegation is not directed at Dr. Archer and thus does require a response from him. To the extent this allegation is construed as being directed at Dr. Archer, it is denied.

102. This allegation is not directed at Dr. Archer and thus does require a response from him. To the extent this allegation is construed as being directed at Dr. Archer, it is denied, including all subparts.

## VICARIOUS LIABILITY OF STONECREST MEDICAL CENTER

103. Defendant incorporates his previous responses to each corresponding allegation as if set forth here in full.

104. This allegation is not directed at Dr. Archer and thus does require a response from him. To the extent this allegation is construed as being directed at Dr. Archer, it is denied.

## CAUSATION AND DAMAGES

105. Defendant incorporates his previous responses to each corresponding allegation as if set forth here in full.

106. Denied.

## COMPLIANCE WITH STATUTORY NOTICE
## AND GOOD FAITH REQUIREMENTS

107. Denied that Plaintiffs complied with Tennessee Code Annotated section 29-26-121 as to Dr. Archer. *See* Dr. Archer's Motion to Dismiss, Reply Memorandum to Plaintiffs' Response to Motion to Dismiss, and Notice of Modification to Motion to Dismiss.

108. Denied. Counsel for this Defendant did not have access to the Centennial Medical Center's clinical records during the time period outlined by this allegation. The Plaintiffs did not provide this Defendant with a HIPAA complaint release permitting access to the Centennial Medical Center records prior to filing their Complaint. Even assuming the pre-suit notice letters were mailed in accordance with Tennessee Code Annotated section 29-26-121,

neither Dr. Archer nor his counsel would be able to request Centennial Medical Center's clinical records with the HIPAA authorizations.

109. Denied. *See* Dr. Archer's Motion to Dismiss, Reply Memorandum to Plaintiffs' Response to Motion to Dismiss, and Notice of Modification Motion to Dismiss.

110. Admitted that a document titled Certificate of Good Faith is attached to the Complaint as **Exhibit 2**. Whether Tennessee Code Annotated section 29-26-122 was, in fact, complied with, is not known at this stage of the proceedings, calls for a legal conclusion, and is denied.

Paragraphs 1-8 of the Plaintiffs' Prayer for Relief are Denied.

## AFFIRMATIVE DEFENSES

1. This Defendant reserves the right to amend their Answer, including, but not limited to, asserting additional affirmative defenses as evidence develops through the discovery process.

2. The Plaintiffs' Complaint fails to state a claim upon which relief can be granted against this Defendant and in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure should therefore be dismissed. *See* Dr. Archer's Motion to Dismiss, Reply Memorandum to Plaintiffs' Response to Motion to Dismiss, and Notice of Modification Motion to Dismiss.

3. This Defendant complied with the applicable standard of care, and no act or omission on the part of this Defendant caused or contributed to any injury complained of by the Plaintiffs.

4. If injuries or damages alleged in the Plaintiffs' Complaint were the result of negligence, which is denied, the Defendant alleges that such injuries may have been caused

solely or in part, by acts or omissions of others, named or unnamed. The Defendant reserves the right to amend his Answer to make additional, specific allegations of comparative fault, including, but not limited to, the Plaintiffs and both non-party or third party appointment, against such individuals and/or entities in the event discovery and/or other proof reveals a basis for such an allegation of comparative fault. Should the negligence of any party, non-party, or third-party be shown, the Defendant hereby request that the amount of liability be apportioned amongst those against whom fault is determined.

More specifically, without waiving the right to amend this Answer as set out above or to add additional details as they become known, Defendant avers that the injuries complained of in this matter occurred due to the fault of either Plaintiff, individually, or both Plaintiffs jointly, through his, her, or their failure to properly seek care after Mr. Ruffino was discharged from the first hospitalization at Centennial Medical Center.

a. Upon the initial discharge from Centennial Medical Center, Plaintiffs were instructed to return immediately if there were any changes.

b. While at home, Mr. Ruffino had a noticeable change.

c. The change lead to him falling.

d. Neither he nor Mrs. Ruffino, on his behalf, sought medical help until almost fifteen (15) hours passed from his discharge.

e. Upon re-presenting the Centennial Medical Center, Mr. Ruffino was beyond the time window for tPa.

f. This episode and the failure to timely seek medical help were the cause of Mr. Ruffino's alleged injuries.

6. The Defendant aver that Plaintiffs' non-economic damages are capped at $750,000.00 by the provisions of The Tennessee Civil Justice Act of 2011, because this action accrued after October 1, 2011.

7. That any award of damages is subject to the procedures and limitations set forth in Tennessee Code Annotated sections 29-39-101 *et seq.*, including Tennessee Code Annotated section 29-39-102.

8. The Defendant aver that all matters and things complained of in the Plaintiffs' Complaint resulted from some independent cause or phenomenon, and did not come about through, or as a result of, any act or omission constituting negligence or malpractice on their part for which they can be held responsible.

9. Defendant denies all allegations of negligence asserted against them and specifically rely upon any and all defenses allowable, pursuant to Tennessee's Health Care Liability Act, Tennessee Code Annotated sections 29-26-115, *et seq*.

10. Defendant pleads and avers any and all defenses available under the Tennessee Health Care Liability Act, Tennessee Code Annotated sections 29-26-101, *et seq*.

11. Any allegation contained within an introductory paragraph, instruction, definition, heading, and/or *ad damnum* clause is denied.

12. That the injuries and damages for which relief is sought were proximately caused by Mr. Ruffino's underlying physiological conditions, and not as a failure of the care by Dr. Archer.

13. Should this matter survive to trial, a jury of twelve (12) to try this case.

14. Defendant's costs in defending this case.

Respectfully submitted on this 2nd day of March 2018.

              HALL BOOTH SMITH, P.C.

         By:  /s/ Bryant C. Witt
             James E. Looper, Jr. BPR #025200
             Bryant C. Witt, BRP #018295
             Fifth Third Center
             424 Church St., Ste. 2950
             Nashville, TN 37219
             (615) 313-9911
             *Counsel for Defendant Dr. Clark Archer*

# CERTIFICATE OF SERVICE

I hereby certify that: I have this 2nd of March 2018 served all parties in this matter with the foregoing **ANSWER OF DR. CLARK ARCHER by CM/ECF**, to counsel of record as follows:

Brian Manookian, Esq.
Brian Cummings, Esq.
Afsoon Hagh, Esq.
CUMMINGS MANOOKIAN PLC
45 Music Square West Nashville, TN 37203
bcummings@cummingsmankoonian.com
bmanookian@cummingsmankoonian.com
afsoon@cummingsmanookian.com

Mark Hammervold, Esq.
Hammervold, PLC
315 Deaderick Street, Suite 1550
Nashville, TN 37238

**Counsel for Plaintiffs, JOHN RUFFINO and MARTHA RUFFINO Husband and Wife**

C. J. Gideon, Jr., Esq
J. Blake Carter, Esq.
GIDEON COOPER & ESSARY
315 Deaderick Street, Suite 1100
Nashville, TN 37238
E-mail: cj@gideoncooper.com
E-mail: blake@gideoncooper.com

**Counsel for HCA Health Services of Tennessee, Inc. d/b/a StoneCrest Medical Center**

HALL BOOTH SMITH

By: __/s/ Bryant C. Witt__