**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

CASE NO.: 3:17-cv-00725

```
                                    )
JOHN RUFFINO and MARTHA RUFFINO,    )
Husband and Wife,                   )
                                    )
     Plaintiffs,                    )
                                    )
vs.                                 )
                                    )
DR. CLARK ARCHER and                )
HCA HEALTH SERVICES OF TENNESSEE, INC.)
d/b/a STONECREST MEDICAL CENTER,    )
                                    )
     Defendants.                    )
                                    )
```

_____

DEPOSITION OF TROY THOMAS POPE, M.D.

March 23, 2018

12:34 p.m. to 3:24 p.m.

Taken by the Defendant, Clark Archer, M.D.

Pursuant to Amended Notice

At the Offices of Hall Booth Smith, P.C.

123 Biltmore Avenue

Asheville, North Carolina

Reported by:

Mary Jo McGill, RDR, CLR

**Page 2**

```
 1              A P P E A R A N C E S
 2  For the Plaintiffs:
 3          Brian Cummings, Attorney at Law
            Cummings Manookian, PLC
 4          45 Music Square West
            Nashville, Tennessee  37203
 5          615.266.3333
            bcummings@cummingsmanookian.com
 6
    For the Defendant, Clark Archer, M.D.:
 7
            James E. Looper, Jr., Attorney at Law
 8          Nathaniel Gorman, Attorney at Law
            Hall Booth Smith, PC
 9          Fifth Third Center
            424 Church Street
10          Suite 2950
            Nashville, Tennessee  37219
11          615.313.9911
            jlooper@hallboothsmith.com
12
    For the Defendant HCA Health Services of Tennessee, Inc.
13  d/b/a StoneCrest Medical Center:
14          J. Blake Carter, Attorney at Law
            Gideon Cooper & Essary
15          315 Deaderick Street
            Suite 1100
16          Nashville, Tennessee  37238
            615.742.9512
17          blake@gideoncooper.com
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                I N D E X
 2  WITNESS                                    PAGE
 3  Called by the Defendant:
 4  TROY THOMAS POPE, M.D.
 5      DIRECT EXAMINATION BY MR. LOOPER         4
 6      CROSS EXAMINATION BY MR. CARTER         97
 7      REDIRECT EXAMINATION BY MR. LOOPER     121
 8
 9                E X H I B I T S
10
11      (Exhibits 2 and 3 were not attached at time of
12  transcription.  To be provided as Late-Filed Exhibits)
13
14      EXHIBIT       DESCRIPTION              PAGE
15      Exhibit 1   Thumb Drive                  5
16      Exhibit 2   E-mails (Late Filed)         9
17      Exhibit 3   Invoices (Late Filed)       11
18      Exhibit 4   Report                      14
19      Exhibit 5   ACEP Document               31
20      Exhibit 6   StoneCrest ER Records       53
21      Exhibit 7   Notes                       70
22      Exhibit 8   Note of Dr. Efobi           71
23      Exhibit 9   Records                     84
24      Exhibit 10  Article                     93
25
```

**Page 4**

P R O C E E D I N G S

Thereupon,

TROY THOMAS POPE, M.D.

Was called as a witness by the Defendant,

Clark Archer, M.D. and, having been first duly sworn,

was examined and testified as follows:

THE WITNESS: I do.

DIRECT EXAMINATION

BY MR. LOOPER:

Q. Dr. Pope, my name is James Looper, and I represent Dr. Clark Archer in this case, and you have been identified as a witness on behalf of the plaintiff, and I'm here to ask you some questions about that.

If I ever ask you a question you don't understand, please tell me you don't understand it, and I will do my best to rephrase it.

If there is something that you need to clarify, please let me know you need to clarify it. If you'll answer with a "yes" or "no" instead of a shake of the head or an "uh-huh," it makes life easier.

If you try to answer my question directly and explain if you need to, that's fine. If I ever interrupt you, I don't mean to. Sometimes we get in a conversation and we will interrupt each other. If I interrupt you please say, "Hey, Mr. Looper, I wasn't

Page 5

1  finished," and I will stop.  And I will do the same to
2  you if you interrupt me.  Is that fair?
3      A.   Fair.
4      Q.   It's also okay to take a break at any time.
5  If you need one, just let me know.  If you would, if
6  there's a question on the table, just answer the
7  question and I'll be happy to take a break whenever you
8  need one.
9          Do you have your file with you in this case?
10     A.   I have a thumb drive with all the electronic
11  files, but I didn't print anything out.
12     Q.   Okay.  Did you make any -- if you would, I'm
13  going to make that thumb drive an exhibit.
14          (Exhibit Number 1 was marked for
15  identification.)
16  BY MR. LOOPER:
17     Q.   What all is on that thumb drive?
18     A.   The administrative documents, like my fee
19  schedule, the documents provided to me by Mr. Cummings,
20  the articles I used in research, a copy of my report,
21  and that should be about it.
22     Q.   All right.  Are there any depositions on
23  there?
24     A.   Copies of the depositions provided me, yes.
25     Q.   Do you know which depositions you have been

Page 6

1  provided?
2      A.   Should be able to reproduce them here.
3          Nurse Bromley's, Nurse McCullough's,
4  Mr. and Mrs. Ruffinos', Dr. Archer's.  I believe there's
5  one from the neurologist recently, Dr. Chitturi.  And I
6  don't believe I can reproduce all of them, because I
7  think there was a couple of more.
8      Q.   You have seen Dr. Archer's deposition?
9      A.   Yes, I have.
10     Q.   Dr. Chitturi, I don't believe, has been
11  deposed in this case.
12     A.   Okay.
13     Q.   Have you seen an affidavit from Dr. Chitturi?
14     A.   I'm not sure.  I'd have to look.
15     Q.   Have you seen Mr. and Mrs. Ruffinos'
16  deposition?
17     A.   Yes.
18     Q.   Okay.  And what medical records -- well,
19  actually, you know what might make this a little bit
20  easier, is there anything in your report where it lists
21  the things you reviewed?  Have you reviewed anything in
22  addition to that?
23     A.   Since then I was provided the dash cam video
24  from the police.
25     Q.   All right.

Page 7

1      A.   And some additional Centennial Medical Center
2  documents, which are on that thumb drive that are not to
3  be included in the report.
4      Q.   What did the dash cam video, did it help you
5  with your opinions in any way?
6      A.   Not really.
7      Q.   Does it show anything that provides you any
8  insight into Mr. Ruffino's condition?
9      A.   It -- it showed me how he was acting at the
10  time he was pulled over, yes.
11     Q.   And how was he acting when he was pulled
12  over?
13     A.   He was functioning normally and appeared to
14  have expressive aphasia.  When I say "functioning
15  normally," I mean, physically walking and interacting
16  with the police.
17     Q.   And smoking a cigarette?
18     A.   I didn't notice.
19     Q.   And you said it looked like from the video he
20  had expressive aphasia?
21     A.   That was what I could discern from the video,
22  he was having trouble speaking.
23     Q.   And I think EMS that morning noted that he
24  was also slurring his speech and having problems
25  speaking?

Page 8

1      A.   Yes, in the ambulance ride, yes.
2      Q.   Are things like e-mails between you and
3  plaintiff's counsel included in that thumb drive?
4      A.   No, they're not.
5      Q.   Did you bring those with you?
6      A.   Well, there are a couple.  Anything that
7  regards -- that involved discussion of fees is in there,
8  and the two links to the records.
9      Q.   What about any factual summaries or things of
10  that nature?
11     A.   We never interacted with factual summaries.
12     Q.   Did you receive a letter with Mr. Cummings
13  with his factual summary of the case?
14     A.   The -- it's included in the report, yes.
15     Q.   Okay.  Is it on that thumb drive?
16     A.   Yes.
17     Q.   All right.  When were you first contacted in
18  this case?
19     A.   I believe it was February of last year.  I
20  would have to look at my records to know exactly.
21  Mr. Cummings might know better than me.
22     Q.   And at that time were you provided the
23  medical records?
24     A.   Yes.
25     Q.   And were you contacted by Mr. Cummings?

Page 9

1   A.   Yes.

2   Q.   You were not contacted through an agency?

3   A.   No.

4   Q.   All right.  What are your rates?  Well, I
5   will get to that in just a minute.  Let me not get off
6   track here.

7        Did everything you receive come
8   electronically?

9   A.   Yes.

10  Q.   Did you store it on a thumb drive, or was it
11  attached to e-mails and you copied it to the thumb
12  drive?

13  A.   Correct.

14  Q.   Okay.  And did you say you had additional
15  e-mails from Mr. Cummings that are not on there?

16  A.   Yes.

17  Q.   Can we make those late-filed Exhibit
18  Number 2, please.

19       (Late-filed Exhibit Number 2 was identified.)

20  Q.   And do you have anything that was in, like, a
21  hard letter version that was not sent to you as an
22  e-mail?

23  A.   No.

24  Q.   And you said the disc has copies of any
25  literature that you have consulted?

Page 10

1   A.   Correct.

2   Q.   Do you remember what literature you have
3   consulted?

4   A.   Not all of them, no, sir.

5   Q.   And your CV has got a list of anything you
6   have published; is that right?

7   A.   Correct.

8   Q.   All right.  And the report you did in this
9   case, that encompasses all of your opinions, correct?

10  A.   Correct.

11  Q.   Have you taken any notes while you were
12  preparing for this case?

13  A.   Some of the literature and depositions and
14  such are highlighted and sticky notes, and that's all in
15  there.

16  Q.   And you can see it on the drive?

17  A.   Uh-huh.

18  Q.   You haven't written, like I'm doing here on a
19  pad, jotting down any thoughts or anything?

20  A.   I haven't.  Try to keep it all organized.

21  Q.   Does that also include all of your invoices
22  that you've sent in this case?

23  A.   It doesn't.  I tried to print those morning.
24  Could not get Quicken to reprint them.

25  Q.   Okay.

Page 11

1   A.   I'm sure I can figure out how to do that, if
2   you would like me to provide them later.

3   Q.   Yes, sir.

4        MR. LOOPER:  We'll make that late-filed
5   Exhibit Number 3, please.

6        (Late-Filed Exhibit Number 3 was identified.)

7   Q.   You say it does have your fee schedule,
8   right?

9   A.   Uh-huh.

10  Q.   Do you remember which records specifically
11  you reviewed from Centennial?

12  A.   Which records specifically?

13  Q.   Uh-huh.

14  A.   There was 569 pages of records.

15  Q.   Is that from the admission on February 17th
16  and the readmission on the 26th, I believe?

17  A.   Yes.

18  Q.   So you reviewed the entire chart from both
19  admissions?

20  A.   Yes.

21  Q.   You had not reviewed those at the time you
22  made your report; is that correct?

23  A.   I reviewed the initial -- the transfer from
24  StoneCrest to Centennial, I had reviewed for the report.
25  The additional visit later I had not at the time of the

Page 12

1   report.

2   Q.   And just to be clear, you haven't actually
3   reviewed any images from any of the CT scans or MRIs,
4   have you?

5   A.   No.  Only radiologist reads.

6   Q.   And you just looked at the reports?

7   A.   Correct.

8   Q.   And if I understand right, you have not
9   reviewed any of his medical records from prior to his
10  admission at StoneCrest in the ER?

11  A.   I've seen -- I've seen some.  I've seen, I
12  think doctor clinic visit, a Dr. Efobi.

13  Q.   Okay.

14  A.   And there may have been -- there's an
15  occasional clinic visit involved, and I don't know
16  exactly when those clinic visits were.

17  Q.   And at the time you did your report, you had
18  not reviewed those either; is that correct?

19  A.   I'd have trouble answering that accurately.

20  Q.   This is printed on front and back, but if I
21  go to page 32, it looks like -- well, no, page 32 is not
22  on the list of material you reviewed.  Here it is.  Page
23  33 is the list of materials you reviewed.  And I will
24  just let you take a look at mine right there.  It's 33
25  and 34.  Sorry kind of backward to you.  Down at the

Page 13

1   bottom.
2       Do these here and here indicate everything
3   you reviewed at the time you made your report?
4       A.   Yes.
5       Q.   All right.
6       A.   Uh-huh.
7       Q.   And just for purposes of the record, that
8   indicates that you reviewed Bates numbered medical
9   records from StoneCrest Medical Center for February 17,
10  2016 ER presentation, Bates numbered medical records
11  from Centennial Medical Center from February 2016, the
12  radiologist interpretations of imaging performed at
13  StoneCrest and Centennial in February 2016, and the
14  depositions of Dr. Clark Archer, Nurse Carol McCullough,
15  Nurse Robert Bromley, John Ruffino, and Martha Ruffino.
16      A.   Yes.
17      Q.   And then there's a list of references here at
18  the bottom.
19      A.   Yes.
20      Q.   Is that's what's included on here?
21      A.   Yes.
22      Q.   Is there anything additional on the jump
23  drive that's not on this list --
24      A.   No.
25      Q.   -- if you know?

Page 14

1       MR. LOOPER:  This will be 4.
2       (Exhibit Number 4 was marked for
3   identification.)
4       MR. LOOPER:  So we'll make your report
5   Exhibit 4.
6   BY MR. LOOPER:
7       Q.   And I think we asked you this earlier, but I
8   apologize.  This contains all of your opinions, correct?
9       A.   Correct.
10      Q.   And by this, I mean Exhibit 4.
11      I think you told me in addition to what's on
12  there, you reviewed the second set of Centennial
13  records --
14      A.   Correct.
15      Q.   -- since you did that?
16      A.   Correct.
17      Q.   And you reviewed some, but you're not sure
18  how much of his pre-StoneCrest records?
19      A.   Correct.  Anything I reviewed that was
20  pre-StoneCrest was included in that, in the Centennial
21  packet of records.
22      Q.   Okay.  So you don't have the actual set from
23  Dr. Efobi's office or from his primary care physician?
24      A.   Not as separate submissions, no.
25      Q.   Okay.  Have you reviewed the expert

Page 15

1   disclosures filed by Dr. Archer?
2       A.   Expert disclosures filed by --
3       Q.   The reports, the thing like this.
4       A.   Oh, right, yes.
5       Q.   You have reviewed those?
6       A.   Yes.
7       Q.   All right.  What about the ones from
8   StoneCrest Medical Center?
9       A.   Can you tell me the specific experts
10  involved?  And if I can remember with a hundred percent
11  accuracy.
12      MR. CUMMINGS:  Can I help you?  They were
13  sent to him all at once.
14      MR. LOOPER:  Okay.
15      MR. CUMMINGS:  So I think he just can't
16  remember who is who.
17      Q.   And I'm going to get to specific names in a
18  minute.  Your attorney tells me you have seen both of
19  those.  I take it you disagree with those?
20      A.   I do disagree.
21      Q.   All right.  Have you reviewed the affidavit
22  of Dr. Chitturi?
23      A.   Yes, I have.
24      Q.   What about the affidavit of Dr. Valdivia?
25  Hang on just a moment.  I mispronounced that.

Page 16

1       MR. CARTER:  Valdivia.
2       Q.   Valdivia.  Thank you.
3       A.   I believe I have.  However, before answering
4   for sure, I'd love to see it and make sure I recognize
5   the text.
6   BY MR. LOOPER:
7       Q.   I will have it out in just a minute.
8       What about the affidavit of Jodi Dodds?
9       A.   That one is not ringing a bell.  What type of
10  doctor was Jodi Dodds?
11      Q.   Neurologist.
12      A.   Neurologist?
13      Q.   Stroke expert.
14      A.   It's certainly possible.  I've read a lot of
15  neurologists' experts reports and affidavits.
16      Q.   All right.
17      A.   The specific names of which ones they are,
18  it's hard for me to pinpoint right now.
19      Q.   Have you asked for anything that you have not
20  been provided?
21      A.   No.
22      Q.   Have you reviewed everything that you think
23  you need to review in order to form your opinions?
24      A.   Yes.
25      Q.   Did reviewing Dr. Chitturi's affidavit, the

Page 17

1 defendant's expert and reports and things of that nature
2 in any way alter your opinions?
3     A.   No.
4     Q.   In looking at your expert report, did you
5 prepare this yourself?
6     A.   Yes.
7     Q.   So when I looked at it, I noticed that on
8 this page it's dated February 2nd.  Down here it's dated
9 January 24th.  And then on the last page where you
10 signed it, it's dated February 5th.  Is there a reason
11 why there are multiple dates in the document?
12    A.   Probably because I need a secretary.
13    Q.   Okay.
14    A.   I began the report in late January and
15 finished it in early February.
16    Q.   Okay.  So it wasn't, like, hodgepodged
17 together.  It was something you worked on, and then you
18 concluded at that point in time?
19    A.   Correct.
20    Q.   All right.
21    A.   That's probably why the table of contents
22 number was off, too.
23    Q.   Okay.  I noticed in doing a background search
24 on you, that you advertise with a company called SEAK,
25 S-E-A-K?

Page 18

1     A.   Correct.
2     Q.   How long have you advertised with them?
3     A.   I've only advertised with them once.  I took
4 some training courses they offered to introduce doctors
5 into expert witnessing, and they offered a -- their
6 advertisement book.  You purchase an advertisement, and
7 they run it in the book.  I'm not quite sure how long.
8 I imagine a year.  It's been approximately a year.
9     Q.   And how much did you pay to do that?
10    A.   $400.  $450, I believe.
11    Q.   And what courses did you take with them?
12    A.   I took an introduction to independent medical
13 examination, and an introduction into expert witness.
14    Q.   All right.  This case you were not retained
15 through SEAK?
16    A.   I don't believe so, no.
17    Q.   Are you billing Mr. Cummings directly?
18    A.   Correct.
19    Q.   How much do you bill per hour in this case?
20    A.   $350.
21    Q.   And do you know how much you have billed so
22 far in this case?
23    A.   It's going to be approximately $5,000.
24    Q.   And how long have you been working as an
25 expert witness?

Page 19

1     A.   One year.
2     Q.   In looking, I saw in your report that you
3 listed one case you testified in?
4     A.   Correct.
5     Q.   Other than this case?
6     A.   (Nodding head.)
7     Q.   Have you been involved in any other cases
8 that you just reviewed?
9     A.   That I just reviewed?  Yes.
10    Q.   How many of those are there?
11    A.   There are, actual review, just two.
12    Q.   All right.  Are they both for plaintiffs?
13    A.   Actually those two are both defense.
14    Q.   Have you given a report in either of those
15 cases?
16    A.   No.
17    Q.   Are you expected to testify in those cases?
18    A.   No.
19    Q.   Is that because you found there was a
20 deviation from the standard of care?
21    A.   One of them, they chose another expert.  The
22 second one, I was not -- I was -- I believed there was a
23 deviation from the standard of care.
24    Q.   And in the year that you've been doing this,
25 how much income have you earned as an expert?

Page 20

1     A.   7,500.
2     Q.   And what percentage of your income is that?
3     A.   Last year I made $400,000.  So ten percent,
4 you could do the math, I suppose.
5     Q.   That's all right.
6         MR. CUMMINGS:  Somebody can.  I don't know if
7 I could.
8     Q.   Are you a member of any other witness
9 services besides SEAK?
10    A.   No.
11    Q.   Have you ever been arrested?
12    A.   No.
13    Q.   Have you ever been sued as a physician?
14    A.   Yes.
15    Q.   How many times?
16    A.   Twice.
17    Q.   Those cases go to trial, get settled, get
18 dropped?  What happened with them?
19    A.   The first one got dropped altogether.  I was
20 dropped early in the process.  The second one, I have
21 been dropped and the case is still active.
22    Q.   All right.  What state were those pending in?
23    A.   The first one in California.  The second one
24 in Kentucky.
25    Q.   In what year was the one in California?

Page 21

1   A.   The date of occurrence, I believe I'm still
2   within ten years.  It's 2009.
3       Q.   And the one in Kentucky?
4   A.   Was 2014.
5       Q.   Were you deposed in any of those cases?
6   A.   Both.
7       Q.   All right.  And what was the name of the one
8   in California?
9   A.   The plaintiff's name was Chaney,
10  Sally Chaney.
11      Q.   Okay.
12          MR. CARTER:  Spell Chaney.
13  A.   C-H-A-N-E-Y.  And the Kentucky is
14  Barry Williams.  Chaney was -- the defendant was North
15  Bay Medical Center.
16      Q.   Okay.
17  A.   Or North Bay Healthcare.  And in
18  Mr. Williams, it was Pikeville Medical Center.
19      Q.   Pikeville?
20  A.   Pikeville, yes.
21      Q.   And do you remember what counties those are
22  pending in, by chance?
23  A.   California would be Solano County, and I
24  believe Pikeville is in Pike County.
25      Q.   All right.  And those are the only two times

Page 22

1   you have been sued?
2   A.   Yes.
3       Q.   Have you ever been involved in any litigation
4   nonmedically related?
5   A.   No.
6       Q.   Have you ever had any issues with your
7   license?
8   A.   No.
9       Q.   And in how many states are you licensed?
10  A.   Kentucky, North Carolina, California, and I
11  have an inactive license in Oregon.
12      Q.   How long have you been practicing in
13  North Carolina?
14  A.   We moved here three years ago, and I practice
15  very little in North Carolina.  Most of my practice is
16  still in Kentucky.
17      Q.   Okay.  And where do you practice in Kentucky?
18  A.   The majority of my work is at St. Joseph
19  Medical Center or St. Joseph Hospital in London,
20  Kentucky.
21      Q.   I've actually been to London, Kentucky.
22  A.   I'm sorry.
23      Q.   Had to get Kentucky CLE, and they require you
24  to do it in person.
25  A.   How about it.  I like London.  It's a good

Page 23

1   hospital.  Good people.
2       Q.   And then --
3   A.   And the rest, it may be more time efficient
4   to refer to my CV.  There's -- I've worked at quite a
5   few hospitals.
6       Q.   So it's all listed on your CV?
7   A.   Yes.
8       Q.   I won't go through all of that then.
9          Are there any hospitals you have worked in
10  that are not on your CV?
11  A.   No.
12      Q.   And it's got the date you worked at all the
13  hospitals?
14  A.   Yes.
15      Q.   I won't waste any time going through that,
16  then.
17          I know you met with Mr. Cummings this morning
18  for roughly 30 minutes.  Have you met with anybody else
19  to prepare for this deposition?
20  A.   No.
21      Q.   Is that the first time you've ever met with
22  Mr. Cummings?
23  A.   In person, yes.
24      Q.   Have you spoken on the phone?
25  A.   Yes.

Page 24

1       Q.   How many times?
2   A.   A handful.  Five or six, I would say.
3       Q.   In meeting Mr. Cummings this morning, what
4   did you all talk about?
5   A.   We talked about his neurologist depositions
6   or the -- his neurologist expert depositions.  Talked
7   about what to expect in an expert deposition, because
8   this is my first.  That's about it.
9       Q.   All right.  What did he tell you to expect?
10  A.   He told me to expect questions related to the
11  time of onset, questions related to his ultimate
12  outcome, questions related to the neurology office
13  visits preceding the case, or preceding the incident.
14      Q.   And what did he tell you about his
15  neurologist expert depos?
16  A.   Mainly explaining why he sent me the extra
17  records, that he was asked about the Centennial Medical
18  Center subsequent visits, explain some of their content,
19  explain his neurologist's opinions about the upcoming
20  case.
21      Q.   And did he tell you what his neurologist
22  opinions came to as far as the outcome of the case is
23  concerned?
24  A.   Bits and pieces, yes.
25      Q.   Okay.  What were those bits and pieces?

Page 25

1    A.   We talked about the outcomes with TPA and
2  endovascular therapy for patients with stroke.
3    Q.   And we'll stop on that one.  Do you agree
4  with Dr. Callahan's assessment that patients that have
5  just TPA only have about a 30 percent chance of success?
6    A.   I believe it's in the 30s.
7    Q.   Less than 40 percent?
8    A.   I believe so, yes.
9    Q.   And I'm sorry I interrupted you a little bit.
10  Can you tell me what else you talked about?
11    A.   He told me that he had two neurology experts.
12  That's about it that I can -- that I can remember.
13    Q.   Let me run through the list of experts and
14  see if you know any of these folks.
15      Do you know Rajit Dhar?
16    A.   No.
17    Q.   Have you reviewed anything that was prepared
18  by him, a disclosure of his?
19    A.   I don't know --
20    Q.   Okay.
21    A.   -- specifically.
22    Q.   It doesn't stick out as something that
23  impacted your opinions?
24    A.   No.
25    Q.   What about Alfred Callahan?

Page 26

1    A.   I don't know.  Did not impact my opinion.
2    Q.   What about Jason Stopyra?  He's at
3  Wake Forest Department of Emergency Medicine.
4    A.   Do not recall.
5    Q.   Dale Criner?  He's a Memphis, Tennessee
6  emergency physician.
7    A.   Do not recall.
8    Q.   Kevin Bonner?  He's a Nashville, Tennessee
9  emergency physician.
10    A.   Don't recall.
11    Q.   Allyson Zazulia at department of neurology at
12  Wash U?
13    A.   No.
14    Q.   Jodi Dodds, I asked you about the affidavit
15  earlier.  He is the head of the stroke program at Duke
16  University.
17    A.   Okay.  I may have -- if I said yes to that
18  earlier, I may have been inaccurate.
19    Q.   You said you didn't know.
20    A.   Okay.
21    Q.   And my recollection -- that's my
22  recollection.  You said, I don't know if I did or not.
23    A.   Okay.  Yeah, I don't know.
24    Q.   Is Wake Forest a well-respected hospital and
25  educational system here in North Carolina?

Page 27

1    A.   I don't know.
2    Q.   What about Duke?
3    A.   It's certainly well-known.  I would say yes
4  to Duke.  My sister worked for a long time at
5  Wake Forest and had a lot of bad things to say about it,
6  so I don't know how to answer for Wake.
7    Q.   That's all right.  Do you know Clark Archer
8  in this case?
9    A.   No.
10    Q.   Do you know Dr. Chitturi?
11    A.   No.
12    Q.   What about Dr. Valdivia?
13    A.   No.
14    Q.   Dr. Efobi?
15    A.   No.
16    Q.   In looking at the records, did you recognize
17  any medical provider that you might know?
18    A.   No.
19    Q.   Are you with a physician provider service
20  when you work as an ER doc, or do you do it on your own?
21    A.   I do, for the last three or four years, I've
22  been what I like to call freelance.  I'm not under any
23  specific obligation to work any specific number of
24  shifts with any specific provider.  But I have a lot of
25  per diem contracts with -- in fact, I still do all of my

Page 28

1  work at Team Health.
2    Q.   Okay.
3    A.   But I only have per diem contracts with them
4  and cover all of their needs each month.  That's why I
5  travel.
6    Q.   How long have you been with Team Health?
7    A.   In this capacity, since 2012.
8    Q.   Okay.
9    A.   I also worked with them for six years on the
10  west coast right out of residency.
11    Q.   Okay.  Can you define the term "standard of
12  care" for me as it applies to this case?
13    A.   Standard of care is the accepted, reasonable
14  treatment of a patient as defined by medical and legal
15  peers.
16    Q.   Do you agree with me that two physicians can
17  exercise their medical judgment and come to different
18  decisions on how to treat a patient and both be
19  appropriate within the standard of care?
20    A.   Yes.
21    Q.   And do you agree with me that the standard of
22  care is not a hard-and-fast rule, but rather it requires
23  the physician to exercise his or her medical judgment at
24  the bedside while taking care of the patient?
25    A.   Yes.

Page 29

1    Q.  And you agree with me that when a physician
2 is at the bedside taking care of a patient, they don't
3 know the ultimate outcome for that patient?
4    A.  Yes.
5    Q.  And you also agree with me that doctors are
6 not required to be perfect when they treat a patient?
7    A.  Not required to be perfect?  I agree with
8 that.
9    Q.  And that it's the practice of medicine; do
10 you agree with that?
11   A.  Correct.
12   Q.  Medicine has not been perfected?
13   A.  Correct.
14   Q.  And you agree with me that patients have a
15 big stake in ensuring their own medical care by seeking
16 medical attention and things of that nature?
17   A.  Yes.
18   Q.  And you agree with me when you first looked
19 at the records in this case, you knew that Mr. Ruffino
20 had had a stroke, correct?
21   A.  Correct.
22   Q.  And you agree with me that a mistake in a
23 physician's judgment does not necessarily mean a
24 deviation from the standard of care?
25   A.  Not necessarily.

Page 30

1    Q.  Tell me about StoneCrest Hospital.
2    A.  It was the first hospital I ever interviewed
3 out of residency, ironically.  That was the only
4 interaction I've ever had with them.
5    Q.  What year was that?
6    A.  2005.
7    Q.  All right.
8    A.  And they are a community medical center.
9 They're not -- they're not a trauma center.  They're not
10 an interventional stroke center.  It's in suburban
11 Nashville, southeast of Nashville, I believe.
12   Q.  Do you know which county they're in?
13   A.  I think it's in Smyrna, the city.
14   Q.  Okay.
15   A.  I'm not sure the county.
16   Q.  All right.  Do you know how many beds?
17   A.  I don't.
18   Q.  Do you know what specialties serves
19 StoneCrest?
20   A.  No.
21   Q.  Do you know what resources are available to
22 physicians in the ER at StoneCrest?
23   A.  Not specifically, but I imagine I'm familiar.
24   Q.  Can StoneCrest perform endoscopic treatment
25 for stroke?

Page 31

1    A.  No.
2    Q.  Have you reviewed any demographic data on
3 Smyrna or StoneCrest Hospital?
4    A.  No.
5    Q.  Are you a member of the AMA?
6    A.  No, I'm not.
7    Q.  Are you a member of the ACEP?
8    A.  Yes.  And I have to pay my dues now or I
9 won't be soon.  I'm late.  They sent me a letter.
10   Q.  Do you agree with the ACEP's guidelines on
11 serving as an expert witness?
12   A.  I'm not familiar with them.
13   Q.  Let's make this Number 5.
14       (Exhibit Number 5 was marked for
15 identification.)
16 BY MR. LOOPER:
17   Q.  Make this Exhibit 5.  Why don't you take a
18 look at it.
19       MR. LOOPER:  I will substitute out a clean
20 copy.  Are you all right with that, Blake?
21       MR. CARTER:  Yeah.
22 BY MR. LOOPER:
23   Q.  Anything that you disagree with?
24   A.  No.
25   Q.  Do you agree that your role in this case is

Page 32

1 to provide sound, scientific testimony based on the
2 facts?
3    A.  Yes.
4    Q.  And agree that an expert witness is obligated
5 to be aware of and consider accepted science and
6 literature in forming opinions?
7    A.  Yes.
8    Q.  And you agree that it would be inappropriate
9 for you to be an advocate for one side or another?
10   A.  Yes.
11   Q.  And you agree that you must put yourself in
12 the shoes of the providers with the knowledge that they
13 had at the time this incident occurred?
14   A.  Yes.
15   Q.  What is TPA?
16   A.  Tissue plasminogen activator.
17   Q.  Are you okay if we just call it "TPA"?
18   A.  Yes, please.
19   Q.  And what does it do?
20   A.  It activates a process in the body that
21 dissolves blood clots.
22   Q.  Are you aware of the studies that indicate
23 that TPA has less efficacy in smokers?
24   A.  No.
25   Q.  Would that surprise you to find out that that

Page 33

1  is the case?
2      A.   Yes, it actually would.
3      Q.   All right.  Why would it surprise you?
4      A.   Because it's not part of my education.  It's
5  not an exclusion or inclusion criteria.  And I'm not
6  aware of it.  I've read all the major trials, and if it
7  was in there, it wasn't emphasized.
8      Q.   Okay.  Are you aware of the literature that
9  discusses that smoking alters fibrinogen?
10     A.   No.
11     Q.   Fibrinogen is one of the components of clot
12  formation, correct?
13     A.   Correct.
14     Q.   And that's part of how TPA works to dissolve
15  the clot, it dissolves the fibrinogen?
16     A.   What dissolves what, whether it's
17  plasminogen, or fiber, or fibrinogen, I lost after
18  biochemistry.  But fibrinogen is intimately involved in
19  the process that TPA works, yes.
20     Q.   All right.  TPA is not given -- well, first
21  off, what is a TIA?
22     A.   TIA is known as a mini stroke, I would say
23  most popularly.  It's when a stroke occurs, and then the
24  occlusion clears itself and the patient returns to
25  normal within 24 hours.

Page 34

1      Q.   It stands for trans ischemic attack?
2      A.   TIA?  Yes, transient ischemic attack.
3      Q.   Transient.  I was abbreviating yet again.  Is
4  it all right if we call that "TIA" as we move forward?
5      A.   Please do.
6      Q.   Or mini stroke?
7      A.   Yes.
8      Q.   And according to Mr. Ruffino's records, he
9  had suffered a number of these mini strokes prior to
10  coming to the StoneCrest emergency room; is that right?
11     A.   I believe there's a question in everyone's
12  opinion what Mr. Ruffino was experiencing.  Some seem to
13  think there were seizures.  Some seem to think they were
14  TIAs.  Some don't go any further than dizziness.  So I
15  can't answer that in the affirmative.
16     Q.   What do you think they were, in looking at
17  the records?
18     A.   I think they were probably TIAs.
19     Q.   Sorry, I had a thought that escaped me.  Give
20  me one second.  Old age is taking over.
21     A.   I hear you.
22     Q.   What are the -- I remember what it was now.
23  I got off the TPA for a second there.
24         What are the risks of TPA?
25     A.   Intracranial bleed.

Page 35

1      Q.   That's a substantial risk, correct?
2      A.   That is the most serious risk.  I guess you
3  need to define substantial for me.
4      Q.   Most serious works for me.
5      A.   Okay.
6      Q.   And it's not -- it's not a low percentage in
7  the standpoint of the people that react that way to TPA,
8  is it?
9      A.   Please rephrase.
10     Q.   How common is an intracranial bleed in the
11  face of giving TPA?
12     A.   Okay.  It's very uncommon.
13     Q.   What percent of people get TPA have an
14  intracranial bleed?
15     A.   I don't remember the exact number.  It's a
16  single digit.
17     Q.   All right.  What are the other risks of TPA?
18     A.   From an ER doctor's standpoint, none.  I
19  guess you could say anaphylaxis, as with any drug that
20  you give, they could have an allergic reaction to it,
21  but that would be about it.
22     Q.   What do you mean by from an ER doctor's
23  standpoint?
24     A.   Well, there may be negative aspects of TPA
25  that an interventional neurologist may know about that I

Page 36

1  don't.
2      Q.   Okay.
3      A.   But when I'm making the decision of whether
4  or not to give TPA, the only negative aspect that enters
5  my mind is the possibility of an intercranial bleed.
6      Q.   Do you consult with a neurologist prior to
7  making the decision to give TPA?
8      A.   If I have time, I'll call one.
9      Q.   Do you have any problem with Dr. Archer
10  consulting with Dr. Chitturi before making a decision on
11  TPA?
12     A.   No.
13     Q.   And that was appropriate and within the
14  standard of care to do so?
15     A.   To consult a neurologist?
16     Q.   Yes, sir.
17     A.   Yes.  May I clarify?  Not required, nor
18  should the neurologist's opinion change yours, if you
19  disagree.  Does that make enough sense to you?
20     Q.   And let me understand the first part, not
21  required, but is not inappropriate.  It is within the
22  standard of care to do so?
23     A.   Yes.
24     Q.   Okay.
25     A.   Unless it would delay the administration of

ESQUIRE
DEPOSITION SOLUTIONS

Page 37

1  the medicine.  That's what I meant by not required.  If
2  I had to wait an hour to talk to a neurologist, don't do
3  it.
4       Q.  And then you would not defer to a
5  neurologist's opinion on giving TPA or an endovascular
6  treatment of a stroke?
7       A.  Not if the patient met all the criteria, no.
8       Q.  What are the criteria?
9       A.  It's a long list.  May I read from my report?
10      Q.  Absolutely.
11      A.  Sure.
12      Q.  Sorry, it's not paperclipped.
13      A.  I wrote too much.  All right.
14          The inclusion criteria are diagnosis of
15  ischemia stroke causing measurable neurologic deficit,
16  onset of symptoms less than 4.5 hours before beginning
17  treatment.
18          MR. CARTER:  What page are you reading from?
19      A.  I'm reading from page 27.
20          And as I read that, this is my error in
21  including this, or including this unrevised -- oh, no
22  there it is.  Four and a half hours at the bottom.
23  Good.
24          So these are -- what I'm reading right now is
25  the inclusion criteria for less than three hours, the

Page 38

1  time when -- the time -- within three hours of the onset
2  of the stroke.
3       Q.  Okay.  So let me back up a just a minute.
4       A.  Okay.
5       Q.  Let's start over.  You are reading from --
6          MR. LOOPER:  Thanks, Blake.
7          MR. CARTER:  I got it on my computer.
8       Q.  Good.  You are on page 27, correct?
9       A.  Uh-huh, correct.
10          Yeah, so inclusion criteria:  Diagnosis of
11  ischemic stroke causing measurable neurological deficit,
12  onset of symptoms less than three hours before beginning
13  treatment, and age greater or equal to 18 years.
14      Q.  All right.  And the three-hour mark is the
15  only time it's approved by the FDA for the use of TPA,
16  correct?
17      A.  By the FDA, correct.
18          And the exclusion criteria, so these are --
19  these are situations where the patient should not
20  receive the TPA; stroke or head trauma in the previous
21  three months, symptoms suggestive of subarachnoid
22  hemorrhage, arterial puncture at a non-compressible site
23  in the previous seven days, history of previous
24  intracranial hemorrhage, intracranial neoplasm, AV
25  malformation or aneurysm, recent intracranial or

Page 39

1  intraspinal surgery.  Elevated blood pressure, which is
2  specific.  There's a specific number that is generally
3  included after that.  It's a systolic pressure greater
4  than 180.  Active internal bleeding.  Acute bleeding
5  diathesis, including but not limited to conditions
6  defined in hematologic, platelet count less than a
7  hundred, heparin use within 48 hours, an abnormally
8  elevated APTT, current anticoagulant use with an INR
9  greater than 1.7, current use of a direct thrombin
10  inhibitor or direct factor XA inhibitor, blood glucose
11  less than 50, CT demonstrating multilobar infarction.
12          And there are some relative exclusion
13  criteria, which means you can use them in consideration,
14  but they do not exclude a patient from getting the
15  medicine.  Excuse me.  Only minor or rapidly improving
16  stroke symptoms, pregnancy, or seizure on the onset of
17  stroke with postictal residual neurologic impairments,
18  major surgery or serious trauma in the previous 14 days,
19  recent gastrointestinal or urinary tract hemorrhage
20  within the previous 21 days, recent acute MI in the
21  previous three months.
22      Q.  Let's stop and just talk about the three
23  hours for a minute.
24          Before I do that, there were a couple of
25  questions I forgot to ask you, some of the background

Page 40

1  questions.
2          Have you had any specific training in stroke?
3       A.  Yes.
4       Q.  What is your specific training?
5       A.  ER residency.
6       Q.  You have not had a residency in neurology,
7  correct?
8       A.  Correct.
9       Q.  You have not done a fellowship in stroke
10  study, correct?
11      A.  Correct.
12      Q.  You have not worked at a stroke specific
13  center, correct?
14      A.  I have.
15      Q.  Let me rephrase that.  I'm sorry.  Hospitals
16  can do that.  But I mean, you have not served as a
17  director of a stroke center?
18      A.  No.
19      Q.  Are you an attending physician in taking care
20  of patients that have a stroke, other than in the
21  emergency room?
22      A.  No.  I've never done any work outside of an
23  emergency room.
24      Q.  All right.  And you've never had any training
25  specific to stroke outside of your ER residency?

Case 3:17-cv-00725    Document 73-2    Filed 04/27/18    Page 10 of 32 PageID #: 885

Page 41

1 A. And personal training I give myself
2 throughout my career, yes.
3 Q. And continuing education?
4 A. Correct.
5 Q. And what I meant was you've not done any
6 specific fellowship in stroke or neurology?
7 A. No.
8 Q. And you're not board certified in neurology
9 or subcertified in stroke neurology?
10 A. Correct.
11 Q. Okay. And then -- and we talked about
12 literature earlier. In looking at the literature, it's
13 important to use the literature that was in place at the
14 time that the event occurred, correct?
15 A. Correct.
16 Q. And that's something as an expert that you're
17 required to do?
18 A. Correct.
19 Q. And then as far as determining what the
20 standard of care is, standard of care can change
21 throughout time, the physicians are expected to comply
22 with; is that fair?
23 A. Correct.
24 Q. And so when you as an expert look back on one
25 of these cases, you have to apply the standard of care

Page 42

1 that would have been appropriate at that time; is that
2 correct?
3 A. Correct.
4 Q. And that's what you endeavor to do as a
5 witness in this case?
6 A. Correct.
7 Q. Now, let's talk about the assessment of
8 John Ruffino's inclusion and exclusion criteria from
9 page 27 of your report.
10 Looking at the second one there, "Onset of
11 symptoms less than three hours before beginning
12 treatment." Dr. Archer first saw this patient at 12:20,
13 correct?
14 A. Correct.
15 Q. When Dr. Archer saw this patient, he had been
16 having symptoms since sometime that morning; is that
17 correct?
18 MR. CUMMINGS: Object to the form.
19 A. He had been having -- he had symptoms at 8:00
20 that morning. Whether or not -- those do not appear to
21 be the same symptoms he was experiencing at 12:20.
22 Q. They don't have to be to be a stroke, though,
23 do they?
24 A. Those symptoms did not appear to be
25 sequential leading up to 12:20. They appear to have

Page 43

1 resolved and recurred.
2 Q. Strokes can wax and wane, can't they, the
3 symptoms of a stroke?
4 A. The symptoms of stroke can wax and wane? I
5 don't feel qualified to answer that question. I --
6 patients that are having a stroke I interact with for
7 about an hour, usually. So if you could call it a
8 stroke, if it has symptoms that are waxing and waning
9 but never resolved, I guess by definition that's still
10 not a TIA so long as it never resolves. Thinking out
11 loud right now. But I don't think I have the -- I could
12 answer that question accurately.
13 Q. In looking at Mr. Ruffino's deposition and
14 Mrs. Ruffino's deposition and all the medical records,
15 it's at least in one medical record that he reported
16 that he woke up with symptoms that morning; did he not?
17 A. He did report that, yes.
18 Q. If you wake up with symptoms of a stroke,
19 it's considered a go-to-bed stroke; is it not?
20 A. Correct.
21 Q. And so in determining whether or not to do
22 TPA or any additional treatment, you would set the time
23 of the onset of symptoms back to when the patient went
24 to bed?
25 A. Or last seen normally, yes.

Page 44

1 Q. Or last seen normally.
2 A. If nobody was with him at bed, it might be
3 dinnertime.
4 Q. Fair enough. So it can push back even
5 earlier if he was by himself?
6 A. Correct.
7 Q. All right. And that's important in
8 determining when to give TPA because of the risks of
9 TPA, correct?
10 A. Correct.
11 Q. And the times that are set out for giving TPA
12 are important times because of the risk of TPA?
13 A. Correct.
14 Q. And it's your opinion that in the -- within
15 the standard of care, TPA should either be given within
16 three hours of the beginning of treatment or within six
17 hours of -- I mean within four and half hours of
18 beginning of treatment?
19 A. Four and a half hours.
20 Q. Four and a half hours?
21 A. Uh-huh.
22 Q. And it's outside of the standard of care to
23 give TPA after four and a half hours?
24 A. Correct.
25 Q. So if Mr. Ruffino's symptoms started at

Page 45

1  8:00 a.m. or earlier, because no one had seen him normal
2  prior to 8:00 a.m., and then when Dr. Archer first saw
3  the patient at 12:20, it was too late to give him TPA;
4  is that correct?
5        MR. CUMMINGS:  Object to the form.
6     A.   If the patient had not returned to normal and
7  had been experiencing symptoms since 8:00 a.m., he
8  should not have given.  But you said at 8:00 a.m. we're
9  stating as time zero?
10     Q.   That's one of the times that's reported.
11     A.   Okay.
12     Q.   He saw him at 12:20.
13     A.   If he could get the medicine into him in
14  18 minutes, then he should have -- he still should have
15  given TPA, because I believe that would be four and a
16  half hours would be 12:30 for the time zero at eight.
17     Q.   The ER physician is required to do a physical
18  exam on the patient before doing TPA, correct?
19     A.   Correct.
20     Q.   He's required to ascertain history and
21  physical before doing that, correct?
22     A.   Correct.
23     Q.   That can't happen instantaneously, can it?
24     A.   Correct.
25     Q.   Dr. Archer first presented a little after

Page 46

1  12:20 to this patient, correct?
2     A.   Correct.
3     Q.   After 12:53 he called a code stroke after
4  doing a history and physical, talking to nurses, and
5  talking with family, correct?
6     A.   I don't remember that specific time, but I
7  believe you're correct.
8     Q.   All right.  And so when Dr. Archer called the
9  code stroke at 12:53 after determining that this fit his
10  definition of what may be a stroke, it was too late to
11  give TPA if he had been having symptoms since 8:00 a.m.
12  or earlier that morning?
13     A.   Correct.
14        MR. CUMMINGS:  Object to the form.
15  BY MR. LOOPER:
16     Q.   And you, as an ER physician, and Dr. Archer
17  as an ER physician, don't make the decision on whether
18  or not endovascular treatment is appropriate for a
19  patient, correct?
20     A.   Correct.
21     Q.   That's left up to neurology?
22     A.   Correct.
23     Q.   And then on the exclusion criteria, it says,
24  "stroke or head trauma in the previous three months"?
25     A.   Correct.

Page 47

1     Q.   Mr. Ruffino had been having mini strokes and
2  quite of number of them in the time leading up to his
3  presentation at StoneCrest, correct?
4     A.   I don't know that, no.
5     Q.   I thought you told me earlier that you
6  thought he was having mini strokes prior to his arrival
7  there.
8     A.   Well, my personal opinion from reading a
9  stack of documents is that they were probably TIAs, but
10  that's strictly an opinion.  I have nothing to say for
11  sure what was going on with Mr. Ruffino.
12     Q.   So you don't know whether he had been having
13  that prior to his arrival or not?
14     A.   I don't.  Nor would it impact that exclusion
15  criteria.
16     Q.   Why would it not impact that exclusion
17  criteria?
18     A.   Because a TIA is not a stroke.  The reason
19  it's an exclusion criteria is because after you have a
20  stroke, the brain tissue is fragile.  And that brain
21  tissue is dead, so it's more likely to bleed.  With a
22  TIA, there's no dead brain tissue.
23     Q.   How long had the clot been present in the M-1
24  segment of the MCA in Mr. Ruffino?
25     A.   Don't know.

Page 48

1     Q.   Do you have any reason to -- let me make sure
2  I'm saying this right.
3        Do you have any reason to dispute that it had
4  been there since December of 2016 at least?
5     A.   I have -- I have no way to comment on that.
6  I don't even entirely understand the question.  You mean
7  the -- the buildup of plaque within that artery or
8  the --
9     Q.   The occlusion.
10     A.   The occlusion that started the stroke?
11     Q.   Yes, sir.  I'm sorry if I use the wrong term.
12  Let me know --
13     A.   It really wouldn't matter.
14     Q.   -- if it doesn't make sense.
15     A.   I don't -- I don't have an opinion on the
16  matter.
17     Q.   All right.  Does that impact the ability to
18  give TPA or endovascular treatment?
19     A.   TPA, no.  I don't know about endovascular
20  treatment.
21     Q.   So the longer an occulusion has been present,
22  it has no impact on the giving of TPA?
23     A.   If an occlusion, if you're referring to an
24  occlusion as a stroke, which is what I would refer to an
25  occlusion as, a complete and total blockage, then, yes,



1  absolutely.  It needs to only be present for four and a
2  half hours.  If you're talking about, like, the build
3  up, narrowing of arteries, it does not affect the --
4      Q.  How much of an occlusion was there on the MRA
5  that was done in December of 2016?
6      A.  I don't recall.
7      Q.  How much of an occlusion was there on the CT
8  angiogram that was done in the ER at the time?
9      A.  I don't recall.
10     Q.  Did it show the artery was completely
11  occluded?
12     A.  I don't recall.
13     Q.  If you assume that it shows the artery was
14  completely occluded on February 17, 2017 -- is that
15  right -- yeah, '17.  That's right.  Am I wrong?
16         MR. CARTER:  You're wrong.  Sixteen.
17  BY MR. LOOPER:
18     Q.  So I'm off by a year here.  Sorry.
19  February 17, 2016.  Earlier when I said December, I
20  meant December of '15, not December of '16.
21     A.  I understand, yes.
22     Q.  All right.  If the CT angiogram that was done
23  on February 17th of 2016 showed a complete occlusion
24  when it was performed a little after 1:00 p.m. or
25  2:00 p.m. that afternoon, that means that that occlusion

1  has been there for some time, correct?
2         MR. CUMMINGS:  Object to the form.
3      A.  The specific occlusion present on the MRI and
4  CTA you're speaking of, I would think had been there for
5  the entire time since that CTA or MRI, yes.
6      Q.  And they don't just materialize
7  instantaneously on the CT angiogram, correct?  It takes
8  time for an occlusion to build up?
9      A.  I'm still worried about the definition of
10  occlusion here.  If we're talking about a stroke
11  occlusion, no, it doesn't.  It takes that, like that
12  (snapping fingers).  You throw an embolism, form a clot,
13  it happens instantaneously.
14         If you're talking about atherosclerotic
15  disease that builds up the narrowing of arteries, yes,
16  that takes time.
17     Q.  If the CTA indicated there was an abrupt,
18  complete occlusion of the artery, does that impact your
19  opinions in this case?
20     A.  What -- so you're talking about the CTA in
21  December?
22     Q.  The CTA that was done on February 17th.
23     A.  At his presentation at StoneCrest?
24     Q.  Uh-huh, yes, sir.
25     A.  No, that doesn't.

1      Q.  Why does it not impact your opinions?
2      A.  Well, the degree of occlusion, even the
3  availability of a CTA, is not part of my decision-making
4  process in treating a patient with TPA.
5      Q.  Does it not impact the effectiveness of TPA?
6      A.  I don't know.
7      Q.  So repeated TIAs are not a contraindication
8  for giving TPA --
9      A.  Correct.
10     Q.  If we come on to the next page, the top line
11  there is only minor or rapidly-improving stroke
12  symptoms?
13     A.  Correct.
14     Q.  In this case, Mr. Ruffino had minor symptoms;
15  is that correct?
16     A.  Any stroke is a major event.  If you're
17  talking about in the scope of how severe a stroke can
18  be, then, yes, his symptoms were minor at the time.
19     Q.  And that fits under the relative exclusion
20  criteria, correct?
21     A.  Under a relative exclusion criteria.
22     Q.  And in that regard, the standard of care does
23  not require the giving of TPA in that instance, correct?
24     A.  I would -- I would disagree.  The number four
25  has been defined as a -- and this -- this would have

1  been in place well before Dr. Archer saw the patient.
2  In today's stroke environment, that number has even gone
3  lower as to any appreciable deficit whatsoever, it will
4  be considered strongly and has been encouraged to be
5  given even with a one.  But the number four has been
6  accepted as a number to -- to consider --
7      Q.  And --
8      A.  -- stroke.
9      Q.  And throughout the course of the day,
10  Mr. Ruffino's symptoms improved and got worse and
11  improved and got worse throughout the entire day; is
12  that correct?
13     A.  From what I can glean from the record,
14  Mr. Ruffino appeared to have symptoms either very early
15  in the morning that clearly existed on the police dash
16  cam, that appeared to not exist by the time he got back
17  to the hospital.  I have no idea whether those symptoms
18  changed in severity, waxed and waned, or what.
19         All I know is he appeared to have expressive
20  aphasia.  And then he appeared to have no neurologic
21  deficit probably an hour after the police dash cam
22  video.  And then at 12:20 he developed new -- or around
23  12:00 he developed new symptoms that got him the NIH
24  score of four.  So I cannot comment on the waxing and
25  waning portion of your statement.

Page 53

1    Q.   At 1:00 was he noted to be back
2  neurologically normal by Nurse Bromley?
3    A.   At 1:00?
4    Q.   Uh-huh.
5    A.   No, I don't believe so.
6    Q.   Just a minute.  I may have the time wrong.  I
7  just want to check it.
8       MR. LOOPER:  Need a bigger table.
9       While we were doing that, we'll just go ahead
10  and make this Exhibit Number 6.
11       (Exhibit Number 6 was marked for
12  identification.)
13       MR. LOOPER:  These are the StoneCrest ER
14  records.  Brian, I have a copy for you.  Hold on a
15  second, and I will get you a page number.  I am going to
16  have to get my magnifying glass out to see this.
17    Q.   So on page 21, there should be a 1:00 p.m.
18  assessment by Nurse Bromley in the bottom right-hand
19  side of that page.  Do you see it at the very bottom,
20  2-17-16, 1300?
21    A.   2-17-16, 1300.  Correct.
22    Q.   Is that a normal neurological assessment at
23  that time?
24    A.   No, it's not.
25    Q.   What's abnormal about it?

Page 54

1    A.   Slurred speech.
2    Q.   Slurred speech is something that Mr. Ruffino
3  had been reporting that he had had constantly for the
4  last month or so; is that correct?
5       MR. CUMMINGS:  Object to the form.
6    A.   I can't remember --
7  BY MR. LOOPER:
8    Q.   If the ER --
9    A.   -- him specifically saying it, actually.
10  I've read it in various depositions, but I can't
11  remember him saying it.
12    Q.   If the ER -- I mean, the paramedics noted
13  that when they saw him, and the triage nurse noted that
14  when she saw him, do you have any reason to dispute
15  that's what he reported to them?
16    A.   No.
17    Q.   And so there was no expressive aphasia noted
18  at that time, correct?
19    A.   None noted, correct.
20    Q.   And there was no facial droop, or right-sided
21  weakness, or any of that noted at that time, correct?
22    A.   Correct.
23    Q.   And then was he also neurologically normal a
24  little after 6:00 that afternoon?
25    A.   Could you please direct me to the page?

Page 55

1    Q.   Yes.  That is on page 24.
2    A.   The first entry?
3    Q.   604 entry.
4    A.   604.  Yes.  Correct.
5    Q.   Everything is noted normal there.  He's not
6  even slurring his words there, is he?
7    A.   That's correct.
8    Q.   And, in fact, he got up and went to the
9  restroom unassisted with normal gait?
10    A.   Correct.
11    Q.   He sat down in a chair and ate a sandwich and
12  potato chips and a drink?
13    A.   Correct.
14    Q.   And it specifically says, "No expressive
15  aphasia noted at this time"?
16    A.   It does.
17    Q.   So at that time he's 100 percent
18  neurologically normal, correct?
19    A.   Yes.
20    Q.   And so on the exclusion criteria that we
21  talked about earlier, throughout the course of that
22  entire day, Mr. Ruffino went from neurologically normal
23  to not neurologically normal; is that correct?
24    A.   Repeat the question again so I get the timing
25  right.

Page 56

1    Q.   From the time he arrived in the StoneCrest ER
2  until the time he left the StoneCrest ER his symptoms
3  waxed and waned; they went from normal to not normal
4  from a neurological evaluation?
5    A.   Correct.
6    Q.   And after the time that Dr. Archer saw him,
7  he presented with a normal neurological evaluation?
8    A.   Judging by what you just showed me, yes.
9    Q.   And there were different times before
10  Dr. Archer saw him that the nurses indicated he had a
11  normal neurological evaluation?
12    A.   Correct.
13    Q.   And so that would be an exclusion to giving
14  TPA, correct?
15       MR. CUMMINGS:  Object to the form.
16    A.   No.  The decision is already made by 6:30.
17  Whether or not to give TPA at 12:20, a neurologic exam
18  that occurred at 6:30 would not enter my...
19    Q.   I'm talking about from a causation
20  standpoint, from a standard of care standpoint in
21  looking back on this, either he had symptoms that
22  started at 8:00 in the morning or a little bit earlier
23  that waxed and waned, or he had a series of TIAs
24  throughout the day in the emergency room?
25       MR. CUMMINGS:  Object to the form.

Page 57

1    A.   A series of TIAs.  Please allow me a moment
2  to look at the neuro checks.
3         Okay.  Thank you.  Could you ask the question
4  again?
5    Q.   So based on those neurological checks, his
6  symptoms at each neurological check varied slightly.  At
7  different times he was completely normal neurologically,
8  both before and after Dr. Archer saw him; is that
9  correct?
10    A.   That is correct.
11    Q.   And based on that, that would indicate that
12  Mr. Ruffino is either having a stroke with symptoms that
13  waxed and waned, where the symptoms began at -- before
14  8:00 a.m. that morning, correct, or he's having serial
15  TIAs throughout the day?
16         MR. CUMMINGS:  Object to the form.
17    A.   I think those are two of the possibilities,
18  yes.
19    Q.   Those are two of the most likely
20  possibilities, aren't they?
21         MR. CUMMINGS:  Object to the form.
22    A.   I don't know about most likely.
23    Q.   Is it most likely that he had a stroke that
24  began a little before 12:20 and that he returned to
25  neurologically normal with no intervention?  That's

Page 58

1  highly unlikely, isn't it?
2    A.   I would consider that unlikely.  These are
3  most likely documentation anomalies.
4    Q.   So then that puts it, if these are all
5  documentation anomalies, then that puts it that these
6  symptoms began sometime before 8:00 a.m. that morning?
7         MR. CUMMINGS:  Object to the form.
8    A.   No.  The anomaly of the absence of a
9  neurologic deficit in between two neurologic exams that
10  show neurologic deficit seems to me to be an anomaly.
11    Q.   So you will accept the neurological exam in
12  the morning as normal in between having an abnormal
13  neurological with EMS and an abnormal exam with
14  Dr. Archer, but you will not accept the neurologic exam
15  in the evening as being normal?
16         MR. CUMMINGS:  Object to the form.
17    A.   It seemed to be repeatedly verified by
18  multiple nurses that the patient didn't have symptoms
19  when he arrived at the hospital, and then both
20  physicians and nurses saw his symptoms at 12:20 or
21  12:00.
22    Q.   Which nurses verified that when he arrived at
23  the hospital that he did not have symptoms?
24    A.   Nurse McCullough.  The PA who did not call
25  code stroke.

Page 59

1    Q.   Did the PA actually evaluate him?
2    A.   I don't know.  He didn't document that he did
3  such.
4    Q.   Okay.  So we don't have any documentation of
5  a history and physical there?
6    A.   Correct.
7    Q.   So we have Nurse McCullough who saw him in
8  triage?
9    A.   Correct.
10    Q.   And then we have -- and based on what
11  Nurse McCullough saw in triage, the PA ordered a -- or
12  nurse practitioner, I can't remember which it was now,
13  ordered a CT to be done, correct?
14    A.   Correct.
15    Q.   And that's one of the things you do if you're
16  concerned about a stroke, is you want to make sure it's
17  not hemorrhagic, correct?
18    A.   Correct.
19    Q.   Because if it's hemorrhagic, TPA is
20  contraindicated?
21    A.   Correct.
22    Q.   And so they documented what they documented,
23  Dr. Archer documented what he documented, and at the end
24  of the evening Nurse Bromley, who was the only nurse who
25  saw the patient all day long, documented neurologically

Page 60

1  normal at the end of the evening, correct?
2    A.   Correct.
3    Q.   And you discount that documentation at the
4  end of the evening from Nurse Bromley?
5    A.   I don't discount it, no.  It wouldn't be part
6  of my decision making for the patient presenting to the
7  ER with a stroke, obviously, because it doesn't exist at
8  that time.
9    Q.   Right.  But in looking at this
10  retrospectively, you have to determine whether or not it
11  was a stroke at 12:20 or if it was a TIA, and you have
12  to determine when symptoms began?
13    A.   Correct.
14    Q.   If it's a stroke at 12:20, you don't return
15  to neurologically normal, correct?
16    A.   If it's a full-blown stroke, no.
17    Q.   And as you told me earlier, TPA is not given
18  unless it's a full-blown stroke?
19    A.   Correct.
20    Q.   And TPA is not given after four and a half
21  hours of symptom onset, correct?
22    A.   Correct.
23    Q.   So based on what is happening here, unless
24  you discount one of the entries, if you believe what's
25  written in the chart --

Case 3:17-cv-00725   Document 73-2   Filed 04/27/18   Page 15 of 32 PageID #: 890

Page 61

1     A.   Uh-huh.

2     Q.   -- which is what you have to go on as an

3   expert, correct?

4     A.   Correct.

5     Q.   Based on what is recorded in this chart, he

6   either had a stroke with symptoms that waxed and waned

7   and began at some point prior to 8:00 a.m. the morning

8   of the 17th, or he was having serial TIAs throughout the

9   day?

10         MR. CUMMINGS:  Object to the form.

11    A.   Those are two possibilities.  Or when I --

12  from gleaning -- from reading the literature what I

13  believe happened is he had a TIA that morning, was

14  neurologically normal for a period of hours, and then

15  had another event at or around noon.

16    Q.   If he had a -- well, event --

17    A.   Another -- and then he had a stroke at or

18  around noon, and the normal neurologic exams after that

19  are probably not accurate, in my opinion.

20    Q.   So you are discounting what's written in the

21  chart right there?

22    A.   If that's what you're --

23         MR. CUMMINGS:  Object to the form.

24    A.   If that's what you call that, yes.

25    Q.   Well, you have to, correct?

Page 62

1     A.   Okay.

2     Q.   I mean, I'm trying to get to how you -- you

3   either have to say that's wrong --

4     A.   Okay.

5     Q.   -- the documentation is wrong in the

6   afternoon --

7     A.   Okay.

8     Q.   -- but it's correct in the morning, right?

9     A.   Understood, yes.

10    Q.   I mean, you -- I'm just trying to make sure

11  I'm understanding where we're going with this.

12    A.   Yes.

13    Q.   All right.  And so -- but if you don't say

14  that documentation is wrong, then he could not have had

15  a stroke at noon, could he?

16    A.   Correct.

17    Q.   And so if the documentation is correct, there

18  are only two things that could have happened; one, he

19  was having serial TIAs off and on all day, or two, he

20  had a stroke whose symptoms waxed and waned that began

21  sometime prior to 8:00 a.m. that morning?

22         MR. CUMMINGS:  Object to the form.

23    A.   Correct.

24  BY MR. LOOPER:

25    Q.   Let's talk a little bit about the next line

Page 63

1   here, seizure at the onset of stroke with -- is that

2   pronounced postictal?

3     A.   Postictal, yes.

4     Q.   Okay.  Residual.

5         There was concern that Mr. Ruffino might have

6   been having seizures, wasn't there?

7     A.   Yes.

8     Q.   And, in fact, he had been put on, was it

9   gabapentin?

10    A.   Yes.

11    Q.   He had been put on gabapentin in order to

12  treat the possibility of seizures, and he had reported

13  to EMS that morning that he had not taken his

14  gabapentin, but had taken his blood pressure and high

15  cholesterol drugs, correct?

16    A.   Correct.

17    Q.   If his -- and he had dizziness all day in the

18  ER, correct?

19         MR. CUMMINGS:  Object to the form.

20    A.   I don't know.

21    Q.   Were all the dizzy assessments -- and feel

22  free to take a look.

23    A.   Okay.

24    Q.   As I read it, the assessments for dizziness

25  indicated he stayed dizzy the entire day, that that

Page 64

1   never improved?

2     A.   These would be around the same area, I

3   suppose.

4     Q.   I would think so.

5     A.   The reason I say I don't know is I don't

6   believe dizziness is part of a neuro exam.

7     Q.   I don't think they were included in the neuro

8   exam.  I think they were included as separate

9   assessments, if that helps you find it.

10    A.   I still haven't found one.  If anybody has

11  some advice.

12    Q.   I may be able to help you out.  I didn't

13  write down the specific page number, but I can probably

14  help find it.

15         MR. CARTER:  Let's look at 15.

16         MR. CUMMINGS:  Can he also look at his

17  affidavit to refresh his memory, or just the pages you

18  want him to look at?

19         MR. LOOPER:  Right now I just want him to

20  look at the pages he's looking at.

21    A.   I still haven't found it on 15.  Oh, vertigo

22  dizziness reassessment.  There it is.  Ongoing symptoms

23  of dizziness.  Okay.

24    Q.   And then there's another --

25    A.   Dizzy other for a month... Condition no

Page 65

1  change... Okay.
2      Q.  And then --
3      A.  I would agree with your statement.
4      Q.  And rather than spend a ton of time going
5  through all of this, there's some in the afternoon as
6  well showing that his dizziness was unchanged.
7      A.  Okay.
8      Q.  So in that regard, he had dizziness
9  throughout the day in the emergency room at StoneCrest,
10 at least every time a notation was made about it?
11     A.  Yes.
12         MR. CUMMINGS:  Object to the form.  What page
13 were we on for the record?
14     MR. LOOPER:  15 is where he started.
15 BY MR. LOOPER:
16     Q.  And dizziness can be a sign of a seizure,
17 correct?
18     A.  Can you define dizziness?
19     Q.  It's what he reported, that he was dizzy --
20         MR. CUMMINGS:  Object to the form.
21     Q.  -- vertigo.
22     A.  Vertigo I would consider a possible symptom
23 of a seizure, although extremely rare.  Otherwise,
24 dizziness, no, is not a symptom of seizure.
25     Q.  Is dizziness a symptom of stroke?

Page 66

1      A.  Once again, vertigo can be a symptom of
2  stroke, although extremely rare.  Otherwise -- so I
3  would consider vertigo a possible symptom of stroke and
4  seizure.  Other definitions of dizziness I would not
5  consider a symptom.
6      Q.  And did you read in Mr. Ruffino's deposition
7  where he reported that he was so dizzy he couldn't
8  drive?
9      A.  I don't recall.
10     Q.  If a patient is so dizzy they cannot drive,
11 that indicates vertigo, would you agree?  That's a
12 severe dizziness.
13     A.  We often try to differentiate what a patient
14 means by dizziness in the emergency department.  And
15 there's generally two definitions:  One is an intense
16 spinning sensation, which is vertigo.  The other is a
17 light-headed sensation, having that sensation before you
18 pass out, and if you got up too quickly, kind of where
19 things go dark and you feel light-headed, which is the
20 term I like to use for it.  So we distinguish between
21 vertigo and light-headed.
22     Q.  Light-headed is a sensation that resolves,
23 correct?
24     A.  Correct.
25     Q.  And in Mr. Ruffino's case, his sensation of

Page 67

1  dizziness did not resolve while he was in the ER?
2         MR. CUMMINGS:  Object to the form.
3      A.  Judging by these entries, no, it did not
4  resolve.
5      Q.  Is that a symptom -- the entries in the
6  chart, is that a symptom of a stroke or not a symptom of
7  a stroke?
8      A.  If I was assessing Mr. Ruffino and he
9  reported to me that he had dizziness, it would not
10 affect my decision to give him TPA.  If I had an
11 objective finding of vertigo, it might affect my
12 decision to give TPA.
13     Q.  And in an objective finding of that, you
14 would not give TPA, correct?
15         MR. CUMMINGS:  Object to the form as "that".
16     Q.  That's what he just said.
17         MR. CUMMINGS:  He said dizziness and vertigo.
18 I'm trying to help both of you, what you're asking
19 about.
20 BY MR. LOOPER:
21     Q.  If you -- your objective finding of vertigo,
22 that's what he said, right?
23     A.  Correct.
24     Q.  If you had an objective finding of vertigo,
25 you would not give TPA, correct?

Page 68

1      A.  If that vertigo caused my physical exam -- if
2  that vertigo somehow made him not meet -- somehow made
3  him fall into the exclusionary criteria, I would not
4  give him TPA.  I'm trying to think of a way that that
5  would make him fall into the exclusionary criteria.
6         As you can see, I've never encountered a
7  stroke patient with just vertigo.  It's exceedingly
8  rare.  I'm having to form this opinion on the fly.  Let
9  me look back.
10        Okay.  So it would not affect my -- it would
11 not change his exclusionary criteria; therefore, would
12 not affect my decision to give a patient who met
13 inclusion/exclusion criteria TPA.
14     Q.  Is the ongoing dizziness that he's having
15 that day related to a stroke or related to something
16 else?
17        MR. CUMMINGS:  Object to the form.
18     A.  The true answer to that is I don't know, if
19 you're asking for my opinion.
20     Q.  Yes, sir.
21     A.  I -- I think it was a subjective complaint
22 that didn't have an objective finding that is not used
23 in the decision to give TPA.
24     Q.  Is it used in the evaluation of whether the
25 patient is having a stroke?

Page 69

1    A.    The feeling of dizziness, not in my opinion,
2  no.
3    Q.    And then at the bottom of this exclusion
4  list, when it moves into the 3 to 4.5 hours, it says,
5  taking an oral anticoagulant.  Mr. Ruffino was taking a
6  high-dose aspirin daily, was he not?
7    A.    Uh-huh.
8    Q.    And that is an exclusion criteria in the 3 to
9  4.5 hours; is it not?
10    A.    No, they wouldn't consider aspirin.  An oral
11  anticoagulant would be -- aspirin is a platelet
12  inhibitor, so is Plavix.
13        An anti-coagulant would be Coumadin, Lovenox,
14  Heparin, or all of the new modern ones, the direct
15  thrombin inhibitors, or factor Xa inhibitors, like
16  Xarelto and Eliquis.
17    Q.    So high-dose aspirin is not considered an
18  oral anti-coagulant for purposes of exclusion?
19    A.    Correct.
20    Q.    Okay.  If you want to kind of take your
21  report and sort of sit it to the side so we don't get
22  that mixed up.  Thank you.  All right.
23        THE WITNESS:  We're at a little pause here.
24  Do you mind if I use the restroom?
25        MR. LOOPER:  Not at all.

Page 70

1        (Recess from 2:04 p.m. to 2:11 p.m.)
2        (Exhibit Number 7 was marked for
3  identification.)
4  BY MR. LOOPER:
5    Q.    Let me show you Exhibit 7.  That's some notes
6  from Dr. Luck.  And down towards the bottom indicates
7  that he has had six to eight episodes with an assortment
8  of physical neurological findings.  Do you see that?
9        MR. CUMMINGS:  Can I point to --
10    A.    Oh, six --
11    Q.    Yeah --
12    A.    -- times --
13    Q.    -- that's fine.  Close to the middle.  Sorry.
14    A.    Yeah, I see that where he says that.  I am
15  sorry, I was reading the whole thing.
16    Q.    That's all right.  You agree that's what
17  Dr. Luck found back in November of 2015?
18    A.    Yes.  And may I revise my earlier statement,
19  I believe I have Dr. Luck's records.
20    Q.    All right.
21    A.    And have reviewed them, but I don't recall
22  the specific page.
23    Q.    And also want to show you a note from
24  Dr. Efobi -- we'll mark this as Exhibit 8 -- where it's
25  the referral from Dr. Luck to Dr. Efobi, who was his

Page 71

1  neurologist back in the latter part of 2015, which also
2  indicates he has had those symptoms ongoing for over a
3  month; is that correct?
4    A.    Yes.  It was two months.
5    Q.    Two months.
6        (Exhibit Number 8 was marked for
7  identification.)
8  BY MR. LOOPER:
9    Q.    And both of those records indicate that
10  Mr. Ruffino was a heavy smoker; is that correct?
11    A.    Correct.
12    Q.    And do you agree with that assessment?
13    A.    Yes.
14    Q.    By being a heavy smoker, that increases his
15  risk of stroke, heart attack, high cholesterol, quite a
16  number of things?
17    A.    Correct.
18    Q.    Is Mr. Ruffino also obese?
19    A.    He's certainly overweight.
20    Q.    Okay.  Does that increase his risk of stroke,
21  heart attack, TIAs --
22    A.    Yes.
23    Q.    -- all of those things?
24        And then being overweight and the combination
25  of smoking and leading a sedentary lifestyle increases

Page 72

1  his risk of all of those things?
2    A.    Yes.
3    Q.    And he was advised of that by a number of
4  physicians, correct?
5    A.    I'm sure he was.  I don't specifically
6  remember in the documents.  But it's very common for
7  doctors to say that to patients.
8    Q.    He was advised to stop smoking?
9    A.    Definitely was.
10    Q.    Exercise?
11    A.    I don't remember the exercise.  I do remember
12  being advised not to smoke.
13    Q.    And to lose some weight?
14    A.    Probably so.
15    Q.    When Dr. Archer saw the patient at 12:20 that
16  day, he did, as you told me, he did an appropriate
17  history and physical?
18    A.    (Nodding head.)
19    Q.    He discussed Mr. --
20        Is that a yes?
21    A.    Yes.
22    Q.    Sorry.  See, I was falling in the trap, too.
23    A.    Yeah.
24    Q.    And I've been doing this for 22 years now.
25        He talked to Mr. Ruffino and Mrs. Ruffino

Case 3:17-cv-00725   Document 73-2   Filed 04/27/18   Page 18 of 32 PageID #: 893

1  about the symptomatology and the history?
2      A.   I can't affirm that he talked to
3  Mrs. Ruffino. I don't believe it specifically says in
4  his note, but --
5      Q.   He said that in --
6      A.   He did? Okay.
7      Q.   -- in his deposition, correct?
8      A.   Once again I'd need to review. I don't
9  specifically remember him saying that.
10     Q.   If you assume that he did that, that is
11 appropriate?
12     A.   Okay.
13     Q.   Do you agree with me?
14     A.   I agree.
15     Q.   All right. He discussed it with the nurses?
16     A.   Correct.
17     Q.   After doing that, he called a code stroke?
18     A.   Correct.
19     Q.   He appropriately ordered a CTA?
20     A.   That's even extra.
21     Q.   All right. He appropriately consulted
22 neurology with Dr. Chitturi?
23     A.   Agreed.
24     Q.   He appropriately got the stroke coordinator,
25 Nurse Seagers involved?

1      A.   Okay. I don't specifically recall that
2  either, but it sounds logical.
3      Q.   Is that appropriate?
4      A.   That would be appropriate.
5      Q.   Assuming that he did that, that was an
6  appropriate thing to do?
7      A.   Yes.
8      Q.   And in doing those things, he moved through
9  the stroke algorithm that an ER physician is supposed to
10 move through, correct?
11     A.   Correct.
12     Q.   So your opinion is essentially that
13 Dr. Archer's mistake was deciding that this was a stroke
14 that had been ongoing since early that morning?
15     A.   Correct.
16     Q.   If Dr. Archer is correct in that regard, he
17 did not deviate from the standard of care in how he took
18 care of this patient, correct?
19         MR. CUMMINGS: Object to the form.
20     A.   Could you give me a specific time I'm
21 considering?
22     Q.   If Dr. Archer is -- if it's correct that
23 Mr. Ruffino's symptoms started sometime before 8:00 a.m.
24 that morning, when Dr. Archer called a code stroke at
25 12:53, he did not deviate from the standard of care by

1  not giving TPA, correct?
2      A.   The timing is so specific in these -- in this
3  answer, I'm trying to pin you down on, like, an actual
4  number that I'm answering about. Like 8:00 a.m.?
5      Q.   The time varies depending on when you ask
6  Mr. Ruffino and --
7      A.   Right.
8      Q.   Because he also reported to providers that he
9  went to bed -- or that he woke up abnormal, didn't he?
10     A.   Yes.
11     Q.   Which is a contraindication to giving TPA --
12     A.   Yes.
13     Q.   -- when Dr. Archer saw him?
14     A.   Yes.
15     Q.   And so based on the time when even Dr. Archer
16 saw him, it's been more than four and a half hours since
17 the onset of symptoms, hasn't it, if you believe
18 Dr. Archer is correct?
19     A.   Yes.
20     Q.   All right. And, therefore, Dr. Archer
21 complied with the standard of care, if he's correct in
22 assessment of the duration of symptoms?
23     A.   Yes.
24     Q.   All right.
25     A.   If, in fact, that time is after 8:00 a.m., my

1  opinion would be -- my opinion would be the patient
2  still had the opportunity to receive TPA.
3      Q.   After Dr. Archer concluded his evaluation at
4  12:53?
5      A.   I've given TPA within 13 minutes of a patient
6  hitting the door.
7      Q.   Dr. Archer called the code stroke at 12:53.
8      A.   Right.
9      Q.   That is four hours and 23 minutes, if the
10 time is at 8:30?
11     A.   Correct.
12     Q.   And that is -- the standard of care does not
13 require Dr. Archer to give TPA in seven minutes. It
14 requires him to --
15     A.   No.
16     Q.   It requires him to evaluate the patient?
17     A.   Exactly.
18     Q.   And so Dr. Archer did not deviate from the
19 standard of care even if the time of onset of symptoms
20 was 8:30, did he?
21     A.   8:30, I agree.
22     Q.   All right.
23     A.   Wait. I'm sorry. No, no, no. Prior to
24 8:00, I agree. 8:30, I believe he saw the patient first
25 off at 12:20.

Page 77

1     Q.   Saw the patient at 12:20.
2     A.   At 12:20.  I think it would be reasonable to
3  say that you could give TPA -- the standard of care, in
4  my opinion, would be he has the ability with all of the
5  testing already done and available, which it was, to
6  give that patient TPA within 30 minutes.  And that would
7  be 12:50.  So four and a half hours prior to that would
8  have been 8:20.
9     Q.   And I think you told me earlier --
10    A.   Uh-huh.
11    Q.   -- that the ER physician is required to do a
12 history and physical?
13    A.   Correct.
14    Q.   Required to obtain the history from the
15 patient?
16    A.   Correct.
17    Q.   The patient's family, and the nurses, review
18 the chart?
19    A.   Review the ER chart, yes.
20    Q.   That's what I mean.
21    A.   Yeah.
22    Q.   And do a thorough history and physical?
23    A.   Correct.
24    Q.   That does not happen instantaneously, does
25 it?

Page 78

1     A.   No.
2     Q.   And, in fact, it would be a deviation from
3  the standard of care to run into the room, look at
4  patient, "you're having a stroke," and pop him with TPA,
5  wouldn't it?
6     A.   Correct.
7     Q.   And so in that regard Dr. Archer did all of
8  those things, and from the time of 12:20 to 12:53 is how
9  long it took him to then call a code stroke?
10    A.   Correct.
11    Q.   That's not a deviation from the standard of
12 care, is it?
13    A.   Correct.
14    Q.   And in so doing, Dr. Archer requested a
15 consult with neurology?
16    A.   Correct.
17    Q.   That's also not a deviation from the standard
18 of care, is it?
19    A.   No.
20    Q.   And it's not a deviation for Dr. Archer to
21 consider the neurologist's opinion in giving TPA, is it?
22    A.   It's not a deviation from the standard of
23 care for him to consider the neurologist's opinion.  It
24 is a deviation from the standard of care for him to not
25 give TPA because of the neurologist's opinion, if the

Page 79

1  patient meets criteria for TPA.
2     Q.   Is that the --
3     A.   In other words, he's allowed to disagree with
4  the neurologist and go ahead and give TPA.
5     Q.   Is that the standard in Smyrna, Tennessee in
6  the ER there?
7          MR. CUMMINGS:  Object to the form.
8     A.   I have never worked in Smyrna, Tennessee.  It
9  would be the standard of care wherever I worked.
10    Q.   I think one of your other criticisms was that
11 Dr. Chitturi didn't have all of the information
12 available to him; is that correct?
13    A.   Could I see that criticism?
14    Q.   It's somewhere in there, I thought.  If
15 that's not a criticism, that's fine, you tell me, no, I
16 don't have that criticism.
17    A.   Say the question one more time.
18         MR. CUMMINGS:  I can help both of you.  He's
19 not criticizing Dr. Chitturi, but I don't know if that's
20 how you meant to make it sound.
21    Q.   Well, my question was, you had a criticism
22 that Dr. Chitturi didn't have all the information?
23    A.   I would agree with that, yes.
24    Q.   If Dr. Chitturi has testified he did have all
25 the information necessary, then that would eliminate

Page 80

1  that criticism; is that correct?
2     A.   So Dr. Chitturi says that he had all the
3  information?
4     Q.   Uh-huh.
5     A.   That would eliminate my criticism of Chitturi
6  saying that he didn't have the information?
7     Q.   Well, you said that Dr. Chitturi wasn't
8  provided all the information.
9     A.   Right.
10    Q.   If Dr. Chitturi says he was provided all the
11 necessary information, then that eliminates that
12 criticism; is that correct?
13    A.   Well, my criticism would have been
14 specifically during -- for that normal period in the
15 emergency department.  So if you're telling me that he
16 is aware of that normal period, then I have an even
17 greater criticism of Dr. Chitturi's performance.
18    Q.   What is your criticism of Dr. Chitturi's
19 performance?
20    A.   He should have recommended TPA.
21    Q.   Do you believe that Dr. Chitturi deviated
22 from the standard of care?
23    A.   No.
24    Q.   Okay.  So I don't understand that.  How do
25 you criticize when you don't believe he deviated from

Page 81

1 the standard of care?

2    A.   I don't believe he had that information.  I

3 don't believe the information of the normal period in

4 the ER was communicated with Dr. Chitturi.  It doesn't

5 appear in his notes anywhere.

6    Q.   If Dr. Chitturi has testified that he did

7 have that information, then that eliminates that

8 criticism, correct?

9    A.   Correct.

10    Q.   And are you then criticizing and saying

11 Dr. Chitturi deviated from the standard of care, if he

12 knew about that?

13    A.   Yes.

14    Q.   If Dr. Chitturi has said that it would not be

15 appropriate to give TPA based on Mr. Ruffino's symptoms

16 over the last month of recurrent paresthesias,

17 weaknesses, and the other things that we've read about,

18 would you be critical of Dr. Chitturi for that?

19    A.   Would I be critical -- and I apologize for

20 clarifying everything, but -- so you are asking me if he

21 said the patient does not meet TPA criteria because of

22 the symptoms he had been having for the last few months?

23    Q.   Correct.

24    A.   I would.  I would criticize Dr. Chitturi for

25 that, yes.

Page 82

1    Q.   So you would say that's a deviation from the

2 standard of care?

3    A.   Yes.

4    Q.   If Dr. Archer relied upon Dr. Chitturi, the

5 neurologist in this case, in formulating his opinions on

6 TPA, Dr. Archer -- it's appropriate for Dr. Archer to

7 rely on Dr. Chitturi, correct?

8    A.   Not in the decision to give TPA.

9    Q.   So Dr. Archer should have overridden the

10 more-trained stroke specialist?

11    A.   I disagree that Dr. Chitturi is more trained

12 than Dr. Archer in -- or at least I disagree that

13 Dr. Chitturi is more trained than Dr. Pope in the

14 treatment of TPA -- in the treatment of stroke in the

15 ER.

16    Q.   Dr. Pope does not establish the standard of

17 care, does he?

18    A.   No.

19    Q.   The standard of care is established by what

20 ordinary and reasonable physicians would do in the same

21 or similar circumstances?

22    A.   Correct.

23    Q.   And are you saying that Dr. Chitturi is being

24 unreasonable in his determination that this patient was

25 not a candidate for TPA even within the 4.5-hour window

Page 83

1 based on his month long of symptoms?

2    A.   Correct.

3    Q.   When Mr. Ruffino was transferred from

4 StoneCrest to Centennial, the records go with him, don't

5 they?

6    A.   Usually, yes.

7    Q.   And it's the job of the physicians that

8 receive the patient to review those records, correct?

9    A.   Correct.  May I revise that answer?  It's

10 important for them to review the clinical pages

11 provided.

12    Q.   And it's assumed that when a physician does a

13 history and physical at the receiving facility, that

14 they review those clinical pages, correct?

15    A.   If they were provided to the physician, I'm

16 sure they would.  There's many times -- I'd say half the

17 time, a patient will arrive in the emergency department

18 from somewhere else and the records have not arrived

19 yet.  Sometimes they arrive by -- with the EMS.

20 Sometimes they are faxed.  Sometimes they are -- they

21 show up later.

22        So I certainly can't criticize someone at the

23 receiving facility for not reviewing documents that may

24 or may not have been there, if that's what we're getting

25 at.

Page 84

1    Q.   Well, Doctor, I think it's pronounced Oncombi

2 (phonetic), did a physical, a history and physical at

3 Centennial the day after Mr. Ruffino arrived, correct?

4    A.   (Nodding head.)

5    Q.   And the records between StoneCrest and

6 Centennial are electronic records, correct?

7    A.   If they exchanged them electronically?

8    Q.   Do you know in they do or not?

9    A.   I don't.

10    Q.   Do you know if they are part of the same

11 hospital system or not?

12    A.   I don't.

13    Q.   The records are supposed to be sent with the

14 patient when they're transferred, correct?

15    A.   Correct.

16    Q.   Dr. Oncombi (phonetic) at Centennial

17 determined that this was a wake-up stroke the day

18 before, didn't he?

19        MR. CUMMINGS:  Object to the form.

20    A.   I don't recall.

21        MR. LOOPER:  Are we on number 9?

22        COURT REPORTER:  Yes, sir.

23        (Exhibit Number 9 was marked for

24 identification.)

25        MR. LOOPER:  Actually, let me give you all

1 the pages of that, just so they are all together.

2     MR. CUMMINGS:  You are allowed to read more

3 than what he just highlighted.

4     THE WITNESS:  Okay.

5     A.   So I agree that Dr. Oncombi (phonetic) said

6 the patient woke up with the above-listed symptoms in

7 the morning.

8     Q.   Which would make it a go-to-bed stroke?

9     A.   Correct.

10     Q.   Would you do me a favor and clip those two

11 pages together?

12     A.   Yes.

13     Q.   Thank you.  Just so we don't get completely

14 mixed up.  Is there any medical record of any physician

15 in this case that determined that this was a new onset

16 stroke at noon, the day that Dr. Archer saw him?

17     A.   From a physician?

18     Q.   Yes.

19     A.   Not to my knowledge.

20     Q.   Has anyone made that determination, other

21 than you?

22     A.   Other than me and the other plaintiffs'

23 experts?

24     Q.   The two neurologists.

25     A.   Myself and the two neurologists, correct.

1     Q.   So none of the treating physicians have made

2 that determination, correct?

3     A.   Not to my knowledge, no.

4     Q.   What was Mr. Ruffino's condition when he left

5 Centennial Hospital?

6     MR. CUMMINGS:  Are you asking the first time?

7     MR. CARTER:  Are you asking him the first

8 time?

9     Q.   Yeah, the first time.  I'm sorry.

10     A.   So the first time.

11     Q.   Thank you.

12     A.   He underwent -- I don't know a specific

13 degree of his deficits.  He still had deficits present.

14 They were improved from their maximum.

15     Q.   A Rankin Score of one or two is considered

16 normal, correct?

17     MR. CUMMINGS:  Object to the form.

18     A.   I don't use Rankin Score at all.  So I'd have

19 to look at the Rankin store criteria.  I use NIH and GCS

20 is about the only ways we describe neurologic deficit.

21     Q.   Is GCS -- Rankin Score is what the

22 literature, all the studies on stroke --

23     A.   Right.

24     Q.   -- utilize the Rankin Score, don't they?

25     A.   Which has zero to recovery, correct, yeah.

1     Q.   And that's what we're talking about,

2 Mr. Ruffino's recovery from the first incident, correct?

3     A.   Right.

4     Q.   And his Rankin Score was a one when he left

5 Centennial the first time, according to the

6 documentation, correct?

7     A.   I don't know that documentation, but I'll

8 believe you.

9     Q.   All right.  And if he has got a Rankin Score

10 of one when he leaves Centennial the first time, that's

11 considered a normal outcome; is that right?

12     MR. CUMMINGS:  Object to the form.

13     A.   I don't know.  I'd have to look at Rankin

14 Score and its criteria.  As I said, we don't use -- I

15 don't deal with the patients in the recovery phase, so

16 Rankin Score never enters my thought process.

17     I know patients have improved Rankin Scores

18 later, but all I know is those improved Rankin Scores.

19 I don't know what specifically each number means.

20     Q.   Mr. Ruffino had experienced significant

21 improvement on discharge, correct, the first time?

22     A.   Correct.

23     Q.   And if I understand it right, you don't know

24 what the Rankin Scale is, correct?

25     A.   Correct.

1     Q.   Mr. Ruffino had a Glasgow Coma Scale of 15

2 when he was discharged?

3     A.   Correct.

4     Q.   And he only had a slight permanent deficit on

5 discharge the first time, correct?

6     A.   Define "slight" for me.

7     Q.   How would you define it?  I mean --

8     A.   I don't know.

9     Q.   How would you define Mr. Ruffino's condition

10 on discharge the first time?

11     A.   I would call it mild residual deficit,

12 something like that, yeah.

13     Q.   There's nothing that affected his ability to

14 handle the activities of daily living, is it?

15     A.   Probably disagree with that.

16     Q.   All right.  How would you disagree with that?

17     A.   Because I would consider any deficit would

18 affect my activities of daily living.

19     Q.   His speech had returned to normal?

20     A.   Okay.

21     Q.   Do you agree or not?

22     A.   I'd have to look at the records.  I don't

23 know -- I don't know -- when he was discharged, I don't

24 know exactly what his deficits were remaining.  I know

25 he improved while at the hospital.

Page 89

1    Q.   So you can't comment on his current condition
2  and how that was related to anything Dr. Archer did; is
3  that fair?
4    A.   I can comment that the majority of patients
5  who receive TPA within a 4.5-hour window presenting for
6  stroke have improved functionality and NIH scores long
7  into the future and immediately.
8    Q.   It's my understanding that less than
9  40 percent have improved.
10   A.   From TPA alone, correct.
11   Q.   From TPA alone?
12   A.   Correct.
13   Q.   So it's not the majority, it's less than
14  40 percent.
15   A.   I should have said patients receiving
16  appropriate comprehensive stroke care, which includes
17  initially TPA, followed by transfer to a stroke center,
18  have the -- have, the majority, improved outcome.
19   Q.   Dr. Archer ordered a transfer to a stroke
20  center, didn't he?
21   A.   Yes.
22   Q.   And Dr. Chitturi was of the opinion that any
23  endovascular treatment would not have been successful;
24  is that correct?
25   A.   I'm not sure if he had that opinion or not.

Page 90

1  I don't recall.
2    Q.   Dr. Chitturi originally was planning to admit
3  Mr. Ruffino to StoneCrest; is that correct?
4    A.   Was that Chitturi or the hospitalist?  I
5  remember they were planning to admit him there, and then
6  someone else became involved and decided to transfer the
7  patient to Centennial.
8    Q.   It was Dr. Archer who made the phone call to
9  have him transferred to Centennial.
10   A.   Okay.
11   Q.   And that complies with the standard of care;
12  does it not?
13       MR. CUMMINGS:  Object to the form.
14   A.   I think it's irrelevant at that point,
15  they're deciding to transfer a patient later.  I would
16  say that's a good decision, but I think it's irrelevant
17  to the standard of care.
18   Q.   You would agree with me that Mr. Ruffino was
19  advised on discharge the first time, that if he
20  experienced any recurrence of symptoms, to immediately
21  return to the ER?
22   A.   Yes.
23   Q.   And Mr. Ruffino did not do that, did he?
24   A.   He did not.
25   Q.   He waited over 15 hours after his symptoms

Page 91

1  started to return to the ER, correct?
2    A.   Correct.
3    Q.   And in doing so, Mr. Ruffino significantly
4  altered the potential outcome that he had; is that
5  correct?
6    A.   As compared to presenting immediately, yes.
7    Q.   All right.  If Mr. Ruffino had presented
8  immediately, more likely than not, he would not have the
9  deficits that he has today?
10   A.   Correct.
11   Q.   And that was information that Mr. Ruffino had
12  been made aware of on discharge from Centennial the
13  first time?
14   A.   I imagine he was.  I don't specifically
15  remember reviewing his discharge paperwork, but that
16  would be very standard for a stroke center.
17   Q.   And you can't say more likely than not that
18  TPA alone, when Dr. Archer and the folks at StoneCrest
19  saw Mr. Ruffino, would have resulted in recannulization,
20  can you?
21   A.   Resulted in recannulization.  Meaning
22  clearing the clot?
23   Q.   Clearing the clot.
24   A.   I can't tell you that, no.
25   Q.   In your Rule 26, did you cite the American

Page 92

1  Stroke Association AHASA survey?
2    A.   The articles?
3    Q.   The articles.
4    A.   Yes.
5    Q.   Can you tell me which year you cited and
6  which criteria?
7    A.   I cited the 2007 article, "Guidelines for the
8  Early Management of Adults with Ischemic Stroke."
9  There's another one.
10       MR. CUMMINGS:  You ask -- I'm pointing him to
11  number six, which I think is what he's asking you about.
12   A.   Okay.
13       MR. CUMMINGS:  Make sure --
14   A.   Yeah, 2007, 2009, and 2013 were the AHAA
15  articles I referenced.  The 2013 one, that's the
16  "Guidelines for the Early Management of Patients with
17  Acute Ischemic Stroke."
18   Q.   When was the patient in the emergency room?
19   A.   Two thousand and -- we just had this problem
20  earlier.  2016.
21   Q.   Why didn't you cite to the Guidelines for
22  Management of Stroke from 2015 instead of the 2013?
23   A.   I'm not sure.  I don't -- I don't -- please
24  show me the article you're speaking of.
25   Q.   Wait a second.

Page 93

1    A.   Or the guideline.
2    Q.   Let me find the page number on that.
3        MR. CARTER:  Page number from his report.
4        MR. LOOPER:  No, I was going to get the
5    article out of my book, and I can't find where I put it.
6    There it is.
7        Let me write something down real quick, and
8    I'll give you this copy, and we'll look at it.  We'll
9    make this Exhibit Number 10.
10        (Exhibit Number 10 was marked for
11    identification.)
12    Q.   You see at the top where it says, "2015
13    updates to 2013"?
14    A.   Uh-huh.
15    Q.   I think you told me earlier that it's
16    important as an expert witness to utilize the literature
17    that would have been in place at the time?
18    A.   Yes.
19    Q.   So that would be the appropriate literature
20    to look at when evaluating this criteria, correct?
21        MR. CUMMINGS:  Object to the form.
22    A.   It would be one of them, yes.
23    Q.   And that replaces the 2013 guidelines,
24    correct?
25    A.   I would agree.

Page 94

1    Q.   You did --
2    A.   I'm guessing that my bibliography is
3    incorrect more than me not having read this.
4    Q.   All right.  Your NIHSS Stroke Scale was four
5    on Mr. Ruffino at the time that he was at StoneCrest,
6    correct?
7    A.   That's correct.
8    Q.   And if you look in the candidates for
9    endovascular thrombectomy -- I think it's page 3031, but
10    I'd have to double check that.
11    A.   I think I see it.  Are you talking about this
12    page?
13    Q.   Yeah.  And I can lean over and point to
14    something, if you don't mind.
15        If you take a look at under number two --
16    actually, I can't read upside down.
17        MR. CARTER:  Just take mine.
18        MR. LOOPER:  Great.  Thank you.
19    Q.   If you look under number two it says,
20    "Patient should receive endovascular therapy with a
21    stent retriever, if they meet all the following
22    criteria."  Do you see that?
23    A.   I do.
24    Q.   Letter E is an NIHSS stroke scale greater
25    than or equal to six.  Do you see that?

Page 95

1    A.   I do.
2    Q.   Mr. Ruffino does not meet that criteria, does
3    he?
4    A.   Not at StoneCrest, no, sir.
5    Q.   So he was not a candidate for TPA and
6    endovascular treatment at StoneCrest, was he?
7        MR. CUMMINGS:  Object to the form.
8    A.   He was not a candidate.  This is for
9    endovascular treatment, not for a TPA.
10    Q.   He was not a candidate for endovascular
11    treatment, was he?
12        MR. CUMMINGS:  Object to the form.
13    A.   I feel this is the first time I have read
14    anything comprehensive about what a patient -- what
15    patients should receive endovascular treatment when.  So
16    as far as reading this, I agree, he did not have an
17    NIHSS score greater than 6, and therefore not an
18    endovascular candidate.  But I'm an ER doc, not a
19    neurologist.  I don't deal with endovascular therapy.
20    Q.   Well, your testimony was that had he received
21    TPA and endovascular therapy, he more likely than not
22    would have improved, correct?
23    A.   Correct.
24    Q.   But based on this, he's not a candidate for
25    endovascular therapy, is he?

Page 96

1        MR. CUMMINGS:  Object to the form.  Do you
2    want the article back to be able to answer that?
3        THE WITNESS:  Sure.
4        MR. CUMMINGS:  Do you want to look at what
5    he's asking you about?
6        THE WITNESS:  Yeah, I suppose I do.  It's
7    going to be a big point, I might need to read some.
8    A.   Please allow me to read.
9    Q.   Please do.
10    A.   If I can go ahead and revise my statement
11    that I said earlier about the bibliography.  I have not
12    reviewed this article, because it's all about
13    endovascular therapy rather than TPA.
14    Q.   I think what you told me earlier, one of the
15    things that's important for an expert to do is to review
16    the relevant literature, correct?
17    A.   Correct.  And I also said earlier that my
18    role in the treatment of this patient is from the ER.
19    From the ER care on, I don't -- I don't -- I'm not
20    involved in the care.
21    Q.   So in that regard, is it fair to say, Doc,
22    and I can short-circuit a lot of this, that you're not
23    here to talk about causation, you're only here to talk
24    about the standard of care?
25    A.   Correct.  I'm here to talk about the standard

Page 97

1  of care in the ER.
2      Q.   And so it's not -- you're not a neurologist,
3  and you're not an expert in the areas of what
4  improvement he would have had had he gotten TPA or --
5      A.   That's --
6      Q.   -- anything of that nature; is that fair?
7      A.   -- fair.
8      Q.   All right.  Let me short-circuit most of this
9  then.
10        MR. LOOPER:  Let's take a quick bathroom
11  break right quick.
12        (Recess from 2:45 p.m. to 2:49 p.m.)
13        MR. LOOPER:  Dr. Pope, I don't believe I have
14  any further questions right now.
15              CROSS EXAMINATION
16  BY MR. CARTER:
17      Q.   Dr. Pope, my name is Blake Carter.  You and I
18  haven't met.  We've sat in the room together.  But I
19  represent the hospital --
20      A.   Okay.
21      Q.   -- which is StoneCrest Medical Center.  I'm
22  going second, which has some inherent challenges,
23  because I need to go back and ask some follow-ups about
24  some things that you were asked about earlier.
25        If at any point in time you don't understand

Page 98

1  my question, will you let me know?
2      A.   Yes.
3      Q.   If you answer my question, is it fair for me
4  to assume that you understood what I was asking?
5      A.   Yes.
6      Q.   Before we start, is there anything
7  specifically that you've testified to on his direct exam
8  that you need to revise?
9      A.   No.
10      Q.   You told us earlier that you had been named
11  as a defendant in two different cases; one in
12  California, and one in Kentucky?
13      A.   That's correct.
14      Q.   Did either of those cases have anything to do
15  with strokes?
16      A.   No.
17      Q.   You told us earlier that StoneCrest was the
18  first hospital you ever interviewed at when you were
19  getting out of residency?
20      A.   Correct.
21      Q.   Did you get the position?
22      A.   I don't even remember.  I got another one in
23  California that I decided to take, so I went there.
24      Q.   We can check that.  I just -- I was curious.
25      A.   I don't think I pursued it any further.  I

Page 99

1  had a colleague that was working in Nashville, so I
2  considered moving there briefly, but didn't go further.
3      Q.   There was earlier discussion about TIAs, and
4  you told us that you think, more likely than not, that
5  Mr. Ruffino's TIAs that predated his presentation on
6  February 17, 2016 were probably caused by the occlusion
7  that's shown on the December 23rd, 2015 MRA?
8        MR. CUMMINGS:  Object to the form.
9      Q.   Do you agree with that statement?
10        MR. CUMMINGS:  Sorry.  Object to the form.
11        MR. CARTER:  That's fine.
12      A.   I don't believe I said it in that detail.
13      Q.   Sure.
14      A.   The extent of my opinion of what was
15  happening to Mr. Ruffino prior to presenting to
16  StoneCrest is that it sounds to me most likely he was
17  having TIAs periodically over the course of the months.
18  I have no opinion about where the occlusion might have
19  been.
20      Q.   Do you have any opinions about what the cause
21  or the likely cause of those TIAs was?
22      A.   No, I don't.
23      Q.   You testified earlier that one of the
24  differentiating factors between TIAs and a stroke is the
25  absence of tissue death in the brain?

Page 100

1      A.   Correct.
2      Q.   If the imaging studies from Centennial show
3  old infarcts in the brain, would that move those earlier
4  symptoms from the TIA category into the stroke category?
5        MR. CUMMINGS:  Object to the form.
6      A.   So you're -- you're saying that he had --
7        Could you just refer to the specific things
8  you're talking about --
9      Q.   Sure.
10      A.   -- and I can probably make a more accurate
11  opinion.
12      Q.   Yeah, no problem.  I don't have the thumb
13  drive in front of me.  I haven't loaded it.
14      A.   Right.
15      Q.   But one of the things that occurred in this
16  case is Dr. Valdivia, the neurologist who provided
17  subsequent care at Centennial, has reviewed the MRI that
18  was done on February 8, 2016, and he looked at the
19  specific areas of the brain that were impacted by the
20  event on February 17, 2016.
21      A.   Okay.
22      Q.   And he provided testimony that in that same
23  area there are old infarcts.
24      A.   Okay.
25      Q.   My question to you is if that's true, does


Case 3:17-cv-00725    Document 73-2    Filed 04/27/18    Page 25 of 32 PageID #: 900

1 that move those TIAs from the TIA category you defined
2 for us earlier to a category of a stroke that TPA might
3 be contraindicated for?
4        MR. CUMMINGS:  Object to the form.
5    A.   No.  If he -- if the -- if the TIA episodes
6 resolve without residual deficit, they were not strokes.
7 The presence or absence of findings on a CT would not
8 change my opinion about that.
9    Q.   So you wouldn't be concerned if those prior
10 TIAs resulted in tissue death?
11    A.   It would not affect my decision of whether or
12 not to give TPA at the time of presentation.
13    Q.   Would it affect whether there would be an
14 increased risk for an intercranial bleed, if TPA had
15 been given?
16    A.   I don't know.
17    Q.   You would defer to a neurologist on that
18 point?
19    A.   I would.
20    Q.   Is there anything else that you need to do to
21 form any of your opinions in this case?
22    A.   No.
23    Q.   Are there any exhibits, tables, graphs,
24 documents that you would rely on for your opinions that
25 aren't included in the report that you provided?

1    A.   No.
2    Q.   You're not currently involved in any research
3 related to treatment of strokes?
4    A.   No.
5    Q.   And you never have at any point in your
6 career?
7    A.   No.
8    Q.   Do you work with any advertising services,
9 other than SEAK?
10    A.   No.
11    Q.   The prior case that you provided testimony
12 in, Nole Espino (phonetic) --
13    A.   Uh-huh.
14    Q.   -- what was that case about?
15    A.   That was I was strictly a damages expert.  I
16 explained to the jury what all the medical terminology
17 meant and what his injuries actually were.
18    Q.   Have you reviewed any of Mr. Ruffino's
19 medical bills in this case?
20    A.   I may have received them, but certainly not
21 reviewed them.  I would have skimmed right past them.
22    Q.   There's no opinions in your report about the
23 reasonableness of the charges associated with his care?
24    A.   No.
25    Q.   And you're not going to be providing any of

1 those types of opinions in this case?
2    A.   Correct.
3    Q.   To be precise, you will not be providing any
4 opinions about the necessity of the care provided to
5 Mr. Ruffino that are reflected on the medical bills?
6    A.   Well -- well, yes, correct.
7    Q.   And you won't be testifying about the
8 reasonableness of those charges either?
9    A.   Correct.
10    Q.   Do you have any depositions that are
11 scheduled between now and January 2019?
12    A.   No.
13    Q.   I think you told us that Mr. Cummings first
14 contacted you in February of 2017?
15    A.   Yes.
16    Q.   Shortly after that, in April of 2017, there
17 was a document that was called a Complaint.  Did you see
18 the Complaint in this case?
19    A.   Yes.
20    Q.   Did you review and approve the Complaint in
21 this case?
22        MR. CUMMINGS:  Object to the form.
23    A.   I reviewed that.
24    Q.   Okay.
25    A.   I don't even know what approved means.

1    Q.   All right.  Let me ask it more precisely.
2 Did you review the Complaint before it was filed?
3    A.   No.
4    Q.   Did you review the Complaint in April of
5 2017?
6    A.   May I ask Mr. Cummings when he sent it to me?
7    Q.   Sure.
8        THE WITNESS:  Do you know when you sent me
9 the original documents?
10        MR. CUMMINGS:  No.  So I don't know.
11    A.   I don't know the exact date.  I believe the
12 Complaint was sent to me with the first bundle of
13 documents, which would have included the StoneCrest
14 medical records, and I think just the medical records at
15 that point, and then the depositions came later.
16    Q.   Will that be on the thumb drive?
17    A.   That will.  The exact date I received them
18 probably won't.
19    Q.   Did it come with an e-mail?
20    A.   Did we use e-mail or DropBox?
21        MR. CUMMINGS:  I don't know.  And I can help
22 you both on something.  If you received the Complaint,
23 do you think it's on the thumb drive?
24        THE WITNESS:  Yes.
25 BY MR. CARTER:

1    Q.   I know what the Complaint is.  My interest is
2  in the date you received it.
3         MR. CUMMINGS:  He might not have gotten it is
4  what I'm trying to get.
5         THE WITNESS:  Oh, are you referring to
6  something different?
7         MR. CUMMINGS:  Just like he thought --
8    A.   My legal terminology is poor.  So what
9  exactly is the Complaint?
10        MR. CUMMINGS:  He called something a
11  deposition earlier that wasn't.
12  BY MR. CARTER:
13    Q.   We're good.  I have it.  I'm going to give it
14  to you to look at it.
15    A.   Great, perfect.  I reviewed a number of
16  things with court headings.
17    Q.   Have you ever seen that document before?
18    A.   I don't think I did.  All of these documents
19  are very similar.  But I do not recall specific lists of
20  not providing proper care, no timely -- not timely
21  ordering.
22    Q.   You don't have a distinct memory of looking
23  at that document before today?
24    A.   I do not.
25    Q.   Okay.

1    A.   Yeah, I do not have a distinct memory.
2    Q.   You were asked some questions earlier about
3  FDA approval of TPA.  Are you aware that the FDA
4  actually rejected efforts to extend the time period
5  beyond three hours for administration of TPA?
6         MR. CUMMINGS:  Object to the form.
7    A.   I'm not aware.
8  BY MR. CARTER:
9    Q.   In addition to the Complaint, there is a
10  document that's been filed that's called an Amended
11  Complaint.  It looks very similar to the Complaint, with
12  a few substantial differences.  And that was filed in
13  January of 2018 as an exhibit to a motion for a leave to
14  amend.
15    A.   I'm fairly certain I have not seen this.
16  But, man, I've looked at a lot of pages.
17    Q.   I'm going to ask you about a statement from
18  this document, and tell me if you agree with it or not.
19  Okay?
20         In February of 2016, the treatment of
21  thrombotic stroke with TPA typically required the TPA be
22  provided within six to eight hours of the onset of
23  symptoms.
24         You don't agree with that, do you?
25    A.   No, I don't.

1    Q.   You don't have any criticism of the care
2  provided by the nurses at StoneCrest, do you?
3    A.   I only have one potential criticism, and that
4  is there's various opinions of what exactly happened.
5  But if Nurse Bromley failed to report symptoms to
6  Dr. Archer, I think that is a deviation as well.
7    Q.   Well, this is -- this is my chance to find
8  out what your opinion is based on facts that are in
9  evidence in the case.  Okay?
10    A.   Uh-huh.
11    Q.   You testified that you reviewed
12  Nurse Bromley's deposition, right?
13    A.   Correct.
14    Q.   And you recall that Nurse Bromley testified
15  that he communicated the patient's status to Dr. Archer?
16    A.   Correct.
17    Q.   You also told us that you reviewed
18  Dr. Archer's deposition?
19    A.   Correct.
20    Q.   And you recall from review of that deposition
21  that he testified that he spoke with Nurse Bromley?
22    A.   Correct.
23    Q.   Assuming those two people are telling the
24  truth, you don't have any criticism of the care provided
25  by Nurse Bromley?

1    A.   Correct.
2         MR. CUMMINGS:  Object to the form.
3    A.   Correct.
4    Q.   So in order for you to have any criticism of
5  the hospital, it would be relying on facts that aren't
6  in evidence?
7    A.   Correct.
8    Q.   You haven't seen anything to suggest that --
9  no evidence to suggest that the information wasn't
10  communicated by the nurses to Dr. Archer?
11    A.   Correct.
12    Q.   You don't have any criticism of StoneCrest
13  for failing to have certain policies and procedures in
14  place?
15    A.   No.
16    Q.   I think you've told us that Dr. Pope would
17  not defer to a neurologist, if a neurologist said TPA
18  was inappropriate, correct?
19    A.   Correct.
20    Q.   Has that ever actually happened in your
21  career?
22    A.   No.
23    Q.   How many times did you order TPA in 2017?
24    A.   Five maybe.  And I'm guessing.  Something
25  that happens every few months.

Page 109

1 Q. And in none of those five cases did you
2 consult a neurologist and the neurologist say, "I don't
3 think TPA is appropriate," and you went ahead and
4 ordered it anyway?
5 A. Right. In every case I would have consulted
6 a neurologist, but none of them ever told me not to give
7 it.
8 Q. Stated differently: In each of those five
9 cases, the neurologist agreed with your decision to
10 order TPA for the patient?
11 A. Correct.
12 Q. So your criticism of Dr. Archer here is, in
13 fact, based on him not doing something that you've never
14 done in your own career?
15 MR. CUMMINGS: Object to the form.
16 A. Could you -- in order to answer that question
17 accurately, could you show me where Dr. Chitturi says he
18 told Dr. Archer not to give TPA?
19 I remember where he wrote he was out of the
20 time window, but I don't recall him actually saying, "I
21 told Dr. Archer not to give TPA and Dr. Archer asked me
22 to give -- if I should give TPA or not."
23 Q. Let's do it this way.
24 A. Okay.
25 Q. If Dr. Chitturi told Dr. Archer not to give

Page 110

1 TPA based on the information he gathered about the
2 patient, is your criticism of Dr. Archer based on
3 something you have never done in your own career?
4 A. Correct.
5 Q. Have you done any research about homocystine
6 levels?
7 A. No.
8 Q. You don't have any idea what impact those
9 have on the architecture of clots?
10 A. No.
11 Q. You don't have any idea what impact
12 homocystine levels have on the effectiveness of TPA?
13 A. No.
14 Q. And you haven't done any research on that
15 point?
16 A. (Shaking head.)
17 Q. No?
18 A. No.
19 Q. You have told us that you haven't actually
20 reviewed any of the underlying imaging studies?
21 A. Correct.
22 Q. Just the reports, right?
23 A. Correct.
24 Q. And is that because you would defer to a
25 radiologist or a neurologist as to what those images --

Page 111

1 imaging studies show?
2 A. Yes.
3 Q. In your report, you identified Laurel County,
4 Kentucky as a medical community that was similar to
5 Smyrna?
6 A. Yes.
7 Q. And I tried to Google this, and I think
8 St. Joseph's is the hospital on your CV that's in Laurel
9 County, correct?
10 A. Yes.
11 Q. And you told us earlier, that's the hospital
12 where you practiced the most?
13 A. Yes.
14 Q. Is there an on-call neurologist available to
15 the ED physicians at St. Joseph?
16 A. There is an on-call neurologist available at
17 St. Joseph's Main in Lexington that we can call, uh-huh.
18 Q. Okay. So unlike --
19 A. They are the stroke center, the St. Joseph
20 Main.
21 Q. So a difference between Laurel County
22 Kentucky and StoneCrest -- or I should say a difference
23 between St. Joseph and StoneCrest is that at St. Joseph
24 at Laurel County, you don't have access to an on-site
25 neurologist in the ED?

Page 112

1 A. We do Monday through Friday, nine to five. I
2 only work nights, so the answer would be no. Or
3 generally, I work nights.
4 Q. So in your practice at St. Joseph, if a
5 patient comes in with signs and symptoms of a stroke,
6 you can't consult a neurologist to evaluate the patient?
7 A. No, I can. It's just as seamless to call
8 St. Joe Main as it would be to call a local neurologist.
9 Q. Let me ask it differently.
10 A. Okay.
11 Q. In your practice as an ER physician at
12 St. Joseph in Laurel County, Kentucky, you can't consult
13 a neurologist to see the patient in person?
14 A. Correct, other than nine to five Monday
15 through Friday.
16 Q. And you only work nights?
17 A. Majority, 90 percent.
18 Q. So in your day-to-day practice, you don't
19 even have the same experience that Dr. Archer had in
20 this case of being able to consult a neurologist to
21 evaluate the patient in person?
22 MR. CUMMINGS: Object to the form.
23 A. Let me add the fact that I worked all nights
24 for about two or three years. So the majority of my
25 career, including St. Joseph London for my first year of

Page 113

1 practice there, I would have had access to daytime
2 physicians, but in the same situations.
3  Q. In 2016 you did not have that access?
4  A. 2016? Two years ago. Correct.
5  Q. What about 2015?
6  A. In summer of 2015 is when I began working
7 mostly nights. So I would have to say I would have had
8 access 2000 February. Taking you on a loop there, I
9 apologize.
10  Q. What is the benefit to an ED physician of
11 consulting a neurologist when a patient has potential
12 signs and symptoms of a stroke?
13  A. I would -- I would say to make sure you've
14 covered all the appropriate inclusion and exclusion
15 criteria and aren't missing anything.
16  Q. In the report you prepared for us, you've
17 broken it down into different sections. In one of the
18 sections that begins on page 3 is an executive summary.
19 And in that executive summary you've got 23 different
20 sentences, or in some cases maybe many paragraphs, if it
21 goes on more than one sentence.
22  The executive summary begins with the
23 statement that "John Ruffino is a 59-year-old male with
24 significant cognitive and physical disabilities
25 resulting from an ischemic stroke on February 17, 2016."

Page 114

1  A. Correct.
2  Q. There are no facts in this summary that
3 predate the presentation to StoneCrest?
4  A. Correct.
5  Q. Given the requirement from the ACEP that you
6 include all of the relevant facts for a given case, why
7 did you not include any of that history in this report?
8  MR. CUMMINGS: Object to the form.
9  A. The relevant facts to this case and the
10 performance of the emergency room doctor begin when he
11 presents to the emergency department and when he leaves.
12  Q. The history given to the EMS providers is
13 irrelevant to Dr. Pope?
14  A. No. Not, the EMS provider on that -- so in
15 other words -- I see what you're getting at.
16  So, yeah, the -- the information required to
17 establish a time of onset is necessary too, yes.
18  Q. Are you aware from your review of the
19 deposition testimony that someone from Home Depot at
20 around 7:30 in the morning is the person who made the
21 initial call?
22  A. Yes.
23  Q. Why did that person call 911?
24  A. I believe because they thought he was acting
25 funny. Probably worried about him driving.

Page 115

1  Q. Why did that fact not make it into this
2 report?
3  A. The -- well, all of that, we have been
4 talking quite a bit about it. The normal period in the
5 emergency department is where time zero began. Anything
6 prior to that is irrelevant to the administration of
7 TPA.
8  Q. As an ER physician, what do you do if you
9 have equivocal reports about timing? Do you use the
10 most conservative time, given the risks to the patient
11 of TPA?
12  A. I do.
13  Q. We don't have what's on the thumb drive, but
14 have you been given a copy of StoneCrest
15 inclusion/exclusion criteria for TPA?
16  A. I have the stroke protocol algorithm. I
17 don't believe I have their specific inclusion/exclusion
18 criteria.
19  Q. So you, as you sit here, don't know what
20 NIHSS score was required at StoneCrest to give TPA
21 beyond three hours?
22  MR. CUMMINGS: Object to the form.
23  A. I agree. I agree with that statement.
24 BY MR. CARTER:
25  Q. Because you haven't seen the

Page 116

1 inclusion/exclusion criteria from StoneCrest?
2  A. Correct.
3  Q. Let me read you another statement. I just
4 want to know if you agree with it or not, and I can't
5 qualify it in any way, because this is all that it says.
6 Okay?
7  A. Okay.
8  Q. In February 2016, seizure activity was not a
9 contraindication for giving TPA to a thrombotic stroke;
10 would you agree with that statement?
11  A. I would.
12  COURT REPORTER: I'm sorry?
13  THE WITNESS: I said "I would," and then I
14 paused.
15  A. Read the statement again, please.
16  Q. In February of 2016, seizure activity was not
17 a contraindication for giving TPA for a thrombotic
18 stroke.
19  MR. CUMMINGS: Object to the form.
20  A. That is hard to answer without any
21 qualification. Seizure activity would definitely be
22 considered in whether or not a patient qualified for IV
23 TPA.
24  Q. Let me ask it this way then.
25  A. Okay.

1    Q.   In February of 2016, could seizure activity,
2  depending on the circumstances, be a contraindication
3  for giving TPA for a thrombotic stroke?
4    A.   Yes.
5        MR. CUMMINGS:  Object to the form.
6  BY MR. CARTER:
7    Q.   What do you think caused Mr. Ruffino's
8  dizziness that he reported on February 17, 2016?
9    A.   I have no opinion.  I have no idea.
10   Q.   Would you agree that dizziness is an unusual
11 presentation for an ischemic stroke?
12   A.   Yes.
13   Q.   We talked around this earlier.  What are the
14 dangers to a patient in getting TPA, if that patient has
15 an elevated platelet count?
16   A.   Elevated platelet count?  I don't know.
17   Q.   You would agree the time constraints that
18 have been -- that we talked about today for giving TPA,
19 that those time constraints are not arbitrary.
20   A.   Are you talking about three-hour,
21 four-and-a-half-hour window?
22   Q.   Sure.
23   A.   Yes, they're not arbitrary.
24   Q.   They're there for a reason?
25   A.   Yes.

1    Q.   And that reason is to protect the patient?
2    A.   Yes.  I would probably say to prevent bad
3  outcomes.
4    Q.   Because if TPA is given beyond those time
5  frames, depending on inclusion/exclusion criteria we've
6  looked at, there is an increased risk for a bad outcome?
7        MR. CUMMINGS:  Object to the form.
8    A.   There is good evidence even up to six hours
9  TPA will end in a good outcome.  The number of patients
10 involved in the studies is a factor.  The statistical
11 certainty of which you can make a comment on safety and
12 efficacy is a factor.
13       So what I can say about the specific timing
14 is it's only been studied well enough up to four and a
15 half hours to be confident that it's worth giving.
16   Q.   And Dr. Pope believes those time frames have
17 value and have meaning?
18   A.   Yes.
19   Q.   Again, we don't have access to exactly what's
20 on the thumb drive.  The lawyers that represent the
21 Ruffinos filed an affidavit from you in this case, and
22 there were three articles attached to it.  One was
23 called "Randomized Assessment of Rapid Endovascular
24 Treatment of Ischemic Stroke."  Have you ever read that
25 article?

1    A.   When was it published?  How about the author?
2  I have mine organized by author.
3    Q.   It's an article from New England Journal of
4  Medicine.
5    A.   Okay.  Is it by Werner Hacke?  New England
6  Journal of Medicine 2008?
7    Q.   It's a 2015 article.
8    A.   Okay.  I can't comment on whether or not I've
9  read it period.  But it was not -- I didn't review it
10 for my report.
11   Q.   It's not an article you rely on to form your
12 opinions in this case?
13   A.   Correct.
14   Q.   Same question.  There was another article
15 attached to your affidavit that was called "Endovascular
16 Therapy for Ischemic Stroke with Profusion Imagining
17 Selection."  Have you ever read that article?
18   A.   Not to my knowledge.
19   Q.   There's another article attached to your
20 affidavit that said, "Stent-Retrieval Thrombectomy after
21 Intravenous TPA and TPA Alone."  Have you ever read that
22 article?
23   A.   I don't believe so.
24   Q.   It's not --
25   A.   I should probably revise those answers.

1  They -- they were not used to formulate my opinions.  I
2  read lots and lots of articles.  So it's very possible I
3  could have read those articles.
4    Q.   You might have read them at some point in
5  your life from date of birth until today?
6    A.   Correct.
7    Q.   But you didn't read them to form your
8  opinions in this case?
9    A.   Correct.
10   Q.   You didn't rely on those articles to form the
11 opinion that you set out in that affidavit that you
12 signed?
13   A.   Correct.
14       MR. CARTER:  Let me take a short break to
15 confer, and I may be done.
16       (Recess from 3:22 p.m. to 3:23 p.m.)
17 BY MR. CARTER:
18   Q.   Doctor, you have understood all of my
19 questions?
20   A.   I have.
21   Q.   And there's no answers to my questions you
22 need to revise?
23   A.   No.
24       MR. CARTER:  Okay.  I don't have any further
25 questions.

Page 121

1          REDIRECT EXAMINATION
2  BY MR. LOOPER:
3       Q.  And I didn't ask you that earlier.  You
4  understood my questions as well?
5       A.  I did.
6       Q.  And none of those you need to revise?
7       A.  None.
8          MR. LOOPER:  Thank you, sir.
9          MR. CUMMINGS:  No questions.  He'll read and
10 sign.  Thanks.
11          Thereupon, the deposition of
12 TROY THOMAS POPE, M.D. concluded at 3:24 p.m.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 122

1               CERTIFICATE OF TRANSCRIPT
2
3  STATE OF NORTH CAROLINA)
4  COUNTY OF BUNCOMBE     )
5          I, MARY JO ARMOUR MCGILL, RDR, CLR, a notary
6  public in and for the State of North Carolina, do hereby
7  certify that on April 23, 2018, there appeared before me
8  TROY T. POPE, M.D., who was duly sworn by me; that the
9  appearances were as shown in the caption hereof; that
10 the foregoing testimony was taken by me in stenotype and
11 thereafter reduced to typewritten form by me; that the
12 foregoing deposition is a true record of the testimony
13 given by the witness; that the reading and signing of
14 the deposition by the witness were not waived.
15          I further certify that I am not of kin or
16 associated with any of the parties to this action or
17 their counsel and that I am not interested in the event
18 thereof.
19
20          April 24, 2018
21
22
23
_____
24 MARY JO ARMOUR MCGILL, RDR, CLR
   Commission Number 200934100040
25

Page 123

1               SIGNATURE PAGE
2          I, TROY T. POPE, M.D., have read the
   foregoing pages of testimony given by me on April 23,
3  2018, in Asheville, North Carolina.
4          This testimony should be corrected as
   follows:
5
   PAGE    LINE     CORRECTION AND REASON THEREFOR
6
7
8
9
10
11
12
13
14
15
   Subject to the foregoing corrections, my testimony is as
16 contained in the foregoing transcript.
17          SIGNED AT _____,
   this
18
   _____ day of _____, ____.
19
20                          _____
                            TROY T. POPE, M.D.
21
   Subscribed and sworn to before me this ____ day of
22 _____, ____.
23
   _____
24 NOTARY PUBLIC
25 My commission expires: _____

Page 124

1  Reference No.: 2109785
2
3  Case:  RUFFINO vs DR. CLARK ARCHER
4          DECLARATION UNDER PENALTY OF PERJURY
5
       I declare under penalty of perjury that
6  I have read the entire transcript of my Depo-
   sition taken in the captioned matter or the
7  same has been read to me, and the same is
   true and accurate, save and except for
8  changes and/or corrections, if any, as indi-
   cated by me on the DEPOSITION ERRATA SHEET
9  hereof, with the understanding that I offer
   these changes as if still under oath.
10
11          _____
12          Troy Thomas Pope, M.D.
13
14          NOTARIZATION OF CHANGES
15               (If Required)
16
17 Subscribed and sworn to on the _____ day of
18
19 _____, 20____ before me,
20
21 (Notary Sign)_____
22
23 (Print Name)                Notary Public,
24
25 in and for the State of _____

**Page 125**

```
1   Reference No.: 2109785
    Case:  RUFFINO vs DR. CLARK ARCHER
2
3   Page No._____Line No._____Change to:_____
4   _____
5   Reason for change:_____
6   Page No._____Line No._____Change to:_____
7   _____
8   Reason for change:_____
9   Page No._____Line No._____Change to:_____
10  _____
11  Reason for change:_____
12  Page No._____Line No._____Change to:_____
13  _____
14  Reason for change:_____
15  Page No._____Line No._____Change to:_____
16  _____
17  Reason for change:_____
18  Page No._____Line No._____Change to:_____
19  _____
20  Reason for change:_____
21  Page No._____Line No._____Change to:_____
22  _____
23  Reason for change:_____
24
    SIGNATURE:_____DATE:_____
25  Troy Thomas Pope, M.D.
```

**Page 126**

```
1   Reference No.: 2109785
    Case:  RUFFINO vs DR. CLARK ARCHER
2
3   Page No._____Line No._____Change to:_____
4   _____
5   Reason for change:_____
6   Page No._____Line No._____Change to:_____
7   _____
8   Reason for change:_____
9   Page No._____Line No._____Change to:_____
10  _____
11  Reason for change:_____
12  Page No._____Line No._____Change to:_____
13  _____
14  Reason for change:_____
15  Page No._____Line No._____Change to:_____
16  _____
17  Reason for change:_____
18  Page No._____Line No._____Change to:_____
19  _____
20  Reason for change:_____
21  Page No._____Line No._____Change to:_____
22  _____
23  Reason for change:_____
24
    SIGNATURE:_____DATE:_____
25  Troy Thomas Pope, M.D.
```