**Page 1**

```
1              UNITED STATES DISTRICT COURT
2            MIDDLE DISTRICT OF TENNESSEE
3                  NASHVILLE DIVISION
```

JOHN RUFFINO and MARTHA
RUFFINO, Husband and
Wife,

          Plaintiffs,          Civil Action No.
                               3:17-cv-00725
v.

                               Jury Demand

DR. CLARK ARCHER and HCA       Judge Campbell
HEALTH SERVICES OF             Magistrate Judge
TENNESSEE, INC. D/b/a          Newbern
STONECREST MEDICAL
CENTER,

          Defendants.

     DEPOSITION OF ALFRED CALLAHAN, III, M.D.
              April 18, 2018
          Deposition of ALFRED CALLAHAN, III,
M.D., taken at the offices of Dr. Callahan,
2000 Glen Echo Road, Suite 122, Nashville,
Tennessee, at 1 p.m. (CST) on the above date
before Stephanie A. Faulkner, LCR, CRI, CPE,
Tennessee Licensed Court Reporter, pursuant
to the Federal Rules of Civil Procedure.

**Page 2**

```
1              A P P E A R A N C E S
2
3    On Behalf of the Plaintiffs:
4         Mr. Brian Cummings
          Attorney at Law
          Cummings Manookian, PLC
5         45 Music Square West
          Nashville, TN 37203
6         615-266-3333
          bcummings@cummingsmanookian.com
7
8    On Behalf of StoneCrest Medical Center:
9         Mr. C.J. Gideon
          Attorney at Law
10        Gideon, Cooper & Essary, PLC
          315 Deaderick Street
11        Suite 1100
          Nashville, TN 37238
12        615-254-0400
13
     On Behalf of Dr. Archer:
14
          Mr. Bryant C. Witt
15        Attorney at Law
          Hall Booth Smith, P.C.
16        424 Church Street
          Suite 2950
17        Nashville, TN 37219
          615-313-9911
18        bwitt@hallboothsmith.com
19
20
21
22
23
24
25
```

**Page 3**

```
1                   I N D E X
2   EXAMINATION                        PAGE
3   By Mr. Gideon..........................    4
4
5
    NUMBER          DESCRIPTION          PAGE
6
    Exhibit No. 1    December 8, 2017,      6
7                    Letter
8   Exhibit No. 2    Handwritten Notes      8
9   Exhibit No. 3    Handwritten Note on   22
                     Envelope
10
    Exhibit No. 4    Article Titled: Acute 46
11                   cigarette smoke
                     exposure reduces clot
12                   lysis - association
                     between altered fibrin
13                   architecture and the
                     response to tPA
14
    Exhibit No. 5    November 24, 2015,    61
15                   Medical Record by
                     Dr. Luck
16
    Exhibit No. 6    February 17, 2016,    62
17                   Centennial Medical
                     Record
18
    Exhibit No. 7    Medical Record Dated  93
19                   February 18, 2016
20  Exhibit No. 8    Medical Record Dated  97
                     February 20, 2016
21
    Exhibit No. 9    Medical Record Dated  101
22                   February 26, 2016
23  Exhibit No. 10   Handwritten Notes     121
24
25
```

**Page 4**

```
1        ALFRED CALLAHAN, III, M.D.,
2   having been first duly sworn, testified as
3   follows:
4             DIRECT EXAMINATION
5   BY MR. GIDEON:
6        Q.   Dr. Callahan, my turn to ask you
7   questions.
8        A.   Yes, sir.
9        Q.   Three things for you to keep in
10  mind.  First, listen to the question and
11  don't answer if you don't understand it,
12  okay?
13       A.   Yes.
14       Q.   Number two, answer it directly.
15  Don't start explaining it before you answer
16  it.  Just answer it directly, then if you
17  need to explain it, I'll never cut you off.
18            Third, if you need to check on a
19  patient, respond to a call, anytime, just let
20  me know and we'll pause.
21       A.   For the second, I'll try.  For the
22  third, yes.  Thank you.
23       Q.   Well, I know you'll have to try,
24  but I'll probably have to remind you, too, to
25  answer the question directly before you begin
```

Page 5

1  an explanation.  If I do that, I hope you
2  won't be offended.
3      A.    I will not be.
4      Q.    Okay.  Have you done all you need
5  to do to form your opinions in this case?
6      A.    Yes.
7      Q.    Okay.  When were you first engaged?
8  And you're free to look at this, if you wish
9  to, the first contact.
10      A.    It's my recollection that
11  Mr. Cummings called me in August of last
12  year, 2017.
13      Q.    What did he ask you to do?
14      A.    To look at a case.
15      Q.    All right.  Did you know it had
16  already been filed?
17      A.    I don't know if he told me that,
18  so...
19      Q.    Now, there is a letter in those
20  materials that's dated in December of 2017,
21  if you could put your hands on that.  And I
22  think that is the first written communication
23  that's dated in those materials.  Will you
24  check and see if that's correct?  I think
25  it's clipped on the outside of that envelope.

Page 6

1      A.    I believe you're right.
2      Q.    What's the date?
3      A.    Of that letter?
4      Q.    Yes.
5      A.    08 December '17.
6      MR. GIDEON:  We'll make the
7  December 8, 2017 letter Exhibit 1.
8          (Whereupon, the above-mentioned
9  document was marked as Exhibit No. 1 to the
10  testimony of the witness.)
11  BY MR. GIDEON:
12      Q.    What was included with the letter
13  of December 8th, 2017 in terms of substantive
14  materials for you to review?
15      A.    My recollection was that I had
16  gotten a CD of imaging with the letter.
17      Q.    Okay.  Was the imaging limited to
18  the CT scan and the CTA at StoneCrest?
19      A.    No.  There were -- there were two
20  discs.  So one was from StoneCrest with
21  imaging and the other was from Centennial
22  with imaging.
23      Q.    All right.  Okay.  As I mentioned
24  to you before we began the deposition, I
25  swear your handwriting has gotten actually

Page 7

1  smaller as the years have gone by, and it
2  started off small to begin with.
3          Did you prepare any notes as you
4  reviewed the imaging at StoneCrest and the
5  imaging at Centennial?
6      A.    Yes, sir, I did.
7      Q.    All right.  I think probably the
8  best thing to do is for you to identify your
9  notes that address your reviews of the
10  imaging.  We'll exhibit those notes.  And I
11  know there's a separate pages, Dr. Callahan,
12  of notes where you describe imaging at
13  Tennova, which it appears you got later,
14  right?
15      A.    Yes.  I received that very
16  recently.
17      Q.    Right.  And by that, we're
18  referring to the December 23, 2015, MRI and
19  MRA at University Medical Center in Lebanon,
20  correct?
21      A.    Yes.
22      Q.    Okay.  Any other recent imaging you
23  received?
24      A.    No.
25      Q.    By the way, have you ever received

Page 8

1  a copy of the affidavit of Jodi Dodds, the
2  vascular neurologist at Duke?
3      A.    I don't recall if -- I think I may
4  have read that electronically.
5      Q.    Do you think you did?
6      A.    I think I did.
7      Q.    Okay.  Have you seen the disclosure
8  of opinion testimony by Jodi Dodds and a
9  Dr. Zazulia from Washington University in
10  St. Louis on our behalf?
11      A.    I don't recall that.
12      Q.    Okay.  All right.  In any event,
13  let's get back to the notes.  How many pages
14  of notes do you have just describing the
15  imaging?
16      A.    One page.
17      Q.    Front and back?
18      A.    No.  Just this side.
19      MR. GIDEON:  Okay.  We're going to
20  make this one page that he's going to be
21  reading from an exhibit.  We'll make this one
22  page Exhibit 2.
23          (Whereupon, the above-mentioned
24  document was marked as Exhibit No. 2 to the
25  testimony of the witness.)

Page 9

1  BY MR. GIDEON:
2      Q.    Now, Dr. Callahan, would you just
3  read your notes, please, of the
4  interpretation of the imaging?  Tell us what
5  study you're looking at first, and then tell
6  us what you thought of it.
7      A.    The page begins, Ruffino imaging;
8  CD, StoneCrest.  CT head plain 2/17/16 1027
9  hours.  Calcification of the left vertebral
10  artery, right internal carotid artery, and a
11  large cisterna magna.  No hyperdense MCA.  No
12  certain changes.
13     Q.    Okay.
14     A.    Want me to continue?
15     Q.    Is that it as far as the CT scan
16  that was done at approximately 10:30 in the
17  morning?
18     A.    Yes.
19     Q.    Okay.  Now, what about the CTA in
20  the afternoon?
21     A.    The notes goes on to say, CTAH,
22  slash, N; head and neck; 2/17/16.  It was
23  obtained at 1409 hours.  Plaque in the left
24  bifurcation slice 66 of 101.  ACA open.  It
25  says, fine -- fin right.  Marked decrease

Page 10

1  left MCA versus -- and then it's blank --
2  coronal.  Implies left M1 mid TICI, T-I-C-I,
3  zero, slash, 41 of 101 with slight flow
4  distally.
5      Q.    Okay.  And TICI, the T-I-C-I, is
6  the method of measurement of blood flow with
7  the ideal being three?
8      A.    Yeah.  It's -- the cardiologists,
9  because they deal with the myocardium, call
10  theirs TIMI.
11     Q.    TIMI.  But you call it TICI?
12     A.    And we used to call it TIMI for the
13  brain thinking it was just any artery.  But,
14  recently, if the cardiologists could have M
15  for myocardium, we could have C for cerebral.
16  So they became TIMI, and we became no longer
17  TIMI, but TICI.
18     Q.    But the point is, under the TICI
19  scale --
20     A.    Same as TIMI.
21     Q.    -- the ideal is three?
22     A.    Correct.
23     Q.    Zero is no flow, three is unimpeded
24  flow?
25     A.    Correct.

Page 11

1      Q.    Okay.
2      A.    Same as TIMI.  You know, they're
3  analogous.
4      Q.    And the goal of a bunch of studies
5  that we will talk about later today is to
6  achieve reperfusion to a two B or three
7  level, correct?
8      A.    Yes.
9      Q.    Okay.
10     A.    On an urgent basis.
11     Q.    Right.  Are you finished with the
12  CTA interpretation?
13     A.    Yes.
14     Q.    Okay.  Were you able to actually
15  see an acute thrombus or embolus in the M1 or
16  M2 branch of the MCA?
17     A.    No.
18     Q.    Okay.  Where was the occlusion?
19     A.    I think it's in the mid portion of
20  the left M1 segment.
21     Q.    And when it's in the mid portion,
22  is that proximal or distal --
23     A.    It's in the middle.
24     Q.    -- or neither?
25     A.    It's in the middle.

Page 12

1      Q.    So it's neither proximal nor
2  distal.  It's in the middle of M1?
3      A.    Yes.
4      Q.    Okay.  Were there occlusions
5  elsewhere on the CTA?
6      A.    Not that I saw.
7      Q.    Could you tell how long the
8  occlusion had been present?
9      A.    No.
10     Q.    Is that because of this study
11  itself, or is that a limitation of the CTA in
12  general?
13     A.    I'm not sure how to answer that.
14     Q.    Is there something wrong with the
15  question?
16     A.    No, no, no.  It's a good question,
17  as you always have them.  But I -- I'm not
18  sure how to -- how to answer how long it had
19  been there based upon that scan.
20     Q.    Okay.
21     A.    Now, I know a lot more about him
22  than just that scan.  But just in terms of
23  the scan by itself --
24     Q.    Right.
25     A.    -- it's -- it shows, you know, a

Page 13

1  high grade lesion in the mid left M1 segment
2  with some flow that gets past it.
3      Q.    How did the flow get past the
4  obstruction or stenosis?
5      A.    It may be that it's not completely
6  occluded, although it looks that way with CT.
7      Q.    Okay.
8      A.    The definitive test for that would
9  not be CTA, but catheter angiography.
10     Q.    Correct.
11     A.    And so the fact that there's flow
12 distally could be that there's just a little
13 bit of flow that's very hard to see using CTA
14 or there is collateral flow from other
15 sources that provides blood flow beyond or
16 distal to where the obstruction is.
17     Q.    Well, I wanted to ask you about
18 that.  As you looked at the CTA, did you see
19 the presence of good collateral flow from the
20 meningeal arteries to the area also served by
21 the M1 branch of the MCA?
22     A.    No.  The -- the CTA has a very hard
23 time looking at collateral depending upon the
24 source in terms of how signal acquisition is
25 done.

Page 14

1      Q.    Well, irrespective of the
2  limitations of the study itself --
3      A.    Right.
4      Q.    -- did you see anything that you
5  thought to be evidence of good collateral
6  flow originating with the meningeal arteries
7  into the same territory served by the M1
8  branch of the MCA?
9      A.    I did not think from that study
10 that there was good meningeal collateral
11 flow.
12     Q.    Okay.
13     A.    There was only distal flow.  So
14 it's getting there somewhere.  How it gets
15 there, I don't know.  The adequacy of that,
16 it's not as bright as the other side.
17     Q.    Could you tell, though, that the
18 flow distal to the mid point of the M1 branch
19 was active flow, or was it just stasis, just
20 blood that's apparent distal to the
21 obstruction?
22     A.    The way the study is done, it's a
23 time study.
24     Q.    Right.
25     A.    And so when you see contrast in the

Page 15

1  vessels, we presume that it flowed there.  It
2  wasn't that there had been already bright
3  signal seen because of clot.  And we already
4  knew, as I mentioned earlier from the CT head
5  scan done that morning, that there was no
6  evidence of clot in the middle cerebral
7  artery on the CT head.
8      Q.    Correct.  Now, you mentioned two
9  areas of -- where you identified the presence
10 of calcification --
11     A.    Yes.
12     Q.    -- on the CT that was done that
13 morning?
14     A.    Correct.
15     Q.    Where were those two locations
16 again?
17     A.    They're in the left vertebral
18 artery and the right internal carotid artery
19 at the siphon.
20     Q.    And on a traditional CT scan, is
21 the calcification shown by virtue of its
22 greater brightness or darkness in relation to
23 the background?
24     A.    It's bright.
25     Q.    All right.  Now, it may require you

Page 16

1  to look at another set of notes, but
2  subsequently you received a copy of an MRI
3  and an MRA that was performed on December 23,
4  2015 at University Medical Center in Lebanon,
5  correct?
6      A.    Yes.  But not at the time of these
7  notes.
8      Q.    Oh, I understand.
9      A.    Yeah.
10     Q.    What I'd like you to do is tell us
11 what you see -- what you saw when you
12 reviewed the MRI and the MRA taken 12/23/15,
13 with particular reference to the left MCA in
14 Mr. Ruffino's brain.
15     A.    The MRA is easier to discuss.  The
16 MRI scan showed no evidence of acute ischemia
17 on 12/23/15 on the diffusion weighted
18 sequences.  The inversion recovery sequences
19 we call flare showed prior ischemia on both
20 sides of the brain.  The gradient sequences
21 showed no evidence of hemorrhage.  The MRA
22 done the same day as the MRI of the head --
23     Q.    On 12/23/15?
24     A.    Correct.  Showed mid M1 signal drop
25 out on the left with distal flow.  And that

Page 17

1  was my opinion about the outside imaging.
2      Q.    Okay.  What do you mean by M1
3  signal drop out?
4      A.    Well, the MRA is a very different
5  bit of technology than CT angiography.  A CT
6  we give dye, and it's a lot of contrast and a
7  time study.  With the MRA it depends upon
8  flow, but it has to do with how we align
9  protons and spin.  So it's heavily dependent
10  upon, one, the direction of flow and the
11  amount of flow.
12      Q.    Okay.
13      A.    So with an MRA, when an artery is
14  narrowed to 50 percent as opposed to 60
15  percent or 70 percent or 80 percent, in terms
16  of the imaging it looks the same because it's
17  called time of flight imaging.  So in this
18  particular example, it shows he's got a mid
19  left M1 segment lesion, and there seems to be
20  flow past it.
21      Q.    Okay.
22      A.    But the degree of narrowing,
23  whether it's 50, 60, 70, 80, or 90 can't be
24  determined from that study.
25      Q.    All right.  Now, how were you able

Page 18

1  to determine the presence of distal flow?
2      A.    Just with the scan.
3      Q.    Okay.
4      A.    You look at that and you see it.
5      Q.    Were you able to determine any
6  volumetric comparison with what you would
7  expect to be the norm for a patient of that
8  age, that body habitus, with his smoking
9  history, his hypertension, all those things,
10  were you able to make a comparison from a
11  volume standpoint of the distal flow versus
12  what you would expect to see?
13      A.    It's difficult to do that, one.
14  Two, there seemed to be flow that is most
15  likely forward given the time of flight
16  signal acquisition, but the brightness of the
17  M2 branches seem less than the right side,
18  the opposite side of the brain.
19          So I think there was probably
20  sufficient narrowing that there was stenosis
21  and some limitation of flow using that
22  technique.  You should take that with a grain
23  of salt though.
24      Q.    Stenosis means what?
25      A.    Narrowing.

Page 19

1      Q.    Okay.  And with respect to the
2  magnetic resonance angiogram or MRA of
3  12/23/15, you cannot tell us to a reasonable
4  degree of medical certainty the degree of
5  stenosis in the M1 branch, correct?
6      A.    I can tell you it's more than 50
7  percent and less than 100.  But in between, I
8  can't tell you.
9      Q.    Now, with respect to the MRI, you
10  made reference to the presence on the flare
11  sequencing of prior ischemia bilaterally.  I
12  don't know if you said symmetrically, but
13  bilaterally I heard?
14      A.    Yes.
15      Q.    Tell us what you were able to see
16  on the MRI in the flare sequence.  Were they
17  ischemic changes in the white matter alone
18  symmetrically and bilateral or not?
19      A.    They're rarely symmetric.  They're
20  most commonly -- it's a very common finding.
21  Typically, they are bilateral.  They vary in
22  size.  And I didn't count numbers on right
23  versus left.  I thought the burden of change
24  was similar.
25      Q.    Secondary to long standing

Page 20

1  hypertension?
2      A.    Well, we never know.  The
3  radiologists read it secondary to all kinds
4  of things.  But I thought they were most
5  likely from some sort of vascular risk factor
6  in this particular gentleman.
7      Q.    Specific to Ruffino, what do you
8  think the bilateral arguably symmetric
9  changes on MRI on 12/23/15 were due to?
10      A.    Yeah.  I don't think they're
11  symmetric.  I think they're asymmetric,
12  number one.  I suspect they're due to
13  smoking, age, inheritance, and
14  hyperlipidemia.
15      Q.    Okay.  What areas of the brain were
16  affected by the changes consistent with
17  chronic ischemia?
18      A.    Only the white matter.  There was
19  no evidence of cortical involvement.
20      Q.    And the cortex is the gray matter
21  that overlies the white?
22      A.    The outside of the brain, right,
23  where the chip set is.
24      Q.    All right.  How long had the
25  stenosis as shown by the MRA been present?

Page 21

1    A.    Yeah.  The scan wouldn't you let
2  you know that.
3    Q.    Based on your familiarity with this
4  form of vascular imaging and this
5  presentation among smoking Caucasian males in
6  the southeast, how long do you think it had
7  been present in this man?
8    A.    For some time.
9    Q.    Years?
10   A.    He probably had had plaque there
11  for an extended period of time, and that may
12  be more than years, even decades.
13   Q.    Okay.  In your statement that you
14  signed you make reference to activated
15  plaque?
16   A.    Yes.
17   Q.    When you use the term "activated,"
18  what do you mean?
19   A.    That there's been some disruption
20  of the cover over the plaque and now there's
21  an interaction with circulating blood so that
22  there's debris laid on top of it.
23   Q.    All right.  Dr. Callahan, do you
24  have a set of notes of the imaging
25  interpretation you did on the 12/23/15

Page 22

1  studies as well?
2    A.    I have a note I wrote on the
3  outside of an envelope.
4    Q.    That's good enough.
5          MR. GIDEON:  Let's make that the
6  next exhibit.
7          (Whereupon, the above-mentioned
8  document was marked as Exhibit No. 3 to the
9  testimony of the witness.)
10  BY MR. GIDEON:
11   Q.    I want to make sure we have a
12  comprehensive oral inventory of what you have
13  and what you received.  You will recall that
14  we delivered a subpoena to your office asking
15  you to have all those materials here today.
16         It is sufficient if you will just
17  tell us what you have and when you received
18  it.  Go ahead.  Start with the beginning.
19  What did you get at the outset and what did
20  you get subsequently?
21   A.    Well, at the outset I had a phone
22  call.  And subsequent to the phone call I
23  sent a bill, which is how I knew I'd been
24  contacted in August of 2017.
25   Q.    Do you have notes, then, of the

Page 23

1  phone call --
2    A.    No.
3    Q.    -- in August of 2017?
4    A.    No.  If I had, I'd have brought
5  them.
6    Q.    How long was the phone call itself
7  as reflected by your invoice?
8    A.    I only know that I spent roughly an
9  hour, but that wasn't the phone call.  There
10  must have been something else that might have
11  been provided me.
12   Q.    All right.  Well, what's the
13  invoice say?  Does it say phone call plus
14  review of some material?
15   A.    Review of provided materials and
16  phone call three-fourths of an hour.
17   Q.    Okay.  Provided materials.  Do you
18  have a memory of what these were?
19   A.    No.  It was my recollection that
20  the matter had been dispensed with in August
21  of 2017, so...
22   Q.    In what way?
23   A.    Well, I'd given my opinion and most
24  often that's that.
25   Q.    How could you give your opinion

Page 24

1  about a case without having received any
2  materials?
3    A.    Oh, I did have materials.  That's
4  when I sent the invoice on the 22nd.  So I
5  had to get something.
6    Q.    We don't know what you got though.
7    A.    And I don't recall either.
8    Q.    And there are no notes reflecting
9  your review of the materials?
10   A.    No.  No.  Notes are less common
11  during the month of August.
12   Q.    Because you're usually in the
13  northeast?
14   A.    Because I was with my
15  grandchildren.
16   Q.    All right.  Then you have this
17  letter that's at the end of the year 2017
18  that we've already exhibited?
19   A.    Correct.  So the letter, as I
20  mentioned, came with discs, two discs of
21  imaging.  So those are the two discs that
22  came with the letter.  And there's the backup
23  set of discs.
24         After that, in review there were
25  letters that I sent of invoices to

Page 25

1   Mr. Cummings.  And then I received a
2   supplemental disclosure of the plaintiff's
3   Rule 26 and affidavit, my affidavit.  And I
4   prepared a statement and a report.  And then
5   I have some backup copies.
6       Q.   That's it?
7       A.   I have a list of cases.  There's
8   supposed to be a CV.  And that's it, I think.
9       Q.   What do you have on your computer
10  that you haven't printed out?  For example,
11  did you get a copy of the deposition of Clark
12  Archer, the ER physician?
13      A.   No.  I haven't seen that.
14      Q.   Okay.  Did you at any time get a
15  copy of the depositions of any of the nurses?
16      A.   Yes.  I received an electronic copy
17  of that.
18      Q.   Which nurses' depositions did you
19  see electronically?
20      A.   Well, I also got Archer
21  electronically, sorry.  I received
22  electronically Archer, Ruffino, Mrs. Ruffino,
23  Carol McCulloch and Bromley.
24      Q.   Any others?
25      A.   I'm looking.  I think that's -- I

Page 26

1   think that's it.
2       Q.   When did you receive the deposition
3   transcripts electronically?
4       A.   I don't know.
5       Q.   Can we tell from the invoicing that
6   you received them before a certain date as
7   reflected by the bill?
8       A.   The invoice I sent was on my birth
9   date, December 13th of '17.  It only talks
10  about review of provided materials.  But
11  given the length of time, that must have been
12  the depositions.  There was a phone call and,
13  also, I reviewed an affidavit.
14      Q.   Your affidavit or somebody else's?
15      A.   It just says "affidavit."  I
16  suspect that -- well, all I know is what it
17  says.
18      Q.   All right.  Now, with the exception
19  of the electronic copies of the depositions
20  you've just mentioned, have you seen
21  electronic versions of any other items?
22  You'll recall I mentioned a Jodi Dodds,
23  vascular neurologist at Duke, and you said
24  you had some recollection of seeing something
25  with her name on it.  You didn't recall

Page 27

1   Dr. Zazulia at Washington University in
2   St. Louis.
3            Do you recall seeing disclosures,
4   affidavits, anything else from any other
5   healthcare providers?
6       A.   It may be crosstalk, but I thought
7   I'd seen something from Duke electronically,
8   but it may be a different case.
9       Q.   There is a neurologist in Lebanon
10  whose name is Deka Efobi that this individual
11  saw on a referral from a Dr. Luck, family
12  practitioner.  Have you seen Dr. Efobi's
13  office notes?
14      A.   I saw a letter that he sent to
15  Dr. Luck in a recent email of Dr. Luck's
16  notes.
17      Q.   But you have not seen Efobi's
18  office notes?
19      A.   Only the copy that he sent to
20  Dr. Luck with initial --
21      Q.   For --
22      A.   -- with the initial -- his initial
23  consult.
24      Q.   Okay.  Did you ever see the
25  homocysteine levels for the lab tests ordered

Page 28

1   by Dr. Efobi?
2       A.   No.
3       Q.   Have you seen the entire Centennial
4   chart?
5       A.   Yes.
6       Q.   Now, you know this patient was
7   transferred on the 17th from StoneCrest to
8   Centennial, remained in the hospital until
9   the 26th of February, and went home.  Have
10  you seen that entire chart?
11      A.   Yes.
12      Q.   Okay.  All right.  Before we came
13  here to take your deposition today, who have
14  you met with with regard to the case against
15  StoneCrest and when did those meetings occur?
16      A.   I met with Mr. Cummings.
17      Q.   When?
18      A.   He came last week on Thursday.  And
19  he may have come once before, but my bills
20  don't reflect that.
21      Q.   Okay.  Have you already issued a
22  bill for the meeting last week on Thursday?
23      A.   No.
24      Q.   How long was the meeting?
25      A.   Ninety minutes.

Page 29

1    Q.    And what was the subject matter of
2  the meeting?
3    A.    The deposition today.
4    Q.    Are you familiar with the name of a
5  physician named Trey Pope?
6    A.    Pope?
7    Q.    Trey Pope, P-O-P-E?
8    A.    No.
9    Q.    Are you familiar with the name of a
10  physician named Rajat Dhar, D-H-A-R?
11    A.    Yes.
12    Q.    How so?
13    A.    I'd heard about him in a phone call
14  last night. And I think I had read something
15  that he may have written in this case,
16  although I may have read him in a different
17  case.
18    Q.    Well, did you have a phone call
19  with Dr. Dhar last night or with someone
20  else?
21    A.    No, I'm sorry. Mr. Cummings called
22  me last night.
23    Q.    Okay. How long was that phone call
24  last night?
25    A.    Half an hour.

Page 30

1    Q.    Did he tell you I'd taken the
2  deposition of Dr. Dhar yesterday in
3  St. Louis?
4    A.    Yes, sir.
5    Q.    What did he tell you about the
6  deposition?
7    A.    That it was complete and thorough.
8    Q.    Well, what did he say about the
9  substance as compared to the form?
10  Substantive testimony by Dhar?
11    A.    Yeah. He reviewed with me
12  Dr. Dhar's opinion that because of the
13  location of the changes in imaging, that IV
14  tPA peripheral thrombolysis might have been
15  especially helpful. That was sort of the
16  main takeaway thing about it.
17    Q.    Did he review with you that
18  Dr. Dhar is not a stroke neurologist?
19    A.    He -- yes. He told me that at Wash
20  U they have a bifurcated program of care. So
21  they have a stroke team that lives in the ED,
22  and then they have an ICU team that takes
23  over after whatever happens in the ED. And
24  that Dhar is not in the ED group, he's in the
25  intensivist group.

Page 31

1    Q.    Right. But by his own admission,
2  did Mr. Cummings tell you Dr. Dhar said he's
3  not a part of the stroke division of the
4  department of neurology at Washington
5  University?
6    A.    I don't know their arrangement. It
7  was my understanding that he's not part of
8  the ED team. He's part of the intensivist
9  care team.
10    Q.    Did Mr. Cummings tell you that
11  Dr. Dhar was insisting yesterday that the
12  occlusion in M1 was very proximal --
13        MR. CUMMINGS: Object to the form.
14  BY MR. GIDEON:
15    Q.    -- and not distal at all?
16    A.    I don't remember that. I don't
17  think I asked him if he knew precisely where
18  it was. But it was my understanding that he
19  thought it was distal, and so there wasn't
20  much clot in it. And, therefore, IV tPA
21  would have been better than I thought.
22    Q.    Yeah. Well, you have spent some
23  time in your career addressing the issue of
24  efficacy of IV tPA alone, haven't you?
25    A.    Well, my work was more catheter

Page 32

1  directed as opposed to the intervenous form.
2    Q.    Well, back in the days when you and
3  Brian Berger were doing intra-arterial
4  thrombolysis of clots, you were threading a
5  catheter up to a point close to the thrombose
6  and then lysing it in that fashion with
7  intra-arterial thrombolytic substances,
8  correct?
9    A.    Yes, that's very close. In 1994 we
10  started doing that at Parkview Hospital.
11    Q.    Right. But in the years since
12  then, you have paid attention to efficacy of
13  intravenous thrombolytics, haven't you?
14    A.    Yes, with what I've read.
15    Q.    Right. And you testified about
16  efficacy of intervenous thrombolytics in the
17  Featherston v. Mercy Health Partners case,
18  correct?
19    A.    I don't remember the names. But
20  I've had an ample opportunity to discuss the
21  benefit that it provides.
22    Q.    Yeah. Featherston is the case
23  involving Lourdes Hospital in Paducah,
24  Kentucky. Do you not recall that now?
25    A.    No.

Page 33

1    Q.    Okay.  And do you recall testifying
2  in Ferrion (phonetic) v. Martin Memorial
3  Hospital, the hospital in Martin, Florida?
4  Surely, you remember the name Ferrion?
5    A.    No, that's harder.  Is this a
6  recent case from Florida with Sean Domnick?
7    Q.    Yes.
8    A.    I remember that case.
9    Q.    Okay.  Do you recall testifying in
10  Featherston that intravenous tPA would be,
11  quote, like whistling at the incoming tide,
12  too much clot to lyse, end quote, in that
13  case?
14    A.    Sounds like something I would say.
15    Q.    All right.
16    A.    Normally, I use a little science
17  with it, too, rather than colloquial
18  commentary.
19    Q.    Do you recall in Featherston
20  testifying that tPA would have been of no
21  benefit in that case because tPA is only good
22  for about a 30 percent benefit?  Do you
23  recall that?
24    A.    That is -- if I said that, I'm
25  correct because that's what the science says.

Page 34

1    Q.    Okay.  Do you recall testifying in
2  Ferrion same thing, that with tPA you're
3  wasting your time because it only has a 30
4  percent benefit?
5    A.    It only has a 30 percent benefit,
6  that statement is accurate.
7    Q.    Okay.  Thirty percent meaning what,
8  out of 30 out of 100 will benefit from
9  intravenous tPA alone?
10    A.    Correct.  Assuming that you
11  establish their candidacy like the NINDS
12  trial publication.  That's where the 30
13  percent came from.
14    Q.    Right.  NINDS is N-I-N-D-S, 1995
15  publication in the New England Journal of
16  Medicine, isn't it?
17    A.    Correct.  December 14th, 1995.
18    Q.    Right.  And isn't that the
19  publication that the FDA relied upon to
20  permit the use of intravenous tPA for up to
21  three hours after the patient was last known
22  normal?
23    A.    That publication, that trial was
24  the basis for which the new drug approval was
25  granted for intravenous thrombolysis for

Page 35

1  acute ischemic stroke in North America by the
2  FDA in June of 2016.
3    Q.    Correct.  And that was they
4  permitted labelling for use up to three
5  hours, correct?
6    A.    That is correct.
7    Q.    Now, there has been a subsequent
8  effort to expand the permitted labelling to
9  authorize the manufacturer to promote the
10  drug as being used for between 3 and 4.5
11  hours, correct?
12    A.    No.
13    Q.    No.  There hasn't been an effort to
14  convince the FDA to permit them to change the
15  labelling?
16    A.    Not that I'm aware of.  Our
17  guidelines talk about the use of the extended
18  time window, but make the point that it's an
19  off label use of the drug.
20    Q.    All right.  So let's just be clear
21  for the purposes of the record itself.  Back
22  in February of 2016 when Mr. Ruffino was at
23  StoneCrest, the FDA approved labelling
24  allowed the use of intravenous tPA for up to
25  three hours after last known normal, correct?

Page 36

1    A.    Yes.  Assuming other issues of
2  candidacy are met.
3    Q.    Correct.  The off label use, that
4  is -- has been advocated by some and
5  recommended by others, is between 3 and up to
6  4.5 hours, assuming other criteria are met as
7  well, correct?
8    A.    That is correct.  It's been part of
9  our guidelines for a long time.
10    Q.    Right.
11    A.    It's not part of the FDA approved
12  use of Alteplase.
13    Q.    Now, what other articles establish
14  that intravenous tPA only provides benefit to
15  30 out of 100 if the patient otherwise fits
16  the selection criteria for use of the drug?
17    A.    It's only the NINDS trial.
18    Q.    Okay.  I have heard other
19  physicians refer to the NINDS trial as one
20  where it took -- you had to treat three to
21  benefit one.  Is that accurate?
22    A.    It's a little bit worse than that,
23  but anyway.
24    Q.    Okay.  Is it your opinion in this
25  case then, that the probability is that if

Page 37

1  Mr. Ruffino had been given intravenous tPA
2  alone, his probable benefit would have been
3  30 percent?
4      A.    Yes.
5      Q.    Thirty percent is less than 50
6  percent, isn't it?
7      A.    Yes.
8      Q.    Okay.  In order for Mr. Ruffino to
9  benefit in this case, he would have required
10  intravenous tPA plus endovascular
11  intervention?
12      A.    Yes.  Or he could have had
13  endovascular intervention without IV tPA to
14  receive what I believe would be the same
15  benefit.  The benefit between IV tPA as we've
16  been discussing and the benefit with
17  endovascular therapy are different benefits.
18  They're not the same.
19      Q.    Correct.
20      A.    Okay.
21      Q.    Correct.  But in terms of
22  addressing the big picture of improvement to
23  a more probably true than not standpoint,
24  more than 50 percent, Mr. Ruffino would have
25  required intravenous tPA plus endovascular

Page 38

1  intervention or endovascular intervention
2  alone?
3      A.    Correct.
4      Q.    Okay.  I was surprised when I read
5  the Ferrion deposition.  I didn't recall that
6  you were an attending at the city hospital.
7  Are you still doing that?
8      A.    I was there yesterday in the ED
9  yesterday.
10      Q.    I want to talk to you for a few
11  moments about your staff privileges.  You
12  have staff privileges at Saint Thomas
13  currently, don't you?
14      A.    Yes.
15      Q.    In the department of neurology?
16      A.    I think it's medicine.  There's no
17  separate neuro department.
18      Q.    How long have you had staff
19  privileges at Saint T?
20      A.    Since 1981.
21      Q.    Okay.  You do not have staff
22  privileges any longer at Centennial, do you?
23      A.    No, I do.
24      Q.    You do?  Are you sure?
25      A.    Well, I think I do.  I get emails

Page 39

1  from them every day about getting patients
2  out of the hospital and paid my dues last
3  year.  So if you know better than I, then
4  thanks for letting me know to get a refund.
5  They owe me 250 bucks.
6      Q.    Dr. Callahan, have you performed an
7  endovascular procedure at Saint Thomas
8  hospital?
9      A.    No.
10      Q.    Have you performed an endovascular
11  procedure at Centennial Medical Center since
12  you and Brian Berger stopped doing the
13  intra-arterial thrombolytic?
14      A.    No.
15      Q.    When did that stop?
16      A.    About 2001.  1994 through 2001.
17  And we did over 400 cases.
18      Q.    Right.  Well, I particularly
19  remember the -- it's either a flight
20  attendant or a pilot with such a dramatic
21  improvement.
22      A.    Yeah.
23      Q.    Do you remember the one I'm talking
24  about?
25      A.    Yeah.  That one made the Discovery

Page 40

1  Channel.  That was so big.
2      Q.    Yeah.
3      A.    But that was neither Berger nor
4  myself.  Those were people that we had
5  trained during the month of August when I was
6  away.
7      Q.    So you can't take credit for that?
8      A.    Only vicariously.
9      Q.    You haven't done any endovascular
10  procedures at Centennial since 2001, correct?
11      A.    No, have not.
12      Q.    What about at -- I think it's still
13  called General Hospital, isn't it?
14      A.    Yeah, Metro General --
15      Q.    Yeah --
16      A.    -- is what they call it.
17      Q.    Have you done any endovascular
18  procedures at Metro General?
19      A.    No.
20      Q.    When's the last time you ordered
21  intravenous tPA for anybody?
22      A.    Earlier this year at Metro General.
23      Q.    Sometime in 2018?
24      A.    Sure.
25      Q.    Let's just take the last two years.

Page 41

1  How many times have you ordered intravenous
2  tPA?
3      A.    Probably two or three.
4      Q.    And how many patients have you seen
5  in the last two years in an, you know, acute
6  care setting, an institutional setting?
7      A.    I don't know the answer to that.
8      Q.    Hundreds?
9      A.    No.  No.  Because it's -- my work
10  at the city hospital is just four days a
11  month.  And then it's not every month of the
12  year.  It's 11 months most years.
13      Q.    Would you agree that someone who
14  claims expertise in the area of stroke should
15  know that the outcomes utilizing intravenous
16  tPA alone never reach 50 percent or greater?
17  Don't you think somebody should know that?
18      A.    I'd have to disagree with your --
19  with your question, but it's a very complex
20  disagreement.
21      Q.    Well, for example --
22      A.    And the reason is that even my
23  friends that know tPA is only worth 30
24  percent have still testified that there would
25  have been benefit because of post hoc

Page 42

1  analysis of the NINDS data.  They even
2  published that.  And I consider these men
3  thoughtful in their academic, you know,
4  bright lights and so forth.  But they -- and
5  I understand the reason for why they say what
6  they do.
7          So it's a little more nuanced in
8  the way that you ask it.  I know it's only
9  good for 30 percent based upon the study, the
10  heart science.
11      Q.    Right.
12      A.    And then those who were delighted
13  with the result, but disappointed with what
14  happened by treating physicians in America
15  over the next decade and a half recut the
16  data to show that there was post hoc benefit,
17  depending on changing the definition of
18  benefit.
19          And I felt that I know why they
20  wanted to say that.  I shared their concern,
21  but I lack their enthusiasm for data dredging
22  and torturing the prior data.  I thought the
23  IV tPA data was the data.
24          And then if you want to have
25  another conclusion, you have to say it's post

Page 43

1  hoc.  We've done data dredging.  We've done
2  all this statistical thing with propensity
3  matching, but you have to be very clear
4  channeled that you're doing it with a purpose
5  rather than having done a scientific study to
6  answer a question.
7      Q.    Well, then let's distill this.  The
8  science tells us benefit, 30 percent?
9      A.    Correct.
10      Q.    If a lawyer can read the
11  publications on the ESCAPE trial, the SWIFT
12  PRIME trial, and the EXTEND-1A trial, then a
13  physician ought to be able to do the same,
14  correct?
15      A.    Yes.
16      Q.    Okay.  The ESCAPE, SWIFT PRIME, and
17  EXTEND-1A trials all demonstrate benefit of
18  intravenous tPA alone at less than 50
19  percent, don't they?
20      A.    That is correct.
21      Q.    Okay.  Have you examined
22  Mr. Ruffino?
23      A.    No.
24      Q.    Do you think any benefit would be
25  served at all by you examining him?

Page 44

1      A.    Not for him.
2      Q.    Do you consider your undertaking in
3  this case to determine his degree of function
4  or dysfunction?  Have you been asked to do
5  that?
6      A.    No, I haven't.
7      Q.    So you're not going to be in a
8  position to say that he's got this degree of
9  permanent impairment or that degree of
10  disability without -- well, based on the
11  information you have, are you?
12      A.    It would require more data.
13      Q.    And an examination, wouldn't it?
14      A.    By someone.
15      Q.    How about you?  Before you could
16  offer an opinion that he has some degree of
17  impairment or disability, that he is
18  permanently limited, wouldn't you have to
19  examine him?
20      A.    No.  Someone -- one of my
21  colleagues could examine him and render an
22  opinion that, if I read it, I would be
23  satisfied with what they said.
24      Q.    Well, have any of your colleagues
25  examined him, rendered an opinion, and sent

Page 45

1    the materials to you for the purposes of you
2    forming an opinion about his degree of
3    impairment or disability?
4        A.    No.
5        Q.    Have you spoken with Ruffino?
6        A.    No.
7        Q.    Have you requested the opportunity
8    to do so?
9        A.    No.
10       Q.    Have you ever even seen him?
11       A.    Yes.
12       Q.    Did you see him on the dash cam
13   video?
14       A.    Yes.  And I listened to Glenn Beck
15   at the same time.
16       Q.    Yeah.  From the police radio?
17       A.    Yes.
18       Q.    I want to ask you about one
19   particular area that I think you're probably
20   interested in and up to speed on.  I'll hand
21   it to you.
22             Dr. Callahan, have you seen this
23   article entitled "Acute cigarette smoke
24   exposure reduces clot lysis - association
25   between altered fibrin architecture and the

Page 46

1    response to tPA"?  Have you seen that
2    previously?
3        A.    No.
4        Q.    Are you aware of any scientific
5    interest in that subject?
6        A.    Not until you handed this to me.
7             MR. GIDEON:  I'll make a copy of
8    this the next exhibit.
9             (Whereupon, the above-mentioned
10   document was marked as Exhibit No. 4 to the
11   testimony of the witness.)
12   BY MR. GIDEON:
13       Q.    Is the publication "Thrombosis
14   Research" generally regarded as reliable and
15   authoritative?
16       A.    You know, I don't get this journal,
17   and I don't know their impact value.
18       Q.    Based on your past expertise and
19   current interest in the field, do you agree
20   that acute cigarette smoke exposure in
21   smokers results in changes in fibrin
22   architecture and the clots associated with
23   those architectural changes are more
24   resistant to lysis with tPA than others
25   untreated by cigarette smoke exposure?

Page 47

1        A.    Do you want me to read the article
2    so I can respond if that's what they showed?
3        Q.    That's what they --
4        A.    And I'm satisfied with how they
5    conducted --
6        Q.    That's what they can conclude.  I
7    don't want to spend the time to have you read
8    the whole article and vet it.  I just wanted
9    you to know whether you agreed with that
10   conclusion or if you have no opinion on that
11   point?
12       A.    At present, I can read what they've
13   written, but have no opinion on that point.
14       Q.    Okay.  What are the fees today?
15   Still $500 an hour?
16       A.    Yes.
17       Q.    What's the charge for medical
18   record review?
19       A.    $500 an hour.
20       Q.    Everything is $500 an hour?
21       A.    Yes.
22       Q.    Is that same thing true if you
23   testify in person?
24       A.    Yes.
25       Q.    What do you make on an annual basis

Page 48

1    in terms of testifying?  Let's take the year
2    that I'm sure you just completed, and I hope
3    you have a memory of your Schedule C.  What
4    did you report as additional income from
5    medical-legal work for 2017?
6        A.    So I didn't -- I didn't tabulate
7    those.  It's done by an accountant.  I get
8    little bitty things in the mail.  They may be
9    called 1099s or --
10       Q.    You get 1099s in the mail?
11       A.    -- that may not be the right
12   number.
13       Q.    Many of them from different lawyers
14   and law firms?
15       A.    Right.  There must have been 20 --
16   at least 20 envelopes that I opened.  But
17   then my accountant actually adds those up and
18   does whatever they do with them.
19       Q.    Well, remember what I said earlier,
20   if you don't know the answer or you don't
21   understand my question, don't answer it.
22             Do you know what the aggregate
23   number was for 2017 --
24       A.    No.
25       Q.    -- for your medical-legal work?

1    A.    No.
2    Q.    Can you ballpark it for me?  More
3  than X and less than Y?
4    A.    No.  I'm -- no.
5    Q.    Is there any year in the last three
6  where you could identify that number for us?
7    A.    I've always used the same approach.
8  The envelopes come.  They open them up.  They
9  add them up, and now, recently, they
10  electronically submit.
11    Q.    Okay.  Now, you have never worked
12  as a registered nurse in any state, have you?
13    A.    No.
14    Q.    And you've never worked as an ER
15  physician in any setting, have you?
16    A.    Correct.
17    Q.    You are not expressing a standard
18  of care opinion on the emergency room nursing
19  staff, correct?
20    A.    Correct.
21    Q.    And you're not expressing a
22  standard of care opinion on the physician
23  extender, Mr. Rhinehart?
24    A.    Correct.
25    Q.    Or the ER physician Dr. Clark

1  Archer?
2    A.    Correct.
3    Q.    Do you know Dr. William Powers
4  personally?
5    A.    No.
6    Q.    You know who he is, though, don't
7  you?  He's chief of vascular neurology at the
8  University of North Carolina?
9    A.    I don't -- I don't know him.
10    Q.    You are familiar with this AHA/ASA
11  guideline, aren't you?
12    A.    Yes.
13    Q.    Dr. Callahan, are you a member of
14  the American Heart Association, American
15  Stroke Association?
16    A.    Yes.
17    Q.    Is it one organization with two
18  names AHA/ASA?
19    A.    That's a good question.  ASA used
20  to be separate from AHA.
21    Q.    Correct.
22    A.    But I think they're probably under
23  the same umbrella.  I don't --
24    Q.    Okay.
25    A.    I'm not really sure.

1    Q.    Well, I would like to direct your
2  attention to just a couple of points on these
3  standards.  If you will turn to page 3029.
4    A.    I'm there.
5    Q.    And this is the area I'm looking at
6  (indicating).
7    A.    I've got it.
8    Q.    It makes the statement that is
9  consistent with what you just said, and that
10  is:  However, because recannulization occurs
11  in only a minority of patients with large
12  vessel occlusion receiving intravenous tPA
13  alone, then it quotes 37.3 percent in the
14  ESCAPE trial.  It then goes on to talk about
15  these efforts to do endovascular
16  interventional care.  You've seen that
17  previously, correct?
18    A.    Yes.
19    Q.    Do you agree with that statement
20  from this publication?
21    A.    Yes.
22    Q.    All right.  Now, this particular
23  publication, which was released in 2015 as an
24  update of the 2013 guidelines, includes a
25  series of recommendations that then appear on

1  page 3031.  Will you turn to those, please.
2  Are you there?
3    A.    I am.
4    Q.    Do you agree with me that after
5  release of these recommendations, the AHA/ASA
6  standards for endovascular treatment
7  established criteria that should be met
8  before a patient was considered for
9  endovascular intervention, and one of those
10  requirements was an NIHSS or NIH stroke scale
11  of 6 or greater, correct?
12        MR. CUMMINGS:  Object to the form.
13  BY MR. GIDEON:
14    Q.    Do you see the subsection E?
15    A.    Yeah.  So, now, these are
16  guidelines.  They're not considered
17  standards.  I know standards probably has a
18  particular meaning on the legal side, but for
19  us they're guidelines.
20    Q.    Right.
21    A.    And as part of what's gone before
22  with their meta-analysis of these trials,
23  even though not all the studies required
24  that, an NIH stroke scale score greater than
25  6 is included into E.

1    Q.    Well, tell me why, to the extent
2  you know, that when the AHA/ASA published its
3  focused update of the 2013 guidelines for the
4  early management of patients with acute
5  ischemic stroke regarding endovascular
6  treatment, one of the recommendations before
7  you would consider endovascular intervention
8  was, quote, NIHSS score of greater than or
9  equal to 6. Why was that selected?
10   A.    I don't know.
11   Q.    Okay. One of the other
12 requirements is an ASPECTS -- excuse me. One
13 of the other guidelines is an ASPECTS score
14 greater than or equal to 6, correct?
15   A.    Yes. In answer to your prior
16 question on page 3029.
17   Q.    Yes?
18   A.    They have a whole paragraph of how
19 they came by that.
20   Q.    Right.
21   A.    So I don't know independently, but
22 they write about how they picked out six.
23   Q.    Okay. Did you participate in any
24 way in the AHA/ASA series of new
25 recommendations in 2015?

1    A.    No.
2    Q.    These guidelines remained in effect
3  through the period of time that Mr. Ruffino
4  was a patient at StoneCrest and Centennial,
5  correct?
6    A.    Yes.
7    Q.    Okay. They have been recently
8  updated again in the spring of 2018, haven't
9  they?
10   A.    They have.
11   Q.    But the recent updates had no
12 application when Mr. Ruffino was a patient at
13 StoneCrest?
14   A.    That's correct. There's very
15 little change in the part of the guidelines
16 that had to do with that particular aspect of
17 stroke care though. They're very similar.
18   Q.    Have you based any of your opinions
19 in this case on specific published
20 guidelines?
21   A.    No. I talked about the
22 publications rather than the guidelines in my
23 affidavit.
24   Q.    Right. And the three studies that
25 you referred to as I recall in your affidavit

1  were the ESCAPE, the SWIFT PRIME, and the
2  EXTEND-1A trials?
3    A.    Right. EXTEND-IA.
4    Q.    EXTEND-IA. Okay. Those are the
5  three trials you referred to, correct?
6    A.    Yes.
7    Q.    Did you actually participate in any
8  of those three trials?
9    A.    I did not.
10   Q.    All right. You agree that one of
11 your responsibilities as a witness offering
12 opinions in this case is to offer only
13 scientifically valid opinions, correct?
14   A.    Yes.
15   Q.    You also agree that you should not
16 be an advocate for or against either party?
17   A.    Yes.
18   Q.    Your job in this case is to offer
19 responsible scientifically valid opinion
20 testimony?
21   A.    Yes, sir.
22   Q.    Now, can you calculate the ASPECTS
23 score on the CTA or the CT that were obtained
24 on February 17, 2016?
25   A.    At StoneCrest?

1    Q.    Yes. Let's start off a little
2  simpler. Did you do that when you looked at
3  those two studies?
4    A.    Yes.
5    Q.    Okay. The Alberta Stroke Program
6  Early CT Score is what ASPECTS stands for,
7  correct?
8    A.    Right. Canada.
9    Q.    And it's focused specifically on
10 changes in the middle cerebral artery
11 distribution, correct?
12   A.    Right.
13   Q.    All right. When you did the
14 evaluation of the CT in the morning and the
15 CTA on the afternoon of February 17, 2016,
16 what ASPECTS, A-S-P-E-C-T-S, score did you
17 assign to either or both of those studies?
18   A.    It's done normally by radiology.
19 They actually have an algorithm that provides
20 the areas of interest. My review of the
21 record did not -- I didn't see that they had
22 rendered an ASPECTS score. I thought the
23 score would have been ten on both exams.
24   Q.    Why, Dr. Callahan?
25   A.    Because I couldn't see tissue

Page 57

1  change that represented acute infarction.
2      Q.    All right.  In your opinion, does
3  it take six hours for the changes associated
4  with a stroke to appear on a CT scan?
5      A.    That's the number we normally give.
6      Q.    Is that the number you feel
7  comfortable with?
8      A.    That's kind of a ballpark number
9  that we use.
10     Q.    Well, you were asked in the Ferrion
11  case to give an opinion to a reasonable
12  degree of medical certainty about how long it
13  would take before a stroke would appear on a
14  CT scan, and after some discussion, you said
15  six hours.  Are you still comfortable with
16  that?
17     A.    Oh, yeah.  I'm not the only one
18  comfortable with that.  It's a fairly common
19  number.
20     Q.    Okay.  Well, let's talk about this
21  particular individual and when he was last
22  normal.  What have you looked at as you've
23  tried to determine what was going on with
24  Mr. Ruffino from the night of the 16th into
25  the morning of the 17th in February of 2016?

Page 58

1  What data sources have you had?
2      A.    Well, for that part of time only
3  the deposition testimony.
4      Q.    All right.  Now, did you compare
5  his deposition with his wife's?
6      A.    No.  I just read them.
7      Q.    Well, did you notice that, to put
8  it charitably, Mr. Ruffino is frequently
9  inaccurate, if not dishonest?
10     A.    I'm not sure about his honesty or
11  accuracy.
12     Q.    Well, you will recall, for example,
13  when I began asking his wife questions she
14  pointed out that her husband had testified
15  incorrectly, to put it charitably, in a
16  number of ways.  Did you see that?
17     A.    I recall that part of the
18  deposition.
19     Q.    All right.  So how much credence
20  can you give to Mr. Ruffino's deposition
21  testimony, then, given that, in terms of
22  deciding what actually happened on the
23  morning of the 17th of February?
24          MR. CUMMINGS:  Object to the form.
25          THE WITNESS:  Yeah.  I think it's

Page 59

1  just a data point.  It would be very
2  difficult for me in the 18th of April 2018 to
3  establish voracity.  We rarely require that
4  in terms of our medical care because it's
5  hard to know the truth.
6  BY MR. GIDEON:
7      Q.    Okay.  Well, for example, in this
8  case you have depositions that you normally
9  don't have when you're treating a patient.
10  As a simple example, I asked Mr. Ruffino if
11  the neurologist, Dr. Efobi, had ever told him
12  to quit smoking and he said no.  Dr. Efobi's
13  notes document that he was instructed to quit
14  smoking aggressively twice.  Did you see
15  that?
16     A.    The only copy of the neurologist
17  notes that I have are the letter that he sent
18  to Dr. Luck.  And they have an item in their
19  electronic medical record that you have to
20  populate with responses, and it said to quit
21  smoking.
22     Q.    Right.
23     A.    Whether that means that he spent an
24  extended period of time counselling a very
25  heavy smoker that he needed to quit, I don't

Page 60

1  know.  The chart reflects that he indicated
2  in the check box that he told him to quit
3  smoking.
4      Q.    Right.  Likewise, in his deposition
5  Mr. Ruffino denied that he'd ever had
6  difficulty speaking with any given event.
7  You saw that wasn't true, didn't you?
8      A.    Well, he had told Dr. Luck
9  different things, anyway.
10     Q.    Well, what I'm trying to get at --
11     A.    There are differences in what
12  patients tell us.  And I've always understood
13  that was just how they communicated with me.
14     Q.    Well, he also testified under oath
15  that he first had difficulty with mini
16  strokes beginning in December of 2015.
17  Here's a copy of Dr. Luck's record.  I don't
18  know if you've seen it or not.
19     A.    No, I have.  Because it started in
20  November according to Dr. Luck, and there had
21  been six episodes.
22     Q.    Okay.  In fact, Dr. Luck's note
23  says that he was having, he being
24  Mr. Ruffino, the man who denied under oath
25  ever having difficulty speaking with any

Page 61

1  episode, who insisted he'd never had any
2  symptoms in his right leg under oath, and had
3  insisted under oath his first trouble was in
4  December of 2015, on November 24, 2015 he
5  told Dr. Luck that he had problems right side
6  of face, can't talk, upper extremity right
7  arm, lower extremity right leg to foot, and
8  also that the onset began a month ago, which
9  would take it into October of 2015.  You've
10 got that in front of you right now, correct?
11      A.    Yes.  Yeah, I've seen this.
12      Q.    Okay.  Well, given just the little
13 bit of time we've spent on this, wouldn't you
14 agree with me that Mr. Ruffino is -- give
15 that to her.  We'll make that an exhibit.
16           MR. GIDEON:  We'll make Dr. Luck's
17 note the next exhibit.
18           (Whereupon, the above-mentioned
19 document was marked as Exhibit No. 5 to the
20 testimony of the witness.)
21 BY MR. GIDEON:
22      Q.    I'm not asking you to criticize the
23 man individually.  But in your role in this
24 case, wouldn't you at least agree with me
25 that he is not an accurate historian and

Page 62

1  that's the most charitable thing you can say?
2      A.    I would say it differently.
3      Q.    Say it differently how?
4      A.    When the brain is involved, as it
5  was in this case, perhaps charity and then
6  some is required.
7      Q.    Okay.  Let's take another look at
8  history.  I'm going to ask you to look at the
9  Centennial history and physical examination
10 dated February 17th, 2016.
11           MR. GIDEON:  Miss, you can just go
12 ahead and mark Dr. Callahan's copy of that
13 and give it back to him.
14           (Whereupon, the above-mentioned
15 document was marked as Exhibit No. 6 to the
16 testimony of the witness.)
17 BY MR. GIDEON:
18      Q.    Have you seen this H and P from
19 Centennial previously, Dr. Callahan?
20      A.    Yes, sir.
21      Q.    You can see from what was dictated
22 by this hospitalist on February 18th and
23 electronically signed February 21st of 2016
24 that this man reported dizziness, slurred
25 speech, facial muscle weakness, that he had

Page 63

1  been having those acute events with speech
2  difficulty and facial weakness for the past
3  month.  And then in the fourth line up from
4  the bottom, he says, "the patient woke up
5  with the above listed symptoms."
6           You saw that, right?
7      A.    I haven't found "the patient woke
8  up."  I was following you, but it's in that
9  paragraph, right?
10           MR. CUMMINGS:  It's right there.
11           THE WITNESS:  Near the bottom?  I
12 got it.  Yes.
13 BY MR. GIDEON:
14      Q.    You see it?  Now, the routine among
15 physicians in the field with management of
16 stroke is, if you wake up with these
17 symptoms, your last normal is when you went
18 to bed the night before, correct?
19      A.    Yes.
20           MR. CUMMINGS:  Object to the form.
21           THE WITNESS:  Yes.
22 BY MR. GIDEON:
23      Q.    And what time did he go to bed on
24 the night of February 16th, 2016?
25      A.    It's not in this note.

Page 64

1      Q.    Just given the amount of
2  information we've looked at so far, which is
3  his deposition testimony, plus a note by
4  Dr. Luck, and this H and P at Centennial, as
5  well as your memory of the records at
6  StoneCrest, when was Mr. Ruffino last normal
7  on the morning of the 17th, 2016?  When was
8  he last normal?
9      A.    Well, the medical records at
10 StoneCrest indicate he was normal that
11 morning after he was seen there.
12      Q.    Right.  That's one source.  This
13 reflects that he woke up on the morning of
14 the 17th with facial muscle weakness,
15 dizziness, and slurred speech.  Do you know
16 what time he normally arose?
17      A.    No.
18      Q.    Do you recall from his deposition
19 that he normally got up well before 6:00
20 because he started working at 5:30 to 6 a.m.,
21 six days a week?
22      A.    I don't recall when he said in the
23 deposition that he got up.
24      Q.    Okay.  Bottom line then, is it may
25 well have been that he was last normal

Page 65

1  whenever he went to bed the night before?
2       MR. CUMMINGS:  Object to the form.
3       THE WITNESS:  I think he was last
4  normal a lot of times because of the nature
5  of what he has in terms of pathology.
6  BY MR. GIDEON:
7       Q.    The current definition of a TIA is
8  what?
9       A.    Temporary neurologic dysfunction
10  lasting less than 24 hours in which imaging
11  is negative.
12       Q.    But we know that it's going to take
13  at least six hours for a stroke to appear on
14  a CT scan, correct?
15       A.    Yes.
16       Q.    How long will it take before a
17  stroke appears on an MR?
18       A.    I don't think anybody knows, but
19  it's much quicker.  Much quicker.
20       Q.    Measured in hours, though, still?
21       A.    Probably under an hour, I think,
22  with diffusion weighted capability.
23       Q.    All right.  Hasn't the definition
24  that you just gave us been altered?
25       A.    There have been suggested changes

Page 66

1  to it.
2       Q.    Well, the definition of 24 hours
3  has been abandoned, wasn't it?
4       A.    Generally so.
5       Q.    Yeah.  Why did you give me the 24
6  hour definition, which was abandoned in 2004?
7       A.    Because it's still in our
8  literature.
9       Q.    Okay.  Well, isn't the current
10  definition, the one that was adopted in 2004
11  and did away with the 24 hour figure, one
12  that says transient neurological changes for
13  which there is no evidence of infarction?
14  Isn't that the definition?
15       A.    Yes.  It's become an imaging
16  requirement rather than the time plus
17  imaging.  I gave you the time plus imaging.
18       Q.    Right.
19       A.    The truth of the matter is, the
20  TIAs don't last 24 hours.  They don't even
21  last one hour.
22       Q.    Right.  In this case, though, do
23  you -- is it normally recommended that you
24  attempt to do an endovascular embolectomy in
25  a patient that has a TIA?

Page 67

1       A.    I don't know of that
2  recommendation.  I mean, TIAs -- the reason
3  we treat someone with TIA is to prevent the
4  stroke, not because of the TIA.
5       Q.    Right.
6       A.    So if a patient had a TIA and has
7  clot in the neck, the treatment is removal of
8  the plaque in the neck.
9       Q.    In this particular case, though,
10  we've got an individual who has -- and I know
11  you haven't seen Dr. Efobi's entire set of
12  notes, but you have seen a letter from
13  Dr. Efobi to Dr. Luck.  You have now seen,
14  again, the Luck November 24, 2015 note.  We
15  know we have an individual who has had a
16  series of TIAs, correct?
17       A.    Yes.
18       Q.    Is it your opinion to a reasonable
19  degree of certainty that the series of TIAs
20  are all originating from the stenosis shown
21  on the 12/23/15 MRA?
22       A.    Yes.
23       Q.    And what is causing the events to
24  occur against the backdrop of an otherwise
25  static stenosis?

Page 68

1       A.    Activated plaque.
2       Q.    And what is activating the plaque
3  in each of these events?
4       A.    He must have some local disturbance
5  of flow.
6       Q.    Could it be --
7       A.    And that's probably driven by
8  platelet interactions with the plaque.
9       Q.    Could it be something as simple as
10  changes in blood pressure?
11       A.    I don't think so.
12       Q.    Well, if we take somebody who has
13  poorly controlled and long standing chronic
14  hypertension, as you know he did, if their
15  blood pressures are diminished, is that
16  sufficient to diminish perfusion in areas of
17  significant stenosis?
18       A.    For critical stenosis, it can.
19       Q.    Okay.  And you know from looking at
20  the MRA in this case that the level of
21  stenosis is between more than 50 and less
22  than 100?
23       A.    Correct.
24       Q.    Do we know whether he had a
25  critical stenosis in the M1 branch of the

Page 69

1  left MCA based on the MRA?
2      A.    We know it based upon what he's
3  doing clinically.
4      Q.    We know it's critical?
5      A.    Well, that there's activated plaque
6  and he must have periods of less flow.  In
7  between, his flow must be adequate.  So for
8  ten minutes he has inadequate flow, and for
9  the next hours or however long it is until
10  the next event, he has adequate flow.
11      Q.    Okay.  You testified in the Ferrion
12  case, Dr. Callahan, another patient that had
13  a series of TIAs, that, quote, these TIAs
14  reflect something very bad is going to happen
15  in the near term, end quote.
16          What is it about sequential TIAs
17  that reflects something very bad is going to
18  happen in the near term?
19      A.    We think that TIA is a temporary
20  manifestation of the stroke that will occur.
21      Q.    All right.
22      A.    And when plaques become activated,
23  there is a window during which that stroke is
24  likely.
25      Q.    What is the window?

Page 70

1      A.    It's unknown.  It's probably --
2      Q.    How do you even know there's a
3  window if the duration is unknown?
4      A.    Do you really want me to tell you
5  that?
6      Q.    No.
7      A.    I was afraid you'd say that.
8      Q.    I don't want a lengthy explanation.
9  What I want is, how could you conceivably
10  know there is a window if the duration itself
11  is unknown?  That makes no sense to me.
12      A.    I'm sorry.
13      Q.    I'm just being honest with you.  A
14  window implies some temporal relational or a
15  spacial relationship?
16      A.    I've got it.  It was quite sometime
17  ago that the suggestion had been made that
18  activated plaque in the carotid would cause
19  stroke and that removal -- surgical removal
20  of that plaque would prevent stroke.  That
21  suggestion was made in 1952 by Miller Fisher.
22          In 1992, published in the New
23  England Journal was the first scientific
24  proof that angiographically proven stenosis
25  greater than 70 percent in individuals with

Page 71

1  activated plaque, so they'd had TIA or minor
2  stroke, endarterectomy was better than
3  medical therapy for the prevention of stroke.
4  This was a great step forward in medicine.
5          When that trial was published, it
6  was my expectation, not being a trialist,
7  that all the group randomized to medical
8  treatment immediately went and got stars
9  placed on their neck for surgical removal of
10  the plaques.
11          In 1998, in the New England
12  Journal, the same group that had done the
13  NASCET study of severe carotid stenosis
14  published their work for the 50 to 70
15  percent, just severe without the capital S,
16  carotid stenosis paper.
17          In that paper in the New England
18  Journal, they had a single graph of what had
19  happened to the individuals in the original
20  NASCET trial.  And what they showed in the
21  graph is that the surgical individuals had a
22  seven percent risk of stroke at times zero
23  because there was chance of causing the
24  stroke in the operating room.  And then
25  immediately after that, the graph dropped and

Page 72

1  the risk of subsequent ipsilateral stroke was
2  about one percent per year.
3          The medical group, the other part
4  of the graph, didn't go to the operating
5  room.  They still had their activated plaques
6  angiographically proven, and for the first
7  three years they were having strokes.  And so
8  the line started above the seven percent.
9  And by year three, even though they had never
10  had their plaques removed or had a balloon
11  job on the plaques, they got to the one
12  percent mark.  And for the next six years, to
13  1998, had a stroke rate equal to the same
14  rate of stroke of the group that had their
15  plaque surgically removed.
16          Dr. Barnett, who published these
17  two papers, had only a single paragraph in
18  the New England Journal to torture those of
19  us that like to read every page and look at
20  every graph.  But here he had suggested that
21  activated plaques in a large artery, some of
22  it became quiet after three years, the area
23  under the curve.
24          Because you might say, well, they
25  all had a stroke.  The answer was, 25 percent

Page 73

1  did.  But 75 percent who never had the
2  operation never had an ipsilateral stroke.
3  And so it's just a phenomenon --
4      Q.    Now I see what you mean about the
5  window, though.  It has a temporal feature to
6  it.
7      A.    So within three years for the
8  carotid, if the plaque hadn't gotten you, it
9  seems like it's not going to get you.  Why is
10  that?  And Barnett never told us.
11     Q.    Well, do you know?
12     A.    We speculate, which isn't the same
13  as knowing, that in 1992 medical therapy for
14  the original NASCET trial consisted of
15  Aspirin, primitive blood pressure medicines
16  like Aldomet, blood thinners like Warfarin,
17  and there were no statins.  That was the year
18  that Simvastatin, you know, first came on the
19  market after the publication of four S.
20         And Dr. Barnett never published if
21  these individuals in Canada and elsewhere
22  got -- now, ACE inhibitors, Lisinopril came
23  out that year -- got a statin, Simvastatin,
24  40 milligrams.  Might have been given a super
25  Aspirin, you know, P2Y12 inhibitor like

Page 74

1  Clopidogrel.
2          I mean, the medical -- what
3  happened in the medical universe changed.
4  It's a great interest that in that same year,
5  1992, the plot of Americans beginning
6  hemodialysis with end stage renal disease hit
7  an inflexion point.  And that inflexion point
8  has changed the slope.
9          So we theorize, though we don't
10  know, that medical treatment came of age.
11  And while some time ago you asked me about
12  numbers needed to treat with IV tPA, which is
13  12, not 3.
14     Q.    Twelve to treat in order to benefit
15  one?
16     A.    Yeah.  For surgical endarterectomy
17  the numbers needed to treat are only seven.
18  That's a huge impact.  Because of the
19  absolute reduction risk, not the relative
20  risk reduction.
21         So in this particular example,
22  there is likely to be a window in a 3
23  millimeter caliber blood vessel because the
24  middle cerebral artery stem is the same
25  caliber as the heart, just like we know

Page 75

1  there's a window in the 10 to 12 millimeter
2  internal carotid artery with activated
3  plaque.
4      Q.    Well, you may not know this, then,
5  but Dr. Efobi saw this man in December of
6  2015, ordered the MRI and the MRA, and then
7  saw the patient again February 11th, 2016.
8          Did Dr. Efobi miss the opportunity
9  to prevent the stroke that you have said
10  occurred on -- sometime on February 17th,
11  2016?
12     A.    As I mentioned to you earlier, I
13  never -- I have only the copy of his initial
14  dictation.
15     Q.    Right.
16     A.    There's nothing in Luck's notes
17  that indicate there's another visit.
18     Q.    There are.
19     A.    But I'm not provided that.
20     Q.    Then you can't answer the question
21  of whether Efobi missed the opportunity to
22  prevent the stroke?
23     A.    If you say I can't, then I can't.
24     Q.    Well, can you?  That's my question.
25  Whether you have the notes or not, can you

Page 76

1  tell me that Dr. Efobi missed the opportunity
2  to prevent the stroke that you described as
3  occurring sometime around February 17, 2016?
4      A.    Yeah.  Optimal medical therapy was
5  not offered to this patient by the
6  neurologist at the initial visit.  After
7  that, I don't know.
8      Q.    What would have been the optimal
9  medical therapy to prescribe to John Ruffino
10  based on what is described in the thank you
11  for the referral note from Efobi back to
12  Dr. Luck?  What should have been prescribed?
13     A.    Dual antiplatelet therapy.
14  Intensive lipid lowering.
15     Q.    Are you finished?
16     A.    That's all that he could have
17  prescribed him.
18     Q.    Okay.
19     A.    He asked him to quit smoking,
20  apparently.
21     Q.    Which he refused to do?
22     A.    No one ever quits smoking.
23     Q.    But you saw he was still smoking in
24  the dash cam when he's waiting for the
25  ambulance people to come pick him up, right?

Page 77

1    A.    I saw that.  I saw him take out the
2 cigarette and light it with his right hand.
3    Q.    What's dual antiplatelet theory?
4    A.    Oh, I'm sorry.  Clopidogrel plus
5 Aspirin.
6    Q.    And intensive lipid lowering would
7 be a statin?
8    A.    Yes.  It would require Atorvastatin
9 40 or 80 milligrams or Rosuvastatin 20 or 40
10 milligram.  None of the other statins or
11 doses of those drugs that would be lower
12 would have been adequate.
13    Q.    Okay.  Do you have an opinion as to
14 the likelihood that this man would have still
15 had a stroke on or around February 17, 2016
16 if those medications had been prescribed and
17 if the patient had taken them after the first
18 visit with Dr. Efobi?
19    A.    I don't know how long of a runway
20 you need for those drugs to have been
21 confident that risk would have been reduced.
22    Q.    You cannot say to a reasonable
23 degree of medical certainty that it would
24 have prevented the stroke?
25    A.    Correct.  We have a study called

Page 78

1 SAMMPRIS that I'm sure you're aware of.  And
2 in that study, medical treatment as I
3 outlined just to you proved superior to
4 ballooning and stenting in patients that were
5 having recurrent TIAs and no stroke.
6    Q.    In this particular case, have you
7 had a chance to look at the MR of February
8 18th, 2016?
9    A.    I have.
10    Q.    What I would like to do now is to
11 switch gears and compare the 12/23/15 MRI and
12 the 2/18/16 MR.  I know that your laptop is
13 equipped with the software necessary to look
14 at the images.  You're free to look at that,
15 if you wish, again.  Alternatively, you're
16 free to look at your notes.  It's your
17 choice.  But I want a comparison of the
18 two --
19    A.    The study that was done before was
20 a CT -- I'm sorry.  It's an MR.
21    Q.    It is an MR.
22    A.    Yeah.
23    A.    12/23/15 --
24    A.    Got you.
25    Q.    -- and 2/18/16.

Page 79

1    A.    Right.
2    Q.    You're free to look at notes.
3 You're free to look at the images again.
4 Your choice.  But tell us what you see.
5    A.    I'd refer to my note, which is part
6 of Exhibit 2.
7    Q.    Okay.  Tell us what you see
8 February 18th, 2016.
9    A.    So that study was obtained at 2018
10 hours at Centennial Medical Center.  And it
11 showed restricted diffusion that was patchy
12 involving the deep left hemisphere and the
13 subinsular regions.  It also showed changes
14 in the left temporal gyral pattern and left
15 high frontal gyral pattern.
16        In addition to restricted diffusion
17 abnormalities on DWI, the flare sequences
18 were positive in the same locations.  The
19 gradient sequence showed no evidence of micro
20 hemorrhage.
21        So this -- these changes were new
22 that had occurred between the prior 12/23/15
23 MR and the MRI at Centennial.
24    Q.    Do you agree that the MR of
25 February 18th, 2016 shows diffused cerebral

Page 80

1 cortical loss?
2    A.    No, I don't agree with that.
3    Q.    You know that's in the --
4    A.    May be in a report, but I don't
5 agree with that.
6    Q.    -- dictated report by the
7 physician?
8    A.    No.
9    Q.    You do not agree with it?
10    A.    No.  What I thought about the scan
11 is what I told you.
12    Q.    I understand.
13    A.    It's not a full dictated report
14 like the radiologists do.
15    Q.    Do you agree the February 18th,
16 2016 MR shows -- on diffusion imaging shows
17 patchy infarcts in the left basal ganglia?
18    A.    That's what I just told you.  I
19 agree with that.
20    Q.    Okay.  Do you agree that that also
21 shows -- that study shows embolic infarcts in
22 the left frontal lobe?
23    A.    Yes.  I told you that, too.  High
24 frontal.  And also left temporal.
25    Q.    And in the left occipital lobe as

Page 81

1   well?
2       A.      Well, that's really temporal but --
3   I would say temporal.
4       Q.      All right.  Does that make it more
5   likely not that there was embolic
6   reduction of perfusion in a number of
7   different sites?
8       A.      I think --
9       Q.      Or is there -- what I'm getting at,
10  is there a single pathway to reduction of
11  perfusion more likely than not?
12      A.      So I think the activated plaque in
13  the mid portion of the M1 segment on the left
14  involved penetrating vessels to the basal
15  ganglia.  And the stroke event was one where
16  there was not subsequent reperfusion in the
17  deep basal ganglia.
18          As part of the flow, no flow, flow,
19  no flow TIA episodes until the penultimate
20  one that was the stroke, there must have
21  distal migration of very small clots that
22  accounted for the change in the gyrus and the
23  high left frontal region and left temporal
24  region that you point out the reader called
25  the left occipital region.

Page 82

1       Q.      Right.
2       A.      So the mechanism is activated
3   plaque with a local disturbance of flow of
4   penetrators and distal small emboli.  These
5   are really small emboli.
6       Q.      Do you --
7       A.      And they had to get there because
8   there had to be flow that took them there.
9   They couldn't have gotten there with
10  collateral flow.
11      Q.      But let's make sure that we all
12  understand what you're saying, Dr. Callahan.
13  Do you think there were episodes of embolic
14  movement here that led to inadequate
15  perfusion of certain areas of the brain, or
16  was there just one episode?
17      A.      We don't know.
18      Q.      Okay.  Over what period of time
19  could there have been several episodes that
20  are consistent with what you see on the
21  February 18th, 2016 MR with the baseline you
22  have of the 12/23/15 MR?
23      A.      So between the 12/23/15 MR and this
24  MR, he had, I think, several episodes that we
25  know of.

Page 83

1       Q.      Between four to ten, depending upon
2   how you count them?
3       A.      Yeah.  I don't know how to count
4   because patients may have more than they
5   count.
6       Q.      Right.
7       A.      In terms of the tissue, we know we
8   went from no tissue damage to tissue damage.
9   In terms of imaging, we know we went from an
10  artery that had plaque that now is an artery
11  that seems to show that there isn't flow by
12  the time he gets to Centennial and they do
13  their studies.
14          As to whether the changes seen on
15  the MRI are all from one episode or more than
16  one, I don't -- I don't know the answer to
17  that.  I know that if these changes were
18  there before, they weren't seen on the CT
19  scan at StoneCrest or seen on the CT -- part
20  of the CTA at StoneCrest.  But we know that
21  that study has sort of a blind area of about
22  six hours.
23      Q.      Right.
24      A.      This study is done the next day, in
25  the evening of the next day.  I mean, it's

Page 84

1   not done quick --
2       Q.      Right.
3       A.      -- in terms of his being at
4   Centennial because he got there on the 17th.
5       Q.      But we also know that CT scan
6   versus the MRI have differing levels of
7   sensitivity and specificity, too, don't they?
8       A.      That's correct.  We've talked about
9   that.
10      Q.      So they're not just a perfect
11  apples to apples comparison?
12      A.      Well, they're just imaging studies.
13      Q.      Correct.  But they don't
14  necessarily see the same things the same way
15  is what I'm getting at?
16      A.      Well, the CT will have
17  perspicacity, just you have to wait a little
18  bit.  The MRI will see it early.
19      Q.      Right.
20      A.      And so, in this case, by the time
21  the MRI sees it, they didn't do another CT.
22  He'd had the CTs at StoneCrest that didn't
23  see it, didn't see it.  And between CT1 and
24  the CTA was, you know, four hours.
25      Q.      Right.

Page 85

1     A.    So the fact that the first one
2  didn't see it doesn't mean that the next one
3  couldn't see it.  But by 1409, it didn't see
4  it.  As to when it happened, it's hard to
5  know.  Because at StoneCrest, you know, he's
6  normal or he's not, he's normal or he's not.
7  Even after they call a code stroke he
8  continues to have what appears to be
9  intermittent adequate flow and then brief
10  periods where there's not adequate flow.
11     Q.    Right.  It appears that he is
12  continuing to have a TIA or TIAs at
13  StoneCrest; isn't that right?
14     A.    Correct.  Yeah.  I don't think he's
15  had the stroke when he gets there because
16  he's recorded as normal in the morning.  And
17  when they do a code stroke, I think
18  Dr. Archer might have found him in the middle
19  of one of the episodes or in some part of the
20  episode.
21            And then I think in my affidavit I
22  go to the time point that's around 1900 hours
23  or sometime thereafter that no one ever
24  records a normal exam after that point.  You
25  know, by then, the clinical event has

Page 86

1  occurred.
2     Q.    Now, in this particular case,
3  though, still focusing on the MR, you have
4  some disagreement with the physician who
5  actually interpreted the study and dictated
6  the report.  You don't see diffused cerebral
7  cortical loss on that particular MR?
8     A.    Well, I didn't look at it for
9  whether there was atrophy in this particular
10  individual.
11     Q.    Well, then you might agree with
12  that if you looked at it again?
13     A.    It's not helpful for me thinking
14  about him in terms of activated plaque in the
15  left M1 segment.
16     Q.    You do agree that the diffusion
17  imaging shows patchy infarcts in the left
18  basal ganglia?
19     A.    Yes.  It --
20     Q.    Now, when did the infarction occur
21  in the left basal ganglia to a reasonable
22  degree of medical certainty?
23     A.    Yeah, we don't know.
24     Q.    Why not?  Why not know?
25     A.    Well, the perspicacity of that

Page 87

1  image, the diffusion weighted image is two
2  weeks.
3     Q.    So it could have been at any time
4  two weeks prior to 2/18/16, correct?
5     A.    In theory, but I don't think that's
6  right.  And the reason is, is that that
7  stroke would have been seen on the CT.  And
8  the CT at 1027 and 1409 didn't see it.
9            So I think in terms of imaging
10  there are brackets to know that that change
11  is going to be when he has now clinical
12  events just like he's always had, but now
13  they persist.
14     Q.    All right.
15     A.    And we don't know exactly when that
16  happened.  But it's clear that by 1927 or so
17  he's no longer having an exam where people
18  say, well, he's normal to me now.
19     Q.    However, in terms of putting the
20  parameters on the timeframe, we know what's
21  apparent on February 18th, 2016 in the
22  evening when the MR is done.  We also know
23  the CT scan is sensitive to identify the
24  changes up to six hours before the imaging.
25  So we know in this case that it goes back to

Page 88

1  two hours before the original CT, if we use
2  the CTA as the most sensitive up to the time
3  of the MR?
4     A.    Well, now your question presumes
5  that he could have the basal ganglia stroke,
6  but be asymptomatic, that that just happens
7  to be an incidental thing.  And I don't know
8  that that's the case.
9     Q.    Well, what would be symptomatic of
10  a permanent injury in the left basal ganglia?
11     A.    Yeah.  I would expect that if it's
12  big enough he would have weakness involving
13  the right face and right arm, with or without
14  involvement of the right leg.  And that the
15  speech would be thick.  But, again, it has to
16  be big enough.
17     Q.    But we know he has had repeated
18  episodes of weakness in the right face, thick
19  speech.  We just don't know how long they've
20  lasted, do we?
21     A.    Well, I think Valdivia said they
22  were stereotypic episodes.  They're all the
23  same.  And he pegged them between 10 and 14
24  minutes, if that can be relied upon.
25     Q.    Well, how long does it require for

Page 89

1  us to have inadequate perfusion in the basal
2  ganglia before there is permanent injury to
3  the tissue?  How many minutes of inadequate
4  perfusion?
5      A.    Yeah.  I don't know the answer to
6  that.
7      Q.    You couldn't because it's a
8  function, isn't it, of how inadequate the
9  perfusion is for how long?
10     A.    And there are more variables than
11  that.
12     Q.    As well as the metabolic demand of
13  the tissue?
14     A.    And more variables than that.
15     Q.    Right.  The bottom line is, it's an
16  unknowable answer, isn't it?
17     A.    Correct.
18     Q.    Okay.  Likewise, you agree that
19  there are embolic infarcts in the left
20  frontal lobe.  When did those occur?
21     A.    Yeah.  I don't know when.
22     Q.    And whether it's the left temporal
23  lobe or left frontal lobe, left occipital
24  lobe, whatever the point, you don't know when
25  those occurred either, do you?

Page 90

1      A.    No.  But I'm -- I'm very
2  parsimonious in thinking, and given that the
3  DWI is positive and so is flare, I think all
4  of these things run together rather than
5  saying, there was a little one that went to
6  the left temporal lobe, and then some unknown
7  delta passes and goes to the high left
8  frontal lobe and then there's another delta
9  time and now we've got patchy change in the
10  DWI.
11         Clinically, I think that he has an
12  event at StoneCrest for which that's the
13  stroke.  And the imaging that they have at
14  Centennial on the next day evening makes it
15  look like that's the stroke.  That fits very
16  nicely.
17     Q.    What's the size of the infarct as
18  shown on the MR of February 18th?  How big is
19  it?
20     A.    I don't know the volume.  And
21  neither did the reader provide a volumetric
22  measure.
23     Q.    Right.  Were you able to measure
24  the size of the infarct core lesion yourself?
25     A.    I did not attempt.

Page 91

1      Q.    Can you do that?
2      A.    It would be difficult because it's
3  patchy.  I know how to do that, but I didn't
4  attempt to do that measure.
5      Q.    Now, did you do an ASPECTS score on
6  this particular study?
7      A.    I don't do ASPECTS on MRs, only CT.
8      Q.    How about the size of the penumbra
9  on the MR February 18th, 2016, could you make
10  an assessment of the impaired, but not
11  infarcted tissue?
12     A.    No.  The CT perfusion study did
13  that, which was done earlier in the day on
14  the 18th at Centennial.
15     Q.    Right.  Well, we'll turn to that
16  right now.  There's another perfusion scan
17  February 18th, 2016.  Have you had a chance
18  to actually look at that yourself?
19     A.    Yes.  That was done at 1247 hours.
20     Q.    What was the size of the penumbra?
21     A.    The area of diminished perfusion is
22  quite large and looks like all of the middle
23  cerebral artery territory on the left.
24     Q.    Okay.  Compare that with the
25  ischemic core?

Page 92

1      A.    It's much smaller.  So there's a
2  diffusion perfusion mismatch.  Those are the
3  cases we look for because we can intervene by
4  providing flow and hit home runs rather than
5  bunts.
6      Q.    Right.  So when you have a mismatch
7  with the ischemic core and a large penumbra,
8  that's one of the things where it's an
9  opportunity to intervene, right?
10     A.    Where we should go to the cath lab.
11     Q.    Right.  You don't cease that
12  opportunity by giving the patient intravenous
13  tPA, though?
14     A.    Well, it's allowed that you could
15  give them tPA, but you need to be headed to
16  cath lab while you're infusing the drug.
17     Q.    Okay.
18     A.    But these are the cases that -- the
19  large vessel occlusions that we live for.  I
20  mean, all the systems have to primed to -- on
21  the lookout for these cases to want to do
22  these.
23     Q.    Well, was there still an occlusion
24  as of the time the perfusion scan was run?
25     A.    It doesn't give you any data about

Page 93

1   that, only that flow is diminished. So you
2   presume that the activated plaque must still
3   be activated. As to how much flow might be
4   there, I don't know the thresholds for how
5   they set their device to calculate how much
6   residual flow could be present.
7        Q.   Well, I want to make sure that
8   we're communicating. Isn't it true that the
9   perfusion scan does not identify any complete
10  occlusion?
11       A.   I don't know how it could identify
12  a complete occlusion. It's just perfusion.
13  So there's reduced perfusion throughout the
14  left MCA, and read by Dr. Lassiter.
15       Q.   Right. Do you know Dr. Lassiter?
16       A.   Very well.
17       Q.   He's a very talented, capable guy,
18  isn't he?
19       A.   He is that.
20            MR. GIDEON: Mark this, please.
21            (Whereupon, the above-mentioned
22  document was marked as Exhibit No. 7 to the
23  testimony of the witness.)
24  BY MR. GIDEON:
25       Q.   What I'm interested in is the

Page 94

1   report by this talented, capable individual
2   we both know.
3            In his findings he says,
4   Dr. Callahan, "There is deceased mean transit
5   time and time to peak throughout the left
6   middle cerebral artery distribution." Point
7   here being, that is the technique used to
8   identify the penumbral tissue, correct?
9        A.   Right.
10       Q.   All right. And that penumbral
11  tissue is in the perisylvian left frontal,
12  temporal and parietal lobes, correct?
13       A.   That's what he wrote.
14       Q.   Okay. Then he says, "There is
15  relatively normal cerebral blood flow and
16  cerebral blood volume."
17            Was there, in fact, an occlusion in
18  the left MCA M1 branch at the time this
19  perfusion scan was done?
20       A.   Yeah. He doesn't know.
21       Q.   Do you, from looking at it
22  yourself?
23       A.   No. No. But that would be a good
24  question for you to ask Dr. Lassiter.
25       Q.   His impression is decreased

Page 95

1   perfusion, then he describes the areas. Then
2   he goes on to say, "without evidence of
3   ischemia at this time."
4            What had relieved the occlusion by
5   the time the perfusion scan was done at
6   Centennial on the 18th at noon?
7        A.   Do you mean, how did it happen?
8        Q.   Yeah.
9        A.   Well, assuming that his study means
10  that there's now TICI 3 flow, which I don't
11  believe it does, but that's something to ask
12  him rather than myself. We know that with
13  activated plaque there can be spontaneous
14  flow again, and maybe that happened.
15       Q.   Well, what I'm asking you to do is
16  take your background and your experience, and
17  as you look at the report and you also have
18  the benefit of having looked at the perfusion
19  scan images themselves, was there evidence of
20  ischemia at the time of the perfusion scan to
21  your eyes?
22       A.   It's only a perfusion study for me,
23  not an ischemia test.
24       Q.   Okay. You're not in a position,
25  then, to disagree with his conclusion that

Page 96

1   there was no evidence of ischemia at the time
2   the study occurred?
3        A.   No.
4        Q.   Okay. Similarly, is one potential
5   explanation for the absence of ischemia that
6   the occlusion had been lysed in some fashion
7   on its own?
8        A.   Well, against that theory is what
9   we learn with the MRI later that evening. So
10  maybe he was flowing at this instant, which I
11  don't believe. And I don't believe
12  Lassiter's report really means that, if you
13  ask him, as compared to that it's still
14  occluded.
15       Q.   Well, what would explain it if, in
16  fact, that is his point?
17       A.   You should ask him so he could
18  explain it.
19       Q.   All right. But what was the
20  point --
21       A.   Because I can't explain what he's
22  trying to tell you.
23       Q.   Okay. You have had access to the
24  entire Centennial record, and there are
25  several notes here by people you know. I'll

Page 97

1  give you a copy of Ron Wilson's note of
2  February 20th.
3        MR. GIDEON:  We'll make this the
4  next exhibit.
5        (Whereupon, the above-mentioned
6  document was marked as Exhibit No. 8 to the
7  testimony of the witness.)
8  BY MR. GIDEON:
9     Q.   And I'm not going to force you to
10  race through the note, but if I'll look to
11  the third page, you'll see this is a note
12  that was electronically signed by Ron Wilson
13  at 11:00 on February 20th, 2016.
14        In that, at the top in the free
15  text assessment and plan he states, "Problem
16  number one, complex left middle cerebral
17  artery hypoperfusion syndrome due to partial
18  occlusion of MCA vessels."
19        Now, is there anything on the
20  imaging up to and including the 20th that
21  supports the conclusion that there was
22  partial occlusion of the MCA vessels?
23     A.   No.
24     Q.   Is there anything about the
25  clinical findings up to and including

Page 98

1  February 20th that support Dr. Wilson's
2  statement that there is a partial occlusion
3  of the MCA vessels?
4     A.   Yeah.  I would have said it
5  differently.  He records the stroke scale
6  score of 3.
7     Q.   Correct.
8     A.   On admission, the stroke scale
9  score was 13.  And so his presumption is that
10  the patient has gotten better because there's
11  been restoration of flow.  And I hate to
12  speak for him, but that would be what I would
13  imagine he was thinking.
14     Q.   Okay.
15     A.   He didn't articulate because of the
16  NIH stroke scale score going from 13 to 3,
17  with the above mentioned imaging, this is my
18  opinion.  He just simply wrote that is --
19  what he wrote.  This is what he's typing.
20     Q.   Right.  Dr. Callahan, for a person
21  to be accurately 13 on the NIH stroke scale
22  and then for it to be 3 48 hours later,
23  doesn't there have to be intervening
24  perfusion?
25     A.   By some means, I would think.

Page 99

1     Q.   Yeah.  How would you otherwise go
2  from a 13 to 3, assuming both are accurately
3  calculated, unless there has been restoration
4  of perfusion?
5     A.   You know, I'm a flow guy.  But the
6  other -- my other stroke colleagues think
7  that there can be other things that go on
8  having to do with excitotoxicity, various
9  somatic things that happen.
10     Q.   What do you think?
11     A.   This particular man got
12  Minocycline, which is thought to maybe
13  provide some sort of benefit in terms of
14  neuro resuscitation.  But I'm -- but I'm
15  still a flow guy.  So I think there must have
16  been some way to get augmented flow.
17     Q.   How did that happen?
18     A.   Only God knows.
19     Q.   If we presume that a flow guy is
20  right, how did flow get restored in this case
21  so as to improve the NIH stroke scale from 13
22  to 3 without endovascular intervention and
23  without intra-arterial or intravenous tPA?
24  How did that happen in this particular case?
25     A.   Yeah.  I don't know.

Page 100

1     Q.   All right.  What's the exhibit
2  number on Dr. Wilson's note?
3     A.   I think it's 9.
4        THE COURT REPORTER:  It's 8.
5  BY MR. GIDEON:
6     Q.   You will recall from looking at the
7  record that Dr. Valdivia's plan of care was
8  to permit permissive hypertension, to keep
9  the patient in bed frequently with the head
10  down.  And it worked pretty well, didn't it?
11     A.   Well, that's what he did.  Whether
12  it's the reason that things changed or not,
13  I've always been skeptical of the blood
14  pressure guys.
15     Q.   Okay.  It's a school of thought
16  that you have some skepticism about?
17     A.   Yes.
18     Q.   I'm not trying to turn this into a
19  personal comparison --
20     A.   No, no, no, no.
21     Q.   -- between you and Dr. Valdivia,
22  but is it a school of thought difference that
23  you have some skepticism about permissive
24  hypertension?
25     A.   I have some skepticism about it.

Page 101

1      Q.      All right.  Well, then,
2  fundamentally?
3      A.      And the reason is that patients can
4  get better and it doesn't have anything to do
5  with what we did.
6      Q.      Well, is that what happened here,
7  in your opinion?
8      A.      He may have gotten better because
9  of part what they did do in terms of Aspirin
10  and Clopidogrel and maybe some of the other
11  medical treatments made a difference.  We
12  don't know.
13      Q.      To a reasonable degree of medical
14  certainty then, you can't say even with the
15  benefit of hindsight why Mr. Ruffino
16  improved, correct?
17      A.      Correct.
18      Q.      All right.  He discharged on
19  February 26 for the first occasion.
20          MR. GIDEON:  This is Dr. Valdivia's
21  note of February 26.
22          (Whereupon, the above-mentioned
23  document was marked as Exhibit No. 9 to the
24  testimony of the witness.)
25          THE WITNESS:  This is the discharge

Page 102

1  note?
2  BY MR. GIDEON:
3      Q.      Yeah.  This is the note by
4  Dr. Valdivia on the 26th.
5      A.      And do you have his NIH stroke
6  scale number?  Because it says one of four,
7  so there's more to the note than what you've
8  given me.
9      Q.      Well, I don't.  You've got the
10  chart.  You're free to look at it, if you
11  wish.
12      A.      I only have an electronic version
13  of the chart, so...
14      Q.      Okay.  Well, I don't have the NIH
15  stroke scale with me.  The individual is
16  ambulating on his own.  He's able to speak,
17  able to dress himself, able to eat, able to
18  do all these things.  What --
19      A.      Well, it doesn't say those things,
20  but --
21      Q.      I know from looking at the rest of
22  the chart that he was able to do that on the
23  26th.  He walked out of the hospital, was
24  able to talk to people.  He was going up and
25  down the hallways, eating normal food,

Page 103

1  dressing himself, doing all those things.
2  Did you not see that when you looked at the
3  chart yourself?
4      A.      I don't recall that part.  I recall
5  seeing an NIH stroke scale score of 6, which
6  is why I was keen to know if you had had the
7  other sheets.
8      Q.      I don't.  Why did this man get to
9  the point where he's able to speak normally,
10  able to walk, able to dress himself, able to
11  eat and walk out of the hospital on the 26th,
12  to a reasonable degree of medical certainty?
13          MR. CUMMINGS:  Object to the form.
14          THE WITNESS:  Because he only had a
15  small stroke rather than a big stroke.
16  BY MR. GIDEON:
17      Q.      Okay.  What assurance does he have
18  as he walks out on the 26th that he's not
19  going to have a recurrence of TIAs or another
20  big stroke?
21      A.      He has no assurance.
22      Q.      What's the probability as this man
23  walks out of the hospital on the 26th that he
24  will have a large stroke at sometime in the
25  future?

Page 104

1      A.      It's very good.
2      Q.      Meaning what?  Put a number on it.
3      A.      More likely than not.
4      Q.      Okay.  Why?
5      A.      Because they hadn't fixed the
6  problem.
7      Q.      And what would you have to do to
8  fix the problem?
9      A.      Eliminate the activated plaque.
10      Q.      How do you do that?
11      A.      You'd have to use the cath lab.
12      Q.      And would you take the activated
13  plaque out of the vessel?
14      A.      No, not in the MCA.  Typically, at
15  this institution in the old days it was done
16  by balloon angioplasty without placement of a
17  stent.
18      Q.      So in order to minimize the more
19  probable than not likelihood of a future
20  major stroke, this man needed to have a PTCA?
21      A.      That's what I would have
22  recommended for him.
23      Q.      And given the fact that it's 2016
24  instead of 2018, would it have been limited
25  to a PTCA or would a stent have been placed?

1    A.    Well, in the old days in another
2  century at that institution, more than 120
3  patients were treated and only one ever had a
4  stent placed.  And that stent was placed in
5  the vertebral basilar artery system in order
6  for rescue.  And there was a paper published
7  about 127 patients in that series by Berger
8  and myself, as well as the endovascular
9  rescue with stent placement because it was
10 the first placement of an endoprosthesis
11 intracranially in the world.
12    Q.    Okay.  But what about this man,
13 what would have been done, stent or PTCA
14 alone?
15    A.    Just balloon angioplasty and
16 medicines.
17    Q.    Why hasn't he had a major stroke
18 since then?
19    A.    He did have another stroke.
20    Q.    But he went home?
21    A.    Came back again with more trouble.
22    Q.    Right.
23    A.    And a much higher NIH stroke scale
24 score.
25    Q.    He went home and he fell down in

1  the bathroom, according to him.  Did you see
2  his history about that?
3    A.    Yes.
4    Q.    He then got progressively worse and
5  waited 15 hours before he came back to the
6  hospital.  Wasn't it a failure to act
7  reasonably on his own part to wait 15 hours
8  before returning to the ER?
9    A.    We think patients need to come
10 quickly to help.
11    Q.    Well, answer the question, then,
12 Dr. Callahan.  In order to exercise
13 reasonable care for his own health, safety,
14 and welfare, shouldn't he have returned to
15 the hospital much sooner than 15 hours after
16 the index event?
17    A.    Sure.  He should have come
18 immediately back to care.
19    Q.    Okay.  And if he had done so, would
20 there have been the opportunity to perform a
21 PTCA and either place a stent or elect not to
22 place a stent?
23    A.    There might have been.
24    Q.    Okay.  What is the timeframe within
25 which percutaneous intervention may occur

1  following the event?
2    A.    In what year?
3    Q.    2016, February of 2016.
4    A.    In that year and in that artery it
5  was six hours, although some of the trialists
6  went out to eight.
7    Q.    But no more than eight?
8    A.    Yes, no more than eight.
9    Q.    All right.  The trials usually
10 attempt to measure outcomes based on death at
11 some point in time, incidents of intracranial
12 hemorrhage, and a measurement of function,
13 frequently the Modified Rankin Score of the
14 goal being between zero and two, correct?
15    A.    I would have said it differently.
16 But the outcomes are prescribed for the trial
17 before the trial is conducted.
18    Q.    Correct.
19    A.    And the benefit in the more recent
20 studies is a Modified Rankin Score at 90 days
21 between zero to two.
22    Q.    Okay.  That's what I'm getting at.
23 Modified Rankin Score between zero and two is
24 a measurement of functional independence,
25 isn't it?

1    A.    Yes.
2    Q.    It doesn't mean that you don't have
3  any limitations, right?
4    A.    It would if you had a score of
5  zero.
6    Q.    Correct.
7    A.    But the definition of benefit is
8  those with zero and those with one and those
9  with two.
10    Q.    Okay.  What is the level of
11 functional independence with a Modified
12 Rankin Score of one?  What is it that's
13 limited, impaired, or disabled?
14    A.    Yeah.  They have -- they have some
15 disturbance of function and they can't use a
16 walker.
17    Q.    Cannot use the walker?
18    A.    Yeah.  I mean --
19    Q.    They're in a wheelchair?
20    A.    Yeah -- no, no, no.  They don't
21 need a walker or anything like that.
22    Q.    Don't need a crutch?
23    A.    I think they can have a stick.
24 They can't use the walker.
25    Q.    Okay.

1    A.    And for a two, they can use a
2 walker, but it cannot have wheels.
3    Q.    Okay.  Do you know if Mr. Ruffino
4 is able to ambulate without assistance?
5    A.    I don't know the answer to that.
6    Q.    If he is able to ambulate without
7 assistance, able to communicate, able to
8 dress himself, does he have a Modified Rankin
9 Score of one or two?
10   A.    I'd have to see him.
11   Q.    You would?
12   A.    And probably somebody that has seen
13 him might have used those scales.
14   Q.    What about incompetence of speech,
15 some people refer to it as dysarthria?
16   A.    We call that thickness of speech.
17   Q.    Yeah.  If we use the term
18 "thickness of speech," and that is the only
19 limitation, where does that fall on the
20 Modified Rankin Score?
21   A.    I presume by that you mean that he
22 has no aphasia.
23   Q.    Right.
24   A.    So it's just his speech is thick.
25 He can think and remember, knows what things

1 are, can name those things, can write, can
2 read, it's just simply he has dysarthria.
3    Q.    And is not articulate, somewhat
4 slow, where does that fall on the MR -- the
5 Modified Rankin Scale?
6    A.    And that he's able to chew and
7 swallow without impairment?
8    Q.    Yeah.
9    A.    Yeah.  That would be a one.
10   Q.    What about limited handwriting
11 skill on the ipsilateral side and --
12   A.    Contralateral?
13   Q.    Contralateral side, yes.  Limited
14 handwriting ability on the contralateral side
15 and some thickness of speech together, is
16 that a Modified Rankin Score of two, but
17 otherwise able to ambulate?
18   A.    Yeah.  It's going to be close to
19 two.  You know, we actually -- it's been
20 modified subsequently so there can be 1.5s as
21 opposed to 1s.
22   Q.    Well, where would you assess him on
23 the Modified Rankin Scale when he left
24 Centennial on February 26th?
25   A.    I was hopeful that Dr. Valdivia

1 might have done that as part of his exit note
2 or it might be in the discharge summary,
3 since they're contemporaneous and know how
4 he's doing things.  And that's why I wanted
5 to know what they said.  I would be unable to
6 come up with a number with what you've shown
7 me here.  And I'm sure that must be somewhere
8 in the record.
9    Q.    Okay.  I want to talk to you about
10 the ESCAPE trial.  The full name of the study
11 was the "Endovascular treatment for Small
12 Core and Anterior circulation Proximal
13 occlusion with Emphasis on minimizing CT to
14 recanalization times," fortunately called
15 ESCAPE.
16   A.    Its' ESCAPE IA.
17   Q.    Do you recall that it required an
18 NIHSS of greater than five to be included in
19 that study?
20   A.    No.  I would look at the New
21 England Journal article again.  But since you
22 probably have it before you, I'm confident
23 with your report.
24   Q.    It also required to be included
25 moderate to good collateral circulation

1 defined as filling 50 percent or more of the
2 middle cerebral artery pial arterial
3 circulation, correct?
4    A.    Again, I trust you with the
5 recitation.
6    Q.    In your opinion, did this man have
7 on any of the imaging studies you saw 50
8 percent or more of the MCA artery pial
9 arterial circulation supported by good
10 collateral circulation?
11   A.    I'd ask the imagers that question.
12   Q.    You don't know and don't have an
13 opinion?
14   A.    No, because they didn't conduct the
15 studies that they did in ESCAPE to arrive at
16 that.
17   Q.    Okay.  In that study, the mortality
18 at 90 days was 10.4 percent in the
19 intervention group.  What were the principal
20 causes of death among those patients placed
21 in the endovascular intervention?
22   A.    I'd have to look at the article to
23 tell you.
24   Q.    Okay.  Do you recall that the
25 lowest NIHSS for endovascular intervention

Page 113

1  was 13?  Among all the patients actually
2  included the lowest was 13?
3      A.   No.  They wanted, you know, severe
4  strokes.  And, typically, that's somewhere
5  north of 10 that we start thinking about
6  the NIH stroke scale score as a surrogate for
7  severity.  And they probably excluded ones
8  above 25 because those are too severe.
9      Q.   With respect to the control group,
10 which is shown on table 1, the lowest NIH
11 stroke scale was 12.  Did you know that?
12     A.   No.  But they want to have a
13 homogenous group because they randomize these
14 individuals.
15     Q.   Okay.  Turning to SWIFT PRIME,
16 which is another study you brought up, the
17 "Solitaire FR with the Intention for
18 Thrombectomy as Primary Endovascular
19 Treatment of Acute Ischemic Stroke," SWIFT
20 PRIME.  The NIH stroke scores range from 8 to
21 29 in that study.  Did you recall that?
22     A.   No.  But I'm delighted that they
23 included people up to 29.
24     Q.   The -- you will recall that this
25 was one the studies that had a particular

Page 114

1  target mismatch profile that was required,
2  correct?
3      A.   It required, actually, rapid
4  software, which had been developed at
5  Stanford and was only available at certain
6  select centers.
7      Q.   Correct.  Using that special
8  software, they had to have an ischemic core
9  lesion that was not greater than 50
10 milliliters, no more than 100 milliliters of
11 tissue, with time to maximum delay of greater
12 than 10 seconds and a mismatch ratio that
13 exceeded 1.8, correct?
14     A.   I trust you with your recitation.
15     Q.   What was the size of the ischemic
16 core lesion in Mr. Ruffino?
17     A.   It was not measured by any of the
18 contemporary radiologists, neither was it
19 calculated by me.  As we spoke before, those
20 calculations that could have been made by me
21 are not the same as the rapid numbers that
22 you mentioned in that trial.
23         Typically, the rapid numbers, the
24 ABC/2 rule, which is what we use, generates
25 numbers that are a little lower in terms of

Page 115

1  tissue volume for infarction than the rapid
2  software.
3      Q.   Okay.  Now, in this particular
4  study of those that were randomized to just
5  intravenous tPA alone, the -- that group of
6  people that got to the Modified Rankin Score
7  of zero to 2, only 35 percent of those.  Do
8  you recall?
9      A.   I trust you.
10     Q.   Okay.  And then, last, the
11 "Extending the Time for Thrombolysis in
12 Emergency Neurological Deficits
13 Intra-Arterial," also known as EXTEND-1A?
14     A.   IA.
15     Q.   IA.  They split the participants
16 between intravenous tPA only or IV tPA and
17 endovascular therapy with a stent retriever,
18 correct?
19     A.   Yes.
20     Q.   A mismatch ratio of greater than
21 1.2 required in this case and an absolute
22 mismatch volume of greater than 10
23 milliliters, an infarct core lesion of less
24 than 70 milliliters as assessed by the rapid
25 software.  Do you recall what the results

Page 116

1  were in that study for those that got IV tPA
2  alone?
3      A.   I'm sure you'll tell me, but it
4  exceeded 50 percent.
5      Q.   No.  It was less than 50 percent.
6  IV tPA alone on 37 percent.
7      A.   I'm sorry.  For endovascular
8  exceeded 50 percent.  I don't know the IV tPA
9  number.
10     Q.   Okay.  Is there anything else
11 that's underway right now, any other trial
12 underway right now, Dr. Callahan, that
13 compares to ESCAPE, SWIFT PRIME, or
14 EXTEND-IA?
15     A.   Well, there are a number of ongoing
16 studies for acute stroke.
17     Q.   Any expected to be releasing their
18 results shortly before our trial in January?
19     A.   The MR CLEAN boys are busy trying
20 to see if IV tPA is necessary.
21     Q.   With endovascular care?
22     A.   That rather than being at a center
23 that can't do the cath lab and then staying
24 there to get IV tPA before you go to the cath
25 lab, if that's a reasonable program.  But

Page 117
1  the -- that study, I don't know where they
2  are with enrollment or when they plan to
3  report out. They did not report out at the
4  recent stroke meeting in LA in February.
5      Q.    Okay.
6      A.    And there was really not much talk
7  about it, and there shouldn't have been much
8  talk about it.
9      Q.    All right.
10     A.    But that's going to be the next.
11     Q.    The next horizon, then, is whether
12  to eliminate use of intravenous tPA and just
13  proceed directly to endovascular
14  intervention?
15     A.    Yes. And -- and the issue that's
16  implicit in that is, how do you figure out in
17  the periphery that it's large vessel
18  occlusion so they need to go quickly to the
19  cath lab somewhere else or they should get IV
20  tPA because it's not a large vessel. And in
21  Holland, they may have an easier way to do
22  that because the country is so small.
23          But in America, that's going to be
24  the issue with whatever they tell us,
25  whatever they've learned scientifically, what

Page 118
1  does that mean for how we're going to care
2  for people in a massively sized country where
3  endovascular capability is only in certain,
4  you know, centers.
5      Q.    Currently, tPA is not approved by
6  the FDA for intra-arterial use, correct?
7      A.    That's correct.
8      Q.    Has the intra-arterial
9  administration of tPA been pushed by the
10  wayside? Been there, done that, is that
11  the --
12     A.    Well, it was never tPA. The
13  studies were done without tPA, was done with
14  an agent that never made it to FDA approval
15  because there was one study that was positive
16  that Berger and I were part of called PROACT
17  II published in 1999.
18          I don't know of any intra-arterial
19  tPA studies going on, even though it's still
20  an arrow in the quiver, I think, for rescue.
21  The new guys, the young ones, are very, very
22  quick with these Solitaire stent retriever
23  devices.
24          So what Berger used to do in six
25  hours, they do in 15 minutes. It's

Page 119
1  phenomenal. Just because of the difference
2  in the technology. And I think that's why
3  it's become so good.
4          But they haven't learned how to
5  rescue all of those patients. It doesn't
6  always work. And there's issue with, you get
7  reperfusion, so TICI 2B or 3, but yet
8  something happened in the microcirculation.
9  And for that, there still may be a place for
10  the administration of lytic therapy for the
11  smaller clots that are still there in the
12  microcirculation.
13          So while it is true in the
14  guidelines, they seemingly are irreverent of
15  the old guys that did work in the last
16  century with catheters, of which I'm one
17  speaking to you. There may be something
18  about our technique that will be useful even
19  for the new jet flyers.
20     Q.    Well, the reason I ask that is that
21  there is a specific statement in the 2015
22  guidelines that emphasizes that
23  intra-arterial use of thrombolytics is not
24  approved by the FDA, and it doesn't spend any
25  time talking about when that option should be

Page 120
1  considered, recommending consideration of
2  that option. That's why I asked if it's --
3  time has passed as far as the leading
4  thinkers in the field?
5      A.    Well, not thinking that I'm
6  leading, the guidelines that you had had us
7  review were developed very, very quickly
8  after the stroke meeting that happened to be
9  in Nashville in February of '15, because MR
10  CLEAN had been published in December '14.
11          And it was a sea change in terms of
12  the leading minds at that time. So very,
13  very quickly in January of '15, you know,
14  this quick recitation of lightening had
15  struck, the Earth had shaken, there was
16  something new to do. And the other studies
17  had all been stopped once MR CLEAN was
18  published in the New England Journal. Those
19  studies are far from incomplete. Even
20  though they were stopped prematurely, they
21  were all positive.
22     Q.    Right.
23     A.    And so once the guideline group had
24  a chance to rewrite the guidelines, which
25  took them until late 2017, though the current

1    2018 guidelines do speak a bit irreverently,
2    but say there's still scientific reason to do
3    what the old dinosaurs like me did in another
4    century.  So I'm grateful that their memory
5    has returned.
6              MR. GIDEON:  Dr. Callahan, always
7    good to see you.  Thank you very much for
8    answering my questions.
9              THE WITNESS:  The pleasure is mine,
10   sir.  It's great to see you again.
11             MR. WITT:  I don't have any
12   questions.
13             MR. CUMMINGS:  No questions.
14             (Whereupon, the above-mentioned
15   document was marked as Exhibit No. 10 to the
16   testimony of the witness.)
17             (Whereupon, the deposition was
18   concluded at approximately 3:06 p.m.)
19
20
21
22
23
24
25

1              C E R T I F I C A T E
2
     STATE OF TENNESSEE     )
3                           )
     COUNTY OF RUTHERFORD   )
4
5
          I, STEPHANIE A. FAULKNER, LCR, CRI,
6    CPE, CERTIFY:
7         The foregoing proceedings were taken
     before me at the time and place stated in the
8    foregoing styled cause with the appearance as
     noted.
9
          Being a Court Reporter, I then
10   reported the proceedings in Stenotype, and
     the foregoing pages contain a true and
11   correct transcript of my said Stenotype notes
     then and there taken.
12
          I am not in the employ of and am not
13   related to any of the parties or their
     counsel, and I have no interest in the matter
14   involved.
15        I FURTHER CERTIFY that this
     transcript is the work product of this court
16   reporting agency and any unauthorized
     reproduction AND/OR transfer of it will be in
17   violation of Tennessee Code Annotated
     39-14-104, Theft of Services.
18
          Witness my signature, this, the 20th
19   day of April, 2018.
20
21
22
23   _____
24   Stephanie A. Faulkner, LCR, CRI, CPE
     LCR No. 323, Expires June 30, 2018
25

1              SIGNATURE OF DEPONENT
2              I, ALFRED CALLAHAN, III, M.D., do
3    hereby certify that I have read the foregoing
4    deposition transcript and find it to be a
5    true and accurate transcription of my
6    testimony, with the following corrections, if
7    any:
8
9    PAGE    LINE    CHANGE
10   _____  _____  _____
11
12   _____  _____  _____
13
14   _____  _____  _____
15
16   _____  _____  _____
17
18   _____  _____  _____
19
20   _____  _____  _____
21
22   _____  _____  _____
23
24                _____
25                Alfred Callahan, III, M.D.