UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JOHN RUFFINO and MARTHA RUFFINO, Husband and Wife, | ) |
| Plaintiffs, | ) |
| vs. | ) No: 3:17-CV-00725 |
| | ) Jury Demanded |
| DR. CLARK ARCHER and HCA HEALTH SERVICES OF TENNESSEE, INC. d/b/a STONECREST MEDICAL CENTER, | ) Judge Crenshaw |
| | ) Magistrate Judge Newbern |
| Defendants. | ) |
| ________________________ | ) |

DEPOSITION OF:

**DR. CLARK ARCHER**

Taken on Behalf of the Plaintiffs

November 17, 2017 at 10:00 a.m.

______________________________________________

*Beverly L. Jones, Licensed Court Reporter*
*3901 West End Avenue*
*The Rokeby Suite 906*
*Nashville, TN 37205*
*(615) 499-9092*

## APPEARANCES

For the Plaintiffs:

Brian Cummings, Esq.
Cummings & Manookian, PLC
45 Music Square West
Nashville, Tennessee 37203

Afsoon Hagh, Esq.
Cummings & Manookian, PLC
45 Music Square West
Nashville, Tennessee 37203

For the Defendants:

James E. Looper, Esq.
Hall, Booth, Smith, P.C.
424 Church Street, Suite 2950
Nashville, TN 37219

C. J. Gideon, Jr.
Gideon, Cooper & Essary, PLC
315 Deaderick Street, Suite 1100
Nashville, TN 37238

I N D E X

EXAMINATIONS

By Mr. Cummings .............................. 5

EXHIBITS

Exhibit No. 1 .............................. 163
Set of medical records

**NOTE: WORD INDEX BEGINS ON PAGE 168**

**STIPULATIONS**

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys of record, that this deposition may be taken at the time and place hereinbefore set forth, by Beverly L. Jones, Licensed Court Reporter and Notary Public, pursuant to the Tennessee Rules of Civil Procedure, as amended;

That the formality of READING AND SIGNING is specifically REQUESTED;

That all objections, except as to the form of the questions and the responsiveness of the answers, are reserved until such time as this deposition, or any part thereof, may be used or is sought to be used in evidence.

**DR. CLARK ARCHER,**

was called as a witness, and having been first duly sworn, testified as follows: "I do."

work in the ER currently at Summit Medical Center?

A. 14, roughly.

Q. Is that shifts or hours?

A. Shifts.

Q. When did you first work in the ER at StoneCrest? And again, if you've got to estimate when that was, just tell us it's an estimate.

A. An estimate. When did I first work there, sir?

Q. In the ER, yes, sir.

A. 2006 or 2007 would be an estimate. It might have been later.

Q. Through what either relationship or agreement do you work in ER's at HCA related hospitals?

A. In what agreement? I'd have to really pull my contract to find that. I'll be quite honest, because there is a -- it's a -- over the years, if you have seen our contracts, they have changed on occasion. So the exact entity I was or have been under with HCA/my other company I work is -- I can't -- I don't know at this present time.

Q. Sure. I understand, and I think I asked a question that wasn't very helpful for getting and answer from you.

Are you an employee of HCA or any other entities?

A. Of HCA or any other entities?

Q. Or any of their entities.

MR. LOOPER: Object to the form.

A. I would still have to look at my contract because of the myriad of companies that I think I have on my contract.

Q. When you currently go to work at an ER in an HCA-related hospital, is that through a contract just with you, or with a group that you're a part of, or some other situation?

A. If I'm not mistaken, again, forgive me if I in any way misstate because I don't have the contract in front of me, but I -- I -- we have similar contracts among partners that I work with. Partners is a loose term I guess. People that I work with, ER docs. But I believe mine is separate and apart from everyone else's.

Q. When you say "we" and you may have said

have a contract, who's the "we"? Is there an entity?

A. Not that I'm aware of. I think it is solo with me.

Q. At any time, have you reviewed the policies and procedures at StoneCrest that apply to ER care?

A. I don't know if I have the exact form that you are maybe speaking of, but in general, I have reviewed a bunch of different modalities of medical care that we would provide at StoneCrest Medical Center.

Q. Do you know whether you have reviewed policies and procedures that StoneCrest has had that apply to the care in the ER?

A. Depending on what would come across, you know, our desks at a given time, we've -- you know, that's a big term. There is a lot of forms on that discussion. Partially, I would say, yes. With exactness to the entire broad spectrum of care rendered at any emergency department, I would say probably very few people have read every page.

Q. When you worked in the StoneCrest ER in 2006, were you required to follow the policies

tell me what you mean by that.

A. Well, I wasn't on duty until noon, roughly. So 12:20 was when I would recall that I walked into the room to greet and take care of John Ruffino.

Q. Did your care and treatment of Mr. Ruffino start at around 12:20 on February 17, 2016?

A. Based on the record, with distant memory, that would be accurate.

Q. Would you agree that 12:20 is less than four hours after 8:30 that same morning?

A. 12:20 is less than four hours from when?

Q. 8:30 that same day. That morning.

A. I would agree that 12:20 is I believe three hours and 50 minutes.

Q. Would you agree that 12:20 is less than six hours from 8:30 in the morning that same day?

A. I would agree that that is true.

Q. Do you agree that Mr. Ruffino did not have a role in selecting you as one of his ER physician providers?

MR. LOOPER: Object to the form.

A. I would agree that he did not have selection of his ER provider.

Q. Did you and Mr. Ruffino have a physician/patient relationship at any point on February 17, 2016?

A. From 12:20 on, we entered into a patient/physician relationship.

Q. Do agree that once you had a physician/patient relationship with Mr. Ruffino on February 17, 2016, you owed him certain duties from a health care prospective?

A. Depending on how you define those duties, I would treat him as anybody rendering the need for the possibilities of emergency care.

Q. Was one of the duties you owed John Ruffino on February 17, 2016, to provide appropriate medical care based on his situation and needs?

A. I would agree that based on his presentation that any -- that you would provide accordingly to his symptomatology needs. I would agree.

Q. Is the sudden onset of weakness a neurological change?

says, Yes?

A. I do.

Q. Are you aware of any weakness issue in any part of the body that's documented in this note?

A. Any weakness in any part of the body? So dizziness is documented above. Any focal weakness documented? I see no clear evidence that there is weakness according to Tony Bromley's note.

Q. What did Nurse Bromley tell you on February 17, 2016 about what he knew regarding Mr. Ruffino's history or problems?

A. I don't know that I can recall any definite exact discussions. I do know the patient presented by ambulance. Again, this may or may not be from Tony, and the initial presentation was dizziness. And I guess we can addendum seizure on the differential by the way. But concerns of a man that is dizzy, with a history of seizures, that did not take his Neurontin that day.

Q. Do you remember anything else Nurse Bromley told you on February 17, 2016, and by told you I mean orally, and I think you knew

that --

A. Yes, sir.

Q. -- regarding Mr. Ruffino?

A. I truly cannot state. I cannot recollect.

Q. Please turn to page 13. Do you see the 19:25 note by Nurse -- I'm going to spell it T-E-L-E-G -- Mr. Gideon, you might know if that's an O-Y?

A. I don't see it yet, but I know that --

Q. It's in the right column, two-thirds of the way down.

A. Right column, two-thirds of the way down. 19:25?

Q. Yes.

A. Okay.

Q. You see the note; correct?

A. I believe I do, yes, sir.

Q. Okay. Do you see the category that says, Ongoing signs and symptoms?

A. I do, yes.

Q. And it says, Dysphagia, right arm weakness; correct?

A. I see that.

Q. Do you know when those started, either

***REPORTER'S CERTIFICATE***

I, BEVERLY L. JONES, Licensed Certified Court Reporter, Notary Public in and for the State of Tennessee at Large,

DO HEREBY CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by me at the time, place, and on the date hereinbefore set forth; and that the foregoing pages constitute a true and correct transcription of said proceedings to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

Taken, November 17, 2017.

IN WITNESS WHEREOF, I have hereunto affixed my official signature and seal of office this 5th day of December, 2017, at Nashville, Tennessee.

*Beverly L. Jones Digitally signed: 8:12 p.m.*

_____________________________________

Beverly L. Jones, LCR #374
My license expires: June 30, 2018
Notary Public At Large State of Tennessee
My commission expires: May 8, 2018