**Page 1**

```
1              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF TENNESSEE
2                  NASHVILLE DIVISION

3
   JOHN RUFFINO and MARTHA RUFFINO,    )
4  Husband and Wife,                   )
                                       )
5        Plaintiffs,                   )
                                       )
6  v.                                  ) No. 3:17-cv-00725
                                       )
7  DR. CLARK ARCHER and HCA            )
   HEALTH SERVICES OF TENNESSEE, INC., )
8  d/b/a STONECREST MEDICAL CENTER,    )
                                       )
9        Defendants.                   )
10
11
12
            DEPOSITION OF RAJAT DHAR, M.D.
13
                  April 17, 2018
14                  9:02 a.m.
15
16
17   Reporter:  John Arndt, CSR, CCR, RDR, CRR
                   CSR No. 084-004605
18                 CCR No. 1186
19
20
21
22
23
24
25
```

**Page 2**

```
1           DEPOSITION OF RAJAT DHAR, M.D., taken
   pursuant to Notice of Taking Deposition, before John
2  Arndt, a Certified Shorthand Reporter and Certified
   Court Reporter, at Washington University School of
3  Medicine, McMillan Hall, 517 South Euclid, Suite 407,
   in the City of St. Louis, State of Missouri, commencing
4  at approximately 9:02 a.m. on April 17, 2018.
5
              APPEARANCES OF COUNSEL
6
7  On Behalf of Plaintiffs:
        Cummings Manookian, PLC
8       45 Music Square West
        Nashville, TN  37203
9       (615) 266-3333
        BY:  MR. BRIAN CUMMINGS
10           bcummings@cummingsmanookian.com
11 On Behalf of Dr. Clark Archer:
        Hall Booth Smith, P.C.
12      424 Church Street, Suite 2950
        Nashville, TN  37219
13      (615) 313-9911
        BY:  MR. BRYANT C. WITT
14           bwitt@hallboothsmith.com
15 On Behalf of HCA Health Services of Tennessee, Inc.,
   d/b/a StoneCrest Medical Center:
16      Gideon, Cooper & Essary
        315 Deaderick Street, Suite 1100
17      Nashville, TN  37238
        (615) 254-0400
18      BY:  MR. C. J. GIDEON, JR.
             cj@gideoncooper.com
19
20
21
22
23
24
25
```

**Page 3**

```
1              INDEX OF INTERROGATION
2  Examination by Mr. Gideon            Page 4
   Examination by Mr. Witt             Page 204
3
4                INDEX OF EXHIBITS
5  Exhibit 2                            Page 11
   Exhibit 3                            Page 12
6  Exhibit 4                            Page 18
   Exhibit 5                            Page 19
7  Exhibit 6                            Page 23
   Exhibit 7                            Page 37
8  Exhibit 8                            Page 46
   Exhibit 9                            Page 46
9  Exhibit 10                           Page 47
   Exhibit 11                          Page 104
10 Exhibit 14                          Page 160
   Exhibit 15                          Page 171
11 Exhibit 15                          Page 171
   Exhibit 16                          Page 203
12 Exhibit 17                          Page 204
   Exhibit 18                          Page 215
13 Exhibit 19                          Page 215
   Exhibit 20                          Page 215
14
              (Exhibits are attached.)
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1       The witness, RAJAT DHAR, M.D., first having been
2  duly sworn, testified as follows:
3        QUESTIONS BY MR. GIDEON:
4     Q.   Good morning.  My name is C.J. Gideon.  I
5  represent StoneCrest, the hospital.  The man to my
6  left, Bryant Witt, who represents Clark Archer.
7     A.   Okay.
8     Q.   I read two depositions you've given so
9  far.  Have you given more than that?
10    A.   No.  Two depositions.  Right.
11    Q.   All right.  Let me cover some general
12 rules I want you to keep in mind.  First, listen to my
13 question.  If you do not understand it, do not answer
14 it.  Tell me you don't understand it, and I'll do a
15 better job the next time.
16    A.   Okay.
17    Q.   Secondly, answer the question directly,
18 and then if you need to give me an explanation, you
19 can, and I'll let you do that.
20    A.   Okay.
21    Q.   All right?
22    A.   Yes.
23    Q.   Third, I just asked you a few moments ago
24 if you had any clinical responsibilities today.  If you
25 do, if you get a page from a resident or a fellow, just
```

Page 5

1  tell me, we'll stop, you can address that, or you can
2  address anything as a matter of personal comfort.  This
3  is not designed to be difficult or burdensome for you
4  at all.
5      A.   Thank you.
6      Q.   Fair enough?
7      A.   Yes.  I shouldn't have any until at
8  least -- till 2:00.  I don't have anyone who will be
9  calling me for clinical reasons until then.
10     Q.   Now, we were told originally that you were
11 available from 9:00 until 3:00.  You're now telling me
12 it's 2:00.  When did that change?
13     A.   No, I have to take over at 3:00, so I have
14 to kind of start wrapping up and be ready to go to meet
15 the physician I'm taking over for by 3:00.  So
16 depending on where we were and how long it takes to
17 wrap up, 2:00 would be a safe time to finish so I can
18 be over the deposition by 3:00 at the latest.  So I
19 think that's why I said 3:00 initially.
20     Q.   Is your entire file in front of you?
21     A.   Yes.
22     Q.   You've not kept anything back?
23     A.   No.
24     Q.   Have you done all you need to do to form
25 all of your opinions in this case?

Page 6

1      A.   Yes.
2      Q.   Are you awaiting any additional
3  information at all?
4      A.   No.
5      Q.   I want to talk about the chronology.  When
6  is the first time you were contacted to participate in
7  this case?  And if you wish to do so, you're free to
8  look at the file.  The key is the date.
9      A.   Okay.  Looks like November the 20th was
10 the first date I received the records and heard about a
11 case.
12     Q.   What year?
13     A.   Of 2017.
14     Q.   Now, were you contacted to participate in
15 this case by a witness brokerage firm?
16     A.   Initially I believe I heard about the case
17 through a brokerage firm, yes.
18     Q.   What's the name of the witness brokerage
19 firm?
20     A.   I believe it was Elite Medical Experts or
21 Elite Experts.
22     Q.   When did you first receive any contact
23 from an outfit called Elite Medical Experts?
24     A.   In reference to this case?
25     Q.   This case, yes.

Page 7

1      A.   I believe it was in the few days before
2  the 20th of November 2017.
3      Q.   So then in terms of being fully accurate
4  and honest with me, your first contact in this case was
5  before November 20th, 2017; correct?
6      A.   Yeah, I don't have that exact date in
7  front of me from these e-mails.  But --
8      Q.   But it was before?
9      A.   It would have been some -- an e-mail from
10 them a day or two before that, I believe.
11     Q.   Where is the e-mail from Elite Medical
12 Experts?
13     A.   That was not -- I believe it was the
14 e-mails to Mr. Cummings that I was asked to provide, I
15 believe, so I didn't print that e-mail off.
16     Q.   Well, we'll ask that you do that.
17     A.   Sure.
18     Q.   That you print out any e-mail traffic from
19 Elite Medical Experts dealing with this case.
20     A.   Okay.
21     Q.   And we'll add that as an Exhibit 1 when
22 you supply it?
23          MR. CUMMINGS:  C.J., let me help you with
24 your request.  I think he's got the name of the group
25 wrong so I don't want you to limit it.  I think the

Page 8

1  name is The Expert Institute.
2      A.   Oh.
3          MR. GIDEON:  Well, we'll see.
4          MR. CUMMINGS:  But your request was -- I
5  don't think you're going to find one from Elite.
6      A.   Okay.
7      Q.   (By Mr. Gideon)  Which one is it?  You
8  should know.
9      A.   I don't keep a record of that here.
10 Usually they just contact me, and then I worked with
11 Mr. Cummings since then, so I haven't -- there's a few
12 different companies I worked with over the years, so I
13 don't keep a record.
14     Q.   Right.
15     A.   Okay.
16     Q.   Well, one of them that you referred to in
17 the past is an outfit called Health Care Litigation.
18     A.   That sounds right.
19     Q.   You referred to that company in the Cassie
20 McGill (ph) case.
21     A.   Okay.
22     Q.   In the Wesley case, the other deposition I
23 read, you said you were hired by Elite Medical Experts
24 in that case.  So I've heard of two.
25     A.   Hmm.



Page 9

1    Q.   Now there's a third.
2    A.   Hmm.
3    Q.   What was the name that Mr. Cummings just
4    mentioned?
5    A.   The Expert Institute, I believe.
6    Q.   Yes.  Okay.  Do you --
7    A.   Sometimes the names change, so -- I know
8    one company has changed names from one to another, so
9    sometimes it's hard to even keep track of who's
10   contacting you.
11   Q.   Do you have a written agreement with The
12   Expert Institute?
13   A.   I don't believe so, no.
14   Q.   Have you had a written agreement with
15   them?
16   A.   I don't believe so, no.
17   Q.   Do you have an expert written agreement
18   with Health Care Litigation?
19   A.   Not to my knowledge.  I believe there was
20   one institute where I had had an agreement, but I
21   can't -- that was many years ago, and I don't recall
22   which one that was.
23   Q.   Who was that?
24   A.   I don't recall.
25   Q.   Have you had a written agreement with

Page 10

1    Elite Medical Experts at any time?
2    A.   No.
3    Q.   How did you get on their brokerage list
4    where they connect you with lawyers?
5    A.   I have no idea.
6    Q.   Did anybody from Elite or Health Care
7    Litigation or The Expert Institute ever call you and
8    say, "Is it okay if we pair you up with lawyers filing
9    lawsuits?"
10   A.   Not to my recollection.
11   Q.   How do they get compensated?
12   A.   I'm not aware of that.
13   Q.   Do you know if they bill the lawyers and
14   then they, the brokerage, pays you?  Is that how it
15   works?
16   A.   Not to my knowledge in all cases, at
17   least.
18   Q.   Do you know if the lawyers have to pay
19   those brokerage firms a flat fee?
20   A.   I'm not aware.
21   Q.   You're not aware of the details at all?
22   A.   No.
23   Q.   All right.  Well, back where we were a few
24   moments ago.  I wanted to figure out when you first got
25   involved, and you said, in terms of what you could

Page 11

1    confirm today, you had some contact with an expert
2    brokerage firm sometime in advance of November 20th.
3    Then you looked at something and you said you had a
4    contact November 20th, 2017.  Who was it with, please?
5    A.   November 20th, it was with Mr. Cummings.
6    Q.   And do you have an e-mail to that effect?
7    A.   Yes.
8    Q.   May I look at it, please?  All right.
9    Looking at the letter -- or the e-mail, rather -- of
10   November 20th, 2017, which we'll make an Exhibit 2 --
11   do you mind if I look at --
12   A.   Sure.
13   Q.   He makes reference to a letter.  And I've
14   seen it.  Here's -- pass it down to the court reporter.
15        [Exhibit 2 marked for identification.]
16   Q.   Maybe it's in this file.
17   A.   You're referring to the letter of -- about
18   the case?
19   Q.   Yes.
20   A.   Okay.
21   Q.   It's -- okay.  Okay.  So we have the
22   November 20th, 2017, e-mail that makes reference to a
23   letter that's dated the same day from Mr. Cummings that
24   includes a series of factual representations about the
25   case, and the e-mail says it accompanied a set of

Page 12

1    StoneCrest records; correct?
2    A.   Correct.
3    Q.   Is this the letter?
4    A.   Yes, this is the letter.
5    Q.   All right.  We'll make that Exhibit 3.
6        [Exhibit 3 marked for identification.]
7    Q.   (By Mr. Gideon)  In terms of your
8    engagement in this case, Dr. Dhar, before we started
9    this morning, who else have you spoken with about this
10   case other than Mr. Cummings?
11   A.   I don't believe I've spoken with anyone
12   apart from Mr. Cummings about this case.
13   Q.   So the answer is no one?
14   A.   No.
15   Q.   When is the first time you met Mr.
16   Cummings in person?
17   A.   Yesterday evening.
18   Q.   What time?
19   A.   Just before 5:00 PM.
20   Q.   And how long did the meeting last?
21   A.   Approximately one hour.
22   Q.   So that's the only in-person meeting
23   you've had with any lawyer in this case before we
24   started this deposition this morning?
25   A.   Prior to today, yes.

Page 13

1   Q.   Do you know when this lawsuit was filed?
2   A.   Not off the top of my head, no.
3   Q.   I've looked through the file materials
4  which you told us a few moments ago happen to be your
5  entire file, and I've not seen a copy of the complaint.
6  And I realize you're a neurologist and not a lawyer,
7  but you know the complaint is the initial document that
8  gets filed to start a lawsuit.  It's the who sues whom
9  and why; right?
10  A.   Okay.
11  Q.   You know that from prior experience, don't
12  you?
13  A.   Seems reasonable, yes.
14  Q.   Have you ever seen the complaint in this
15  case?
16  A.   I don't believe so, no.
17  Q.   Have you ever seen the amended complaint
18  in this case?
19  A.   No.
20  Q.   Have you examined Mr. John Ruffino at any
21  time?
22  A.   I have not.
23  Q.   Would it help you at all in forming any of
24  your opinions in this case to examine Mr. Ruffino?
25  A.   I don't believe it would affect my

Page 14

1  opinions that I'm presenting in this case, no.
2   Q.   Have you ever asked for the opportunity to
3  examine him?
4   A.   No.
5   Q.   Have you ever spoken with Mr. Ruffino?
6   A.   No.
7   Q.   Have you ever asked for the opportunity to
8  do so?
9   A.   No.
10  Q.   During the course of the discovery process
11  in this case, I've got a copy of the dash cam, which as
12  you know from watching TV is the video footage from a
13  police car when there's a stop.
14  A.   Yes.
15  Q.   Have you ever looked at the dash cam video
16  on Mr. Ruffino?
17  A.   I reviewed it briefly, yes.
18  Q.   When?
19  A.   I believe in the last month.
20  Q.   How did you get a hold of it?
21  A.   I believe it was sent to me through an
22  e-mail link in that chain of e-mails.
23  Q.   Now, in the letter which we made Exhibit
24  3, like some physicians, you use a system for
25  determining how much time you spend on a case by

Page 15

1  writing on some document in the case.  Exhibit 3 in the
2  upper right-hand side reflects time spent on the case.
3  May not be the only time record you have, but I don't
4  see any record at all reflecting a review of the dash
5  cam.  Is there a record reflecting when you looked at
6  the dash cam?
7   A.   In terms of the time?
8   Q.   Yes, the date and the amount of time you
9  spent.
10  A.   I don't believe so, no.  That was
11  subsequent to these records being completed.
12  Q.   Did you ever get a copy of Mr. Ruffino's
13  deposition?
14  A.   I did.  That's included in the folder
15  here.
16  Q.   Did you read it?
17  A.   Yes, I did.
18  Q.   Did you notice that I asked him in his
19  deposition whether he was smoking when he was waiting
20  for the EMTs to come and while he was talking to the
21  police?
22  A.   I remember smoking as something he did,
23  but I don't remember that question, no.
24  Q.   Yeah.  Well, I asked him specifically if
25  he was smoking while he was waiting for the EMTs to

Page 16

1  come and while he was with the police, and he denied it
2  unequivocally at Page 61, Lines 24; Page 62, Lines 9.
3  You're free to confirm it, if you want to, in the
4  deposition.  But you know from looking at the dash cam
5  that's not true, don't you?
6   A.   I don't -- didn't see that in the dash cam
7  so I didn't --
8   Q.   You didn't see him smoking on the dash
9  cam?
10  A.   No.
11  Q.   Did you look at the dash cam very
12  carefully?
13  A.   Not every moment of it, no.  I just --
14  Q.   Well, how long was it?
15  A.   I believe it was almost 45 minutes long.
16  Q.   Are you familiar with a publication
17  entitled Thrombosis Research?
18  A.   I've heard of it, yes.
19  Q.   Is it a reliable publication in the field
20  of medicine?  (Hands document to witness.)
21  A.   Can you clarify what you mean by reliable?
22  Q.   Well, I'll give you my definition of
23  authoritative or reliable, and that is a publication
24  that is first and foremost peer-reviewed, makes it a
25  point of publishing information that has been verified

Page 17

1 or confirmed to be accurate, and generally follows
2 accepted scientific principles.
3      Something -- it's not just an ad hoc case
4 report by somebody in a community, but in fact attempts
5 to compile research, reflects its methods, justifies
6 the conclusions, and then submits the proposed article
7 to a peer review board, much like the American -- the
8 neurology publication. Something like that.
9      A.   I --
10      Q.   With that background, is Thrombosis
11 Research a reliable publication?
12      A.   From what I can tell, yes.
13      Q.   Before today, had you ever seen the
14 article "Acute Cigarette Smoke Exposure Reduces Clot
15 Lysis -- Association Between Altered Fibrin
16 Architecture and the Response to tPA"?
17      A.   I had not, no.
18      Q.   Do you agree with the concept published by
19 the article, that clots generated after smoking are
20 resistant to thrombolysis?
21      A.   I mean, I'd have to read it in more
22 detail. I certainly would not be able to take any
23 definitive statements about that without reading it and
24 also knowing what other literature is out there.
25      Q.   So you haven't looked at it before?

Page 18

1      A.   No.
2      Q.   You don't know from your actual experience
3 whether that concept is true or false; right?
4      A.   I mean, my sense of what I know before is
5 that regardless of risk factors, tPA has efficacy.
6 That's my understanding of the literature.
7      Q.   My question to you is very specific. Do
8 you know whether smoking reduces the effectiveness of
9 tPA in an existing clot? It's a yes or no.
10      A.   That's not something that I'm aware of,
11 no.
12      Q.   Okay. Well, we'll make a copy of that
13 Exhibit 4, please. Just hand it to him.
14      A.   Okay.
15      Q.   You're free to look at it later if you'd
16 like to.
17      [Exhibit 4 marked for identification.]
18      Q.   When I was reading the Wesley deposition,
19 you said that your charges at that time were $400 an
20 hour for medical record review, $500 for deposition
21 testimony. Are those charges higher now?
22      A.   I don't believe my charges have changed,
23 but I do have --
24      Q.   Would you look and see? I asked you to
25 give us your fee schedule.

Page 19

1      A.   $450 an hour for review and $500 for
2 deposition.
3      Q.   So the review fees have gone up by $50 an
4 hour; correct?
5      A.   Not in my recollection. That's the same
6 schedule that I've always had, but I can't -- I don't
7 have the deposition prior -- maybe that was an error
8 that I stated before. I'm not sure.
9      Q.   Perhaps. We'll make this Exhibit 5, which
10 is his fee schedule.
11      [Exhibit 5 marked for identification.]
12      Q.   According to your testimony in the McGill
13 case, you made $7,440 doing this kind of work in the
14 calendar year 2015 and then almost double that, made
15 $12,285, in 2016 doing this. We've now completed 2017.
16 How much money did you make doing medical/legal reviews
17 in calendar year 2017?
18      A.   I don't have the exact amount, but having
19 done my taxes I know it was less than $10,000 this past
20 year.
21      Q.   You have to report that on a Schedule C,
22 don't you?
23      A.   That's correct.
24      Q.   And what was your Schedule C number?
25      A.   My Schedule C for all business-related

Page 20

1 work was approximately $40,000, but --
2      Q.   And 10 grand of it was legal-related work?
3      A.   Exactly. Maybe less so, because I know
4 30-something was for other consulting I do not to do
5 with legal.
6      Q.   Now, in one of the cases -- let's see.
7 Yes. In McGill, you testified that you had to sign an
8 agreement with Washington University that dealt with
9 medical/legal consulting. Is that correct?
10      A.   I believe -- if I recall correctly, I was
11 stating that there's a general ethics or agreement that
12 you sign that might include some subsection that deals
13 with that kind of thing.
14      Q.   Are there any provisos imposed by
15 Washington University in St. Louis that control any
16 element of your consulting? And I'll just throw out
17 some ideas -- how much you can do, the subjects you can
18 consult in, what you can charge -- anything like that?
19      A.   I'd have to confirm the exact details, but
20 I don't believe there's a limit on the amount of
21 consulting within reason or an exact charge except
22 within reasonable limits or some such terminology, but
23 it's fairly unconstrained within some gross
24 constraints.
25      Q.   Do you have to get the permission of the



Page 21

1  chair of your department to take on any cases?
2      A.   No.
3      Q.   You know that's done at some schools?
4      A.   I'm not aware of that, no.
5      Q.   Is it correct that you spend about 25 to
6  33 percent of your time in clinical activities?
7      A.   That's correct.
8      Q.   And you spend one week per month in the
9  neuro ICU; correct?
10     A.   That's correct.
11     Q.   That is correct?
12     A.   Yes.
13     Q.   How do you spend the other three-quarters
14 to 66 percent of your time as a physician?
15     A.   Performing research and teaching.
16     Q.   Now, in the real world today, research
17 also requires funding, doesn't it?
18     A.   That's correct.
19     Q.   Does your CV reflect your funded research
20 projects?
21     A.   It should, yes.
22     Q.   Can we get that out and identify the
23 funded research projects just by page and line number,
24 please?
25     A.   On Page 8, there is a section, current

Page 22

1  research support, that lists the main one or two
2  sources of current research funding.
3      Q.   Okay. And there's one at the top,
4  governmental. The title is genetics and prediction of
5  cerebral addendum after hemispheric stroke?
6      A.   That's correct.
7      Q.   And you are one of the researchers but not
8  the principle investigator?
9      A.   No, I am the principle investigator.
10     Q.   Okay. All right. What's the funding?
11 How much?
12     A.   The funding is primarily for my salary --
13 75 percent of my salary, and then some additional
14 amount for research expenditures, but only a small
15 amount.
16     Q.   Well, what is your funding for this
17 particular project? It's not listed.
18     A.   Over five years it might be in the
19 $700,000 range.
20     Q.   And then onto the non-governmental
21 clinical trials. You've got a title naloxone for
22 optimization for hypoxemia in lung donors study. You
23 are the principle investigator for that?
24     A.   Yes.
25     Q.   And what's the amount of that study and

Page 23

1  who's funding it?
2      A.   There's no funding for that. That's
3  simply a trial that I'm performing. That's what I was
4  in France presenting the results of. But I don't
5  receive any money from that. It's funded -- the trial
6  itself is funded administratively by an organization,
7  but I don't receive any money from that.
8      Q.   Well, while we're at it let's make his CV
9  the next exhibit, which would be --
10          THE REPORTER:  6.
11     Q.   (By Mr. Gideon)  6?  Will you pass that to
12 him, please?
13          [Exhibit 6 marked for identification.]
14     Q.   None of your current or former research
15 deals with efficacy of tPA, does it?
16     A.   No, I don't believe my research is
17 directly on that area, no.
18     Q.   None of your current or former research
19 deals with efficacy of any other thrombolytic agent,
20 whether it's streptokinase or urokinase --
21     A.   No.
22     Q.   -- or some other substance; correct?
23     A.   No.
24     Q.   That is correct?  You're --
25     A.   That is correct that it doesn't.

Page 24

1      Q.   None of your funded research deals with
2  intravenous or intraarterial use of thrombolytics;
3  correct?
4      A.   Correct.
5      Q.   And none of your current or former
6  research deals with instrumentation -- endovascular
7  instrumentation to break up, remove, or retrieve a clot
8  or thrombus; correct?
9      A.   Correct.
10     Q.   Now, when is the last time that you
11 actually performed an embolectomy -- an endovascular
12 embolectomy?
13     A.   I'm not a physician. I'm not in that line
14 of work that performs the embolectomy. That's usually
15 a radiology division who performs that.
16     Q.   So the answer to the question then is
17 never; right?
18     A.   That's correct.
19     Q.   Even in training?
20     A.   Correct.
21     Q.   Now, if I remember your CV correctly, you
22 went through a neurology residency, and then you had a
23 fellowship in neurointensive care and something else,
24 didn't you?
25     A.   No, my fellowship was in neurointensive

Page 25

1  care only.
2      Q.   Throughout all of your neurology
3  residency, throughout all of your fellowship and your
4  entire career as a fully-minted attending physician,
5  you've never once performed an embolectomy; right?
6      A.   Not myself, no.
7      Q.   How close to the table have you been when
8  somebody else is performing an embolectomy?
9      A.   I mean, I've certainly been present during
10  a lot of endovascular procedures as the neurologist
11  involved in a patient's care.
12      Q.   Right.
13      A.   But not doing the procedure.  But very
14  close.
15      Q.   Not holding the catheter?
16      A.   No.
17      Q.   You've never held the guide wire?
18      A.   I mean, I've done -- I've held a guide
19  wire for angiography in the brain but not necessarily
20  this procedure.
21      Q.   Now, have you ever performed what used to
22  be much more common, and that's intraarterial use of
23  tPA or another thrombolytic?  Have you ever done that?
24      A.   Again, I haven't done it myself but I've
25  been involved in many cases when that was more common.

Page 26

1      Q.   Remember my question, my point at the
2  beginning, just answer it directly.
3      A.   Sure.
4      Q.   All this deals with you, not if you know
5  somebody who's done it, not if you've seen somebody do
6  it.
7      A.   Yeah.
8      Q.   Have you ever been the person who inserted
9  the catheter and released some thrombolytic drug in an
10  intraarterial fashion?
11      A.   No.
12      Q.   Did StoneCrest, my client, have a neuro
13  ICU?
14      A.   Not to my knowledge.
15      Q.   Was it a rural hospital?
16      A.   It's not to my knowledge a rural hospital.
17      Q.   What is it, then?  Is it a community
18  hospital, or is it a tertiary facility?
19      A.   I mean, from what I can tell it's a
20  community hospital with some specialists but not
21  tertiary level of expertise.
22      Q.   Tertiary level would be something like
23  Washington University, Barnes-Jewish Hospital; correct?
24      A.   Correct.
25      Q.   Or Vanderbilt or Duke University Medical

Page 27

1  Center; correct?
2      A.   Correct.
3      Q.   How would you get -- if you flew into
4  Nashville, how would you get to StoneCrest Medical
5  Center?
6      A.   I think you'd have to take the highway out
7  of the city a little bit to the west, I believe.
8      Q.   And how far west would you go before you
9  got to StoneCrest?
10      A.   I don't know it's exact distance, but I
11  believe it's within 20 miles, but not exactly sure.
12      Q.   20 miles west?  And then once you got to
13  StoneCrest, what would you find in terms of
14  specialists?  You said they had some specialists.
15      A.   Right.
16      Q.   Which ones do they have?
17      A.   I mean --
18      Q.   Do they have, for example, orthopedic
19  spine?
20      A.   That I'm not sure.  I know for example in
21  this case they have a neurologist.
22      Q.   Yes.
23      A.   That's the only specialist that I'm aware
24  of that's relevant to this case.
25      Q.   Any other specialists that you're familiar

Page 28

1  with?
2      A.   I didn't come across in my review here,
3  no.
4      Q.   The neurologist who was involved in the
5  care of Mr. Ruffino, his last name is Chitturi --
6  Seresh Chitturi -- did you get a copy of his affidavit
7  in these materials?
8      A.   I believe I did see something from him.
9      Q.   Would you please locate that affidavit?
10  Here's some other materials.
11      A.   Yeah.
12      Q.   And right now, Dr. Dhar, all I'm trying to
13  confirm is that you've got a copy of his affidavit.  It
14  was available to you for your review.
15      A.   Looks this is it here -- affidavit of
16  Seresh Chitturi.
17      Q.   Yes.  You did get it.  When did you get
18  this set of materials that's clipped together, which
19  appears to be -- and I haven't looked at it
20  carefully -- but it appears to be the disclosures we
21  made of a series of physicians and the opinions they
22  would express in this case.  When did you receive that?
23      A.   It would be in the e-mails, but I believe
24  it was in March of this year.
25      Q.   And I'll bet you recognized one of those

1  physicians, didn't you?
2      A.    I did come across one physician I
3  recognized, yes.
4      Q.    Yes.  Dr. Zazulia?
5      A.    That's correct.
6      Q.    Now, how long have you known her?
7      A.    Probably since I've been here, so at least
8  10 years.
9      Q.    Right.  Right.  Is she the chief of
10 vascular neurology here?
11     A.    No.
12     Q.    What's her position?
13     A.    I'm not aware if she has any position
14 within the neurology department.
15     Q.    What's her role with respect to the stroke
16 program at Washington University in St. Louis?
17     A.    I mean, she's one of the stroke
18 neurologists.
19     Q.    She is?
20     A.    Yes.
21     Q.    Are you one of the stroke neurologists?
22     A.    I'm one of the critical care neurologists.
23     Q.    I didn't ask about critical care.
24     A.    Sure.
25     Q.    I asked about stroke.  Are you one of the

1  stroke neurologists?
2      A.    No, I'm not in the stroke division, no.
3      Q.    The answer then is a simple no; right?
4      A.    No.  Yes.
5      Q.    Who else besides Dr. Zazulia is one of the
6  stroke neurologists?
7      A.    There's at least four or five others, I
8  believe.
9      Q.    When you saw that she was involved in this
10 case too, did you ask the people that hired you if it
11 was okay if you discussed your findings with Dr.
12 Zazulia?
13     A.    No.
14     Q.    Have you discussed your findings with Dr.
15 Zazulia?
16     A.    No.
17     Q.    Were you surprised that Dr. Zazulia
18 disagreed with you?
19     A.    I don't even remember her saying that
20 specifically, so I didn't -- it didn't come across my
21 mind to be surprised at that, no.
22     Q.    Who decides whether somebody is a stroke
23 neurologist here or isn't?  How is the neurology
24 program organized here at Washington University?
25     A.    It's divided into divisions, and you're

1  simply hired and placed within a division that best
2  suits your practice.
3      Q.    And your skills and your background?
4      A.    Sometimes.  Not always.
5      Q.    Have you always been in the neuro ICU --
6      A.    Yes.
7      Q.    -- division?
8      A.    Yes.
9      Q.    Have you ever been in the stroke division?
10     A.    No.
11     Q.    Is there a formal stroke division?
12     A.    Stroke or cerebral vascular -- I forget
13 the title, but --
14     Q.    Vascular neurology?
15     A.    Vascular neurology.
16     Q.    Have you ever been in the vascular
17 neurology division?
18     A.    No.
19     Q.    Are you a member of the American Academy
20 of Neurology?
21     A.    No, no longer.
22     Q.    Have you ever been?
23     A.    Yes, in the past.
24     Q.    When?
25     A.    Maybe in 2005, 2006.

1      Q.    Why did you stop being a member of the
2  American Academy of Neurology?
3      A.    Just cost and utility.
4      Q.    You didn't think you had gotten much from
5  it?
6      A.    That's correct.
7      Q.    Are you familiar with whether they have
8  guidelines that govern so-called expert testimony?
9      A.    I'm not aware, but it wouldn't surprise
10 me.
11     Q.    Do you agree that for you and the opinion
12 is -- in the position of an opinion witness, somebody
13 expressing opinions about other cases, other people --
14 that it's reasonable to expect you to become familiar
15 with the practice setting of the occurrence?  Do you
16 think that's reasonable?
17     A.    Yeah, that seems reasonable.
18     Q.    Have you ever practiced, since you
19 finished your fellowship, in a practice setting like
20 StoneCrest Hospital in Smyrna, Tennessee?
21     A.    I mean, there's certainly overlap between
22 the two.  There are some differences and similarities
23 in the practice setting.
24     Q.    No, I asked if you have ever actually
25 practiced in a setting similar to StoneCrest.  That's

1 the question.
2     A.    I mean, yeah, I mean, there are
3 similarities.
4     Q.    Where?  Where have you practiced, other
5 than Washington University Medical Center --
6     A.    Well, I think they are --
7     Q.    -- in St. Louis, Missouri?
8     A.    That's where I practice, which has
9 similarities to StoneCrest in this regard.
10     Q.    Well, we'll talk about similarities in a
11 moment, but I want to know if you've ever been the
12 neurologist at a hospital like StoneCrest in a rural
13 community, whether it's Kansas, or Missouri, or
14 Illinois.  You've been the on-duty neurologist like
15 Dr. Chitturi at a hospital like StoneCrest as your job,
16 ever?
17     A.    Outside of what I've done here, no.
18     Q.    Is it correct that we would call what you
19 do here tertiary care?
20     A.    Certainly that's a big part of it.
21     Q.    All right.  Do you agree with the
22 requirement that when you're expressing opinions about
23 causation, standards of care, whatever it may be, that
24 it's reasonable to expect you to identify whether those
25 opinions are based on personal experience,

1 guidelines -- published guidelines -- or prevailing
2 expert opinion?  Don't you think that's a reasonable
3 request?
4     A.    Yes.
5     Q.    Let's talk for just a moment about
6 prevailing expert opinion.  Have you vetted a single
7 opinion that you're going to express in this case with
8 any other physician?
9     A.    Not specific to this case, no.
10     Q.    All right.  I looked through your
11 materials quickly as we began the deposition.  I did
12 not see any published guidelines included in the
13 materials.  Have you referred to any published
14 guidelines as you formed your opinions in this case?
15     A.    Not for this case, no.
16     Q.    Have you formed your opinion in this case
17 based on any published article?
18     A.    No.
19     Q.    You would agree, wouldn't you, Dr. Dhar,
20 that any opinion you express in this case at minimum
21 has to be scientifically valid?
22     A.    Yes.
23     Q.    That's your responsibility; correct?
24     A.    Yes.
25     Q.    Do you also agree that one of your ethical

1 responsibilities as a reviewer in this case, as an
2 honest broker, is that you've got to be prepared to
3 tell the lawyer that hires you the good and bad about
4 that lawyer's case?
5     A.    Sure.
6     Q.    You recognize it would be entirely
7 inappropriate for you to be an advocate for one side in
8 the litigation; correct?
9     A.    Yes.
10     Q.    Are you a member of the American Medical
11 Association?
12     A.    I am not.
13     Q.    Not that organization either?
14     A.    No.
15     Q.    Are you a member of the American Heart
16 Association?
17     A.    Yes.
18     Q.    And the American Stroke Association, the
19 ASA?
20     A.    Yes, that's part of the American Heart
21 Association.
22     Q.    I thought they were separate and apart,
23 but they're not?
24     A.    Huh-uh.  They're the same.
25     Q.    So you're a member of the AHA/ASA?

1     A.    Exactly.
2     Q.    Does that organization, the AHA/ASA,
3 publish guidelines?
4     A.    Yes.
5     Q.    And in fact, one of the things they
6 published is the 2015 American Heart
7 Association/American Stroke Association focused update
8 of the 2013 guidelines for the early management of
9 patients with acute ischemic stroke regarding
10 endovascular treatment; correct?  (Hands document to
11 witness.)
12     A.    Okay.  Yes.
13     Q.    Tell me how long ago you first looked at
14 the set of guidelines that are in front of you right
15 now.
16     A.    I believe I looked at them when they first
17 were released in 2015.  I don't believe I've looked at
18 them since then, but certainly at that time.
19     Q.    You have never looked at the guidelines in
20 front of you in connection with your engagement in this
21 case, have you?
22     A.    No.
23     Q.    Don't you think you should have?
24     A.    I mean -- no.
25     Q.    No?  All right.  We'll make that Exhibit

Page 37

1  6, please.

2      THE REPORTER:  7.

3      MR. GIDEON:  7.

4      [Exhibit 7 marked for identification.]

5      Q.   (By Mr. Gideon)  William Powers is the

6  principle author of the guideline revision in 2015;

7  correct?

8      A.   Correct.

9      Q.   Isn't he regarded as one of the consensus

10  stars in the field of care of patients with stroke?

11      A.   Yes, I would agree.

12      Q.   Longtime chair of the vascular neurology

13  section at UNC; correct?

14      A.   Of neurology, I believe, not vascular

15  neurology.

16      Q.   But his emphasis has been in the care and

17  treatment of patients with stroke, hasn't it?

18      A.   Yes.

19      Q.   He's actually the person who trained Dr.

20  Zazulia, isn't he?

21      A.   That's correct.

22      Q.   Yes.  Would you agree with me, using the

23  definition I gave you earlier of authoritative and

24  reliable, that the 2015 American Heart

25  Association/American Stroke Association focused update

Page 38

1  of the 2013 guidelines for the early management of

2  patients with acute ischemic stroke regarding

3  endovascular treatment is in fact authoritative and

4  reliable for the purposes of this case?

5      A.   I don't know if I could say they were

6  entirely authoritative for this case.  I think they're

7  generally reasonable guidelines.

8      Q.   Okay.  Same thing would hold true.  You'll

9  have to look at specific sections then to tell me

10  whether you agree with specific sections; correct?

11      A.   Yes, I --

12      Q.   Just like our discussion about the

13  thrombosis article and smoking?

14      A.   Exactly.  How they would relate to this

15  case would depend.

16      Q.   Yes.  All right.  Now, have you ever

17  worked as a registered nurse in the emergency room

18  anywhere?

19      A.   No.

20      Q.   Have you ever been licensed as an RN in

21  Tennessee or any other state?

22      A.   No.

23      Q.   As you reviewed this case, did you find

24  any order given by an advanced practice person or by a

25  doctor that the nursing staff at StoneCrest did not

Page 39

1  comply with?

2      A.   I'm not aware of any time that I found

3  that, no.

4      Q.   So the answer is what?  They did comply

5  with all the orders given or they didn't?

6      A.   They did, as far as I -- in my review they

7  did, yes.

8      Q.   Well, then consistent with your testimony

9  in the McGill case, you would not be critical of the

10  nurses here because they, quote, followed the orders

11  they were given, end quote?  You agree with that?

12      A.   Yes.

13      Q.   During your career here -- I don't suspect

14  that this is the case -- but have you ever worked as a

15  moonlighting ER physician at any of the smaller

16  hospitals?

17      A.   No.

18      Q.   And your training, neurology residency,

19  and fellowship both in Canada; correct?

20      A.   Residency in Canada and fellowship here.

21      Q.   Fellowship here?

22      A.   Yes.

23      Q.   Residency in Canada, you didn't moonlight

24  at any community hospitals like StoneCrest, did you?

25      A.   Not -- I mean, I worked in those hospitals

Page 40

1  as part of my training, but not as a moonlighter.

2      Q.   But those are clearly not contiguous to

3  Tennessee?  Those were in Canada; correct?

4      A.   They may be similar in many ways, but yes,

5  not in Tennessee.

6      Q.   Now, here at this tertiary center, do they

7  follow the traditional approach, and that is, you have

8  to apply for staff privileges at a hospital every two

9  years?  Do you have to do that here?

10      A.   I believe there's some re-credentialing

11  every one or two years here, yes.

12      Q.   Yeah.  Can't be more than every two;

13  otherwise you'd be not compliant with the joint

14  commission.  You know that, don't you?

15      A.   Every year or two years, yes.

16      Q.   And you also have to make a specific

17  request for the kinds of thing you can do; right?

18      A.   Yes, I believe so.

19      Q.   Have you in all the years you've been here

20  ever had privileges to perform an endovascular

21  embolectomy?

22      A.   No.

23      Q.   Have you ever applied for privileges to

24  perform any form of intraarterial revascularization?

25      A.   No.

Case 3:17-cv-00725   Document 114-6   Filed 12/14/18   Page 10 of 55 PageID #: 1383

Page 41

1      Q.    Do you have the privileges to order tPA in
2   the neuro ICU?
3      A.    Yes.
4      Q.    When's the last time you ordered tPA in
5   the neuro ICU?
6      A.    It's probably been a few years since
7   that's happened.
8      Q.    How many is a few years?  As I get older,
9   a few years gets longer and longer.  How many?
10     A.    I don't have an exact recollection, but
11  certainly not in the last two years, maybe, so --
12     Q.    Why not?
13     A.    We haven't had that many cases of strokes
14  that occur in the neuro ICU.
15     Q.    So that I am clear, in the time that you
16  have been here at Washington University in St. Louis as
17  a physician -- fully-trained physician, after your
18  fellowship was completed -- have you consulted and been
19  on the consultation panel to the emergency room here?
20     A.    I mean, certainly we can be consulted at
21  the emergency room, yes.  It depends -- if we're
22  required.
23     Q.    Well, here's what I'm getting at.  You may
24  know this, you may not.  But in a facility like
25  StoneCrest, they will have a call list --

Page 42

1      A.    Uh-huh.
2      Q.    -- of specialists that the emergency room
3   can call.  They'll have an ophthalmologist who's on
4   call.  They'll have an orthopedic surgeon who's on
5   call.  If they have a neurologist with staff
6   privileges, they'll have a neurologist on call.  Have
7   you been on the call schedule to the ER here at
8   Washington University?
9      A.    Yeah, I believe they have two schedules
10  for neurologists, one for stroke and one for
11  non-stroke.
12     Q.    And you're on the non-stroke?
13     A.    No.
14     Q.    You're on the stroke call schedule?
15     A.    We're more affiliated with the stroke, but
16  myself, I have not recently been on the stroke schedule
17  because I mainly do ICU now.
18     Q.    How long has that been the case that you
19  have not even been on the ER stroke call list?  How
20  many years?
21     A.    Probably at least 10 years.
22     Q.    That's pretty much the whole time you've
23  been here; right?
24     A.    Since I started maybe focusing on the ICU
25  side of things.

Page 43

1      Q.    Do you have your report in front of you,
2   Doctor?
3      A.    Yes.
4      Q.    I notice there's some highlighting.  When
5   did you last look at it?
6      A.    This was highlighted yesterday.  I
7   printed --
8      Q.    Are you familiar with it?
9      A.    Yes.
10     Q.    Will you find any reference in the report
11  you prepared -- well, let me take that back.  Do you
12  find any reference in the report you signed that
13  says -- that uses the phrase "standard of care" or
14  "acceptable standard of professional practice" --
15  either one of those phrases?
16     A.    I don't believe I see those words or
17  terminology in this report, no.
18     Q.    Is there another report that I should be
19  looking at?
20     A.    This is the only report I created in this
21  case.
22     Q.    Well, you didn't really create the report?
23  The e-mails say the report was sent to you and then you
24  had to add some things at the end.  Isn't that right?
25         MR. CUMMINGS:  Object to the form.

Page 44

1      A.    No.
2          MR. CUMMINGS:  Go ahead and answer.
3      A.    That's incorrect.
4      Q.    (By Mr. Gideon)  Well, let's look.
5      A.    The e-mail was the opposite.
6      Q.    Well, let's look.
7      A.    Sure.
8      Q.    I looked at it just before we started the
9   deposition, and I put some of these pieces of paper on
10  it.  Let's look.  You might be right.  Here's the
11  e-mail I was thinking of, and you can tell me if there
12  are any others.  January 30th, 2018.  And you're free
13  to read it in its entirety before you answer the
14  question.  And if you can find any others that deal
15  with the genesis of this report, please do.
16     A.    Okay.  Sorry.  And what was your --
17     Q.    All right.
18     A.    Yeah.  Go ahead.
19     Q.    Is the e-mail of January 30th, 2018, in
20  fact as I suggested, one that deals with the content of
21  the report that's right by your right hand?
22     A.    Yes, there's a few e-mails, but that's
23  probably the longest one that deals with it.
24     Q.    Correct.
25     A.    All on that same day.

Page 45

1    Q.   And doesn't the e-mail of January 30th,
2  2018, reflect that Mr. Cummings had added information
3  to your report?
4    A.   I think it says that a sentence was added
5  at the end or a section was added to the end to meet
6  certain criteria.
7    Q.   Correct.  So why don't you just read for
8  us what was added not by you but by the lawyer that
9  retained you?  Just read that section to us.
10    A.   "The revisions are largely to add the
11  categories of information at the end of the document.
12  Throughout the document, please fill in the blanks to
13  provide the corresponding information.  The opinions
14  were obviously left the same."
15    Q.   Who had prepared the initial opinions?
16    A.   I did.
17    Q.   Good.  Where is the e-mail from you to
18  them saying, "Here's my original set of opinions"?
19    A.   I believe here it says, "Would you like me
20  to forward you my draft opinions?  I reviewed" --
21  that's on the 30th.
22    Q.   January 30th, 2018?
23    A.   January 30th.  In that morning.  I
24  reviewed the depositions and notes, so that's where I
25  was asking to -- if -- I created that report and should

Page 46

1  I send that on, and then that response was in response
2  to that report being sent out.
3    Q.   Okay.  So is January 30th, then, the last
4  time anyone was adding to, deleting from, or changing
5  the report?
6    A.   Let me confirm that, but that was when
7  that was done.  Let me see.  That was the last time
8  changes were made, but I do see the date is February
9  the 5th, so I imagine by the time I had had a chance to
10  review it and respond and made sure everything was
11  reflected, it was still a few more days from the 30th.
12    Q.   That's fine.  We will make those two
13  e-mails of January 30th, 2018, from him and then to
14  him, the next exhibits, please.
15    A.   I put those --
16    Q.   If you'd hand those to the court reporter.
17    A.   Yeah.  Those pages.
18        [Exhibit 8 marked for identification.]
19        [Exhibit 9 marked for identification.]
20    Q.   And then as Exhibit 10, we will make the
21  report that is in front of Dr. Dhar right now that has
22  the highlighting on it --
23    A.   Okay.
24    Q.   -- that he says is the final work that
25  was completed February 5th, 2018.

Page 47

1    A.   Right.  And I do have the original copy
2  that I signed.  This was the reprint that I printed
3  yesterday.
4    Q.   We'll look at that in a minute.
5    A.   Okay.
6        [Exhibit 10 marked for identification.]
7    Q.   Now, by February 5th, 2018, you had
8  testified in the McGill case, you had testified in the
9  Wesley versus Northwest Regional Medical Center case.
10  That was the one in Mississippi?
11    A.   That's correct.
12    Q.   McGill was one I think in around Memphis,
13  wasn't it?
14    A.   Memphis, Tennessee.
15    Q.   Yeah.  And you had reviewed four to six
16  cases --
17    A.   That sounds about right.
18    Q.   -- by that time?
19    A.   Yes.
20    Q.   Then you get this case, the Ruffino case.
21  You're testifying in it, and you knew you were going to
22  testify in it when you signed that report, didn't you?
23    A.   I didn't know what would be the next step.
24    Q.   Why did you not identify that you were
25  expressing any opinions on standards of care or

Page 48

1  standards of acceptable professional practice in that
2  report?
3    A.   I'm not sure I understand the question.
4    Q.   Well, you know that a health care provider
5  in Missouri, in Kansas, in Tennessee -- their conduct
6  is evaluated based on whether they comply or don't
7  comply with accepted standards of professional
8  practice?  You know that, don't you?
9    A.   Seems reasonable.
10    Q.   Yeah.  You know that here in Missouri, the
11  fact that an outcome is not good in the neuro ICU does
12  not mean you've done something wrong; correct?
13    A.   Yes.
14    Q.   The question is whether you and your
15  fellows have complied with accepted standards of care
16  in the neuro ICU in a similar set of circumstances with
17  a similar patient?  You understand that, don't you?
18    A.   Yes.
19    Q.   Are you telling me then in this case that
20  you are not going to express any opinions about whether
21  any of the health care providers complied or did not
22  comply with accepted standards of professional practice
23  or the standard of care?
24    A.   No, I believe I'm giving my opinions on
25  that.  I may not have used that terminology, I guess.



1  I made my report more from the medical perspective, and
2  then if there was input in technology, I guess that's
3  the feedback that I got from Mr. Cummings and then made
4  sure that things were expressed in legal terms. I'm
5  not still an expert in how to express those things --
6  my medical opinions in a legal way.
7      Q.  Well, you've conceded that your report,
8  which had been vetted by Mr. Cummings and additions had
9  been made by the 30th of January, does not use the
10 phrase "standard of care" or "standard of acceptable
11 professional practice" a single time; right?
12     A.  I don't believe I used those words, no.
13     Q.  But you're telling me today that you do
14 intend to express some opinions about standards of care
15 regarding somebody; right?
16     A.  Yes.
17     Q.  Who?
18     A.  Dr. Archer.
19     Q.  Dr. Archer the ER physician?
20     A.  That's correct.
21     Q.  Anybody else?
22     A.  I'm --
23     Q.  The question is simple. Anybody else
24 other than Dr. Archer?
25     A.  I don't believe there's any other

1  physicians that I refer to in terms of issues with the
2  standard of care that were --
3      Q.  I'll ask the question again. Anybody else
4  other than Dr. Archer?
5      A.  I made opinions on both Dr. Archer and Dr.
6  Chitturi, but the primary issue was the communication
7  of Dr. Archer.
8      Q.  I'll ask it one more time. Are you
9  expressing any standard of care opinions on anybody
10 other than Clark Archer, M.D.? That's a yes or a no.
11     A.  Well, I guess I do include Dr. Chitturi in
12 there then as well.
13     Q.  So you're expressing opinions critical of
14 Seresh Chitturi?
15     A.  I believe that's included in my opinion,
16 yes.
17     Q.  Okay. I don't see anything in that
18 report -- and I promise you I've looked at it carefully
19 over and over and over again. I don't see a word of
20 criticism of Dr. Chitturi in there. Will you show me
21 the language that reflects to any fair-minded person
22 that you are critical of the performance of Dr.
23 Chitturi? Just find the section on Exhibit 10, and
24 then we'll look at it together.
25     A.  I believe the only section that would

1  answer your question is just the statement where I say,
2  "Dr. Chitturi did not seem to be aware that
3  neurological examinations by the nurse had found him
4  neurologically normal from the time of triage through
5  at least 12:00 that day."
6      Q.  Anything else?
7      A.  I believe that's my -- the one criticism
8  of that practice that I found.
9      Q.  Oh. And you agree that with respect to
10 Dr. Chitturi, there is no statement by you that Dr.
11 Chitturi deviated, failed to comply with accepted
12 standards of practice for a neurologist or standards of
13 care? Do you agree with that?
14     A.  Yes.
15     Q.  All right. Have you done any work to try
16 and determine what the actual approved labeling for tPA
17 is?
18     A.  Could you clarify what you mean by work?
19     Q.  Yes. Have you taken the time to look and
20 see what the FDA has permitted the manufacturer of
21 alteplase to label its product?
22     A.  I believe I am aware of the FDA labeling,
23 yes.
24     Q.  FDA labeling for tPA, brand name
25 alteplase, limits its use to three hours after the

1  patient was last normal; isn't that correct?
2      A.  Yes.
3      Q.  The FDA actually was presented with a
4  request by the manufacturer of tPA to extend its
5  labeled use to 4.5 hours; correct?
6      A.  I can't -- I mean, I can't comment exactly
7  on that.
8      Q.  Don't you think that somebody who's
9  offering opinions in this field should know the answer
10 to that question?
11     A.  No.
12     Q.  All right. You don't know? Do you know
13 if the FDA rejected the request by the manufacturer of
14 tPA to extend labeled use for -- from three up to
15 four-and-a-half hours?
16     A.  No, I specifically -- I don't know that
17 specifically, no.
18     Q.  Is it your opinion that the administration
19 of the appropriate dose -- I don't want to argue with
20 you about volume; okay?
21     A.  Okay.
22     Q.  There is a fairly standardized volume of
23 tPA that's utilized across the country, isn't there?
24     A.  Yes.
25     Q.  And what's that volume?



Page 53

1      A.    .9 milliliters per kilogram -- milligrams
2   per kilogram -- up to a maximum dose.
3      Q.    In an intravenous administration?
4      A.    In an intravenous way, yes.
5      Q.    Yeah.  Okay.  Using that dosing, is it
6   your opinion that that dose of tPA in this case would
7   have revascularized Mr. Ruffino's middle cerebral
8   artery territory?
9      A.    My opinion is that more likely than not,
10  it would have facilitated the revascularization, yes.
11     Q.    Alone?  tPA alone?  That -- you're
12  answering a question I didn't ask.  It's real simple
13  here.  The question is, would tPA alone in Mr. Ruffino
14  have revascularized his left middle cerebral artery?
15  Yes or no?
16     A.    Well, nothing in medicine is yes or no so
17  I can't answer that question definitively because we
18  don't know the answer.  I can only give my -- the
19  probabilities that more likely than not it would have.
20     Q.    Okay.  You agree with me that more likely
21  than not then means that something has to be more than
22  50 percent probable; correct?
23     A.    Yes.
24     Q.    And are you telling -- are you testifying
25  under oath that administration of tPA alone in this

Page 54

1   case would have more probably than not revascularized
2   Mr. Ruffino's left middle cerebral artery distribution?
3      A.    To be specific, yes, I'm saying that it
4   would have more likely than not improved the perfusion
5   beyond the blockage.
6      Q.    That's not my question.  Don't answer
7   questions I haven't asked.  The question focuses on
8   revascularization.
9      A.    Could you clarify what you mean by
10  revascularization?
11     Q.    Yes.  Would it have lysed whatever
12  blockage existed such that the flow, the perfusion of
13  blood, would have revascularized the area served by his
14  left MCA?
15     A.    Yes.
16     Q.    So I want to make sure I have a concrete
17  answer to a concrete question.
18     A.    Sure.
19     Q.    Are you telling me that in your
20  carefully-considered opinion, utilization of the
21  standard dose of intravenous tPA would have more
22  probably than not revascularized Mr. Ruffino's left MCA
23  if given at any time on February 17th, 2016?
24     A.    Could you clarify -- any time?  I just
25  don't want to answer the wrong question.  You're saying

Page 55

1   at any time when he presented with a stroke, or are you
2   saying anytime later?
3      Q.    At the time that he presented at
4   StoneCrest.
5      A.    Yes.  If --
6      Q.    You and I agree -- and we'll do the
7   question again so we have all the time constraints
8   nailed down.
9      A.    Okay.
10     Q.    We agree he presented at 9:48 at the
11  hospital; correct?
12     A.    Correct.
13     Q.    We agree that at 12:20 Clark Archer saw
14  him?  You remember that; correct?
15     A.    Sometime between 12:00 and noon -- 1:00,
16  yes.
17     Q.    You agree that at about 12:54, Clark
18  Archer called a code stroke?
19     A.    Yes.
20     Q.    You do remember that?
21     A.    Yes.
22     Q.    You recall that Dr. Chitturi said in his
23  affidavit that he consulted in the care of Mr. Ruffino
24  at approximately 12:54 or 12:56; correct?
25     A.    That's -- yes, that seems correct.

Page 56

1      Q.    In that time frame?
2      A.    Yes.
3      Q.    Let's give Dr. Chitturi 25 or 30 minutes
4   to consider what to do and do it.  If at any time
5   between 9:48 on the morning of February 17th, 2016, and
6   2:00, is it the opinion of Dr. Dhar that tPA alone, if
7   given intravenously, would have revascularized the
8   patient's left MCA territory more probably than not?
9      A.    Yes.
10     Q.    Now, you have an obligation, don't you, to
11  make sure that the opinions that you express are
12  consistent with research; right?
13     A.    Yes.
14     Q.    You have an opinion -- you have a
15  responsibility to make sure your opinions are
16  consistent with guidelines, published data?
17     A.    That's part of it, yes.
18     Q.    Right.  Tell me what research, if any, you
19  have ever looked at to attempt to verify the opinion
20  you just gave.
21     A.    I mean, in my accumulation of reading,
22  there's literature that shows that tPA is more likely
23  than not able to revascularize clots in the MCA based
24  on angiographic studies, based on outcome studies.
25     Q.    Well, I asked you not -- just to tell me

Case 3:17-cv-00725    Document 114-6    Filed 12/14/18    Page 14 of 55 PageID #: 1387

Page 57

1  what you think these unspecified studies have said.
2  I've asked you to tell me what they are. I've read a
3  lot of them. What are the names, the articles, the
4  titles of -- I'll give you more specifically -- tell me
5  the name of just two articles, publications, or
6  guidelines that support what you just said. Just give
7  me two.
8      A.  Yeah, I don't think I would be able to
9  just list off the name of the articles. Those are kind
10  of things that are in the summary of expert -- kind of
11  expertise that I've accumulated. I don't have the
12  exact article. I could certainly try to locate those.
13      Q.  Good. Well, I'll give you that
14  opportunity after today's deposition if you'll get it
15  done in seven days. Okay?
16      A.  Okay.
17      Q.  We agree, don't we -- we talked about
18  time. We also agree that Mr. Ruffino had a large
19  vessel occlusion on the 17th of February 2016; correct?
20      A.  That's my opinion, that yes, it seems like
21  he did.
22      Q.  All right. Let's take a look at the
23  consensus guidelines that you told us were reliable and
24  authoritative at Page 3029. You may need to get them
25  back from the court reporter. This is the publication

Page 58

1  that came out in 2015, and it's Page 3029.
2      A.  Okay.
3      Q.  Dealing specifically with the issue of
4  more probable than not. Here's the section you need to
5  read, which says what you just told us is absolutely
6  wrong. (Indicating document.) Let me read it to you.
7      A.  Go ahead.
8      Q.  I'll read it to you. I want to make sure
9  you follow along. Quote, however, because
10  recanalization occurs in only a minority of patients
11  with large vessel occlusion receiving intravenous tPA
12  alone -- example, 37.3 percent in the escape trial,
13  comma. You see that?
14      A.  Yes.
15      Q.  That's absolutely inconsistent with what
16  you just told us, isn't it?
17      A.  No.
18      Q.  No? Did you look at the trials? Have you
19  looked at, for example -- and I'll take you through.
20  Did you look at the IMS III trial, the Interventional
21  Management of Stroke Trial Three?
22      A.  I mean, I'm aware of all those trials,
23  yes.
24      Q.  Have you looked at the publication,
25  Doctor, that discusses that trial?

Page 59

1      A.  Not in preparation for this, no.
2      Q.  Have you looked at the MR and
3  recanalization of stroke clots using embolectomy,
4  widely known as Mr. Rescue?
5      A.  I mean, again, I'm aware of the trial but
6  haven't read it for this case.
7      Q.  Have you looked at the intraarterial
8  versus systemic thrombolysis for acute ischemic stroke
9  known as synthesis?
10      A.  That one I'm not aware of, no.
11      Q.  You're not even aware of the study, are
12  you?
13      A.  No, I'm not aware of that study.
14      Q.  Have you looked at the solitaire FR with
15  intention for thrombectomy as primary endovascular
16  treatment of acute ischemic stroke, fortunately known
17  as swift prime?
18      A.  Yes.
19      Q.  Have you read that study?
20      A.  In the past, yes.
21      Q.  And have you looked at extending the
22  full-time for thrombolysis in emergency neurological
23  deficits intraarterial, known as EXTEND-1A? Have you
24  looked at those, that article?
25      A.  Yes, I believe I'm aware of that.

Page 60

1      Q.  Isn't it true that any one of the
2  publications that I just described reflected the use of
3  tPA alone produced recanalization in less than 50
4  percent of the patients -- every single study?
5      A.  I'm talking about this case, not what the
6  studies showed.
7      Q.  Let's talk about the studies because
8  there's no study on this case. Let's take the
9  literature and talk about it for a moment. Isn't it
10  correct that every published study that has compared
11  tPA alone with embolectomy has confirmed that tPA alone
12  dealing with large vessel occlusion leads to
13  recanalization in less than 50 percent of the patients?
14  Isn't that true?
15      A.  Yes, but that doesn't apply to this case.
16      Q.  Why?
17      A.  Okay.
18      Q.  Tell me why the literature, all the
19  literature --
20      A.  Yeah.
21      Q.  -- doesn't apply to this case.
22      A.  Because the literature and those trials
23  includes a wide variety of patients, occlusions, and
24  severities. I'm dealing with the likelihood of
25  reperfusion, recanalization in this case, which is a



1  specific subset of maybe the kinds of patients that
2  were included in those studies.
3       So you cannot extrapolate a study that
4  included many different kinds of large vessel
5  occlusions, including much more large and proximal
6  conclusions, to this case which was a not a proximal
7  large occlusion.
8       Q.  What was it?
9       A.  It was a smaller distal occlusion.
10      Q.  Where?
11      A.  In the end the M1s, M2, which is a
12  smaller blood vessel, and so that's why I cannot use
13  the numbers that you provided and reject that data that
14  you provided as a general statement to apply to this
15  case.
16      Q.  Well, then let's look at it from a
17  different angle.  Let's assume for a moment I was a
18  cynic and I didn't believe you.  What would I be able
19  to look at to verify that what you have just told me
20  has any weight at all, any scientific validity?
21      A.  Yeah.
22      Q.  Other than you just saying, "Trust me.
23  I'm a smart guy."
24      A.  Sure.
25      Q.  What else is there?

1       A.  There are certainly scientific studies
2  that show the likelihood of tPA's efficacy on clot is
3  much greater with more distal occlusion and conversely
4  much smaller with much more proximal and larger clots.
5       Q.  Okay.  Similarly, there is a lot of
6  literature that deals with use of tPA specific to
7  particular branches of the middle cerebral artery;
8  correct?
9       A.  There are some studies, yes.
10      Q.  Yeah.  In fact, Dr. Zazulia identified one
11  for us that was attached to our answer.  Did you see
12  that?
13      A.  I didn't look at the study, but I saw that
14  a study was referenced, yes.
15      Q.  Right.  Did you look at the study that was
16  referenced in our answer to the complaint?
17      A.  No.
18      Q.  Why not?
19      A.  I just received these recently, so I
20  haven't -- it wasn't something that -- I had already
21  formed my opinion.  I didn't change anything at that
22  point.
23      Q.  The study referenced in the answer that
24  you are aware of says that 80 percent of the patients
25  with an occlusion in M1 do not get recanalization with

1  tPA alone.  Are you aware of that?
2       A.  No, I'm not aware of that.
3       Q.  That study says that 80 percent of the
4  individuals with an occlusion in M2 do not get
5  recanalization with tPA alone.  Why would you not look
6  at that data to make sure you were right?
7       A.  Well, there was plenty of other data that
8  doesn't show that.
9       Q.  Okay, we'll see the data that supports
10  your opinion within five days?  Is that fair?
11      A.  Seven days, yes.
12      Q.  Seven days?  Okay.  I'll give you my
13  business card so you can e-mail it to us.  All right.
14  Then embolectomy in this case was not necessary in
15  order to change the outcome.  If we accept what you
16  say, tPA alone would have done the job more probably
17  true than not?
18      MR. CUMMINGS:  Object to the form.
19      Q.  (By Mr. Gideon)  Right?
20      A.  No, that's not true.
21      Q.  It's not?  Why?
22      A.  Well --
23      Q.  Why isn't it true -- if tPA alone would
24  have recanalized the vessel, why was embolectomy even
25  something to consider?

1       A.  Because in medicine we don't deal with 50
2  percent of helping half of patients being enough.
3  We're trying to make all our patients better, and tPA
4  as you pointed out, is not 100 percent effective.
5       Q.  No.
6       A.  It doesn't recanalize all patients, and we
7  don't know in every patient what the efficacy will be,
8  so --
9       Q.  Then --
10      A.  We want to give each patient the best
11  chance they can.
12      Q.  Well, but we don't deal -- in the law, we
13  don't deal with best chances, good chances, better
14  chances.  We deal with probabilities.  Do you know
15  that?
16      A.  Yes.
17      Q.  What I need to have from you before I
18  leave today is direct, unqualified answers or
19  admissions that you can't answer the question, which is
20  also okay.  First, you told me a few minutes ago that
21  none of the studies that identified that you're
22  familiar with can be applied to Mr. Ruffino -- you
23  couldn't identify any studies that could be applied to
24  Mr. Ruffino, but in your answer just a minute ago you
25  said, "We never know with any given patient, so we try

1  and give them the best chance."

2      How do you know then with Mr. Ruffino that
3  you've never seen, you've never talked to, you've never
4  touched, that tPA would have worked more probably true
5  than not for him?  How do you know that?

6      A.  For that --

7      MR. CUMMINGS:  Object to the form.

8      A.  For that exact reason.

9      Q.  (By Mr. Gideon)  What?

10     A.  We don't know 100 percent, but we know
11  more likely than not.

12     Q.  Why is it then that the -- Dr. William
13  Powers, largely regarded as one of the leading lights
14  in stroke care, would make this statement that it's
15  just so completely uninformed in these guidelines, that
16  quote, however, because recanalization occurs in only a
17  minority of the patients with large vessel occlusion
18  receiving intravenous tPA alone -- dot, dot, dot --

19     A.  Yes.

20     Q.  Why would he make something that is so
21  absolutely wrong?

22     A.  It's not absolutely wrong.

23     Q.  No?  Is it true?  Is that statement true?

24     A.  It's true in general, but not in this
25  case.

1      Q.  And is the distinction in this case that
2  even though you told me Mr. Ruffino had a large vessel
3  occlusion -- you did testify to that?

4      A.  Yes.

5      Q.  What is the distinction between the
6  language Dr. Powers uses and your characterization of
7  Mr. Ruffino's case?

8      A.  The type of large vessel occlusion.

9      Q.  The type of large vessel occlusion?  And
10  what is his specific type of large vessel occlusion?

11     A.  A smaller more distal occlusion.

12     Q.  Smaller than what?

13     A.  Than -- the larger vessel is more
14  proximally.

15     Q.  Well, proximal versus distal is location;
16  it's not a size; right?

17     A.  No, it is a size.

18     Q.  Oh, it is?

19     A.  The proximal vessels are bigger and the
20  distal vessels are smaller.

21     Q.  So the proximal vessels have a larger
22  lumen?

23     A.  Exactly.

24     Q.  And therefore if it's occluded it's a
25  larger thrombus?

1      A.  Exactly.

2      Q.  Correct?  Distal vessels, smaller lumen,
3  and therefore if occluded, probably a smaller thrombus.

4      A.  Almost definitely a smaller thrombus, in
5  this case, based on this case -- which is why Dr.
6  Powers is not incorrect in general, but he obviously
7  doesn't know this case.  This case likely, more likely
8  than not, has a very small clot, and there's specific
9  reasons in this case -- again, different from
10  guidelines.  My opinions are based on this case and the
11  review of the case, not of the guidelines, which are
12  general, that there are -- is likely a very small clot
13  in this case, not even just general M2, but even
14  smaller than the average M2 clot.

15     Q.  All right.  Well, let's talk about your
16  view of the imaging.  I know you haven't been through a
17  neuroradiology fellowship, but looking at MRs and CT
18  scans is part of what you do on a regular basis, isn't
19  it?

20     A.  Yes.

21     Q.  Do you interpret CTAs, CT angiograms, on a
22  regular basis?

23     A.  Yeah.

24     Q.  And do you also interpret CT perfusion
25  scans on a regular basis?

1      A.  Less so, but somewhat.

2      Q.  You --

3      A.  Yeah.

4      Q.  Even though you're not going to dictate
5  the formal report --

6      A.  Right.

7      Q.  -- on an imaging study, you still rely
8  upon your own assessment of these studies --

9      A.  Sure.  Yes.

10     Q.  -- in delivering care?

11     A.  Yes.

12     Q.  Correct?

13     A.  Yes.

14     Q.  Where specifically was the occlusion in
15  this specific patient, Mr. Ruffino, as shown by the CT
16  angiogram run at StoneCrest at about 1:34 on the
17  afternoon of February 17th, 2016?

18     A.  Okay.  The CTA that I reviewed was around
19  14:0-something, 14:04, but --

20     Q.  It was ordered at 13-something.

21     A.  Okay.  So 2:00 or so.  There was an
22  occlusion either right at the end -- either the M1 or
23  more likely at the start of the M2 branch, from my
24  review.

25     Q.  Be very careful.  Which one was it in?

1 Was it in M1 or in M2?

2      A.   Sometimes on CT you can't tell because all

3 the branches are not seen, so it's basically at the

4 border of those two.

5      Q.   Border of M1 and M2?

6      A.   In my best opinion, yes.

7      Q.   That's as close as you can get?

8      A.   Based on my review, yes.

9      Q.   And the size of the vessel that appeared

10 to you to be occluded is what?

11      A.   The size of the vessel?

12      Q.   Uh-huh.

13      A.   I mean, it would be in the millimeters.

14      Q.   Right, but you're familiar with core labs,

15 aren't you?

16      A.   Core labs?  No.

17      Q.   You're not familiar with that?  Do you

18 know how to measure the probable lumen size of a vessel

19 on a CTA?

20      A.   Sure.  Yes.

21      Q.   Well, then -- did you do it?

22      A.   No, I didn't do it in this case, no.

23      Q.   Why not?  In this specific case, why not?

24      A.   Because I mean, the diameter is not --

25 great estimate of the clot size.

1      Q.   We just spent five minutes with you

2 telling me that it was.

3      A.   That's one of the factors.  That wasn't

4 the only factor.  The bigger factor --

5      Q.   Look, Doctor, you just spent a bunch of

6 time telling me --

7           MR. CUMMINGS:  Can he -- Mr. Gideon, can

8 he finish that?  I know you don't realize that he was

9 still talking, but I think he was.

10      A.   So it was a smaller vessel.  That is one

11 factor, but I didn't measure that smaller vessel, one,

12 because we know it was a smaller vessel; it didn't help

13 me to say is it two or three millimeters.  But

14 secondly, because we had the sense, as many experts

15 have stated, that there may be an underlying MCA

16 stenosis in this case, as being recognized on prior

17 imaging.

18      Q.   (By Mr. Gideon) Let's see.  Let's go back

19 to the report of Exhibit 10, dated February 5th, 2018,

20 and let me just ask you.  Did you set out to omit any

21 of your opinions when you wrote this report -- to leave

22 anything out?

23      A.   No.

24      Q.   Did you intend for this report to be a

25 comprehensive statement of what your opinions would be?

1      A.   That was my intention, yes.

2      Q.   By the time you wrote this report,

3 February 5th, 2018, with the contributions from the

4 lawyer that hired you that we've talked about already,

5 did you even know that this man had undergone an MR

6 angiogram on December 23, 2015?

7      A.   Yes.

8      Q.   Had you seen it by that time?

9      A.   I had only seen the report by that time.

10      Q.   But you had not seen the study itself?

11      A.   Not at that time, no.

12      Q.   You have now seen the study, haven't you?

13      A.   That's correct.

14      Q.   And do your opinions about the December

15 23, 2015, MRA differ in any way from the report on that

16 MRA?

17      A.   Well, it's not my intention to provide any

18 opinions on that MRI.  I wasn't asked to opine on the

19 radiologist's opinion on that MRI.

20      Q.   Well, that's not what I asked you.  Does

21 your view of the MRA of 12-23-15 differ in any respect

22 from the report?

23      A.   Again, I don't feel comfortable providing

24 an opinion on that MRI.  I did review --

25      Q.   I didn't ask you whether you felt

1 comfortable.  You need to answer my questions.

2      A.   Okay.

3      Q.   I didn't ask if you felt comfortable,

4 wanted to.  I asked you did your view of the MRA of

5 December 23, 2015, differ in any way from what was

6 reported by the person who reviewed it?

7      A.   I believe it did give me a sense that

8 there was some underlying abnormality of that vessel

9 after I reviewed it.

10      Q.   What was the difference?

11      A.   The difference meaning I saw an

12 abnormality there or at least a possible abnormality

13 that was not mentioned in the report.

14      Q.   Okay.  And what abnormality or possible

15 abnormality did you see on the MRA of 12-23-15 that had

16 not been described by the physician who interpreted

17 that study?

18      A.   There was some narrowing or abnormality of

19 the middle cerebral artery on the left side.

20      Q.   And how impressive or complete was the

21 narrowing in the left MCA on the 12-23-15 study?

22      A.   It's impossible to say because the MRI

23 just wasn't accurate enough to be able to measure

24 anything, but it certainly looked like there was some

25 abnormality, is all I could say.

Page 73

1    Q.    Could you tell us the degree of probable
2 occlusion or stenosis?
3    A.    No.  No.
4    Q.    Could you tell us where the narrowing
5 was -- which branch?  For example, M3, M1, M2?
6    A.    I think again it was in the distal M1,
7 proximal M2 area.
8    Q.    Basically the same area where the CTA, CT
9 angiogram at StoneCrest reflected occlusion?
10    A.    Yes, in a similar -- in a similar
11 location, yes.
12    Q.    Right.  Now, in the CTA of February 17th,
13 2016, were you able to actually see a thrombus or
14 embolus?
15    A.    I was able to see a lack of filling, which
16 then you interpret as a thrombus.  You don't in a CTA
17 generally see a thrombus itself.
18    Q.    Correct.  But you can't -- just because
19 there is no flow of contrast material beyond a
20 particular point, you can say that there is stenosis of
21 some sort, but you can't say it is because of a
22 thrombus or embolus, can you?
23    A.    No, the thrombus was based on my clinical
24 opinion as well as the radiographic, not solely on the
25 radiographic.

Page 74

1    Q.    Correct.  Now, a thrombus is something
2 that has formed at that particular site; correct?
3    A.    Either at that site or come from another
4 site.
5    Q.    No, an embolus is what comes from another
6 site, isn't it?
7    A.    An embolus starts off at a thrombus so
8 we -- we use it interchangeably, call it either
9 thromboembolus or a thrombus.
10    Q.    But in terms of being precise, an embolus
11 is a thrombus that started somewhere and embolized and
12 moved to a different location; isn't that correct?
13    A.    Again, no.  The use of the word thrombus
14 in stroke is used to describe either of the two.  If
15 you see a thrombus, almost universally but not in this
16 case likely, thrombi in the MCA are emboli, and they're
17 still called thrombi.  So no.  Most thrombi that cause
18 stroke come from other place.  We know that; that's
19 very clear.  In this case, however, this likely, more
20 likely than not, is a thrombus de novo rather than a
21 thromboembolus.
22    Q.    So your view then is now that you've had a
23 chance to see the 12-23-15 MRA and looked at the
24 clinical case, the clinical picture, and also look at
25 the CT angiogram on the afternoon of the 17th at

Page 75

1 StoneCrest, you think what actually happened was the
2 atheromatous plaque in the left MCA, whether it's M1 or
3 M2, ruptured and formed an occlusion at that location?
4    A.    Yes, that is my opinion.
5    Q.    You don't think it's likely that the clot
6 formed in the legs or somewhere else or formed in the
7 right atrium and then traveled to the MCA?
8    A.    I think that's less likely now on my
9 further review.
10    Q.    Okay.  Most of the time, though, most --
11 the greatest majority of cases, a stroke in the MCA is
12 due to a clot forming somewhere else, most often in the
13 right atrium, and traveling to the MCA, isn't it?
14    A.    The left atrium, but yes.
15    Q.    Left atrium?
16    A.    Left atrium.
17    Q.    Yeah.
18    A.    But that's why these guidelines deal with
19 that more common case and not Mr. Ruffino's case, which
20 is a less common and again more amenable to a
21 thrombolytic kind of clot.
22    Q.    I see.
23    A.    That's why I provided my opinion different
24 from the guidelines.
25    Q.    Well, I want to see since you didn't omit

Page 76

1 any of the really important stuff and you wanted to
2 make sure that we were completely informed, where is
3 there a reference at all to the 12-23-15 magnetic
4 resonance angiogram at University Medical Center, or,
5 while you're looking at it, any statement that more
6 likely than not Mr. Ruffino's occlusion was a thrombus
7 in situ in the left MCA?
8    A.    Sure.
9    Q.    Any language to that effect that would
10 have fairly shared that information with me.  Please
11 find it for me.
12    A.    Sure.  No, I mean, I mentioned just that
13 he had an MRI/MRA, but I had only seen the report at
14 that time, and that there was a thrombus -- again, as a
15 generic term -- but I didn't have that information to
16 say what kind of thrombus it was at that time.  Now,
17 none of that changes my opinion on the efficacy of tPA
18 but it simply adds to the definitiveness of that
19 information.
20    Q.    Well, then where is the language that I've
21 asked you to identify in your report?  You've not
22 answered my question.
23    A.    No, just the fact that he had an MRI.  The
24 other details were not available to me at that time.
25    Q.    And have never been included in a

Page 77

1  subsequent report; right?

2      A.  No.

3      Q.  Have you shared this information that you
4  just shared with me with the lawyer that retained you
5  before we came here?

6      A.  I don't -- like I said, it didn't change
7  my opinion about the tPA, so I didn't --

8      Q.  I didn't ask you about tPA.

9      A.  Sure.

10     Q.  I asked you if you shared your opinion
11  with Mr. Cummings --

12     A.  Sure.  No.

13     Q.  -- about the importance of the 12-23-15
14  MRA?

15     A.  Not specifically.

16     Q.  The likelihood that the thrombus formed at
17  that precise location in the MCA.  Did you share that
18  with him?

19     A.  Not to my recollection.

20     Q.  Why not?

21     A.  Mainly, as I was trying to say, because it
22  didn't change my opinion so I didn't feel it was a
23  substantive new -- that a new opinion formed based on
24  that.

25     Q.  Where is the statement in your report then

Page 78

1  that reflected your firm opinion that tPA alone would
2  have been sufficient to recanalize Mr. Ruffino's left
3  MCA?

4      A.  I'm not sure I've -- tPA separate from the
5  thrombectomy in this report.

6      Q.  Well, you've told us now today that we
7  don't need to worry about that thrombectomy because
8  it's more probable than not that tPA alone would have
9  done the job to recanalize.  Where is that statement in
10  this report?

11         MR. CUMMINGS:  Object to the form.

12     A.  First I certainly did not say that there
13  was no need for thrombectomy.  That's a
14  mischaracterization of my statement entirely.

15     Q.  (By Mr. Gideon)  it is?

16     A.  That I clarified a number of times, that I
17  feel there was a strong reason for the thrombectomy,
18  but simply to your question, which was not in my report
19  because it wasn't a strong -- it wasn't an opinion that
20  I formed, but you simply asked would -- you formed the
21  question would tPA have recanalized, and I answered it,
22  but it wasn't -- that specific sub-question was not
23  something I opined on.  I opined on the whole scenario.

24     Q.  Well, I don't know what you just -- why
25  you just said what you did in response to my question.

Page 79

1  Mine's really simple.  Is there any statement in your
2  report that tPA alone, more probably that not, would
3  have recanalized Mr. Ruffino's artery?  Simple
4  question.  Is it in there or not?

5      A.  The opinion is that tPA and/or
6  thrombectomy, so one or both for his stroke, but more
7  likely than not experienced an improved neurological
8  outcome and recovery from his stroke.  That's the
9  closest opinion I can provide.

10     Q.  There's one, and you said tPA and/or?

11     A.  And/or.

12     Q.  "It is my opinion that should Mr. Ruffino
13  have received tPA and/or endovascular thrombectomy"?
14  That's it?

15     A.  Yes.

16     Q.  Okay.  Improved neurological outcome?

17     A.  Right.  That's my opinion.

18     Q.  All right.  Well, let's talk for a minute
19  about neurological outcomes.  You're familiar with the
20  modified Rankin score, aren't you?

21     A.  Right.  Yes.

22     Q.  In the modified Rankin score --
23  R-A-N-K-I-N -- functional independence is a score of
24  zero to two; correct?

25     A.  I believe that's an accepted range, yes.

Page 80

1      Q.  And isn't that the goal of tPA and/or
2  thrombectomy, and that is to have a patient who when
3  the treatment's finished has a modified Rankin score of
4  zero to two?

5      A.  No, the goal is modified Rankin of zero.
6  Sometimes zero to one would be our goal for patients
7  with stroke.

8      Q.  All right.  And how do you measure a
9  modified Rankin score of one?  Then I'll ask you a
10  modified Rankin score of two, so make sure you
11  distinguish between the two.

12     A.  I'd like to have the definitions in front
13  of me before I define them for you.  I don't have them
14  in front of me.

15     Q.  Okay.

16     A.  It's degrees of disability.

17     Q.  It's degrees of disability?

18     A.  So one is basically symptoms without
19  limitation, and two is some greater but still not
20  significant limitation in function, mainly mobility.
21  But the exact definitions, again, I'd like to have in
22  front of me before I define them for you.

23     Q.  Well, up to a modified Rankin score of
24  two, you would agree with me, is functional
25  independence; correct?

Page 81

1    A.   That's generally considered independent,
2  but still maybe with some symptoms and limitations, and
3  hence one being better with less limitations.
4    Q.   And in fact, all the studies -- and I can
5  go through all the names with you once again if we need
6  to -- synthesis -- of course we won't cover that
7  because you've never read it.  But the Interventional
8  Management of Stroke Trial Three, IMS III, the Mr.
9  Rescue, the escape trial.  You're familiar with that.
10  The shift prime and the EXTEND-1A -- they all
11  identified and defined the intended good outcome as a
12  modified Rankin score of zero to two, didn't they?
13    A.   Yes.  The tPA trials use zero to one in
14  general.
15    Q.   But we're talking about trials.  The ones
16  I just mentioned to you were tPA and/or thrombectomy,
17  weren't they?
18    A.   But there were trials of tPA versus
19  non-tPA and that's the first opinion you were asking
20  about, is if he did or did not receive tPA.  So those
21  trials are not answering that question.  That's why I
22  don't use those trials or these guidelines as reference
23  to this case because none of them deal with the
24  question that you asked me which is tPA or not getting
25  tPA.

Page 82

1    Q.   Right.
2    A.   And those trials used a different cutoff.
3    Q.   What trial -- what definition did the
4  NINDS study in 1995, published in the New England
5  Journal of Medicine, that was the basis for the use of
6  tPA intravenously -- what standard did it use for good
7  outcomes based on a modified Rankin score?
8    A.   Well, it didn't actually didn't use the
9  modified Rankin on its own.  It had a global cumulative
10  score that you'd need a statistician to explain, but
11  from my recollection the Rankin part of it was mainly
12  zero to one but it also had other, like NI stroke scale
13  and global Ostrom (ph) score that was calculated for
14  statistical reasons.  So that trial -- the trials
15  generally have used zero to one, in my recollection,
16  but that trial I know specifically was more complicated
17  because it had a combined outcome.
18    Q.   Right.  And wasn't the NINDS study --
19  which I assume you're familiar with; it was published
20  in the New England Journal of Medicine -- kind of a
21  groundbreaking study -- they had to treat three
22  patients to benefit one, didn't they?
23    A.   I don't know -- I mean, I think that is,
24  again, a misleading statistic, yes.
25    Q.   Well, do you know if that statistic is in

Page 83

1  the NINDS study or not before you tell me it's
2  misleading?
3    A.   I'm not aware that that's in the study,
4  no.
5    Q.   And isn't it true -- and shouldn't an
6  expert, somebody who really is an expert, know this,
7  that in the NINDS study, the trial of intravenous tPA,
8  recanalization occurred in approximately just 30
9  percent of the patients?
10        MR. CUMMINGS:  Object to --
11    Q.   (By Mr. Gideon)  Isn't that right?
12        MR. CUMMINGS:  Sorry.  Object to the form.
13    A.   Again, with all different occlusions.
14    Q.   (By Mr. Gideon)  Isn't that number right?
15    A.   In the study, yes.
16        MR. CUMMINGS:  C.J., when you can, I need
17  a bathroom break.
18        MR. GIDEON:  Sure.
19    Q.   (By Mr. Gideon)  Do you want to take a
20  break too, Doctor?
21    A.   I'm fine, but we can take a short break
22  now.
23        MR. GIDEON:  I'm happy to take a break
24  whenever anybody wants to.  We'll stop now and --
25        [A brief recess was taken.]

Page 84

1    Q.   (By Mr. Gideon)  The MRA of December 23,
2  2015, showed narrowing in arterial structures generally
3  described as the middle cerebral artery on the left
4  side of Mr. Ruffino's brain; correct?
5    A.   In my review that's what I saw.
6    Q.   And isn't it more probable than not that
7  the narrowing in the middle cerebral artery
8  distribution was due to atheromatous plaque?
9    A.   I think more likely than not that's a
10  reasonable assumption or guess, yes.
11    Q.   An atheromatous plaque itself is not
12  dissolved by tPA, is it?
13    A.   No.
14    Q.   You have to have a fresh thrombus in order
15  to activate it, dissolve it with alteplase; correct?
16    A.   Yes.  Yes.
17    Q.   So we will agree then that if you have a
18  patient who has a stenosis due to progressive
19  atheromatous narrowing of a vessel, tPA is not going to
20  Roto-Rooter that atheromatous plaque away; correct?
21    A.   Correct.
22    Q.   Now, do you know Jodi Dodds, the chief of
23  vascular neurology at Duke?
24    A.   No.
25    Q.   Have you looked up anything on her



Page 85

1  background?
2      A.   No.
3      Q.   Did you actually look at her report in
4  this case?
5      A.   If it was in here I probably did.  The
6  was.
7      Q.   Do you remember whether there was a report
8  from a Jodi Dodds, chief of vascular neurology at Duke?
9      A.   There was a number of reports that kind of
10 ran together, to be honest, so I don't know who said
11 what.
12     Q.   Did you, as you were trying to think of a
13 trial that might support what you were telling me under
14 oath, did you think about the Atlantis trial?
15     A.   It didn't come to mind, no.
16     Q.   Do you know about the Atlantis trial?
17 Have you ever heard of it before?
18     A.   Yes.
19     Q.   The Atlantis trial was one where they made
20 an effort in the United States and other areas to
21 extend the use of tPA between three and five hours;
22 correct?
23     A.   Yes.
24     Q.   And it was a complete failure, wasn't it?
25     A.   I don't know if I would qualify it as a

Page 86

1  failure because I believe it's been incorporated into
2  further studies that show an overall benefit in tPA in
3  that time window.
4      Q.   Isn't it true that the conclusion of the
5  Atlantis trial was there was no, no benefit, on a more
6  probable-than-not basis, for extending the use of tPA
7  from three to five hours?  Wasn't that the conclusion?
8      A.   Of that one study at that time, yes.
9      Q.   And when was that one study at that time?
10     A.   It was I think over 15 years ago.
11     Q.   Atlantis was over 15 years ago?
12     A.   I believe so.
13     Q.   Okay.  All right.  Would you agree with a
14 neurologist, a person who offers testimony in this
15 case, that IV tPA is only good for about a 30 percent
16 benefit?  As a general rule, would you agree with that
17 statement?
18     A.   I'd need to have it clarified what 30
19 percent benefit and what.
20     Q.   Benefit in terms of recanalization,
21 revascularization.  Only 30 out of 100 patients will be
22 recanalized, revascularized by IV tPA alone.
23     A.   Yes, again, as I've said many times, in
24 all types of occlusion the average is about 30 percent.
25 Not in this case.

Page 87

1      Q.   And are you telling me that we will find
2  literature, though, that says that if you can identify
3  that cohort of patients that have existing atheromatous
4  plaque and there is a plaque rupture such that a
5  thrombus forms at that location, that we will find
6  literature showing that more than 50 percent of those
7  patients are recanalized or revascularized by tPA
8  alone?
9      A.   I'm saying that opinion is based on my
10 summary of all my knowledge, not just one single study.
11     Q.   I asked a different question.  Are you
12 going to be able to provide me with a single study or
13 even two?
14     A.   I will --
15     Q.   You will look?
16     A.   I will look, but I --
17     Q.   But you don't know that you will be able
18 to do that?
19     A.   My opinion is not based on any single
20 study, yes.
21     Q.   Well, there may be a requirement, though,
22 that your opinion be supported by a study, so here's
23 the question, and then we'll move on.  Are you aware,
24 as we sit here today having this discussion, of a
25 single study in the world's literature that supports

Page 88

1  your testimony that in a patient with atheromatous
2  plaque that ruptures and there is a thrombus formation
3  at that location, that tPA alone intravenously will in
4  more than 50 percent of the cases revascularize or
5  recanalize?  Are you aware of any such study?
6      A.   I'm not aware of one single study that
7  deals with all those subgroups, no.
8      Q.   That deal with the subgroups that you say
9  are specific to this case?
10     A.   Yes.  My opinion, again, is based not on a
11 single study but on a full expert scientific review of
12 multiple medical and scientific opinions on atheroma,
13 thrombus, stroke, and so there's no single study that I
14 used to incorporate all that information.  So --
15     Q.   Right.  Now, did you ever look at the
16 inclusion or exclusion criteria for the use of tPA at
17 StoneCrest?
18     A.   I don't believe I looked at the
19 StoneCrest, but in general I'm aware of the
20 inclusion/exclusion criteria for tPA.
21     Q.   I didn't ask you if you had this --
22     A.   Oh.
23     Q.    -- generic view of what was okay.  I
24 asked a very specific question.
25     A.   Okay.

1    Q.   I need to go back to where we started.
2  Please answer my questions directly.  Did you look at
3  the StoneCrest inclusion or exclusion criteria,
4  question mark?
5    A.   Not in my recollection.
6    Q.   It was never furnished to you?
7    A.   Again, not in my recollection.
8    Q.   And you didn't ask for it?
9    A.   No.
10    Q.   Do you know if it is common to have an
11  exclusion criteria of a systolic blood pressure greater
12  than 185?
13    A.   Yes.
14    Q.   You say you know.  What is common in terms
15  of exclusion?  It's normally excluded if the systolic
16  is over 185?
17    A.   Yes.  Persistently above that, yes.
18    Q.   Persistently above.  For how long?
19    A.   Despite treatment, if it stays above that.
20    Q.   For how long, is the question?
21    A.   I don't believe there's a certain time
22  window before you need to treat.
23    Q.   Is there an exclusion or inclusion
24  criteria at Washington University St. Louis in the ER
25  in effect in February of 2016?  Did they have such a

1  document?
2    A.   I would say similar, yes.  Similar
3  guidelines.
4    Q.   What was their exclusion criteria for the
5  use of tPA in terms of last normal as of February of
6  2016?
7    A.   At that time I believe it would have been
8  four-and-a-half hours.
9    Q.   4.5 here at the tertiary center?
10    A.   That's right.
11    Q.   And that would be measured four-and-a-half
12  hours from last normal; correct?
13    A.   Yes.
14    Q.   Have you actually looked to see if there
15  was an inclusion or exclusion criteria in the ER here
16  at this facility in February of 2016?  Or are you just
17  guessing there probably would be?
18        MR. CUMMINGS:  Object to the form.
19    A.   I mean, it's hard to -- could you clarify?
20    Q.   (By Mr. Gideon)  Yeah, I can.  Have you
21  looked to see if there was an inclusion and exclusion
22  criteria for use of tPA in the ER here in February of
23  2016?
24    A.   Yes, I'm aware of off the -- that there
25  are ER guidelines for the use of tPA, yes.

1    Q.   And are you aware of the content of these
2  guidelines?
3    A.   Pretty closely, I would say.
4    Q.   Was there a requirement that the patient's
5  presentation fall within a range of the NIH stroke
6  scale, referred to as the NIHSS?
7    A.   I don't believe there's a specific
8  guideline or cutoff for that, no.
9    Q.   There wasn't a maximum NIHSS in the ER
10  protocol?
11    A.   Not to my knowledge.
12    Q.   And there wasn't a minimum?
13    A.   Not to my knowledge.
14    Q.   Now, was there a NIH stroke scale minimum
15  for the use of endovascular embolectomy in the -- in
16  this hospital in February of 2016?
17    A.   Again, I don't believe there's a hard
18  cutoff, but there are some guidelines.
19    Q.   The guidelines that were national in
20  February 2016 were that the NIH stroke scale, if less
21  than six, endovascular embolectomy was not indicated;
22  correct?
23        MR. CUMMINGS:  Object to the form.
24    A.   I think in general that's correct, yes.
25    Q.   (By Mr. Gideon)  Wasn't that the standard

1  utilized here in February of 2016?
2    A.   I don't -- I can't say for endovascular
3  what the protocol was.  I only know the tPA ones.
4    Q.   What was the standard at Centennial
5  Medical Center in February of 2016 in terms of
6  performance of endovascular embolectomy or
7  thrombectomy?  What was the minimum NIHSS required
8  before they would consider doing it?
9    A.   Again, I'm not aware of those specific
10  cutoffs at that center.
11    Q.   Now, you do agree that you know from the
12  materials you've looked at that nobody was going to
13  perform endovascular treatment at StoneCrest; correct?
14    A.   Correct.
15    Q.   And transfer was necessary in order for
16  that to occur; correct?
17    A.   Correct.
18    Q.   Let's talk for just a moment.  Dr.
19  Chitturi's affidavit -- and it's Paragraph 9.  I think
20  you already told me you found it in this stack of
21  materials.
22    A.   Okay.
23    Q.   Don't knock your coffee over.
24    A.   Yeah.
25    Q.   Look at Paragraph 9 of his affidavit,

Page 93

1  please.
2     A.  Yes.
3     Q.  And you see that he states in Paragraph
4  9 -- and of course I'm looking at this upside-down, so
5  it's not designed to be a literal statement, but the
6  guidelines there required an NIH stroke scale of six or
7  greater, and he would not have recommended transfer for
8  endovascular embolectomy.  You've seen that; correct?
9     A.  I see that statement, yes.
10    Q.  Do you have any basis for disagreeing with
11  that conclusion?
12    A.  Well, I would disagree that guidelines and
13  requirement are the same thing.  I mean, I think the
14  guidelines do generally state, but obviously each
15  individual patient can be treated differently from the
16  guidelines.
17    Q.  Are you of the school of thought, Doctor,
18  that a physician can comply with published guidelines
19  but you might still find them falling below what you
20  define as accepted standards of care?
21    A.  Yes, I believe I've said that before.
22    Q.  Yeah, you have.  In fact, in the McGill
23  case, do you remember testifying that you would be
24  prepared to say that somebody could, in your judgment,
25  fall below standards of care even though they've

Page 94

1  complied completely with published guidelines?  Do you
2  remember saying that?
3     A.  Yeah.
4     Q.  And that doesn't bother you a bit, does
5  it?
6     A.  No.  Guidelines are not supposed to be the
7  letter of the law.
8     Q.  Who told you that?
9     A.  I didn't realize someone has to tell me
10  that.
11    Q.  Okay.  And likewise you've testified under
12  oath and you're saying it again today that a physician
13  could follow the guidelines published in stroke --
14  published by the American Stroke Association -- and
15  still fall below what you define as the standard of
16  care; correct?
17    A.  Correct.
18    Q.  What made you the arbiter of what's right
19  and wrong if your opinions are at odds with the
20  guidelines, Doctor?  Where do you get off taking that
21  position, is my question?
22       MR. CUMMINGS:  Object to the form.
23       I think it's dangerous for any physician
24  to use the guidelines to justify how they treat
25  individual patients, so I'm simply a physician who

Page 95

1  looks at each individual patient differently, and I
2  think many -- most good physicians would do the same
3  and not rely on guidelines when treating an individual
4  patient.
5     Q.  (By Mr. Gideon)  Well, now we should be
6  able to reach an accord on one part, and that is the
7  physicians in this case, Dr. Chitturi, Dr. Archer, they
8  are dealing with Mr. Ruffino prospectively; correct?
9     A.  Correct.
10    Q.  And Dr. Dhar, on the other side, is
11  looking at this case without time constraints and with
12  the benefit of hindsight; correct?
13    A.  Right.
14    Q.  Now, tell me, what are the risks
15  associated with giving tPA?  It's not a risk-free drug,
16  is it?
17    A.  There are some increased risks of
18  bleeding, primarily.
19    Q.  Yeah.  And in fact, it's one of those
20  drugs, isn't it, that one of the areas where there is
21  an increased risk of bleeding is an intracerebral
22  bleed, isn't it?
23    A.  Yes.
24    Q.  Such that when bleeding occurs, it can be
25  catastrophic for the patient; correct?

Page 96

1     A.  Can be.
2     Q.  Yeah.  That's one of the reasons why last
3  time to normal is so important, isn't it?
4     A.  That can be used in your weighting of how
5  the risk of -- the risks and the benefit a weight on
6  time, yes.
7     Q.  Correct.  Well, what I'm getting at is
8  this is consistent with what you and I talked about
9  before, and that is if tPA is most effective in a
10  freshly-formed thrombus, you want to attempt to lyse
11  that freshly-formed thrombus earlier rather than later;
12  correct?
13    A.  Yes, earlier is definitely better.
14    Q.  Because the systemic risks associated with
15  tPA are the same throughout the time of use; right?
16    A.  Yes, generally the same, yes.
17    Q.  Right.  So if you're giving tPA to a
18  patient and it's hours and hours and hours since the
19  thrombus formed, you have this terrifying risk of
20  intracerebral bleeding, and the further out in time you
21  are from last normal, the less likelihood you're going
22  to help; right?
23    A.  Yes.
24    Q.  It's that simple?
25    A.  Yes.



Page 97

1    Q.   So let's talk about last normal in this
2  case.
3    A.   Okay.
4    Q.   Which I hope you looked at carefully.
5    A.   Yes.
6    Q.   Didn't you?
7    A.   Yes.
8    Q.   Well, let's just start off to begin with.
9  Did you look at Mr. Ruffino's deposition carefully to
10 focus on what he said about last normal?
11   A.   I believe I did, yes.
12   Q.   And did you also look at Mrs. Ruffino's
13 testimony about her husband's truthfulness?
14   A.   I did see some of that in her deposition,
15 yes.
16   Q.   Let's talk for just a moment about the
17 credibility of the source of information. Do you
18 recall, Doctor, that Mr. Ruffino said Dr. Efobi, the
19 private practice neurologist, never told him to quit
20 smoking? Do you recall him saying that?
21   A.   I don't recall that specifically, but I
22 remember Dr. Efobi did state that in his -- that he had
23 recommended quitting smoking.
24   Q.   Right. You've seen Dr. Efobi's records;
25 correct?

Page 98

1    A.   Yes, I believe so.
2    Q.   And it's a she, by the way?
3    A.   Oh, she. Okay.
4    Q.   And Dr. Efobi clearly documented her
5  recommendations, her instructions to Mr. Ruffino to
6  quit smoking; correct?
7    A.   Yes.
8    Q.   Which was entirely appropriate?
9    A.   Yes.
10   Q.   You notice that she also ordered a series
11 of lab tests, didn't she?
12   A.   Yes.
13   Q.   And one of those lab tests was to identify
14 his homocystine level; correct? Do you remember that?
15   A.   I don't remember that testing specific,
16 but that --
17   Q.   Well, that test is pretty important, isn't
18 it, in terms of risk of thrombus or embolus formation?
19   A.   No, generally very unimportant.
20   Q.   Unimportant?
21   A.   Yes.
22   Q.   And an expert in this field would know
23 then that the literature fully supports the notion that
24 homocystine levels have nothing to do with the risk of
25 bleeding; right?

Page 99

1    A.   Sorry. Could you -- I thought you said
2  thrombus or bleeding. Sorry. Just clarify the
3  question.
4    Q.   Sure. You're telling us that homocystine
5  levels are unimportant in terms of likelihood of
6  thrombus or embolus?
7    A.   In this case I don't feel it's a
8  relevant -- it's the most relevant lab test, yes.
9    Q.   That's not the question I asked.
10   A.   Okay.
11   Q.   I didn't ask whether it was the most
12 relevant, least reveal, or relevant lab test.
13   A.   Okay. Okay.
14   Q.   I want to cover what you just said and get
15 it narrowed down so that when somebody else looks at
16 this, they can tell you whether you're right or wrong.
17 Are you telling us under oath that homocystine levels
18 are unimportant in deciding whether the patient has an
19 increased risk of thrombus or embolus formation,
20 question mark? It's a yes or no.
21   A.   No, not unimportant, no.
22   Q.   It's not unimportant?
23   A.   No.
24   Q.   So then you didn't pay any attention to
25 the level in this case. Why is that?

Page 100

1    A.   I don't recall. Either it wasn't
2  significantly elevated or, as I said, it's not very
3  important. It's not a major factor.
4    Q.   It's not unimportant, but it's not --
5    A.   It's not --
6    Q.   -- very unimportant?
7    A.   Exactly.
8    Q.   Well, how important is it?
9    A.   Mildly important.
10   Q.   Mildly important. Well, then it's worth
11 at least mild knowledge of what it was. So what was
12 it? Was it significantly elevated or not?
13   A.   I don't recall.
14   Q.   Isn't the truth that you didn't look at it
15 at all?
16   A.   No, I don't believe that's the truth.
17   Q.   Where are Dr. Efobi's records in this
18 material? You told us earlier you brought your whole
19 file with you. Where are they --
20   A.   Well, most of what I reviewed was
21 electronic and I --
22   Q.   You told us earlier you brought your whole
23 file with you. I relied on what you told me. I want
24 you to show me Dr. Efobi's records, please.
25   A.   Well, this is my notes based on reviewing

1 the records.

2    Q.   Where are Dr. Efobi's records?

3    A.   I brought the records that I have printed

4 out.

5    Q.   All right.  So you have some records we've

6 not seen today that are digital?

7    A.   Right.

8    Q.   They're on a computer?

9    A.   Right.

10   Q.   You didn't bring the computer?

11   A.   Right.  It's on my work computer, which I

12 can't bring.

13   Q.   You don't have a laptop?

14   A.   No.

15   Q.   You don't even carry a laptop around?

16   A.   I mean generally not, no.

17   Q.   Well, did you just decide not to do it

18 today?

19   A.   I did not realize or wasn't asked to bring

20 the laptop with the electronic files, I guess, or

21 didn't realize I was.

22   Q.   So what is on the laptop or the base

23 station in your office that we haven't seen today?

24   A.   The records that I reviewed.  StoneCrest

25 Medical Center and some other records, I believe, from

1 Dr. Efobi, in my recollection -- various electronic

2 files with those records on it.

3    Q.   How about the Centennial Medical Center

4 records?  Did you ever look at those?

5    A.   I reviewed some, but I don't believe I

6 have the full records from the Centennial Medical

7 Center.

8    Q.   Well, how much of the Centennial record

9 did you look at?  You do know, don't you --

10   A.   Yes.

11   Q.    -- he was transferred to Centennial on

12 February 17th; right?

13   A.   Yes.

14   Q.   Did you see the entire longitudinal record

15 from February 17th to February 26th, 2016?

16   A.   I saw some records, but I cannot say if I

17 saw them all.  I mean, I focused mainly on that day and

18 then maybe the next day what happened.

19   Q.   But he wasn't at Centennial just for a day

20 or two?

21   A.   Correct.

22   Q.   He was there until the 26th?

23   A.   Right.  And I don't recall going through

24 all those records, no.

25   Q.   Do you ever recall seeing Mr. Ruffino's

1 condition when he was discharged from Centennial on

2 February 26th, 2016?

3    A.   I think I saw it from his deposition or

4 various depositions, not from the records.

5    Q.   Let make sure we're talking to each other.

6 Looking at the Centennial Medical Center records, did

7 you see anything reflecting his condition -- and this

8 is John Ruffino -- on February 26th, 2016?

9    A.   Not from my recollection, no.

10   Q.   Did you ever see his condition on the

11 20th, 21st, 22nd, 23rd, 24th, or 25th of February 2016?

12   A.   I don't see any recollection of me

13 reviewing those from my notes that I have those records

14 reviewed or annotated, at least.

15   Q.   You have no recollection of ever seeing

16 those records, and likewise there is no notation that

17 you saw them in your notes; correct?

18   A.   That's correct.

19   Q.   And you are a person who normally makes a

20 notation as you review some records, don't you?

21   A.   Of anything significant, yes.

22   Q.   And you have only three pages of

23 handwritten notes?

24   A.   On this case.

25   Q.   On this case?

1    A.   Yes.

2    Q.   We will make those Exhibit 11.

3    A.   Yes.

4    Q.   Will you pass these to the court reporter,

5 please?

6    A.   Yes.  Make sure they're in the right

7 order.  That's --

8    Q.   How would you know?

9    A.   Yes.  Not the most clear, except the title

10 is on the first page, so -- and then the summary is on

11 the final page.  So I guess that's --

12        [Exhibit 11 marked for identification.]

13   Q.   All right.  When we were talking about

14 John Ruffino, I asked you if you had looked at his

15 deposition and asked you if you had looked at his

16 wife's deposition.  Would you agree with me that even

17 assessing his testimony just based on what his wife

18 said, he was a charitably, you'd say, a poor historian,

19 or less than charitably, dishonest under oath?  Would

20 you agree with that?

21   A.   I don't think I could say dishonest.  I

22 noticed that she questioned some of his recollections.

23 That's the furthest I would probably be able to go.

24   Q.   Well, would you agree then that based on

25 her testimony he is at best a very poor historian?

Page 105

1   A.   I would simply -- I would say that she
2  disagreed with him on some facts for sure, yes.
3   Q.   Well, let's focus on your careful review
4  of this very important topic, and that is when this man
5  was last normal. Let's start first with -- and you're
6  free to look at those notes if you wish to at any time.
7   A.   Okay.
8   Q.   When did this man start having what I'll
9  call TIAs? And I guess we should see if you find that
10  acceptable. Transient ischemic attacks. Is that a
11  fair description of what he had before February 17th,
12  2016?
13   A.   I think certainly in retrospect it's --
14  with the benefit of hindsight it's very reasonable to
15  say these were TIAs. I think even prospectively
16  it's -- they were more likely than not TIAs. We would
17  say they're transient neurological episodes.
18   Q.   Is there a new word for this transient
19  neurological episodes, a TNE?
20   A.   No, I think that's how -- that's the word
21  we've always used, but TIAs is just more common because
22  most of them are due to ischemia. But until you know
23  that, you don't want to say it's a TIA until we have
24  some more information.
25   Q.   Let's continue your retrospective

Page 106

1  evaluation of this case. Was Mr. Ruffino, in your
2  opinion, having TIA symptoms because of the stenosis
3  shown on the MRA of 12-23-15?
4   A.   In retrospect I certainly think that's the
5  most likely explanation for his symptoms.
6   Q.   When did these TIAs actually first begin,
7  based on a point-by-point review you've made with the
8  benefit of hindsight?
9   A.   I believe it was earlier in December of
10  2015.
11   Q.   You think that might be wrong?
12   A.   Could be. I know there was a number, at
13  least four, but I'm trying to find the first date. I
14  mean, I guess there's a note of even something in
15  August of that year, but again, I didn't -- beyond the
16  deposition, I didn't have definite data on that.
17   Q.   Yeah, but you had Dr. Efobi's notes, you
18  tell us.
19   A.   Yeah.
20   Q.   She had a history.
21   A.   Right. I don't think I noted the first
22  date, at least. I just remember there was a number of
23  episodes. That was enough for me to say these were
24  likely TIAs and the dates didn't really --
25   Q.   What's the difference between a TIA and a

Page 107

1  stroke?
2   A.   I mean, it's a good question. I would
3  think a TIA we don't think has permanent damage to the
4  brain.
5   Q.   How do you know?
6   A.   That's why it's tough, because we don't
7  always know, so the fact that they resolve relatively
8  quickly, within 15 minutes or so, gives you a high
9  likelihood more likely than not this is a TIA and not a
10  stroke, so we use time as a surrogate.
11   Q.   What is the definition of a TIA to
12  distinguish it from stroke? How long must the symptoms
13  last or how soon must the symptoms resolve -- is a
14  better way to put it -- to distinguish between a TIA
15  and a stroke?
16   A.   I mean, I would say, again, most within 15
17  minutes, but generally anything lasting more than an
18  hour you would be very concerned to say that's a
19  transient event without damage.
20   Q.   Were you able to see the existence of any
21  damage in Mr. Ruffino's brain on the MR of 12-23-15?
22   A.   No. Again, and that would add to the
23  conclusion that these were likely TIAs and not strokes.
24   Q.   Because you don't see any damage, any
25  preexisting damage at all?

Page 108

1   A.   Certainly not a -- there were some minor
2  abnormalities in the brain, but not enough to say a
3  definite stroke.
4   Q.   Well, that's not what I asked.
5   A.   Okay.
6   Q.   Was -- on the 12-23-15 MRI were there
7  permanent changes in the parenchyma of his brain?
8   A.   Yes.
9   Q.   And what were the permanent changes in the
10  parenchyma of his brain already apparent on 12-23-15?
11   A.   Small lesions in the white matter, not
12  consistent with stroke, but consistent with maybe some
13  chronic ischemia to the brain.
14   Q.   Chronic ischemia meaning consistent with
15  lacunar infarcts?
16   A.   No.
17   Q.   No? Definitely not consistent with
18  lacunar infarcts?
19   A.   Definitely -- right.
20   Q.   But --
21   A.   What we call --
22   Q.   White matter changes consistent with
23  longstanding hypertension?
24   A.   Yes, that's one of the most common
25  etiologies for these white matter lesions.

1    Q.    And where were the white matter lesions
2  already obvious in the 12-23-15 MR?  What portions of
3  the brain?
4    A.    Both sides of the white matter in the
   hemispheres of the brain.
6    Q.    Well, there are two hemispheres; correct?
7    A.    Yes.
8    Q.    Left and right?
9    A.    Yes.
10    Q.    There's white matter and gray matter in
11  the brain; correct?
12    A.    Correct.
13    Q.    So where were the permanent changes in his
14  MR already on 12-23-15 before he ever set foot at
15  StoneCrest?
16    A.    So the white matter abnormalities were in
17  the white matter and they were on both sides.
18    Q.    In addition to describing tissue based on
19  its appearance, white versus gray, there are sections
20  of the brain.  There's the parietal, the temporal, the
21  frontal -- those areas.  Where in terms of segments of
22  the brain were these white matter changes that were
23  symmetrical and on both sides?
24    A.    They were small areas in the -- probably
25  the frontal white matter.

1    Q.    Left and right frontal lobe?
2    A.    Frontal or parietal.
3    Q.    And you didn't have any trouble seeing
4  them, did you?
5    A.    No.  Given hindsight, it was easy to see
6  there were some abnormalities there, but very small.
7    Q.    Right.  Uh-huh.  Okay.  Now, let's talk
8  about when you thought these events first occurred.
9    A.    Okay.
10    Q.    You tell us based on the most careful
11  review that you can do they began in December of 2015?
12        MR. CUMMINGS:  Object to the form.
13    Yeah, in my -- at the time of my review,
14  December 2015, but it looks like in his deposition he
15  mentions maybe something in August.
16    Q.    (By Mr. Gideon)  Of 2015?
17    A.    2015.
18    Q.    Let's take a look at Dr. Luck's (ph)
19  record of November 24, 2015.  I think you'll find this
20  interesting.  (Hands document to witness.)
21    A.    Okay.
22    Q.    Have you ever seen any of the records from
23  Dr. Luck of November 24, 2015, previously?
24    A.    Just -- I hadn't seen them for my opinion.
25  I've seen them briefly since then.

1    Q.    When did you just see them briefly?  I
2  thought you brought with you everything, and I didn't
3  see them.
4    A.    I don't have them printed out.  I just saw
5  them electronically very briefly in the last week.
6    Q.    Well, when did you get these new records
7  within the last week?  What else came with it
8  besides --
9    A.    I think it was just this -- some documents
10  from this physician.  I really didn't have a chance to
11  review them in any detail.
12    Q.    Well, let's take a look here.
13    A.    Okay.
14    Q.    As of November 24, 2015, you can see that
15  Mr. Ruffino -- right up here, Doctor.  (Indicating
16  document.)
17    A.    Yes.
18    Q.    The history of present illness.
19    A.    Yes.
20    Q.    Is complaining that -- Mr. Ruffino is
21  complaining to Dr. Luck that he's having problems with
22  the right side of his face, he can't talk, problems
23  with the upper extremity, right arm, and the lower
24  extremity, right hip and leg to the foot.  The severity
25  is severe.  The onset was a month ago, which would put

1  it back into either the earliest part of November or
2  October of 2015, and it occurred -- is it eight times
3  that month or six times that month?
4    A.    Six times.
5    Q.    Six times that month, lasting 10 minutes,
6  one time while driving.  And that's why Dr. Luck
7  referred this patient on to Dr. Efobi.  This is
8  substantially different than the history you got
9  previously, isn't it?
10    A.    No, this is entirely consistent with
11  having multiple TIAs prior to the stroke.
12    Q.    Well, isn't it true that Dr. Efobi
13  described four events total based on Mr. Ruffino's
14  history?  We now have six more; isn't that right?
15    A.    I'm not sure -- these are a separate six
16  or these are four out of the six?  I can't tell -- this
17  is the same four, plus two more.
18    Q.    You just don't know?
19    A.    No, I don't know.
20    Q.    What is the risk presented by TIAs in
21  terms of the probability that once you've had one and
22  then had two and three, that it becomes more and more
23  progressively likely that you will in fact have a
24  disabling stroke?
25    A.    Yeah, I don't believe there's any clear



Page 113

1    data to support that.
2        Q.    One way or the other?
3        A.    Right.  There is a risk of stroke with
4    TIAs, but I don't believe it's any more likely with
5    more frequent episodes.
6        Q.    So you wouldn't agree with a neurologist
7    then who says that once somebody has had sequential
8    TIAs, that is a sure sign that bad things are going to
9    happen?  You wouldn't agree with that?
10       A.    No, I would agree -- we know he has
11   multiple TIAs, as I state in my opinion -- at least
12   four is multiple -- and so I agree that he's at high
13   risk.  I don't know if six versus four makes an
14   increased difference.  He certainly was having TIAs and
15   had multiple ones.  I would certainly agree with that.
16       Q.    All right.  Well, why is it then with
17   repeated TIA, repeated TIA, repeated TIA -- why is it
18   that at some point in time -- and we're going to talk
19   about it -- he forms a thrombus either in M1 or M2 of
20   the left MCA?  Why?  Why after maybe four, maybe 10,
21   maybe six -- who knows?
22       A.    Yeah.
23       Q.    Why does it occur in this patient at that
24   location?
25       A.    Yeah.  We have no idea.

Page 114

1        Q.    Well, can you tell me what makes it most
2    likely?  What is it about him, his conduct, his life,
3    his experience, his blood pressure -- any factor --
4    made formation of the thrombus at that location more
5    likely than not after the series of TIAs?
6        A.    Yeah, I don't think the series matters,
7    but I think it simply reinforces the fact that there
8    was this underlying lesion more likely than not there.
9    That's the main risk factor, the fact that there's an
10   unstable lesion.  And then why it develops a stroke one
11   day, we don't know, but certainly having that lesion
12   would explain, I think, now having seen the MRA, why he
13   was having so many events.
14       Q.    Now, you used the term unstable lesion.
15   Are you telling us that each of these TIAs, however
16   many there were, based on Mr. Ruffino, the historian,
17   were due to plaque rupture in the atheromatous plaque
18   in the left MCA at either M1 or M2?
19       A.    Don't know if we can say plaque rupture,
20   but certainly instability of something around that
21   plaque.  I don't think we know --
22       Q.    Tell me what you mean by instability.
23       A.    Simply that TIAs are due to some change,
24   and when something changes, it's unstable, that most of
25   the time he doesn't have a TIA and then when he does,

Page 115

1    clearly there's been a change in the blood flow past
2    that stenosis.
3        Q.    Well, then what we can do is nail it down
4    in terms of what's most likely.
5        A.    Okay.
6        Q.    We know that with respect to each of these
7    TIAs, with the benefit of hindsight, it is more
8    probable than not that there was a change in perfusion
9    through the left MCA at M1 and/or M2; correct?
10       A.    I would agree with that.
11       Q.    All right.  What is the most probable
12   explanation for a change in perfusion at the left MCA
13   at M1 or M2 to trigger these TIAs, irrespective of how
14   many there were?
15       A.    Sure.  More likely than not, some clot or
16   plaque change that happened at that time.
17       Q.    And more likely than not, a thrombus that
18   his own onboard system lysed?  Do you think that's most
19   likely?
20       A.    I think there's certainly a good chance
21   that was a factor, yes.
22       Q.    We all generate naturally-recurring
23   thrombolytics within our system, don't we?
24       A.    Yes.
25       Q.    Do you think it's really likely that it is

Page 116

1    a clot-diminishing perfusion, or do you think that it's
2    more likely changes in his blood pressure?
3        A.    I think it's more likely a clot, but
4    again, as I said, we can't state for sure, but more
5    likely than not I think this was a clotting process,
6    not a blood pressure process.
7        Q.    Now, whether there is permanent injury as
8    a result of diminished perfusion is a factor determined
9    by metabolic demand of the tissue and degree of
10   diminished perfusion; correct?
11       A.    Primarily duration, I would say, of the
12   diminished -- like if that clot stays and doesn't go
13   away, then the duration extends such that the damage is
14   permanent.
15       Q.    Correct.  Now, we do know that there is a
16   an MR of 12-23-15, but we don't have an MR in January
17   of 2016 and we don't have any MR until February 18th,
18   2016; correct?
19       A.    Yes.
20       Q.    Isn't that right?
21       A.    That's correct.
22       Q.    Did you actually look at the February
23   18th, 2016, MR that was done at Centennial Medical
24   Center?
25       A.    I looked at the report of that one, not



Page 117

1  the actual image itself.
2      Q.   So the answer is no --
3      A.   No.
4      Q.    -- I've never looked at the imaging
5  study?
6      A.   Not the imaging itself, no.
7      Q.   You do not -- let's see which ones you
8  actually looked at.  Did you actually look at the CT
9  perfusion that was done at Centennial?
10     A.   I looked -- no.
11     Q.   Have you looked at any of the imaging
12 studies at Centennial?
13     A.   Not Centennial, just StoneCrest and the
14 MRA.
15     Q.   So then collectively, irrespective of how
16 long the admission was at Centennial, you have never
17 put your eyes on the study itself?
18     A.   No.
19     Q.   Now, you've got StoneCrest imaging, here
20 you've got Centennial Medical Center imaging Ruffino, a
21 disc that you've never opened; right?
22     A.   That's right.
23     Q.   When did you get the disc of the
24 Centennial Medical Center imaging that you've never
25 opened?

Page 118

1      A.   I think I just got those yesterday.
2      Q.   What else did you just get yesterday?
3      A.   This I got previously in the mail in the
4  last -- when I was gone out of the country.
5      Q.   Excuse me.
6      A.   Sorry.
7      Q.   The "this" won't be clear on a transcript.
8      A.   Oh, sorry.
9      Q.   There is a reference to Tennova Healthcare
10 Lebanon, which is the 12-23-15 imaging.  When did you
11 first get that?
12     A.   It arrived when I was out of the country
13 in the last seven days.
14     Q.   In France?
15     A.   Exactly.
16     Q.   You first looked at the Tennova 12-23-15
17 imaging yesterday?
18     A.   Or the day before.  In the last two days,
19 yes.
20     Q.   Are any of your notes pertinent to your
21 interpretation of that imaging from 12-23-15?
22     A.   No.
23     Q.   Did you make any notes as you reviewed the
24 12-23-15 imaging?
25     A.   No.

Page 119

1      Q.   After you got back from France, you found
2  out that you had also been sent Centennial Medical
3  Center imaging; correct?
4      A.   Yes.
5      Q.   That you've never looked at?
6      A.   Not at this point, no.
7      Q.   And you have StoneCrest imaging.  When did
8  you first get the StoneCrest imaging?
9      A.   Also yesterday.
10     Q.   Yesterday?
11     A.   Yes.
12     Q.   So before you signed off on your opinion
13 in this case, you had never once actually looked at any
14 imaging studies; correct?
15     A.   Only the reports not the imaging
16 themselves.
17     Q.   Let me just ask the question so I get an
18 unequivocal answer.  Before you finalized your February
19 5th, 2018, report, it is correct you had never laid
20 eyes on a single imaging study yourself; correct?
21     A.   Correct.
22     Q.   Okay.  Let's talk about the -- what you
23 understand to be the case with respect to the February
24 18th MR.
25     A.   Okay.

Page 120

1      Q.   He had diffuse cerebrocortical loss;
2  correct?  I'll save you some time.  (Hands document to
3  witness.)  I'm handing you a copy of the February 18th,
4  2016, MR of the brain.
5          MR. CUMMINGS:  Thanks.
6          MR. WITT:  Thank you.
7          MR. GIDEON:  Uh-huh.
8      Q.   (By Mr. Gideon)  If you look at the
9  results, the third element, it says mild diffuse
10 cerebrocortical volume loss.
11     A.   Okay.
12     Q.   You saw that previously if in fact you
13 looked at this report?
14     A.   I --
15     Q.   Do you have an opinion as to whether or
16 not that diffuse cerebrocortical volume loss was due to
17 the chronic changes shown on the MRI of 12-23-15 in the
18 white matter?
19     A.   Don't think it's the same, but I mean,
20 similar processes can cause both.
21     Q.   Well, then where is this change, this mild
22 diffuse, meaning everywhere, cerebrocortical volume
23 loss?  Where is it as compared to the white matter
24 changes you described previously?
25     A.   Okay.  Corti -- it's in the cortex, so

Page 121

1  gray matter.
2      Q.   We're not neurologists.
3      A.   Okay.  Yes.  The surface of the brain.
4      Q.   So we have the gray matter on top of the
5  white matter; right?
6      A.   Right.  So there's some diffuse loss of
7  the size of that gray matter.
8      Q.   Right.  And what does the gray matter do?
9      A.   I mean, generally, it houses the brain
10  cells -- most of the main brain cells.
11      Q.   Right.  Therefore the February 18th, 2016,
12  MR, comparing it with 12-23-15, shows white matter
13  loss, to your eyes, 12-23-15, and a report reflecting
14  gray matter loss February 18th, 2016.  What in your
15  opinion is the cause of the diffuse cerebrocortical
16  volume loss in the gray matter?
17      A.   I can't say for sure.  I could only
18  speculate that it could be also the same thing that
19  caused the white matter, but really, without looking at
20  it, I have no opinion on that.
21      Q.   You know it's there from the report; you
22  just don't know why?
23      A.   And I would like to look at the images as
24  well to compare at some point.
25      Q.   Right.  Nobody's kept you from looking at

Page 122

1  them?
2      A.   No.  Just --
3      Q.   This report likewise refers on diffusion
4  imaging -- which is a component of a magnetic resonance
5  scan; correct?
6      A.   Correct.
7      Q.   Diffusing imaging shows patchy infarcts of
8  the left basal ganglia; right?
9      A.   Right.
10      Q.   Now, infarct is death of tissue, isn't it?
11      A.   Yes, we think so.
12      Q.   What, in your opinion, was the cause of
13  the patchy infarcts in the left basal ganglia of Mr.
14  John Ruffino as of February 18th, 2016?
15      A.   The event, the untreated event he had on
16  the 16th at StoneCrest.
17      Q.   I see.
18      A.   The blockage and a stroke.
19      Q.   Now, were you ever provided with the
20  affidavit of a Dr. Valdivia?
21      A.   That doesn't sound familiar, no.
22      Q.   Doesn't sound familiar at all?
23      A.   (Shaking head "no.")
24      Q.   Does the name Valdivia just sound familiar
25  to you in the slightest?

Page 123

1      A.   I know there was a doctor at Centennial.
2  I don't know if that was the one, but there was a
3  doctor's name that vaguely sounds familiar.  That might
4  have been, but I didn't review those records in great
5  detail, so I don't have a great --
6      Q.   Yeah, I can tell.
7      A.   Yeah.
8      Q.   Well, do you know whether or not Dr.
9  Valdivia has expressed the opinion that these infarcts
10  in the left basal ganglia of Mr. Ruffino are old and
11  preceded February 17th, 2016?
12      A.   The question is if I'm aware that he said
13  that?
14      Q.   Yes.
15      A.   No, I'm not aware he said that.
16      Q.   For you to determine whether these left
17  patchy infarcts in the basal ganglia are something that
18  happened on the 17th or something older than that,
19  you'd actually have to look at the imaging, wouldn't
20  you?
21      A.   No, I think the report in this case is
22  pretty definitive that these are new.
23      Q.   Oh, it is?
24      A.   Yes.
25      Q.   I see.  Okay.

Page 124

1      A.   Diffusion images are very definitive.  If
2  they're showing up only there, you know it's basically
3  within 24 hours.
4      Q.   You do know that?
5      A.   Yes.
6      Q.   And of course the radiologist that's
7  dictating this report, Dr. Waters (ph), would know
8  that, too; right?
9      A.   Yes.  That's why he says acute left-sided
10  infarcts.
11      Q.   I see.  Where is it that he says acute
12  patchy infarcts on the diffusion?
13      A.   In the impression.  In the impression.
14  Under the impression he says acute left-sided infarcts,
15  as discussed above.
16      Q.   I see.
17      A.   Mainly involving the left basal ganglia
18  and corona radiata.
19      Q.   Okay.  Now, what about the very tiny
20  embolic infarcts in the left frontal lobe and the left
21  occipital lobe?  What caused those?
22      A.   Probably also the stroke of the day prior
23  that he presented with.
24      Q.   That's your opinion to a reasonable degree
25  of certainty?

Page 125

1    A.    Yes.
2    Q.    Did you see any patchy infarcts in the
3  left basal ganglia and the corona radiata on the
4  12-23-15 MR?
5    A.    No.
6    Q.    Did you look for them?
7    A.    I did, yes.
8    Q.    Now, on the 2-18-16 MR, could you tell us
9  the size of the infarct core lesion?
10    A.    On this MRI?
11    Q.    Yes.
12    A.    Again, since I haven't reviewed it, I
13  can't give you a volume without -- and it's not stated
14  in the report.
15    Q.    Right.  So you wouldn't be able to answer
16  that question?
17    A.    Not exactly, no.
18    Q.    Can you grade the infarct using the
19  ASPECTS scoring system?
20    A.    We don't usually grade infarcts with
21  ASPECTS scoring system, so no.
22    Q.    Well, some of the trials actually have,
23  though, haven't they?
24    A.    No.
25    Q.    None?

Page 126

1    A.    Not to grade infarcts.
2    Q.    How do you measure the difference between
3  core infarct tissue that's lost versus what's called
4  the penumbra, the tissue that might go either way?
5    A.    On an MRI?
6    Q.    Yes.  How do you go about doing that?
7  What is it that distinguishes one from the other?
8    A.    The best sense of the core on MRI is the
9  diffusion images that show what we think is more likely
10  already infarcted.
11    Q.    But when you see it, tell us what you see.
12    A.    A bright area on that diffusion sequence,
13  as is stated here, that lights up on that one sequence,
14  which picks up the core areas of infarction.
15    Q.    And with respect to the penumbra, what do
16  you see as compared to the core areas of infarct?
17    A.    The MRI is not able to inform you at all
18  about penumbra -- this kind of MRI.
19    Q.    The only way you can do anything
20  responsible with respect to the size of the penumbra is
21  using the CT perfusion scan?
22    A.    Some kind of perfusion scan is usually
23  needed for that, either CT or MR perfusion.
24    Q.    All right.  Well, let's take a look at the
25  perfusion scan done the same day, and I have a copy of

Page 127

1  it for you.
2    A.    Thank you.
3    Q.    So you don't have to look back.  (Hands
4  document to witness.)
5        MR. CUMMINGS:  Thanks.
6    Q.    (By Mr. Gideon)  By the way, did you make
7  any notations on the perfusion scan in your notes?
8    A.    Let's see.  I don't believe so, no.
9    Q.    Can you tell us then from what you've done
10  so far the absolute size of the penumbra and the extent
11  to which there was a mismatch with the ischemic core,
12  based on this study?
13    A.    This -- I'm just looking at the time now.
14  So the CT was at --
15    Q.    The CT perfusion is done at 12:00 AM on
16  February 18th, 2016?
17    A.    And the MRI --
18    A.    The MRI was performed at seven -- excuse
19  me.
20    A.    Where does it say --
21    Q.    It was signed off at 21:37 on February
22  18th.
23    A.    Got you.
24    Q.    So we know it had to have been done sooner
25  than that.

Page 128

1    A.    Some time -- so some time later that day,
2  the MRI was performed.  So the CT perfusion seems like
3  it shows decreased perfusion in the left MCA
4  distribution, so --
5    Q.    That's not what it says.
6    A.    Oh, I was just reading -- decreased
7  perfusion throughout the left middle cerebral artery
8  distribution --
9    Q.    No --
10    A.    -- in the impression at the bottom.  Am I
11  not reading the right thing?
12    Q.    It says there is decreased mean transit
13  time and time to peak throughout the left MCA
14  distribution of the perisylvian, left frontal,
15  temporal, and parietal lobes, period.  Then it says
16  there is relatively normal cerebral blood flow and
17  cerebral blood volume.  He goes on to say decreased
18  perfusion throughout the left middle cerebral artery
19  distribution without evidence of ischemia at this time.
20    A.    Okay.  Yeah.
21    Q.    So what I'm asking you is to tell us --
22  first of all, can you tell us the size of the penumbra
23  and using the MRI as well as the degree of mismatch
24  between the infarcted core and the penumbra in this
25  patient as of February 18th?

Case 3:17-cv-00725    Document 114-6    Filed 12/14/18    Page 32 of 55 PageID #: 1405

1    A.   No, I don't think you can use the two
2 different studies at two different times to do that. I
3 think --
4    Q.   Can you tell us the size of the penumbra
5 then based on the February 18th, 2016, CT perfusion
6 scan?
7    A.   It seems like all I can say from the CT is
8 there was decreased perfusion in that MCA area at that
9 time.
10    Q.   But you can't tell us the size of the
11 penumbra?
12    A.   No, because we don't have a measure of the
13 core at this time that's very accurate.  We know on the
14 MRI that there was already some infarcted tissue
15 however many hours later.
16    Q.   But you can't tell us the size of the
17 infarction?
18    A.   On a CT I would have a hard time knowing
19 the definitive size of the core.
20    Q.   Yeah, well, what about on the MR?  Can you
21 tell us the size of the ischemic core?
22    A.   Again, not exactly, but it looks like it's
23 patchy, meaning it's not the whole MCA.
24    Q.   Yeah.
25    A.   That's all I could really say.

1    Q.   Right.  What is the meaning that we should
2 assign, guided by your knowledge, of Dr. Lasseter's
3 (ph) statement that there is relatively normal cerebral
4 blood flow and cerebral blood volume?  What does that
5 mean?
6    A.   Again, I would really like to look at the
7 images because I have a hard time interpreting this
8 particular study because in the sentence before he says
9 decreased mean transit time throughout the left MCA and
10 uses that, in my opinion, to say decreased perfusion,
11 but in fact decreased perfusion causes increased mean
12 transit time, so there seems to be some inconsistency
13 in his interpretation, so I'd really want to confirm
14 those findings based on the actual study.
15    Q.   This is a report where nobody can reach a
16 conclusion just from looking at the report itself;
17 right?
18    A.   It seems there are some questions that
19 remain.
20    Q.   And this is a really important issue,
21 isn't it, this CT perfusion scan, in terms of
22 determining his condition on the 18th?
23    A.   I think the MRI is probably the more
24 useful study.
25    Q.   Is this not an important study?

1    A.   At this time it does not seem very
2 important because this was done, as you stated, on the
3 18th when by that time he would have been much more
4 outside the window that many hours post-onset -- like
5 if this was done much earlier, then it would be an
6 important study.
7    Q.   Now, this study, though, tells us there is
8 no evidence of ischemia; correct?
9    A.   That's what it says.  I can't corroborate.
10    Q.   Right.  And ischemia is inadequate
11 perfusion; right?
12    A.   Well, then it would be an oxymoron to say
13 decreased perfusion without decreased perfusion --
14    Q.   Well, you can have decreased perfusion
15 without ischemia, can't you?
16    A.   Yeah.  It depends how you define ischemia.
17    Q.   Well, right.  Well, ischemia is inadequate
18 perfusion to supply the metabolic needs of the tissue
19 in order to avoid tissue death; right?  Isn't that --
20    A.   Yes.
21    Q.   Well, you can have inadequate perfusion
22 that is not so inadequate that the tissue dies; right?
23    A.   Yeah, that's possible.
24    Q.   So what he's saying here is there's no
25 evidence of ischemia.  How is it possible that with no

1 tPA and no embolectomy, there isn't complete
2 interruption of blood flow at the M1, M2 branch of the
3 left MCA in this patient?  How is that possible?
4    A.   There is decreased perfusion throughout,
5 so we know that this occlusion is having an effect on
6 perfusion.  That's at least the one consistent part --
7 is the MCA distribution has decreased perfusion.
8    Q.   There was decreased perfusion on February
9 twenty -- excuse me -- December 23, 2015?  The vessel
10 was already narrowed?
11    A.   I don't think we have a perfusion study at
12 that time.  That's the only way you can tell decreased
13 perfusion.  An MRA does not tell you about perfusion --
14 an MR perfusion does.  And this is, as far as I'm
15 aware, the only perfusion study that he had.
16    Q.   The perfusion scan of February 18th, 2016,
17 does not reflect stoppage of blood flow at the M1 or M2
18 branch of the left middle cerebral artery, does it?
19 Doesn't reflect stoppage?
20    A.   No, it does reflect -- it is entirely
21 consistent with a blockage of the M2 branch.
22    Q.   Okay.  Relatively normal cerebral blood
23 flow and cerebral blood volume without evidence of
24 ischemia is entirely consistent with complete
25 interruption of blood flow, according to you?

Page 133

1    A.   Yes.  Absolutely.  And I can explain if
2  you'd like.
3    Q.   No.  I'll just take that bit of
4  guidance --
5    A.   Okay.
6    Q.   -- and write it down.  Do you know that
7  the treatment of this gentleman consisted of bedrest,
8  allowing his blood pressure to climb, and to keep his
9  head down?
10    A.   That sounds reasonable, yes.
11    Q.   That's described by Dr. Valdivia in one of
12  his notes as permissive hypertension.  Do you
13  understand that to be an accepted method of treatment?
14    A.   Yes, certainly.
15    Q.   It worked very well for Mr. Ruffino,
16  didn't it?
17    A.   Can you clarify what you mean by that?
18    Q.   Well, for an individual like Mr. Ruffino,
19  would an NIH stroke scale of three be a good outcome?
20    A.   I don't think having persistent
21  neurological deficits of speech immobility is a good
22  outcome.  No.
23    Q.   What would be a good outcome measured by
24  an NIH stroke scale then?
25    A.   Zero.

Page 134

1    Q.   Zero?  Okay.  Therefore the only good
2  outcome is a perfect outcome; right?
3    A.   No.
4    Q.   No?  Well, what are the probabilities
5  then -- let's talk about outcomes for a moment.  If you
6  use tPA as the only intervention, intravenous tPA, what
7  is the distribution of outcomes using the NIH stroke
8  scale as the final arbiter of how good the outcome
9  actually is?
10    A.   Some people achieve that and some people
11  don't.
12    Q.   I asked about distributions, not just
13  generalities.
14    A.   I don't have a distribution in my head.
15    Q.   What percentage of patients have an NIH
16  stroke scale of zero to two following tPA in vessels
17  like those that you say were occluded here?  What's the
18  distribution of those?
19    A.   It is -- all I can is it is a greater
20  distribution than without tPA.
21    Q.   But greater than a null set is
22  meaningless?  Wouldn't you agree?
23    A.   Not to the patient who doesn't get tPA.
24    Q.   What about in terms of data that's useful
25  to people?

Page 135

1    A.   Uh-huh.
2    Q.   What's the percentage then of those that
3  do get tPA in these vessels that have an NIH stroke
4  score of zero to two after this successful timely
5  treatment?
6    A.   As I said, the meaningful distribution is
7  that it's a greater distribution without tPA.
8    Q.   Tell me what the distribution is, instead
9  of comparing it to something that is meaningless.
10  Better than something that is unknown and undefined is
11  not answering the question, Doctor.
12    A.   It's not unknown or undefined what the
13  outcome is without tPA.  That's very well known and
14  well defined.
15    Q.   I didn't ask you what it was without tPA.
16  I'm going to ask you one more time.
17    A.   Okay.
18    Q.   What is the outcome with tPA with an NIH
19  stroke scale of zero to two?
20    A.   What is the probability?
21    Q.   What is the outcome, the distribution of
22  probabilities?
23    A.   I don't understand the question.
24    Q.   Okay, I'll ask it a fifth or sixth or
25  seventh time until we communicate.  What percentage of

Page 136

1  patients with timely tPA, intravenous tPA, end up with
2  an NIH stroke scale of zero to two when the occlusion
3  is comparable to the occlusion here, left MCA M1 or M2?
4    A.   Over what time period?  Like when --
5    Q.   As a result of the treatment, timely
6  treatment with tPA.
7    A.   No.  No.  Sorry.  What -- it's measured at
8  different times after the stroke in terms of the
9  improvement, so we know that there's a great
10  proportion, let's say -- I don't have the exact number,
11  but a greater percentage at 24 hours, but not everyone
12  gets to that scale at 24 hours, and then over time
13  still more people, a greater percentage, reach that
14  over seven days.
15    Q.   Okay.  Well, let's take both.  At 24 hours
16  post-tPA, timely tPA comparable to Mr. Ruffino, what
17  percentage of them have an NIH stroke scale of zero to
18  two and what percentage at seven days have an NIH
19  stroke scale of zero to two?
20    A.   Yeah.  I mean, I'd have to look at that
21  exact number, but it's certainly, I would guess, around
22  the 50 percent mark.
23    Q.   Around 50 percent?  Both 24 hours and at
24  seven --
25    A.   And then higher at seven days, above 50



Page 137

1 percent.
2    Q.    About 50 percent?
3    A.    Above.
4    Q.    Above or about or near?
5    A.    At 24 hours, about, and by seven days,
6 above.
7    Q.    And surely I'll find that somewhere. Is
8 there an article that says that? Is there a set of
9 guidelines that says that?
10    A.    Again, as always, I'm basing my opinions
11 on the synthesis of the medical literature. That's --
12    Q.    Just what you've gathered as you've gone
13 through life?
14    A.    Hopefully that's how physicians work, not
15 based on one study, but on synthesis of experience.
16    Q.    Synthesis?
17    A.    And seeing patients and reading the
18 literature.
19    Q.    What about the modified Rankin score?
20 What's that distribution?
21    A.    Again, I can't quote it right now off the
22 top of my head.
23    Q.    What percentage of patients who have
24 timely tPA for an occlusion like this one end up with
25 an NIH stroke scale of three at 24 hours?

Page 138

1    A.    If they start with an NIH stroke scale of
2 four, so that would be basically having now to minimal
3 improvement, I would say less than half have no
4 improvement. I would say the majority have
5 improvement -- significant improvement.
6    Q.    And the time for administration of tPA,
7 according to you in February of 2016, was up to how
8 many hours after last normal?
9    A.    I mean, the FDA approved after three hours
10 and here we do it up to four-and-a-half hours.
11    Q.    I asked in terms of standards of care,
12 this continuing synthesis stuff that you've given us.
13 What was the standard of care for a place like
14 StoneCrest in terms of how long after last normal tPA
15 was permitted to be given?
16    A.    I think definitely under three -- within
17 three hours and in selected cases up to four-and-a-half
18 hours.
19    Q.    And what was the criteria for selected
20 cases up to 4.5 hours?
21    A.    I think those would be determined based on
22 the individual -- again, synthesis of that patient
23 based on risk factors for bleeding, the size of the
24 stroke.
25    Q.    Risk factor for bleeding?

Page 139

1    A.    The size of the stroke.
2    Q.    Size of the stroke based on clinical
3 assessment?
4    A.    Largely, and risk factors of bleeding,
5 diabetes being the main one, or use of blood thinners.
6 So there are certain things you weigh in that longer
7 time window to make sure the patient will bleed and
8 not -- will not bleed -- and have a benefit, as you
9 alluded to, so you're more selective in that extended
10 time window.
11    Q.    You have to become more selective outside
12 of three hours?
13    A.    Exactly. Three hours universally should
14 be given. In this case, it was within three hours,
15 but --
16    Q.    What was within three hours?
17    A.    The time he presented, from onset of his
18 stroke symptoms to when he was evaluated.
19    Q.    Oh, let's talk about that a little bit,
20 and in fact we did discuss it. I didn't get to it.
21 When was he last normal?
22    A.    Last normal that I can tell was 12:00 PM,
23 exactly at noon that day.
24    Q.    And had he had a TIA earlier that day?
25    A.    I think that's unclear. He had an

Page 140

1 event -- again, a transient neurological event -- but
2 not one that was similar or entirely consistent with
3 his TIAs.
4    Q.    What transient neurological event had he
5 had on the morning of February 17th, 2016?
6    A.    I believe the main symptom of this event
7 was dizziness.
8    Q.    And what time did that start?
9    A.    Sometime between 8:00 and 8:30 AM.
10    Q.    First time he had any problems at all was
11 between 8:00 and 8:30 in the morning; correct?
12        MR. CUMMINGS: Object to the form.
13    A.    First time that day that he experienced
14 dizziness was between 8:00 and 8:30 AM.
15    Q.    (By Mr. Gideon) First time Mr. Ruffino
16 had any problems at all was between 8:00 and 8:30 on
17 the morning of February 17th, 2016?
18        MR. CUMMINGS: Object to the form.
19    A.    No, of course as we've stated very
20 clearly, he had multiple prior TIAs prior to that.
21    Q.    (By Mr. Gideon) I wasn't asking about the
22 15th, the 14th, the 13th --
23    A.    You're saying that day.
24    Q.    Talking about the day of the 17th.
25    A.    Okay.



1    Q.   February 17th, 2016.  First time he had
2   any problems that day were between 8:00 and 8:30 when
3   he experienced dizziness?
4    A.   Yes.
5    Q.   And you base that on what?
6    A.   Based it on a number of -- synthesized
7   number of things.  The --
8    Q.   Well, synthesize it with specificity for
9   us.  What's that come from, since you weren't there,
10  you didn't take a history?
11   A.   Sure.  Based on when he presented to the
12  ER, what he complained of, from the EMS report, from
13  his own deposition.  I believe those are the three main
14  sources.
15   Q.   What about his wife's deposition?
16   A.   I did not based on that since she wasn't
17  there at 8:00 to 8:30 AM.
18   Q.   Oh, she wasn't?
19   A.   No.
20   Q.   What about his history to any of the
21  physicians at Centennial?
22   A.   I didn't base it on that, no.
23   Q.   Why did you not consider that?
24   A.   Because he was having a stroke at that
25  time and I don't -- one is he's had a stroke and he may

1   not be entirely reliable to remember the next day what
2   his exact -- happened in that very busy day before,
3   so --
4    Q.   Is there a correlation between somebody
5   having stroke symptoms and impairment of memory?
6    A.   Can be.
7    Q.   Well, if he was having a TIA, which is a
8   time-limited neurological event, doesn't that also
9   affect his ability to recall detail?
10   A.   It depends.  I mean, it wouldn't last, but
11  it can affect it temporarily.
12   Q.   Sure.  Well, the underlying cause is the
13  same in each?  The question is whether or not it causes
14  a permanent change; right?
15   A.   The size of the ischemia could also be
16  larger with a stroke than the TIA.
17   Q.   Right.
18   A.   So it could affect more of the brain and
19  affect memory more completely.
20   Q.   Right.  But in this particular case you
21  have considered the ER record, which is his history
22  that morning to the people in the ER; correct?
23   A.   I believe so.
24   Q.   He is the historian there?
25   A.   Yes.

1    Q.   You've considered the EMS record, which is
2   his history; correct?
3    A.   Yes.
4    Q.   And you've considered the deposition of
5   John Ruffino months and months later?
6    A.   Yes.
7    Q.   Right?
8    A.   Yes.
9    Q.   No other sources?
10   A.   I mean, to me those seem like the most
11  reliable and commonly-used sources when someone
12  presents with these kind of --
13   Q.   Well, perhaps they do, but you have not
14  concerned yourself with whether this man is a reliable
15  historian, have you?
16   A.   No, I always concern myself with that.
17  When someone presents, we want to make sure the sources
18  are reliable, and given the consistency of this story,
19  it seemed very consistent that he had something happen
20  between 8:00 and 8:30 that involved dizziness.  That's
21  the furthest I could go given the information we had.
22   Q.   Well, the history you've just given us
23  that you accepted is totally inconsistent with the
24  history that was given to the folks at Centennial;
25  right?  (Hands document to witness.)  Here's a copy of

1   the history given to Dr. Michael Nottidge (ph) at
2   Centennial, which is inconsistent with what you just
3   told us.  The night before yesterday, he went to bed in
4   usual state of health.  In the morning yesterday, he
5   got ready to go to work.  At that time the wife noted
6   that the patient was not speaking normal and that he
7   was confused.  At about 08:00 while at work, he had
8   increased right-sided weakness and aphasia and
9   dysarthria.  This history that was given back in
10  February of 2016 reflects that he had problems when he
11  was getting around in the morning, and if you looked at
12  his wife's deposition, you know that he got around
13  between 5:00 and 6:00 in the morning; right?
14   A.   Sorry.  He got around -- can you clarify
15  what you mean by "got around"?  He was able to --
16   Q.   As he was getting around to go to work, it
17  was always at 5:00 to 6:00 in the morning.
18   A.   Okay.
19   Q.   Right?
20   A.   That sounds right.
21   Q.   Let's just take these building blocks.
22  She testified that he got around at between 5:00 and
23  6:00.  When I deposed him, he initially said he went to
24  work at 7:00, but then he admitted he went to work at
25  6:00.

Page 145

1    A.   Okay.

2    Q.   These symptoms described in this note to
3  Dr. Nottidge are all occurring as he is getting around
4  before he goes to work at 06:00; right?

5    A.   According to this note, yes.

6    Q.   Yeah.  And you saw his wife's deposition,
7  didn't you, where she said specifically she was there
8  when her husband gave Dr. Nottidge this history, that
9  it was from him?

10    A.   Yeah.

11    Q.   Remember that?

12    A.   Again, that's why I don't feel like this
13  is a reliable report.

14    Q.   Okay.  Let's see if I can understand the
15  logic of Dr. Dhar.  You base your conclusion on last
16  time normal based on history from Mr. Ruffino to the
17  EMS people, to the ER, and in his deposition, and you
18  completely ignore the history he gave to Michael
19  Nottidge on the morning of February 18th, 2016?

20        MR. CUMMINGS:  Object to the form.

21    Q.   (By Mr. Gideon)  Right?

22    A.   I don't think ignore.  You relatively
23  weight it, but more importantly, I made my opinion, as
24  you asked about earlier, based on reasonable care in a
25  similar facility, and so I base my opinion on what

Page 146

1  information was available to those physicians caring
2  for him on the 17th, not what he subsequently might
3  have told someone.

4        So I'm basing my opinion on what was known
5  when he presented, which was that he had dizziness that
6  started at 8:00 to 8:30 and he was fine earlier in the
7  day, so that's why I choose that, along with the fact
8  the next day his memory was not as good.

9    Q.   Is that right?

10    A.   He had already had a stroke, we see on
11  MRI, so based on my synthesis and my plentiful
12  experience with medical notes, I feel this note the
13  next day is less reliable than when someone comes
14  directly to the ER with a very clear story that's
15  consistent.  That's why I choose to not believe this
16  note.

17    Q.   I see.

18    A.   Yeah.

19    Q.   Do you see your role in this case, too, to
20  decide where to find the truth in terms of factual
21  things?  You're not just offering opinions on standards
22  of care and causation as a scientist, but you're also a
23  truth arbiter?  You decide where the truth lies?

24    A.   I'd like to think I look for the truth,
25  yes.

Page 147

1    Q.   Yeah.  And not only look for it, but you
2  decide where it ultimately ends up?

3    A.   I mean, based on the synthesis of
4  information, yes.

5    Q.   So you not only synthesize science and
6  synthesize standards of care; you're a truth meter,
7  too, from a synthesis standpoint?

8    A.   Well, I think you always have to judge the
9  reliability and validity of information, yes, that's
10  always very important.

11    Q.   Okay.  Well, if we conclude -- if, for
12  example, a jury concludes that Mr. Ruffino is not
13  reliable, then your last time to normal calculation
14  could be terribly wrong, couldn't it?

15        MR. CUMMINGS:  Object to the form.

16    A.   Again, I'm basing what the physicians
17  would have known and should have known on the day he
18  presented.

19    Q.   (By Mr. Gideon)  I'm talking about the
20  truth.  I'm trying to synthesize truth a little bit,
21  too.  If the jury decides that Mr. Ruffino is a --
22  perhaps not only a poor historian, but dishonest, if
23  they make that decision -- which you know is their
24  prerogative, not yours -- your calculation of last time
25  to normal could be terribly wrong?  You recognize that,

Page 148

1  don't you?

2        MR. CUMMINGS:  Object to the form.

3    A.   I recognize anything's possible, but I'm
4  giving my opinion based on the information I see.

5    Q.   (By Mr. Gideon)  Yeah.  Now, if in fact
6  what we just talked about -- and that is if at 6:00 in
7  the morning Mr. Ruffino has symptoms that include what
8  we just talked about in Dr. Nottidge's note, dizziness,
9  confusion, and then at 8:00 to 8:30 it extends to
10  slurring and problems in his right upper extremity --
11  when was he last normal?

12    A.   Again, he was last normal at noon that
13  day.

14    Q.   So each time somebody's symptoms stop, the
15  clock resets for the administration of tPA?

16    A.   Exactly.

17    Q.   Where will I find that in any literature
18  or textbook anywhere --

19    A.   I think --

20    Q.   -- that as soon as the symptoms stop, the
21  clock resets for the administration of tPA?

22    A.   That's standard daily teaching for tPA,
23  yes.

24    Q.   Just --

25    A.   I can't name a -- which chapter it's in.



Page 149

1 I would assume it's in any chapter. That's -- every
2 stroke physician knows that.
3     Q.    Everybody knows that?
4     A.    Yes. That's one of the basic tenets of
5 tPA administration, is last known well. If someone
6 gets better, then the clock starts again. I don't
7 think it's written down in an article. It may be, but
8 I certainly couldn't list that article.
9     Q.    Well, what was this man's NIH stroke scale
10 then at noon in this case?
11     A.    From the best documentation that
12 StoneCrest provided, it was zero.
13     Q.    And how long did this man's NIH stroke
14 scale continue to be zero after noon?
15     A.    Some time around between 12:20 to 12:30,
16 he had these symptoms start up again and his NI stroke
17 scale would have gone up.
18     Q.    To what?
19     A.    We don't know, because I don't see it was
20 clearly timed or documented what -- there's poor
21 documentation, in my opinion, in his neurological
22 examination by the physicians caring for him.
23     Q.    Well, that's -- that criticism's not in
24 your report either, is it?
25     A.    I thought I did state that it wasn't well

Page 150

1 documented, so --
2     Q.    Well, what you just shared with us,
3 though, that the documentation was poor by the
4 physicians -- that's not in this report either, is it?
5     A.    I certainly say the communication between
6 physicians was poor.
7     Q.    Look, Doctor, I just asked about
8 documentation. Don't answer a question I didn't ask.
9 Is there anything in your report that addresses poor
10 documentation of neurologic status? Pretty simple
11 question.
12     A.    I think the only statement is where on the
13 facts -- the facts --
14     Q.    Don't tell me about other statements.
15     A.    Yeah.
16     Q.    I want to know where in this report is
17 there a statement that the doctors did a poor job of
18 documenting the neurologic status of this patient,
19 period. That's all I want to know right now.
20     A.    I don't believe there's a specific
21 statement on that.
22     Q.    I asked you earlier if you had omitted
23 your opinions and you said no, and each time we
24 continue our discussion it seems like we keep coming up
25 with more opinions that you express and then you can't

Page 151

1 find them in the report. Why is that?
2     A.    I mean, I don't think that was a central
3 opinion to what I was trying to say. It's simply you
4 asked a question and I came up with a response to that,
5 but it probably wasn't an opinion or thought I had at
6 the time when I prepared this report.
7     Q.    Well, I do want to know -- instead of you
8 offloading the inability to answer a question based on
9 criticism of somebody else, I want you to tell us using
10 your synthesis of the facts the NIH stroke scale at
11 various points along the way. When the patient arrives
12 in the morning and is first seen at about 9:48, what's
13 his NIH stroke scale then?
14     A.    Again, it's not documented. I can only,
15 from what we have, guess it was zero.
16     Q.    At noon, it's --
17     A.    Zero.
18     Q.    And when Dr. Archer sees the patient
19 between, shall we say, 12:20 and 12:54, it is four,
20 according to his own documentation; correct?
21     A.    Sometime in between noon and 2:00 PM, it's
22 four, yes.
23     Q.    Now, you recall from looking at the
24 nursing notes that the patient's symptoms wax and wane
25 throughout the rest of the day, don't they?

Page 152

1     A.    There was subsequent to that some changes
2 in his exam through the day, yes.
3     Q.    Yes. Such that subsequent to 12:20 to
4 12:54, there are times when the NIH stroke scale would
5 in fact have been zero; correct?
6     A.    Sorry. Say that time period again.
7     Q.    After 12:54, post-Dr. Archer's initial
8 evaluation of the patient, there are times when this
9 patient's NIH stroke scale is zero; correct?
10     A.    I cannot -- again, because it was not
11 documented -- verify that. All I can say is that at
12 least till 3:00 PM it seemed like he had deficits as
13 reflected by Dr. Chitturi and Dr. Archer.
14     Q.    And then after 3:00 PM --
15     A.    Yeah, that I don't know.
16     Q.    -- there are times when there are no
17 deficits documented; correct?
18     A.    In the nursing note.
19     Q.    Yeah.
20     A.    But not in any physician notes.
21     Q.    One of the factors that somebody who is
22 actually caring for a patient has to synthesize is to
23 determine whether tPA is indicated based on minimal or
24 improving symptoms; correct?
25     A.    Correct.



Page 153

1    Q.   That's one of those tough things that a
2  neurologist or an ER physician has to evaluate as they
3  synthesize things in real time; right?
4    A.   Yes.  Yes.
5    Q.   And this patient had minimal symptoms on
6  presentation?
7    A.   No.
8    Q.   No?
9    A.   No.  At 12:00 when he had his code stroke,
10  he had significant symptoms, not minimal.
11    Q.   Did he present at 12:20?  I thought you
12  told us he presented at 9:48 in the morning.
13    A.   No, you said that.  I said his stroke
14  presented, which is what the presentation refers to,
15  not when the patient happened to come to the ER.
16  Presentation is presentation of the stroke.
17    Q.   Ah, I see.
18    A.   Which we've clarified as 12:20.
19    Q.   At arrival at the hospital at 9:48 when he
20  first comes in, his NIH stroke scale is zero; right?
21    A.   That is not the question you asked,
22  which --
23    Q.   I'm asking it now.
24    A.   Yes.  As far as I can tell, it was zero.
25    Q.   And is it traditional to give tPA to

Page 154

1  patients with an NIH stroke scale of zero?
2    A.   No.
3    Q.   Would it be responsible to give tPA to
4  patients with a stroke scale of zero?
5    A.   No.
6    Q.   Would it be malpractice to give tPA to a
7  patient with a stroke scale of zero?
8    A.   Not in every case, no.
9    Q.   Not in every case?
10    A.   No.
11    Q.   Do the guidelines support giving tPA to a
12  patient with a stroke scale of zero?
13    A.   Again, guidelines don't apply.
14    Q.   I asked about guidelines.  You know, I
15  have looked to try and find your guidelines and I
16  haven't ever found any -- any publications by you on
17  this topic, so I've got to look at guidelines published
18  by other people.  Do the other people's published
19  guidelines like the AHA and the American Stroke
20  Association -- do they recommend or authorize tPA in a
21  patient with a stroke scale of zero?
22    A.   Guidelines don't authorize anything.
23    Q.   Do they encourage or recommend it?
24    A.   They don't encourage.  They do not state
25  they should be given with minor or resolving symptoms,

Page 155

1  and then leave it to the physician's discretion, and so
2  there are cases where an NIH stroke scale of zero could
3  very much necessitate -- and it could even be below the
4  standard of care to deviate from the guidelines, as
5  you've asked me before, and give tPA to someone with an
6  NIH stroke scale of zero.  I don't believe in this case
7  it should have been done, but I'm just simply answering
8  your question.
9    Q.   Well, I'm glad.  Then in this case we
10  don't have to deal with you saying that tPA should have
11  been given when the patient arrived?
12    A.   That is correct.
13    Q.   And you agree it shouldn't have been given
14  until -- the earliest was about 12:20 to 12:54?
15    A.   That's correct.
16    Q.   And by that time this is now at least four
17  hours post his history of dizziness and complications;
18  correct?
19    A.   It's six months post his onset of
20  symptoms, as we've established.
21    Q.   Six months post?
22    A.   He's been having these symptoms for six
23  months.
24    Q.   Really?
25    A.   Or sorry -- yeah, six months.  August --

Page 156

1  isn't -- didn't we clarify August was his first
2  episode?
3    Q.   I'm talking about February.  I'm talking
4  about hours --
5    A.   Yeah.  I'm talking about onset of symptoms
6  for him, his first ever symptoms, because there's no
7  artificial time -- midnight becomes a new day.
8    Q.   I get to ask the questions today.
9    A.   Okay.
10    Q.   I'm talking about February 17th, 2016.
11  Get that in your mind.  At 12:20 to 12:54, by your own
12  analysis of history, the initial dizziness, the initial
13  symptoms on that day had begun at 8:00 to 8:30;
14  correct?
15    A.   No.
16    Q.   No?
17    A.   Incorrect.
18    Q.   What had occurred at 8:00 to 8:30, Doctor?
19    A.   He had perhaps, as we said, a transient
20  neurological or a TIA or transient neurological event
21  at that time.
22    Q.   All right.  Well, then how long did the
23  TIA last that began at 8:00 to 8:30 that morning?
24    A.   As far as we can tell, it had resolved by
25  10:00 AM when he was triaged when he was no longer

1  having dizziness and had a normal exam and an NIH
2  stroke scale of zero.
3      Q.   And was he still having slurring of his
4  words at 9:30 to 9:35?
5      A.   That I don't believe is documented.
6      Q.   No?
7      A.   Whether he had that or not.
8      Q.   Did you ever get a copy of the EMS record?
9      A.   I did see that he --
10     Q.   The question is, did you get a copy of the
11 EMS record?
12     A.   I don't recall, but I saw it mentioned
13 somewhere.
14     Q.   You saw somebody refer to it?
15     A.   Yes.
16     Q.   It might have been in another deposition?
17     A.   Might have been.
18     Q.   Well, if in fact this individual had a
19 TIA, did the TIA start at 8:00 and resolve at around
20 10:00?  Is that what you're telling us?
21     A.   There was -- sometime in that time frame
22 of two hours, there was an event that led to his
23 presentation.
24     Q.   And I am to understand then that,
25 according to standards of care as you share them with

1  us and guide us, that as soon as the symptoms stop,
2  there's a complete reset on time?
3      A.   Yes.
4      Q.   And therefore all you would ever really
5  need to do is make sure that if somebody's got symptoms
6  suggestive of a stroke, it's just have as much as a
7  15-minute window when they stop and it's a complete
8  reset?
9      A.   Yes.
10     Q.   Surely that is in some publication in the
11 western world.  Can you identify it for me?
12     A.   Not right now, but I would be amazed if
13 every stroke neurologist didn't agree with that
14 statement.
15     Q.   You'll be amazed by it?
16     A.   Yes.
17     Q.   And what are you going to do if it turns
18 out that other stroke neurologists, not only think that
19 it's wrong, but it's irresponsible to say that?  What
20 would you do if that's what you were confronted with?
21     A.   I'd be shocked.
22     Q.   How about on the 17th itself, the H & P?
23 Did you ever look at this particular record?  (Hands
24 document to witness.)
25         MR. CUMMINGS:  Thanks.

1          MR. GIDEON:  Uh-huh.
2      Q.   (By Mr. Gideon)  In the -- I want to show
3  you what I'm focusing on.  There's a description of the
4  symptoms at the top, which you would expect in an H &
5  P.
6      A.   Okay.
7      Q.   56-year-old Caucasian male, medical
8  history significant for hypertension,
9  hypercholesterolemia, who presented to StoneCrest ED on
10 account of dizziness and slurred speech with facial
11 muscle weakness as well.  This started around 8:00 PM
12 (ph) yesterday morning.  Do you see that?
13     A.   Yes.
14     Q.   Patient is, however, a poor historian, so
15 history was obtained by chart review and also from
16 wife.  The patient stated he has been having these
17 acute events with speech difficulty and facial weakness
18 of unknown, I guess, duration for the past one month.
19 He's had about three episodes so far which really
20 lasted for about three to five minutes and resolved
21 completely afterwards.  Then it says the patient
22 presented to the StoneCrest Medical Center facility
23 way, way after the thrombolytic window and at that
24 time.  Doesn't make sense, that sentence.  Down below
25 that -- it would be one, two, three, four more lines --

1  it says, the history, patient woke up with the
2  above-listed symptoms.  Do you see that section?
3      A.   Yes.
4      Q.   Now, if that history is correct that he
5  woke up with slurred speech, dizziness, and facial
6  muscle weakness, by accepted standards his last time
7  normal would be when he went to bed; isn't that right?
8      A.   For that episode, yes.
9      Q.   Yes.  Let's make this history and physical
10 at Centennial the next exhibit.  What's the number?
11         THE REPORTER:  That will be 12.
12         [Exhibit 12 marked for identification.]
13     Q.   (By Mr. Gideon)  Who's the chair of your
14 program?
15     A.   Of neurology?
16     Q.   Yes.
17     A.   David Holtzman.
18     Q.   Spell the last name?
19     A.   H-O-L-T-Z-M-A-N.
20     Q.   Next thing I want you to see is there's a
21 neurologist who was involved in this patient's care at
22 Centennial whose name is Ron Wilson.  You'll see his
23 name under the attending up on the right side.  (Hands
24 document to witness.)
25     A.   Okay.  Yeah.

1    Q.    Have you ever seen this record before?
2    A.    I don't believe so, no.
3    Q.    I'm going to be very interested to see
4  just how much of the Centennial chart you've seen.  How
5  do we go about doing that?  How do we take an inventory
6  of what's on your computer reflecting what you actually
7  have seen?
8    A.    I mean, I can share the file somehow or
9  print them out, I mean, if you would want me to print
10  them out.
11    Q.    I don't want to waste paper.
12    A.    Right.  That's why I --
13    Q.    I really don't want to waste paper, but
14  can you download the Centennial materials you actually
15  received onto a disc and make that disc an exhibit to
16  this deposition, please?
17    A.    Okay.  I can put everything that I've
18  received and then you can have that.
19    Q.    I want just the Centennial record --
20    A.    Okay.
21    Q.    -- reflecting what you received, please.
22    A.    Okay.
23    Q.    Will you do that as an exhibit and give it
24  to this court reporter?
25    A.    Okay.  I'll -- yeah.  Because I don't

1  recall reviewing this record --
2    Q.    All right.  Well, Ron Wilson, I'm telling
3  you, is an experienced neurologist in Nashville.
4    A.    Okay.
5    Q.    He's been practicing a long time.  And
6  what I want to ask you about is his assessment -- it's
7  on the second page of the materials I've given you,
8  which is the NIH stroke scale.
9    A.    Okay.
10    Q.    And it shows that he has facial palsy,
11  minor paralysis, a one, in that category.  He has
12  language aphasia, mild loss of fluency, a one, and
13  dysarthria, slurring, intelligible, one, for a total
14  NIH stroke scale of three.  Do you see that?
15    A.    Yes.
16    Q.    Now, in this particular case what tells us
17  that this man wasn't having another TIA at the time
18  this NIH stroke scale was done?
19    A.    I mean, the fact that he'd already had an
20  MRI that showed a stroke.
21    Q.    Anything else?
22    A.    Again, from this record, no, but the fact
23  that he had these deficits -- if he had them
24  consistently, then I would say that would be the
25  best --

1    Q.    Yeah, but you can't tell us he had them
2  consistently because you haven't seen the Centennial
3  chart?
4    A.    Right.  No, you'd have to be able to
5  examine him at two points and document that, and
6  that -- I don't have that data in front of me.
7    Q.    Correct.
8    A.    Yes.
9    Q.    My point is you know from what you have
10  seen that when he has described transient ischemic
11  attacks, he has described difficulty with speaking,
12  slurring of his words; right?  Right?
13    A.    Yes.
14    Q.    Which he's doing here.  He has described
15  facial weakness.  You saw that in the history with Dr.
16  Luck back in November 2015; right?
17    A.    Yes.
18    Q.    What else is positive?  Mild loss of
19  fluency.  If that's new, then that only accounts for an
20  NIH stroke scale one, doesn't it?
21    A.    New since when?  Sorry.
22    Q.    New as of that date.  What I'm getting at
23  is, can you tell us he wasn't having a recurrence of a
24  TIA at the time Ron Wilson saw him on the morning of
25  February 20th?

1    A.    Mainly because Dr. Wilson doesn't say
2  that.  He would say these are new deficits that --
3    Q.    I didn't ask what Ron Wilson will say.  I
4  asked what you can say.  Can you tell us this man
5  wasn't having another TIA -- yet another one -- at the
6  time of this exam?
7    A.    I think that's highly unlikely, yes.
8    Q.    Can you say it wasn't happening, is my
9  question?
10    A.    Yes, because Dr. Wilson mentioned -- MRI
11  with a stroke already, so once you've had a stroke, you
12  can no longer diagnose someone with a TIA anymore.
13    Q.    Well, once he's had a stroke, then is he
14  no longer capable of having tPA again?
15    A.    A recent stroke is a contraindication to
16  tPA, yes.
17    Q.    How recent?
18    A.    Any time in the last few weeks, even.
19    Q.    So if in fact somebody's had a stroke and
20  it's in the last few weeks, then that is a
21  contraindication for tPA?
22    A.    If he then had another stroke
23  subsequently,
24    Q.    Right.
25    A.    Like even this next day, if this was



1  another event, then you would not want to give him tPA.
2      Q.    Was this another event on the 20th?
3      A.    Not that I can tell from this note, no.
4      Q.    Well, let's look in fact at what's in Page
5  3 of these materials I've attached here.
6      A.    Okay.
7      Q.    This is the note by Ron Wilson, and as
8  I've assured you, he is a capable neurologist, and he's
9  looked at the case, he's looked at the imaging.  Unlike
10 you, he's actually looked at the imaging.
11     A.    Okay.
12     Q.    You see where he describes at the top --
13 he says there's a complex left middle cerebral artery
14 hypoperfusion syndrome due to partial occlusion of MCA
15 vessels.  He doesn't say the patient has been occluded,
16 does he?
17     A.    He has partial occlusion.
18     Q.    Yes.  Now, what's the difference between a
19 complete occlusion and a partial occlusion, as if us
20 laypeople can't figure that out on our own?
21     A.    Some flow versus no flow.
22     Q.    Yeah.  And in this case this man had some
23 flow back 12-23-15, didn't he?
24     A.    We don't have a perfusion study on
25 12-23-15.

1      Q.    It's probable he had some flow despite
2  occlusion?
3      A.    Right.  Absolutely.  I would -- given that
4  he wasn't having a stroke back then, I would say very
5  likely he had flow, yes.
6      Q.    Here Dr. Wilson talks about, not a stroke,
7  but to hypoperfusion syndrome, doesn't he?
8      A.    No, his very first diagnosis is acute
9  thromboembolic -- separate issue -- cerebrovascular
10 accident.  That's his diagnosis, and that, as you know,
11 is a synonym for stroke.  So his main diagnosis is this
12 patient has a stroke.  He's in my most charitable
13 explanation, I think, going deeper into the cause based
14 on hypoperfusion, et cetera, but clearly he believes he
15 had a stroke, because as you said, he reviewed the MRI
16 that showed a stroke.
17     Q.    I see.  Well, do you know if the acute
18 thromboembolic cerebrovascular accident was
19 auto-populated or not?
20     A.    I don't know how these notes work, no.
21     Q.    Focusing on what is --
22     A.    I hope not.
23     Q.    Focusing on what is free text, meaning
24 what is written by the physician himself -- you see
25 that reference to free text, assessment and plan?

1      A.    Yes.
2      Q.    You know what free text means, don't you?
3      A.    Yes.
4      Q.    It means the doctor wrote it himself;
5  right?  What is a hypoperfusion syndrome due to partial
6  occlusion?  Share with us your synthesis of that
7  information.
8      A.    My synthesis is that he's saying that,
9  even despite the stroke, he still has areas of his
10 brain that are hypoperfused beyond the stroke because
11 of this still-partial occlusion, and so that's why we
12 need to keep his blood pressure high and watch his
13 deficits to make sure he doesn't have a bigger stroke.
14     Q.    I see.
15     A.    That he clearly recognizes the stroke,
16 because even though, as you said, this is not free
17 text, that doesn't mean it's not valid.  It's -- his
18 Number 1 problem is the most valid statement in that
19 impression, which is stroke.  That's certainly a
20 fallacy to say the free text is more valid than the
21 selected Problem Number 1 that we select specifically
22 that that's the most accurate problem.
23     Q.    I see.
24     A.    So I wouldn't say that's fair to impugn
25 him with -- say that he didn't select that carefully.

1      Q.    What's --
2      A.    But I think he's gone beyond that, to be
3  more specific.
4      Q.    Okay.  What is neuronal hibernation?
5      A.    That's a good question.
6      Q.    You're the -- synthesize it for me.
7      A.    I didn't present that word.  I -- if you
8  give me the context, I guess I can --
9      Q.    It's in the report?
10     A.    Where?
11     Q.    Give me your expertise on neuronal
12 hibernation?
13     A.    Where is that in the report?  Oh, right
14 here at the bottom here.
15     Q.    It's right in front of you.
16     A.    Ischemic neuronal hibernation.
17     Q.    Plan is to continue supportive care hoping
18 for collateral formation and recovery of the areas of
19 ischemic cerebral neuronal hibernation.  What is that?
20     A.    From what I can interpret here, he's
21 saying that there is this broad area of hypoperfusion
22 for the whole MCA, again, as we discussed, likely
23 because he saw that CT perfusion study that showed that
24 area, that there's more of his brain beyond what's
25 already stroked that's at risk and we want to preserve

1 the blood flow.  He talked about blood pressure,
2 head-down position, and we want to make sure that
3 tissue, which may be hibernating, does not go on to
4 have an infarct.
5        Q.   Okay.  Next note, it's the next day.  I
6 suspect you probably haven't seen this either.  Why
7 don't you go ahead and tell us if you have?  (Hands
8 document to witness.)
9           MR. CUMMINGS:  Thank you.
10     A.   No.
11     Q.   (By Mr. Gideon)  No what?
12     A.   No, I haven't seen it.
13     Q.   Okay.  There's another reference here,
14 Problem Number 1, free text assessment and plan,
15 complex left middle cerebral artery hypoperfusion
16 syndrome due to partial occlusion of MCA vessels.  You
17 want to synthesize that for us and tell us what's that
18 mean?
19     A.   That sounds like the same -- that is,
20 looks like, a copy and paste of what he wrote the day
21 before.
22     Q.   But it's free text again, isn't it?
23     A.   The free text -- just copy and paste --
24     Q.   Yes.
25     A.   -- so it's actually less spontaneous than

1 anything else.
2     Q.   What does it mean?  Does it mean the same
3 thing as the day before?
4     A.   Yeah.  It looks like the same as that
5 statement he made before, that there's this thing -- he
6 still wants to keep the blood pressure up.
7 Hypertension seems to have stabilized.  To keep that
8 blood circulating.
9     Q.   Because of the area of occlusion that you
10 now know exists -- excuse me -- the area of stenosis
11 that you now know exists in the left middle cerebral
12 artery distribution that was apparent 12-23-15?
13     A.   Right.  So even -- he's saying that he's
14 had a stroke, but we want to preserve the rest of his
15 brain, which still has hypoperfusion.
16     Q.   Right.  Why is there still hypoperfusion
17 poststroke?
18     A.   Exactly.
19     Q.   Why?
20     A.   Because he still has that stenosis, so he
21 had the stroke, which is likely due to a clot that
22 wasn't lysed fast enough, and then the stroke is there.
23 We see that on the MRI.  But yet he also seems like
24 he's recognizing there's still low flow, so more than
25 just the stroke, which is from the thrombus -- as he

1 said, thromboembolic -- he also believes he has a
2 bigger area that could stroke and he's very worried
3 about that and so he's making these notations.
4     Q.   Okay, we'll make a copy of that document
5 and the one that preceded it as the next two exhibits,
6 please.
7           [Discussion off the record.]
8           MR. GIDEON:  13 is the disc of your --
9 what you actually were furnished for Centennial Medical
10 Center admissions, and 14 and 15 will be the last two
11 notes that we've just talked about.
12           [Exhibit 14 marked for identification.]
13           [Exhibit 15 marked for identification.]
14     Q.   (By Mr. Gideon)  Now, if there were timely
15 administration of tPA, according to your calculations,
16 the patient would have been able to walk out of the
17 hospital in seven days; right?
18     A.   I think more likely than not he would have
19 had better mobility, yes.
20     Q.   I'm going to ask specific questions.
21 Would the patient have been able to walk out of the
22 hospital within seven days if tPA was given in a timely
23 fashion?
24     A.   I think more likely than not, yes.
25     Q.   Would the patient have been able to speak

1 to someone in an understandable fashion if he had been
2 given tPA in a timely fashion?
3     A.   Again, I mean, he is able to speak, but he
4 has deficits, and I think more likely than not those
5 would be improved by the tPA.
6     Q.   You're still doing something I asked you
7 not to do earlier, which is to answer questions I
8 didn't ask.  Would the patient be able to speak if he'd
9 received timely tPA at the expiration of seven days?
10     A.   I mean, he is able to speak, so that's why
11 I can't answer the question, because even --
12     Q.   Clearly even without tPA he was able to
13 speak; correct?
14     A.   Right.  So that's why I was saying it's
15 just more likely he could speak better.
16     Q.   Right.  Would -- tPA is not going to make
17 his speaking abilities actually improve over his
18 baseline; right?
19     A.   No, it would improve over the stroke.
20     Q.   Right.  Right.
21     A.   The stroke that he had caused him trouble
22 speaking, and if he didn't have that stroke or a
23 smaller stroke, which the tPA would give him a better
24 chance of having, then the speech deficit would be
25 lessened.

Page 173

1    Q.   Well, then I'll ask the same question
2 again. TPA does not make you speak better than you
3 were speaking before the stroke occurred, does it?
4    A.   No.  No.
5    Q.   You agree with that?
6    A.   Yes.
7    Q.   So if he wasn't a particularly articulate
8 man, tPA doesn't make him as articular as you are, does
9 it?
10    A.   It would not improve his speech, no,
11 beyond that.
12    Q.   When he walked out of Centennial Medical
13 Center on February 26th, what were his limitations, if
14 any? Can I help you find something?
15    A.   I'm trying to see my notes where I
16 reviewed that.
17    Q.   You're looking at a letter Mr. Cummings
18 sent you.
19    A.   That has some of the summaries of the
20 Centennial records and has time points.  Because I
21 didn't review the Centennial records in the same detail
22 because I was focusing on the tPA decision on that one
23 day.
24    Q.   Right.  We're focusing on something
25 else --

Page 174

1    A.   And my opinion wasn't related to that
2 other stuff of what happened later, so I didn't focus
3 on that.  That's --
4    Q.   The question remains, what was his
5 condition when he walked out of the hospital on
6 February 26th, 2016?
7    A.   Yeah, I don't have that.  I don't --
8    Q.   And if the answer is, "I don't have a
9 clue," just tell me.
10    A.   Yeah, I don't have the exact information
11 on that.
12    Q.   How long was he out of the hospital before
13 he returned?
14    A.   I know he did return.  I don't have the
15 exact time frame between the two.
16    Q.   Is the answer, "I don't know"?
17    A.   Yes.
18    Q.   Why did he return to Centennial Medical
19 Center?
20    A.   I believe he had some new or worsening
21 symptoms.  Again, I didn't review those records in
22 detail.
23    Q.   How long after his discharge did he have
24 new or worsening symptoms?
25    A.   I don't know.

Page 175

1    Q.   What was the cause of his new or worsening
2 symptoms that you don't know about?
3    A.   I don't know.
4    Q.   What is Mr. Ruffino's level of function
5 today?
6    A.   I believe from the deposition, which is
7 what I did review, he has some trouble with speech and
8 mobility.
9    Q.   Well, the deposition was videotaped.  Did
10 you actually look at the video?
11    A.   No, I just have this -- the written report
12 of that.
13    Q.   The written -- the transcription?
14    A.   The transcription.
15    Q.   You didn't look at his wife's description
16 of what he can and cannot do?
17    A.   I did look at his wife's deposition as
18 well.
19    Q.   Wouldn't you think that somebody who is
20 significantly impaired would not be driving?
21    A.   Depends on the impairment, I guess.
22    Q.   Well, let's talk about --
23    A.   Speech impairment doesn't -- sorry.
24    Q.   Let's talk about him.  We'll talk about
25 motor impairment to begin with.

Page 176

1    A.   Okay.
2    Q.   Should a person with significant motor
3 impairment be driving?
4    A.   Can't provide an opinion without knowing
5 the specific motor impairments, but --
6    Q.   What motor impairment did he have as of
7 the time of his deposition?
8    A.   I believe just some trouble walking, then
9 trouble with his arm.  I have to find the exact
10 details.
11    Q.   Is it not in your notes?
12    A.   Again, I don't have as many notes on the
13 long-term outcomes as I do on that date.  That's,
14 again, what I focused mostly on.
15    Q.   Well, there's nothing in your report that
16 tells us that you're going to be offering an opinion
17 about Mr. Ruffino's disability, employment --
18    A.   Right.
19    Q.   -- income-earning capacity, is there?
20    A.   No.
21    Q.   And is this one area where you're not
22 going to be offering an opinion on a subject that's not
23 in your report?
24    A.   Right.  The only opinion I'm offering is
25 that -- the chances of tPA helping that ultimate



1 disability, but not what the implications of that are.
2      Q.    Right.  The only thing you're telling us
3 is there are chances that tPA improves the outcome?
4      A.    Yes.
5      Q.    But you just can't specify by how much?
6      A.    Yes.
7      Q.    Did you know before you and I talked today
8 that Mr. Ruffino fell at home in the bathroom, and even
9 though he was progressively worsening at home, he
10 waited 15 hours to go back to the hospital?  Did you
11 know about that?
12      A.    I didn't until I reviewed the expert
13 disclosures.
14      Q.    Now that you know about that from the
15 expert disclosures, isn't it irresponsible for a
16 patient to -- who admits he was told if anything
17 changes, come back -- to wait 15 hours and get worse
18 and worse and worse?  Don't you think that's
19 irresponsible?
20      A.    I mean, I don't know the specifics of this
21 case, but in general you would hope someone who gets
22 worse should come back, yes.
23      Q.    Well, I'm talking about this case.
24      A.    I haven't reviewed the specifics of this
25 case.

1      Q.    Well, I'm giving you the specifics.
2      A.    I can't comment without reviewing them
3 myself.
4      Q.    You cannot comment on Mr. Ruffino's own
5 admitted failure to return, even though you've read his
6 deposition?
7      A.    I'd have to look at that part again.
8      Q.    Page 82, Lines 18, to Page 83, Line 5, he
9 admitted he should have gone back.  But you still can't
10 reach a conclusion?
11      A.    I haven't reviewed that before, and that
12 wasn't part of my opinion, no.  Which page?
13      Q.    Well, I'm going to ask you right now.
14 Isn't it part of your opinion that a patient who admits
15 he was told, "Come back immediately if you have any
16 problems," falls at home, and waits a full 15 hours
17 before returning, while he is getting progressively
18 worse -- isn't that a failure to exercise reasonable
19 care for his own health, safety, and welfare?
20      A.    Which page was this on?
21      Q.    I want you to answer my question.
22      A.    Well, I would just like to have the
23 information.  I think in general that's true, yes.
24      Q.    What about in this case?
25      A.    Again, I don't know enough details in this

1 case to tell you.
2      Q.    This is one area where, because it
3 involves a potential criticism of the patient, you're
4 unwilling to answer the question?
5      A.    No, it's specifically because I don't feel
6 comfortable without having done my due diligence to
7 read the records and know truly the details of anything
8 that happened at Centennial, as you pointed out in
9 great detail, or what happened after, that I simply
10 don't feel comfortable providing an informed opinion on
11 all the details of that day and what happened and -- I
12 know a lot of things happened -- so I just simply don't
13 feel comfortable doing that at this time.
14      Q.    Well, this is the last time to do that.
15 Do you have an opinion or not?
16      A.    Again, I don't have enough information to
17 have that opinion.
18      Q.    All right.  Let's talk about these trials
19 for just a moment.  I just want to make sure you and I
20 have an understanding about what the trials did and
21 didn't do.
22      A.    All right.
23      Q.    The Interventional Management of Stroke
24 Trial Three, which is called IMS III -- you are
25 familiar with that, are you not?

1      A.    Generally familiar, yes.
2      Q.    Isn't it true that before anybody would
3 even be enrolled in that study, they had to have an NIH
4 stroke scale of greater than or equal to 10?
5      A.    That sounds about right.
6      Q.    And they compared IV tPA within three
7 hours versus embolectomy; correct?
8      A.    I believe so, yes.
9      Q.    And isn't it true that they reported there
10 was no significant difference in outcome between the
11 intravenous IPA-only group -- excuse me -- intravenous
12 tPA-only group and the endovascular group for a good
13 outcome measured as a modified Rankin scale of zero to
14 two?  Isn't that the result of that study?
15      A.    In that study, yes.
16      Q.    And isn't it true that in that study where
17 they looked at the patients with an NIH stroke scale of
18 10 or greater, they got what was defined as
19 revascularization based on a thrombolysis and cerebral
20 infarction Grade 2B to 3 in only 41 percent of the tPA
21 cases?
22      A.    That sounds about right.
23      Q.    41 percent is less than 50 percent, isn't
24 it?
25      A.    I believe so, yes.

Page 181

1    Q.   Let's talk about the MR and recanalization
2 of stroke clots using embolectomy, which is more
3 commonly referred to as Mr. Rescue; right?
4    A.   Okay.
5    Q.   People enrolled in this were either
6 ineligible for intravenous tPA or they had persistent
7 vessel occlusion after intravenous tPA; correct?
8    A.   I don't recall the details of that trial
9 to say, but sounds reasonable.
10    Q.   Well, how would you have any significant
11 numbers of people with persistent vessel occlusion
12 after intravenous tPA, given what you've told us today,
13 that it always succeeds in more than 50 percent of the
14 cases?
15    A.   I would say always and 50 are oxymorons
16 also, so definitely it succeeds in some cases, as I've
17 said, but there are many cases where it doesn't,
18 especially in those proximal occlusions, unlike what he
19 had.
20    Q.   Right.
21    A.   So there's definitely a big role for
22 embolectomy in these treatments.  As I said, in this
23 case tPA would have provided a benefit more likely than
24 not, but that doesn't mean that there's also additional
25 benefit from more aggressive treatment.

Page 182

1    Q.   Well, I want to talk about what's actually
2 been published and is not just a synthesis that you're
3 sharing with us.  How could you ever have a pool of
4 patients in sufficient numbers to look at people who
5 didn't get benefit from intravenous tPA given what
6 you've already told us today?  You've made it sound as
7 if that pool is so vanishingly small.
8    A.   No, I simply said it was over 50 percent.
9 That still leaves half of all strokes, which are
10 roughly 800,000 every year in America, so that's quite
11 a few patients who don't improve with tPA.
12    Q.   400,000 people a year?
13    A.   No, I'm saying there's 800,000 strokes per
14 year.
15    Q.   Yeah, and I did a little math.  50 percent
16 of 800,000 would be 400,000?
17    A.   Sure.
18    Q.   400,000 people don't improve with tPA each
19 year in the United States?
20    A.   Well, 800,000 don't get tPA, first of all.
21 Unfortunately, most people don't get tPA.
22    Q.   Well, you're running away from the topic.
23    A.   No.
24    Q.   800,000 people a year have a stroke in the
25 United States.

Page 183

1    A.   Okay.
2    Q.   What percentage of them get tPA?
3    A.   Probably less than 10 percent.
4    Q.   Why?
5    A.   They come to the ER late.  They have some
6 other exclusion criteria.  There's a number of reasons
7 why the rate's so low, mainly because of late
8 presentation.
9    Q.   Mainly because of late presentation by
10 these folks?
11    A.   Yes.
12    Q.   But I thought the time reset when the
13 symptoms stopped.
14    A.   And most people don't have what he had.
15 He has a very unique case where his symptoms reset.  In
16 those cases then you re -- most people are not lucky
17 enough to have that scenario where you can reset.
18    Q.   What percentage of the 800,000 a year
19 actually get tPA?
20    A.   Again, I --
21    Q.   You're an expert.  Tell me.
22    A.   No, I'm not a machine, though.  It seems
23 like you're asking me these questions as if I know
24 every study off by heart and every number off by heart.
25 I simply don't.

Page 184

1    Q.   Well, give us a number.  You brought up
2 800,000 strokes per year in the United States.
3    A.   Right.  And I said roughly 10 percent get
4 tPA.
5    Q.   10 percent, so it would be 80,000?
6    A.   Sure.
7    Q.   That's a large enough number for the
8 Centers for Disease Control to track; right?
9    A.   Sure.
10    Q.   Do you know if the CDC actually tracks
11 outcomes for those patients that get tPA?
12    A.   No, I do not.
13    Q.   All right.  Let's talk about the next
14 trial, ESCAPE, also known as endovascular treatment for
15 small core and anterior circulation proximal occlusion,
16 with emphasis on minimizing CT to recanalization times;
17 right?  That required an NIHSS of greater than five,
18 didn't it?
19    A.   If you say so.
20    Q.   I say so.  Do you agree?
21    A.   I don't disagree.
22    Q.   It also required moderate to good
23 collateral circulation, didn't it?
24    A.   I have no idea.
25    Q.   Do you know if the CT, the CTA in this



1   case on the afternoon of the 17th of February, showed
2   good collateral circulation from the meningeal
3   arteries?
4       A.   I believe there were some collaterals, but
5   not -- and again, I don't have that information in
6   front of me.
7       Q.   You didn't record anything about the
8   existence or the degree of collateral circulation, did
9   you?
10      A.   No, I didn't record that.
11      Q.   And there's nothing in your report about
12  the existence or degree of collateral circulation on
13  the CTA, is there?
14      A.   No.
15      Q.   The fact of matter is the CTA on the
16  afternoon of the 17th shows exuberant luxury perfusion,
17  doesn't it?
18      A.   Luxury perfusion is, I mean, I think
19  different from collaterals, but --
20      Q.   It shows exuberant luxury perfusion,
21  doesn't it?
22      A.   I can't comment on that.  I don't have
23  that information.
24      Q.   Why not?
25      A.   I didn't see that when I reviewed the CTA.

1       Q.   Don't you think that you should have, if
2   it was present, seen it -- if present?
3       A.   Well, I mean, there's lots of things that
4   were present that were not seen, like the MRA was read
5   as normal, and so if they can be things that are seen
6   by --
7       Q.   We're not talking about somebody else.
8   We're talking about an expert with your expertise.
9   You, for example.  When you ultimately got the MRA of
10  12-23-15, you saw that the radiologist had missed the
11  degree of occlusion in the MCA, the degree of stenosis
12  in the MCA?
13      A.   I mean, I certainly suspected there was a
14  degree of stenosis when I reviewed it, yes.
15      Q.   Yeah.  Likewise, on the CTA the
16  radiologist didn't describe luxury perfusion.
17      A.   And I --
18      Q.   But did you see it?
19      A.   I didn't see it, no.
20      Q.   What significance does luxury perfusion
21  have?
22      A.   It can mean that there's an area of damage
23  that's already happened to the brain.
24      Q.   Yeah.
25      A.   And I certainly didn't see that.

1       Q.   In the --
2       A.   And sorry.  Very different from
3   collaterals, so I thought you were asking about
4   collaterals.
5       Q.   Well, actually, I'll ask about both.
6       A.   Okay.  Sure.
7       Q.   Did you see any robust collateral
8   circulation in the CTA on the afternoon?
9       A.   I generally don't review the collaterals
10  on CTA.  I mean, angiography is a lot better for
11  collaterals, but I did see some, but I am not
12  comfortable grading -- not as a radiologist -- a grade
13  of collaterals.
14      Q.   Now, on the ESCAPE trial, in order to be
15  enrolled, the patients that had the endovascular
16  intervention had to have a minimum NIH stroke scale of
17  13; correct?
18      A.   Okay.
19      Q.   Isn't that correct?
20      A.   I don't know.
21      Q.   And for the controls, which were tPA
22  alone, they had to have a minimum stroke scale of 12,
23  didn't they?
24      A.   I'm not sure.
25      Q.   Well, what do you know about the ESCAPE

1   trial?
2       A.   I don't have every information on every
3   trial in my mind, no.
4       Q.   I didn't ask about every trial and all the
5   trials.
6       A.   I --
7       Q.   I asked about one trial.  What do you know
8   about the ESCAPE trial?
9       A.   Not that level of detail.
10      Q.   I didn't ask level of detail.
11      A.   Okay.
12      Q.   What do you know about the ESCAPE trial,
13  if anything?
14      A.   Not enough apparently to answer these
15  questions.
16      Q.   What do you know about the SWIFT PRIME
17  trial?  Anything?
18      A.   I know that it was a trial that showed
19  benefit of adding Solitaire-based retrieval to tPA in
20  patients who had large vessel occlusion.
21      Q.   Any more than that?
22      A.   That's enough certainly to take away for
23  clinical practice.
24      Q.   I see.  You know that in order to be
25  enrolled in SWIFT PRIME, you had to have an NIH stroke

1  scale of a minimum of eight and no more than 29?
2  Didn't you know that?
3      A.   That also sounds correct, yes.
4      Q.   You also had to have a target mismatch
5  profile between the ischemic core and the penumbra,
6  didn't you?
7      A.   In some of those trials, yes.
8      Q.   In SWIFT PRIME specifically?
9      A.   I can't remember that specifically.  I
10  know some trials did have specific --
11      Q.   Do you know in this case whether Mr.
12  Ruffino would fit the SWIFT PRIME criteria?
13      A.   No, I specifically -- no, we don't know
14  because he didn't have the appropriate studies to tell
15  us.
16      Q.   And let's talk about extending the time
17  for thrombolysis in emergency neurological deficits
18  intraarterial, the EXTEND-1A.  This was one where
19  participants were split between IV tPA only, which you
20  say works all the time, and IV tP -- excuse me -- and
21  endovascular therapy, plus intraarterial tPA; correct?
22      A.   Again, I don't recall the details of the
23  differences of all these trials.
24      Q.   Do you recall whether there was a mismatch
25  ratio required to enroll?

1      A.   No.
2      Q.   And if so, what there was?
3      A.   No.
4      Q.   Do you recall the results where tPA
5  intravenously alone in tertiary centers in the SWIFT --
6  excuse me -- EXTEND-1A trial -- the most recent of
7  these trials, the best of these trials -- what was the
8  percentage of patients that had revascularization from
9  intravenous tPA alone?
10      A.   How do they define revascularization?
11      Q.   The same thing I talked about before.
12      A.   Well --
13      Q.   2B to 3 flow through that vessel.
14      A.   The reason I ask is, again, not knowing
15  the trial off by heart, if they didn't do
16  anything except tPA and didn't do endovascular in that
17  group, how would they know the revascularization,
18  because you need to have the angio to know that?  So
19  did both -- did that tPA group also have an angiogram?
20      Q.   Yes.
21      A.   Okay.
22      Q.   And what they did was they compared
23  intravenous tPA --
24      A.   And they did the --
25      Q.   -- versus intravenous tPA plus the use of

1  endovascular intervention?
2      A.   But I guess I'm asking if those ones who
3  didn't get endovascular -- they still put them through
4  an angiogram to measure the flow?  I mean, that --
5      Q.   Yes.
6      A.   I'd have to --
7      Q.   To determine if they reached the --
8      A.   That seems --
9      Q.   -- thrombolysis in intracranial --
10  whatever it is -- the 2B to 3 scale -- to show that
11  it's been revascularized?
12      A.   Seems unnecessarily invasive, so I don't
13  recall that's even the case.  I'm not saying that
14  you're lying.  I'm simply -- I can't verify that
15  because I find it hard to believe that an ethical trial
16  would put people through angiography without giving
17  them the benefit of the procedure, so I can't comment
18  on that, whether that's true or not.
19      Q.   Well, the thing that really is material is
20  to take this trial that was done at some of the really
21  fine centers -- and in fact, wasn't it done here, too?
22      A.   Some -- SWIFT PRIME was done here.
23      Q.   SWIFT PRIME?  Yeah.
24      A.   Other ones might be.
25      Q.   Yeah, there were two people from

1  Washington University in St. Louis in either SWIFT
2  PRIME or EXTEND-1A --
3      A.   Definitely SWIFT PRIME, I think --
4      Q.   I can't remember -- two people from
5  Washington University in St. Louis, neither of which
6  was you.  But what I thought was interesting about the
7  EXTEND-1A was this was a case where they had one set of
8  patients that got intravenous tPA alone, and then they
9  had the other group that was more aggressive where they
10  got the intravenous tPA and the endovascular
11  embolectomy.
12      A.   And --
13      Q.   And what I'm asking you is this, Doctor.
14  Do you know what percentage of patients were
15  revascularized to the 2B/3 scale with tPA alone?
16      A.   In this large group of more severe
17  strokes, proximal occlusions, I would guess it's less
18  than 50 percent.
19      Q.   Oh, it is.  It's 37 percent, substantially
20  less than 50 percent.
21      A.   In a diff --
22      Q.   Yes.
23      A.   In a very different patient population.
24      Q.   How many of the John Ruffinos were in the
25  EXTEND-1A trial?



Page 193

1    A.    I don't know, but I would guess very few.

2    Q.    How many of the John Ruffinos were in the

3  SWIFT PRIME trial?

4    A.    Also a minority.  That's why --

5    Q.    Minority of how many?

6    A.    I don't have it in front of me.  I could

7  look up if they present that data.

8    Q.    Yeah.

9    A.    But certainly I, again, would not base my

10  treatment of him on a trial of just general stroke

11  patients.  I --

12    Q.    I know.  You base it on synthesis, this

13  kind of glow that comes from experience?

14    A.    I would hope that you would want your

15  physicians to do that.

16        [A brief recess was taken.]

17    Q.    Were you ever able to score, yourself, Mr.

18  Ruffino's NIH stroke scale, the NIHSS, after Dr.

19  Archer's assessment of four at 12:20 to 12:52 on

20  February 17th, 2016?

21    A.    Are there times, you mean?

22    Q.    Yeah.  Were you ever able, based on what

23  you've done in this case, to assign an NIH stroke scale

24  to Mr. Ruffino the rest of the day, any time the rest

25  of the day, after Dr. Archer assigned a score of four

Page 194

1  between 12:20 and 12:52?

2    A.    No, I think the only time --

3    Q.    Is that --

4    A.    Yes --

5    Q.    You were able to -- if so, what time?

6    A.    Only -- yes, with Dr. Chitturi's note,

7  which is the only neurologist note that gave you the

8  details, I was able to say that he had this facial

9  weakness, slurred speech, and aphasia, which in fact is

10  similar to what we discussed in Dr. Wilson's note, so

11  in that three to four range.  And that's the best

12  estimate I was able to obtain later in the day.

13    Q.    So based on Dr. Chitturi's affidavit and

14  the note, you think the NIH stroke scale at about the

15  time of Dr. Chitturi's consultation was three to four?

16    A.    Yes, it seemed consistent with that range.

17    Q.    Was Mr. Ruffino's NIH stroke scale ever

18  higher than three to four through the remainder of his

19  stay at StoneCrest?

20    A.    The only time I could estimate that it was

21  a little bit worse, into the five or six range, was

22  based on a nursing examination.  That's -- although we

23  have later -- at 19:27 some note is made of some

24  weakness in the grip in the arm, which would add at

25  least another point or two to the scales, so again, it

Page 195

1  might be to the five or six range.

2    Q.    Anything higher than that at any time?

3    A.    I don't believe I was able to see any

4  other higher scores.

5    Q.    Have we now covered all of your opinions?

6    A.    We've covered the opinions -- I mean, the

7  only thing backing up those opinions we haven't covered

8  is the examination and -- versus the reliability of the

9  history.  That was something that I have an opinion on,

10  that the examinations by the nurse are more reliable

11  than the history, so that's kind of related to that

12  opinion that we haven't quite explored, so --

13        You were asking about -- this history was

14  unreliable and someone said this and the time.  So my

15  opinion was largely based on the fact that we haven't

16  explored that if you have a patient like that where you

17  do have this lack of clarity, and on again, off again,

18  then it's my opinion that you have to strongly go by

19  the examination that someone who's qualified does, not

20  just a patient who may or may not recognize things, so

21  that's one I don't think we touched on, is my strong

22  beliefs that that -- in this complex scenario -- is

23  really critical is what exams that we have that were

24  normal and then became abnormal.

25    Q.    Okay.  Well, are you telling me then that

Page 196

1  you place greatest weight on the nursing examination?

2    A.    Any medical examination, including Dr.

3  Archer's, but we only have the nursing ones before

4  then, so I base it on the sequence of examinations more

5  so than the point you made about the history being

6  variable.  That's why I really rely on that more,

7  because there are times when histories are not 100

8  percent clear and people may say things the next day

9  that were not -- you have to go on what that patient

10  showed you in terms of aphasia, in terms of facial

11  droop, in terms of arm weakness.

12        We know he had those at some point, and so

13  my opinion is largely based on that fact more so than

14  all this history and recurrent symptoms and what he

15  says.  So that's the one part I didn't expound on.

16    Q.    Is there anything else that we have not

17  touched on where you have an opinion that we've not

18  covered today?

19    A.    No.

20    Q.    Do you wish to revise the answers you've

21  given me today in any respect?

22    A.    The only answer I would want to clarify

23  after this is what degree of the Centennial notes I

24  reviewed, because I really don't remember reviewing

25  these notes, so I don't know what degree I have.  I'd

Page 197

1  have to get back to you on that.  I know I reviewed
2  some mention of how he was doing at that time, but I
3  don't know if I reviewed the medical notes themselves.
4      Q.    You don't have any recollection?
5      A.    I mean --
6      Q.    You might have reviewed more than you
7  recalled today, is what you're saying?
8      A.    Yes, but it seems like I reviewed less
9  than the -- Dr. Wilson's notes seem very reasonable,
10  but I don't remember reading those, so --
11      Q.    Good.  Well, we're going to find out what
12  you got to review; right?
13      A.    Sure.  Absolutely.
14      Q.    You're going to load that down to a disc?
15      A.    Right.
16      Q.    Now, you're charging me $500 an hour to
17  ask you questions and get answers today; correct?
18      A.    Correct.
19      Q.    Will any of that money go to Washington
20  University School of Medicine?
21      A.    No.
22      Q.    Will any of that money go to the division
23  of neurology and the department of internal medicine at
24  Washington University?
25      A.    No.

Page 198

1      Q.    None of that will go to a resident or
2  fellow or any patient in need of care?  It will all go
3  to you individually; correct?
4      A.    And mainly the government, it seems today.
5      Q.    Well, do you pay a higher tax rate in the
6  United States than anybody else?
7      A.    No, I suppose not.
8      Q.    You don't pay a 50 percent more probable
9  than not tax rate anymore, do you?
10      A.    I don't believe so.
11      Q.    No.  How do you say most of it goes to the
12  government then?  What's the deal?
13      A.    No, it just feels that way today because I
14  just submitted my taxes this morning.
15      Q.    Oh, I see.
16      Q.    And so all of that money -- a lot of it is
17  owed at the end of the year.
18      Q.    Yeah.  Yes, tell me this.  Do you make
19  $500 an hour when you're in the neuro ICU caring for
20  patients?
21      A.    I've never calculated that, but I doubt --
22      Q.    Let's do it.  Let's do some calculations.
23  I don't want to intervene and intrude on your personal
24  financial matters.  You may come from a wealth family,
25  you may not.  That's none of my business.  But in terms

Page 199

1  of what you're actually paid as a doctor --
2      A.    Yeah.
3      Q.    Do you make $500 an hour when you're in
4  the neuro ICU with a resident or fellow when you're
5  caring for a patient?
6      A.    I don't believe so.
7      Q.    What do you think you actually make on a
8  per-hour basis?  Take your salary, yourself.
9      A.    All right.
10      Q.    Calculate it by your clinical hours, and
11  tell me what you actually make per hour, ballpark, plus
12  or minus $10 or $15.
13      A.    I mean, for my clinical weeks it might be
14  $20,000 a week when I'm on call for a whole week, so I
15  guess you could divide that by however many hours.
16      Q.    And how many hours are you on?
17      A.    It depends how many times I get called,
18  but you could say 40 hours.  It's probably more,
19  obviously.  So 20,000 divided by 40 is, I think, 500.
20      Q.    What about when you're doing teaching?  Do
21  you get 500 bucks an hour?
22      A.    No, I'm -- we mainly get paid for our
23  clinical time.  The teaching and research is kind of
24  for free.
25      Q.    Yeah.

Page 200

1      A.    We support ourselves mainly through our
2  clinical activity.  That's how --
3      Q.    All right.  So let's say you spend one
4  week a month in clinical activities and you're getting
5  $500 an hour.
6      A.    Yeah.
7      Q.    But you have three more weeks where you're
8  not getting paid anything?
9      A.    Yeah.  Sure.  Yeah.
10      Q.    You're getting more like 125 bucks an
11  hour, aren't you?
12      A.    If it's averaged out over that time, yes.
13      Q.    Right.  It's true then that this
14  medical/legal after-the-fact opinion testimony is the
15  most lucrative thing you do as a doctor, isn't it?
16      A.    No, I do -- like I said, the other
17  consulting I do is actually far more lucrative.
18      Q.    Doing what?  For whom?
19      A.    Other just non-legal consulting.
20      Q.    Like what?  What are you talking about?
21      A.    I believe it's in my CV, but I work for
22  ConsultOn (ph), organ donation issues, transplant
23  issues, for example.  Yes.
24      Q.    Uh-huh.  And you get paid more than 500
25  bucks an hour for that?



Page 201

1  A.  Yes.  Or speaking as an expert.  It's also
2  more than $500 an hour.
3  Q.  Well, on the speaking rotation --
4  A.  Yes.
5  Q.  -- are you speaking at the behest of a
6  pharmaceutical company?
7  A.  In that case, yes.
8  Q.  And are you speaking as an offered or an
9  invited expert by a pharmaceutical company --
10  A.  Yes.
11  Q.  -- on the issues of administration and
12  efficacy of tPA?
13  A.  No, not tPA.
14  Q.  No?  Have you ever done a presentation
15  where you've been asked by a pharmaceutical company to
16  lecture other doctors on indications for or efficacy of
17  tPA?
18  A.  Not a paid lecture, no.
19  Q.  No?  Okay.  One of the things you did have
20  was a subpoena, and I asked you to bring some materials
21  with you, and I noticed it when I flipped through it
22  earlier.  There were some things from your --
23  A.  Past.
24  Q.  Well, off the CV that we did have.  You'll
25  want to keep that.

Page 202

1  A.  This is a list here.  So --
2  Q.  Let's make sure he has this.  That's that
3  letter?
4  A.  Oh yeah, that's --
5  Q.  But there were some things I saw that were
6  some downloads of some presentations you'd made.
7  A.  Yeah.
8  Q.  Early CSF volume changes predict malignant
9  edema and large hemispheric infarction.  Can you tell
10  me what this two-sided material is?  (Indicating
11  document.)
12  A.  Those two one-sided posters that you had
13  asked for that reflect research that I'm working on in
14  stroke.  And you'd requested those --
15  Q.  Where was this presented?
16  A.  It might be in your report.  Oh, it's in
17  my CV, certainly.  There were two different
18  conferences.  This one was the International Stroke
19  Conference, which is the American Stroke Association,
20  and I believe the other one was at a conference for
21  translational science.
22  Q.  Are the materials in the early CSF volume
23  changes poster board -- are they still accurate?
24  A.  Yes.  I mean, these ones are -- yes, they
25  are.

Page 203

1  Q.  Okay.  We'll make this the next exhibit.
2  [Exhibit 16 marked for identification.]
3  Q.  And another specific item I asked for from
4  your CV is this series of slides -- it looks like
5  PowerPoint slides -- that deal with evidence-based
6  prevention and treatment of neurological complications
7  after acute ischemic stroke.  You still have the
8  PowerPoint slides, don't you?
9  A.  Yes.  This was printed off from those.
10  Q.  And the material in this particular series
11  of slides remains accurate today?
12  A.  No, not necessarily.  These are quite old,
13  so some things in stroke have changed.  This is from a
14  number of years ago, so I'd have to look and see what's
15  changed.  But they were accurate as of that time, I
16  would think.
17  Q.  They were accurate as of that time, but
18  you can't vouch for them being accurate today; right?
19  A.  I mean, a lot of them probably are, but
20  there are some new trials that have come out, as you've
21  seen in Stroke, even since 2010 or 2012.
22  Q.  Okay.  We'll make that the next exhibit.
23  Mr. Witt's going to ask you some questions.  While he
24  is doing that, may I just continue to look through your
25  file --

Page 204

1  A.  Yeah.
2  Q.  -- so I can see if there's anything else
3  we need to exhibit?
4  [Exhibit 17 marked for identification.]
5  A.  Yes, those are all the exhibits.
6  Q.  Can I just slide this -- well, here's
7  another one, too -- your report.  Put it back in the
8  file.  It has a blue sticker on it.
9  A.  Which -- oh, because I'm still referring
10  to this for my -- to answer my opinions.
11  Q.  I thought you had copy of it in here.
12  A.  This is the copy.  That's the original.
13  So I can refer to that.
14  Q.  Why don't you use the original?
15  A.  Yeah.  Okay.
16  Q.  May I otherwise have this --
17  A.  Yeah.  Yes.
18  Q.  -- while he asks you questions?  And I'll
19  see what else we need to exhibit.
20  MR. GIDEON:  Thank you for your time.
21  A.  Thank you.
22  QUESTIONS BY MR. WITT:
23  Q.  Doctor, good afternoon.  I represent Clark
24  Archer in this lawsuit that's been filed by Mr. Ruffino
25  and Mrs. Ruffino.  What is your understanding of Clark



Page 205

1 Archer's role in the medical care provided to John
2 Ruffino?
3    A.   That he was -- came on shift after Mr.
4 Ruffino arrived in the ER, and sometime after he came
5 on he was informed that there had been a change in the
6 status, and he went to see the patient and found some
7 neurological deficits at that time, and at some point
8 there activated the code stroke.
9    Q.   What specialty does Dr. Archer practice?
10    A.   Emergency medicine, to my understanding.
11    Q.   Would you agree with me that the standard
12 for acceptable professional practice, acceptable
13 medical care, can vary between two physicians who
14 practice different specialties?
15    A.   That's a good question.  I mean, for a
16 given disease I would think it was standard, but
17 obviously different specialties have different purviews
18 in some cases, so I'd have to know the specific case,
19 but in general that might be true in some cases.
20    Q.   Did Dr. Archer consult a neurologist in
21 this case?
22    A.   Yes.
23    Q.   Was it appropriate for him to do so?
24    A.   Yes, I believe so.
25    Q.   Why?

Page 206

1    A.   I believe he felt the patient was having a
2 stroke, and I believe felt a neurologist could add some
3 additional input to his treatment at that time.
4    Q.   What additional input would a neurologist
5 add if you treat the same disease process the same no
6 matter what your specialty is?
7    A.   I think maybe the more complex aspects
8 could be handled by a neurologist in terms of the
9 endovascular treatment -- that had been relatively new
10 in that time -- knowing if that was an option.  And he
11 may have wanted guidance on the tPA.  Even though I
12 think emergency physicians are aware of tPA, he may
13 have wanted some extra -- a second opinion.  I don't
14 recall in his deposition the exact reasons, but I mean,
15 there are reasons I can imagine why he wanted that
16 extra input.
17    Q.   And that's because the background,
18 training, and experience of a neurologist is different
19 from the background, training, and experience of an ER
20 physician; correct?
21    A.   That's true.
22    Q.   Are you board-certified in emergency
23 medicine?
24    A.   No.
25    Q.   Have you completed a residency in

Page 207

1 emergency medicine?
2    A.   No.
3    Q.   When was the last time you did a single
4 shift as an ER physician?
5    A.   Not since residency.
6    Q.   And that was when?
7    A.   That ended in 2005.
8    Q.   So 13 years ago?
9    A.   Yes.
10    Q.   And I believe I heard you testify earlier
11 that you had at some point spent some time as an
12 on-call neurologist for the ER here at Barnes.  Is that
13 right?
14    A.   I mean, I -- not for many years.  I mean,
15 when I came, I did some consultations in neurology and
16 was on the call schedule, but that was minimal.
17    Q.   And I believe you said that was in excess
18 of 10 years ago?
19    A.   Yeah, probably around 10 years.
20    Q.   So you believe it's been about 10 years
21 since you've even provided any consult services in an
22 ER; correct?
23    A.   I've not been on the official consult
24 schedule, but we do go to the ER for patients coming to
25 the ICU fairly frequently, but not in the

Page 208

1 official consult role that was asked.
2    Q.   So for patient hand-offs from ER to neuro
3 ICU, you would certainly talk to the ER staff?
4    A.   Exactly.  So I have good awareness of what
5 happens in the ER.  I train a lot of ER doctors,
6 actually, in neurology and emergency aspects of
7 neurology, so I'm very aware of what emergency
8 physicians know about tPA and other aspects of
9 neurology as part of my work.
10    Q.   Fill in the blanks for me there.  You
11 train a lot of ER doctors.  Are you talking about
12 residents?
13    A.   Yes.
14    Q.   So --
15    A.   So --
16    Q.   These are not board-certified ER doctors?
17 These are residents that are going through their
18 residency to become board-certified?
19    A.   So when they become board-certified, they
20 have received good neurological training, yes.
21    Q.   Right.  Okay.
22    A.   And the primary training they get during
23 their ER residency, at least here, is by working with
24 us in the neuro ICU to see how emergency patients
25 transition from the ER to the ICU.

1    Q.   To give them the advantage of your
2  background and experience as a board-certified
3  neurologist?
4    A.   To get that -- that's their training
5  before they become ER doctors, yes.
6    Q.   Are there any opinions that we have not
7  discussed already with -- that you hold or intend to
8  express with regard to the medical care provided by
9  Clark Archer?
10    A.   I think I expressed it, but maybe I should
11  restate it in case -- I don't want to be accused of not
12  clarifying -- that code stroke was called, but I do
13  state this here, that the CT angiogram was not done for
14  a time, as we clarified, till after 2:00, so I think
15  there was some delay in that time period that's wrapped
16  up in that acute management, but I wanted to make sure
17  that was stated separately so I wasn't not saying
18  that -- that that was a delay in what Dr. Archer and
19  the team did in the ER to not facilitate a rapid study
20  in terms of the CT angiogram.
21    Q.   So it's clear to me from your report that
22  you're expressing an opinion regarding the cause of
23  John Ruffino's current deficits and that they would
24  have been improved -- in your opinion, more likely than
25  not -- would have been improved had tPA and/or an

1  endovascular process taken place?
2    A.   Yes.
3    Q.   Correct?
4    A.   Yes.
5    Q.   But it seems to me in your deposition
6  you're going beyond that causation opinion and you're
7  offering opinions regarding the standard of care that
8  applies to Dr. Archer, a board-certified ER physician,
9  in this case.  Am I misunderstanding that?  Because I
10  don't see anywhere where it talks about standard of
11  care in your report.
12    A.   Yeah, I guess I have a -- maybe don't have
13  a full understanding of the difference between not
14  doing something -- I guess that's causation versus
15  standard of care.  So there was things that identified
16  that were not done that led to that poor outcome.
17    Q.   Right.
18    A.   I maybe misunderstood that was a standard
19  of care issue, but maybe I misunderstood that.
20    Q.   Right.  So I thought maybe that was the
21  case.
22    A.   Right.
23    Q.   So that's why I'm trying to clarify this
24  now.  As I understand your report, again, you're saying
25  that if tPA or an endovascular process had been used,

1  more likely than not, then John Ruffino's neural
2  deficits would be less?
3    A.   Yes.
4    Q.   Correct?
5    A.   Right.
6    Q.   Are you offering any opinions regarding
7  the standard of care or the acceptable medical
8  professional practice that applies to Dr. Archer, a
9  board-certified ER physician, or not?
10    A.   So I guess the two that maybe weren't
11  spelled out very clearly in my report were to perform
12  an emergent imaging study of an acute stroke patient
13  and to communicate the time of onset information to Dr.
14  Chitturi.  Those would be the two aspects that I felt
15  were below the standard of care and led then later to
16  that poorer outcome as well, so I probably didn't state
17  it clearly in that way.
18    Q.   Anything else that you believe violates
19  the standard of care that Dr. Archer did?
20    A.   No, that's it.
21    Q.   So you feel you're qualified to offer
22  opinions regarding the standard of care that applies to
23  an ER physician?
24    A.   As it relates to obtaining emergent
25  imaging and communicating with other neurologists, for

1  example, I'm very qualified to know what I would expect
2  an ER physician to communicate to a neurologist about
3  the time of onset and to communicate that we need to
4  get an urgent imaging (ph).  Those two things I do
5  think I'm very qualified to comment on.
6    Q.   And why do you think you're qualified to
7  offer opinions regarding the standard of care
8  applicable to a different specialty?
9    A.   Mainly because, as I said, that is the
10  area where our specialties intersect.  I work with a
11  lot of ER physicians.  I know what the expectations
12  are, and stroke is managed between the two specialties,
13  and it's very critical that both specialties fulfill
14  their roles, and so I'm aware of their role just as
15  they would be aware of the neurologist's role.
16    Q.   Even though you haven't consulted with an
17  ER physician on an active case in the ER, by your own
18  testimony, for over 10 years; correct?
19    A.   But I've been involved in -- correct.
20  I've been involved in hundreds of cases -- when the
21  patients get tPA, they come to the ICU for monitoring,
22  and so that continuum of care is very well known to me
23  because I see hundreds of patients who have that done
24  appropriately -- rapid imaging, good communication of
25  time of onset -- and get tPA.

Page 213

1      Q.    Let me review my notes, but I think I'm

2  almost done, Doctor.

3      A.    Okay.

4      Q.    What is it that you feel Dr. Archer failed

5  to communicate to the -- to Dr. Chitturi, the neurology

6  consult?

7      A.    From what I can tell -- and I believe Dr.

8  Archer says this as well in his deposition -- that he

9  heard that these symptoms were new from the nurse who

10  had discovered these symptoms, and so from the best I

11  can tell, it was clear to him that these were new

12  symptoms that had come on at that time, and such -- and

13  I'm more confident in that opinion because he called a

14  code stroke at that time while it was not called when

15  Mr. Ruffino first came in, and that is -- that was very

16  appropriate.

17           I feel like that was definitely at the

18  standard of care and it was good that they recognize

19  those symptoms, called a code stroke, should have

20  performed imaging to look for the cause why he was now

21  having these new and lasting deficits, but yet he knew

22  that symptoms were new, but yet Dr. Chitturi clearly in

23  his notes says that he believed from his review those

24  symptoms had been there longer.  So if Dr. Archer had

25  communicated that, it would have, in my opinion,

Page 214

1  significantly altered the likelihood that tPA would

2  have been given.

3      Q.    So let me make sure I understand your

4  answer.  Are you telling me it's your belief that Dr.

5  Archer failed to communicate the fact that these

6  symptoms were new to Dr. Chitturi?

7      A.    Exactly.

8      Q.    Anything else you feel that Dr. Archer

9  failed to communicate to Dr. Chitturi?

10      A.    No.

11      Q.    And if it turns out that Dr. Archer did

12  communicate this concept to Dr. Chitturi, then that

13  wouldn't be a valid criticism anymore, would it?

14      A.    No, if Dr. Chitturi said I definitely

15  heard about this, but yet I still thought it wasn't

16  appropriate to give tPA, then that's a separate

17  criticism.  I wouldn't criticize Dr. Archer for that.

18      MR. WITT:  Okay.  Those are all the

19  questions I have.  Thank you.

20      MR. GIDEON:  I need to ask that we make as

21  the next exhibit -- what's the number?

22      THE REPORTER:  This will be 18.

23      MR. GIDEON:  Number 18 will be the

24  remainder of these e-mails.  Number 19 -- and I'll have

25  to ask you to copy this on a color copier.  Number 19

Page 215

1  will be the transcript of Dr. Archer that Dr. Dhar

2  reviewed on January 23, 2018.  And then there's some

3  highlighting and there's some blue pen on it, so I'd

4  like to have a color copy of that.  The --

5      THE REPORTER:  That was 19.

6      MR. GIDEON:  Yeah.  20 will be a copy of

7  the defense Rule 26 disclosures with the heading

8  Ruffino experts on it.  There's, again, highlighting in

9  pen, so I'll need to have color copies of that made,

10  too.  And I believe that's it.  So thank you.

11      THE WITNESS:  Thank you.

12      [Exhibit 18 marked for identification.]

13      [Exhibit 19 marked for identification.]

14      [Exhibit 20 marked for identification.]

15

16        [SIGNATURE RESERVED.]

17

18

19

20

21

22

23

24

25

Page 216

1

2        C E R T I F I C A T E

3

4      I, JOHN ARNDT, a Certified Shorthand

5  Reporter and Certified Court Reporter, do hereby

6  certify that prior to the commencement of the

7  examination, RAJAT DHAR, M.D., was sworn by me to

8  testify the truth, the whole truth and nothing but the

9  truth.

10      I DO FURTHER CERTIFY that the foregoing is a

11  true and accurate transcript of the proceedings as

12  taken stenographically and before me at the time,

13  place and on the date hereinbefore set forth.

14      I DO FURTHER CERTIFY that I am neither a

15  relative nor employee nor attorney nor counsel of any

16  of the parties to this action, and that I am neither a

17  relative nor employee of such attorney or counsel, and

18  that I am not financially interested in this action.

19

20       _John Arndt_____

21

22  JOHN ARNDT, CSR, CCR, RDR, CRR

23  CSR No. 084-004605

24  CCR No. 1186

25

Page 217

```
1
2               DEPOSITION ERRATA SHEET
3
4    Our Assignment No. J2100034
5    Case Caption:  RUFFINO v. ARCHER
6
7          DECLARATION UNDER PENALTY OF PERJURY
8           I declare under penalty of perjury
9    that I have read the entire transcript of
10   my Deposition taken in the captioned matter
11   or the same has been read to me, and
12   the same is true and accurate, save and
13   except for changes and/or corrections, if
14   any, as indicated by me on the DEPOSITION
15   ERRATA SHEET hereof, with the understanding
16   that I offer these changes as if still under
17   oath.
18          Signed on the _____ day of
19   _____, 20___.
20
21   _____
22           RAJAT DHAR, M.D.
23
24
25
```

Page 219

```
1
2               DEPOSITION ERRATA SHEET
     Page No._____Line No._____Change to:_____
3    _____
     Reason for change:_____
4    Page No._____Line No._____Change to:_____
     _____
5    Reason for change:_____
     Page No._____Line No._____Change to:_____
6    _____
     Reason for change:_____
7    Page No._____Line No._____Change to:_____
     _____
8    Reason for change:_____
     Page No._____Line No._____Change to:_____
9    _____
     Reason for change:_____
10   Page No._____Line No._____Change to:_____
     _____
11   Reason for change:_____
     Page No._____Line No._____Change to:_____
12   _____
     Reason for change:_____
13
     SIGNATURE:_____DATE:_____
14           RAJAT DHAR, M.D.
15
16
17
18
19
20
21
22
23
24
25
```

Page 218

```
1
2               DEPOSITION ERRATA SHEET
3    Page No._____Line No._____Change to:_____
     _____
4    Reason for change:_____
     Page No._____Line No._____Change to:_____
5    _____
     Reason for change:_____
6    Page No._____Line No._____Change to:_____
     _____
7    Reason for change:_____
     Page No._____Line No._____Change to:_____
8    _____
     Reason for change:_____
9    Page No._____Line No._____Change to:_____
     _____
10   Reason for change:_____
     Page No._____Line No._____Change to:_____
11   _____
     Reason for change:_____
12   Page No._____Line No._____Change to:_____
     _____
13   Reason for change:_____
14   SIGNATURE:_____DATE:_____
             RAJAT DHAR, M.D.
15
16
17
18
19
20
21
22
23
24
25
```