**Page 1**

```
1            UNITED STATES DISTRICT COURT
             MIDDLE DISTRICT OF TENNESSEE
2                 NASHVILLE DIVISION
3
4
5
   JOHN RUFFINO and MARTHA RUFFINO,    )
6  Husband and Wife,                   )
                                       )
7            Plaintiffs,               )
                                       )
8                                      ) Civil Action No.
                                       ) 3:17-cv-00725
9                                      )
   DR. CLARK ARCHER and HCA            ) Jury Demand
10 HEALTH SERVICES OF TENNESSEE, INC.  ) Judge Crenshaw
   d/b/a STONECREST MEDICAL CENTER,    ) Magistrate Judge
11                                     ) Newbern
             Defendants.              )
12
13
14
15        VIDEO DEPOSITION OF MARTHA RUFFINO
16              OCTOBER 24, 2017
17
18 The video deposition of MARTHA RUFFINO was taken pursuant
19 to Notice on the 24th day of October, 2017, beginning at
20 1:09 p.m., at the Wingfield Inn, 1101 Housman Street,
21 Mayfield, Kentucky; said video deposition was taken for
22 any and all purposes permitted by law.
23
24
25
```

**Page 2**

```
1  APPEARANCES:  Brian Cummings
                 CUMMINGS MANOOKIAN, PLC
2                45 Music Square West
                 Nashville, Tennessee 37203
3                ATTORNEY FOR PLAINTIFFS
4
5                C.J. Gideon, Jr.
                 J. Blake Carter
6                GIDEON, COOPER & ESSARY, PLC
                 315 Deaderick Street, Suite 1100
7                Nashville, Tennessee  37238
                 ATTORNEYS FOR HCA HEALTH SERVICES OF
8                TENNESSEE, INC. d/b/a STONECREST
                 MEDICAL CENTER
9
10
                 Nate  Gorman
11               HALL BOOTH SMITH, P.C.
                 424 Church Street
12               Suite 2950
                 Nashville, Tennessee  37219
13               ATTORNEY FOR CLARK ARCHER, M.D.
14
15
   ALSO PRESENT: John Ruffino
16               PLAINTIFF
17               Nathan Belcher
                 VIDEOGRAPHER/OHIO VALLEY REPORTING
18
19
20
21
22
23
24
25
```

**Page 3**

```
1
2        VIDEO DEPOSITION OF MARTHA RUFFINO
3                OCTOBER 24, 2017
4
5                  I N D E X
```

```
6  CAPTION, APPEARANCES & INDICES: ---------------- 1-3
7  TESTIMONY OF MARTHA RUFFINO: ------------------- 4-108
       Direct Examination by Mr. Gideon: ------------ 4-100
8      Cross Examination by Mr. Gorman: ------------- 100-102
       Redirect Examination by Mr. Gideon: ---------- 102-108
9
   CERTIFICATE BY REPORTER: ----------------------- 109
10
   DEPONENT CERTIFICATION: ------------------------ 110-112
11
   EXHIBITS: -------------------------------------- Attached
12
13
14
15               INDEX OF EXHIBITS
                                      Marked for
16 Exhibit                          Identification
17 Exhibit 1: ------------------------------------- 37
18 Exhibit 2: ------------------------------------- 42
19 Exhibit 3 (to be produced at a later date): ----- 57
20 Exhibit 4: ------------------------------------- 59
21
22
23
24
25
```

**Page 4**

```
1       VIDEOGRAPHER:  This is the deposition of Martha
2  Ruffino being taken in the Middle District of Tennessee,
3  Nashville Division; John Ruffino and Martha Ruffino versus
4  Dr. Clark Archer and HCA Health Services of Tennessee,
5  Inc., d/b/a StoneCrest Medical Center.  Today's date
6  October 24, 2017.  Start time 1:11 p.m.  We are located at
7  the Wingfield Inn in Mayfield, Kentucky.
8       At this time will counsel please state their
9  appearances for the record?
10      MR. CUMMINGS:  Brian Cummings for the
11 plaintiffs.
12      MR. GIDEON:  C.J. Gideon, Blake Carter for HCA
13 Health Services of Tennessee doing business as StoneCrest
14 Medical Center.
15      MR. GORMAN:  Nate Gorman for defendant, Dr.
16 Clark Archer.
17      THE WITNESS, BEING FIRST DULY SWORN UPON HER
18 OATH, TESTIFIED AS FOLLOWS:
19      DIRECT EXAMINATION BY C.J. GIDEON, JR., ATTORNEY
20 FOR HCA HEALTH SERVICES OF TENNESSEE, INC. d/b/a
21 STONECREST MEDICAL CENTER:
22      Q   MS. Ruffino, how many depositions have you
23 given?
24      A   None.
25      Q   This is the first time?
```

1    A   Yes.

2    Q   Okay.  I won't ask you to remember all the
3  rules I gave your husband, so I'll start off again.

4        Please listen to the question I ask you and let
5  me finish before you begin to answer.  You saw a few times
6  where your husband thought he knew what I was asking and
7  he started answering before I was finished?

8    A   Yes.

9    Q   It makes her job quite difficult when we
10  speak at the same time, so let me finish.

11       Number two, if at any time I ask you a question
12  that's not clear, all you have to do is tell me and I'll
13  make it clear.  I promise you that.

14       Third, if you need to take a break as a matter
15  of personal comfort, check on a grandson or anything like
16  that, you let me know.  All I ask you to do is answer the
17  question that's pending and then you can take a break.
18  Good enough?

19   A   That's good.  Thank you.

20   Q   What did you look at, review, or even
21  evaluate as you prepared to give a deposition in this
22  case?

23   A   I didn't look at anything.

24   Q   You didn't look at a piece of paper before
25  this deposition?

1        MR. CUMMINGS:  He doesn't mean today.  He means
2  at all.

3    A   Oh, yes.  I looked at a lot of papers
4  regarding.

5    Q   Okay.  Well, let's talk about a lot of
6  papers you looked at regarding.  What papers did you look
7  at?  What did they deal with?

8    A   They dealt with what happened to my husband
9  at the hospital and papers I received with the lawyer.

10   Q   You're going to have to help me with some
11  more precise description.  One thing that is exchanged in
12  lawsuits like this is what's called a set of answers to
13  interrogatories.  They're written questions each side can
14  ask the other and you have to answer under oath.  We've
15  sent some to you and your husband which have been
16  answered.  Did you look at those?

17   A   Yes.

18   Q   Okay.  Did you look at the Complaint that
19  was filed naming you and your husband as the suing people,
20  suing Dr. Archer and suing HCA Health Services of
21  Tennessee?

22   A   Yes.

23   Q   All right.  Have you looked at any of the
24  hospital records, Centennial, two admissions in February,
25  another one in August of 2016, one in Skyline?  Have you

1  looked at those?

2    A   Yes.

3    Q   Have you looked at the StoneCrest clinical
4  records?

5    A   Yes.

6    Q   Did you look at those things with your
7  husband?

8    A   Yes.

9    Q   All right.  So when he told me he didn't
10  look at anything, that wasn't accurate, was it?

11   A   No.

12   Q   What else did you look at that he didn't
13  tell me about?

14   A   That's pretty much it.

15   Q   Well, did you look at your two and a
16  quarter page handwritten notes before we started this
17  deposition in order to get ready?

18   A   Yes.

19   Q   All right.  Well, that's another item to
20  add to it.  Did he look at it too?

21   A   I don't believe he did.

22   Q   All right.  What else did you look at
23  beyond what you've already told me about?  You don't need
24  to repeat yourself, but I want to make sure you've told me
25  about everything you looked at as you got ready to give

1  today's deposition.

2    A   I remember looking at all the stuff that's
3  been sent to us from you and from Brian and my notes.  I
4  believe I looked at everything.

5    Q   As I said, I didn't need you to repeat
6  anything you've already listed.  Is there anything you
7  looked at to prepare for this deposition that you have not
8  told me about?

9    A   No.

10   Q   Did you see a videotape telling you how to
11  go about giving a deposition?

12   A   No.

13   Q   Did you look at anything online that
14  explains how to go about giving a deposition?

15   A   No, sir.

16   Q   Have you met with any lawyers to prepare
17  for the deposition?

18   A   No.

19   Q   You didn't meet with any lawyers?

20   A   Just Brian.

21   Q   Brian Cummings?

22   A   Cummings, yes.

23   Q   He is your lawyer, isn't he?

24   A   Yes.

25   Q   When did you meet with him?

Page 9

1   A   To prepare for the deposition -

2   Q   Yes, ma'am.

3   A   - I met with him yesterday.

4   Q   How long?

5   A   Half hour, hour.

6   Q   Which one is it?

7   A   Half hour.

8      MR. CUMMINGS:  C.J., I need to speak up to the

9   extent she's going to lead you astray.

10     Tell him whether that was on the phone or in

11  person.

12     THE WITNESS:  That was on the phone.

13     MR. CUMMINGS:  In case that wasn't clear,

14  because I know you used the term "meet" and I can see how

15  that could be misunderstood by the witness.  Your question

16  was clear, C.J.

17     Q   Was your husband involved in that phone

18  meeting for half an hour?

19  A   Yes.

20     Q   I asked him if he'd met with anybody and he

21  said no.  That answer was incorrect too, correct?

22  A   Correct.

23  Q   Are you disabled?

24  A   Yes.

25  Q   Since when?

Page 10

1   A   I believe it was February of 2015.

2      Q   Is that when the determination was made on

3   a disability application?

4   A   Yeah.

5      Q   When had you submitted a disability

6   application, submitted it, turned it in?

7   A   In February of, well, 2014.  February 2014

8   is when I submitted it.  I'm sorry.

9   Q   Did it take them a whole year to act on it?

10  A   Oh, yeah.

11  Q   Really?  Was your application in February

12  of 2014 submitted in the Smithville, Tennessee Social

13  Security Office?

14  A   Yeah.

15  Q   And you were notified in February 2015 by

16  mail that the application had been approved?

17  A   Yes.

18  Q   Were you required to go see any particular

19  doctor before the application was approved?

20  A   Yes.

21  Q   Did you have to have pulmonary function

22  testing?

23  A   Yes.

24  Q   Where did you go for that?

25  A   It was a doctor's office.  I don't - - in

Page 11

1   Smithville.

2      Q   Okay.  Which included the pulmonary

3   function testing?

4   A   Yeah.

5      Q   Is that the only physician you had to go

6   see in connection with that disability application?

7   A   Yes.

8      Q   When it was approved in February of 2015,

9   did you receive a lump sum check that was roughly

10  equivalent to what you would have gotten on a monthly

11  basis if your application had been approved when it was

12  submitted?

13  A   Yes.

14  Q   All right.  How much was that lump sum?

15  A   I believe it was like 12,000.

16  Q   And how much do you receive per month now?

17  A   900.

18  Q   Even?

19  A   954.

20  Q   And what's the disability based on?

21  A   My COPD.

22  Q   Secondary to smoking?

23  A   Yes.

24  Q   How old were you when you started smoking?

25  A   Probably ten.

Page 12

1   Q   And when did you stop?

2   A   In 2000.

3   Q   And have you worked anywhere since 2014?

4   A   No.

5   Q   When is the last time, ma'am, you had what

6   I call a public job, working for somebody in the

7   community?

8   A   I work right now cleaning, cleaning offices

9   at night, just one night a week.

10  Q   Here in Mayfield?

11  A   Yes.

12  Q   Do you disclose that income that you get

13  from that -

14  A   Yes.

15  Q   - to the Social Security Administration?

16  A   Yes.

17  Q   All right.  When prior to that was the last

18  time you had a regular public job?

19  A   In 2014.

20  Q   Doing what?

21  A   I was supervisor and director of operations

22  of an assisted living facility.

23  Q   Where?

24  A   In Michigan.

25  Q   In 2014, before your husband moved here to

Case 3:17-cv-00725    Document 114-7    Filed 12/14/18    Page 3 of 28 PageID #: 1431

Page 13

1 take the job with Republic Services?

2    A  Yes.

3    Q  All right. Now, in the answers to
4 interrogatories there was a reference to you, and I really
5 didn't understand this at all, but it referred to you in
6 answer to Interrogatory Number 11 being charged with a
7 crime where you were a manager of a gas station. You let
8 a company use a bad credit card. You got charged and
9 placed on probation. And for the life of me I couldn't
10 understand how you, if you let somebody use a bad credit
11 card, could be charged with a crime. Can you tell me what
12 that was actually about?

13    A  Yes. Normally when you run the credit
14 card, if it didn't run, you would type in numbers. But my
15 supervisor gave me a certain number to put that card
16 through because she said it was a good card. So I was
17 doing it and had been doing it for them whenever they came
18 in; and then we went to court on it because apparently it
19 wasn't a good card. And I didn't have money for a lawyer
20 and...

21    Q  So did you plead guilty to some crime?

22    A  I pled no contest.

23    Q  To some charge. What was the charge
24 against you for entering a clearance number on a bad card?
25 What were you charged with?

Page 14

1    A  Something - I'm not sure - about electronic
2 device.

3    Q  Was it something a charge that dealt with
4 dishonesty?

5    A  I would think so, yeah.

6    Q  Can you recall the charge itself?

7    A  No.

8    Q  Okay. Dealt with a criminal charge on
9 credit card clearance?

10    A  Yes.

11    Q  And you were using a clearance number that
12 actually didn't belong to the people that presented the
13 card; is that right?

14    A  No.

15    Q  Okay. Tell me where the crime is then.
16 Maybe you don't understand it either.

17    A  No, I don't.

18    Q  It doesn't make any sense to me how you can
19 be charged with a crime if you're being told by your
20 manager "Use this number to get this card approved."
21 That's how it's described in Interrogatory Number 11, and
22 that's why I'm asking you about it. It makes no sense to
23 me. But you pled no contest to a charge that had
24 something to do with dishonesty, right?

25    A  Yes.

Page 15

1    Q  What community was that in?

2    A  In Michigan, in Oakland County.

3    Q  What's the city that's the county seat of
4 Oakland County?

5    A  Waterford.

6    Q  Say it again.

7    A  Waterford.

8    Q  Waterford. Okay. Now, this was in '92 or
9 '93?

10    A  Yes.

11    Q  You were not known as Martha Ruffino then,
12 were you?

13    A  No.

14    Q  What was your last name then?

15    A  Crothers.

16    Q  C-r-o-t-h-e-r-s?

17    A  Yes.

18    Q  Have you been married previously?

19    A  Yes.

20    Q  How many times?

21    A  Once.

22    Q  And was your maiden name Crothers or was
23 your married name Crothers?

24    A  Married.

25    Q  And how many children did you have in that

Page 16

1 marriage?

2    A  Three.

3    Q  Are they all alive and well?

4    A  Yes.

5    Q  Where are they now?

6    A  Two of them live in Michigan and one lives
7 in Maine.

8    Q  Any grandkids?

9    A  Yes.

10    Q  How many?

11    A  Eight and one more on the way.

12    Q  Good for you. All in either Michigan or
13 Maine?

14    A  Yes.

15    Q  So why are you in Mayfield, Kentucky?

16    A  I didn't have anybody to help me with my
17 husband when we were in Tennessee. My best friend and her
18 family lived here, and I moved here to get help.

19    Q  And that best friend was the lady that died
20 in September of this year, Deborah Langston?

21    A  Yes. August 14th.

22    Q  August of this year?

23    A  Yes.

24    Q  She came to Centennial to see you and your
25 husband, didn't she?

**Page 17**

1  A  Yes.

2  Q  Your husband told us that the death was

3  unexpected.

4  A  Yes.

5  Q  What did she die of?

6  A  A blood clot went to her lung.

7  Q  Pulmonary embolus?

8  A  Yeah.

9  Q  Well, it's been two months since she's

10  died.  There's nobody here to help you with your husband.

11  Have you thought about moving back to Tennessee?

12  A  No.

13  Q  You thought about moving to Michigan or

14  Maine?

15  A  Michigan, yes.

16  Q  Are you planning to move to Michigan now?

17  A  Yes.

18  Q  When are you moving?

19  A  I'm not sure yet.

20  Q  But it's pretty much a decision has been

21  made?

22  A  Yeah.

23  Q  Where are you going to live?

24  A  Probably with one of my sons.

25  Q  Which one?

**Page 18**

1  A  Joseph Crothers.

2  Q  Is he the oldest?

3  A  No.  He's the middle one.

4  Q  Do they have a house that's large enough to

5  accommodate you and your husband?

6  A  Yes.

7  Q  Does the house that you're thinking about

8  moving into, does it have a walk-in shower?

9  A  Yes.

10  Q  Does it already have a lift chair?

11  A  No.

12  Q  Does it have a hospital bed already in

13  place?

14  A  No.

15  Q  Have you made any steps at all to get him,

16  your husband, approved for Medicaid in Michigan in advance

17  of the move?

18  A  No.

19  Q  Have you applied for Medicare for your

20  husband or yourself?

21  A  I'm not - - no.

22  Q  Why not?

23  A  I'm just confused on whether it was

24  Medicare or Medicaid.

25  Q  Let me tell you the difference between the

**Page 19**

1  two.

2  A  Okay.

3  Q  Medicare started off in the '60s, when

4  Lyndon Johnson was the president, as a healthcare plan for

5  seniors.  So when you went on Social Security you could be

6  part of the Medicare program which was an insurance plan

7  for seniors.  As time has gone by, it is now available for

8  people who are on disability.

9  A  Yeah.

10  Q  That's the Federal Medicare Program for

11  Disability and Seniors.  The Medicaid program is designed

12  to cover people who don't have the resources to pay for

13  their own insurance.

14  A  Okay.

15  Q  So that's the difference.  Have you applied

16  for Medicare?

17  A  Yes.

18  Q  Where and when?

19  A  For myself when I was in Tennessee.

20  Q  In Smithville you applied at the same time

21  you applied for disability benefits -

22  A  Yeah.

23  Q  - for COPD.  And when you were approved for

24  disability benefits in February of 2015, were you also

25  approved for Medicare within 90 days after that?

**Page 20**

1  A  No.

2  Q  Did they deny you Medicare?

3  A  Yes.

4  Q  What was the basis for denying it?

5  A  That everybody has to wait at least two

6  years before they can get it.

7  Q  All right.  February '15 is over two years

8  ago.  Have you applied for Medicare since then?

9  A  Yes.  I have Medicare.

10  Q  When did you apply and when did you get it?

11  A  I got it in February of two-thousand - -

12  I'm not sure of the exact date.

13  Q  Well, we know you've got it today.

14  A  Yes.

15  Q  So it had to be February of 2017 or

16  February of 2016, one of the two?

17  A  Yes.

18  Q  Has your husband applied for Medicare?

19  A  Yes.

20  Q  Where and when?

21  A  We applied down here in Kentucky and

22  through the Social Security Office here in Kentucky.

23  Q  In Mayfield?

24  A  Yes.

25  Q  Okay.  When did you apply?

1    A   I'm not sure of the exact date.

2    Q   One of the things you told me you reviewed
3  as you got ready for this deposition were those answers to
4  interrogatories.  It asks about any applications for
5  government benefits, and there was no disclosure at all of
6  the application for Medicare that you tell me occurred
7  already.  So I need to know when the application occurred.

8    A   I really can't remember.  And he does not
9  have it yet.

10   Q   Months ago?

11   A   Yes.

12   Q   Before you answered the interrogatories in
13 this case?

14   A   Yes.

15   Q   Why didn't you tell us about the
16 application for Medicare, then?  Whether it was granted or
17 not, it asked did you apply?

18   A   I don't remember seeing that.

19   Q   I asked your husband this morning if he had
20 applied for Medicare and he said no.  That wasn't correct,
21 was it?

22   A   No.

23   Q   Just the brief discussion we've had so far
24 we have confirmed that your husband was not accurate in
25 his answers to several questions I've asked him, correct?

1    A   Correct.

2    Q   Have you made a list, as you were seated
3  back there, of all the other answers he gave me that are
4  not right?

5    A   No.

6    Q   Can you think of others right now where he
7  answered under oath in a way that just isn't right?

8    A   Probably a few, yeah.

9    Q   Okay.  Well, let's start off with a few.
10 When is the first time he started having spells?

11   A   I can't remember the exact dates.  I would
12 say 2015.

13   Q   Month and year is fine.  I don't expect you
14 to be able to remember that it was 12/21/15 at 2:00 in the
15 afternoon.  I don't have that expectation, but I do want
16 to know the month and the year.  What month of 2015 did he
17 start having spells?

18   A   I do not remember the exact month.

19   Q   Putting aside the exact month, can you tell
20 me the first time you saw a spell and how it presented
21 itself?

22   A   We were in Wal-Mart and he grabbed my arm
23 and said, "Hold up."  And I asked him, "What's wrong?"
24 And he just stood there and then he finally said that he
25 couldn't move his right side, felt heaviness, and he was

1  dizzy.  And it went away real fast.

2    Q   Okay.  Which Wal-Mart was it?

3    A   In Mayfield.  I'm sorry.  It was Tennessee,
4  in Lebanon.

5    Q   The one in - - aren't there a couple in
6  Lebanon, though?

7    A   No.

8    Q   Okay.

9    A   Not to my knowledge.

10   Q   He was having trouble moving his whole
11 right side, arm and leg, right?

12   A   Yes.

13   Q   Now, you heard him tell me under oath
14 earlier that he had only had problems with his arm, right?

15   A   Yes.

16   Q   That was false too, wasn't it?

17   A   Yes.

18   Q   He told me he has no problems with his
19 memory, and yet he's told me incorrect answers to several
20 questions.  When did you first notice him having problems
21 with his memory?

22   A   After he had his stroke.

23   Q   When?  How soon after the stroke?

24   A   Right away.

25   Q   Has he had a consistent problem with his

1  memory since the stroke but only since the stroke?

2    A   Yeah.

3    Q   Do you know why Dr. Efobi describes him as
4  having problems with his memory in December of 2015?

5    A   No.

6    Q   Do you know of any reason why Dr. Efobi
7  would record him having problems with memory -

8    A   No.

9    Q   - at that time?
10     Had your husband had a problem with hearing loss
11 back in December of 2015?

12   A   No.

13   Q   Had he had a problem with shortness of
14 breath back then?

15   A   No.

16   Q   You quit smoking in 2000, but he was still
17 smoking two packs a day in 2015?

18   A   Yes.

19   Q   Had you tried to get him to quit?

20   A   Yes.

21   Q   Many times?

22   A   Yeah.

23   Q   Did you attend the visit with him and Dr.
24 Efobi on December - - I think it's 14th, 2015?

25   A   No.

1    Q   Do you know why he went to see Dr. Efobi?

2    A   Yeah.

3    Q   Why?

4    A   He said he was having problems with

5 weakness on his right side.

6    Q   Arm and leg?

7    A   And dizziness, yes.

8    Q   The first experience you had was the trip

9 to Wal-Mart in Lebanon. He described two other episodes

10 before he saw Dr. Efobi. Were you there with him on those

11 two other episodes?

12    A   No.

13    Q   You weren't there on either one?

14    A   No.

15    Q   So in terms of what you actually saw, you'd

16 seen one episode before he went to see Dr. Efobi?

17    A   Yes.

18    Q   You were not working in December of 2015,

19 were you?

20    A   No.

21    Q   You could have gone with him to Dr. Efobi's

22 office?

23    A   Yeah.

24    Q   Was there a reason why you didn't go?

25    A   No.

1    Q   All right. Now, when he was in the

2 Wal-Mart with you and had that episode, did he have

3 difficulty speaking?

4    A   Yes, for a second. Yes.

5    Q   How was that demonstrated? How did you

6 notice he had some difficulty speaking?

7    A   He was trying to talk to me and he couldn't

8 get nothing out.

9    Q   Was his speech then like it is now?

10    A   No.

11    Q   How is it different?

12    A   His whole voice and everything was

13 different.

14    Q   Well, during the middle of this event at

15 Wal-Mart, how was his speech different than what we saw

16 and heard today?

17    MR. RUFFINO: Don't know.

18    MR. CUMMINGS: Mr. Ruffino, if you can't be

19 quiet, you can't be in the room.

20    MR. RUFFINO: Okay.

21    MR. CUMMINGS: Okay? And these gentlemen are

22 nice enough to not have said that until now, so you either

23 need to make the commitment to stay seated or to sit in a

24 different room. Okay? It's the rules for everybody else.

25 It's not special for you. Okay?

1    MR. RUFFINO: Okay.

2    MR. CUMMINGS: Thank you.

3    THE WITNESS: Sorry.

4    (Direct Examination continues by Mr. Gideon:)

5    Q   The question, I wouldn't be surprised if

6 you've forgotten what I asked you. His pattern of speech,

7 his tone, his articulation that we've seen today, how is

8 it different than it was during the middle of the event at

9 Wal-Mart? Compare them for me.

10    A   He had his normal voice back then, I mean,

11 and the episode only lasted a second.

12    Q   But you told me he had difficulty speaking

13 during that episode.

14    A   But he didn't actually speak. He just

15 didn't speak. He was like trying to get something out to

16 me and then he stopped and then - -

17    Q   I see. He wasn't able to express anything

18 -

19    A   Right.

20    Q   - to you at all? Okay.

21    Now, when is the last time that you have seen

22 him unable to express words to you at all?

23    A   Today.

24    Q   Today. Did he have a period of expressive

25 aphasia today where he couldn't talk?

1    A   He can talk, but he kind of hesitates. He

2 can't gets things out.

3    Q   How frequently does that happen?

4    A   All the time.

5    Q   Would you say 15 times a day, 20 times a

6 day?

7    A   Yeah. At least 15 or 20 times a day.

8    Q   And how long has that been the case?

9    A   Since the stroke.

10    Q   But it was also true before the stroke,

11 wasn't it?

12    A   No.

13    Q   We just talked about one episode at

14 Wal-Mart, right?

15    A   The episode at Wal-Mart - -

16    Q   The two other episodes you didn't watch?

17    A   I wasn't there for. The episode at

18 Wal-Mart, he didn't really speak; he just couldn't get

19 anything out.

20    Q   Did you know that your husband, who was the

21 only patient with Dr. Efobi on the 14th, told her he was

22 unable to speak with all of the episodes? Did you know

23 that?

24    A   No.

25    Q   Have you ever looked at Dr. Efobi's

1 records?

2    A   I believe I have some of them, yeah.

3    Q   Do you recall looking at Dr. Efobi's

4 records and seeing where your husband reported to her that

5 he had numbness and weakness in his extremities, had

6 tingling and was also having memory loss? Did you see

7 that when you looked at the record?

8    A   Yes.

9    Q   Do you know of any reason why she would

10 record memory loss before the stroke if it wasn't true?

11    A   I don't - - no, I don't know.

12    Q   Did you see where she recorded that your

13 husband had episodes of depression, anxiety, and panic

14 attacks before the stroke? Did you see that?

15    A   No.

16    Q   Had your husband had episodes of depression

17 before his stroke?

18    A   Not to my knowledge.

19    Q   Anxiety before his stroke?

20    A   No.

21    Q   Panic attacks?

22    A   No.

23    Q   Had he had episodes of back pain and joint

24 pain before his stroke?

25    A   No.

1    Q   That's also in the records. Did you see

2 that? No?

3    A   No.

4    Q   Did you go with him when he went to

5 University Medical Center to have the MRI and the MRA of

6 his brain?

7    A   No.

8    Q   Do you happen to have - even if it's

9 secondhand from him - what the reason was for those tests?

10    A   Because he was having the spells or

11 whatever.

12    Q   Your husband told us that Dr. Efobi made a

13 diagnosis of seizures. Do you recall that -

14    A   Yes.

15    Q   - testimony? Was that testimony accurate

16 or inaccurate?

17    A   I would say inaccurate.

18    Q   Do you know why Dr. Efobi recorded a

19 diagnosis of seizures in your husband's case even before

20 his stroke?

21    A   No.

22    Q   Do you know why she prescribed Neurontin

23 for him?

24    A   No.

25    Q   Do you have any healthcare training as an

1 LPN or RN or nurse's tech?

2    A   A nurse's aide.

3    Q   Have you been through the nurse's aide

4 training in the state?

5    A   Yeah. Not in this state, no.

6    Q   Michigan?

7    A   Michigan.

8    Q   Okay. Then you have some idea what a

9 seizure is, don't you?

10    A   Yeah.

11    Q   Had you ever seen your husband have a

12 seizure?

13    A   No.

14    Q   Has he had a seizure since his stroke?

15    A   Yes.

16    Q   How many times?

17    A   Four or five.

18    Q   And what do they look like when he's having

19 a seizure?

20    A   He just shakes and goes, like, kind of

21 unconscious. If he's standing, he falls.

22    Q   Okay. Have you seen any correlation

23 between him shaking and falling with his blood pressures?

24    A   No.

25    Q   Does he keep a blood pressure chart?

1    A   Not anymore, but we did.

2    Q   When? When did you keep the blood pressure

3 chart?

4    A   When the doctor asked us to.

5    Q   Which doctor asked you, when?

6    A   Dr. Olivier, his heart doctor.

7    Q   Okay. But Dr. Olivier didn't start seeing

8 your husband until October of 2016, correct?

9    A   Uh-huh. Correct.

10    Q   Before that time did anybody ask your

11 husband to keep a blood pressure chart?

12    A   Not to my knowledge.

13    Q   How long has your husband had a challenge

14 with high blood pressure?

15    A   I don't know.

16    Q   When your husband was sent to Dr. Efobi,

17 was it on a referral from a Dr. Luck, L-u-c-k?

18    A   Yeah.

19    Q   Had you ever been to see Dr. Luck?

20    A   Yes.

21    Q   Where did Dr. Luck practice?

22    A   In Lebanon, Tennessee.

23    Q   Was it at the Neighborhood Health Clinic

24 office?

25    A   No. He had his own office on Maple Road.

Page 33

1    Q    Did he abandon that office or close it?
2    A    He closed it, yes.
3    Q    And where did he move to?
4    A    Knoxville.
5    Q    Your husband told me under oath initially
6 that he looked up Dr. Efobi and picked her as a
7 neurologist. That's not true either, is it?
8    A    No.
9    Q    In fact, Dr. Luck sent your husband to see
10 Dr. Efobi?
11    A    Yeah.
12    Q    That's the truth?
13    A    Yes.
14    Q    What problems, if any that you know of, did
15 your husband go see Dr. Luck about that led Dr. Luck to
16 send your husband to Dr. Efobi?
17    A    Having spells of getting dizzy and
18 weakness.
19    Q    Okay. On any of these spells before the
20 stroke did your husband tilt over and fall?
21    A    No.
22    Q    He continued driving?
23    A    Yes.
24    Q    Now, he went back to see Dr. Efobi February
25 11, 2016. Did you go for that visit?

Page 34

1    A    No.
2    Q    Why not?
3    A    He was working and he went inbetween his
4 runs.
5    Q    Well, the notes there on that visit reflect
6 that he had another TIA-like spell and he was worried. Do
7 you remember him being concerned?
8    A    Yeah.
9    Q    Where was that other TIA-like spell and
10 what had happened?
11    A    I'm not sure. I was not with him.
12    Q    I'm sorry, ma'am?
13    A    I'm not sure. I wasn't with him.
14    Q    Do you know how close it was to the time
15 that he saw Dr. Efobi?
16    A    No.
17    Q    Okay. Do you know or did he report to you
18 that he had numbness in his right arm and difficulty
19 swallowing followed by fatigue and headaches after that
20 last event, the last spell before he went to see Dr. Efobi
21 again?
22    A    He's told me, yeah, that he had felt dizzy
23 at times but it didn't last long.
24    Q    Beyond the dizziness did he tell you,
25 though, that he had numbness with his spells?

Page 35

1    A    No.
2    Q    Did he tell you he had difficulty
3 swallowing?
4    A    No.
5    Q    Did he tell you that he had fatigue, just
6 really tired after the event would occur?
7    A    No.
8    Q    Did he tell you he had headaches?
9    A    A headache.
10    Q    Did he tell you that Dr. Efobi leaned on
11 him hard to stop smoking?
12    A    No.
13    Q    Did he explain to you why she prescribed
14 Neurontin for him?
15    A    No.
16    Q    Okay. What medications was he on in
17 February of 2017 before his stroke occurred? What did he
18 take on a regular basis?
19    MR. CARTER: 2016.
20    Q    Excuse me. I said something wrong.
21 February of 2016, what medications was he on before he had
22 his stroke?
23    A    He was on I believe it's called Lisinopril
24 for his blood pressure.
25    Q    Yes.

Page 36

1    A    And he was on something for cholesterol. I
2 don't know the name of it.
3    Q    A statin?
4    A    Possibly. I'm not sure of the name.
5    Q    Okay. Anything else?
6    A    No.
7    Q    Did he take a baby aspirin each morning?
8    A    He may have.
9    Q    You're not sure if he did?
10    A    I'm not sure.
11    Q    Did he take one at night?
12    A    No.
13    Q    Did you take baby aspirin?
14    A    No.
15    Q    What was his work schedule?
16    A    He worked six days a week.
17    Q    From when until when?
18    A    From like 6:00 in the morning until usually
19 6:00 or 7:00 at night.
20    Q    Okay. In that same time frame were you
21 working at all?
22    A    No.
23    Q    Okay. Let's take a look at the phone
24 record in front of you, and I'll ask the court reporter to
25 slide that Exhibit 1 over. Let's start off - - and this,

Page 37

1 by the way, Ms. Ruffino, the one that I handed to you that

2 has your number on it, do you have that in front of you?

3    A    Yeah.

4    Q    Your number is 248-762-5356, correct?

5    A    Yes.

6    MR. GIDEON:  Ma'am, we will make that sheet

7 that's in front of her Exhibit 1 to her deposition.

8    Would you hand that to the court reporter just

9 for a minute?

10    (DOCUMENT MARKED AS EXHIBIT 1 FOR IDENTIFICATION

11 AND IS ATTACHED HERETO.)

12    Q    And you have your husband's in front of you

13 too?

14    A    My husband's what?  This?

15    Q    The phone record.  The Exhibit 1 from his

16 deposition you got in front of you too?

17    A    I guess so, yes.

18    Q    Get yours open in front of you.  You with

19 me?

20    A    I'm trying to read here.

21    Q    Okay.  If you will locate your Exhibit 1, I

22 think I'm reading it correctly, your first phone call is

23 an incoming call at 8:58 a.m. from 248-770-1584.  Isn't

24 that correct?

25    A    I believe so.

Page 38

1    Q    All right.  And it's 16 minutes long,

2 correct?

3    A    I'm not sure.  Can - - what I'm looking at

4 here?

5    Q    He can show it to you.  If you read across

6 the sheet, it says 2/17, 8:58A, shows the number

7 248-770-1584.  Go across.  It says - -

8    MR. CUMMINGS:  C.J., I can already tell she's

9 not looking at the right line.  Can I point her to the

10 right line?

11    MR. GIDEON:  Sure.  Yeah.

12    MR. CUMMINGS:  Stay right there.

13    MR. GIDEON:  Highlight it for her if you want

14 to.

15    MR. CUMMINGS:  8:58 a.m., Mr. Gideon, before I

16 highlight the wrong one?

17    MR. GIDEON:  Yeah.

18    MR. CUMMINGS:  Got it.  I'm going to go all the

19 way across.

20    (Direct Examination continues by Mr. Gideon:)

21    Q    Incoming call to you from your husband for

22 16 minutes?

23    A    Okay.

24    Q    Now you see where I am, Ms. Ruffino?

25    A    Yes.

Page 39

1    Q    And if you need some confirmation, if you

2 look at the exhibit to your husband's deposition you'll

3 see that at 8:58 it also shows a 16-minute call to

4 248-762-5356.  See what I'm talking about?  Kind of

5 checking our math.

6    A    I do see.

7    Q    Did your husband call you at 8:58?

8    A    Yes.

9    Q    You talked for 16 minutes, didn't you?

10    A    Not to him.

11    Q    Who did you talk to?

12    A    The people from - - the ambulance people, I

13 believe.

14    Q    Okay.  This is important to us to identify

15 who's on the other end of the line.  Did your husband

16 initially call you and say, "I want you to talk to these

17 people"?

18    A    Yeah.

19    Q    Is that how - -

20    A    Yeah.

21    Q    That is the first time you'd heard from him

22 since he left that morning, correct?

23    A    Yeah.

24    Q    What time had he left the house that

25 morning?

Page 40

1    A    I'm not sure.  I was sleeping.

2    Q    That's okay if you were sleeping.  What

3 time did he normally leave when you weren't sleeping?

4    A    Somewhere around 5:30, 6:00.

5    Q    When he left at 5:30 or 6:00 that morning

6 did you observe him being confused and not speaking

7 normally?

8    A    No, I didn't see him.  I wasn't awake.

9    Q    So you have no idea how he was that morning

10 before he left?

11    A    Right.

12    Q    You don't know whether he was normal or not

13 at 5:30 or 6:00, do you?

14    A    No.

15    Q    You don't know if he was normal or not at

16 7:00, do you?

17    A    No.

18    Q    You don't know if he was normal or not at

19 8:00?

20    A    No.

21    Q    And you don't know if he was normal or not

22 at 8:58, do you?

23    A    No, I don't.

24    Q    Okay.  At 8:58, what did he tell you or say

25 to you before he passed the phone off to somebody else?

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

1    A    He said there was something wrong and he
2  was going to the hospital, and he handed the phone to
3  them.
4    Q    You heard him say this morning under oath
5  that initially the Smyrna Police came to the location and
6  were with him and that they called Rutherford EMS,
7  correct?
8    A    Yes.
9    Q    When you talked to the people on the phone,
10 were you talking to Smyrna Police or were you talking to
11 Rutherford EMS?
12    A    EMS.
13    Q    You sure about that?  I want to know if
14 you're sure of that.
15    A    I'm sure I talked to EMS.
16    Q    At 8:58, is the question.
17    A    I believe so.
18    Q    You think you might be wrong, that you were
19 actually talking to the police for 16 minutes?
20    A    That's a possibility, but I talked to a
21 lady and she said they were taking him to the hospital.
22 Maybe it was a police officer.  I'm not quite sure.
23    Q    Look up here.  This is from Page 55 of the
24 StoneCrest records.  See up here in the left-hand corner?
25    A    Uh-huh.

1    Q    You can see the times recorded by
2  Rutherford EMS; the time they got a call, the time they
3  responded to the call, the time they dispatched, the time
4  they arrived.  And you can see that the first call to
5  Rutherford EMS was a half an hour after the call you're
6  talking about, right?
7    A    Yeah.
8    Q    So do you really think you were talking to
9  Rutherford EMS half an hour before they were called?
10    A    No.
11    Q    Okay.  I didn't think so.
12    MR. GIDEON:  We'll make a copy of Page 55 the
13 next exhibit.
14    (DOCUMENT MARKED AS EXHIBIT 2 FOR IDENTIFICATION
15 AND IS ATTACHED HERETO.)
16    Q    So what did you talk to the police about
17 for 16, 15 or 16 minutes?
18    A    Whomever I was talking to was giving me
19 directions on how to get to the hospital.
20    Q    Did they tell you which hospital they were
21 going to go to?
22    A    Yes.
23    Q    Did you give them any instructions about
24 which hospital to go to?
25    A    I asked them why they were going there.  I

1  thought they would have brought him to one closer to us.
2  And they said they had to take him to the hospital closest
3  to them.
4    Q    My question was, did you give them any
5  instructions about where you wanted him to go?
6    A    No.
7    Q    Did you have a preference as to any
8  particular hospital?
9    A    No.
10    Q    Had you ever been admitted to a hospital
11 yourself since you'd moved to Tennessee?
12    A    Yes.
13    Q    Which one?
14    A    The one in Lebanon.
15    Q    University Medical Center?
16    A    Yeah.
17    Q    And what was the nature of the admission
18 there?
19    A    I had a gallbladder taken out.
20    Q    Elective surgery?
21    A    Uh-huh.
22    Q    Yes?
23    A    Yes.
24    Q    Is that the only admission you had there?
25    A    Yes.

1    Q    Did you think the care there was
2  acceptable?
3    A    Yes.
4    Q    Did you suggest to them that they take him
5  to University Medical Center because of your good
6  experience and, secondly, because that's where the imaging
7  studies had been done?
8    A    No.
9    Q    Did you tell them that your husband had had
10 an MRA and an MRI at University Medical Center?
11    A    No.
12    Q    Did you tell them that he had been cared
13 for by Dr. Efobi whose office was near the University
14 Medical Center?
15    A    No.
16    Q    Okay.  Did you say anything other than
17 asking them why they were going to take him to StoneCrest
18 and they said it's closest?
19    A    No.
20    Q    Did you know whether StoneCrest Medical
21 Center was owned or operated by HCA Health Services of
22 Tennessee, Inc.?
23    A    No.
24    Q    Did you know whether HCA Health Services of
25 Tennessee, Inc. employed any of the doctors there at

Page 45

1 StoneCrest?

2    A    No.

3    Q    Did you know anything about the hospital's
4 capacity to take care of somebody with a stroke?

5    A    No.

6    Q    Did you know whether they accepted your
7 husband's insurance or not?

8    A    No.

9    Q    Okay.  Had you ever seen any advertising
10 from HCA Health Services of Tennessee, Inc. regarding
11 StoneCrest or any other hospital?

12    A    No.

13    Q    Okay.  What else did you talk about for 16
14 minutes?  That's a lot of time.

15    A    What I remember is them trying to tell me
16 where to go.  I was trying to write it down.

17    Q    Okay.  Were you at home?

18    A    Yes.

19    Q    Did you all have internet service at home?

20    A    Yes.

21    Q    Were you able to look up StoneCrest Medical
22 Center on the internet and then do the map function to get
23 directions how to get there?

24    A    I probably could have, yes.

25    Q    Did you?

Page 46

1    A    No.

2    Q    All right.  What time did you leave to go
3 to the hospital?

4    A    I do not remember.

5    Q    What time did you arrive at the hospital?

6    A    I do not know.

7    Q    What time did you leave the hospital?

8    A    I do not know.

9    Q    What time of the morning was it that you
10 first set foot in the emergency room at StoneCrest?

11    A    I'm not sure what the time was.

12    Q    Can you narrow it down to a half an hour?

13    A    I'm not sure what time it was.

14    Q    Can you tell me you were there before
15 lunch, or not?

16    A    Before lunch, yes.

17    Q    How much before lunch?

18    A    I'm not sure.

19    Q    So you could have gotten there at 11:30?

20    A    Could've, but didn't.

21    Q    Well, tell me the did.  Did get there at
22 what time?

23    A    I'm not sure exactly what time it was.  It
24 was in the morning, but I don't know the exact time.

25    Q    Well, the morning would run from whenever

Page 47

1 you got up - - what time was that?

2    A    About 7:30.

3    Q    From 7:30 until 11:59.  That's the morning.
4 What time are you certainly there?

5    A    9:00 a.m.

6    Q    Your husband wasn't there when you arrived?

7    A    I said I don't remember the time.  It was
8 in the morning, but I don't remember the exact time.

9    Q    Let me make it very clear so that you and I
10 are communicating.  Can you tell me when you arrived at
11 StoneCrest?  Between the time you woke up at 7:30 and the
12 end of the morning at 11:59, can you tell me when it was?

13    A    Not exactly, no.

14    Q    Was your husband at StoneCrest when you
15 arrived?

16    A    Yes.

17    Q    Where was he?

18    A    He was in the emergency unit.

19    Q    Well, was there a room or was he - -

20    A    He was in a little tiny room.

21    Q    Tiny room.  Was there a number by the room?

22    A    There could have been.  I don't remember
23 it.

24    Q    If you looked at the StoneCrest records and
25 you remember looking at these Rutherford County EMS

Page 48

1 records, your husband did not get to StoneCrest until
2 between 9:48 and 9:52.  Okay?  So you know you weren't
3 there then, right?

4    A    Yeah.

5    Q    By the time you got there he was already in
6 the ER.  He was in a room, correct?

7    A    He was still in the ER, yes.

8    Q    But had he been anywhere else?  Had he gone
9 for his first CT scan?

10    A    He could've, yes.

11    Q    Had he had his first chest x-ray?

12    A    Could have.

13    Q    The first chest x-ray was at 10:17.  Did
14 you see it occur?

15    A    He had several tests done.  I'm not sure
16 the time of any of them.

17    Q    The first CT scan was read at 10:29.  Did
18 you see him go to radiology and come back?

19    A    Yes.

20    Q    All right.

21    A    More than once.

22    Q    Did you see the second CT scan, where he
23 went to radiology and came back, in the afternoon?

24    A    Yes.

25    Q    You were there for that?

Case 3:17-cv-00725    Document 114-7    Filed 12/14/18    Page 12 of 28 PageID #: 1440

Page 49

1    A   Yeah.  I was there, yeah.

2    Q   All right.  What else do you recall

3  actually observing?  We've got an afternoon CT scan, about

4  1:30 in the afternoon.  Do you recall anything else

5  occurring?

6    A   Going for tests.  For a few.

7    Q   What kinds of tests?

8    A   I'm not sure.

9    Q   Was there a time during the day where you

10 left the ER and went out to charge your phone in your car?

11   A   No.

12   Q   That never happened?

13   A   No.

14   Q   Did you leave the hospital at all that

15 afternoon or that late morning?

16   A   No.

17   Q   Do you recall ever seeing a person who

18 introduced himself as Clark Archer?

19   A   Yes.

20   Q   When?  What time of the day was it?

21   A   Afternoon.  Early afternoon.

22   Q   What did Clark Archer look like then?

23   A   Kind of tall, thin.

24   Q   How old would you guess he is?

25   A   Younger.

Page 50

1    Q   Forties?

2    A   Yeah.

3    Q   Glasses or no glasses?

4    A   I don't recall that.

5    Q   Do you remember him having a white coat on?

6    A   I don't recall that.

7    Q   Or a blue coat or a green coat?  Don't

8  recall?

9        (WITNESS NODS NO INDICATING THE NEGATIVE.)

10   Q   Do you remember seeing anything on his

11 identification badge?

12       (WITNESS NODS NO INDICATING THE NEGATIVE.)

13   A   No?

14   A   No.

15   Q   Okay.  How many times did you see Clark

16 Archer on the 17th of February 2016?

17   A   Twice.

18   Q   Tell us about the first visit.  Did he

19 introduce himself to you?

20   A   Yes.

21   Q   Were you in the room, the small room with

22 your husband?

23   A   Yes.

24   Q   What did Clark Archer say or do in that

25 first encounter?

Page 51

1    A   He told me that they found a clot and they

2  were taking him up for surgery.

3    Q   Taking him up for surgery at StoneCrest?

4    A   Yes.

5    Q   You're sure of that?

6    A   I'm positive of that.

7    Q   And you remember that distinctly?

8    A   Uh-huh.

9    Q   Yes?

10   A   Yes.

11   Q   Okay.  Did you say anything in response to

12 that?  For example, "Where is the clot?"

13   A   I asked where is it and I asked how bad it

14 was and he said - - he just said they found it and they're

15 taking him up for surgery, and he was gone.

16   Q   He tells you they found a clot, they're

17 going to take him up for surgery.  And you ask the

18 question, "Well, how bad is it?"  And what was the other

19 question you asked?

20   A   Can't remember exactly.

21   Q   And he didn't answer your question; he just

22 left?

23   A   We only spoke for a second.

24   Q   All right.  Did you say, "Now, wait a

25 minute.  I've got some questions for you.  Would you

Page 52

1  please answer the question I just asked?"  Did you say

2  anything?

3    A   No.  There was also male nurse in the room

4  and he was in there trying to tell me they were dismissing

5  my husband, so I was kind of arguing between both.

6    Q   You were arguing with Dr. - -

7    A   Not Dr. Archer.  With the -

8    Q   With the male nurse?

9    A   - nurse saying he's not going nowhere yet.

10   Q   Right.  Do you recall the male nurse saying

11 whether they were discharging or transferring your

12 husband?

13   A   He said discharging.

14   Q   And you're absolutely certain of that?

15   A   Yes.

16   Q   You're certain of that as all of the

17 testimony you have given in this case?

18   A   Yes.

19   Q   Okay.  Did you sign a transfer form?

20   A   I believe so.

21   Q   Did you sign a transfer form that permitted

22 the transfer of your husband to Centennial Medical Center?

23   A   I believe so.

24   Q   When did you sign the form?

25   A   I'm not sure of the time.

Case 3:17-cv-00725   Document 114-7   Filed 12/14/18   Page 13 of 28 PageID #: 1441

1    Q    Before or after this discussion with a
2  nurse about discharge?
3    A    I believe after.
4    Q    You said you saw Dr. Archer a second time.
5  First time he told you they found a clot.  They were going
6  going to take him to surgery -
7    A    Uh-huh.
8    Q    - at StoneCrest.  Second time you saw Dr.
9  Archer was how much time later?
10   A    Few hours.
11   Q    Several hours.  What did he say to you?
12   A    I asked him how come he wasn't gone to
13 surgery.  He just said that they were going to send him
14 over to Centennial Hospital where they could take care of
15 him better.
16   Q    All right.  About what - -
17   A    That there was nothing they could do there.
18   Q    About what time of the day was that
19 conversation?
20   A    I'm not sure what time it was.
21   Q    Did you ask Dr. Archer any questions?
22   A    I asked him why did he tell me that they
23 were taking him for surgery and then not doing it.  And he
24 said that they were unable to do that type of surgery
25 there and they were going to send him over to Centennial

1  where they have a neuro unit there or something and he'd
2  get better care.  That's what he told me.
3    Q    Okay.  Any other questions by you?
4    A    No.
5    Q    Any questions by your husband?
6    A    No.
7    Q    Is this the point in time where you and/or
8  your husband sign the transfer form?
9    A    I'm not sure.  I don't believe so.  I'm not
10 sure what time I signed a transfer form.
11   Q    After this second conversation with Clark
12 Archer, how much time was it before your husband was
13 actually moved to an ambulance and taken to Centennial?
14   A    Hours later.
15   Q    How many?
16   A    I'm not sure.
17   Q    Okay.  Now, did you make any notes of what
18 was going on while you were at StoneCrest?
19   A    While I was at Centennial.
20   Q    I didn't ask you about Centennial.  I asked
21 you, did you make any notes while things were going on
22 while you were at StoneCrest?
23   A    No.
24   Q    When did you start making notes at
25 Centennial?  What day was it?

1    A    The evening of 2017.  February 17,
2  two-thousand -
3    Q    That night you started making notes?
4    A    Yes.
5    Q    Where are all those notes?
6    A    I have them at home.
7    Q    Okay.  Did you later take the notes and put
8  them together in this two and a quarter page summary?
9    A    Yeah.
10   Q    Okay.  Did you tell your lawyers that you
11 had all these original notes at home?
12   A    Yeah.
13   Q    Okay.  Let's take an inventory.  How many
14 original notes are there?  How many pages?
15   A    I don't know.
16   Q    Estimate it for me so that we can have some
17 idea of how burdensome it would be to get them together.
18   A    Ten.
19   Q    Ten or fifteen maybe?
20   A    Maybe.
21   Q    Have you lost or altered any of those 10 or
22 15 pages?
23   A    No.
24   Q    Have you added to them at all since the
25 night of February 17?  Filled them in?

1    A    I don't know.
2    Q    Well, the question's very direct and I want
3  a direct answer.  At any time since February 17, 2016,
4  have you filled in any of those notes or completed any of
5  the thoughts on those notes?
6    A    Yes.
7    Q    When did you start doing that?
8    A    I wrote down all the stuff that was going
9  on when I was sitting at Centennial, and then I just
10 rewrote them basically so you could read it.
11   Q    When?  The question is, when did you start
12 filling them in, adding to them, and rewriting them?  When
13 did that occur?
14   A    At the hospital.
15   Q    When?  There were two admissions to
16 Centennial, ma'am.  One on February 17 to February 26.
17 Another one - -
18   A    February 17th.
19   Q    All the rewrites occurred the same day, the
20 17th of February 2016?
21   A    I believe so, yes.
22   Q    And all the ink's the same ink from the
23 same pen?
24   A    I would believe so.
25   Q    Would you be surprised and absolutely

1 astounded if they're ever analyzed and somebody says these
2 weren't written at the same time?

3    A   I'm not quite sure what your - -

4    Q   Here is the really clear-cut question:  Did
5 you add to those notes at any time after February 17,
6 2016, question?

7    A   I didn't add to them, no.

8    Q   Did you rewrite them after - -

9    A   I rewrote them, yes.

10    Q   Let me finish my question.
11 Did you rewrite them after February 17, 2016?

12    A   Yeah.

13    Q   How many times?

14    A   Once.

15    Q   When?  When did you rewrite them?

16    A   I believe that night at the hospital.

17    Q   Why did you rewrite something the same
18 night?

19    A   So they were readable.  I do that with
20 everything.

21    Q   Okay.  Well, we want the originals that you
22 have at home, all of them, and we'll make those Exhibit 2.
23 So please get those.  I'm sorry.  Exhibit 3.  So please
24 get those and give them to your lawyers.

25    A   Okay.

1    Q   Now, when was this document prepared?

2    A   This was prepared at Centennial Hospital.

3    Q   When?

4    A   February 18th, 17th.

5    Q   Somewhere in that area?

6    A   Uh-huh.

7    Q   Yes?

8    A   Yes.

9    Q   Why did you write this two and a quarter
10 page summary when you had all those other original notes
11 that you were making?

12    A   I'm not sure.

13    Q   Okay.

14    A   Being at a hospital, you get bored.  I was
15 just sitting there and I was writing what was going on.

16    Q   Well, the first line is not right.  You
17 were not sitting at StoneCrest Hospital with your husband,
18 correct, when this was prepared?

19    A   Not when I actually wrote this exact one,
20 no.

21    Q   Right.  So this very document that is
22 Exhibit 3 - -

23    MR. GIDEON:  What is this?  Have we made it an
24 exhibit yet?

25    MR. CARTER:  No, we have not.

1    MR. GIDEON:  This will be Exhibit 4 then.

2    (DOCUMENT MARKED AS EXHIBIT 4 FOR IDENTIFICATION
3 AND IS ATTACHED HERETO.)

4    Q   The one that's in front of you that's a
5 copy of this sheet you prepared begins by saying, "Sitting
6 at StoneCrest Hospital with my husband."  That's not
7 truthful, is it?  This wasn't written at StoneCrest?

8    A   This is what I wrote off my notes because
9 that's where I started writing, was at StoneCrest.

10    Q   This document you just told me you wrote at
11 Centennial on the evening of February 17.  Is that true or
12 not?

13    A   That's when I rewrote this here one, off
14 notes.

15    Q   Okay.  So this here one was rewritten at
16 Centennial, correct?

17    A   Correct.

18    Q   So the first statement in this document,
19 "sitting at StoneCrest Hospital with my husband" is not
20 accurate, is it?

21    A   Off my notes, it was.

22    Q   Was this document written at StoneCrest
23 Hospital?

24    A   Not this exact one, but it was on my notes
25 when I first started.

1    Q   I'm not asking you about your notes now.
2 I'm asking you - -

3    A   Okay.  This was at StoneCrest - -
4 Centennial.

5    Q   Exhibit 4 was written at Centennial?

6    A   Yes.

7    Q   It was not written at StoneCrest?

8    A   Correct.

9    Q   First sentence in this document is not
10 accurate, correct?

11    A   Correct.

12    Q   Now, how about this:  Who told you that "He
13 picked up an order from Home Depot in Smyrna.  After he
14 left one of the workers from Home Depo called my husband's
15 boss Gordon Lee."?  Who gave you that information?

16    A   My husband.

17    Q   Okay.  "And said something was wrong with
18 John.  So Gordon called my husband and told him to pull
19 over."  Who was the source of that information?

20    A   John.

21    Q   John, your husband?

22    A   Yes.

23    Q   "Gordon called the police and they called
24 EMS as soon as they seen my husband."  Your husband was
25 the source of that?

1      A   Yes.

2      Q   We know today that's not accurate, isn't
3  it?  You know that after looking at the EMS records,
4  correct?  You know the first people you talked to - you
5  talked to - were actually the police for 16 minutes,
6  correct?  Correct?

7      A   Yeah.

8      Q   You don't mention anything about the police
9  calling you in this note, do you?

10     A   No.

11     Q   You say, "My husband had EMS call me to
12 tell me where they were taking him."  But you told me that
13 that call occurred in the first phone call; and that was
14 from the police, wasn't it?  Yes?

15     A   I don't know if that was from the police or
16 the EMS.

17     Q   Well, we've already established EMS hadn't
18 even been called at the time of the phone - -

19     A   Okay.  Then it was from the police.

20     Q   You missed that significant detail that
21 night, didn't you?

22     A   I guess I did.

23     Q   Okay.  Have you looked at this two and a
24 half, two and a quarter page document to find any other
25 inaccuracies?  Before we got here today did you look at it

1  to see if it was inaccurate in other ways?

2      A   No.

3      Q   Okay.  Let's look at the last line on the
4  first page.

5      A   Okay.

6      Q   Last line on the first page you write that
7  the "nurse came in and said they were going to discharge
8  him and all the tests came back fine," correct?

9      A   Yes.

10     Q   You told me just a minute ago that when you
11 first saw Dr. Archer he told you they'd run a test, they
12 found a clot, and they were going to take him to surgery.
13 And that was before the nurse talked about discharging,
14 right?

15     A   The nurse came in twice about discharging.

16     Q   Sequence, ma'am, is, as you told the story
17 today under oath, Clark Archer first tells you a test has
18 identified a clot and they're going to take him to
19 surgery, right?

20     A   Yes.  Yes.

21     Q   And then you said the nurse said "we're
22 going to discharge him," correct?

23     A   Yes.

24     Q   That detail is not in here either, is it?

25     A   I'm not sure.  The nurse came in at one

1  time and told me they didn't find nothing and they were
2  going to discharge him.

3      Q   Why didn't you put down the time you got to
4  the hospital?

5      A   I'm unsure of the time.

6      Q   Two-thirds down it says, "When I arrived at
7  the hospital my husband looked bad."  Why didn't you put
8  down the time?

9      A   I wasn't thinking about putting down - - I
10 don't know.

11     Q   How was he very confused when you arrived?
12 What was he doing that led you to think he was confused?

13     A   Because he was trying to talk to me and he
14 made no sense.

15     Q   Was he not able to speak or were his words
16 garbled?  Was he using the wrong words?  What was the
17 explanation?

18     A   Wrong words and he was just not making
19 sense at all in what he was saying.

20     Q   Give me an example.  Put me there as best
21 you can of what he was articulating that made no sense.

22     A   He was telling me he's at work when he's in
23 the hospital, and he just did not know what was going on.

24     Q   Were you able to understand what he said
25 even though it didn't make sense?

1      A   No.  Not all of it, no.

2      Q   What was it that you were able to
3  understand?  What words did he actually say that were
4  clear to you?

5      A   I don't recall.

6      Q   Okay.  Do you actually remember him telling
7  you that he was at work?

8      A   I do at one point, yeah.

9      Q   When during the admission was it that he
10 was telling you he was at work?

11     A   When I first got to the hospital.

12     Q   And was the male nurse in his room when you
13 first got there?

14     A   He wasn't in the room with him until after
15 I got there.  I mean, he might have been there before, but
16 no one was in the room with him when I got there.

17     Q   At the moment you went in?

18     A   Right.

19     Q   You had to have asked somebody, "Where is
20 John Ruffino?" to find the room, wouldn't you?

21     A   Yeah.

22     Q   Did you speak to a male or female and ask
23 them or did you say, "I'm Martha Ruffino.  My husband is
24 here.  Where is he?"  Something like that?

25     A   Exactly.  And they - -

1    Q   Did they walk you, escort you to the room?
2    A   Yeah.
3    Q   Can you remember where the room was in
4 relationship to the nurse's station?
5    A   No.  I do not remember that.
6    Q   Okay.  Did you have to wait in the waiting
7 room for a while before someone would let you back into
8 the treatment area?
9    A   No.
10    Q   Did you have to show any kind of ID to get
11 back in the treatment area?
12    A   No.
13    Q   None?  You just walked right in?
14    A   Uh-huh.
15    Q   Really?  Okay.
16       What was the person like?  What did he or she
17 look like who acknowledged your presence and took you to
18 John Ruffino's room?
19    A   Nobody actually took me to his room.  They
20 buzzed a button to let me in the back and told me what
21 number to go to.
22    Q   All right.  When you got there did your
23 husband already have an IV line in place?
24    A   Yes.
25    Q   Which arm?

1    A   I don't remember.
2    Q   Was it both arms or just one?
3    A   One.
4    Q   Okay.  And you don't remember which side?
5    A   No, I don't.
6    Q   Was he gowned?
7    A   Yes.
8    Q   Did you ask him, "What have they done for
9 you so far"?
10    A   I didn't, no.
11    Q   You just tell me what you asked him.  Just
12 share with us as you got in the room what you asked.
13    A   I don't even remember what I asked him when
14 I first got in the room.
15    Q   Well, let's say after two minutes, three
16 minutes, four, what did you ask?
17    A   I remember asking him if he's okay and
18 what's going on.
19    Q   And his response was what?
20    A   He couldn't tell me.  He didn't respond.
21    Q   Made no noise or garbled words?
22    A   Kind of gurgled (sic) words and his eyes
23 were as big as saucers.  He looked very frightened.
24    Q   Okay.  Anything else you noticed about him?
25    A   No.

1    Q   Was he laying on a gurney or a bed or was
2 he seated on an exam table?
3    A   He was on a bed, table, whatever you want
4 to call it.
5    Q   Was he covered with a blanket?
6    A   With a sheet, yes.
7    Q   Were you able to see him moving his left or
8 right leg?
9    A   He wasn't moving at all then.
10    Q   Question was whether you were able to see
11 his legs -
12    A   No, I was not.
13    Q   - under the sheet?  Yes or no?
14    A   No.
15    Q   So could you tell, since you couldn't see
16 his left or right leg, whether he was moving his left or
17 right leg?
18    A   Correct.
19    Q   You could or could not?
20    A   I could not.
21    Q   Okay.  Did you ask him if he could move his
22 left or right leg?
23    A   No.
24    Q   Had you had any experience with anyone
25 having a stroke previously?

1    A   No.
2    Q   All right.  You worked at an assisted
3 living facility up in Michigan for a period of time?
4    A   Uh-huh.
5    Q   Were you in the financial side or were you
6 in the healthcare side of that business?
7    A   Both.
8    Q   Surely there were some people in the
9 assisted living facility that had strokes?
10    A   Yeah.
11    Q   So you had some idea -
12    A   Yes.
13    Q   - how strokes generally will affect one
14 side versus the other?
15    A   Yes.
16    Q   Those kind of things?
17       Taking your limited experience at an assisted
18 living facility, what did you know about strokes?
19       Coming up zero?
20    A   Yeah.
21    Q   Okay.  When you got to Centennial did you
22 have a discussion with Dr. Valdivia?
23    A   Yes.
24    Q   Tell me about that discussion with Dr.
25 Valdivia, when it was and what was said.

1    A   He came into the room and they ordered more
2  tests to be done on my husband.  And after they did the
3  tests and stuff, then he came back down to talk to me.
4  And he apologized to me for my husband being in the
5  condition he was in and that something wasn't done sooner
6  because now it was too late for him to do anything.
7    Q   Okay.  What else did he say?
8    A   He said not to ever take him back to
9  StoneCrest again, that he felt he didn't get good care,
10  the right care.
11    Q   All right.  So what had you told him about
12  the care at StoneCrest at that point in time?
13    A   I had told him nothing about it at that
14  time.
15    Q   So what did he know about the care at
16  StoneCrest at that time?
17    A   He told me that they should have given him
18  a shot or something like that to clear it up.
19    Q   Just a shot to clear it up.  What did he
20  know about StoneCrest, in terms of just kind of some minor
21  details, when your husband had arrived?
22    A   I'm sure he read the records.
23    Q   Were the records already there?
24    A   Yes.  They came with him there, I believe.
25    Q   How do you know that?

1    A   I don't know that for sure.
2    Q   All right.  Assuming that the records were
3  there, do you know that Dr. Valdivia had even had the time
4  to read the StoneCrest records yet?
5    A   I believe he did.
6    Q   Did he say to you, "I have read the
7  StoneCrest records," something like that?
8    A   He didn't say that to me, no.
9    Q   It's not in this note, the rewrite of the
10  note.  There's no mention in the rewrite of the note of
11  Dr. Valdivia looking at the records, is there?
12    A   No.
13    Q   Now, there is a mention that you didn't
14  tell us about now about Dr. Valdivia allegedly being very
15  critical of Dr. Efobi too, right?
16    A   Yes.
17    Q   In fact, I asked you what he said and you
18  included the criticism of StoneCrest but you didn't
19  mention anything about Dr. Efobi.  Did he say something
20  about Dr. Efobi?
21    A   Yes.
22    Q   How did he know that your husband had even
23  seen Dr. Efobi?
24    A   We told him.  I told him.
25    Q   You did.  Did he tell you never to take

1  your husband back to see Dr. Efobi?
2    A   Before my husband was dismissed he told me
3  not to take him back to Dr. Efobi or back to that hospital
4  again.
5    Q   Now, why is it you and your husband did not
6  sue Dr. Efobi?
7    MR. CUMMINGS:  To the extent your answer is
8  based on something I have told you as your attorney, I
9  need to instruct you not to answer.  If you can answer his
10  question without sharing something I have told you,
11  provide that part.
12    Q   Question stands.  You mentioned to us
13  alleged critiques from Dr. Valdivia of both StoneCrest and
14  Dr. Efobi.  Why didn't you sue Dr. Efobi?
15    A   I have no answer.
16    MR. CUMMINGS:  Again, the same - -
17    Q   No answer.  Okay.
18    Have you told me all of the specific words from
19  Dr. Valdivia?
20    A   Yeah.
21    Q   Now, at the time that you had your first
22  contact with Clark Archer, the gentleman we described
23  earlier, was your husband conscious and alert?
24    A   He was conscious.  I don't think he was
25  actually alert.

1    Q   Okay.  At the time of the first contact
2  with Clark Archer, did your husband know what month it was
3  and what his age was?
4    A   Not sure.
5    Q   Did you ever ask your husband to open or
6  close his eyes at any time?
7    A   No.
8    Q   Did you ever ask him to squeeze your
9  fingers?
10    A   No.
11    Q   Did you ever look at your husband to see if
12  his eyes would track around as you moved through the room?
13    A   No.
14    Q   Did you ever determine whether or not any
15  portion of your husband's face didn't move with the rest
16  of his face?
17    A   No.
18    Q   Did you ever ask your husband to hold his
19  right or left arm up to see if he could keep them up?
20    A   No.
21    Q   Did you ever ask him to hold his left or
22  right leg up to see if he could keep them up?
23    A   No.
24    Q   Did you at any time determine whether or
25  not your husband could stand on his own power?

1    A    No.
2    Q    Did he ever get up and go to the bathroom
3  the whole time you were there at StoneCrest?
4    A    Yes.
5    Q    How many times?
6    A    Once.
7    Q    Was there a bathroom in the small room or
8  was it somewhere down the hall?
9    A    Down the hall.
10    Q    Did you see your husband walk to the
11  bathroom down the hall?
12    A    I had to help him.
13    Q    How?
14    A    I got a wheelchair from outside and I
15  helped him get out of the bed and put him in there.  Then
16  I had to help him get to the toilet.
17    Q    Okay.  And did you get him up out of the
18  wheelchair yourself?
19    A    Yes.
20    Q    And then let him go to the toilet?
21    A    Yes.  I was right in there with him to help
22  him.
23    Q    Is this before or after Dr. Archer tells
24  you that they found a clot in his head?
25    A    I believe before.

1    Q    Okay.  You told me that the first time you
2  talked to Dr. Archer he told you they found a clot in his
3  head, right?
4    A    Yes.
5    Q    Okay.  So you hadn't seen Dr. Archer yet
6  when you took your husband to the bathroom, right?
7    A    I believe so.
8    Q    Okay.  You believe I'm correct?  You hadn't
9  seen him yet?
10    A    Yes.
11    Q    Okay.  Was there ever a time while you were
12  at the ER that your husband walked on his own power to the
13  bathroom?
14    A    No.
15    Q    You told me earlier that you've actually
16  looked at the StoneCrest records.  Is that not correct?
17    A    Yeah.  I don't remember everything it said
18  on the records, but yeah.
19    Q    Have you not seen that there are at least
20  two entries of your husband getting up and walking under
21  his own power to the bathroom and back?
22    A    No, I did not see that; but no, that did
23  not happen while I was there.
24    Q    Okay.  But we don't know when you were
25  there, do we?  Do we?

1    A    No.
2    Q    Did you ever see a Dr. Chitturi do an
3  examination of your husband?
4    A    No.
5    Q    Did you ever see any nurse other than a
6  male nurse do anything with your husband, to your husband,
7  or for your husband?
8    A    Later that evening, but most the day it was
9  a male nurse that was in there.
10    Q    Okay.  And how frequently was the male
11  nurse in there during the time you were at the hospital?
12    A    A few times.
13    Q    For how long?
14    A    For a few minutes.
15    Q    And where was the nurse's station; from
16  your husband's room how far away was it?
17    A    I'm not sure.
18    Q    Five feet?
19    A    Maybe.
20    Q    Three feet?
21  (WITNESS NODS NO INDICATING THE NEGATIVE.)
22    Q    Wasn't your husband's room literally kind
23  of catty-corner directly across the hall from the nursing
24  station?
25    A    I'm not sure.

1    Q    You don't recall?
2    A    No.
3    Q    Okay.  Did you ever see a person named Mark
4  Rinehart?
5    A    Not to my knowledge, no.
6    Q    Are the only people that you recall seeing
7  in terms of involvement in the care of your husband a male
8  nurse, Dr. Archer, and another nurse later in the day?
9    A    Yes.
10    Q    And was the other nurse later in the day a
11  male or a female?
12    A    Female.
13    Q    Did you ever get her name?
14    A    No.
15    Q    Did you ever get the male nurse's name?
16    A    No.
17    Q    Did you ever ask the male nurse for
18  anything he did not provide?
19    A    No.
20    Q    Did you ever ask the female nurse for
21  anything she did not provide?
22    A    No.
23    Q    Did you ever ask Clark Archer for anything
24  he didn't provide?
25    A    No.

1    Q   Did you ever ask anybody why it was taking
2 so long to transfer your husband from StoneCrest to
3 Centennial?
4    A   Yes.
5    Q   And what answer were you given by whom?
6    A   By Dr. Archer.
7    Q   What did he say?
8    A   And he said, well, that they're taking him
9 to StoneCrest because - - or to Centennial because they
10 cannot do what needs to be done for him there.
11    Q   I understood that.  You told me that
12 earlier, but I asked you if you had ever asked anybody why
13 it was taking whatever amount of time it took to get your
14 husband transferred from StoneCrest to Centennial?
15    A   Only answer I got from the nurse on that
16 was because they have to wait for the ambulance.
17    Q   Did you ever suggest to any of the doctors
18 or nurses that you really wanted to see your husband go to
19 University Medical Center in Lebanon?
20    A   I did at one time, but that was because I
21 wasn't - - when I first got there, thinking that he would
22 have been better off there because it was closer to home.
23    Q   Who did you communicate that preference to?
24    A   I believe one of the nurses.
25    Q   All right.  And what was the response from

1 the nurse?
2    A   That he would get better care at
3 Centennial.
4    Q   And which nurse was this that answered that
5 question?
6    A   I'm not sure.  I don't know the names.
7    Q   Was it the male nurse or not?
8    A   No.  It wasn't him.
9    Q   It wasn't that male nurse?
10    A   No.  It was somebody that I went out and
11 talked to.
12    Q   About what time was it when you
13 communicated the question as to whether or not it would be
14 better to go to University Medical Center since it was
15 closer to home?
16    A   I'm not sure what time it was.
17    Q   Do you know if your husband drove by
18 University Medical Center coming from the house to the
19 Home Depot in Smyrna?
20    A   I don't know.
21    Q   You used to be familiar with that route,
22 weren't you, from your home to the Home Depot in Smyrna?
23    A   Yeah.
24    Q   How far off I-40 were you in Alexandria?
25    A   You mean from the, like, expressway in

1 Lebanon?
2    A   Yes, ma'am.
3    A   About 45 minutes.
4    Q   There's a hospital in Alexandria, small
5 one.  Wasn't Doctors Hospital there?  Doctors Hospital was
6 in Smithville, wasn't it?
7    A   I'm not sure.
8    Q   Okay.  But at your home, your home in
9 Alexandria, to get from there to the Home Depot in Smyrna
10 what route would your husband have taken?
11    A   I honestly do not know.
12    Q   You don't know?
13    A   No.
14    Q   When you left your home to get to
15 StoneCrest Medical Center, what route did you take?
16    A   I took 70 to the expressway and - -
17    Q   Meaning Highway 40, Interstate 40?
18    A   Yes.
19    Q   Is that what you mean by the expressway?
20    A   Yes.
21    Q   You took 70 to Interstate 40?
22    A   Uh-huh.
23    Q   And then went - -
24    A   And I don't remember the exact route or the
25 names of the roads.

1    Q   Did you not get on Interstate 24 at some
2 point in time?
3    A   I'm not positive.
4    Q   How long did it take you from your home to
5 get to StoneCrest?  Forty-five minutes?
6    A   Forty-five minutes, hour.
7    Q   Okay.  Did you go anywhere else other than
8 directly to StoneCrest after you got the call from the
9 police?
10    A   No.  I went directly to the hospital.
11    Q   Do you recall watching any of the nurses
12 performing any examination on your husband in the room?
13    A   Not at StoneCrest.
14    Q   Do you recall any of the doctors performing
15 any examinations on your husband at StoneCrest?
16    A   No.
17    Q   Do you recall at any time your husband
18 eating anything at StoneCrest?
19    A   No.
20    Q   Do you recall him ever receiving a tray
21 with a sandwich, chips and a drink?
22    A   No.
23    Q   Do you recall anybody ever explaining why
24 he was going to have a second CT scan?
25    A   No.

Page 81

1    Q   Did you notice any changes in your
2 husband's speech patterns where it would get better for a
3 while, get worse, get better, get worse?
4    A   Yes.
5    Q   What did you notice that - - how did it
6 change such that it waxed and waned?
7    A   He'd just have trouble getting things out.
8 It would like he would be talking and then all the sudden
9 he couldn't - - like trying to remember what he's trying
10 to say.
11    Q   So he would be able to speak okay and then
12 he'd get stuck?
13    A   Uh-huh.
14    Q   Yes?
15    A   Yes.
16    Q   And then he'd be able to speak okay again
17 and then would get stuck?
18    A   Yes.
19    Q   Did you ever notice any changes in his
20 eyes?
21    A   His eyes looked - -
22    Q   Big?
23    A   Yes.
24    Q   Did he have his glasses on?
25    A   No.

Page 82

1    Q   His driving glasses?
2    A   No.
3    Q   Did you ever notice any difference in
4 strength between his right arm, the upper arm, and the
5 left arm, the upper arm?
6    A   Yeah.  He wasn't moving his right arm, but
7 he was moving his left arm.
8    Q   Okay.  And when did you first notice that
9 he was not moving his right arm?
10    A   When I was helping him get up to go to the
11 bathroom.
12    Q   Okay.  Now, on the transfer to Centennial
13 did you ride in the ambulance?
14    A   No.
15    Q   How did you get there?
16    A   I drove my car.  Followed the ambulance.
17    Q   About what time did you get to Centennial?
18    A   I don't know.  It was nighttime.  I know
19 that.
20    Q   Dark?
21    A   Uh-huh.
22    Q   Of course it's February.  It's going to be
23 dark at 5:30.  Who is the first physician you had any
24 contact with at Centennial?
25    A   I believe Dr. Valdivia.  There might have

Page 83

1 been a - - I'm not sure.
2    Q   You saw a physician in the emergency room
3 first before you saw Dr. Valdivia, didn't you?
4    A   I'm sure I did, yeah.
5    Q   And you saw a physician in the medical
6 intensive care unit before you saw Dr. Valdivia, correct?
7    A   When he got to Centennial he had already
8 had a room waiting for him there.  He went right to his
9 room.  He didn't go to the emergency part right away.
10    Q   Are you telling me that your husband was
11 not seen by an emergency room physician but instead went
12 directly into a room?
13    A   Yeah.  There might have been another doctor
14 that came in.  I don't recall.
15    Q   Do you recall a hospitalist doctor seeing
16 your husband first, somebody other than Dr. Valdivia?
17    A   Yeah.  Yeah.
18    Q   Do you remember the name of that
19 hospitalist?
20    A   No.
21    Q   Do you recall your husband telling the
22 hospitalist that his problems had begun that morning at
23 8:00 with dizziness and slurred speech?  Remember your
24 husband saying that?
25    A   Yeah.

Page 84

1    Q   Do you recall your husband telling that
2 physician, that hospitalist that he had been having - he,
3 your husband, had been having - those acute events with
4 speech difficulty and facial weakness for the past month?
5 Remember him telling him that?
6    A   Yes.
7    Q   I asked your husband if he had told a
8 doctor at Centennial those very things and he denied it
9 under oath.
10    A   Yes.
11    Q   You're telling me you heard it, right?
12    A   Yes.
13    Q   So what your husband said is false,
14 correct?
15    A   Yes.
16    Q   What explains him giving me false testimony
17 under oath on those points?
18    A   He's - - his memory and what he says is not
19 accurate and has not been accurate since the stroke.
20    Q   So he is not to be trusted?
21    A   Yeah.
22    MR. CUMMINGS:  Object to the form.
23    Q   Do you remember your husband then telling
24 Dr. Michael Nottidge that as he - your husband - was
25 getting ready to go to work, he was not speaking normal

ESQUIRE
DEPOSITION SOLUTIONS

Page 85

1  and he was confused?  Do you remember him saying that?
2      A   I believe so.
3      Q   Getting ready to go to work at 7:00 in the
4  morning or 6:00; which one is it?
5      A   6:00.
6      Q   So at 0600 your husband, by his own
7  admission, was not speaking normally and was confused,
8  correct?  Right?
9      A   I wasn't with him, so I don't know.
10     Q   You heard him tell a physician that fact,
11  correct?
12     A   Correct.
13     Q   Your husband did not arrive at StoneCrest
14  Medical Center until 9:46 in the morning, did he?
15     A   I'm not sure of the time.
16     Q   You can do the math, though, can't you?  If
17  he's got the problems at 6:00, 9:46 is three hours and 46
18  minutes later, isn't it?
19     A   Yeah.
20     Q   Have you done any research on what you
21  referred to as "the shot"?
22     A   No.
23     Q   Have you ever heard anybody mention the
24  word TPA to you?
25     A   Yes.

Page 86

1      Q   Have you looked at the Complaint to see
2  where there are references to TPA?
3      A   Yes.  No.
4      Q   When you were getting ready for this
5  deposition and you looked at the Complaint that you told
6  me you looked at, the lawsuit, did you notice that the
7  factual allegations in the lawsuit are wrong?
8          MR. CUMMINGS:  Object to the form.
9      A   I object.
10         MR. CUMMINGS:  That's for me to object.  You
11  answer.
12     Q   Your objection is overruled, ma'am.
13         Did you notice that the Complaint, the lawsuit
14  itself, makes factual allegations that are wrong based on
15  your own sworn testimony?
16         MR. CUMMINGS:  I object to the form.  You answer
17  the question.
18     A   I'm not sure.
19     Q   Did you notice, is the question?  Did you
20  notice that the factual allegations in the very Complaint
21  that started this lawsuit are inaccurate based on your own
22  sworn testimony?
23         MR. CUMMINGS:  Same objection.
24     A   No.
25     Q   Okay.  When is it likely your husband will

Page 87

1  be eligible for Medicare?  Have some idea?
2      A   Like two years would be February.  This
3  February.
4      Q   February of '18?
5      A   February '18.
6      Q   That's what you expect to occur?
7      A   Yes.
8      Q   All right.  Well, let's talk for a few
9  moments about the first and second admission at
10  Centennial.  I asked you about Dr. Ron Wilson.  Do you
11  recall speaking with him?
12     A   I don't remember the name, but I could
13  have.
14     Q   Do you recall your husband getting better
15  rapidly at Centennial?
16     A   I wouldn't say getting better rapidly; but,
17  yeah, he did get better a little bit.
18     Q   Well, isn't it true that on February 18th
19  you told the physicians your husband was improved in just
20  one day there?
21     A   Yes.  They had run a test on him and it
22  worked.
23     Q   What was the test they ran on him that
24  worked?
25     A   I don't know what it was called.

Page 88

1      Q   Do you recall speaking with Dr. Wilson on
2  February 20th and February 21st where he told you there
3  was only a partial blockage?
4      A   No.
5      Q   Okay.  Was your husband able to get up and
6  walk on his own on February 21st?
7      A   He was walking - - well, I still assisted
8  him, but he was walking.
9      Q   Wasn't he walking better than he's walking
10  today?
11     A   At that time and point, yes.
12     Q   Yes?
13     A   Before they did the, the test on him he
14  wasn't; but after they did that on him, he was.
15     Q   By February 21st your husband was able to
16  walk while he was at Centennial better than he is walking
17  today, correct?
18     A   Yes.
19     Q   How was he able to walk better than?  How
20  was it different than what we have seen today?
21     A   Really isn't too much different, but...
22     Q   Just told me it was better.  I want you
23  to explain it.  How is it better?
24     A   He was maybe able to move a little bit
25  faster.

Case 3:17-cv-00725    Document 114-7    Filed 12/14/18    Page 22 of 28 PageID #: 1450

**Page 89**

1 Q Okay. He continued to get better every
2 single day at Centennial until he was discharged on
3 February 26th, correct?

4 A Yeah.

5 Q His language got better. Speech got
6 better. His ability to move got better day after day
7 after day, correct?

8 A Yes.

9 Q And by February 26th he was able to walk on
10 his own, speak on his own, and do everything reasonably
11 well, wasn't he? Slow, but well?

12 A Very slow, and he was still confused a
13 little bit and...

14 Q Okay. Then you all went home on the 26th,
15 correct?

16 A Uh-huh.

17 Q Yes?

18 A Yes.

19 Q And one of the things you were told when
20 you went home was if there was any change come back
21 immediately, correct?

22 A Yes.

23 Q On the morning of the 27th of February your
24 husband fell at 4:30 in the morning, correct?

25 A Yeah.

**Page 90**

1 Q You did not go back to Centennial Medical
2 Center until 1949 that same day; 15 hours later, correct?

3 A I don't think it was 15 hours later, but it
4 was - -

5 Q 4:30 in the morning. Time of arrival at
6 Centennial is 1949. That's 15 hours and 19 minutes.

7 Could have been.

8 Q Why did you not go back after he had fallen
9 backwards and was getting worse all day long? Why?

10 A He was - - it's not - - I don't know how to
11 explain that.

12 Q You need to. Try.

13 A He wasn't like - - he said he was fine. I
14 was talking to him. He was still able to move. Then when
15 I seen him starting to have trouble moving and when he
16 couldn't start answering me and stuff, that's when
17 I decided I was going to just put him in the car and take
18 him back.

19 Q Ma'am, when you got back to the hospital on
20 February 27th didn't you and your husband tell the doctors
21 and nurses there that after his fall he had gradually
22 worsened all day long? Isn't that what you told them?

23 A Yeah. Gradually, yeah.

24 Q He was substantially worse when you
25 returned to the hospital on the 27th than he had been when

**Page 91**

1 he was discharged, correct?

2 A Yeah.

3 Q The prior day?

4 A Yes.

5 Q Why? What did they tell you was the reason
6 for him being substantially worse off after spending a day
7 at home?

8 A They really didn't. They took him down and
9 ran more tests and they said he didn't have another
10 stroke, but they really didn't tell me why.

11 Q Okay. Did you participate in any of the
12 visits with Dr. Andre Olivier?

13 A Uh-huh.

14 Q Yes?

15 A Yes.

16 Q Did you go to the office visits?

17 A Yes.

18 Q Do you recall Dr. Olivier telling you that
19 what he thought was wrong with your husband was atrial
20 fibrillation?

21 A Yes.

22 Q Where his heart would flutter?

23 A Yes.

24 Q And do you recall Dr. Olivier telling you
25 that the worry there is it will toss clots? Do you

**Page 92**

1 remember him mentioning that?

2 A No.

3 Q Okay. What was his explanation as to why
4 your husband needed to have that loop recorder placed in
5 his chest?

6 A I'm not sure of the - - he just told me
7 that they would put that in and then he can keep better
8 track of what's going on with him.

9 Q Do you all still do what your husband
10 explained to me earlier, and that is connect that -

11 A Yes.

12 Q - thing to a mouse?

13 A Yeah.

14 Q Can you explain that better than your
15 husband did? What do you connect?

16 A We have a machine that sits next to the bed
17 and at night I have to take - - it's like a little pad.
18 It looks like a mouse from a computer. And I have to put
19 that on his chest and let it read what's going on. Then I
20 put it back onto the device and it sends the information
21 to them.

22 Q And it sends the information -

23 A Yes.

24 Q - to Dr. Olivier?

25 A Yes.

Page 93

1    Q    When is the last time you all have seen Dr.
2 Olivier?
3         A    I'm not exactly sure.  It's been a while.
4         Q    Well, as you will recall from the questions
5 I asked your husband, first visit to him was October 6,
6 2016.  Second visit, November 4, 2016.  Asked to return
7 February 4, 2017.  And you all have never been back, have
8 you?
9         A    No.  But he also said that unless we
10 thought he was actually having problems, don't worry about
11 it.
12        Q    Okay.  Have you gotten any feedback,
13 though, from the information that you're getting from the
14 loop recorder?  Any letters or reports or anything -
15        A    No.
16        Q    - talking about that information?
17        A    No.
18        Q    Do you know if your husband is having
19 atrial fibrillation?
20        A    No.
21        Q    You don't know?
22        A    I don't know, no.
23        Q    Visitors at StoneCrest.  Other than you and
24 your husband, did you have anybody else come to the
25 hospital at StoneCrest to see you or your husband?

Page 94

1         A    My brother came.
2         Q    What's his name?
3         A    John Ridell.
4         Q    Ridell?
5         A    Uh-huh.
6         Q    Where does he live?
7         A    He lives in Tennessee.
8         Q    Where?  Big state.
9         A    Maryville, Tennessee.
10        Q    What's he do for a living?
11        A    He works in a factory.
12        Q    What time did he come to the hospital?
13        A    I'm not exactly sure.  Right - - he got
14 there in time for us to when they were dismissing him, we
15 were going to Centennial, so...
16        Q    Nobody else other than your brother?
17        A    No.
18        Q    Okay.  What about at Centennial?  I know
19 Deborah Langston visited there.  Did she come down from
20 Mayfield?
21        A    Yes.
22        Q    Anybody else come to see you or your
23 husband?
24        A    No.
25        Q    Not any of your kids?

Page 95

1         A    No.
2         Q    Does your husband have access to a
3 neurologist here in Kentucky?
4         A    No.  We see - - I take him back to
5 Tennessee, Nashville, to see Dr. Marie Dongas.
6         Q    Do you like her?
7         A    Yeah.
8         Q    Have you seen Dr. Valdivia in her office?
9         A    No.
10        Q    Is your husband having any problems with
11 pain in his left hip and leg?
12        A    Sometimes, yes.
13        Q    How does that present itself and how does
14 it limit him?
15        A    Irritates when he walks.
16        Q    Does the chronic pain in his left hip and
17 leg keep him from helping out around the house?
18        A    Yeah.  Probably.
19        Q    What does he do to help out around the
20 house, if anything?
21        A    Not a lot.
22        Q    What could he do if he was willing to?
23        A    Not sure.
24        Q    He can drive, right?
25        A    Drive?

Page 96

1         Q    Drive a car?
2         A    No.
3         Q    He doesn't drive?
4         A    No.
5         Q    He told me this morning he was able to
6 drive a car -
7         A    Yeah.
8         Q    - and had a driver's license.  Was that
9 false too?
10        A    Yes.
11        Q    He is on Social Security.  He told me that.
12        A    Yes.
13        Q    Is that true?
14        A    Yes.
15        Q    He does know that correctly?
16        A    Yeah.
17        Q    And how much is he paid?
18        A    1800.
19        Q    Do you handle the finances in the family?
20        A    Yeah.
21        Q    Do you handle the banking accounts and
22 expenses?
23        A    Yes.
24        Q    Have you or your husband paid anything
25 yourselves for all of the medical care, hospital care that

Page 97

1  he's had since his stroke?
2      A   I don't believe so, no.
3      Q   The current insurance policy that you have
4  now, did he get that through an ObamaCare exchange?
5      A   Yes.
6      Q   That's true?
7      A   Yeah.
8      Q   And who is the insurance company?
9      A   That he has now?
10     Q   Yes, ma'am.
11     A   It's Blue Cross, Anthem.
12     Q   Is that the Blue Cross in Kentucky?
13     A   Yes.
14     Q   When is it that you decided you should go
15 see a lawyer?  Question is, when?
16     A   While he was in the hospital.
17     Q   Which one?  Centennial?
18     A   Centennial, yes.
19     Q   First or second admission?
20     A   Second.
21     Q   Okay.  And what made you decide you should
22 go see a lawyer?  Did you see an ad on a TV or something
23 like that?
24     A   No.
25     Q   What made you decide to go see a lawyer?

Page 98

1      A   I felt that he didn't get proper treatment
2  and nobody acted on him fast enough.
3      Q   And what was missing was this shot you
4  referred to?
5      A   Uh-huh.
6      Q   Yes?
7      A   Yes.
8      Q   Anything else that he didn't get -
9      A   No.
10     Q    - other than the shot?
11     A   No.
12     Q   Have you had anybody come to your house
13 here in Kentucky to take videotape of your husband getting
14 around in the home?
15     A   No.
16     Q   Have you had a physical therapist or a
17 speech therapist come to evaluate your husband here at the
18 home in Kentucky?
19     A   No.
20     Q   Have you made any efforts to secure him
21 some physical therapy here in Kentucky, at Jackson
22 Purchase Hospital or any of the private physical therapy
23 locations?
24     A   Yeah.  I can't afford it.
25     Q   No.  My question is, have you made any

Page 99

1  efforts to secure it; contacted them and said, "Would you
2  come out and do an evaluation"?  Have you done that?
3      A   No.
4      Q   Did you know Mr. Cummings previously?
5      A   No.
6      Q   How did you find him?
7      A   I looked in the phonebook.
8      Q   And is that how you made the connection?
9      A   Yes.
10     Q   Have you spoken with any other lawyers
11 besides Mr. Cummings?
12     A   No.
13     Q   Have you understood the questions I asked
14 you?
15     A   Not all of them.
16     Q   Which one have I asked you you didn't
17 understand?
18     A   I can't - - I can't think of it off the top
19 of my head right now.
20     Q   Is there any answer that you've given me so
21 far today that you'd like to change?
22     A   Not that I can think of.
23     Q   Have you been honest with me?
24     A   Yes, I believe so.
25     Q   Okay.  And the only explanation you can

Page 100

1  give me for your husband not being accurate is that his
2  memory isn't good now?
3      A   Right.
4      Q   Did he ever have any problems with his
5  memory before the stroke, to your knowledge?
6      A   No.  Not at all.
7      Q   And would there have been any reason for
8  him to tell a doctor he was having problems with his
9  memory before the stroke unless it was true?
10     A   Yeah.
11     Q   What?  What would be the reason?
12     A   I was just agreeing with you.
13     Q   You're agreeing with me there would be no
14 reason in the world for your husband to tell a doctor he
15 was having problems with his memory before the stroke
16 unless that happened to be true?
17     A   Right.
18     Q   Okay.  Thank you.
19     A   You're welcome.
20     MR. GORMAN:  I've got just a few quick
21 questions.
22     CROSS EXAMINATION BY HON. NATE GORMAN, ATTORNEY
23 FOR CLARK ARCHER, M.D.:
24     Q   What was your maiden name?
25     A   My maiden name was - - my maiden name was

1 Ridell. Martha Ridell.

2     Q   Okay. And do you have any family in
3 Tennessee besides that one brother in Maryville?

4     A   No.

5     Q   Do you use Facebook?

6     A   He does.

7     Q   He does?

8     A   And I look at it sometimes, yeah.

9     Q   Do you all post on Facebook?

10     A   I don't, no.

11     Q   Does he post on Facebook?

12     A   Sometimes.

13     Q   Has he posted anything about this case or
14 any of the facts related to it?

15     A   I don't believe so.

16     Q   Do either of you all have a Twitter or any
17 other social media?

18     A   No.

19     Q   Do you ever comment online for any reason;
20 news articles, anything like that?

21     A   Myself, no.

22     Q   Does he?

23     A   I'm not really sure, but I don't believe
24 so.

25     Q   Is there any company or party that's

1 funding this lawsuit?

2     A   No.

3     Q   Do either of you all socially drink?

4     A   No.

5     Q   Any alcohol at all?

6     A   No.

7     Q   That's all I have for today.

8     MR. GIDEON: Brian, I've got two more.

9     REDIRECT EXAMINATION BY MR. GIDEON:

10     Q   Look at exhibit, whatever it is, the phone
11 records.

12     MR. CUMMINGS: Hers, C.J., or?

13     MR. GIDEON: Hers.

14     MR. CUMMINGS: Okay. Back to the highlight
15 page?

16     MR. GIDEON: Yes. 2/17. February 17. You've
17 already highlighted, I hope, the 16-minute call.

18     MR. CUMMINGS: This is where he is.

19 She's on that page.

20     Q   You there?

21     A   Yeah.

22     Q   You'll see we've got calls at 8:58, which
23 is what we were talking about before.

24     A   Uh-huh.

25     Q   Then there is one at 9:28 that's also with

1 your husband's number, correct?

2     A   Correct.

3     Q   And then there's another one at 9:51,
4 husband's number. There's one at 9:52, husband's number.
5 Then there's one at 9:53, husband's number. Correct?

6     A   Correct.

7     Q   Who were you talking to in the 9:53 call,
8 ma'am?

9     A   I'm not positive.

10     Q   Well, it's to your husband's number, isn't
11 it?

12     A   Yes.

13     Q   Do you know if he was en route to the
14 hospital at the time or already there? If you don't know,
15 you can say so.

16     A   I don't know.

17     Q   Then there are two calls to the
18 248-917-1138. Do you see those? They're to Pontiac,
19 Michigan, from your phone.

20     A   From my phone?

21     Q   Yes, ma'am.

22     A   Oh, okay. Yeah, I see.

23     Q   I assume those are family members?

24     A   Yes.

25     Q   Who is it that's on the other end of the

1 248-917-1138 phone number?

2     A   I believe that's my oldest son.

3     Q   And his name is what?

4     A   Shane Crothers.

5     Q   Shane.

6 And then there are two other calls. There's one
7 at 12:50 to a 248-770-8702. It's incoming. And one at
8 1:49, 865-437-8852. With whom were those calls?

9     A   The 770 number, that was my other son that
10 lives in Maine.

11     Q   First name, please?

12     A   David Crothers.

13     Q   Okay. And how about the 865-437 number?

14     A   I believe that was my son Joseph.

15     Q   You spoke to all three of the boys?

16     A   Yeah.

17     Q   How long had you been at the hospital when
18 you called the boys?

19     A   I'm not sure.

20     Q   Did the boys all get along with your
21 husband?

22     A   Yes.

23     Q   Had a good relationship with him?

24     A   Yes.

25     Q   All right. Next page. 3:20 and 3:44.

1 Actually there are three calls: 3:20, 3:44, and 3:51.

2 All to 270-970-8886 in Mayfield, Kentucky. Are those all

3 to the lady that died?

4     A   Yes.

5     Q   In September of 20 - -

6     A   August.

7     Q   August of 2017?

8     A   August 14th.

9     Q   This year?

10    A   Yes.

11    Q   The call at 3:55 to 865-437-8852, is that

12 to a family member?

13     MR. CUMMINGS: It's incoming.

14    A   I'm not positive.

15    Q   Isn't that one of the numbers we looked at

16 already?

17    A   It might have been.

18    Q   Yeah. One of the boys?

19    A   I'd have to look at my phone to tell you

20 for sure, but...

21    Q   Okay. Well, I'm confident we've already

22 covered that.

23     At 4:01 there's a call to Pontiac, Michigan,

24 248-917-1138. Who is that?

25    A   I believe that's my oldest son Shane's

1 number.

2     Q   All right. 4:34, 248-402-3343, incoming.

3 Who is that?

4    A   What was that number?

5    Q   248-402-3343. At 4:34 in the afternoon,

6 incoming.

7     MR. CUMMINGS: C.J., I'm going to show her.

8 She's nowhere near where I know you're looking at. Okay?

9    It's okay.

10    THE WITNESS: I see the number.

11    MR. CUMMINGS: Just let me show you. 248 is the

12 first three digits at 4:34 p.m.?

13    MR. GIDEON: Yes.

14    MR. CUMMINGS: I'll leave my pen there, but this

15 is the one he's asking you about. Okay?

16    THE WITNESS: Okay.

17    MR. CUMMINGS: Hear his question, but that's the

18 one. Leave the highlighter.

19    Q   Who is that, ma'am?

20    A   I'm not positive unless I look at my phone.

21 I don't remember their numbers by heart.

22    Q   Okay.

23    A   Most people don't anymore.

24    Q   That's true.

25     And then the last one - I don't believe we've

1 identified - is 5:02 p.m. It is an incoming call and it

2 is 207-745-3570. Do you know who that is?

3    A   Not offhand. Could be one of his brothers.

4    Q   And then you go dark the rest of the day.

5 You have no additional calls that evening.

6    A   Okay.

7    Q   Can you explain why that's the case? Did

8 your battery die?

9    A   Not that I recall.

10    Q   Okay. Thank you.

11    MR. GORMAN: I'm done. Thank you.

12    MR. CUMMINGS: No questions. She'll read and

13 sign.

14    MR. CARTER: That handwritten note in front of

15 her is Exhibit 4 which we identified orally, but I don't

16 think was marked.

17    MR. CUMMINGS: Okay.

18    VIDEOGRAPHER: This concludes the deposition of

19 Martha Ruffino. End time, 3:12 p.m. Off record.

20    (VIDEO DEPOSITION ENDED AT 3:12 P.M.)

21    AND FURTHER DEPONENT SAYETH NOT: - -

22    DEPONENT'S SIGNATURE REQUESTED: - -

23    (WHEREUPON, DOCUMENTS REFERRED TO DURING THE

24 COURSE OF THE VIDEOTAPED DEPOSITION HAVE BEEN MARKED FOR

25 IDENTIFICATION AND HAVE BEEN ATTACHED HERETO AND MADE A

1 PART HEREOF.)

2    (UNLESS OTHERWISE NOTIFIED BY THE PARTIES

3 INVOLVED, THE TAPED RECORDING MADE IN CONNECTION WITH THE

4 TAKING OF THE VIDEOTAPED DEPOSITION WILL BE DESTROYED SIX

5 MONTHS FROM THE DATE OF THE VIDEOTAPED DEPOSITION.)

## Page 109

```
 1        COMMONWEALTH OF KENTUCKY)
                                 ) SS:
 2        COUNTY OF DAVIESS      )

 3

 4     I, Jane Belcher, Notary Public, State-at-Large, do
 5   hereby certify that the aforegoing deposition was taken at
 6   the time and place set forth in the caption thereof; that
 7   the witness therein was duly sworn on oath to testify the
 8   truth; the proceeding was reported by me stenographically;
 9   and the aforegoing is a true and correct transcript to the
10   best of my ability.
11     I further certify I'm not a relative or employee of
12   attorney or counsel of any of the parties hereto, nor a
13   relative or employee of such attorney or counsel, nor do I
14   have any interest in the outcome or events of this action.
15     I hereby certify that the appearances were as stated in
16   the caption.
17        DATED THIS 30TH DAY OF OCTOBER 2017.
18
19        _____
          JANE BELCHER, NOTARY PUBLIC
20        STATE-AT-LARGE
          NOTARY ID 479570
21        OHIO VALLEY REPORTING SERVICE
          2200 EAST PARRISH AVENUE, SUITE 106-E
22        OWENSBORO, KENTUCKY  42303
23        COMMISSION EXPIRES:
          DECEMBER 7, 2020
24        COUNTY OF RESIDENCE:
          DAVIESS COUNTY, KENTUCKY
25
```

## Page 110

```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF TENNESSEE
 2                  NASHVILLE DIVISION
 3   JOHN RUFFINO and MARTHA RUFFINO,     )
     Husband and Wife,                    )
 4                                        )
                Plaintiffs,               )
 5                                        )
                                          ) Civil Action No.
 6                                        ) 3:17-cv-00725
                                          )
 7   DR. CLARK ARCHER and HCA             ) Jury Demand
     HEALTH SERVICES OF TENNESSEE, INC.   ) Judge Crenshaw
 8   d/b/a STONECREST MEDICAL CENTER,     ) Magistrate Judge
                                          ) Newbern
 9              Defendants.               )
10
11        VIDEO DEPOSITION OF MARTHA RUFFINO
12                OCTOBER 24, 2017
13              DEPONENT CERTIFICATION
14
15     I, MARTHA RUFFINO, do hereby certify that the
16   aforegoing deposition was taken at the time, place, and
17   for said purposes as indicated in the caption, and that
18   said deposition is a true, complete and accurate
19   transcript thereof.
20
21
22     This, being the _____ day of _____ 2017.
23
24        _____
          MARTHA RUFFINO,
25        DEPONENT
```

## Page 111

```
 1
 2
 3   STATE OF _____:
 4   COUNTY OF _____:
 5
 6     I, _____, do hereby certify that
 7   MARTHA RUFFINO hereby personally appeared before me and
 8   acknowledged same.
 9
10     This, being the _____ day of _____ 2017.
11
12        _____
          NOTARY PUBLIC
13
14        COMMISSION EXPIRES: _____
15        COUNTY OF RESIDENCE: _____
16
17
18
19
20
21
22
23
24
25
```

## Page 112

```
 1              ERRATA SHEET
     INSTRUCTIONS: After reading the transcipt, please note any
 2   change, addition or deletion on this sheet.  DO NOT mark
     on the actual transcript. (Use additional paper if needed
 3   and attach to this sheet)
 4   Please sign and date this errata sheet and return it to
     the court reporting agency indicated below.
 5
     WITNESS NAME: MARTHA RUFFINO
 6
     DATE OF DEPOSITION: OCTOBER 24, 2017
 7
 8   Page Number _____ Line Number _____
 9   Change _____
10   Page Number _____ Line Number _____
11   Change _____
12   Page Number _____ Line Number _____
13   Change _____
14   Page Number _____ Line Number _____
15   Change _____
16   Page Number _____ Line Number _____
17   Change _____
18   Page Number _____ Line Number _____
19   Change _____
20   Page Number _____ Line Number _____
21   Change _____
22
23   _____    _____
     SIGNATURE OF DEPONENT          DATE
24
25
```