1  A.  That they failed to perform an EKG.
2  Q.  In the emergency room?
3  A.  No.
4  Q.  In what clinical setting?
5  A.  Pre-hospital.
6  Q.  In that matter did you claim to be familiar
7  with the standard of care in the suburbs of Atlanta,
8  Georgia, in a pre-hospital setting?
9  A.  Yes.
10 Q.  And in that matter, where you were retained
11 by a plaintiff, did you conclude that a healthcare
12 provider had violated the standard of care?
13 A.  Yes.
14 Q.  In Parker versus HCEMS, were you retained
15 by the plaintiff or a defendant?
16 A.  Defendant.
17 Q.  Who was the defendant that retained you?
18 A.  I was named by all three or four different
19 attorneys.
20 Q.  Does "HCEMS" stand for some county
21 emergency medical services?
22 A.  Yes.
23 Q.  You remember what county?
24 A.  I want to say Harnett, but I can't tell you
25 for 100 percent.

1   Q.   What state is that in?
2   A.   North Carolina.
3   Q.   And in that matter, where you were paid by
4   the defendants, did you conclude that no healthcare
5   provider had violated the standard of care?
6   A.   Correct.
7   Q.   Have you ever been a defendant in a
8   lawsuit?
9   A.   No.
10  Q.   Have you ever been subject to any type of
11  disciplinary action at a hospital?
12  A.   No.
13  Q.   Have you ever been subject to any type of
14  disciplinary action by a licensing authority?
15  A.   No.
16       THE WITNESS:  Can you let me know when a
17       good time for us to take a break would be?
18       MR. MANOOKIAN:  Yeah, we can take one right
19       now.
20                  (RECESS TAKEN.)
21  BY MR. MANOOKIAN:
22  Q.   Doctor, you've given depositions before, as
23  we previously discussed, correct?
24  A.   Yes, sir.
25  Q.   For your prior testimony today and the

1  remainder of your testimony, you know that if you
2  have a question about my question or find it
3  confusing or need clarification, you can tell me
4  that, correct?
5       A.   Yes, sir.
6       Q.   And you will do that, correct?
7       A.   Yes, sir.
8       Q.   So if you give an answer to a question, we
9  can presume that you understood the question,
10 correct?
11      A.   Yes, sir.
12      Q.   You were not personally present, obviously,
13 during the events that gave rise to this lawsuit,
14 correct?
15      A.   Correct.
16      Q.   You don't have any independent knowledge of
17 what occurred, correct?
18      A.   Correct.
19      Q.   You have to rely on the materials that you
20 reviewed that are listed in your report, correct?
21      A.   Correct.
22      Q.   And from those materials, as we discussed,
23 you've summarized and included the relevant and
24 pertinent facts of this matter, correct?
25      A.   I would say the most relevant, yes.

```
 1      Q.    Well, are there pertinent or relevant facts
 2   that you've omitted from your report?
 3      A.    Not purposely.
 4      Q.    Okay.  Whether intentional or
 5   unintentional, are you aware of any pertinent or
 6   relevant facts that you feel you've omitted from your
 7   report that you now can tell me?
 8      A.    There's nothing that I'd like to add right
 9   now.
10      Q.    Your report is complete and comprehensive,
11   in your opinion, correct?
12      A.    You know, since I wrote this, I've read
13   some additional deposition testimony, and that's
14   obviously not in this report.  But I don't think it
15   changes the substance of my opinion on standard of
16   care or causation.
17      Q.    Having reviewed additional deposition
18   testimony since you prepared this report, are there
19   additional material or pertinent facts or opinions
20   that you'd like to add to the report?
21      A.    I'd be happy to add them, but like I said,
22   it doesn't change my opinion as far as standard of
23   care or causation.
24      Q.    Well, that's not my question.
25            My question is, are you now aware of
```

1  pertinent facts that you weren't aware of at the time
2  that you prepared this report that you would have
3  included in the report?
4      A.   It really depends on what the goal is, and
5  I don't think any of the additional information that
6  I read would have changed anything.  So I'm happy
7  with the way the report still reads.
8      Q.   What additional deposition testimony did
9  you review since you prepared this report?
10     A.   Deposition of Pope, Callahan, Kreiner, and
11 Dod.
12     Q.   And having reviewed those depositions,
13 there is nothing that you would add, delete or revise
14 about your report, as you sit there today, correct?
15     A.   Like I said, I'm happy with the way the
16 report reads.
17     Q.   Did Mr. Ruffino suffer a stroke in February
18 of 2016?
19     A.   Yes.
20     Q.   Did Mr. Ruffino suffer a stroke on February
21 17, 2016?
22     A.   He was suffering from a stroke on that
23 date, yes.
24     Q.   When, on February 17, 2016, did Mr. Ruffino
25 experience irreversible ischemic injury to his brain?

1      A.   That's a great question.  And I think it
2 really lends to the complexity of Mr. Ruffino's
3 presentation.  And there's really two ways to look at
4 this.
5           This could have been what we call a wake-up
6 stroke, where he had symptoms upon wakening on the
7 17th, or he could have had these spells or episodes
8 like he had been having for a month, with
9 intermittent waxing and waning symptoms, until
10 approximately 6:25, after which -- excuse me, 7:25
11 p.m., after which I don't have any documentation that
12 his neurologic exam returns to normal, or even
13 suggests it.
14      Q.   Having previously testified under oath that
15 you included the pertinent material facts regarding
16 this matter in your report and that you're
17 comfortable with how your report reads, where do you
18 opine that this could have been a wake-up stroke?
19           MR. CARTER:  Object to the form.
20           MR. WITT:  Same objection.
21           **THE WITNESS:  I don't.**
22 BY MR. MANOOKIAN:
23      Q.   That's nowhere in this report, is it,
24 Doctor?
25      A.   No, it's not.

```
 1        Q.    And as you sit there today, you've
 2   identified that as one of two possibilities in this
 3   case?
 4        A.    Certainly possible, yes, sir.
 5        Q.    That's a pretty material opinion; wouldn't
 6   you agree?
 7        A.    I don't think it really matters in this
 8   case.  I don't think --
 9        Q.    It doesn't matter whether or not
10   Mr. Ruffino experienced a wake-up stroke or a stroke
11   sometime later in the day?
12        A.    I think it lends to the complexity of his
13   presentation, and I do point that out in my report.
14   And the fact that --
15        Q.    That's not my question.
16              I'm paying a lot of money for your answers
17   today, and I'd like straight ones when possible.  I
18   understand that certainly there are nuances and
19   subtleties in the practice of medicine, but my
20   question is very simple and it's a follow-up to a
21   statement that you just made.
22              Is it your position that it's not important
23   in this case as to whether Mr. Ruffino experienced a
24   wake-up stroke or a stroke sometime later in the day?
25        A.    As it lends to the standard of care and the
```

1   decision not to administer IV thrombolytics, that is
2   correct.  And I can explain that further if you'd
3   like me to.
4        Q.   I'm going to ask you some other questions,
5   but I likely will get back to that.
6             Can you say, to any degree of medical
7   probability, whether or not Mr. Ruffino suffered a
8   wake-up stroke on February 17, 2016?
9        A.   Please ask that again.  I didn't quite
10  understand it.
11       Q.   Can you say -- can you say, to any degree
12  of medical probability, as to when Mr. Ruffino
13  suffered a stroke on February 17, 2016?
14       A.   I'm sorry.  I don't think I'm really
15  understanding your question.
16       Q.   What time did Mr. Ruffino have his stroke
17  on February 17, 2016?
18       A.   I don't think anybody knows for 100
19  percent.  I think there's several possibilities.
20       Q.   And as a result, you can't say, to any
21  degree of medical probability, as to when Mr. Ruffino
22  suffered the stroke on February 17, 2016, correct?
23       A.   Not hour and minute.  I don't think anybody
24  can.  And that's part of the problem in this case.
25       Q.   You can't say, to any degree of medical

1  probability, even what three-hour window
2  Mr. Ruffino's stroke occurred on February 17, 2016,
3  correct?
4      A.   I cannot tell you what three-hour window,
5  but I can expound on that by saying that there's
6  several opinions as to when the stroke started and
7  when TIAs ended, if there were even TIAs on the 17th.
8           Mr. Ruffino's presentation on the 17th to
9  the emergency department was quite complicated, and
10 the identification of a time stamp of when he was
11 last known normal is very difficult to identify.
12     Q.   Do you provide any opinion whatsoever in
13 your report as to when Mr. Ruffino's stroke occurred
14 on February 17th, 2016?
15     A.   I don't think I do give a time.
16     Q.   And that's because you can't identify one
17 to a reasonable degree of medical probability,
18 correct?
19     A.   Correct.  But I can tell you this:  That
20 when Dr. Archer called a code stroke, that was the
21 correct thing to do.  And he called it as a code
22 stroke, not as a code TIA.
23     Q.   So by the time Dr. Archer called the code
24 stroke, you agree that Mr. Ruffino was experiencing a
25 stroke?

1  A. He could have been, yes. And that's what
2  the standard of care requires.
3  Q. It was appropriate for Dr. Archer to call a
4  code stroke at or around 12:53 on February 17, 2016,
5  correct?
6  A. Yes.
7  Q. And that's because it had become apparent
8  that Mr. Ruffino was either having a stroke at that
9  moment or was exhibiting the symptoms that would lead
10  an emergency room physician to believe that he was
11  having a stroke, right?
12  A. That he could have been having a stroke,
13  yes. I would agree with that statement.
14  Q. We don't call a code stroke just because,
15  right?
16  A. Could you repeat that question?
17  Q. Sure.
18  Dr. Archer believed that Mr. Ruffino was
19  either having a stroke or was exhibiting such
20  significant symptoms of one that code stroke needed
21  to be called, correct?
22  A. Yes.
23  Q. And he was correct in making that
24  determination, wasn't he?
25  A. Yes.

1	Q.	At 12:53 on February 17, 2016, correct?
2	A.	Yes, sir.
3		MR. WITT:  Mr. Manookian, this is Brian.
4	We're having a little bit of breakdown in the
5	video and in the sound on this end at least.
6		(OFF THE RECORD.)
7	BY MR. MANOOKIAN:
8	Q.	Doctor, your report likewise does not take
9	a position or identify when Mr. Ruffino experienced
10	onset of symptoms of the stroke on February 17, 2016,
11	correct?
12	A.	Correct.
13	Q.	That is because you cannot and do not have
14	an opinion on when Mr. Ruffino experienced onset of
15	symptoms of a stroke, correct?
16	A.	Well, I have an opinion.  I just don't have
17	an opinion of exactly what time it was, and I don't
18	think anybody can tell you that.  That's part of the
19	problem of the case.
20	Q.	I may have missed it.  I don't see anything
21	in the opinions section of your report that
22	identifies a time of onset of symptoms of stroke for
23	Mr. Ruffino.
24		Is it your position that you now have an
25	opinion on when he experienced onset of symptoms?

1  A.  Well, like I said just a little bit ago, I
2  think it's possible for a whole range.
3           MR. WITT:  We've lost you entirely.
4                (OFF THE RECORD.)
5  BY MR. MANOOKIAN:
6      Q.  Doctor, you agree with me that your written
7  report does not include any opinion on when
8  Mr. Ruffino experienced onset of symptoms of stroke,
9  correct?
10     A.  Yes.
11     Q.  And that is because you cannot identify
12 that time to any reasonable degree of medical
13 probability, correct?
14     A.  If you ask me to identify it within a
15 three-hour period, I would answer that question, yes.
16     Q.  But that is not something that you chose to
17 do in your written report, correct?
18     A.  I don't think I can tell you exactly when
19 the stroke started, and there's varying opinions as
20 to when the stroke started.  And we see that --
21     Q.  But you've not -- you do not express an
22 opinion -- I'm sorry.  The video link just, by very
23 nature, is going to result in us talking over each
24 other a couple of times.  Let me let you finish.
25     A.  I think we get varying times, from

1  different depositions, of the opinions of when the
2  stroke may have started, and I think it's safe to say
3  that it happened in that less-than-24-hour period
4  sometime before 7:25 and sometime after he went to
5  sleep the night before.
6          But if you ask me the exact time that the
7  stroke started, I cannot give you an hour and minute.
8      Q.   In your written report, you agree that you
9  don't identify any time that you opine the stroke
10 started, correct?
11     A.   Yeah, I don't believe I do.
12     Q.   You don't identify in this report that this
13 stroke occurred sometime overnight on February 16th,
14 to sometime into the morning on February 17th, do
15 you?
16     A.   No.  I hope my report shows and states that
17 the presentation was complex, that the identification
18 of the time stamp was difficult to make.  And I think
19 that's supported by the depositions that we are able
20 to read and also the medical record.
21          For example, the medical record says, from
22 Dr. Archer, that it started approximately 8:30,
23 whereas the affidavit for Dr. Chitturi says
24 approximately 8 o'clock.
25     Q.   You agree that neither of those individuals

1  were with or personally observing Mr. Ruffino prior
2  to 10:00 a.m., at the earliest, on February 17th,
3  correct?
4      A.   Absolutely.  The first time we even have
5  mention of symptoms is that he was talking to his
6  boss and felt dizzy, was told to pull over.
7           And that is, by its very nature, difficult
8  to identify as a time stamp, because he didn't
9  identify the start.  It was identified by an outside
10 observer.
11     Q.   And you agree that was around 9:25 a.m.?
12     A.   Plus or minus.
13     Q.   That's the time you put in the front page
14 of your report, correct?
15     A.   That was when EMS got there.  The phone
16 call happened before that.
17     Q.   Well, I'm reading from your report that EMS
18 was called at 9:25.
19          It doesn't identify when they arrived on
20 the scene, does it?
21     A.   My report does not.
22     Q.   So the absolute earliest your report
23 identifies even a possible symptom is 9:25 a.m. on
24 February 17, 2016, correct?
25     A.   I didn't write this to address the