**In the Matter Of:**

*JOHN RUFFINO vs*

*DR. CLARK ARCHER*

*3:17-cv-00725*

*ROGER CRINER*

*May 11, 2018*



1st in Reporting, 1st in Service, 1st in Technology

We Bridge the State and Cover the Nation!

www.alphareporting.com

800-556-8974

```
          UNITED STATES DISTRICT COURT
          MIDDLE DISTRICT OF TENNESSEE
                NASHVILLE DIVISION
_____


JOHN RUFFINO and        )
MARTHA RUFFINO,         )
husband and wife,       )
                        )
     Plaintiffs,        )
                        )
VS.                     )CIVIL ACTION NO.:
                        )3:17-cv-00725
DR. CLARK ARCHER and    )
HCA HEALTH SERVICES OF  )
TENNESSEE, INC., d/b/a  )
STONECREST MEDICAL      )
CENTER,                 )
                        )
     Defendants.        )

_____



                    DEPOSITION

                        OF

            ROGER D. CRINER, JR., M.D.

                  MAY 11, 2018







             Alpha Reporting Corporation
                  236 Adams Avenue
              Memphis, Tennessee 38103
                   (901) 523-8974
                www.alphareporting.com
```

**Page 2**

1     The deposition of ROGER D. CRINER, JR.,
2 M.D., is taken on this, the 11th day of May, 2018,
3 on behalf of the Plaintiffs, pursuant to notice and
4 consent of counsel, beginning at approximately
5 12:53 p.m. in the offices of Hall Booth Smith, 40
6 South Main Street, Suite 2800, Memphis, Tennessee.
7     This deposition is taken pursuant to the
8 terms and provisions of the Federal Rules of Civil
9 Procedure.
10     All forms and formalities, including the
11 signature of the witness, are waived, and objections
12 alone as to matters of competency, irrelevancy and
13 immateriality of the testimony are reserved to be
14 presented and disposed of at or before the hearing.

**Page 3**

1              A P P E A R A N C E S
2
3 FOR THE PLAINTIFFS:
4 BRIAN MANOOKIAN, ESQ.
  Cummings Manookian PLC
5 45 Music Square West
  Nashville, TN 37203
6 615.266.3333
  bmanookian@cummingsmanookian.com
7
8
  FOR THE DEFENDANT DR. CLARK ARCHER:
9
  BRYANT C. WITT, ESQ.
10 Hall Booth Smith, P.C.
  Fifth Third Center
11 424 Church Street, Suite 2950
  Nashville, TN 37219
12 615.313.9911
  bwitt@hallboothsmith.com
13
14
  FOR THE DEFENDANT HCA HEALTH SERVICES OF TENNESSEE,
15 INC., d/b/a STONECREST MEDICAL CENTER:
16 J. BLAKE CARTER, ESQ.
  Gideon, Cooper & Essary
17 Suite 1100, 315 Deaderick Street
  Nashville, TN 37238
18 615.254.0400
  blake@gideoncooper.com
19
20
  COURT REPORTING FIRM:
21
          ALPHA REPORTING CORPORATION
22        SANDRA MARCHKY, RMR, CRR
          236 Adams Avenue
23        Memphis, Tennessee 38103
          901-523-8974
24        www.alphareporting.com
25

**Page 4**

1              I N D E X
2 ROGER D. CRINER, JR., M.D.
      BY MR. MANOOKIAN                         5
3
4            EXHIBIT INDEX
5 1   Dr. Criner's File                        47
6
7 COURT REPORTER'S CERTIFICATE                 48

**Page 5**

1     ROGER D. CRINER, JR., M.D.,
2 having been first duly sworn, was examined and
3 testified as follows:
4              EXAMINATION
5 BY MR. MANOOKIAN:
6   Q.  Can you state your full name for the
7 record?
8   A.  Roger Dale Criner, Jr.
9   Q.  And, Dr. Criner, what is your current
10 address?  Where do you practice?
11  A.  It's on Kate Bond Road in Bartlett.  I
12 don't know the actual street number of the hospital.
13  Q.  What is the hospital?
14  A.  Saint Francis Bartlett.
15  Q.  And what is your professional role at that
16 hospital?
17  A.  I am the system medical director of that
18 emergency department and the emergency department
19 also at Saint Francis Park which is on Park Avenue.
20 That's my current title.
21  Q.  Did you bring any materials with you today
22 to this deposition?
23  A.  Yes.
24  Q.  Can I see them?
25  A.  Sure.

**Page 6**

1  Q.  Are these all the materials you brought
2  today?
3  A.  Yes.
4  Q.  Is that your laptop?
5  A.  It is.
6  Q.  Why did you bring that?
7  A.  Because the files that are on the thumb
8  drive were the various depositions and reports that
9  were sent to me. And I also have them loaded onto
10 here so I can pull them up and read them, if needed.
11 Q.  Got it. Is this thumb drive for me?
12 A.  It -- sure.
13 Q.  Are these materials for me?
14 A.  I would -- we can certainly make copies of
15 them. Some of them, great. There's a couple of
16 them I would like to retain a copy for myself.
17 Q.  Okay. Tell me what portion of these
18 materials you want to retain.
19 A.  My time log I would like to retain. The
20 CV you can have. The subpoena, the expert report
21 you can have. The printed-off articles you can
22 have. And I would like to keep that as well.
23 Although they could probably be emailed to me later,
24 if needed.
25 Q.  Have you been retained to give opinions in

**Page 7**

1  this case?
2  A.  I have been retained to give an opinion on
3  Dr. Archer.
4  Q.  Is that the extent of the opinion
5  testimony you intend to offer?
6  A.  Yes.
7  Q.  Who retained you?
8  A.  Hall Booth Smith.
9  Q.  How were you first contacted by Hall Booth
10 Smith?
11 A.  I believe I was called by Pamela
12 Chamberlain.
13 Q.  Do you have an existing relationship with
14 Hall Booth Smith or Pamela Chamberlain?
15 A.  I think I've done one other case with
16 them -- one or two other cases.
17 Q.  Do you know if it's one or two?
18 A.  I think there's two that -- I definitely
19 know of one other one. I think there also is
20 another one that I've done.
21 Q.  Do you recall the names of either the
22 plaintiffs or the defendants in those cases?
23 A.  One of them I do. Last name is Short.
24 Q.  What's the last name?
25 A.  Short.

**Page 8**

1  Q.  Is that the defendant?
2  A.  That is -- I can't remember offhand.
3  Q.  Were you retained to give opinions about a
4  doctor's care in that case?
5  A.  Yes.
6  Q.  Do you remember the name of the doctor
7  whose care you evaluated in that case?
8  A.  Not at this time.
9  Q.  Is the other case Beverly Prescro versus
10 William Byrd?
11 A.  No. That was a case from, I believe,
12 2011. And Jerry Mitchell was the attorney that I
13 was working with on that case. The name of his firm
14 I think has changed.
15 Q.  How many cases have you offered opinion
16 testimony in in the last five years, to the best of
17 your recollection?
18 A.  Cases that have been sworn testimony or
19 depositions, just one, that one that was listed on
20 that expert opinion.
21 Q.  Well, how many cases have you provided
22 even a written report in in the last five years?
23 A.  Just that one.
24 Q.  So what did you do in the Short case?
25 A.  Nothing as of this time, other than review

**Page 9**

1  some preliminary records.
2  Q.  What about the other case with Hall Booth?
3  A.  I can't recall.
4  Q.  When were you retained in that case?
5  A.  I can't -- on the Short case?
6  Q.  Yes, sir.
7  A.  That's been I think within the last six
8  months perhaps. But I would have to look in my
9  records to be certain.
10 Q.  The other case whose name you can't
11 recall, do you recall how long ago it was that you
12 were first retained in that case?
13 A.  No.
14 Q.  Has it been within the last year?
15 A.  I don't believe it has. But again I am
16 not certain about that. I know that I've had
17 conversations with Miss Chamberlain about the Short
18 case and this case. I just can't recall if there's
19 been three cases or not.
20 Q.  Have you ever been the defendant in a
21 lawsuit regarding medical care?
22 A.  Yes, I was listed once.
23 Q.  Were you recently non-suited from that
24 case?
25 A.  Yes.

**Page 10**

1  Q.  What were the allegations globally,
2  because I understand there are a number of
3  defendants in that case, and then as to you
4  individually prior to you being non-suited?
5  A.  The allegation, to the best of my
6  recollection, was the patient came in to be seen for
7  back pain, felt like there -- the provider felt like
8  there may be a problem with the disc in the low
9  back, suggested conservative therapy initially and
10 follow-up with an orthopedic spine specialist.  The
11 patient I think a month later ended up going to the
12 orthopedic spine specialist, at some point did get
13 an MRI which did show a bulging disc.  A decision
14 was made with the orthopedic spine doctor to have
15 surgery.  And after surgery, the patient had a foot
16 drop.  And the allegation, to the best of my
17 recollection, was the surgery should have been done
18 more emergently upon that initial emergency room
19 visit.
20 Q.  Did you give a deposition in that case?
21 A.  I don't believe I did.
22 Q.  Who represented you in that case?
23 A.  I think that was also Jerry Mitchell.
24 Q.  What total amount of time have you spent
25 evaluating the care in this case?  If you need to

**Page 11**

1  consult your --
2  A.  Yeah, this is my time log right here.
3  Q.  -- time log, you can do so.
4  A.  I'm going to have to add this up.  37.25
5  hours, if my math is correct, up to this point, not
6  including today.
7  Q.  Having spent 37.25 hours evaluating the
8  care provided in this case, do you agree that
9  Mr. Ruffino had a stroke on February 17th, 2016?
10 A.  No, I do not.
11 Q.  Do you believe that Mr. Ruffino had a
12 stroke in February of 2016?
13 A.  No, I do not.  I believe he had a stroke.
14 I don't believe I know from looking at the records
15 exactly when that occurred.
16 Q.  But you can't say to a reasonable degree
17 of medical certainty that Mr. Ruffino had a stroke
18 on February 17th, 2016?
19 A.  I believe a stroke had occurred at some
20 point and he had symptoms of it that day.
21 Q.  Maybe I'm missing you.  I thought you just
22 told me that he did not have a stroke on February
23 17th, 2016?
24 A.  Misunderstanding of what I'm saying.  I do
25 believe that he has had a stroke.  I do not know

**Page 12**

1  that I can say with certainty that it was at that
2  time on that day.  I believe it was before then.
3  Q.  Do you know if he had a stroke on February
4  17, 2016?
5  A.  He had symptoms of a stroke.
6  Q.  But you can't say to a reasonable degree
7  of medical certainty that Mr. Ruffino had a stroke
8  on February 17, 2016, correct?
9  A.  I believe the stroke started earlier than
10 that.
11 Q.  Do you believe to a reasonable degree of
12 medical certainty that Mr. Ruffino experienced a
13 stroke on February 17, 2016?
14 A.  My answer is still the same.  He had
15 symptoms of a stroke.  He had had a stroke, but I
16 don't know that it started on that day.  I think it
17 started earlier than that day.
18 Q.  And that's fine if you don't know.  That's
19 a perfectly acceptable answer.
20 By not knowing, then you certainly can't
21 express to a reasonable degree of medical certainty
22 that Mr. Ruffino had a stroke on February 17, 2016,
23 correct?
24 MR. CARTER:  Object to form.
25 THE WITNESS:  That is not correct.

**Page 13**

1  BY MR. MANOOKIAN:
2  Q.  Are you saying to a reasonable degree of
3  medical certainty that Mr. Ruffino did have a stroke
4  on February 17, 2016?
5  A.  Mr. Ruffino had symptoms and had findings
6  consistent with a stroke on that day.  I think the
7  difficulty I'm having is when you say he had a
8  stroke on that day, the implication that I'm hearing
9  is it started on that day.  And that is the part
10 that I'm disagreeing with.  I think it started
11 before.
12 Q.  Are you saying, regardless of when it
13 started, Mr. Ruffino experienced a stroke on
14 February 17, 2016?
15 A.  He had symptoms and signs of a stroke on
16 that day.  I don't think we can be certain at this
17 point exactly when that started.  I think it started
18 earlier than that.
19 Q.  Okay.  And I'm not talking about when it
20 started right now or symptoms or signs.  Symptoms
21 and signs are different than an actual clinical
22 occurrence of the stroke.
23 Let me just ask you this.  At any time in
24 February of 2016 did Mr. Ruffino experience a
25 stroke?

**Page 14**

1  A. Yes.
2  Q. What date?
3  A. I don't think we know that.
4  Q. You can't say to any degree of medical
5  certainty on what date Mr. Ruffino experienced a
6  stroke in February of 2016, correct?
7  A. My opinion is the symptoms started before
8  he -- it was a wake-up stroke.
9  Q. Listen to my question. Can you say to a
10 reasonable degree of medical certainty on what day
11 or days in February of 2016 Mr. Ruffino experienced
12 a stroke?
13 A. I believe he woke up with symptoms of a
14 stroke on that day. It may have started before the
15 actual -- before midnight, whatever time he went to
16 bed is the last known normal.
17 Q. I hear you say woke up with symptoms. I'm
18 asking about actually experiencing a stroke not just
19 having the symptoms. What symptoms do you think he
20 woke up with on February 17, 2016?
21 A. By Mr. Ruffino's deposition, when he
22 presented to Home Depot for work at 7:30, an
23 external person, a manager at Home Depot I think it
24 was, said he did not look right at that time. So
25 there was somebody objectively looking from the

**Page 15**

1  outside. He had symptoms at that time.
2  Additionally, in his deposition he talks about
3  being dizzy and pulling over and someone called 911.
4  I think it may have been his boss.
5  Q. Is it your understanding that Mr. Ruffino
6  spent the night at Home Depot?
7  A. It is not my understanding that he did
8  that, no.
9  Q. So when you said he woke up with symptoms
10 and I asked you to identify what those symptoms were
11 and you told me an external person at Home Depot
12 told him he did not look right and he was dizzy, are
13 those the symptoms you are talking about when he
14 woke up?
15 A. From my review of the case, I believe he
16 was unaware of whatever the abnormal was, which it
17 appears to be facial droop, he was unaware of those
18 things. Someone had to point that out to him.
19 Since he was unaware of that, we don't know exactly
20 when it started. Could have been the night before.
21 That's why I think it was more than likely a wake-up
22 symptom of the stroke.
23 Q. If nobody informed him of it until he was
24 at Home Depot, are you just speculating that he woke
25 up with those symptoms?

**Page 16**

1  A. I'm not speculating.
2  Q. Are you guessing?
3  A. I'm not guessing.
4  Q. What do you base it on when your testimony
5  is the first report of symptoms was someone at Home
6  Depot telling him he, quote-unquote, did not look
7  right?
8  A. I'm basing it on when patients present to
9  the emergency department you go by your best guess
10 of last known normal. And he obviously had
11 something that wasn't correct at 7:30 that he was
12 unaware of. So there's no way that we can
13 definitively say it started at 7:30.
14 Q. When you say it, you mean symptoms?
15 A. Correct. I'm sorry.
16 Q. As a result, there's no way that you can
17 definitively say that Mr. Ruffino experienced a
18 stroke on February 17, 2016, correct?
19     MR. CARTER: Object to form.
20     THE WITNESS: That is not correct.
21 BY MR. MANOOKIAN:
22 Q. Well, I've asked you and maybe it's a
23 deficit in my understanding. Are you saying that
24 Mr. Ruffino did experience a stroke on February 17,
25 2016?

**Page 17**

1  A. It is opinion that Mr. Ruffino at some
2  point during -- how do I want to phrase this so that
3  we can move on?
4      I do believe that Mr. Ruffino had a stroke.
5  Whether or not I can be certain that it started on
6  the 17th or the 16th is the portion that I think
7  there is question about.
8  Q. You can't say to a reasonable degree of
9  medical certainty even what day the stroke began,
10 correct?
11 A. That is correct. It could have started on
12 the 16th.
13 Q. What evidence do you rely on to conclude
14 that Mr. Ruffino's stroke could have occurred on the
15 16th of February?
16 A. The most significant piece of information
17 that I read that gives me concern that it may have
18 started earlier is the conversation that he had with
19 the Home Depot manager, when the Home Depot manager
20 noticed that there was something not correct in the
21 way that Mr. Ruffino looked, and that was at 7:30.
22 And Mr. Ruffino was not aware of that at 7:30. So
23 if he was --
24 Q. So the only evidence that you have that
25 this stroke might have started on February 16th is

**18**

1 someone at Home Depot telling Mr. Ruffino on
2 February 17th that he didn't look right?
3    A.   Is that a question?  I'm sorry.
4    Q.   Yes, sir.
5    A.   Say it again.
6    Q.   The only evidence that you rely on to
7 conclude that Mr. Ruffino's stroke may have started
8 on February 16, 2016 is that an individual at Home
9 Depot told him on February 17th that he did not look
10 right?
11    A.   That's a portion of why I think there's
12 uncertainty as to the onset with regards to whatever
13 the appearance was of the face.  I would imagine
14 it's facial drooping from the individual looking at
15 him saying he didn't look right.  There's also a
16 comment in the Rutherford County EMS run report and
17 let me -- I can pull that up.
18    Q.   While you are doing that, this statement
19 by a Home Depot employee that he did not look right,
20 was that as specific as the Home Depot employee was
21 regarding his appearance?
22    A.   I'd have to go back and look at
23 Mr. Ruffino's deposition to see the wording exactly.
24    Q.   What was your understanding when you
25 reached opinions in this case regarding what the

**19**

1 Home Depot individual's statement was regarding what
2 didn't look right?
3    A.   To the best of my recollection, from
4 Mr. Ruffino's deposition, he was told by this
5 manager, you don't look right.
6    Q.   What does that mean?
7    A.   What that means -- I don't know what that
8 means exactly.  I know that it means he did not look
9 normal to that individual.
10    Q.   What is that individual's barometer of
11 normalcy in appearance, do you know?
12    A.   I do not know.
13    Q.   Did you track that individual down and ask
14 him?
15    A.   I have not.
16    Q.   Could it have been that Mr. Ruffino looked
17 pale?
18    A.   I have no opinion on what it could have
19 meant with respect to that.
20    Q.   Could it have meant that he looked
21 disheveled?
22    A.   I have no opinion what that meant.  I
23 wasn't there at the time.
24    Q.   Could it have meant that he had his
25 clothes on inside-out?

**20**

1    A.   I have no opinion on what that meant.
2    Q.   Having his clothes on inside-out wouldn't
3 be a symptom of a stroke, would it?
4    A.   It could be.
5    Q.   Could it?
6    A.   Uh-huh.
7    Q.   Having no idea what it meant when this
8 unidentified employee at Home Depot said that
9 Mr. Ruffino did not look right, how did you make
10 that leap to it was a symptom of a stroke?
11    A.   Part of an emergency medicine physician's
12 history taking, especially with regards to patients
13 that may have had a stroke, is to try to find the
14 last individual that saw someone, when was the last
15 time you saw this patient, did they appear normal to
16 you, how were they not.  So whenever I have an
17 individual that has seen someone that says no, they
18 didn't look right, to me, that brings into question
19 in my mind when did the symptoms start.  And if this
20 manager saw something that he thought looked
21 abnormal, to me, that leads me to believe that the
22 symptoms at least were present at 7:30.  And since
23 Mr. Ruffino was unaware that there was something not
24 normal or correct in his appearance at that time,
25 then we really don't know exactly what time the

**21**

1 onset was.
2    Q.   Well, really don't know whether that
3 signals the onset either, do we?
4    A.   You are correct.  I agree with that.  You
5 don't know that the onset was at 7:30.  It could
6 have been earlier.
7    Q.   It could have been later, couldn't it?
8    A.   No.
9    Q.   Why not?
10    A.   If symptoms were present at 7:30, then --
11    Q.   But you already testified under oath that
12 you have no idea what it meant when this
13 unidentified individual at Home Depot who you've
14 never spoken to made the statement that Mr. Ruffino,
15 quote-unquote, did not look right, correct?
16       MR. WITT:  Object to the form of the
17 question.
18       THE WITNESS:  I do not know what
19 specifically he saw.  But I do know that there was
20 an external third party that saw something that
21 seemed abnormal to them.  And that's an important
22 part of a history.
23 BY MR. MANOOKIAN:
24    Q.   Do you know whether that individual at
25 Home Depot knew Mr. Ruffino well?

**Page 22**

1  A.  I do not know that.
2  Q.  Do you know whether that was the first
3  time that person had ever seen Mr. Ruffino?
4  A.  Let me go back to Mr. Ruffino's
5  deposition.  My recollection is he had made
6  deliveries there before.
7  Q.  Rather than have you read through the
8  deposition, which I understand you've already done,
9  I'll just move on because I've only got a couple
10 hours with you here today.
11     Do you know whether the unidentified
12 individual at Home Depot did a neurological check on
13 Mr. Ruffino?
14 A.  I do not know that.
15 Q.  You have nothing to suggest that he did,
16 correct?
17 A.  I have no opinion on that.
18 Q.  Do you know whether the person at Home
19 Depot was a male or a female?
20 A.  I believe it was a male, but I'm not
21 certain of that either.
22 Q.  Do you know what his mental state was at
23 the time?
24 A.  I do not know that.
25 Q.  You don't know if he was intoxicated?

**Page 23**

1  A.  I have no opinion on that.
2  Q.  Do you know if he was under the influence
3  of any drugs?
4  A.  I have no opinion on that.
5  Q.  Likewise, you have no opinion on whether
6  or not this person at Home Depot was an accurate
7  historian when it came to Mr. Ruffino's appearance
8  on the morning of February 17, 2016, correct?
9  A.  It's incumbent upon someone taking a
10 history to not discount what's being told to you by
11 anyone that can provide history on a patient.  So I
12 believe you have to give it credence.
13 Q.  You work in the emergency room?
14 A.  Yes, sir.
15 Q.  You work there every day?
16 A.  Not every day.  I enjoy a couple days off
17 here and there.
18 Q.  Most days?
19 A.  I'm there clinically between 10 and 12
20 shifts a month.
21 Q.  Do you ever get people who come in there
22 trying to get pain meds?
23 A.  Sure.
24 Q.  You ever get people coming in there trying
25 to get pain meds when they shouldn't have pain meds?

**Page 24**

1  A.  That's a judgment call.  But overall, yes,
2  sometimes it does happen.
3  Q.  Do you give credibility to their histories
4  blindly?
5  A.  I listen to all my patients.
6  Q.  But you find some to be more credible than
7  others, correct?  That's part of your job, isn't it,
8  to evaluate all the circumstances, look at the
9  entire history, determine what might be true
10 motivations for what's being reported, and use your
11 judgment as a professional to determine how much
12 weight you are going to give to one historian or
13 another, correct?
14     MR. CARTER:  Object to form.
15     THE WITNESS:  It's not my job to determine
16 their motivations.  It's my job to determine what's
17 medically in their best interest.
18 BY MR. MANOOKIAN:
19 Q.  In doing that, sometimes you have to weigh
20 people's credibility, correct?
21 A.  I disagree with that.  I don't weigh their
22 credibility.  I weigh --
23 Q.  What do you --
24 A.  I'm sorry.  Go ahead.
25 Q.  What do you take into account if somebody

**Page 25**

1  is coming into the ER looking for opiates?
2  A.  Do I find objective findings that are
3  consistent with a need for that type of medication?
4  That's what I'm looking for.
5  Q.  So when they describe their pain level, is
6  that something that you have to factor some of their
7  subjectivity into?
8  A.  To some extent, sometimes I have to factor
9  that in.  For instance, if someone says they have a
10 pain level of 10 out of 10 and they're eating
11 Dorito's and drinking a Coke with normal vital signs
12 as they tell me that, then what I'm observing is not
13 necessarily consistent with what they're describing.
14 Q.  Do you know whether there was any evidence
15 of a stroke for Mr. Ruffino on the initial CT
16 performed at the hospital at approximately
17 10:37 a.m.?
18 A.  My recollection is that CT was considered
19 to be normal.
20 Q.  When you say normal, that means no
21 evidence of a stroke at 10:37 a.m.?
22 A.  When I say normal, to the radiologist, the
23 brain tissue and appearance on that CT appeared
24 normal.  That, in itself, does not exclude a stroke.
25 Q.  Well, there was no evidence of a stroke on

**26**

1 that CT at 10:37 a.m., correct?
2    A. That CT was read out as normal.
3    Q. If there was evidence of a stroke, that CT
4 would have been abnormal, correct?
5    A. Correct.
6    Q. So there was no evidence of a stroke on
7 that normal CT finding for Mr. Ruffino at
8 approximately 10:37 a.m. at the facility on February
9 17, 2016, correct?
10    A. I am not a radiologist and I cannot make
11 an interpretation myself of the films. But the
12 recollection I have of the report from the
13 radiologist is it was normal.
14    Q. With no evidence of a stroke, correct?
15    A. I can go by only what they say.
16    Q. Okay. Well, it seems like you are willing
17 to take the word of the guy at the Home Depot pretty
18 blindly.
19    Do you have some reason to dispute the
20 radiologist's finding?
21    A. I have no reason to dispute it. I believe
22 the CT was read out as normal.
23    Q. With no evidence of a stroke, correct?
24    A. I don't believe that was in their
25 dictation.

**27**

1    Q. But if there had been evidence of a
2 stroke, you agree that the CT finding would have
3 been abnormal, correct?
4    A. That is correct.
5    Q. And as a result, we can conclude there was
6 no evidence of a stroke with the CT performed at
7 approximately 10:37 a.m. on February 17, 2016,
8 correct?
9    A. I don't agree with that statement. I
10 believe the CT was read out as normal. I do not
11 agree with the statement that that means there were
12 no signs of a stroke.
13    Q. What were the signs of the stroke that
14 were present in the CT that took place at
15 approximately 10:37 on February 17, 2016?
16    A. The CT was read out as normal.
17    Q. So there were no signs of a stroke,
18 correct?
19    A. The CT was read out as normal. There were
20 no abnormal findings that the radiologist commented
21 on.
22    Q. Have you just decided that you don't want
23 to say that there was no evidence of a stroke in
24 that CT?
25    A. I guess the part that I'm struggling with

**28**

1 is, I get a CT report or any reasonable physician
2 gets a CT report, it's read out as normal, that does
3 not preclude that a stroke has occurred. I guess
4 that's the part that I'm struggling with.
5    Q. I understand.
6    A. Okay.
7    Q. But the CT itself showed no evidence that
8 a stroke had occurred, correct?
9    A. The CT was read out as normal.
10    Q. The CT could have been wrong, right?
11    MR. CARTER: Object to form.
12    THE WITNESS: There are no certainties.
13 BY MR. MANOOKIAN:
14    Q. Okay. But the CT showed no evidence that
15 a stroke had occurred by 10:37, correct?
16    A. The CT was read out as normal. That does
17 not preclude the fact that a stroke has occurred.
18    Q. By 10:37 a.m. on February 17, 2016, other
19 than the unknown individual at Home Depot, what
20 evidence do you have that a stroke had occurred?
21    A. One of the other portions in review of the
22 records that brings into my mind a question about
23 the exact onset was one of the statements typed by
24 one of the medical providers from Rutherford County
25 EMS where they noticed that there was some slurred

**29**

1 speech present and the patient advised them that
2 that had been present since December of the year
3 before.
4    Q. Does that mean that the onset of symptoms
5 for the stroke that occurred sometime in February of
6 2016 were in December of 2015?
7    A. It gives me concern that it occurred
8 earlier than the 17th. Whether it was in December
9 or whether there were more symptoms that developed
10 afterward, I can't answer that. But he did advise
11 to the EMS that he had had slurred speech since
12 December.
13    Q. So despite normal CT being read at
14 10:37 a.m., you believe Mr. Ruffino may have
15 experienced a stroke on some unspecified day either
16 in 2015 or 2016 because of the statement by someone
17 at Home Depot and a line in the EMS report?
18    A. That gives me concern, yes.
19    Q. I understand the concern. But can you say
20 to a reasonable degree of medical certainty that
21 Mr. Ruffino experienced a stroke at some time prior
22 to 10:37 a.m. on February 17, 2016?
23    A. There were symptoms present before that
24 time.
25    MR. MANOOKIAN: Listen to my question.

**30**

1 Can you read it back please?
2       (Read back)
3       THE WITNESS: It is my belief that his
4 symptoms started earlier than that.
5 BY MR. MANOOKIAN:
6   Q.  I'm not talking about his symptoms. I'm
7 asking about actually experiencing a stroke prior to
8 10:37 a.m. on February 17, 2016, and whether you are
9 willing to say to a reasonable degree of medical
10 certainty that he had a stroke prior to 10:37 a.m.
11 on that date?
12   A.  Yes, I believe he had a stroke earlier
13 than that time.
14   Q.  It's your testimony that Mr. Ruffino had a
15 stroke earlier than 10:37 a.m. on February 17th,
16 2016, and you're testifying to that to a reasonable
17 degree of medical certainty, correct?
18   A.  I believe that his symptoms started
19 earlier than that.
20   Q.  Listen to my question. I'm not asking
21 about symptoms. I'm asking about when he
22 experienced a stroke. Do you understand that?
23       You told me earlier that having his clothes on
24 inside-out might be a symptom of a stroke, correct?
25   A.  Speaks to cognition difficulties, yes.

**31**

1   Q.  I'm not talking about when he might have
2 had his clothes on inside-out. I'm asking about
3 when he actually experienced a stroke and whether
4 you can say you know one way or another.
5   A.  I cannot tell you exactly when his stroke
6 occurred. I do believe it occurred earlier than
7 10:30.
8   Q.  Is it your testimony to a reasonable
9 degree of medical certainty that Mr. Ruffino
10 experienced a stroke prior to 10:37 on February 17,
11 2016?
12   A.  I believe that he had symptoms of a stroke
13 earlier than that time.
14   Q.  I'm not asking about the symptoms. You
15 know that I'm not because we've been through it.
16       Do you just not want to answer certain
17 questions?
18   A.  I don't believe that's a clear-cut answer.
19   Q.  Because we're paying a lot of money to ask
20 you questions today and to get your answers. You
21 understand that, right?
22   A.  I understand how it works.
23   Q.  What are you charging me an hour to answer
24 questions today?
25   A.  500 an hour.

**32**

1   Q.  500 an hour. Can you listen to this
2 question and answer it about experiencing a stroke,
3 not a symptom of a stroke which you told me might be
4 having his clothes on inside-out? Can you do that?
5       MR. CARTER: Object to form.
6       MR. WITT: Object to the form.
7       THE WITNESS: I'm happy to answer the
8 questions that I'm asked to the best of my ability.
9 BY MR. MANOOKIAN:
10   Q.  Is it your opinion to a reasonable degree
11 of medical certainty that Mr. Ruffino experienced a
12 stroke prior to 10:37 a.m. on February 17, 2016?
13       MR. CARTER: Object to form.
14       THE WITNESS: I believe that the symptoms
15 of a stroke had started earlier than that. One
16 cannot be, in my opinion, absolutely certain the
17 time of onset other than what you glean from the
18 history that you can get from the information that's
19 been given. He had symptoms earlier than 10:30. I
20 believe it is possible that his stroke occurred
21 earlier than that time.
22 BY MR. MANOOKIAN:
23   Q.  While it may be possible that Mr. Ruffino
24 experienced a stroke earlier than 10:37 a.m. on
25 February 17, 2016, you can't say it to a reasonable

**33**

1 degree of medical certainty, can you?
2   A.  I cannot be certain, no, I cannot.
3   Q.  You can't state it to a reasonable degree
4 of medical certainty, can you?
5   A.  I cannot be certain the exact time that it
6 occurred. I do believe it was before 10:30.
7   Q.  But you can't state that to a reasonable
8 degree of medical certainty, even though you believe
9 it might be possible, correct?
10   A.  I cannot be certain exactly when the onset
11 was.
12   Q.  Do you agree that certainly in
13 Mr. Ruffino's case the onset of symptoms was not
14 clear?
15   A.  I agree with that.
16   Q.  How many hours after a stroke occurred
17 would it take for evidence of that stroke to be
18 demonstrated on a head CT?
19   A.  That's a difficult question to answer, and
20 for this reason. Typically, you'll start to see
21 some changes between six and eight hours out.
22 However, there are cases where I've had patients
23 that have had strokes and had mild symptoms,
24 residual symptoms after the stroke and they've had
25 CAT scans that appear normal. So a normal CAT scan

**Page 34**

1 does not always preclude the fact that someone has
2 had a stroke. And when I say normal, I mean
3 interpreted by a radiologist as normal.
4  Q. What's another way to determine if someone
5 is neurologically normal?
6  A. I don't understand the question.
7  Q. Do nurses do neurological checks?
8  A. Nurses do a cursory nursing exam which is
9 not the same as a full neurological exam by a
10 physician.
11  Q. Is that a yes to my question?
12  A. Please restate the question.
13  Q. Do nurses do neurological checks?
14  A. They do cursory neurological evaluations,
15 yes.
16  Q. Is the phrase cursory neurological
17 evaluation a clinical term?
18  A. I'm a clinician and I'm using the term, so
19 in this case it would be a clinical term.
20  Q. Is it your position that any phrase you
21 use because you're a clinician becomes a clinical
22 term?
23  A. It's not every phrase, no.
24  Q. Okay. Is there an accepted clinical
25 definition of the phrase cursory nursing exam?

**Page 35**

1  A. There is not an accepted definition, no.
2  Q. What hospital do you work at?
3  A. Mostly Saint Francis Bartlett and some at
4 Saint Francis Park.
5  Q. Do nurses in the emergency departments at
6 those hospitals conduct neurological checks on
7 individuals who might have been experiencing a
8 stroke?
9  A. They do sometimes do neurological exams,
10 yes.
11  Q. Are the neurological exams performed by
12 nurses at Saint Francis performed for the purpose of
13 determining whether someone might be experiencing a
14 stroke?
15  A. The nursing exams are looking for abnormal
16 findings. That's a different exam though than is
17 performed by the physician at the time. I guess
18 what I'm getting at is, is their exam, it's just
19 different from the standpoint of I'm doing a full
20 NIH stroke scale in a little more detail. If you
21 just order neuro checks on patients, are they awake,
22 alert, are they able to stand, very vague and basic
23 neurological evaluation for just simply to do neuro
24 checks. It's different than NIH stroke scale done
25 by a physician.

**Page 36**

1  Q. Why do you keep bringing up physicians?
2 I'm just asking you whether or not nurses do these
3 examinations.
4  A. Nurses do neuro checks, yes.
5  Q. And they do neuro checks to determine
6 whether someone might be experiencing a stroke, for
7 example?
8  A. They do neuro checks for a multitude of
9 reasons. That would be one of those reasons.
10  Q. Would that type of neuro check be more
11 clinically valuable to you than a random observation
12 by an unspecified person at a Home Depot?
13  A. I have to give -- it's important for me to
14 listen to all sources of history. So I would not
15 say that one is more important than the other.
16  Q. It's your clinical opinion here today that
17 a neurological check performed by a licensed
18 healthcare practitioner in the confines of a medical
19 facility is not more clinically valuable to you as a
20 physician than a random observation by this person
21 at a Home Depot?
22  A. That's not what I'm saying.
23  Q. You know that Mr. Ruffino had a number of
24 neurological checks performed on him by nurses in
25 the time that he was at the hospital, correct?

**Page 37**

1  A. I believe in review of the records there
2 were some neuro checks, yes.
3  Q. Did you read Nurse Bromley's deposition?
4  A. Yes.
5  Q. Do you recall whether she testified that
6 she performed neurological checks on Mr. Ruffino?
7  A. If it is the individual I'm thinking
8 about, I could be incorrect, but I think Nurse
9 Bromley is a male.
10  MR. CARTER: That's right.
11  THE WITNESS: So I read the right
12 deposition?
13  MR. CARTER: Yes.
14  THE WITNESS: There were neuro checks done
15 by Nurse Bromley.
16 BY MR. MANOOKIAN:
17  Q. Do you recall that Nurse Bromley performed
18 at least six neuro checks in a two-hour period
19 between 10 a.m. and noon on February 17, 2016?
20  A. I don't recall the exact number.
21  Q. Do you recall that Nurse Bromley performed
22 multiple neuro checks in the two-hour period --
23  A. I recall -- I'm sorry.
24  Q. -- between 10 a.m. and noon?
25  A. I recall there being more than one. I

**38**
1 don't know how many there were.
2  Q.  What were Nurse Bromley's findings after
3 performing multiple neurological checks on
4 Mr. Ruffino?
5  A.  I would have to go back and look at that
6 portion of the record.
7  Q.  Did you find that portion of the record to
8 be less helpful or valuable in reaching your
9 opinions than, for example, an individual's
10 statements at Home Depot?
11  A.  I don't find one to be less or more
12 helpful in forming opinion.
13  Q.  As a clinician, it would be important to
14 take into consideration and evaluate the multiple
15 neurological checks performed on Mr. Ruffino between
16 10 a.m. and noon, correct?
17  A.  As a clinician, it's important for me to
18 take a history from my patient and glean as much
19 information as I can from outside sources and inside
20 sources to come to an opinion on how best to treat
21 someone.
22  Q.  Is that a yes to my question?
23  A.  Please restate the question.
24  Q.  Would it be important to take into
25 consideration the multiple neurological checks

**39**
1 performed on Mr. Ruffino between 10 a.m. and noon?
2  A.  It's important to take a history from all
3 sources.  So if that information is available at the
4 time, it's useful to have.
5  Q.  It's important to take the neurological
6 checks that occurred on Mr. Ruffino between 10 and
7 noon into consideration, correct?
8  A.  It's important to take all information
9 into consideration.
10  Q.  I get it.  I mean, I understand it's
11 important to take all information into
12 consideration.  I'm being a little more specific.
13  A.  I understand.
14  Q.  It's important to take all of it into
15 consideration and certainly it's important to take
16 those neuro checks into consideration, right?
17  A.  If that's available to you, it's important
18 to take them into consideration.
19  Q.  There's nothing controversial about that,
20 is there?
21  A.  One to me is not more important than the
22 other.
23  Q.  Those neurological checks are just as
24 important as anything else that you would take into
25 consideration, correct?

**40**
1  A.  All of the history available is important.
2  Q.  Did you author a facts section of your
3 report?
4  A.  My report is right there.  I'll pull it up
5 here as well.
6  Q.  Do you recall if you authored a section
7 entitled facts?
8  A.  I don't recall the exact way it was typed
9 up at the time without referring to it.  But I can
10 certainly refer to it.  There it is.  Yes, there is
11 one called facts.
12  Q.  In that section you laid out the facts
13 that you thought were important in arriving at your
14 opinions, correct?
15  A.  That is correct.
16  Q.  And you did so in detail, correct?
17  A.  Detail that I felt was applicable.
18  Q.  So anything that's applicable is contained
19 here in this facts section that you took the time to
20 author as part of the report you were paid to do in
21 this case, correct?
22  A.  I believe these facts help lead to an
23 opinion in this case, that is correct.
24  Q.  Listen to my question.  All applicable
25 facts that you used in arriving at your opinion are

**41**
1 detailed in your report that you were paid to
2 complete that were delivered to the lawyers in this
3 case, correct?
4  A.  These are the facts that I think were most
5 pertinent in this case.  There are other portions of
6 the record that I reviewed that also gave
7 information that was useful to me in coming up with
8 the opinions.  But these are the facts that I felt
9 were most pertinent for forming the opinion.
10  Q.  Did you just previously tell me that all
11 facts are equally important when we were talking
12 about the neurological checks?
13  A.  All history available is important with --
14  Q.  And the neurological checks aren't any
15 less important, correct?
16  A.  All history is important.
17  Q.  Can you answer my question?
18  A.  Neurological checks are important, history
19 is important, all of it is important.
20  Q.  The neurological checks are just as
21 important as any other facts that you would
22 consider, correct?
23  A.  They are just as important, yes.
24  Q.  Why are they omitted from the facts
25 section of your report?

**42**

1  A.  Because they're not the most pertinent
2  facts to me for forming the opinion.
3  Q.  How do you use the word pertinent?
4  A.  Pertinent to me means the things that are
5  most important at that time, the most pressing, the
6  most --
7  Q.  So those neurological checks weren't any
8  less important, correct?
9  A.  The neurological checks were important,
10 that is correct.
11 Q.  And they weren't any less important than
12 any of the other data that you considered, correct?
13 A.  All of the history is important.  But
14 those neurological checks did not affect or lead me
15 to have any difference of opinion versus what's
16 written on the facts section of the report.
17 Q.  Do you agree in the facts section of your
18 report, which is what your opinions are based on and
19 what you testified included all the pertinent data
20 that you used, there's a gap between 9:56 a.m. and
21 12:20 p.m. demonstrated in points 5 and 6?
22 A.  Please repeat what the question was.
23 Q.  Your facts section, it omits the period of
24 Mr. Ruffino's care between 9:56 a.m. and 12:20 p.m.,
25 correct?

**43**

1  A.  I don't believe that it's an omission.  I
2  believe that these are the facts that led me to the
3  opinion that I have.
4  Q.  Show me where in this facts section you
5  discuss the specifics of Mr. Ruffino's care that
6  occurred between 9:56 a.m. and 12:20 p.m.
7  A.  This facts section does not have a
8  complete reproduction of the medical chart between
9  that period of time, no.
10 Q.  I didn't ask you if it had a complete
11 reproduction of the medical chart.  I wouldn't
12 expect that.
13 A.  Okay.
14 Q.  That wouldn't be a report, would it?
15 A.  Well, I was confused.
16 Q.  That would just be the medical records,
17 wouldn't it?
18 A.  Well, that's what it appeared you were
19 asking.  That's what was confusing.
20 Q.  I'm asking if you even discussed the
21 medical care he received between 9:56 a.m. and
22 12:20 p.m.?
23 A.  That portion is not in the facts section
24 of my report.
25 Q.  You omitted that portion from the facts

**44**

1  section of your report, didn't you?
2  A.  An omission would be something that is
3  intentionally done.  What I put in the facts section
4  were the things that were most pertinent to me to
5  form the opinion.
6  Q.  An omission is something that is
7  intentionally done.  You wrote this, didn't you?
8  A.  I did write this.
9  Q.  You wrote it volitionally, correct,
10 intentionally?
11 A.  Yes.
12 Q.  You chose what went in this, right?
13 A.  That is correct.
14 Q.  Mr. Witt didn't tell you what to write,
15 did he?
16 A.  That is correct.
17 Q.  Mr. Looper didn't tell you what to write,
18 correct?
19 A.  That is correct.
20 Q.  You chose what to write?
21 A.  That is correct.
22 Q.  You chose to omit the portion of
23 Mr. Ruffino's care that occurred between 9:56 a.m.
24 and 12:20 p.m., correct?
25 A.  I chose to put pertinent facts that helped

**45**

1  form the opinion that I have.
2  Q.  You do not think that the care that
3  Mr. Ruffino received between 9:56 a.m. and
4  12:20 p.m. was pertinent, correct?
5  A.  That's not what I said.
6  Q.  Tell me what you are saying, because it
7  sounds like you're trying to parse out language.
8  I'm just asking you to confirm that you didn't
9  discuss any of the care that occurred in that
10 greater than two-hour window in your facts section,
11 correct?
12 A.  The pertinent parts of the history and
13 record were what were put in the facts section that
14 come into my opinion.
15 Q.  I got it that you put the pertinent stuff
16 in.  You left the impertinent stuff out, right?
17 A.  Doesn't mean it's not important.  It just
18 didn't impact my opinion.
19     MR. MANOOKIAN:  Take a five-minute break.
20     MR. WITT:  Yes, sir.
21     (Recess taken)
22 BY MR. MANOOKIAN:
23 Q.  Do you agree that Mr. Ruffino was driving
24 a delivery truck on the morning of February 17,
25 2016?

### 46

1  A.  Mr. Ruffino was driving a truck.  I can't
2  be certain what kind it was.  I don't recall.
3  Q.  Do you have any evidence that Mr. Ruffino
4  drove the delivery truck on the morning of February
5  17, 2016 in anything other than a satisfactory
6  fashion?
7  A.  I have no reason to think otherwise.
8  Q.  Have you reviewed any dash cam video?
9  A.  No.
10  Q.  You haven't reviewed the dash cam video of
11  Mr. Ruffino on February 17, 2016?
12  A.  No, sir.
13  Q.  Do you know whether that would show or
14  indicate whether, for example, his clothes were on
15  inside-out?
16  A.  If I haven't seen it, then I wouldn't be
17  able to give an opinion about it.
18  Q.  Well, someone might have told you.
19  A.  No one has told me and I haven't seen it.
20  Q.  Have you reviewed imaging of Mr. Ruffino's
21  head performed in December of 2016?
22  A.  I have not.
23  MR. MANOOKIAN:  Those are all my
24  questions.
25  MR. WITT:  I have no questions.

### 47

1  MR. CARTER:  I don't have any questions
2  either.
3  MR. MANOOKIAN:  Thank you, Doctor.
4  (Thereupon, Exhibit No. 1 was marked
5  for identification.)
6  (Whereupon, the deposition was
7  concluded at 2:03 p.m.)

### 48

3           C E R T I F I C A T E
4  STATE OF TENNESSEE   )
                         )
5  COUNTY OF SHELBY     )
6
    I, SANDRA MARCHKY, RMR, CRR, LCR #729,
7  Licensed Court Reporter, in and for the State of
   Tennessee, do hereby certify that the above
8  deposition was reported by me, and the transcript is
   a TRUE and accurate record to the best of my
9  knowledge, skills, and ability.
10    I further certify that I am not related to
   nor an employee of counsel or any of the parties to
11  the action, nor am I in any way financially
   interested in the outcome of this case.
12
    I further certify that I am duly licensed by
13  the Tennessee Board of Court Reporting as a Licensed
   Court Reporter as evidenced by the LCR number and
14  expiration date following my name below.
15    I further certify that this transcript is
   the work product of this court reporting agency and
16  any unauthorized reproduction and/or transfer of it
   will be in violation of Tennessee Code Annotated
17  39-14-104, Theft of Services.
18
19  _____
       SANDRA MARCHKY, LCR #729
20     Expiration Date 6-30-2019
       ALPHA REPORTING CORPORATION
21     236 Adams Avenue
       Memphis, Tennessee 38103

## Exhibits

**Exhibit 1** 47:4

### 1

**10** 23:19 25:10 37:19,24 38:16 39:1,6
**10:30** 31:7 32:19 33:6
**10:37** 25:17,21 26:1,8 27:7,15 28:15,18 29:14,22 30:8,10,15 31:10 32:12,24
**12** 23:19
**12:20** 42:21,24 43:6,22
**16** 18:8
**16th** 17:6,12,15,25
**17** 12:4,8,13,22 13:4,14 14:20 16:18,24 23:8 26:9 27:7,15 28:18 29:22 30:8 31:10 32:12,25 37:19
**17th** 11:9,18,23 17:6 18:2,9 29:8 30:15

### 2

**2011** 8:12
**2015** 29:6,16
**2016** 11:9,12,18,23 12:4,8,13,22 13:4,14,24 14:6,11,20 16:18,25 18:8 23:8 26:9 27:7,15 28:18 29:6,16,22 30:8,16 31:11 32:12,25 37:19

### 3

**37.25** 11:4,7

### 5

**5** 42:21

**500** 31:25 32:1

### 6

**6** 42:21

### 7

**7:30** 14:22 16:11,13 17:21,22 20:22 21:5,10

### 9

**911** 15:3
**9:56** 42:20,24 43:6,21

### A

**a.m.** 25:17,21 26:1,8 27:7 28:18 29:14,22 30:8,10,15 32:12,24 37:19,24 38:16 39:1 42:20,24 43:6,21
**ability** 32:8
**abnormal** 15:16 20:21 21:21 26:4 27:3,20 35:15
**absolutely** 32:16
**acceptable** 12:19
**accepted** 34:24 35:1
**account** 24:25
**accurate** 23:6
**actual** 5:12 13:21 14:15
**add** 11:4
**Additionally** 15:2
**address** 5:10
**advise** 29:10
**advised** 29:1
**affect** 42:14
**afterward** 29:10
**agree** 11:8 21:4 27:2,9,11 33:12,15 42:17

**ahead** 24:24
**alert** 35:22
**allegation** 10:5,16
**allegations** 10:1
**amount** 10:24
**answers** 31:20
**appearance** 18:13,21 19:11 20:24 23:7 25:23
**appeared** 25:23 43:18
**appears** 15:17
**applicable** 40:17,18,24
**approximately** 25:16 26:8 27:7,15
**Archer** 7:3
**arriving** 40:13,25
**articles** 6:21
**attorney** 8:12
**author** 40:2,20
**authored** 40:6
**Avenue** 5:19
**awake** 35:21
**aware** 17:22

### B

**back** 10:7,9 18:22 22:4 30:1,2 38:5
**barometer** 19:10
**Bartlett** 5:11,14 35:3
**base** 16:4
**based** 42:18
**basic** 35:22
**basing** 16:8
**bed** 14:16
**began** 17:9
**belief** 30:3
**Beverly** 8:9

**blindly** 24:4 26:18
**Bond** 5:11
**Booth** 7:8,9,14 9:2
**boss** 15:4
**brain** 25:23
**bring** 5:21 6:6
**bringing** 36:1
**brings** 20:18 28:22
**Bromley** 37:9,15,17,21
**Bromley's** 37:3 38:2
**brought** 6:1
**bulging** 10:13
**Byrd** 8:10

### C

**call** 24:1
**called** 7:11 15:3 40:11
**care** 8:4,7 9:21 10:25 11:8 42:24 43:5,21
**CARTER** 12:24 16:19 24:14 28:11 32:5,13 37:10,13
**case** 7:1,15 8:4,7,9,11,13,24 9:2,4,5,10,12,18,24 10:3,20,22,25 11:8 15:15 18:25 33:13 34:19 40:21,23 41:3,5
**cases** 7:16,22 8:15,18,21 9:19 33:22
**CAT** 33:25
**certainties** 28:12
**certainty** 11:17 12:1,7,12,21 13:3 14:5,10 17:9 29:20 30:10,17 31:9 32:11 33:1,4,8
**Chamberlain** 7:12,14 9:17
**changed** 8:14
**charging** 31:23
**chart** 43:8,11

**check** 22:12 36:10,17
**checks** 34:7,13 35:6, 21,24 36:4,5,8,24 37:2, 6,14,18,22 38:3,15,25 39:6,16,23 41:12,14, 18,20 42:7,9,14
**circumstances** 24:8
**clear** 33:14
**clear-cut** 31:18
**clinical** 13:21 34:17, 19,21,24 36:16
**clinically** 23:19 36:11, 19
**clinician** 34:18,21 38:13,17
**clothes** 19:25 20:2 30:23 31:2 32:4
**cognition** 30:25
**Coke** 25:11
**comment** 18:16
**commented** 27:20
**complete** 41:2 43:8,10
**concern** 17:17 29:7, 18,19
**conclude** 17:13 18:7 27:5
**conduct** 35:6
**confines** 36:18
**confused** 43:15
**confusing** 43:19
**conservative** 10:9
**consideration** 38:14, 25 39:7,9,12,15,16,18, 25
**considered** 25:18 42:12
**consistent** 13:6 25:3, 13
**consult** 11:1
**contacted** 7:9
**contained** 40:18

**controversial** 39:19
**conversation** 17:18
**conversations** 9:17
**copies** 6:14
**copy** 6:16
**correct** 11:5 12:8,23, 25 14:6 16:11,15,18,20 17:10,11,20 20:24 21:4,15 22:16 23:8 24:7,13,20 26:1,4,5,9, 14,23 27:3,4,8,18 28:8, 15 30:17,24 33:9 36:25 38:16 39:7,25 40:14, 15,16,21,23 41:3,15,22 42:8,10,12,25
**County** 18:16 28:24
**couple** 6:15 22:9 23:16
**credence** 23:12
**credibility** 24:3,20,22
**credible** 24:6
**Criner** 5:1,8,9
**CT** 25:15,18,23 26:1,2, 3,7,22 27:2,6,10,14,16, 19,24 28:1,2,7,9,10,14, 16 29:13 33:18
**current** 5:9,20
**cursory** 34:8,14,16,25
**CV** 6:20

**D**

**Dale** 5:8
**data** 42:12,19
**date** 14:2,5 30:11
**day** 11:20 12:2,16,17 13:6,8,9,16 14:10,14 17:9 23:15,16 29:15
**days** 14:11 23:16,18
**December** 29:2,6,8,12
**decided** 27:22
**decision** 10:13

**defendant** 8:1 9:20
**defendants** 7:22 10:3
**deficit** 16:23
**definition** 34:25 35:1
**definitively** 16:13,17
**degree** 11:16 12:6,11, 21 13:2 14:4,10 17:8 29:20 30:9,17 31:9 32:10 33:1,3,8
**delivered** 41:2
**deliveries** 22:6
**demonstrated** 33:18 42:21
**department** 5:18 16:9
**departments** 35:5
**deposition** 5:22 10:20 14:21 15:2 18:23 19:4 22:5,8 37:3,12
**depositions** 6:8 8:19
**Depot** 14:22,23 15:6, 11,24 16:6 17:19 18:1, 9,19,20 19:1 20:8 21:13,25 22:12,19 23:6 26:17 28:19 29:17 36:12,21 38:10
**describe** 25:5
**describing** 25:13
**detail** 35:20 40:16,17
**detailed** 41:1
**determine** 24:9,11,15, 16 34:4 36:5
**determining** 35:13
**developed** 29:9
**dictation** 26:25
**difference** 42:15
**difficult** 33:19
**difficulties** 30:25
**difficulty** 13:7
**director** 5:17
**disagree** 24:21

**disagreeing** 13:10
**disc** 10:8,13
**discount** 23:10
**discuss** 43:5
**discussed** 43:20
**disheveled** 19:21
**dispute** 26:19,21
**dizzy** 15:3,12
**doctor** 8:6 10:14
**doctor's** 8:4
**Dorito's** 25:11
**drinking** 25:11
**drive** 6:8,11
**droop** 15:17
**drooping** 18:14
**drop** 10:16
**drugs** 23:3
**duly** 5:2

**E**

**earlier** 12:9,17 13:18 17:18 21:6 29:8 30:4, 12,15,19,23 31:6,13 32:15,19,21,24
**eating** 25:10
**emailed** 6:23
**emergency** 5:18 10:18 16:9 20:11 23:13 35:5
**emergently** 10:18
**employee** 18:19,20 20:8
**EMS** 18:16 28:25 29:11,17
**ended** 10:11
**enjoy** 23:16
**entire** 24:9
**entitled** 40:7
**equally** 41:11

ER 25:1

evaluate 24:8 38:14

evaluated 8:7

evaluating 10:25 11:7

evaluation 34:17 35:23

evaluations 34:14

evidence 17:13,24 18:6 25:14,21,25 26:3, 6,14,23 27:1,6,23 28:7, 14,20 33:17

exact 28:23 33:5 37:20 40:8

exam 34:8,9,25 35:16, 18

EXAMINATION 5:4

examinations 36:3

examined 5:2

exams 35:9,11,15

exclude 25:24

existing 7:13

expect 43:12

experience 13:24 16:24

experienced 12:12 13:13 14:5,11 16:17 29:15,21 30:22 31:3,10 32:11,24

experiencing 14:18 30:7 32:2 35:7,13 36:6

expert 6:20 8:20

express 12:21

extent 7:4 25:8

external 14:23 15:11 21:20

### F

face 18:13

facial 15:17 18:14

facility 26:8 36:19

fact 28:17 34:1

factor 25:6,8

facts 40:2,7,11,12,19, 22,25 41:4,8,11,21,24 42:2,16,17,23 43:2,4,7, 23,25

February 11:9,12,18, 22 12:3,8,13,22 13:4, 14,24 14:6,11,20 16:18,24 17:15,25 18:2,8,9 23:8 26:8 27:7,15 28:18 29:5,22 30:8,15 31:10 32:12,25 37:19

felt 10:7 40:17 41:8

female 22:19

files 6:7

films 26:11

find 20:13 24:6 25:2 38:7,11

finding 26:7,20 27:2

findings 13:5 25:2 27:20 35:16 38:2

fine 12:18

firm 8:13

follow-up 10:10

foot 10:15

form 12:24 16:19 21:16 24:14 28:11 32:5,6,13

forming 38:12 41:9 42:2

Francis 5:14,19 35:3, 4,12

full 5:6 34:9 35:19

### G

gap 42:20

gave 41:6

give 6:25 7:2 8:3 10:20 23:12 24:3,12 36:13

glean 32:17 38:18

globally 10:1

great 6:15

guess 16:9 27:25 28:3 35:17

guessing 16:2,3

guy 26:17

### H

Hall 7:8,9,14 9:2

happen 24:2

happy 32:7

head 33:18

healthcare 36:18

hear 14:17

hearing 13:8

helpful 38:8,12

historian 23:7 24:12

histories 24:3

history 20:12 21:22 23:10,11 24:9 32:18 36:14 38:18 39:2 40:1 41:13,16,18 42:13

Home 14:22,23 15:6, 11,24 16:5 17:19 18:1, 8,19,20 19:1 20:8 21:13,25 22:12,18 23:6 26:17 28:19 29:17 36:12,21 38:10

hospital 5:12,13,16 25:16 35:2 36:25

hospitals 35:6

hour 31:23,25 32:1

hours 11:5,7 22:10 33:16,21

### I

idea 20:7 21:12

identify 15:10

imagine 18:13

implication 13:8

important 21:21 36:13,15 38:13,17,24 39:2,5,8,11,14,15,17, 21,24 40:1,13 41:11, 13,15,16,18,19,21,23 42:5,8,9,11,13

included 42:19

including 11:6

incorrect 37:8

incumbent 23:9

individual 18:8,14 19:9,13 20:14,17 21:13,24 22:12 28:19 37:7

individual's 19:1,10 38:9

individually 10:4

individuals 35:7

influence 23:2

information 17:16 32:18 38:19 39:3,8,11 41:7

informed 15:23

initial 10:18 25:15

initially 10:9

inside 38:19

inside-out 19:25 20:2 30:24 31:2 32:4

instance 25:9

intend 7:5

interest 24:17

interpretation 26:11

interpreted 34:3

intoxicated 22:25

### J

Jerry 8:12 10:23

job 24:7,15,16

Jr 5:1,8

**judgment** 24:1,11

### K

**Kate** 5:11
**knew** 21:25
**knowing** 12:20

### L

**laid** 40:12
**laptop** 6:4
**lawsuit** 9:21
**lawyers** 41:2
**lead** 40:22 42:14
**leads** 20:21
**leap** 20:10
**led** 43:2
**level** 25:5,10
**licensed** 36:17
**Likewise** 23:5
**listed** 8:19 9:22
**listen** 14:9 24:5 29:25 30:20 32:1 36:14 40:24
**loaded** 6:9
**log** 6:19 11:2,3
**long** 9:11
**looked** 17:21 19:16,20 20:20
**lot** 31:19
**low** 10:8

### M

**M.D.** 5:1
**made** 10:14 21:14 22:5
**make** 6:14 20:9 26:10
**male** 22:19,20 37:9
**manager** 14:23 17:19 19:5 20:20

**MANOOKIAN** 5:5 13:1 16:21 21:23 24:18 28:13 29:25 30:5 32:9, 22 37:16
**materials** 5:21 6:1,13, 18
**math** 11:5
**means** 19:7,8 25:20 27:11 42:4
**meant** 19:19,20,22,24 20:1,7 21:12
**medical** 5:17 9:21 11:17 12:7,12,21 13:3 14:4,10 17:9 28:24 29:20 30:9,17 31:9 32:11 33:1,4,8 36:18 43:8,11,16,21
**medically** 24:17
**medication** 25:3
**medicine** 20:11
**meds** 23:22,25
**mental** 22:22
**midnight** 14:15
**mild** 33:23
**mind** 20:19 28:22
**missing** 11:21
**Misunderstanding** 11:24
**Mitchell** 8:12 10:23
**money** 31:19
**month** 10:11 23:20
**months** 9:8
**morning** 23:8
**motivations** 24:10,16
**move** 17:3 22:9
**MRI** 10:13
**multiple** 37:22 38:3, 14,25
**multitude** 36:8

### N

**names** 7:21
**necessarily** 25:13
**needed** 6:10,24
**neuro** 35:21,23 36:4,5, 8,10 37:2,14,18,22 39:16
**neurological** 22:12 34:7,9,13,14,16 35:6,9, 11,23 36:17,24 37:6 38:3,15,25 39:5,23 41:12,14,18,20 42:7,9, 14
**neurologically** 34:5
**night** 15:6,20
**NIH** 35:20,24
**non-suited** 9:23 10:4
**noon** 37:19,24 38:16 39:1,7
**normal** 14:16 16:10 19:9 20:15,24 25:11, 19,20,22,24 26:2,7,13, 22 27:10,16,19 28:2,9, 16 29:13 33:25 34:2,3, 5
**normalcy** 19:11
**noticed** 17:20 28:25
**number** 5:12 10:2 36:23 37:20
**Nurse** 37:3,8,15,17,21 38:2
**nurses** 34:7,8,13 35:5, 12 36:2,4,24
**nursing** 34:8,25 35:15

### O

**oath** 21:11
**Object** 12:24 16:19 21:16 24:14 28:11 32:5,6,13
**objective** 25:2

**objectively** 14:25
**observation** 36:11,20
**observing** 25:12
**occurred** 11:15,19 17:14 28:3,8,15,17,20 29:5,7 31:6 32:20 33:6, 16 39:6 43:6
**occurrence** 13:22
**offer** 7:5
**offered** 8:15
**offhand** 8:2
**omission** 43:1
**omits** 42:23
**omitted** 41:24 43:25
**onset** 18:12 21:1,3,5 28:23 29:4 32:17 33:10,13
**opiates** 25:1
**opinion** 7:2,4 8:15,20 14:7 17:1 19:18,22 20:1 22:17 23:1,4,5 32:10,16 36:16 38:12, 20 40:23,25 41:9 42:2, 15 43:3
**opinions** 6:25 8:3 18:25 38:9 40:14 41:8 42:18
**order** 35:21
**orthopedic** 10:10,12, 14

### P

**p.m.** 42:21,24 43:6,22
**paid** 40:20 41:1
**pain** 10:7 23:22,25 25:5,10
**pale** 19:17
**Pamela** 7:11,14
**Park** 5:19 35:4
**part** 13:9 20:11 21:22 24:7 27:25 28:4 40:20

**party** 21:20
**patient** 10:6,11,15 20:15 23:11 29:1 38:18
**patients** 16:8 20:12 24:5 33:22 35:21
**paying** 31:19
**people** 23:21,24
**people's** 24:20
**perfectly** 12:19
**performed** 25:16 27:6 35:11,12,17 36:17,24 37:6,17,21 38:15 39:1
**performing** 38:3
**period** 37:18,22 42:23 43:9
**person** 14:23 15:11 22:3,18 23:6 36:12,20
**pertinent** 41:5,9 42:1, 3,4,19
**phrase** 17:2 34:16,20, 23,25
**physician** 28:1 34:10 35:17,25 36:20
**physician's** 20:11
**physicians** 36:1
**piece** 17:16
**place** 27:14
**plaintiffs** 7:22
**point** 10:12 11:5,20 13:17 15:18 17:2
**points** 42:21
**portion** 6:17 17:6 18:11 38:6,7 43:23,25
**portions** 28:21 41:5
**position** 34:20
**practice** 5:10
**practitioner** 36:18
**preclude** 28:3,17 34:1
**preliminary** 9:1
**Prescro** 8:9

**present** 16:8 20:22 21:10 27:14 29:1,2,23
**presented** 14:22
**pressing** 42:5
**pretty** 26:17
**previously** 41:10
**printed-off** 6:21
**prior** 10:4 29:21 30:7, 10 31:10 32:12
**problem** 10:8
**professional** 5:15 24:11
**provide** 23:11
**provided** 8:21 11:8
**provider** 10:7
**providers** 28:24
**pull** 6:10 18:17 40:4
**pulling** 15:3
**purpose** 35:12

**Q**

**question** 14:9 17:7 18:3 20:18 21:17 28:22 29:25 30:20 32:2 33:19 34:6,11,12 38:22,23 40:24 41:17 42:22
**questions** 31:17,20,24 32:8
**quote-unquote** 16:6 21:15

**R**

**radiologist** 25:22 26:10,13 27:20 34:3
**radiologist's** 26:20
**random** 36:11,20
**reached** 18:25
**reaching** 38:8
**read** 6:10 17:17 22:7 26:2,22 27:10,16,19

28:2,9,16 29:13 30:1,2 37:3,11
**reason** 26:19,21 33:20
**reasonable** 11:16 12:6,11,21 13:2 14:10 17:8 28:1 29:20 30:9, 16 31:8 32:10,25 33:3, 7
**reasons** 36:9
**recall** 7:21 9:3,11,18 37:5,17,20,21,23,25 40:6,8
**received** 43:21
**recently** 9:23
**recollection** 8:17 10:6,17 19:3 22:5 25:18 26:12
**record** 5:7 38:6,7 41:6
**records** 9:1,9 11:14 28:22 37:1 43:16
**refer** 40:10
**referring** 40:9
**relationship** 7:13
**rely** 17:13 18:6
**remember** 8:2,6
**repeat** 42:22
**report** 6:20 8:22 16:5 18:16 26:12 28:1,2 29:17 40:3,4,20 41:1, 25 42:16,18 43:14,24
**reported** 24:10
**reports** 6:8
**represented** 10:22
**reproduction** 43:8,11
**residual** 33:24
**respect** 19:19
**restate** 34:12 38:23
**result** 16:16 27:5
**retain** 6:16,18,19
**retained** 6:25 7:2,7 8:3 9:4,12

**review** 8:25 15:15 28:21 37:1
**reviewed** 41:6
**Road** 5:11
**Roger** 5:1,8
**role** 5:15
**room** 10:18 23:13
**Ruffino** 11:9,11,17 12:7,12,22 13:3,5,13, 24 14:5,11 15:5 16:17, 24 17:1,4,21,22 18:1 19:16 20:9,23 21:14,25 22:3,13 25:15 26:7 29:14,21 30:14 31:9 32:11,23 36:23 37:6 38:4,15 39:1,6
**Ruffino's** 14:21 17:14 18:7,23 19:4 22:4 23:7 33:13 42:24 43:5
**run** 18:16
**Rutherford** 18:16 28:24

**S**

**Saint** 5:14,19 35:3,4,12
**scale** 35:20,24
**scan** 33:25
**scans** 33:25
**section** 40:2,6,12,19 41:25 42:16,17,23 43:4,7,23
**shifts** 23:20
**Short** 7:23,25 8:24 9:5, 17
**show** 10:13 43:4
**showed** 28:7,14
**signals** 21:3
**significant** 17:16
**signs** 13:15,20,21 25:11 27:12,13,17
**simply** 35:23

sir  9:6 18:4 23:14
slurred  28:25 29:11
Smith  7:8,10,14
sources  36:14 38:19,20 39:3
Speaks  30:25
specialist  10:10,12
specific  18:20 39:12
specifically  21:19
specifics  43:5
speculating  15:24 16:1
speech  29:1,11
spent  10:24 11:7 15:6
spine  10:10,12,14
spoken  21:14
stand  35:22
standpoint  35:19
start  20:19 33:20
started  12:9,16,17 13:9,10,13,17,20 14:7,14 15:20 16:13 17:5,11,18,25 18:7 30:4,18 32:15
state  5:6 22:22 33:3,7
statement  18:18 19:1 21:14 27:9,11 29:16
statements  28:23 38:10
street  5:12
stroke  11:9,12,13,17,19,22,25 12:3,5,7,9,13,15,22 13:3,6,8,13,15,22,25 14:6,8,12,14,18 15:22 16:18,24 17:4,9,14,25 18:7 20:3,10,13 25:15,21,24,25 26:3,6,14,23 27:2,6,12,13,17,23 28:3,8,15,17,20 29:5,15,21 30:7,10,12,15,22,24 31:3,5,10,12 32:2,3,12,15,20,24 33:16,17,24 34:2 35:8,14,20,24 36:6
strokes  33:23
struggling  27:25 28:4
subjectivity  25:7
subpoena  6:20
suggest  22:15
suggested  10:9
surgery  10:15,17
sworn  5:2 8:18
symptom  15:22 20:3,10 30:24 32:3
symptoms  11:20 12:5,15 13:5,15,20 14:7,13,17,19 15:1,9,10,13,25 16:5,14 20:19,22 21:10 29:4,9,23 30:4,6,18,21 31:12,14 32:14,19 33:13,23,24
system  5:17

**T**

taking  20:12 23:9
talking  13:19 15:13 30:6 31:1 41:11
talks  15:2
telling  16:6 18:1
term  34:17,18,19,22
testified  5:3 21:11 37:5 42:19
testifying  30:16
testimony  7:5 8:16,18 16:4 30:14 31:8
therapy  10:9
things  15:18 42:4
thinking  37:7
thought  11:21 20:20 40:13
thumb  6:7,11
time  6:19 8:8,25 10:24 11:2,3 12:2 13:23 14:20,24 36:6
tissue  25:23
title  5:20
today  5:21 6:2 11:6 22:10 31:20,24 36:16
told  11:22 15:11,12 18:9 19:4 23:10 30:23 32:3
total  10:24
track  19:13
treat  38:20
true  24:9
two-hour  37:18,22
type  25:3 36:10
typed  28:23 40:8
Typically  33:20

**U**

Uh-huh  20:6
unaware  15:16,17,19 16:12 20:23
uncertainty  18:12
understand  10:2 22:8 28:5 29:19 30:22 31:21,22 34:6 39:10,13
understanding  15:5,7 16:23 18:24
unidentified  20:8 21:13 22:11
unknown  28:19
unspecified  29:15 36:12

**V**

vague  35:22
valuable  36:11,19 38:8
versus  8:9 42:15
visit  10:19
vital  25:11

**W**

wake-up  14:8 15:21
weigh  24:19,21,22
weight  24:12
William  8:10
WITT  21:16 32:6
woke  14:13,17,20 15:9,14,24
word  26:17 42:3
wording  18:23
work  14:22 23:13,15 35:2
working  8:13
works  31:22
written  8:22 42:16
wrong  28:10

**Y**

year  9:14 29:2
years  8:16,22

14:15,24 15:1 19:23 20:15,24,25 22:3,23 29:21,24 30:13 31:13 32:17,21 33:5 35:17 36:25 39:4 40:9,19 42:5 43:9