# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| JOHN RUFFINO and MARTHA RUFFINO, Husband and Wife, | ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | CASE No. 3:17-cv-00725 |
| v. | ) ) | Judge Campbell |
| | ) | Magistrate Judge Newbern |
| DR. CLARK ARCHER and HCA HEALTH SERVICES OF TENNESSEE, INC. d/b/a STONECREST MEDICAL CENTER | ) ) ) ) | JURY DEMANDED |
| | ) | |
| Defendants. | ) ) | |

## DR. ARCHER'S MOTION IN *LIMINE* NO. 1 TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT, TROY T. POPE, M.D., ON CERTAIN ISSUES OF CAUSATION

COMES NOW Defendant, Dr. Clark Archer (hereinafter "Dr. Archer") and respectfully moves the Court in *limine* to enter an Order excluding any testimony from Plaintiffs' expert, Troy T. Pope, M.D., regarding:

(1) Whether the administration of intravenous tPA[1] alone would have, to a reasonable degree of medical certainty, caused Mr. Ruffino to have an improved neurologic outcome;

(2) Whether an endovascular thrombectomy or any endovascular interventions, alone or in addition to the administration of tPA would have caused, to a reasonable degree of medical certainty, Mr. Ruffino to experience an improved neurologic outcome.

## ARGUMENT AND AUTHORITY:

First, the Court of Appeals for the Sixth Circuit has expressly held that when a federal court exercises it diversity jurisdiction over a case, the Federal Rules of Evidence govern

---

[1] Tissue plasminogen activator.

procedural issues, whereas state substantive law, here Tennessee's, governs the substantive issues. *Legg v. Chopra*, 286 F.3d 286, 289-290 (6th Cir. 2002). Tennessee's substantive law requires that plaintiff establish through competent expert testimony the following elements:

> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
> **(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.**

Tenn. Code Ann. § 29-26-115 (2018) (**emphasis** added). The last element is the causation prong that a plaintiff is required to establish through expert testimony. *Id.*

Pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), an expert witness must be qualified to offer opinions that will assist the jury in understanding the evidence or a fact in issue. In order to be qualified, the expert's opinions and testimony must be based on "credible and reliable science." *Legg*, 286 F.3d at 291. Courts are tasked with the role of gatekeeper and required to ensure that expert testimony is relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589).

Some of the relevant factors a court is to consider in determining whether an expert's testimony is reliable are:

> [1] Whether a theory or technique . . . can be (and has been) tested;
> [2] Whether it has been subjected to peer review and publication;
> [3] Whether, in respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation; and

[4] Whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Kumho Tire Co.*, 526 U.S. at 149-50 (citing *Daubert*, 509 U.S. at 592-94) (internal quotations omitted). Further non-exclusive factors a court may consider are:

(1) Whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995).

(2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (noting that in some cases a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered").

(3) Whether the expert has adequately accounted for obvious alternative explanations. *See Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994) (testimony excluded where the expert failed to consider other obvious causes for the plaintiff's condition). *Compare Ambrosini v. Labarraque*, 101 F.3d 129 (D.C. Cir. 1996) (the possibility of some uneliminated causes presents a question of weight, so long as the most obvious causes have been considered and reasonably ruled out by the expert).

(4) Whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting." *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997). *See Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167, 1176 (1999) (*Daubert* requires the trial court to assure itself that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

(5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give. *See Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167, 1175 (1999) (Daubert's general acceptance factor does not "help show that an expert's testimony is reliable where the discipline itself lacks reliability, as for example, do theories grounded in any so-called generally accepted principles of astrology or necromancy."), *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269 (5th Cir. 1998) (en banc) (clinical doctor was properly precluded from testifying to the

3

> toxicological cause of the plaintiff's respiratory problem, where the opinion was not sufficiently grounded in scientific methodology); *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir. 1988) (rejecting testimony based on "clinical ecology" as unfounded and unreliable).

Fed. R. Evid. 702 advisory committee note.

In the present case, as set out in further detail below, Dr. Pope is not qualified to testify about certain issues related to causation in the instant case either because he has retracted such opinions, or he lacks a reliable scientific basis for the opinions.

> **I.** **Dr. Pope cannot offer an opinion regarding whether the administration of intravenous tPA alone would have caused an improved neurologic outcome.**

In the present case, Dr. Poe indicated that the scope of his Rule 26 Report was to cover causation and that his opinion was that the failure to administer intravenous tPA and transfer Mr. Ruffino to a comprehensive stroke center, more likely than not worsened Mr. Ruffino's outcome.[2] Dr. Pope also executed an affidavit that stated "I am familiar with . . . the recent medical literature regarding outcomes for stroke patients as published in peer-reviewed medical journals, and I have formed opinions in this matter on (3) causation."[3] Much of his Rule 26 Report mirrors his affidavit. In sum, his Rule 26 report is simply that the administration of tPA **and** an endovascular thrombectomy would have likely provided Mr. Ruffino with a better outcome than he received without that treatment being provided.[4]

During his deposition, Dr. Pope indicated that he could not give an opinion to a reasonable degree of medical certainty (more likely than not), that IV tPA alone would have caused or contributed to cause an improved neurologic outcome in Mr. Ruffino.

---

[2] *See* Dr. Troy Pope's Rule 26 Report ("Dr. Pope's Report"), at 3 of 35; 33 of 35; 35 of 35. A copy of this document has been filed separately pursuant to a Notice of Filing.

[3] *See* Affidavit of Dr. Troy Pope (Dr. Pope's Aff."), at ¶¶ 9, 15. A copy of this Affidavit was previously filed and is Doc. 46-1.

[4] *See* Dr. Troy Pope's Rule 26 Report, at 22 of 35.

4

More specifically, Dr. Pope testified:

> Q. And we'll stop on that one. Do you agree with Dr. Callahan's assessment that patients that have just TPA only have about a 30 percent chance of success?
>
> A. I believe it's in the 30s.
>
> Q. Less than 40 percent?
>
> A. I believe so, yes.[5]
>
>          * * *
>
> Q.   It's my understanding that less than 40 percent have improved.
>
> A.    From TPA alone, correct.
>
> Q.   From TPA alone?
>
> A.    Correct.[6]
>
>          * * *
>
> Q.   And you can't say more likely than not that TPA alone, when Dr. Archer and the folks at StoneCrest saw Mr. Ruffino, would have resulted in recannulization, can you?
>
> A. Resulted in recannulization. Meaning clearing the clot?
>
> Q. Clearing the clot.
>
> A. I can't tell you that, no.[7]
>
>          * * *
>
> Q. And so it's not -- you're not a neurologist, and you're not an expert in the areas of what improvement he would have had had he gotten TPA or –
>
> A. That's –

---

[5] Transcript of the Deposition of Troy T. Pope, M.D., on March 23, 2018 ("Dr. Pope's Depo."), at 27:3 – 8. A copy of this transcript is being filed pursuant to a Notice of Filing.

[6] Dr. Pope's Depo., at 89:8 – 12.

[7] *Id.* at 91:17 – 24.

Q.-- anything of that nature; is that fair?

A. -- fair.[8]

As the foregoing exchanges make clear, the medical literature does not support, nor does Dr. Pope disagree, that IV tPA alone would have cause or contributed to cause Mr. Ruffino, to a reasonable degree of medical certainty, to experience an improved neurologic outcome. Therefore, any testimony otherwise would be unreliable and subject to exclusion pursuant to Rule 702 of the Federal Rules of Evidence. Further, his Rule 26 Report did not purport to sever the administration of tPA alone from his opinion on causation. Likewise, Rule 403 of the Federal Rules of Evidence. would require exclusion of any testimony along these lines as it would mislead the jury, confuse the issues (Dr. Pope's opines that administration of tPA **and** then transfer to a comprehensive stroke center are required), lead to a waste of time or undue delay as defense counsel would then have to impeach Dr. Pope's testimony (likewise leading to further confusion of the issues).

For these reasons, Dr. Archer respectfully asks this Court to enter an order excluding any testimony from Dr. Pope regarding the administration of tPA alone and whether it would have cause or contributed to cause Mr. Ruffino, to a reasonable degree of medical certainty, to have experienced an improved neurologic outcome.

II.     **Dr. Pope is not qualified to offer an opinion about endovascular treatment or whether it, alone or subsequent to the administration of tPA, would have caused Mr. Ruffino to have an improved neurologic outcome.**

In Dr. Pope's Rule 26 Report, he opined that "individually and together, the departures from the standard of care more likely than not caused or contributed to cause the continued severity of John Ruffino's symptoms that resulted from brain injury sustained during an acute

---

[8] *See* Dr. Pope's Depo, at 97:2 – 97:7 (**emphasis** added).

6

ischemic stroke on 2/17/16."[9]    In further detail, his report offered the following opinions regarding causation:

> [I]t was within the window of time at 1220-1300 <u>for treatment of the stroke including IV tPa **and** an endovascular thrombectomy to have likely provided Mr. Ruffino with a better outcome than he received without that treatment being provided</u>.  The treatment that could have been provided by Dr. Archer and/or under his direction and/or management was to administer IV tPA and to arrange transfer to a comprehensive stroke center. Had those things been done within at least 6 hours of Dr. Archer first seeing the patient at approximately 1220, Mr. Ruffino would have had a better outcome from his stroke. That improved blood flow via such treatment being provided within 6 hours of 1200 would have likely limited or prevented the permanent brain injury that occurred as a result of the lack of such treatment causing that decreased blood flow through that vessel of the brain – thus providing a better outcome for the patient.[10]

However, during his deposition, Dr. Pope offered the following opinions on endovascular treatment:

> Q. And you, as an ER physician, and Dr. Archer as an ER physician, don't make the decision on whether or not endovascular treatment is appropriate for a patient, correct?
>
> A. Correct.
>
> Q.  That's left up to neurology?
>
> A. Correct.[11]

Essentially, his testimony is that he cannot offer an opinion on whether endovascular treatment was warranted in this case. As an Emergency Room physician,[12] Dr. Pope conceded that he cannot give an opinion as to whether endovascular treatment should or should not be ordered for

---

[9] *See* Dr. Pope's Report, at 3 of 35, ¶ 3; 6 of 35, ¶ c;

[10] Dr. Pope's Report, at 22 of 35(**emphasis** added); *see also* Dr. Pope's Aff., at ¶¶ 15, 19.

[11] Dr. Pope Depo., at 46:16 – 22.

[12] Dr. Pope's Report, at 32 of 35 ("Since 2013, I have continuously worked as an ER physician at St. Joseph London Hospital in London, Kentucky.")

7

a patient. Thus, it naturally follows that he would not be able to offer an opinion as to whether endovascular treatment (including a thrombectomy[13]) would cause or contribute to an improved neurologic outcome for Mr. Ruffino. Dr. Pope does not even know if it would be medically indicated in this case, so there is no basis for him to state that it would change any outcome Mr. Ruffino experienced.

Further, even without this portion of his testimony, the rest of Dr. Pope's testimony indicates that the basis for his opinions on endovascular treatment such as a thrombectomy are not reliable. In Dr. Pope's Rule 26 Report, he indicated that the basis of part of his testimony was the AHA/ASA Guidelines that were published in 2013.[14] Specifically, he testified to the following:

> A. Yeah, 2007, 2009, and 2013 were the AHAA articles I referenced. The 2013 one, that's the "Guidelines for the Early Management of Patients with Acute Ischemic Stroke."
>
> Q. When was the patient in the emergency room?
>
> A. Two thousand and -- we just had this problem earlier. 2016.
>
> Q. Why didn't you cite to the Guidelines for Management of Stroke from 2015 instead of the 2013?
>
> A. I'm not sure. I don't -- I don't – please show me the article you're speaking of.[15]
>
> [Dr. Pope was handed a copy of the 2015 Guidelines, which were marked as Exhibit 10 to his deposition]
>
> * * *

---

[13] A thrombectomy the surgical removal of a thrombus, which is a blood clot that adheres to the wall of blood vessel or organ and may or may not obstruct the follow of blood. *See* THOMBUS; THROMBECTOMY, TABER'S ONLINE MEDICAL DICTIONARY (22nd ed. 2015) *available* at https://www.tabers.com/tabersonline/view/Tabers-Dictionary/744622/all/thrombus;
https://www.tabers.com/tabersonline/view/TabersDictionary/737862/all/thrombectomy

[14] Dr. Pope's Report, at 34 of 35, at ¶ 6.

[15] Dr. Pope's Depo., at 92:14 – 24.

Q. You see at the top where it says, "2015 updates to 2013"?

A. Uh-huh. Q. I think you told me earlier that it's important as an expert witness to utilize the literature that would have been in place at the time?

A. Yes.

Q. So that would be the appropriate literature to look at when evaluating this criteria, correct?

[OBJECTION OMITTED]

A. It would be one of them, yes.

Q. And that replaces the 2013 guidelines, correct?

A. I would agree.

Q. You did –

A. I'm guessing that my bibliography is incorrect more than me not having read this.

Q. All right. Your NIHSS Stroke Scale was four on Mr. Ruffino at the time that he was at StoneCrest, correct?

A. That's correct.

Q. And if you look in the candidates for endovascular thrombectomy -- I think it's page 3031, but I'd have to double check that.

A. I think I see it. Are you talking about this page?[16]

* * *

Q. If you look under number two it says, "Patient should receive endovascular therapy with a stent retriever, if they meet all the following criteria." Do you see that?

A. I do.

---

[16] Dr. Pope's Depo., at 93:12 – 94:12.

9

Q. Letter E is an NIHSS stroke scale greater than or equal to six. Do you see that?

A. I do.

Q. Mr. Ruffino does not meet that criteria, does he?

A. Not at StoneCrest, no, sir.

Q. **So he was not a candidate for TPA and endovascular treatment at StoneCrest, was he?**

[OBJECTION OMITTED]

A. **He was not a candidate. This is for endovascular treatment, not for a TPA.**

Q. He was not a candidate for endovascular treatment, was he?

[OBJECTION OMITTED]

A. I feel this is the first time I have read anything comprehensive about what a patient – what patients should receive endovascular treatment when. **So as far as reading this, I agree, he did not have an NIHSS score greater than 6, and therefore not an endovascular candidate. But I'm an ER doc, not a neurologist. I don't deal with endovascular therapy.**

Q. Well, your testimony was that had he received TPA and endovascular therapy, he more likely than not would have improved, correct?

A. Correct.

Q. But based on this, he's not a candidate for endovascular therapy, is he?

[Plaintiff's Counsel]: Object to the form. Do you want the article back to be able to answer that?

[Dr. Pope]: Sure.

[Plaintiff's Counsel]: Do you want to look at what he's asking you about?

[Dr. Pope]: Yeah, I suppose I do. It's going to be a big point, I might need to read some.

A. Please allow me to read.

Q. Please do.

A. If I can go ahead and revise my statement that I said earlier about the bibliography. I have not reviewed this article, because it's all about endovascular therapy rather than TPA.

Q. I think what you told me earlier, one of the things that's important for an expert to do is to review the relevant literature, correct?

A. Correct. **And I also said earlier that my role in the treatment of this patient is from the ER. From the ER care on, I don't -- I don't -- I'm not involved in the care.**[17]

As the foregoing testimony reveals, Dr. Pope does not have a reliable basis for his opinion that endovascular therapy would cause or contribute to Mr. Ruffino experiencing an improved neurologic outcome. The peer reviewed medical literature that he relied on to reach his opinion has been updated and modified. *See Kumho Tire Co.*, 526 U.S. at 149-50 (citing *Daubert*, 509 U.S. at 592-94) (internal quotations omitted). Likewise, general acceptance in the medical community often may be established by the publication of guidelines. Here, Dr. Pope's testimony is not in accordance with the guidelines that existed when the injury was alleged to have occurred. *See id.* Further, as indicated by the final response of Dr. Pope, he admits he cannot offer an opinion on endovascular treatment, much less whether it would have impacted the neurologic outcome of Mr. Ruffino.[18]

Additionally, Dr. Pope should not be permitted to testify about endovascular procedures pursuant to Rule 403 of the Federal Rules of Evidence. Dr. Pope's testimony indicates that his

---

[17] Dr. Pope's Depo., at 94:19 – 96:20 (**emphasis** added).
[18] Dr. Pope's Depo., at 96:17 –20; 97:2 – 9.

opinions on endovascular treatment are not supported by the peer review medical literature, and that opinions about causation related to the performance or lack thereof of an endovascular treatment are beyond his experience as an ER physician.  Any relevance that Dr. Pope would be able to offer on endovascular procedures lack probative value as they are unqualified and unreliable, and they would seriously misled the jury about generally accepted medical opinions on the issue.  Therefore, any such opinions should be excluded pursuant to Rule 403.  Similarly, it would lead to undue delay and a waste of time because he has already indicated he is not opining about that issue and cannot give reliable testimony about the issue.[19]

Finally, even if the Court could find that Dr. Pope was otherwise qualified to offer an opinion concerning endovascular treatment, Dr. Pope withdrew his opinions endovascular treatments (with or without the administration of tPA), which would indicate that any new opinion would be unreliable.  Specifically, Dr. Pope testified that:

> [Defense Counsel]Q. And so it's not -- you're not a neurologist, and **you're not an expert in the areas of what improvement he would have had had he gotten TPA** or –
>
> [Dr. Pope] A. **That's** –
>
> Q.-- **anything of that nature; is that fair**?
>
> A. -- **fair**.[20]

For these reasons, Dr. Archer respectfully asks this Court to bar any and all testimony from Dr. Pope regarding endovascular treatments and whether they would have caused or contributed to cause Mr. Ruffino to experience an improved neurologic outcome.

---

[19] Dr. Pope's Depo., at 46:16 - 22; 96:17 – 20; 97:2 – 97:7.

[20] Dr. Pope's Depo., at 97:2 – 7 (**emphasis** added).

## CONCLUSION:

For the foregoing reasons, Dr. Archer respectfully asks this Court for entry of an Order striking all testimony and excluding all testimony from Dr. Pope regarding whether the administration of tPA, alone or in conjunction with an endovascular procedure, or performance of an endovascular treatment, alone or in conjunction with the administration of tPA, would have caused or contributed to cause Mr. Ruffino to experience an improved neurologic outcome.

Respectfully submitted on this 14th day of December 2018.

**HALL BOOTH SMITH, P.C.**

By: /s/ Bryant C. Witt
   James E. Looper, Jr. BPR #025200
   Bryant C. Witt, BRP #018295
   Fifth Third Center
   424 Church St., Ste. 2950
   Nashville, TN 37219
   (615) 313-9911

   *Counsel for Defendant Dr. Clark Archer*

13

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document has been furnished by electronic means via the Court's electronic filing system, this 14th day of December 2018, to counsel of record as follows:

Afsoon Hagh, Esq.
CUMMINGS MANOOKIAN PLC
45 Music Square West Nashville, TN 37203
afsoon@cummingsmanookian.com

Brian Cummings, Esq.
Cummings Law
4235 Hillsboro Pike #300
Nashville TN 37215
T: 615.800.6822
F: 615.815.1876
brian@cummingsinjurylaw.com

Mark Hammervold, Esq.
Hammervold, PLC
315 Deaderick Street, Suite 1550
Nashville, TN 37238
mark@hammervoldlaw.com

*Counsel for Plaintiffs, John Ruffino and Martha Ruffino,*

HALL BOOTH SMITH

By: ___/s/ Bryant C. Witt

14