## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| JOHN RUFFINO and MARTHA RUFFINO, Husband and Wife, | ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | CASE No. 3:17-cv-00725 |
| v. | ) | Judge Campbell |
| | ) | Magistrate Judge Newbern |
| DR. CLARK ARCHER and HCA HEALTH SERVICES OF TENNESSEE, INC. d/b/a STONECREST MEDICAL CENTER | ) ) ) ) | JURY DEMANDED |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DR. ARCHER'S MOTION IN *LIMINE* NO. 2 TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT, DR. RAJAT DHAR

COMES NOW Defendant, Dr. Clark Archer (hereinafter "Dr. Archer") and respectfully moves the Court in *limine* to enter an Order excluding any testimony from Plaintiffs' expert, Rajat Dhar, M.D., ("Dr. Dhar") on the grounds that he is not competent to opine as to certain specific issues and that his opinions on causation and other issues in this case are so unreliable as to require the Court strike his prior testimony and exclude any testimony at trial.

**I.      Dr. Dhar is not competent to offer opinions concerning the standard of care applicable to an emergency room physician.**

Dr. Dhar, a neurologist who has not practiced as an emergency room physician ("ER physician") in the past year in a contiguous state to Tennessee,[1] in the emergency room, or as a consultant for an ER physician in the past calendar year in a contiguous states, does not meet the locality rule in Tenn. Code Ann. § 29-26-115(b), and therefore, he is not competent to offer an

---

[1] *See* Deposition Transcript of Rajat Dhar, M.D. ("Dr. Dhar Depo."), at 39:18 – 40:5. A complete copy of this transcript will be filed pursuant to a separate Notice of Filing.

opinion about the standard of care applicable to Dr. Archer, an emergency room physician. In federal diversity actions, state law generally governs substantive issues, while federal law is to govern procedural issues. *Legg v. Chopra*, 286 F.3d 286, 289 (6th Cir. 2002). Accordingly, the Federal Rules of Evidence, as procedural rules, govern the admissibility of testimony, including competence of the witness. *Legg*, 286 F.3d at 289-90. Yet, in civil actions, the Federal Rules of Evidence accommodate state laws regarding witness competency through Rule 601, which states, in relevant part, "in a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision." *Legg*, 286 F.3d at 290; F.R.E. 601. Undergirding Rule 601 is the recognition that [s]tate witness competency rules are often intimately intertwined with a state substantive rule," which is particularly true in a health care liability action because absent applicable medical expert testimony regarding the standard of care, a plaintiff's claim will fail. *Legg*, 286 F.3d at 290. Therefore, through application of Rule 601 of the Federal Rules of Evidence, Tennessee's witness competency rules govern the admissibility of medical expert testimony in a health care liability action.

As to a medical expert's competence, in relevant part, Tenn. Code Ann. § 29-26-115 provides:

> (a) In a health care liability action, the claimant shall have the burden of proving by evidence as provided by subsection (b):
>
> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
>
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

2

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

(b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred.

The Tennessee Supreme Court has held that subsection (b) determines competence of the witness, whereas subsection (a) establishes the elements that must be proven and contains Tennessee's locality rule. *Shipley v. Williams*, 350 S.W.3d 527, 550 (Tenn. 2011). The Tennessee Supreme Court has also offered guidance on the elements necessary to establish an expert witness' competence. As to subsection (b), the Tennessee Supreme Court held:

> The witness must be (1) "licensed to practice in the state or a contiguous bordering state," (2) "a profession or specialty which would make the person's expert testimony relevant to the issues in the case," and (3) must have "had practiced this profession or specialty in one . . . of these states during the year preceding the date that the alleged injury or wrongful act occurred." Therefore, the only grounds for disqualifying a medical expert as incompetent to testify are (1) that the witness was not licensed to practice in Tennessee, Georgia, Alabama, Mississippi, Arkansas, Missouri, Kentucky, North Carolina, or Virginia; (2) that the witness was not licensed to practice a profession or specialty that would make the person's expert testimony relevant to the issues in the case; or (3) that the witness did not practice this profession in one of these states during the year preceding the date of the alleged injury or wrongful act.

*Shipley*, 350 S.W.3d at 550. "A court's inquiry into the competency of a proffered witness requires an examination of the issues presented in the case to determine whether the expert's

3

profession or specialty makes the expert's testimony relevant to those issues." *Mitchell v. Jackson Clinic, P.A.*, 420 S.W.3d 1, 8 (Tenn. Ct. App. 2013).

More specifically, the *Mitchell v. Jackson Clinic*[2] case was concerned with whether the ER physician proffered by the plaintiff was competent to offer testimony about the standard of care applicable to two (2) pediatricians as it concerned "providing care to neonates with jaundice and hyperbilirubinemia." 420 S.W.3d at 8. The proffered ER physician provided an affidavit that indicated he had completed a pediatric residency from 1990 – 1994 in Tennessee, was board certified in internal medicine, that he practiced in the specialties of pediatric, toxicology, and emergency medicine, and that he was familiar with the recognized standard of acceptable professional practice of medical doctors practicing in a specialty that treats newborns with jaundice, Family Practice, and Pediatrics. *Id.* at 8-9. However, the Court noted, among other things, that the proffered expert's CV failed to indicate any professional experience in the field of pediatrics, that the proffered expert testified to failing the pediatric board exam three (3) times, and that he did not see any patients in a pediatric practice setting since his pediatric residency (more specifically, that he did not see newborns in the hospital in the same practice setting as the defendants), and that he was not part of the department of pediatrics of any hospital. *Id.* at 8-11. The *Mitchell* court found that although the ER physician has some prior experience in pediatrics (during his residency) and had seen numerous cases of jaundice, this exposure to pediatrics was not sufficient because he had not practiced in pediatrics in the year proceeding the alleged negligent acts, and thus, he was not competent to offer an opinion as to the standard of care. *Id.* at 11 ("[T]he purported expert must . . . have practiced in an area that would allow him or her to testify expertly concerning the specific issues raised in the lawsuit. . .

---

[2] *Mitchell v. Jackson Clinic, P.A.*, 420 S.W.3d 1, 8 (Tenn. Ct. App. 2013).

4

. there is simply no evidence to support a finding that [proffered expert] has current or recent expertise in the field . . . or the standard of care under the American Academy of Pediatrics' Guidelines for jaundice such that his testimony would aid the trier of fact in a determination of whether [defendant doctors] deviated from the applicable standard of care.").

In the present case, Dr. Dhar, as a neurologist in the neuro intensive care unit ("neuro ICU") is not competent to opine as to the specific issue of the standard of care applicable an emergency room ("ER") physician such as Dr. Archer.  More specifically, Dr. Dhar, as a neurologist, is not licensed to practice a profession or specialty that would make his testimony relevant to the issue of the standard of care applicable to an emergency room physician, and even if this Court finds that neurologists in general could offer testimony relevant to the issue of the standard of care applicable to an emergency room physician, Dr. Dhar has not practiced the portions of his specialty relevant to that issue during the year proceeding the alleged injury.

During Dr. Dhar's testimony, he conceded that "background, training, and experience of a neurologist is different from the background, training, and experience of an ER physician,"[3] that he is not board certified in emergency medicine,[4] that he has not completed a residency in emergency medicine,[5] and that he has not worked a shift as an ER physician since residency in 2005.[6]  As such, Dr. Dhar lacks the competency to opine as to the issues of the standard of care applicable to ER physician.  Much like the ER physician in *Mitchell*, Dr. Dhar lacks board certification in the specialty he is offering an opinion on the standard of care for, and he has not worked in the emergency room since 2005, at which point he practiced as a resident in Canada. *See Mitchell*, 420 S.W.3d at 8-11.  Although a neurologist may be competent to offer opinions

---

[3] Dr. Dhar Depo., at 206:17 - 21.

[4] *Id.* at 206:22 – 24.

[5] *Id.* at 206:25 – 207:2

[6] *Id.* at 207:3 – 19

relevant to other issues in this case,[7] a neurologist must still have practiced the subspecialties of neurology that would be relevant to the specific issue of the standard of care applicable to an ER physician in order to be competent to offer an opinion as to that issue. As pointed out in Dr. Dhar's deposition, the neurology department where he practices in Missouri is comprised of "stroke neurologists" and "critical care neurologist," and Dr. Dhar practices in the latter group.[8] More importantly, Dr. Dhar testified that he has not served on the "stroke call schedule," which is a schedule that provides for neurologist to be available for the ER physicians to call for an official consultation, in over ten (10) years.[9] Specifically, when questioned again, Dr. Dhar testified:

> [Defense Counsel] Q. And I believe I heard you testify earlier that you had at some point spent some time as an on-call neurologist for the ER here at Barnes. Is that right?
>
> [Dr. Dhar] A. I mean, I -- not for many years. I mean, when I came, I did some consultations in neurology and was on the call schedule, but that was minimal.
>
> Q. And I believe you said that was in excess of 10 years ago?
>
> A. Yeah, probably around 10 years.
>
> Q. So you believe it's been about 10 years since you've even provided any consult services in an ER; correct?
>
> A. I've not been on the official consult schedule, but we do go to the ER for patients coming to the ICU fairly frequently, but not in the official consult role that was asked.[10]

Although Dr. Dhar purports to train ER physicians, he has only trained residents who have not taken their emergency medicine board exams,[11]and their training is limited to transitions from

---

[7] As briefed in depth in the next section, Dr. Dhar's opinions as to causation do not pass the reliability requirements of Fed. R. Civ. P. 702 and *Daubert* and are more appropriately excluded on that basis.

[8] Dr. Dhar Depo. 30:22 – 31:17.

[9] Dr. Dhar Depo., at 41:23 – 25.

[10] Dr. Dhar Depo., at 207:10 – 208:1.

the ER to the neuro ICU (a circumstance which has no bearing on any issues in the present case), and none of Dr. Dhar's interactions with residents can impart to him what the standard of care is or is not in the ER for a board certified ER physician. Dr. Dhar's testimony has established that he practices a different specialty than Dr. Archer and that Dr. Dhar has not performed any duties of his specialty (neurology) that would intersect with the practice of emergency medicine for over (10) ten years. Thus, Dr. Dhar has not "practiced the relevant 'profession or specialty in . . . the year preceding the date of the alleged injury or wrongful act'" because he has not practiced any aspect of neurology in the calendar year proceeding February 17, 2016, that would assist the trier of fact in understanding the standard of care for an ER physician. *See Mitchell*, 420 S.W.3d at 11 (quoting *Shipley*, 350 S.W.3d at 550).

For these reasons, Dr. Archer respectfully asks that this Court enter an Order striking all of Dr. Dhar's testimony concerning the standard of care applicable to an ER physician and excluding the same from the trial of this matter.

### II. Dr. Dhar's testimony is unreliable and must be excluded pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert*.

In addition to Dr. Dhar's lack of competence to testify regarding the standard of care applicable to an ER physician, Dr. Dhar is not qualified pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) to testify: (1) about the causation prong of Tenn. Code Ann. § 29-26-115(a), (2) in accordance with Tennessee's locality rule, and in the alternative, to the extent not excluded on competency grounds, (3) the standard of care applicable to an emergency room physician. Therefore, his testimony is too unreliable to permit it to be placed before the jury.

---

[11] Dr. Dhar Depo., at 207:20 - 208:12

7

With respect to expert testimony, pursuant to Rule 702 of the Federal Rules of Evidence, federal courts are to serve a gatekeeping function in which they ensure that any ensure that "any and all scientific testimony . . . is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589). The requirement that the expert's testimony be reliable is to safeguard against the wide testimonial latitude expert witnesses enjoy in comparison to other witnesses. *See Kumho Tire Co.*, 526 U.S. at 148.

Further, the Sixth Circuit has explained that a *Daubert* challenge to a medical expert in a health care liability action is separate from the inquiry on whether the medical expert is competent, and that this inquiry must follow a determination of an expert's competence. *Legg*, 286 F.3d at 291. As opposed to competency, a *Daubert* challenge (Rule 702) is a challenge to the expert's qualification since it is "directed at the science and methodology behind the witness's testimony," and insuring that "expert testimony is based on credible and reliable science" – *i.e.*, "the expert can reach the conclusion stated through proper scientific methodology." *Legg*, 286 F.3d at 291 (citations omitted). *Daubert* and its progeny *Kumho Tire Co.*, have distilled the relevant non-exclusive factors for a court to consider when determining whether an expert is qualified to give testimony that will help the trier of fact as:

> [1] Whether a theory or technique . . . can be (and has been) tested;
> [2] Whether it has been subjected to peer review and publication;
> [3] Whether, in respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation; and
> [4] Whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Kumho Tire Co.*, 526 U.S. at 149-50 (citing *Daubert*, 509 U.S. at 592-94) (internal quotations omitted). In response to *Daubert* and *Kumho Tire Co.*, Rule 702 of the Federal Rules of Evidence was amended in 2000 to incorporate the principles espoused in those cases. Fed. R.

8

Evid. 702 advisory committee's note. The amended Rule 702 of the Federal Rules of Evidence

states in full:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to
> determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods;
> and
> (d) the expert has reliably applied the principles and methods to the
> facts of the case.

The Sixth Circuit has summarized the rule to have three (3) requirements "[f]irst, the witness

must be qualified by 'knowledge, skill, experience, training, or education.' Second, the testimony

must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to

determine a fact in issue.' Third, the testimony must be reliable." *U.S. ex rel. Tennessee Valley*

*Auth. v. 1.72 Acres of Land In Tennessee*, 821 F.3d 742, 749 (6th Cir. 2016). Additionally, the

advisory note to Rule 702 indicates other factors are relevant to the inquiry of qualification such

as:

> (1) Whether experts are "proposing to testify about matters
> growing naturally and directly out of research they have conducted
> independent of the litigation, or whether they have developed their
> opinions expressly for purposes of testifying." *Daubert v. Merrell*
> *Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995).
>
> (2) Whether the expert has unjustifiably extrapolated from an
> accepted premise to an unfounded conclusion. *See General Elec.*
> *Co. v. Joiner*, 522 U.S. 136, 146 (1997) (noting that in some cases
> a trial court "may conclude that there is simply too great an
> analytical gap between the data and the opinion proffered").
>
> (3) Whether the expert has adequately accounted for obvious
> alternative explanations. *See Claar v. Burlington N.R.R.*, 29 F.3d
> 499 (9th Cir. 1994) (testimony excluded where the expert failed to
> consider other obvious causes for the plaintiff's condition).

*Compare Ambrosini v. Labarraque*, 101 F.3d 129 (D.C. Cir. 1996) (the possibility of some uneliminated causes presents a question of weight, so long as the most obvious causes have been considered and reasonably ruled out by the expert).

(4) Whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting." *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997). *See Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167, 1176 (1999) (*Daubert* requires the trial court to assure itself that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

(5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give. *See Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167, 1175 (1999) (Daubert's general acceptance factor does not "help show that an expert's testimony is reliable where the discipline itself lacks reliability, as for example, do theories grounded in any so-called generally accepted principles of astrology or necromancy."), *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269 (5th Cir. 1998) (en banc) (clinical doctor was properly precluded from testifying to the toxicological cause of the plaintiff's respiratory problem, where the opinion was not sufficiently grounded in scientific methodology); *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir. 1988) (rejecting testimony based on "clinical ecology" as unfounded and unreliable).

Fed. R. Evid. 702 advisory committee note. Further, the admissibility of all expert testimony is subject to Rule 104(a) of the Federal Rules of Evidence, and the proponent, in this case the Plaintiffs, has the burden of establishing the pertinent admissibility requirements are met aby a preponderance of the evidence. Fed. R. Evid. 702 advisory committee notes (citing *Bourjaily v. United States*, 483 U.S. 171 (1987)). In the context of a *Daubert* challenge, the Sixth Circuit has further explained that a physician may testify regarding matters within his or her own

professional experience; however, "when the doctor strays from such professional knowledge, his or her testimony becomes less reliable, and more likely to be excluded under Rule 702."[12]

Returning to the instant case, all of Dr. Dhar's opinions in this case lack the reliability required by Rule 702 of the Federal Rules of Evidence to permit them to be placed before a jury. Dr. Dhar's testimony reveals that he has not vetted any of his opinions in this case with another physician,[13] that he has not referred any published guidelines in creating his opinions,[14] that he has not formed his opinions in this case based on any published articles,[15] and that he has not looked at the 2015 American Heart Association/American Stroke Association focused updates of the 2013 guidelines for the early management of patients with acute ischemic stroke regarding endovascular treatment.[16]  Therefore, his opinions do not appear to be consistent with peer reviewed or published literature nor does it appear that Dr. Dhar has undertaken any efforts to determine whether his opinions enjoy "general acceptance within a relevant scientific community," as he has not consulted others in the medical community or reexaminedpeer reviewed literature to ensure his opinions are supported.  Likewise, Dr. Dhar has not performed any research pertinent to the opinions he has formed in this case.[17]  Therefore, he cannot claim that his opinions or theories can be or have been tested.  Rather, his opinions have been developed expressly for purposes of testifying as they do not grow out of his research that was conducted independently of this case. Simply put, Dr. Dhar's opinions are unsupported by anything that would indicate they are reliable and appear to be conjured out of thin air, and therefore, the Court should exclude his testimony.

---

[12] *Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 428 (6th Cir. 2009) (citations omitted).
[13] Dr. Dhar's Depo., at 34:5-9.
[14] *Id.* at 34:13 – 15.
[15] *Id.* at 34:10 - 18; *see also Id.* at 58:25 – 60:6
[16] *Id.* at 35:25 – 36:22.
[17] *Id.* at 23:14 - 24:9

**A.** **Dr. Dhar is not qualified to opine regarding the causation prong of Tenn. Code Ann. § 29-26-115(a) as it relates to the administration of tPA alone.**

More specifically, as Dr. Dhar's opinions concern causation in this case, Dr. Dhar disclosed in his Rule 26 report[18] that:

> [S]hould Mr. Ruffino have received TPA **and/or** endovascular thrombectomy for his acute stroke, he would have, more likely than not, experienced an improved neurological outcome and recovery from this stroke. He had a clear vessel occlusion and was within the time window at which both TPA and thrombectomy have been shown to significantly improve outcomes after acute stroke, **as has been published in peer-reviewed literature in the past few years.** This type of treatment (within 4.5 hours of the onset of this type of stroke for TPA and 6 hours for thrombectomy) is effective because it provides reperfusion of blood flow to the ischemic brain and minimizes that amount of brain tissue that dies. This directly contributes to improved neurological recovery.[19]

During Dr. Dhar's deposition he articulated his causation opinion as to the intravenous administration of tPA alone as follows:

> [Defense counsel] Q. . . . Using that dosing [standard dosing quantity], is it your opinion that that dose of tPA in this case would have revascularized Mr. Ruffino's middle cerebral artery territory?
>
> [Dr. Dhar] A. My opinion is that more likely than not, it would have facilitated the revascularization, yes.
>
> Q. Alone?· tPA alone? That -- you're answering a question I didn't ask. It's real simple here. The question is, would tPA alone in Mr. Ruffino have revascularized his left middle cerebral artery? Yes or no?
>
> A. Well, nothing in medicine is yes or no so I can't answer that question definitively because we don't know the answer. I can only give my – the probabilities that more likely than not it would have.

---

[18] Dr. Dhar testified that counsel assisted him with the drafting of his report. *See* Dr. Dhar Depo., at 43:22 – 46:19.

[19] Dr. Rajat Dhar's Rule 26 Report (Dr. Dhar's Report"), at p. 3. ¶ 1 (**emphasis** added). A complete copy of this transcript will be filed pursuant to a separate Notice of Filing.

Q. Okay. You agree with me that more likely than not then means that something has to be more than 50 percent probable; correct?

A. Yes.

Q. And are you telling -- are you testifying under oath that administration of tPA alone in this case would have more probably than not revascularized Mr. Ruffino's left middle cerebral artery distribution?

A. To be specific, yes, I'm saying that it would have more likely than not improved the perfusion beyond the blockage.

Q. That's not my question. Don't answer questions I haven't asked. The question focuses on revascularization.

A. Could you clarify what you mean by revascularization?

Q. Yes. Would it have lysed whatever blockage existed such that the flow, the perfusion of blood, would have revascularized the area served by his left MCA?

A. Yes.[20]

* * *

Q. . . . . If at any time between 9:48 on the morning of February 17th, 2016, and 2:00, is it the opinion of Dr. Dhar that tPA alone, if given intravenously, would have revascularized the patient's left MCA territory more probably than not?

A. Yes.[21]

However, when Dr. Dhar was questioned about the methodology and science supporting the above opinion, he was unable to cite to any studies in support of his opinion[22] despite his report indicating that his opinions were supported by "peer-reviewed literature published in the past few years."[23] In fact, Dr. Dhar testified in the following manner:

---

[20] Dr. Dhar's Depo., at 53:5 – 54:15.
[21] *Id.* at 56:3 – 9.
[22] *Id.* at 56:18 – 57:16.
[23] Dr. Dhar's Report, p 2, ¶ 1.

13

Q. All right. I looked through your materials quickly as we began the deposition. I did not see any published guidelines included in the materials. Have you referred to any published guidelines as you formed your opinions in this case?

A. Not for this case, no.

Q. Have you formed your opinion in this case based on any published article?

A. No.[24]

The above exchange indicates that there is no scientific support for his opinions. His lack of a reliable basis is not limited to the previous excerpt. He was later questioned about what specific articles or guidelines that supported his opinion about the administration of tPA alone would have revascularized the patient's left MCA territory more probably than not, and he was unable to do so.[25] Dr. Dhar was given seven (7) days to locate and provide the names of the articles, but to date, he has not provided any.[26] Further, when confronted with the published, peer reviewed medical literature, Dr. Dhar's testimony was simply that his opinions are "**about this case, not what the studies showed**."[27] Dr. Dhar conceded that there were no published, peer reviewed literature that supported his position. Specifically, he testified:

Q. Isn't it correct that every published study that has compared tPA alone with embolectomy has confirmed that tPA alone dealing with large vessel occlusion leads to recanalization in less than 50 percent of the patients? Isn't that true?

A. Yes, but that doesn't apply to this case.[28]

This exchange would indicate that Dr. Dhar has created an opinion solely for the purpose of litigation. When pressed for further support for his position, which was that Mr. Ruffino suffered

---

[24] Dr. Dhar's Depo., at 34:10 - 18.
[25] *Id.* at 57:3 – 12.
[26] *Id.* at 57:13 – 16.
[27] *Id.* at 60:1 – 6.
[28] *Id.* at 60:9 – 15.

14

from a distal occlusion at the end of the M1 or M2 blood vessel,[29] Dr. Dhar cited generally to "scientific studies" that tPA's efficacy on clots was greater with more distal occlusions and was much smaller with more proximal and larger clots.[30] When confronted with publications that stated that for individuals with an occlusion in the M1 or M2 arteries and who received administration of tPA alone, eighty percent (80%) of those individuals did not get recanalization,[31] Dr. Dhar again indicated he would furnish studies to support his position in seven (7) days, but no studies have been provided to date.[32] Further, Dr. Dhar conceded in his testimony that Mr. Ruffino had a large vessel occlusion,[33] which by his own testimony would indicate that tPA was not as effective and was less than fifty percent (50%) effective at recanalization or revascularization. Likewise, Dr. Dhar agreed that only about thirty 30% or people will be revascularized or recanalized by tPA alone.[34]

When taken together, Dr. Dhar's testimony that administration of intravenous tPA alone would have caused Mr. Ruffino to have experienced a better neurologic outcome is simply unsupported by the published, peer reviewed literature on the topic, which indicates that the administration of tPA alone would not, to a reasonable degree of medical certainty (more likely than not), have improved Mr. Ruffino's neurologic outcome. Dr. Dhal failed to produce the promised literature supposedly supporting his position. Additionally, Dr. Dhal failed to articulate a reliable, scientific methodology employed in formulating this opinion. Indeed, the theory he seeks to testify about does not enjoy widespread acceptance in the medical community, which is

---

[29] *Id.* at 61:5 – 15; 68:18 – 69:6; 73:4 – 11.
[30] Dr. Dhar's Depo. at 66:1 – 4.
[31] *Id.* at 62:23 – 63:8.
[32] *Id.* at 63:9 – 13.
[33] *Id.* at 66:1 – 4.
[34] *Id.* at 86:20 - 25.

evidenced as well by the lack of publications and the lack of vetting by other neurologists.[35] The theory he seeks to opine about (*i.e.,* that intravenous administration of tPA alone would have resulted in an improved neurologic outcome through the recanalization or revascularization of the occluded artery) has been tested, as documented in the peer reviewed, medical literature, and the tests on the theory have revealed that recanalization or revascularization through the use of tPA alone would not to a reasonable degree of medical certainty (*i.e.*, greater than 50%) occur. This is directly at odds with Dr. Dhar's opinion and testimony in this case. In sum, Dr. Dhar's opinion about causation through the use of tPA alone in unreliable as it lacks a basis grounded in science, and therefore, Dr. Dhar's testimony regarding causation that the administration of tPA alone would lead to an improved neurologic outcome in Mr. Ruffino must be excluded.

> **B.** **Dr. Dhar is not qualified to offer a causation opinion regarding the whether a thrombectomy or embolectomy,[36] alone or in addition to the administration of intravenous tPA, would have improved Mr. Ruffino's neurologic outcome.**

Further, Dr. Dhar is unqualified to opine as to whether an endovascular thrombectomy, alone or in conjunction with the administration of tPA, would have, to a reasonable degree of medical certainty, improved Mr. Ruffino's neurologic outcome. First, Dr. Dhar has not performed an embolectomy.[37] Dr. Dhar is not and has not performed any research in the past related to "endovascular instrumentation to break up, remove, or retrieve a clot or thrombus."[38] He has never held privileges to perform an endovascular embolectomy.[39] Therefore, Dr. Dhar has not performed any research on this topic nor has he tested any of his theories. Dr. Dhar cannot show that his theories enjoy any general acceptance in the neurologic community since he

---

[35] Dr. Dhar's Depo., at 34:5 – 9 (testifying that he has not vetted his opinions with any other physician.).

[36] Thrombectomy and embolectomy are used interchangeably as Dr. Dhar indicated that "thrombus" and "embolus" may be used interchangeably. *See* Dr. Dhar's Depo., at 74:1 – 21.

[37] Dr. Dhar's Depo., at 24:10-20; 25:2 – 20.

[38] *Id.* at 24:5-9.

[39] *Id.* at 40:19 – 22.

16

has not discussed his opinions with any other physicians and has not cited to any peer reviewed publications that support his position. When Dr. Dhar was questioned about trials and peer, review medical literature was unable to recall the details of the differences of all the trials.[40] His opinions are therefore founded on untested theories and lack any real basis for reliability.[41]

Further indicating a lack of reliability on endovascular treatment, Dr. Dhar is unaware of the minimum NIHSS (National Institute of Health Stroke Scale) score required at Centennial Medical Center before a thrombectomy or embolectomy can be performed,[42] and even if he was, it would be little use to him since he conceded he does not even know what the endovascular protocol was at Washington Hospital, which is where he practices.[43] Absent a basis for comparison, his opinions on whether a embolectomy or thrombectomy would have, to a reasonable degree of medical certainty, caused an improved neurologic outcome in Mr. Ruffino are unreliable and speculative.

### C     Dr. Dhar is not qualified to opine regarding the standard of care applicable to an emergency room physician.

Similar to the argument on Dr. Dhar's competence to testify to the standard of care applicable to an emergency room physician, in the alternative, he is not qualified to offer this opinion. For Dr. Dhar's testimony on the standard of care to assist the jury, it must be reliable; however, his testimony is not reliable because his testimony reveals his lack of familiarity with the applicable standard. Dr. Dhar admitted that the "background, training, and experience of a neurologist is different from the background, training, and experience of an ER physician,"[44] that

---

[40] *Id.* at 189:16- 23.
[41] *See id.* at 137:7 – 11.
[42] Dr. Dhar's Depo., at 92:2-10
[43] *Id.* at 91:25 – 92:3.
[44] *Id.* at 206:17 - 21.

17

he is not board certified in emergency medicine,[45] that he has not completed a residency in emergency medicine,[46] and that he has not worked a shift as an ER physician since residency in 2005.[47] He has not discussed his opinions with any ER physicians.[48] Further, Dr. Dhar's testimony was that he has not served on the "stroke call schedule" in over ten (10) years, which means he has not performed an official ER consult in that time.[49] Thus, Dr. Dhar lacks a reliable basis on which to opine about the standard of care applicable to an ER physician during the interaction between a with an ER physician and neurologist for an official consult for stroke care as he has not performed an official consult for an ER physician in over 10 years. Likewise, he lacks a reliable basis to opine about standard of care applicable to an ER physician for ordering emergent imaging for a suspected stroke in the ER since he has not ordered one as an ER physician since his residency in 2005, which was in Canada.[50] Dr. Dhar simply has no professional experience on which to draw that would permit him to testify about the standard of care applicable to an ER physician. *See Gass*, 558 F.3d at 428 ("When, however, the doctor strays from such professional knowledge, his or her testimony becomes less reliable, and more likely to be excluded under Rule 702.").

Additionally, Dr. Dhar does not train ER physicians, and the residents he does train are not board certified in emergency medicine and their training is limited to the interactions between a ER physician and neurologist as it relates to transfer of a patient into the neuro ICU,[51]

---

[45] *Id.* at 206:22 – 24.

[46] *Id.* at 206:25 – 207:2

[47] Dr. Dhar's Depo., at 207:3 – 19

[48] *Id.* at 34:5- 9.

[49] *Id.* at 41:23 – 25; 207:10 – 208:1.

[50] *Id.* at 39:14 – 20; 207:3 – 19; 211:6 – 17.

[51] Dr. Dhar Depo., at 207:20 - 208:12.

18

a department StoneCrest does not have.[52]  Therefore, Dr. Dhar lacks any measure of reliability to be able to testify about the standard of care applicable to a specialty he does not practice or for a specialty that his own neurology practice does not intersect.  Therefore, Dr. Dhar's testimony about the standard of care applicable to an ER physician should be struck and excluded under Rule 702 of the Federal Rules of Evidence.

> **1. Dr. Dhar has not disclosed an opinion about the standard of care applicable to an ER physician in his Rule 26 Report and cannot be allowed to testify about the applicable standard of care to an ER physician or a deviation from it before the jury.**

Even if the Court were to find that Dr. Dhar's testimony demonstrated the required reliability to permit his to testify about the standard of care applicable to an ER physician, Dr. Dhar's Rule 26 Expert Report never disclosed such an opinion. Pursuant to Rule 26 of the Federal Rule of Civil Procedure, a party is to provide an expert report for each of its experts that contains "a complete statement of all opinions the witness will express and the basis and reasons for them."  Parties also have a duty to supplement their expert disclosures pursuant to Rule 26(e), and when they fail to do so, Rule 37(c) provides that "the party is not allowed to use that information or witness to supply evidence. . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 26; 37. "[A] 'report must be complete such that opposing counsel is not forced to depose an expert in order to avoid an ambush at trial; and moreover the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources.' " *R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) (quoting *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 n.6 (7th Cir. 1998)).  Additionally, compliance with Rule 26(a) is required and a failure to comply with it mandates that district court punish a party for discovery violations in connection with

---

[52] *Id.* at 26:12 – 14.

Rule 26 absent harmless or substantially justified violations. *U.S. ex rel. Tennessee Valley Auth.*, 821 F.3d at 752; *see also* Fed. R. Civ. P. 37(c)(1); Local Rule 39.01(5)(C).[53] To determine whether there is substantial justification for failing to supplement or provide the requisite information, a court is to examine the following factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.[54]

As previously noted, Dr. Dhar's Rule 26 Report did not include any opinion about the standard of care applicable to an ER physician, nor did it include any opinion about a deviation from the applicable standard of care.[55] Further, Dr. Dhar admitted that his report did not contain any mention of the standard of care. Specifically, he testified:

> Q. Will you find any reference in the report you prepared -- well, let me take that back. Do you find any reference in the report you signed that says -- that uses the phrase "standard of care" or "acceptable standard of professional practice" -- either one of those phrases?
>
> A. I don't believe I see those words or terminology in this report, no.
>
> Q. Is there another report that I should be looking at?
>
> A. This is the only report I created in this case.[56]

* * *

---

[53] *See* Local Rule 39.01

> Expert witness disclosure statements may not be supplemented after the applicable disclosure deadline, absent leave of Court. Expert witnesses may not testify beyond the scope of their expert witness disclosure statement. The Court may exclude the testimony of an expert witness, or order other sanctions provided by law, for violation of expert witness disclosure requirements or deadlines.

[54] *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015).

[55] *See* Dr. Dhar's Report.

[56] Dr. Dhar's Depo., at 43:10 – 21.

Q. Are you telling me then in this case that you are not going to express any opinions about whether any of the health care providers complied or did not comply with accepted standards of professional practice or the standard of care?

A. No, I believe I'm giving my opinions on that I may not have used that terminology, I guess. I made my report more from the medical perspective, and then if there was input in technology, I guess that's the feedback that I got from Mr. Cummings and then made sure that things were expressed in legal terms. I'm not still an expert in how to express those things -- my medical opinions in a legal way.

Q. Well, you've conceded that your report, which had been vetted by Mr. Cummings and additions had been made by the 30th of January, does not use the phrase "standard of care" or "standard of acceptable professional practice" a single time; right?

A. I don't believe I used those words, no.

Q. But you're telling me today that you do intend to express some opinions about standards of care regarding somebody; right?

A. Yes.

Q. Who?

A. Dr. Archer.

Q. Dr. Archer the ER physician?

A. That's correct.[57]

* * *

Q. So it's clear to me from your report that you're expressing an opinion regarding the cause of John Ruffino's current deficits and that they would have been improved -- in your opinion, more likely than not -- would have been improved had tPA and/or an endovascular process taken place?

A. Yes.

---

[57] *Id.* at 48:19 – 49:20.

Q. Correct?

A. Yes.

Q. But it seems to me in your deposition you're going beyond that causation opinion and you're offering opinions regarding the standard of care that applies to Dr. Archer, a board-certified ER physician, in this case. Am I misunderstanding that?· Because I don't see anywhere where it talks about standard of care in your report.

A. Yeah, I guess I have a -- maybe don't have a full understanding of the difference between not doing something -- I guess that's causation versus standard of care. So there was things that identified that were not done that led to that poor outcome.

Q. Right.

A. I maybe misunderstood that was a standard of care issue, but maybe I misunderstood that.

Q. Right. So I thought maybe that was the case.

A. Right.[58]

* * *

Q. Are you offering any opinions regarding the standard of care or the acceptable medical professional practice that applies to Dr. Archer, a board-certified ER physician, or not?

A. So I guess the two that maybe weren't spelled out very clearly in my report were to perform an emergent imaging study of an acute stroke patient and to communicate the time of onset information to Dr. Chitturi. Those would be the two aspects that I felt were below the standard of care and led then later to that poorer outcome as well, so I probably didn't state it clearly in that way.

Q. Anything else that you believe violates the standard of care that Dr. Archer did?

A. No, that's it.[59]

---

[58] Dr. Dhar Depo., at 209:21 – 210:23.
[59] Dr. Dhar Depo., at 211:6 – 20.

22

Dr. Dhar's testimony clearly establishes that his report did not contain opinions on the standard of care, much less what he perceived to be deviations from the standard of care for an ER physician. Turning to the factors to determine whether the omission was substantially justified or is harmless, first, the surprise occurred at Dr. Dhar's deposition. It was recorded and may be used against Dr. Archer in the upcoming trial. Second, this surprise cannot be cured at this point in time. Dr. Dhar testified that Plaintiffs' counsel assisted him with preparing and/or drafting his Rule 26 Report. If he had any misunderstanding, there was ample time for Plaintiffs' counsel to correct his terminology. Third, permitting Dr. Dhar to testify about the standard of care will require additional testimony time. Fourth, Plaintiffs have disclosed an board certified emergency room physician to testify about the applicable standard of care for an ER physician so Dr. Dhar's testimony on this topic is not vital to Plaintiffs' case and would be cumulative. As to the final factor, although this is for Plaintiffs to explain, it should be noted that if Dr. Dhar did not understand what he was asked to give an opinion about of the terminology to use, Plaintiffs' counsel could have clarified the issue before submitting the Rule 26 report since there was discussion between counsel and Dr. Dhar.

Therefore, Plaintiffs violated Rule 26(a) and (e) with respect to Dr. Dhar's report, and pursuant to Rule 37(c)(1), Dr. Dhar's testimony about the applicable standard of care for an ER physician and any deviation from that standard should be struck and excluded.

### D. Tennessee's locality rule requires that Dr. Dhar's testimony be struck and excluded.

To challenge whether the medical expert's testimony is admissible pursuant to the "locality rule," codified in subsection Tenn. Code Ann. 29-26-115(a)(1), a challenging party

23

move to exclude the testimony pursuant to Rules 702 and 703. *See Legg*, 286 F.3d at 291;

*Shipley*, 350 S.W.3d at 552-53. The Tennessee Supreme Court in *Shipley* held that:

> [A] medical expert must demonstrate a modicum of familiarity with the medical community in which the defendant practices or a similar community. Generally, an expert's testimony that he or she has reviewed and is familiar with pertinent statistical information such as community size, hospital size, the number and type of medical facilities in the community, and medical services or specialized practices available in the area; has discussed with other medical providers in the pertinent community or a neighboring one regarding the applicable standard of care relevant to the issues presented; or has visited the community or hospital where the defendant practices, will be sufficient to establish the expert's testimony as relevant and probative to "substantially assist the trier of fact to understand the evidence or to determine a fact in issue" under Tennessee Rule of Evidence 702 in a medical malpractice case and to demonstrate that the facts on which the proffered expert relies are trustworthy pursuant to Tennessee Rule of Evidence 703.
>
> * * *
>
> A proffered expert may educate himself or herself on the characteristics of a medical community in order to provide competent testimony in a variety of ways, including but not limited to reading reference materials on pertinent statistical information such as community and/or hospital size and the number and type of medical facilities in the area, conversing with other medical providers in the pertinent community or a neighboring or similar one, visiting the community or hospital where the defendant practices, or other means[.]

*Shipley*, 350 S.W.3d at 552-53.

As at least one federal district court has explained, *Shipley* created two (2) approaches by which the medical expert may demonstrate that they meet Tennessee's locality rule: (1) demonstrating familiarity with the medical community itself (the "familiarity approach") or (2) demonstrating familiarity with a medical community **and** that this medical community is similar to the one connected to the case (the "similarity approach"). *McDaniel v. UT Med. Grp., Inc.*,

24

No. 16-CV-2895-TMP, 2018 WL 795506, at *4 (W.D. Tenn. Feb. 8, 2018).[60]  Under the similarity approach, courts may "assess the experts' knowledge of 'pertinent statistical information such as community size, hospital size, the number and type of medical facilities in the community, and medical services or specialized practices available in the area.'" *McDaniel*, 2018 WL 795506, at * 5 (quoting Shipley, 350 S.W.3d at 554).  This information serves a substitute by which the expert can link the standard of care in community A, which he or she knows, to the standard of care in community B, which the expert may not know, through the use of similar demographics and statistics.  *Id.*  Under the familiarity approach, conversations with local providers about the applicable standard of care and visiting the defendant's medical community are permissible to establish familiarity, whereas statistical information is not.  *Id.*

In the present case, Dr. Dhar did not testify to having visited StoneCrest, Smyrna, Tennessee, or Nashville, Tennessee,[61] nor has he discussed his opinions with any other physicians from those communities or places.[62]  Dr. Dhar incorrectly believes that StoneCrest is located 20 miles to the Southwest of Nashville, Tennessee.[63]  StoneCrest is Southeast of Nashville, Tennessee and located in Rutherford County.  Therefore, Dr. Dhar cannot demonstrate the familiarity approach to the locality rule.

As to the similarity approach, Dr. Dhar does not know whether StoneCrest has a neuro ICU, which is the specialty department in which he practices.[64]  He does not know whether StoneCrest has an orthopedic spine specialist on call or any other type of specialist than a

---

[60] A copy is attached as **Collective Exhibit 1 to MIL 2.**

[61] *See generally* Dr. Dhar Depo.

[62] *Id.* at 34:5 – 9 (testifying that he did not discuss his opinions with any other physicians).

[63] *Id.* at 27:3 – 11.

[64] *Id.* at 26:12 – 14.

neurologist on call.[65]  Dr. Dhar testified that he did not need to know what other specialists StoneCrest had available.[66]  Dr. Dhar is aware that StoneCrest is a community hospital with some specialists, which is not a tertiary level hospital, which is how Washington University or Vanderbilt University would be classified.[67] Dr. Dhar has previously worked in hospitals smaller that tertiary level hospitals when he was in Canada, but he never worked in a community hospital, much less one in Missouri.[68]  Further, Dr. Dhar is not even aware of the protocol for an endovascular treatment in his own hospital, much less of one located in Smyrna, Rutherford County, Tennessee.[69]  He has offered no testimony on demographics of St. Louis, Missouri, or Smyrna, Tennessee, or the types of medical facilities located in each.  There has been no testimony linking the two (2) medical communities together. Dr. Dhar does not have a reliable basis to establish his familiarity for Smyrna, Rutherford County, Tennessee.  He has offered no testimony about the similarities between Washington University's hospital where he practices and StoneCrest, other than he was unaware of the number or types of specialties available at StoneCrest. As Dr. Dhar's testimony demonstrates, he is not familiar with the medical community to which StoneCrest or Dr. Archer belong, which is Smyrna, Rutherford County, Tennessee, under the familiarity approach, and plaintiffs have not carried their burden in establishing that Dr. Dhar is sufficiently familiar with a community similar to Smyrna,, Rutherford County, Tennessee, pursuant to the similarity approach because Dr. Dhar has not practiced in a similarly situated hospital in a rural or community setting, he is unaware of the specialties offered at StoneCrest, and he is not even fully aware of protocols at his own hospital.

---

[65] *Id.* at 27:14 – 28:3.
[66] *Id.* at 27:18 – 28:3.
[67] Dr. Dhar Depo., at 26:17 – 27:2.
[68] *Id.* at 33:14 – 17; 39:23 – 40:5.
[69] *Id.* at 91:25 – 92:3.

26

Therefore, Dr. Dhar has not complied with the locality rule, and he cannot offer an opinion as to the standard of care applicable to an emergency room physician in Smyrna, Tennessee. The Court should accordingly strike his testimony and exclude his testimony at trial on this topic.

### III. Alternatively, Rule 403 of the Federal Rules of Evidence require that this Court strike and exclude Dr. Dhar's testimony.

Should the Court find that Dr. Dhar is competent to testify and his testimony has a reliable basis, Rule 403 of the Federal Rules of Evidence still requires the exclusion of his testimony regarding the standard of care applicable to an ER physician in Tennessee. Rule 403 requires the exclusion of evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

In the present case, any probative value to be gained from Dr. Dhar's testimony regarding the standard of care is substantially outweighed by the dangers of confusing the issues and/or misleading the jury. As a neurologist, one who has not performed an official consult in the ER[70] or worked in the ER in over a decade,[71] his testimony will be confusing to the jury and likely mislead them as to what the standard of care permits an ER physician to do under the circumstances of this case. Further, Dr. Dhar never disclosed in his report that he was offering an opinion on the standard of care,[72] and therefore, Dr. Archer would be prejudiced by this testimony at trial, and he was in fact already prejudiced at the time the deposition was taken as there was nothing in the report to reflect that the testimony would cover those topics.[73]

---

[70] Dr. Dhar Depo., at 41:23 – 25; 207:10 – 208:1.

[71] *Id.* at 207:3 – 19.

[72] *Id.* at 210:4 - 22; 211:6 – 20; Dr. Dhar's Report.

[73] *See* Local Rule 39.01

Therefore, should the Court find Dr. Dhar competent and qualified to testify on the standard of care applicable to the board certified ER physician in Tennessee, Rule 403 still requires exclusion of Dr. Dhar's testimony on this point. Therefore, Dr. Archer respectfully asks the Court for the entry of an Order striking and excluding Dr. Dhar's testimony on the applicable standard of care on these grounds.

## IV.    CONCLUSION

For the foregoing reasons, Dr. Archer respectfully asks this Court to strike all of Dr. Dhar's testimony and exclude Dr. Dhar from testifying at trial.

Respectfully submitted on this 14th day of December 2018.

HALL BOOTH SMITH, P.C.

By:    /s/ Bryant C. Witt
       James E. Looper, Jr. BPR #025200
       Bryant C. Witt, BRP #018295
       Fifth Third Center
       424 Church St., Ste. 2950
       Nashville, TN 37219
       (615) 313-9911
       *Counsel for Defendant Dr. Clark Archer*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been furnished by electronic means via the Court's electronic filing system, this 14th day of December 2018, to counsel of record as follows:

Afsoon Hagh, Esq.
CUMMINGS MANOOKIAN PLC

---

Expert witness disclosure statements may not be supplemented after the applicable disclosure deadline, absent leave of Court. Expert witnesses may not testify beyond the scope of their expert witness disclosure statement. The Court may exclude the testimony of an expert witness, or order other sanctions provided by law, for violation of expert witness disclosure requirements or deadlines.

28

45 Music Square West Nashville, TN 37203
afsoon@cummingsmanookian.com

Brian Cummings, Esq.
Cummings Law
4235 Hillsboro Pike #300
Nashville TN 37215
T: 615.800.6822
F: 615.815.1876
brian@cummingsinjurylaw.com

Mark Hammervold, Esq.
Hammervold, PLC
315 Deaderick Street, Suite 1550
Nashville, TN 37238
mark@hammervoldlaw.com

*Counsel for Plaintiffs, John Ruffino and Martha Ruffino,*

HALL BOOTH SMITH

By: ___/s/ Bryant C. Witt