# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| JOHN RUFFINO and MARTHA RUFFINO, Husband and Wife, | ) ) ) | |
| Plaintiffs, | ) ) | CASE No. 3:17-cv-00725 |
| v. | ) ) ) | Judge Campbell<br>Magistrate Judge Newbern |
| DR. CLARK ARCHER and HCA HEALTH SERVICES OF TENNESSEE, INC. d/b/a STONECREST MEDICAL CENTER | ) ) ) ) | JURY DEMANDED |
| Defendants. | ) ) ) | |

## DR. ARCHER'S RESPONSE TO PLAINTIFFS' MOTION IN *LIMINE*

COMES NOW Defendant, Dr. Clark Archer (hereinafter "Dr. Archer") and responds to the Plaintiffs' Omnibus Motion in Limine (Doc. 115). The numbered sections below corresponded to each of the evidentiary issues raised in the Plaintiff's Omnibus Motion in Limine.

**1. The Court should not permit any new opinions, new experts, new bases for expert opinions from any party unless they were disclosed in their Rule 26 Expert Disclosures or cross-designated.**

Defense counsel is not opposed in principle to limiting its experts to those disclosed in its Rule 26 Disclosures and to the extent supplemented or amended by their sworn deposition testimony. Defense counsel would respectfully ask that any such Order apply equally to the Plaintiffs. Further, it should be noted that Defendant cross designated the experts disclosed in StoneCrest's Rule 26 Disclosures and disclosed an intention to call Mr. Ruffino's treating providers to testify. Therefore, Defendant has designated, among other treating providers, himself, Suresh Chitturi, M.D., Adrian A. Jarquin-Valdivia, M.D., and Maria F. Dongas, M.D., along with an expert neurologist, Jodi Dodds, M.D. Plaintiffs have been fully appraised of these experts, the

66507999-3
3226-0011

facts they base their opinions on, and their opinions. Therefore, any Order entered by the Court should not curtail the testimony of these experts or their opinions as disclosed and to the extent supplemented or amended by their sworn deposition testimony.

**a. Kevin Bonner, M.D., will not be called to testify at trial.**

Defendant previously withdrew Dr. Bonner as an expert and does not anticipate calling Dr. Bonner to testify at trial, and therefore, does not contest this narrow issue.

**b. The Court should permit testimony on the Plaintiffs' responsibility or comparative fault for Mr. Ruffino's present alleged neurologic deficits.**

The precise basis of the allegation of comparative fault against the Plaintiffs has been known to the Plaintiff at least since the filing of Dr. Archer's Answer on March 2, 2018. Dr. Archer's Answer pleads the following affirmative comparative fault allegation:

> More specifically, without waiving the right to amend this Answer as set out above or to add additional details as they become known, Defendant avers that the injuries complained of in this matter occurred due to the fault of either Plaintiff, individually, or both Plaintiffs jointly, through his, her, or their failure to properly seek care after Mr. Ruffino was discharged from the first hospitalization at Centennial Medical Center.
> a. Upon the initial discharge from Centennial Medical Center, Plaintiffs were instructed to return immediately if there were any changes.
> b. While at home, Mr. Ruffino had a noticeable change.
> c. The change lead to him falling.
> d. Neither he nor Mrs. Ruffino, on his behalf, sought medical help until almost fifteen (15) hours passed from his discharge.
> e. Upon re-presenting the Centennial Medical Center, Mr. Ruffino was beyond the time window for tPa.
> f. This episode and the failure to timely seek medical help were the cause of Mr. Ruffino's alleged injuries.

Doc. 55 - Answer of Dr. Clark Archer p. 17.

The expert disclosures of the Defendants appropriately disclose expert opinions and the factual basis for those opinions in support of this allegation of comparative fault. First, as stated above, Defendant designated Mr. Ruffino's treating providers and cross-designated the experts designated by StoneCrest, which also included some of Mr. Ruffino's treating providers.

2

StoneCrest designated Adrian A. Jarquin-Valdivia, M.D., one of Mr. Ruffino's treating providers. Dr. Valdivia was disclosed to offer an opinion, among other issues, regarding Mr. Ruffino's presentations to Centennial Medical Center and "that Mr. Ruffino negligently delayed in returning to Centennial on February 27, 2016 after a fall at home, causing extension of his stroke and the majority of his deficits." Likewise, StoneCrest disclosed Maria F. Dongas, M.D., one of Mr. Ruffino's treating providers. In StoneCrest's disclosures, adopted by Defendant, Dr. Dongas' opinion was disclosed, in relevant part, as "Mr. Ruffino was negligently delayed in returning to Centennial on February 27, 2016 after a fall at home, causing extension of his stroke and the majority of his deficits."

Second, Defendant disclosed his own expert to provide an opinion regarding the Plaintiffs' negligence or responsibility for Mr. Ruffino's present deficits. In Dr. Stopyra's Rule 26 Report, on page 4[1] under "Opinions," it states, "Nothing Dr. Archer did or did not do contributed to Mr. Ruffino's present date neurologic status." On pages 5 through page 6, his report states:

> Mr. Ruffino's deficits upon discharge from Centennial on 2/26/2017 were much less than what he presented back on Centennial on his second admission and eventually . When [sic.] Mr. Ruffino came back to Centennial for the second admission on 2/27/16 he had a stroke which was much worse than the deficits he was discharged with on his first admission on 2/17/16. The Second admission and worsening of Mr. Ruffino's deficits have nothing to do with the care Dr. Archer provided him on 2/17/16.

Likewise, under the facts portion of Dr. Stopyra's Rule 26 Report on page 4, it states the following:

> Mr. Ruffino returned to Centennial Medical Center and met with Dr. Terry Cain at 1918 2/27/16 after sudden onset increased right sided weakness, worsening aphasia and a fall starting at 0430 on 2/27/16. At this time his NIHSS was 21, and he had focal weakness, numbness, the inability to speak, and vision change. Dr. Dongas examined Mr. Ruffino and found "speech was dysarthric and had expressive dysphasia, and word finding difficulty." "He had

---

[1] Dr. Stopyra's Rule 26 Report does not have page numbers.

flattening of the right nasolabial fold." "Right Arm 0/5, right leg some withdrawal to stimulation." "He relates being able to feel light tough on the left arm." Plantar reflex upgoing on the right." He was discharged to Saint Thomas Midtown Hospital for rehabilitation on 3/3/16.

As demonstrated by the above excerpts of Dr. Stopyra's Rule 26 Expert Report, Mr. Ruffino's current neurologic status is the result or was caused by his second stroke, and Dr. Stopyra disclosed an opinion about the second presentation to Centennial Medical Center. The Plaintiffs are and have been on notice that the scope of Dr. Stopyra's opinion and testimony would cover the second Centennial Medical Center presentation along with the Plaintiffs' delay in seeking treatment since the time of the Defendant's expert witness disclosures. Likewise, Dr. Stopyra disclosed sufficient facts underpinning his opinion about Mr. Ruffino's second presentation to Centennial Medical Center and the Plaintiffs' delay in seeking treatment as demonstrated in the last paragraph of his facts section includes facts about the second presentation to Centennial Medical Center, the time of the fall, and the time of the Plaintiffs' presentation. Plaintiffs' had an opportunity to explore Dr. Stopyra's opinion regarding the second presentation to Centennial Medical Center when they took his deposition, and they choose not to do so. The Plaintiffs, having had the opportunity to explore Dr. Stopyra's opinion during his deposition, cannot now claim to be ambushed or caught off guard by an opinion that was disclosed and that they failed to inquire about.

Rule 37(c) of the Federal Rules of Civil Procedure requires that the Court examine whether there was surprise to the party against whom the evidence will be offered prior to excluding that evidence. *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015) (citations omitted). Here, there is no surprise. As outlined above the facts and the opinion were contained in the Complaint, Dr. Stopyra's expert report and the expert disclosures of the other experts listed above. Plaintiffs

4

had an opportunity to explore his opinions about causation and the second presentation to Centennial Medical Center at Dr. Stopyra's deposition. They elected not to explore these opinions and cannot claim to be surprised now. This evidence is vitally important to assist the jury with apportioning fault, which directly impacts whether Plaintiffs' can recover at all.

The Court should permit the Defendants to present expert testimony and other evidence about the second presentation to Centennial Medical Center and the Plaintiffs' failure to timely seek care and treatment after Mr. Ruffino experienced a fall at 4:30 a.m., on February 27, 2017, and waited fifteen (15) hours to return to Centennial Medical Center. This comparative fault allegation has been quite clearly and repeatedly pled and has been properly supported with expert opinion testimony. The Plaintiff's Motion is not well taken and should be denied.

### c. The Court should permit opinions from Jason Stopyra regarding the onset time of a stroke or stroke symptoms.

Plaintiffs again mischaracterize Dr. Stopyra's report and his deposition testimony. Dr. Stopyra's testimony is that no one can give an exact time at which Mr. Ruffino was experiencing a stroke because Mr. Ruffino's presentation was complicated. Specifically, Dr. Stopyra testifies:

> Q. What time did Mr. Ruffino have his stroke on February 17, 2016?
>
> A. I don't think anybody knows for 100 percent. I think there's several possibilities.
>
> Q. And as a result, you can't say, to any degree of medical probability, as to when Mr. Ruffino suffered the stroke on February 17, 2016, correct?
>
> A. Not hour and minute. I don't think anybody can. And that's part of the problem in this case.
>
> Q. You can't say, to any degree of medical probability, even what three-hour window Mr. Ruffino's stroke occurred on February 17, 2016, correct?

5

> A. I cannot tell you what three-hour window, but I can expound on that by saying that there's several opinions as to when the stroke started and when TIAs ended, if there were even TIAs on the 17th. Mr. Ruffino's presentation on the 17th to the emergency department was quite complicated, and the identification of a time stamp of when he was last known normal is very difficult to identify.
>
> Q. Do you provide any opinion whatsoever in your report as to when Mr. Ruffino's stroke occurred on February 17th, 2016?
>
> A. I don't think I do give a time.
>
> Q. And that's because you can't identify one to a reasonable degree of medical probability, correct?
>
> A. Correct. But I can tell you this: That when Dr. Archer called a code stroke, that was the correct thing to do. And he called it as a code stroke, not as a code TIA.[2]

Plaintiffs attempt to frame their issue with Dr. Stopyra's testimony as he cannot offer an opinion on time to a reasonable degree of medical certainty; however, it would be more accurate to frame the issue as Dr. Stopyra is certain, to a reasonable degree of medical probability, that the exact time at which Mr. Ruffino experienced a stroke cannot be determined due to the complicated nature of his presentation, which includes Mr. Ruffino's history of seizures, the various reported times of last known normal, waxing and waning of symptoms, and neurologically normal assessment before and after 1300, and therefore, Dr. Stopyra is certain, to a reasonable degree of medical probability, that the administration of tPA was contraindicated by unclear timing of Mr. Ruffino's last known normal occurred.   Dr. Stopyra's report indicated that Mr. Ruffino's "clinical presentation on 02/17/16 to EMS, ED staff and ED providers was complicated by the fact that he had been having similar symptoms for longer than a month."  Further, his report indicated:

> The administration of TPA at 1300 as suggested by plaintiff experts Pope and Dhar would have been inappropriate and potentially dangerous.   The fact that Mr. Ruffino once again had a normal

---

[2] Dr. Stopyra Depo. at =41:16 – 42:22

> neurologic exam at 1804 as documented by Nurse Bromley provides evidence that Mr. Ruffino did not meet the criteria of acute ischemic stroke at 1300. Dr. Archer's careful attention to Mr. Ruffino's complex intermittent neurologic history in the 2-3 months preceding his presentation to the StoneCrest ED prevented this error.

His testimony on the start time of the stroke or symptoms is within the scope of his report and is concerned with the complicated presentation. His opinion is that tPA cannot be administered because the exact time of last known normal cannot be determined. When there is a complicated presentation and last known normal is not readily apparent, a physician is to use the most conservative last known normal when assessing whether tPA administration is indicated. Therefore, this Court should permit Dr. Stopyra to testify about the different possible times of last known normal since it is within the scope of his report and prior testimony and relates to his opinion, which he holds to a reasonable degree of medical certainty, that the administration of tPA was not appropriate at 1300 because Mr. Ruffino's last known normal could not be determined. These opinions were all appropriately disclosed in Dr. Stopyra's report, and were stated to a more likely than not level of probability, which is the applicable standard for admissibility of expert opinions. The Plaintiffs' Motion is not well taken and should be denied.

## 2. So long as Plaintiffs do not open the door, Defendants do not oppose exclusion of Mrs. Ruffino's prior arrest.

Although a plea of no contest is a conviction pursuant to Rule 609 of the Federal Rules of Evidence,[3] Counsel does not oppose this issue as the conviction is over 10 years old. However, to the extent the Plaintiffs open the door regarding Mrs. Ruffino's criminal background or attempt to bolster her credibility by questions designed to elicit responses that she has not been arrested, or

---

[3] *Shuler v. Michigan Physicians Mut. Liab. Co.*, 679 N.W.2d 106, 118 (2004) ("[W]e agree with the federal courts of appeal that have determined, after construing federal rules that are nearly identical in all relevant respects, that a conviction that ordinarily could be used for impeachment purposes is not excluded from that use because the conviction resulted from a plea of no contest.").

that she has never committed and offense impugning her honesty or credibility, Defendant should

be permitted to impeach Mrs. Ruffino with her prior arrest.

### 3. The statements by the head of the building supply department at the Smyrna Home Depot regarding Mr. Ruffino's appearance are admissible.

Defendant and defense experts should be permitted to inquire into when Mr. Ruffino first

had notice that he may be experiencing symptoms associated with a stroke and what other

disinterested, non-parties observed on the day in question at the time of the events.  These facts

and statements are relevant as they make the fact of when Mr. Ruffino's symptoms first began

more or less probable and are of consequence in determining the action, which is whether or not

tPA was medically indicated.  *See* Fed. R. Evid. 401.  The full exchange at Mr. Ruffino's

deposition is as follows:

> Q.  . . . .What time of the day did you first notice that you were
> having any dizziness that day?
>
> A. 8:30.
>
> Q. 8:30 in the morning?
>
> A. Yeah. 8:00 or 8:30.
>
> Q. Which one was it; 8:00 or 8:30?
>
> A. 8:30.
>
> Q. And where were you when you first noticed that you had some
> dizziness?
>
> A. I was at - - I didn't notice it. I was told by a guy that works at the
> Smyrna store, Smyrna Home Depot.
>
> Q.  A guy at the Smyrna Home Depot told you you were dizzy?
>
> A. Yeah. He said that - - he said that I looked funny or weird or
> something.

8

Q. Okay. Well, that to me is a little different than you feeling dizzy. My question was, when is the first time on the morning of February 17, 2016 that you felt any dizziness? What time was that?

A. I'm not sure.

Q. Where were you when you first felt any dizziness?

A. I was leaving the store and driving away.

Q. Leaving the Home Depot store?

A. Yeah.

Q. In Smyrna?

A. Yeah.

Q. Okay. Now, did you tell me that your company tracked your movements?

A. Yeah.

Q. So they would know when you were leaving the Smyrna Home Depot, wouldn't they?

A. Yeah.

Q. Can you tell me about what time it was that you were leaving the Smyrna Home Depot?

A. 8:00, 8:30.

Q. 8:00 to 8:30. Okay. In addition to you feeling some dizziness, somebody told you that your face looked odd or weird?

A. Yeah.

Q. And you pointed to the right side of your face.

A. Yeah.

Q. What did this person tell you?

A. He didn't say anything. He just said, "You don't look right."

9

Q. "You don't look right"?

A. Yeah.

Q. Did you feel anything, perceive anything when he said, "You don't look right"?

A. No.

Q. Did you feel like you were drooling out of –

A No.

Q. - that side of –

A. No.

Q. - your mouth?

A. No.

Q. Did you feel like you couldn't speak correctly?

A. No.

Q. Did you feel anything weird at all yourself?

A. Not really.

Q. Okay. Well, did you say, "Well, thanks for calling me weird"? Did you say something back to him?

A. No, I didn't. I just drove off.

Q. Who is this guy that commented you looked weird?

A. He's the guy that - - he's the guy that - - he's the head of the - - he's the head of - - he's the head of the - - he's the head of the building supply department.

Q. In Smyrna?

A. Yeah.

Q. Do you recall what it is that you picked up at the Smyrna Home Depot that morning?

10

A. No.

Q. What time did you get to the Smyrna Home Depot that morning?

A. 7:30.

Q. Was that the first stop of the day for you?

A. Yes.

Q. All right. And you didn't feel any dizziness until you were leaving?

A. Yes.[4]

First, a statement that "you don't look right," "you look weird," or words of similar import are not hearsay because they are not being offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(c). The statements of the head of the building supply department at the Smyrna Home Depot are not offered to establish that Mr. Ruffino actually did not look right or weird, but rather the comments from the head of the building supply department at the Smyrna Home Deport are being offered to establish when Mr. Ruffino had notice of his symptoms. *See United States v. Kilpatrick*, 798 F.3d 365, 386 (6th Cir. 2015) ("If an out-of-court statement is offered purely to show the statement's effect on the hearer, then this usage is not hearsay."). The effect on Mr. Ruffino was that he was aware of possible symptoms while he was at Home Depot in Smyrna on his route for his job.  One of the key issues in the present case is when did Mr. Ruffino's symptoms begin, or stated another way, when did he have notice that his symptoms first began since he, as the patient, would be the one reporting the onset of symptoms to his health care providers.  There are different times reported to different medical providers throughout Mr. Ruffino's care and treatment, which range from the time Mr. Ruffino woke up, 8:00 a.m., and 8:30 a.m.  It is

---

[4] Mr. Ruffino Depo, at 47: 14 – 50:14.

immaterial whether Mr. Ruffino actually looked weird or didn't look right, as the statements are being offered to show when Mr. Ruffino first became aware of his symptoms.

Additionally, and in the alternative, the statement is not hearsay pursuant Rule 801(d)(2)(B) of the Federal Rules of Evidence because Mr. Ruffino adopted the statement. "Adoption can be manifested by any appropriate means, such as language, conduct, or silence." *United States v. Jinadu*, 98 F.3d 239, 244 (6th Cir. 1996). Mr. Ruffino adopted the statement or believed that statement to be true when he described the statement to counsel during his deposition. When questioned about when and where his symptoms, specifically his dizziness, began, he responded:

> A. I was at - - I didn't notice it. I was told by a guy that works at the Smyrna store, Smyrna Home Depot.
>
> Q. A guy at the Smyrna Home Depot told you you were dizzy?
>
> A. Yeah. He said that - - he said that I looked funny or weird or something.
>
> Q. Okay. Well, that to me is a little different than you feeling dizzy. My question was, when is the first time on the morning of February 17, 2016 that you felt any dizziness? What time was that?
>
> A. I'm not sure.
>
> Q. Where were you when you first felt any dizziness?
>
> A. I was leaving the store and driving away.
>
> Q. Leaving the Home Depot store?
>
> A. Yeah.
>
>             * * *
>
> Q. Okay. Well, did you say, "Well, thanks for calling me weird"? Did you say something back to him?

A. No, I didn't. I just drove off. [5]

The above exchange indicates that Mr. Ruffino adopted the statement as true. He did not dispute that he looked weird or strange or take any actions to correct the statement. He did not contest the man's observation. Mr. Ruffino volunteered these statements when when questioned about when he first noticed that he felt dizzy, which would indicate that he adopted these statements as the demarcation of when his symptoms began. Thus, Mr. Ruffino has adopted the statements, and they are not hearsay.

Second, even if the statements are considered hearsay (*i.e.*, are being offered for the truth of the matter asserted – Mr. Ruffino did look "weird" or "not right"), exceptions are present that permit the Court to admit these statements. Pursuant to Rule 803(1) of the Federal Rules of Evidence, the statement by the "head of the building supply department" at the Smyrna Home Depot qualifies as a present sense impression. This was a statement describing or explaining the condition of Mr. Ruffino's appearance and face while or immediately after the head of the building supply department at the Smyrna Home Depot perceived it. The policy underlying this exception is that the contemporaneousness of the statement to the events does not allow time for misrepresentation. *See* Fed. R. Evid. 803(1) advisory committee notes ("[I]s that substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation."). Here, this statement occurred when the observation was made and is in accordance with the policy behind the expectation. It goes no further than a description of the condition offered at the time of perception. *See United States v. Phelps*, 572 F. Supp. 262, 265 (E.D. Ky. 1983) ("It should be noted that the exception is limited to statements made while an event or condition is perceived or immediately thereafter. The theory of the Rule will not support

_____

[5] Mr. Ruffino Depo., at 47:12 – 48:15; 50:4 -16.

13

a substantial time interval between event and statement.") (citations omitted). Because the statement is limited and occurred at the time of perception of the condition (*i.e.*, seeing Mr. Ruffino's face), these statements comport with the present sense impression exception to hearsay, and the Court should permit their admission into evidence.

Additionally, whether the declarant is identified or not is irrelevant to whether to allow this statement into evidence since the basis for the rule is the temporal relationship between the observation and the statement. Assuming *arguendo*, this is not some random bystander, but it was someone that Mr. Ruffino knew well enough to be able to identify his position at the Smyrna Home Depot a year and a half after the events took place. Therefore, he is not an unknown declarant and is sufficiently identified. Further, even if he were an unidentified individual, the case cited to by Plaintiffs, *Ricciardi v. Children's Hospital Medical Center*, for the proposition that unknown sources are untrustworthy such that they cannot be admitted pursuant the present sense impression exception, is inapplicable as it is concerned with Rule 803(6), which is the business records exception. 811 F.2d 18, 22 (1st Cir. 1987). This exception is supported by different policy rationales than the present sense impression exception. *See* Fed. R. Evid. 803(6) advisory committee note ("The element of unusual reliability of business records is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation."). Thus, Plaintiffs reliance is misplaced, and the present sense impression along with the circumstances surrounding the utterance of the statement support its admission.

Likewise, this qualifies as excited utterance under Rule 803(2), as someone with an abnormal look or deficit with his or her face is a startling event or condition. The comment was a

14

spontaneous statement in response to observing Mr. Ruffino's face. The appearance or drooping of one side of someone's face can be an alarming or shocking experience. It was startling enough that the man from Home Deport felt the need to contact Mr. Ruffino's boss to notify him of Mr. Ruffino's face.[6] The excited utterance, supported by the spontaneity of the statement, permits this statement to be put before the jury.

Further, Pursuant to Rule 803(3) of the Federal Rules of Evidence a declarant's state of existing mental condition is an exception to the rule against hearsay. "Rule 803(3) allows witnesses to recount hearsay statements (that is, statements offered to prove the truth of the statements' factual content) when the statement's original declarant is expressing his or her then-existing state of mind." *United States v. Kilpatrick*, 798 F.3d 365, 386 (6th Cir. 2015). Here, the statement is being offered to establish the declarant's, the man from the Smyrna Home Depot, then existing state of mind (motive, intent, or plan), which was to prevent Mr. Ruffino from continuing to drive or to have Mr. Ruffino seek medical attention. The man from Home Depot notified Mr. Ruffino of his abnormal appearance and then took further steps to contact Mr. Ruffino's boss regarding his concerns, which lead to Mr. Ruffino pulling his truck over and the police and EMS personnel being dispatched to attend to him. Mr. Ruffino testified that his boss, Gordon Lee, called him, and instructed Mr. Ruffino to pull over because that the guy from Home Depot had contacted Gordon Lee with his concerns about Mr. Ruffino.[7] Without the man at Home Depot's present sense motive, plan, or intent, Mr. Ruffino is never instructed to pull over, never has police and EMS personnel dispatched to him, and is never transferred to StoneCrest. Therefore, these statements

---

[6] *See* Mr. Ruffino Depo., at 56:6 – 19.
[7] Mr. Ruffino Depo., at 56:6 – 19.

15

may be admitted to show the declarant's motive, intent, and purpose in calling Mr. Ruffino's boss regarding his concerns over Mr. Ruffino's appearance and health.

For these reasons, Defendant respectfully requests that the Court deny Plaintiffs' Motion on this issue.

**4. Dr. Criner should be permitted to offer an opinion that stroke occurred prior to 10:37 a.m., on February 17, 2016.**

Dr. Criner should be permitted to testify that a stroke occurred prior to 10:37 a.m., on February 17, 2016, as the statements by the head of the building supply department at Home Depot are not inadmissible hearsay (as briefed above), and even if they were, experts are permitted to form opinions on inadmissible hearsay, and there are other bases of Dr. Criner's opinion besides the statements made at Home Depot. Likewise, Dr. Criner is capable and did in fact offer his opinions to the degree of probability required.

Regarding the basis of an expert's opinion, physicians, as medical experts, reasonably rely on the statements of a patient, whether the patient is recounting his or her own observations or the observations of others, along with the reports and statements of other when making a diagnosis. Likewise, physicians rely on all sources of information available when taking a history and making a diagnosis or working through their differential analysis. The advisory committee note to Rule 703 of the Federal Rules of evidence explicitly recognizes that physicians base their opinions on a wide array of sources, some of which will not be admissible. Specifically, the advisory committee note from 1972 states:

> The third source contemplated by the rule consists of presentation of data to the expert outside of court and other than by his own perception. In this respect the rule is designed to broaden the basis for expert opinions beyond that current in many jurisdictions and to bring the judicial practice into line with the practice of the experts themselves when not in court. **Thus a physician in his own practice bases his diagnosis on information from numerous**

> sources and of considerable variety, including statements by
> patients and relatives, reports and opinions from nurses,
> technicians and other doctors, hospital records, and X rays.
> **Most of them are admissible in evidence**, but only with the
> expenditure of substantial time in producing and examining various
> authenticating witnesses. The physician makes life-and-death
> decisions in reliance upon them. His validation, expertly performed
> and subject to cross-examination, ought to suffice for judicial
> purposes.

Fed. R. Evid. 703 advisory committee note (**emphasis** added). Further, the advisory committee

note to Rule 702 clarifies the relationship between Rules 702 and 703. In relevant part, it states:

> Subpart (1) of Rule 702 calls for a quantitative rather than qualitative
> analysis. The amendment requires that expert testimony be based on
> sufficient underlying "facts or data." The term "data" is intended to
> encompass the reliable opinions of other experts. *See* the original
> Advisory Committee Note to Rule 703. The language "facts or data"
> is broad enough to allow an expert to rely on hypothetical facts that
> are supported by the evidence. *Id.*
>
> When facts are in dispute, experts sometimes reach different
> conclusions based on competing versions of the facts. The emphasis
> in the amendment on "sufficient facts or data" is not intended to
> authorize a trial court to exclude an expert's testimony on the ground
> that the court believes one version of the facts and not the other.
>
> There has been some confusion over the relationship between Rules
> 702 and 703. The amendment makes clear that the sufficiency of the
> basis of an expert's testimony is to be decided under Rule 702. Rule
> 702 sets forth the overarching requirement of reliability, and an
> analysis of the sufficiency of the expert's basis cannot be divorced
> from the ultimate reliability of the expert's opinion. In contrast, the
> "reasonable reliance" requirement of Rule 703 is a relatively narrow
> inquiry. When an expert relies on inadmissible information, Rule
> 703 requires the trial court to determine whether that information is
> of a type reasonably relied on by other experts in the field. If so, the
> expert can rely on the information in reaching an opinion. However,
> the question whether the expert is relying on a sufficient basis of
> information--whether admissible information or not--is governed by
> the requirements of Rule 702.

Fed. R. Evid. 702 advisory committee note. Thus, the inquiry is first whether the facts or data are

of the type reasonably relied upon by experts in the same field, regardless of whether admissible

or not, and then the expert's opinion is reliable because the underlying facts are sufficient to permit the expert to reach the opinion through reliable principles and methods.

Although the head of the building supply department at the Smyrna Home Depot are admissible, even if these statements were inadmissible hearsay, these statements, whether relayed directly or by the patient or a family member, are of the type reasonable relied upon by the experts in the medical field. *See* Fed. R. Evid. 703. The advisory committee note to Rule 703 makes it clear that physicians regularly rely on a wide array of different sources of information in making a diagnosis. Fed. R. Evid. 703 advisory committee note. Therefore, regardless of whether the statements are admissible, Dr. Criner may rely upon them in order to reach his opinion about when the stroke or the symptoms of the stoke began.

Additionally, Dr. Criner's opinion on the start time of the stroke and/or symptoms of a stroke are supported by other facts besides the statement of the head of the building supply department at the Smyrna Home Depot. Dr. Criner's testimony, in part, is the following:

> A. I believe he woke up with symptoms of a stroke on that day. It may have started before the actual -- before midnight, whatever time he went to bed is the last known normal.
>
> Q. I hear you say woke up with symptoms. I'm asking about actually experiencing a stroke not just having the symptoms. What symptoms do you think he woke up with on February 17, 2016?
>
> A. By Mr. Ruffino's deposition, when he presented to Home Depot for work at 7:30, an external person, a manager at Home Depot I think it was, said he did not look right at that time. So there was somebody objectively looking from the outside. He had symptoms at that time. **Additionally, in his deposition he talks about being dizzy and pulling over and someone called 911. I think it may have been his boss.**
>
> Q. Is it your understanding that Mr. Ruffino spent the night at Home Depot?
>
> A. It is not my understanding that he did that, no.

Q. So when you said he woke up with symptoms and I asked you to identify what those symptoms were and you told me an external person at Home Depot told him he did not look right and he was dizzy, are those the symptoms you are talking about when he woke up?

A. From my review of the case, I believe he was unaware of whatever the abnormal was, which it appears to be facial droop, he was unaware of those things. Someone had to point that out to him. Since he was unaware of that, we don't know exactly when it started. Could have been the night before. That's why I think it was more than likely a wake-up symptom of the stroke.

Q. If nobody informed him of it until he was at Home Depot, are you just speculating that he woke up with those symptoms?

A. I'm not speculating.

Q. Are you guessing?

A. I'm not guessing.

Q. What do you base it on when your testimony is the first report of symptoms was someone at Home Depot telling him he, quote-unquote, did not look right?

A. I'm basing it on when patients present to the emergency department you go by your best guess of last known normal. And he obviously had something that wasn't correct at 7:30 that he was unaware of. So there's no way that we can definitively say it started at 7:30.

Q. When you say it, you mean symptoms?

A. Correct. I'm sorry.[8]

* * *

Q. What evidence do you rely on to conclude that Mr. Ruffino's stroke could have occurred on the 16th of February?

A. The most significant piece of information that I read that gives me concern that it may have started earlier is the conversation that

---

[8] Dr. Criner Depo., at 14:13 – 16:15 (**emphasis** added).

he had with the Home Depot manager, when the Home Depot manager noticed that there was something not correct in the way that Mr. Ruffino looked, and that was at 7:30. And Mr. Ruffino was not aware of that at 7:30. So if he was --

Q. So the only evidence that you have that this stroke might have started on February 16th is someone at Home Depot telling Mr. Ruffino on February 17th that he didn't look right?

A. Is that a question? I'm sorry.

Q. Yes, sir.

A. Say it again.

Q. The only evidence that you rely on to conclude that Mr. Ruffino's stroke may have started on February 16, 2016 is that an individual at Home Depot told him on February 17th that he did not look right?

A. That's a portion of why I think there's uncertainty as to the onset with regards to whatever the appearance was of the face. I would imagine it's facial drooping from the individual looking at him saying he didn't look right. **There's also a comment in the Rutherford County EMS run report and let me -- I can pull that up**.

Q. While you are doing that, this statement by a Home Depot employee that he did not look right, was that as specific as the Home Depot employee was regarding his appearance?

A. I'd have to go back and look at Mr. Ruffino's deposition to see the wording exactly.[9]

* * *

A. **One of the other portions in review of the records that brings into my mind a question about the exact onset was one of the statements typed by one of the medical providers from Rutherford County EMS where they noticed that there was some slurred speech present and the patient advised them that that had been present since December of the year before.**

Q. Does that mean that the onset of symptoms for the stroke that occurred sometime in February of 2016 were in December of 2015?

---

[9] Dr. Criner's Depo., at 17:13 – 18:13 (**emphasis** added).

20

A. It gives me concern that it occurred earlier than the 17th. Whether it was in December or whether there were more symptoms that developed afterward, I can't answer that. **But he did advise to the EMS that he had had slurred speech since December**.

Q. So despite normal CT being read at 10:37 a.m., you believe Mr. Ruffino may have experienced a stroke on some unspecified day either in 2015 or 2016 because of the statement by someone at Home Depot **and a line in the EMS report?**

A. That gives me concern, yes.

Q. I understand the concern. But can you say to a reasonable degree of medical certainty that Mr. Ruffino experienced a stroke at some time prior to 10:37 a.m. on February 17, 2016?

A. There were symptoms present before that time.[10]

* * *

Q. What were Nurse Bromley's findings after performing multiple neurological checks on Mr. Ruffino?

A. I would have to go back and look at that portion of the record.

Q. Did you find that portion of the record to be less helpful or valuable in reaching your opinions than, for example, an individual's statements at Home Depot?

A. I don't find one to be less or more helpful in forming opinion.

Q. As a clinician, it would be important to take into consideration and evaluate the multiple neurological checks performed on Mr. Ruffino between 10 a.m. and noon, correct?

A. **As a clinician, it's important for me to take a history from my patient and glean as much information as I can from outside sources and inside sources to come to an opinion on how best to treat someone.**

Q. Is that a yes to my question?

A. Please restate the question.

---

[10] Dr. Criner Depo., at 28:21 – 29:24 (**emphasis** added).

Q. Would it be important to take into consideration the multiple neurological checks performed on Mr. Ruffino between 10 a.m. and noon?

A. It's important to take a history from all sources. So if that information is available at the time, it's useful to have.

Q. It's important to take the neurological checks that occurred on Mr. Ruffino between 10 and noon into consideration, correct?

A. It's important to take all information into consideration.

Q. I get it. I mean, I understand it's important to take all information into consideration. I'm being a little more specific.

A. I understand.

Q. It's important to take all of it into consideration and certainly it's important to take those neuro checks into consideration, right?

A. If that's available to you, it's important to take them into consideration.

Q. There's nothing controversial about that, is there?

A. One to me is not more important than the other.

Q. Those neurological checks are just as important as anything else that you would take into consideration, correct?

A. All of the history available is important.[11]

As the above excerpts demonstrate, Dr. Criner considered more than just the statement from the head of the building supply department at the Smyrna Home Depot. He has sufficient facts, that other physicians would rely upon such as the medical records, patient's own statements (Mr. Ruffino's deposition), and EMS records, on which to base his opinions besides the statements at Home Depot. He applied different sources of information to reach an opinion that the stroke

---

[11] Dr. Criner Depo., at 38:2 – 39:21 (**emphasis** added).

22

symptoms began prior to 10:37 a.m., on February 17, 2016, in the same manner other physicians would apply their training, education, and experience. However, even if the statements at Home Depot were hearsay, Dr. Criner has established other sources in support of his opinion. Likewise, Dr. Criner disclosed in his report the documents he reviewed in preparation of his opinion, the portion of which is reproduced below:

### DOCUMENTS REVIEWED

1. Bates Numbered Records from Neurology Clinic Associates
2. Bates Numbered Records from TriStar StoneCrest Medical Center
3. Bates Numbered Records from Centennial Medical Center
4. Bates Numbered Records from Saint Thomas Midtown
5. Bates Numbered Records from Rutherford County EMS
6. Affidavit of Suresh Chitturi, MD
7. Expert Report from Dr. Troy Pope
8. Expert Report from Dr. Alfred Callahan
9. Expert Report from Dr. Rhajat Dhar
10. Deposition of Dr. Archer
11. Deposition of RN McCulloch
12. Deposition of RN Bromley
13. Deposition of Mr. Ruffino
14. Deposition of Mrs. Ruffino
15. Deposition of RN Telegdy
16. TriStar Health Master Stroke Algorithm
17. *2015 AHA/ASA Focused Update of the 2013 Guidelines for the Early Management of Patients With Acute Ischemic Stroke Regarding Endovascular Treatment https://www.strokeassociation.org/idc/groups/heart-public/@wcm/@hcm/@gwtg/documents/downloadable/ucm_487907.pdf*
18. American Academy of Emergency Medicine- tPA For Stroke – Potential Benefit, Risks, and Alternatives http://www.aaem.org/UserFiles/file/tpaedtool-AAEM.pdf

All of this information and history were equally important in rendering his opinion about the start time of both Mr. Ruffino's symptoms and/or his stroke. Plaintiffs' are now asking the Court to weigh the evidence on which Dr. Criner bases his opinion instead of determining whether it is of the type reasonably relied upon by physicians. His opinion is based on facts and information reasonably relied upon by experts in the medical field, and therefore, he should be permitted to testify about whether Mr. Ruffino experienced a stroke prior to 10:37 a.m., on February 17, 2016.

Addressing next whether a physician's opinion must be to a reasonable degree of medical certainty, the *Johnson v. Memphis Light Gas & Water Div.*, 695 F. App'x 131, 138 (6th Cir. 2017)

23

case cited by the Plaintiffs for the proposition that "expert medical testimony should also be excluded as unreliable when the opinion cannot be offered to a reasonable degree of medical certainty," states the exact opposite of what the Plaintiffs cite it for in their motion. The *Johnson* court held:

> [I]t is the long-standing rule of this circuit that for expert testimony to be admissible, there is no 'magic words' test. That is, scientific experts need not attach the modifier "to a reasonable degree of medical certainty" to their opinions to gain admissibility. As this Court recently held, "the phrase ['with a reasonable degree of medical certainty']— the conclusion by itself—does not make a causation opinion admissible. The '*ipse dixit* of the expert' alone is not sufficient to permit the admission of an opinion.

*Johnson*, 695 F. App'x at 136–37 (citations omitted). Likewise, "[t]he standards 'reasonable medical certainty' and 'reasonable medical probability' are [ ] terms of art in the law and have no analog for a practicing physician." *Johnson*, 695 F. App'x at 136 (citations omitted). Rather, the hurdle is whether the opinion is probable, which means more likely than not. *Id.* Dr. Criner testified to the following:

> A. My opinion is the symptoms started before he -- it was a wake-up stroke.
>
> Q. Listen to my question. Can you say to a reasonable degree of medical certainty on what day or days in February of 2016 Mr. Ruffino experienced a stroke?
>
> A. I believe he woke up with symptoms of a stroke on that day. It may have started before the actual -- before midnight, whatever time he went to bed is the last known normal.
>
> Q. I hear you say woke up with symptoms. I'm asking about actually experiencing a stroke not just having the symptoms. What symptoms do you think he woke up with on February 17, 2016?
>
> A. By Mr. Ruffino's deposition, when he presented to Home Depot for work at 7:30, an external person, a manager at Home Depot I think it was, said he did not look right at that time. So there was somebody objectively looking from the outside. He had symptoms

24

at that time. Additionally, in his deposition he talks about being dizzy and pulling over and someone called 911. I think it may have been his boss.

Q. Is it your understanding that Mr. Ruffino spent the night at Home Depot?

A. It is not my understanding that he did that, no.

Q. So when you said he woke up with symptoms and I asked you to identify what those symptoms were and you told me an external person at Home Depot told him he did not look right and he was dizzy, are those the symptoms you are talking about when he woke up?

A. From my review of the case, I believe he was unaware of whatever the abnormal was, which it appears to be facial droop, he was unaware of those things. Someone had to point that out to him. Since he was unaware of that, we don't know exactly when it started. Could have been the night before. **That's why I think it was more than likely a wake-up symptom of the stroke.**

Q. If nobody informed him of it until he was at Home Depot, are you just speculating that he woke up with those symptoms?

A. I'm not speculating.

Q. Are you guessing?

A. I'm not guessing.[12]

As demonstrated by the above exchange, Dr. Criner stated that it was more than likely that Mr. Ruffino experienced a wake-up stroke, which occurs when the last known time of normal cannot be conclusively established in the morning. Even if he is not able to offer this opinion to a reasonable degree of medical certainty, he is not required to vouch for every fact underlying his ultimate opinion in this case to a reasonable degree of medical certainty. The issue in this case is whether Dr. Archer complied with the standard of care applicable to an emergency room physician

---

[12] Dr. Criner Depo., at 14:7 – 16:3 (**emphasis** added).

in his treatment of Mr. Ruffino. Tenn. Code Ann. § 29-26-115(a). Dr. Criner's opinion in this matter is that it was not medically indicated for Dr. Archer to administer tPA during his treatment of Mr. Ruffino. His opinion is that Mr. Ruffino had a complicated presentation to StoneCrest. Dr. Criner disclosed opinions about the complicated presentation and that the onset of symptoms was not clear. A portion of his report is reproduced below:

> 3. tissue Plasminogen Activator (tPA) is not a benign pharmaceutical agent. The NINDS study found greater than 5% of patients that receive tPA have bleeding into the brain. Additionally, 45% of those patients in which bleeding occurred, died. It is reasonable and appropriate to consider the benefits and risks when providing any medication to a patient. Certainly, in Mr. Ruffino's case, the onset of symptoms was not clear. Certainty of the onset of neurological deficits is paramount when considering tPA, as additional harm is possible. This reinforces my opinion that Dr. Archer followed the standard of care at the time he initially evaluated Mr. Ruffino by consulting Dr. Chitturi for additional neurological opinion.
>
> 4. It is my opinion, within a certain degree of medical certainty, that Dr. Clark Archer did not deviate from the expected standard of care at the time he attended to Mr. Ruffino at 1220 on 2-17-16. I offer this opinion based on the material reviewed in combination with over expertise and experience accumulated in over 10 years of full-time emergency department practice.

Dr. Criner disclosed an opinion that the onset of the stroke symptoms was not clear and that the onset is important when considering whether or not to administer tPA. He does not need to be able to state that every fact he relied upon occurred to a reasonable degree of medical certainty in order to testify that tPA was not medically indicated when Dr. Archer provided care and treatment to Mr. Ruffino.

For these reasons, Plaintiffs' motion should be denied, and Dr. Criner should be permitted to offer an opinion that Mr. Ruffino's stroke symptoms and/or stroke began prior to 10:37 a.m., on February 17, 2016.

**5. The Court should permit questioning concerning the reasonableness of other experts Opinions.**

Defense counsel should be permitted to question experts about the reasonableness of other experts and about the reasonableness of their testimony. This line of questioning does not invade

26

the provenience of the jury, who will still be capable of weighing each witness's testimony on their own in accordance with the jury instructions from the Court.

To exclude this line of questioning and testimony would deprive defense counsel of presenting evidence regarding the variance in the practice of medicine between physicians of the same specialty. The practice of medicine is not an exact science. There is variation between any two (2) physicians in the same specialty and this difference in opinion does not establish a deviation from the standard of care.

Further, this line of questioning is in accordance with another jury instruction that will be requested, which is the following:

> When there is more than one accepted method of diagnosis or treatment, and no one of them is used exclusively and uniformly by all physicians of good standing, a physician is not negligent for selecting an accepted method of diagnosis or treatment that later turns out to be unsuccessful. This is true even if the method is one not favored by certain other physicians.

Alternate Methods, 8 Tenn. Prac. Pattern Jury Instr. T.P.I.-Civil 6.14 (2018 ed.). Questions such as "do you agree that reasonable experts can have different opinions," or that other expert's "opinions are reasonable," are directed in establishing this permitted variance in the practice of medicine, which is not a deviation from the standard of care. Further this type of questioning is directed at ensuring that the expert's testimony is reliable and in accordance with generally accepted medical practices. These questions do not improperly bolster an expert's credibility, but merely seek to illustrate that differences in opinion do not establish a deviation from the standard of care. Therefore, for these reasons, the Court should permit defense counsel to employ these lines of questioning.

**6. The Court should exclude lay opinion from the Plaintiffs regarding medical opinions along with other opinions that require expert testimony and are outlined in Defendant's Omnibus Motion at Paragraph 9.**

In response, Defendant would respectfully direct the Court to its Motion in *Limine* No. 8 Omnibus Motion, at ¶ 9, which appears to request similar relief as the Plaintiffs. Therein, Defendant requests the Court enter a similar Order excluding lay witness testimony on, among other topics, the applicable standard of care, medical diagnoses, causation, life expectancy, and Mr. Ruffino's deficiencies, physical or cognitive conditions, his capabilities (before and after February 17, 2016), and future medical needs. All these topics are beyond the keen of a lay witness and require a level of expertise that the Plaintiffs do not possesses. Therefore, the Court should enter an Order excluding the Plaintiffs' testimony on the foregoing topics.

**7. Defendant has sufficiently pled a comparative fault defense and should be permitted to present argument and evidence in support.**

As Plaintiffs correctly pointed out, Defendant raised the affirmative defense of comparative fault in his Answer to Plaintiffs' Amended Complaint. (Doc. 65, 14-15). However, Plaintiffs failed to mention that Defendant asserted comparative fault against both Plaintiffs, individually and jointly, for their failure to bring Mr. Ruffino back to Centennial Medical Center after his initial discharge once he experienced a new neurologic change. *Id.* Specifically, Defendant's comparative fault claim is plead as follows:

> More specifically, without waiving the right to amend this Answer as set out above or to add additional details as they become known, Defendant avers that the injuries complained of in this matter occurred due to the fault of either Plaintiff, individually, or both Plaintiffs jointly, through his, her, or their failure to properly seek care after Mr. Ruffino was discharged from the first hospitalization at Centennial Medical Center.
> a. Upon the initial discharge from Centennial Medical Center, Plaintiffs were instructed to return immediately if there were any changes.
> b. While at home, Mr. Ruffino had a noticeable change.

> c. The change lead to him falling.
> d. Neither he nor Mrs. Ruffino, on his behalf, sought medical help until almost fifteen (15) hours passed from his discharge.
> e. This episode and the failure to timely seek medical help were the cause of Mr. Ruffino's alleged injuries.

(Doc. 65, 14-15). As demonstrated above, Defendant has sufficiently pled comparative fault as to the Plaintiffs and has complied with Federal pleading requirements.

At this time, Defendant is not intending to assert that any third party, which now includes StoneCrest, should be apportioned comparative fault by the jury. However, given that the Amended Complaint still contains vicarious liability claims against StoneCrest that are premised upon the actions of Nurse Bromley[13] and that Plaintiffs' experts offered criticisms and opinions concerning deviations from the standard of care by other health care providers (*e.g.*, Dr. Dhar offered criticisms of Dr. Chitturi[14] and Dr. Pope disclosed criticisms of Nurse Bromley[15]) in their sworn deposition testimony, the Defendant should be permitted to use these statements for purposes of impeachment of Plaintiff's experts and witnesses.

Therefore, for the foregoing reasons, Defendant respectfully requests that this Court deny the Plaintiffs' Motion on these issues.

### 8. The Court should exclude all counsel's personal opinions about the justness of this case and other topic within the scope of Tenn. Sup. Ct. R. 3.4(e)(2)-(3).

Defense counsel is not opposed to this motion in theory; however, defense counsel would respectfully request that it apply equally to Plaintiffs' counsel and not be so broad as to preclude analysis based on the facts in evidence. Likewise, as there are sure to be competing timelines of events, defense counsel would request that any Order does not preclude statements such as, "[i]f

---

[13] (Doc. 61, ¶¶ 54, 68-70).
[14] Dr. Dhar Depo., at 50:5 – 51:14.
[15] Dr. Pope's Rule 26 Report, at 35.

29

you believe the testimony of witness X, then Y naturally follows," and statements of similar import.

**9. The Court should preclude mention of the specific Ad Damnum amount.**

In full, Tenn. Code Ann. § 29-26-117 states: "In a health care liability action the pleading filed by the plaintiff may state a demand for a specific sum, but such demand shall not be disclosed to the jury during a trial of the case notwithstanding § 20-9-302 to the contrary." The Tennessee Supreme Court has held that this statute applied equally to both plaintiffs and defendants. *Elliott v. Cobb*, 320 S.W.3d 246, 251 (Tenn. 2010). Therefore, Defendant is not opposed to the exclusion of the ad damnum clause; however, Defendant would like to ensure that is any order on this issue does not foreclose counsel from arguing a monetary amount or lack thereof of this case. Pursuant to *Elliott v. Cobb*, a party is permitted to argue or suggest a monetary valuation for non-economic damages and/or the ultimate worth of the action to the jury. 320 S.W.3d at 252. So long as defense counsel is still permitted to make these arguments and Plaintiffs are likewise excluded from mentioning the ad damnum clause, Defendant does not oppose exclusion of argument or suggestion of Plaintiffs' ad damnum clause.

**10. Comment or Evidence that StoneCrest Medical Center was formerly a defendant should be permitted by this Court.**

Plaintiffs' Motion in *Limine* No. 10 is a blatant attempt to foreclose Defendants' right to appraise the jury of the allegations contained in Plaintiffs' Amended Complaint. Tennessee law has long permitted counsel to read the complaint to the jury. Specifically, Tenn. Code Ann. § 20-9-302 states in full: "In the trial of any civil suit, counsel shall be permitted to read the counsel's entire declaration, including the amount sued for, to the jury at the beginning of the lawsuit, and may refer to the declaration in argument or summation to the jury." *See also* 8 Tenn. Prac. Pattern Jury Instr. T.P.I.-Civil 1.02 (2018 ed.) comment ("The complaint may be read to the jury.").

Although as pointed out in Plaintiffs' prior motion, the amount sued for may not be read to the jury in a medical malpractice case, there is no other prohibition on counsel reading the Complaint or the allegations stated therein.

Further, as a practical matter, to the extent that any pleadings or other papers filed with the Court are entered into evidence, the caption of the case contains StoneCrest. Should such documents be put before the jury, then any confusion or prejudice will likewise be put before the jury.

Finally, omitting the fact that StoneCrest was originally in the case may in fact be more confusing to the jury that glossing over this fact. As the Amended Complaint now reads, there are allegations against StoneCrest based on the actions of Nurse Bromley. Further, there are allegations about control of Dr. Archer by StoneCrest. For example, Plaintiffs Amended Complaint states that one of the ways in which Dr. Archer did not comply with the standard of care is by "[n]ot following StoneCrest's written policies and procedures that existed on February 17, 2016 as applied to the work-up diagnosis, and treatment of ER patients with a suspected stroke." (Doc. 61, at ¶ 60, b). Also, there are allegations that "On February 17, 2016, the ER staff at StoneCrest did nothing to treat Mr. Ruffino's stroke," which are beyond Dr. Archer control. *Id.* at ¶ 54. Permitting comment on the fact the StoneCrest was a defendant but has been dismissed are relevant, at the very minimum, to those allegations. *See* Fed. R. Evid. 401. Allowing testimony that StoneCrest was dismissed from the suit would keep the jury from being confused as to why there are allegations against StoneCrest that are being lobbed against Dr. Archer now. Permitting inquiry into this would prevent a Plaintiffs from employing the impermissible captain of the ship theory against Dr. Archer. Further, the Plaintiffs will not be prejudiced by this information

For these reasons, Defendant respectfully request that counsel and witnesses, whether defense of Plaintiffs', be permitted to reference the fact that StoneCrest was formerly a party in this lawsuit.

## **<u>CONCLUSION:</u>**

For the foregoing reasons, Defendant respectfully request that the Court enter an Order reflecting the relief requested herein.

Respectfully submitted on this 21st day of December 2018.

**HALL BOOTH SMITH, P.C.**

By: <u>/s/ Bryant C. Witt</u>
James E. Looper, Jr. BPR #025200
Bryant C. Witt, BRP #018295
Fifth Third Center
424 Church St., Ste. 2950
Nashville, TN 37219
(615) 313-9911

*Counsel for Defendant Dr. Clark Archer*

32

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing document has been furnished by electronic means via the Court's electronic filing system, this 21st day of December 2018, to counsel of record as follows:

Afsoon Hagh, Esq.
CUMMINGS MANOOKIAN PLC
45 Music Square West Nashville, TN 37203
afsoon@cummingsmanookian.com

Brian Cummings, Esq.
Cummings Law
4235 Hillsboro Pike #300
Nashville TN 37215
T: 615.800.6822
F: 615.815.1876
brian@cummingsinjurylaw.com

Mark Hammervold, Esq.
Hammervold, PLC
315 Deaderick Street, Suite 1550
Nashville, TN 37238
mark@hammervoldlaw.com

*Counsel for Plaintiffs, John Ruffino and Martha Ruffino,*

HALL BOOTH SMITH

By: _____/s/ Bryant C. Witt_

33